**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CIVIL ACTION NO. 20-22945-CIV-SCOLA**

| | |
|---|---|
| CARNIVAL CORPORATION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>DECURTIS CORPORATION and<br>DECURTIS LLC,<br><br>　　　　　Defendants. | **SECOND AMENDED COMPLAINT FOR (1) BREACH OF CONTRACT, (2) VIOLATIONS OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1832 *et seq.*; (3) VIOLATIONS OF THE FLORIDA UNIFORM TRADE SECRETS ACT, Fla. Stat. §§ 688.001 *et seq.*; AND (4) PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Carnival Corporation ("Carnival") hereby brings this Second Amended Complaint against Defendants DeCurtis Corporation and DeCurtis LLC (collectively "DeCurtis") and alleges on personal knowledge as to all matters relating to Carnival and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.　　　Carnival is the world's largest and leading cruise vacation company.  It also is the creator and owner of a ground-breaking technology platform known as the One Cruise Experience Access Network®, also referred to as the O.C.E.A.N.™ or OCEAN® Platform, which combines a first-of-its-kind wearable device (OceanMedallion™ or Medallion®) with a network of servers, sensors, readers, and software to deliver unparalleled guest engagement and personal service to guests on Carnival's MedallionClass™ ships.  The OCEAN® Platform is the result of Carnival's years of hard work and substantial investment, including efforts by hundreds of Carnival employees and scores of third-party contractors.  The OCEAN® Platform is transforming the cruise industry, and competitors are scrambling to catch up.

-1-

2.      Defendant DeCurtis Corporation is a Carnival contractor that assisted with rapid prototyping work related to the OCEAN® Platform.  At the outset of that work, DeCurtis signed an agreement, referred to as the Master Services Agreement ("MSA"), that acknowledged Carnival's ownership of the technology under development and agreed to maintain in confidence the extensive confidential information and trade secrets to which DeCurtis was given access.  The MSA further prohibited DeCurtis from disclosing or using any written material, work product, or discoveries resulting from work under the MSA in connection with any presentations or work for other customers or prospective customers.

3.      Carnival recently discovered that DeCurtis has been making presentations to and working with Carnival competitors to develop technology platforms that copy the OCEAN® Platform and otherwise misappropriate and infringe Carnival intellectual property.  In response, Carnival exercised its contractual right to audit DeCurtis' compliance with the MSA and its obligations thereunder.  In breach of the MSA, DeCurtis refused to comply with its audit obligations, and it further admitted in writing that an audit of its records of work performed under the MSA would necessarily also disclose confidential information of third-party competitors of Carnival.  This admission by DeCurtis that work product prepared under the MSA had been used for and comingled with third-party work product not only confirmed DeCurtis' breach of contract but also provides additional evidence of DeCurtis' misappropriation of Carnival trade secrets and infringement of Carnival patents.

4.      Particularly in light of the challenging circumstances currently confronting the cruise industry, Carnival hoped to persuade DeCurtis voluntarily to comply with the MSA and to remedy its misappropriation and infringement of Carnival intellectual property.  But DeCurtis charted a different course.  On April 8, 2020, DeCurtis without warning filed a civil action in the

United States District Court for the Middle District of Florida challenging the enforceability of Carnival's patents and raising other meritless claims.  DeCurtis filed that action notwithstanding that the MSA expressly requires disputes between the parties to be resolved in this Court.  Carnival accordingly was left no choice but to initiate this action to seek justice by putting an end to DeCurtis' contractual breaches and other unlawful conduct.  On July 15, 2020, the District Court for the Middle District of Florida granted Carnival's motion to transfer DeCurtis' action to the Southern District of Florida, and that case was ultimately consolidated with the present one.

5.      This Second Amended Complaint asserts claims for breach of contract, trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et seq.* (the "DTSA") and the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 *et seq.*; and patent infringement.  Carnival hereby seeks preliminary and permanent injunctive relief, monetary damages, attorneys' fees and costs, an accounting, and such other relief as the Court may deem necessary and proper to redress the injuries caused by DeCurtis' unlawful conduct.

## PARTIES

6.      Plaintiff Carnival is a corporation organized and existing under the laws of the Panama, with its U.S. principal place of business in Miami, Florida.

7.      Carnival is a world leader in leisure travel, with nine leading brands that offer a wide range of vacation experiences tailored to deliver outstanding value to guests with diverse backgrounds and travel preferences.  Carnival is best known for being the world's leading cruise line company.  Founded in 1972 with just a single ship, Carnival's portfolio of global cruise line brands now includes Carnival Cruise Line, Holland America Line, Princess Cruises and Seabourn in North America.  Together, Carnival's cruise line brands comprise the world's largest cruise

company with a fleet of 105 ships visiting more than 700 ports around the world. Carnival Corporation employs over 120,000 people worldwide and serves 11.5 million guests annually.

8. Defendant DeCurtis Corporation is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Orlando, Florida. DeCurtis' website bills the corporation as a "leader in transformational experience technology focused on cruise." Defendant DeCurtis LLC is a Delaware limited liability corporation headquartered in Orlando, Florida. DeCurtis LLC designs, develops, engineers, manufactures, markets, and sells systems and methods for providing guests' engagement with cruise ship facilities through the use of wireless sensing technologies.

9. Formed in April 2019, DeCurtis LLC is a continuation or reincarnation of the DeCurtis Corporation under a different name. Alternatively, DeCurtis LLC is a mere instrumentality or alter ego of the DeCurtis Corporation, and DeCurtis LLC is dominated and controlled by DeCurtis Corporation to such an extent that the DeCurtis LLC has no separate existence. DeCurtis LLC describes its business in the same exact manner as DeCurtis Corporation, has the same physical address as DeCurtis Corporation, is comprised of the same employees as DeCurtis Corporation, has the same website and advertising as DeCurtis Corporation, and claims ownership of the same property as DeCurtis Corporation.

## JURISDICTION AND VENUE

10. The Court has federal-question subject matter jurisdiction over Carnival's trade secret misappropriation claim arising under the DTSA pursuant to 28 U.S.C. § 1331 (federal question). The Court has federal-question subject matter jurisdiction over Carnival's patent infringement claims arising under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338 (patents).

11.     The Court has supplemental jurisdiction over Carnival's breach of contract and other state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution and are based on the same underlying nucleus of fact.

12.     This Court has both general and specific personal jurisdiction over DeCurtis because its principal place of business lies within the State of Florida, because it has conducted and does conduct business within the State of Florida and this judicial district, and because it carried out a substantial portion of the wrongful conduct at issue, and caused injury, within the State of Florida and this judicial district.

13.     Venue in this district is appropriate under 28 U.S.C. §§ 1391(b), (c), and (d) and 1400.  Defendant resides in the State of Florida and this judicial district, because a substantial part of the events giving rise to the dispute occurred within this district, and because DeCurtis has committed acts of infringement and has a regular and established place of business in this district. For example, in a 2019 press release DeCurtis stated that it had an "office and presence" in Miami, Florida.

14.     The parties' written MSA further provides that the exclusive jurisdiction for litigation of any dispute, controversy or claim arising out of or in connection with the MSA or the breach thereof shall be litigated by the parties and/or their successors in the Federal or State court with competent jurisdiction located in Miami-Dade County, Florida.  The causes of action asserted in this Second Amended Complaint arise out of and are in connection with the MSA and DeCurtis's breach thereof.  Accordingly, this Court is the appropriate forum for litigating this dispute as well as all other disputes between the parties arising out of work done under the MSA.

## FACTUAL ALLEGATIONS

### Carnival's Breakthrough Technology in Guest Experience:  the OCEAN® Platform

15.     Carnival's unparalleled success in the cruise and leisure travel industry is due in significant part to innovation.  This began years ago with Carnival's first cruise ship, a converted ocean liner which featured a number of innovative elements along with a festive onboard ambiance unlike any other cruise ship sailing at the time.  Since then, Carnival has remained the leader in the field, consistently rethinking the cruise experience and delivering new, exciting technologies and other features for its guests.

16.     Carnival was the first in the cruise industry to have a vision for how new technology centered around wearable devices could revolutionize leisure travel by delivering personalized experiences.  And Carnival was the first to design, development, and implement that vision.

17.     In June 2014, Carnival began a development project, which was given the internal name "Project Trident," with a goal to create technology that would enable an entirely new level of service and personalized attention in leisure travel through a proprietary guest interaction and connection ecosystem.   This proprietary guest interaction system comprises a connected "experience platform" that combines a guest wearable device with a cross-platform Guest and Crew digital interaction tool to enable guest identification, commerce, payments, communications and navigation capabilities.  Carnival understood that such a proprietary guest interaction system would give Carnival a considerable competitive advantage.

18.     Project Trident was an enormous undertaking.  Carnival employees from a host of disciplines, including business strategy, operations, information technology, finance, guest services, marketing & sales, and ship design & engineering, were engaged in the innovation process at every stage of Project Trident.  The core Project Trident team was comprised of a cross-

functional blend of experts in experience design, show quality, brand development, creative design, digital interactivity, engineering, ecosystems, platform creation, and experience activation and integration.   This core team included highly specialized, individually selected Carnival employees with deep experience in the holistic experience innovation space.   Many of these employees were hired by Carnival specifically to work on Project Trident.

19.     In addition to devoting extensive human capital to Project Trident, Carnival also invested substantial financial resources in the Project.  Carnival built out a dedicated 12,000 square foot facility, dubbed the Carnival Experience Innovation Center ("XIC"), to enable multi-disciplinary collaboration in an organic environment dedicated to Project Trident.  To maintain secrecy and security, Carnival housed its XIC in a highly secure location.  The XIC was, and remains, protected by robust physical and electronic security.  Access to the facility was, and remains, tightly restricted.

20.     Carnival has invested hundreds of million dollars in Project Trident development efforts.  That figure does not include the substantial additional sums required to outfit Carnival's ships with hardware components required to implement the resulting OCEAN® Platform on each MedallionClass™ ship, which include thousands of sensors connected by approximately 72 miles of cable throughout the ships' many decks, as well as approximately 4,000 interactive digital portals supported by multiple cloud-based datacenters.

21.     In investing heavily in Project Trident, Carnival was not following an obvious or predictable path. Project Trident reflected Carnival's commitment to remaining the leader in cruise vacation innovation by taking calculated risks in developing pioneering new technologies.  The OCEAN® Platform was the first of its kind in the industry and Carnival's efforts were met with skepticism from some in the industry and related fields.

22.     Carnival's willingness to invest heavily in its vision and to undertake risks to remain a technology leader has paid off.  As alleged further below, Carnival has successfully implemented the OCEAN® Platform, garnering widespread acclaim, delighting millions of customers, and providing Carnival with a competitive advantage.

**DeCurtis Becomes a Contractor Subject to the Parties' MSA**

23.     In addition to Carnival's own employees and resources, Project Trident required Carnival to engage outside contractors to perform defined tasks to assist in implementing Carnival's vision.  DeCurtis was one such contractor.  Carnival engaged DeCurtis to assist in the critical rapid prototyping phase of Project Trident.

24.     On July 1, 2014, Carnival and DeCurtis executed a non-disclosure agreement ("NDA") to allow the parties to discuss entering into a business relationship.  Carnival and DeCurtis subsequently entered into a Master Services Agreement ("MSA") on July 24, 2014.  The MSA superseded the NDA and remains in force today.

25.     Carnival engaged DeCurtis in reliance on DeCurtis' promise to maintain the secrecy of both confidential information provided by Carnival and work product created by DeCurtis for Carnival (collectively referred to in the MSA as "Carnival Information").  To that end, the MSA imposed on DeCurtis strict confidentiality obligations with respect to all Project Trident information provided by Carnival to DeCurtis.

26.     Among other restrictions, the MSA provides that (i) DeCurtis shall not use any Carnival Information for its own use or for any purpose other than the specific purpose of completing the services under the MSA; (ii) DeCurtis shall not disclose any Carnival Information to any other person or entity; (iii) DeCurtis will hold the Carnival Information in strict confidence

and protect the confidential information from disclosure; and (iv) DeCurtis shall only reveal Carnival Information to DeCurtis employees on a need to know basis.

27.     In addition, the MSA expressly states that Carnival owns all work performed by DeCurtis under the MSA.  The MSA provides that all material prepared for Carnival under the MSA and related Statements of Work ("SOWs"), including trade secrets, inventions, business methods, programs, processes, discoveries, improvements, developments, designs, software programs, systems, specifications, documents or abstracts, or summaries thereof or any other material, and any derivative works thereof, shall remain the sole property of Carnival.  The MSA specifically prohibits DeCurtis' use of Carnival Information in connection with presentations to or work for other clients or prospective clients and permits use only of DeCurtis' "general knowledge and know how" in connection with any non-Carnival matter.

28.     The foregoing obligations remain in full force under the terms of the MSA, which is self-renewing and has never been terminated by either party.  Moreover, by its terms, the foregoing obligations survive even termination of the MSA.

29.     The MSA expressly acknowledges that breach of DeCurtis' confidentiality obligations may cause Carnival irreparable harm for which money is inadequate compensation, and that Carnival will be entitled to temporary and permanent injunctive relief to enforce its confidentiality rights, in addition to damages and other available remedies.

30.     The MSA also includes an audit provision that requires DeCurtis to keep accurate and complete records of all matters relevant to or as required by the MSA.  Carnival has continuing access to inspect those records at any reasonable time upon prior notice to ensure DeCurtis' compliance with the terms and conditions of the MSA.

31.     As provided for in the MSA, Carnival and DeCurtis entered into a series of SOWs defining in detail the services DeCurtis would provide for Carnival at various stages of the process and the work product and deliverables DeCurtis would create for Carnival.  The work product and deliverables included, among other things, prototypes; software; source code; architecture documents; technical specifications (e.g., data interface designs); databases; enterprise-ready web services; presentations; and documentation with respect to operations procedures, creative strategy, experience content, application support, deployment plans, and testing.  The documents and other information to which DeCurtis created for Carnival were Carnival's confidential and trade secret information.  Carnival had invested heavily in creating this information, as described above, and derived substantial economic value from this information, including by virtue of its secrecy.

32.     Carnival's work on rapid prototyping was intense and included working closely with DeCurtis for well over a year.  During this time period, as contemplated by the MSA, DeCurtis had access to substantially all of Carnival's extant confidential information, trade secrets, and other Carnival Information.

33.     DeCurtis personnel worked at Carnival's XIC and gained access to documents describing Carnival's vision, strategy, plans (e.g., strategy presentations), experience platform models, technical design documents, and list of strategic vendors.  Those materials included Carnival's proprietary plans for combining a wearable device containing Bluetooth Low Energy and Near Field Communications, mobile applications, and a digital engagement system, all functioning as a unified system on a multi-layer microservices platform technical architecture.  The materials Carnival provided to DeCurtis also included development schedules and team plans, early concepts for Carnival's wearable device, and Carnival's experience vision.  Carnival had

invested heavily in creating this information, as described above, and derived substantial economic value from this information, as described below.

34.    From the effective date of the MSA through at least the end of 2015, Carnival continued to provide confidential information and trade secrets to DeCurtis concerning Carnival's required hardware requirements; enterprise architecture; corporate abstraction layer of strategic services; interface layer designs, data models, database structures, and data interface designs and adapters; API dependencies; non-functional requirements; Carnival's particularized agile development methodology (timing and ordering of development sprints for different components); web service needs; show plans; user interface plans; design work; integration of technical components; testing plans; site surveys; functional plans; and studio shows.  Carnival had invested heavily in creating this information, as described above, and derived substantial economic value from this information, as described below.

35.    In 2016 and 2017, Carnival's focus on Project Trident gradually shifted from prototyping to implementing the solution on board cruise ships.  Ultimately, it took Carnival over 40 months to ready the Project Trident system for live testing, which commenced in November 2017.

**Carnival's Successful Introduction of the OCEAN® Platform**

36.    In January 2017, Carnival's CEO, Arnold Donald, made history as the first travel industry executive to deliver the opening keynote at CES, the world's largest consumer technology event.  He used his speech to announce the OCEAN® Platform – the world's first interactive guest experience platform capable of transforming vacation travel with a highly personalized and elevated level of customized service on a large scale.

37.     At the heart of Carnival's OCEAN® Platform is the OceanMedallion™ wearable, which is approximately the size of a quarter and weighs less than 2 ounces.   Each OceanMedallion™ is connected to a specific guest and interacts with thousands of sensors using Bluetooth Low Energy and Near Field Communication.

38.     The OCEAN® Platform was the result of Carnival's extensive work, investment, and ingenuity in Project Trident.     Carnival's OCEAN® Platform, enabled by the OceanMedallion™ wearable, facilitates payment, shipboard wayfinding, shipmate location services, personalized itineraries, expedited embarkation, and a wide range on-demand services. For example, guests can place a food or drink order from anywhere on the ship, and the OceanMedallion™ directs crew members to their location.   The OceanMedallion™ also enables point-to-point wayfinding across the ship—like step-by-step directions to a restaurant or lounge— thanks to an intelligent navigation assistant.   The OceanMedallion™ also provides guests with touchless access to their state rooms—no key cards required.

39.     One of the key innovations of Carnival's OCEAN® Platform is its use of the aforementioned sensor network, Bluetooth Low Energy beacons, and mobile applications in order to create an end-to-end, holistically integrated guest engagement system.   Specifically, the OceanMedallion™ wearables themselves act as Bluetooth Low Energy beacons that uniquely identify the devices and their associated guests.   This feature is critical to enabling the functionalities described above.

40.     The OCEAN® Platform system debuted on a single cruise ship in November 2017. At present, six cruise ships have been outfitted with OCEAN® Platform technology; these are known as MedallionClass™ ships.   Carnival plans to implement the OCEAN® Platform technology on at least six more cruise ships through the end of 2021.

-12-

41.     Accolades for the OCEAN® Platform have poured in.  IoT Breakthrough awarded Carnival the 2019 IoT Wearables Innovation of the Year for the OceanMedallion™, and one early reviewer described use of the OceanMedallion™ as "a magical experience that foretells the way that the internet of things ought to work."  FastCompany magazine named Carnival as one of the world's most innovative companies, citing the introduction of OceanMedallion™.  Press reports have described the OCEAN® Platform as a "game changer for the cruise industry."  Articles gushed that Carnival had "revolutionized" the guest experience with "super-smart tech."

42.     Furthermore, the OCEAN® Platform technology has been a source of additional revenue and profit for Carnival.

**Carnival's Patent Protection for Innovations from Project Trident**

43.     Carnival recognized that its Project Trident and OCEAN® Platform innovations included patentable inventions, and accordingly, Carnival applied for and obtained patent protection for this valuable intellectual property.

44.     Carnival filed provisional patent applications in the United States on November 11, 2016 and December 30, 2016.  Carnival filed a first United States utility application on March 15, 2017 claiming priority to these two provisional applications, and Carnival has since filed several other United States utility applications claiming priority to this utility application.  These utility applications have resulted in issued United States patents.  Carnival also filed an application under the international Patent Cooperation Treat (PCT) on May 17, 2017 claiming priority to the provisional applications and the first United States utility application.  Carnival has filed national stage patent applications in several countries and jurisdictions throughout the world based on the PCT application and has been issued patents already in some of these countries.

45.     In total, Carnival has nine granted patents (seven in the United States) and twenty-three pending patent applications in this patent family.  The granted patents in this family include the three patents asserted in this lawsuit:  United States Patent Numbers 10,045,184 (the "'184 Patent"); 10,049,516 (the "'516 Patent"); and 10,157,514 (the "'514 Patent").

46.     Carnival filed provisional patent applications on November 11, 2016 and December 30, 2016.  Carnival filed its application for the '184 Patent on March 15, 2017 and filed its applications for the '514 Patent and the '516 Patent on March 16, 2017, each of which claims priority to the two provisional applications.  These applications remained confidential and were not published by the patent office until May 17, 2018.  The '184 Patent issued on August 7, 2018.  The '514 Patent and '516 Patent issued on December 18, 2018 and August 14, 2018, respectively.

47.     Carnival's patents describe and claim "a novel guest engagement system that relies on recent improvements in low power wireless communication technologies and distributed sensor networks to provide novel services to those guests without requiring guests to proactively identify and/or authenticate themselves. The guest engagement system thereby enables hosts to seamlessly engage with the guests throughout their facilities and provide recommendations to the guests based on the guests['] previous experiences."  '184 Patent, Col. 1:44-52.

48.     The patents describe systems that allow guests to have "individual guest devices" that are used to automatically identify and authenticate the guests throughout the facility to seamlessly provide services. The guest devices (or Medallions) periodically broadcast beacon signals that uniquely identify the devices and their associated guests and obviate any need for a guest to provide additional identification or take other affirmative action to access resources.

49.     The periodic beacon signals are detected by sensors provided throughout the facility and used by the guest engagement system to provide personalized services.  More specifically, in

one aspect, "a guest engagement system includes a plurality of guest devices provided to users of the guest engagement system, each guest device including a wireless communication antenna and operative to emit a periodic beacon signal broadcasting a unique identifier of the guest device using Bluetooth low energy (BLE) communications. The guest engagement system further includes a sensor network comprising a plurality of sensors each mounted at a different known location and operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by guest devices of the plurality of guest devices that are proximate to the sensor." '184 Patent, Col. 2:2-25.

50.     The different patents and claims in Carnival's patent family claim different aspects of Carnival's inventions.   These include the construction and operation of the portable guest devices, the guest engagement system architecture, the interactions between portable guest devices and sensors, and functionalities made possible by the system such as automatic unlocking of doors, wayfinding, and payment services.

51.     The '184 Patent teaches and claims a guest engagement system where portable devices serving as beacons communicate with a networked, sensor-rich environment to enhance the guest experience. The '184 Patent confronts technical problems facing the inventors that resulted in "interactions between hosts and guests [being] impersonal and disjointed." '184 Patent, Col. 1:42-43. By overcoming those constraints through the creation of a novel and unconventional system, using both individual components that themselves were not routine, well-understood, or conventional as well as arranging those components in a way that was not routine, well-understood, or conventional, the inventors enabled various technical improvements over prior art systems including (1) a new and superior user interface, (2)  relocation of demanding computer-intensive resources, (3)  an improved beacon-centric model of communication to the environment,

(4) improved battery life and power consumption, (5) enhanced security through novel door lock mechanism designs, and (6) an improved location determination system particularly suited for environments such as a cruise ship.  In short, the '184 Patent reveals a paradigm-shifting approach to guest engagement system design.

52.     Prior to the invention, almost every type of interaction in conventional systems of the type described in the '184 Patent's background required a different form of communication, identity recognition, or authentication process. *See* '184 Patent, Col. 1:32-42 (noting that prior art systems provided service and engagement on the basis of users providing a name or identification, tapping or swiping an access card, or having information on bookings retrieved manually by a host through a computer terminal).  To the extent devices were used to permit access, *e.g.*, an access card for a locked door, guests using those devices were required to affirmatively present such credentials prior to gaining access.

53.     The '184 Patent describes in great detail improvements to the capabilities and functionalities of both the network platform as a whole and the specific components within that network.   The '184 Patent teaches a new network environment that has specific asserted improvements in computer, sensor, beacon, peripheral, and automatic door lock capabilities. These improvements address unique technical challenges confronting Carnival's inventors, as discussed in detail below.  To summarize briefly, the '184 Patent improved the functionality of the sensor network by enabling use of low cost, low energy BLE sensors in the place of comparatively complex stationary beacons; improved the capabilities and functionality of door locks by equipping them with wireless sensors capable of two-way communications that interoperate with a separate access panel peripheral; improved the capability and functionality of payment terminals by enabling them to interoperate with sensors, peripherals, and mobile beacons; and improved the

capability and functionality of portable beacon devices using integrated BLE (and also, in some cases, NFC) antennas, and further by designing those devices to operate in various different communication modes with the sensor network, improving security and power consumption. These improvements are specifically recited in the claims, including in how the claims recite the structure and operation of the portable devices and sensor network.

54.     Many of the problems solved by the '184 Patent are problems rooted in computer technology and wireless networks.   The '184 Patent solves problems related to location determination, configuration needs, deployment speed, data access, and security, as described in examples below.  The '184 Patent's technical improvements, in turn, enable accurate wayfinding and location determination in an environment such as a cruise ship, more efficient and secure room access, more efficient and secure payment, and improved and more efficient power consumption. The benefits enabled by the '184 Patent were not possible in conventional systems because of technical limitations inherent in how conventional systems were constructed and operated.  The inventions described and claimed in the '184 Patent overcame those technical limitations.

55.     The inventions described and claimed in the '184 Patent do not implement wireless communication in an otherwise conventional system.  Indeed, the conventional guest engagement model could wirelessly communicate information from networked computing devices to central servers (e.g., "having information on bookings retrieved manually by a host through a computer terminal").  '184 Patent, Col. 1:32-43.  Rather, the patent describes and claims improvements in the functionality of guest engagement systems and the devices that make up such systems by implementing a completely new and unconventional system, which uses unconventional and non-generic portable devices carried by users, unconventional and non-generic peripheral devices and

sensors of various kinds rather than the conventional computing devices and sensors, and an unconventional and non-generic sensor network.

56.     Moreover, at the time of the inventions, there had been efforts to leverage Bluetooth Low Energy to improve guest engagement systems, but these efforts all focused on utilizing BLE beacons as stationary objects that continually broadcast beacon signals to any devices containing sensors that might happen to come within communication range of the beacon.   Carnival's inventors recognized that this model would not be suited to address Carnival's unique vision for an unprecedented immersive guest engagement system, which requires automated location services enabled by many thousands of points of reference aboard a moving cruise ship.

57.     The '184 Patent's claimed inventions are not directed to and have different inventive concepts than any such stationary BLE beacon systems (which themselves would not have been routine or conventional):  they flip the entire frame of refence by making the *sensors stationary* and the *beacons mobile*.  The overall arrangement of this system, which was not well-understood, routine, or conventional at the time Carnival conceived it, was an inventive concept driven by, and directed to address, technical issues particular to Carnival's unique use case.  In doing so, the '184 Patent's inventors devised several technical improvements to the hardware and software components themselves.  These improvements facilitate the '184 Patent's unconventional and specific arrangement of its system components.  This arrangement represented an important technical innovation in and of itself.

58.     This inventive, unconventional arrangement is captured in the claims.  Every claim of the '184 Patent requires at least (i) a "plurality of *portable guest devices* provided to users of the guest engagement system *to be carried by the users*, each guest device" including a wireless communication antenna which is configured for "*Bluetooth low energy (BLE)*" communications

and further which has a "unique identifier"; (ii) a "sensor network comprising a plurality of sensors each *mounted*" at a different [known] location and operative to detect/receive the *"unique identifiers"* emitted using or based on "BLE communications" by or with the portable guest devices that are "proximate" to the sensor, along with a "communication network connecting each of the plurality of sensors of the sensor network." '184 Patent, independent claims 1, 7, 11, 19. All claims other than claim 19 also specifically recite that the portable device is operative to broadcast periodic BLE beacon signals. The claims thus each capture, at the highest level, the unconventional arrangement of components and the unconventional portable devices and sensors/sensor networks themselves. None of these components, either individually or in combination, were generic or conventional.

59.     Furthermore, each of the claims encompasses additional unconventional aspects of the components and overall arrangement of the components. For example, claim 1 further specifies that the "sensors" include "access panels each configured to control an associated electronically controlled door lock," and then recite further details of the structure and operation of the access panels. Claim 4 recites that the radio, first transceiver, and second transceiver of each access panel operate according to different communications standards. Claims 5 and 6 recite additional structural and functional features of the claimed sensor network. Claim 7 further specifies that the "sensors" include both "interface devices" and "access panels each configured to control an associated electronically controlled door lock," and then recite further details of the structure and operation of the interface devices and access panels. Claims 11 and 19 recite that the portable device has two wireless communication antennas respectively configured for BLE and NFC communications. Claim 11 (as does claim 20) further recites that the guest devices are configured to selectively operate in a bi-directional communication mode using BLE and in a

beacon mode using BLE, and further, that sensors are operative to transmit commands to cause the guest device to change between the two operating modes. Claim 14 specifies that the sensors include access panels operative to engage in encrypted bi-directional communication with the guest devices. Claims 15-18 recite additional aspects of the structure and operation of the sensors and sensor network. Claim 19 also recites that the sensors include vending terminals operative to engage in encrypted bi-directional communication with a guest device using NFC to authenticate the guest device and selectively authorize payment based on the identity of the authenticated guest device. These components individually, as well as their ordered combination, were inventive and not routine, well-understood, and conventional. Further facts related to these points are discussed below.

60.     DeCurtis has expressly acknowledged that the model for arranging beacon and sensor system components, as described and claimed in the '184 Patent, was not a conventional solution, and that such a model departed significantly from any conventional systems. In 2018— years after Carnival filed patent applications first describing its inventive concepts—DeCurtis began marketing its own solution by touting the same arrangement of components described and claimed in the '184 Patent as "where the magic really happens." DeCurtis claimed that "[b]eacons had, thus far, been the stationary object." DeCurtis dismissed the idea of improving a system that used stationary BLE beacons as merely "enabling your environment to shout more accurately."

61.     Instead, DeCurtis claimed that "we inverted the traditional model in a way that allows for rapid and intelligent consumption of location data and keeps privacy in mind." DeCurtis thus touted a "new" model of "tethering people to beacons" so that "your environment can respond intelligently to those people that are present" in a way that existing systems could not. DeCurtis claimed (in 2018) to be "introducing the concept of a wearable" that "contains a small beacon."

DeCurtis identified technical improvements that were made possible by this "inverted" model: "improve safety and security, drive operational efficiencies, and transform the guest experience."

62.     DeCurtis' systems, as set forth in detail below, infringe the '184 Patent.  The components and arrangement of components touted by DeCurtis as inventive and not well-understood, routine, or conventional even years after Carnival's inventions are captured by the '184 Patent's claims.

63.     Further evidence that the inventions claimed in the '184 Patent embody inventive concepts—and are neither merely applying wireless technology to conventional systems nor applying well-understood, routine, and conventional technology—is the outpouring of praise for Carnival's OCEAN® platform discussed in Paragraphs 39-45 above, much of which has focused on inventive aspects of the claimed system (e.g., the structure and operation of the wearable device) as well as the technical improvements to guest engagement systems as a whole, which are also covered by the '184 Patent's claims.  In addition, Carnival's competitors, including NCL and Virgin, only announced their own guest engagement systems years after Carnival introduced the OCEAN® platform.  These systems closely track the OCEAN® platform and, at least in the case of the Virgin system, directly infringe the '184 Patent as set forth below.  NCL and Virgin employees and executives have publicly acknowledged that they were playing "catch-up" to Carnival and "learned from" Carnival's OCEAN® platform.  These facts further show that the inventions claimed in the '184 Patent cover inventive concepts that were not routine, conventional, and well-understood.

64.     One technical improvement of the '184 Patent's claimed systems is that they enable improved wayfinding functionality.  The '184 Patent identifies a specific problem in conventional systems.  "For example, in the case of wayfinding on a cruise ship, traditional location

-21-

determination systems such as GPS cannot readily be used for multiple reasons. First, the cruise ship can move, and wayfinding within the ship must therefore be based on the moving reference frame of the ship rather than a fixed (e.g., land-based) reference frame. As a result, GPS-based location determination and other fixed-reference frame location determinations are of limited use since a user's GPS-based location cannot be used to determine where the user is located relative to the moving ship. Second, the cruise ship includes substantial masses of metal and other surfaces which interfere with the propagation of GPS-based signals (such that GPS signals cannot be received inside the ship) and/or cause substantial signal noise as a result of electromagnetic signals bouncing off of metallic surfaces. As a result, traditional location determination systems are generally not effective for wayfinding on a ship."  Col. 33:43-60.

65.    The '184 Patent then teaches that "[i]n order to address the shortcomings noted above, the guest engagement system 10 provides its own wayfinding functionality based on the network of sensors 13 of the guest engagement system 10."  Col. 33:61-64.  The specification then describes in detail how the unconventional sensor network and associated technology, working with the unconventional guest devices, can provide this wayfinding functionality.  Col. 33:65-36:5. The result is a concrete technical improvement to "traditional" location systems:  "The wayfinding functionality provided by the guest engagement system 10 can be used for wayfinding within a moving reference frame as well as within a fixed reference frame."  Col. 33:40-43.  This improved wayfinding functionality results from the unconventional portable devices and sensors claimed in the '184 Patent and the ordered combination of those components.

66.    Years later, DeCurtis recognized that improved wayfinding was a concrete technical benefit of the architecture and functionality of its own (infringing) systems over conventional location systems like GPS.  DeCurtis has advertised that "[b]y leveraging a reader

model that truly allows high fidelity location in space (not geo-location, but close-range, meter-level or better accuracy**)** systems can (and have) been built that can create amazing experiences."

67.     Another technical improvement facilitated by the '184 Patent's innovative components and the ordering and arrangement of its system components is a reduction in the complexity, energy usage, and costs of the network infrastructure itself.  In a conventional system of the type described in the '184 Patent's background, information would be transmitted by, e.g., "computer terminals" which would be costly, take up scare space, would each have their own display, processor, memory, and so on, and which would consume substantial power.  By contrast, the sensors of the '184 Patent's system can be configured to have "minimal (or no) on-board processing power and memory" and require "minimal configuration during initial system installation", '184 Patent, Col. 8:3-8.  This technical improvement is an important differentiator for Carnival's business (ships must be dry docked during installation of Carnival's system).  Whereas the conventional approach would have required installation and configuration of thousands of relatively complex, expensive, power-inefficient computer terminals in stationary locations throughout Carnival's ships, the '184 Patent's system's unconventional model replaced such terminals with simpler, lower cost, energy-efficient sensors connected to peripheral devices supplying power and performing processing functions.  '184 Patent, Col. 8:35-39.  Once the inventors replaced complex computer terminals or the like with comparatively simple stationary sensors, the benefits of offloading power, storage, and processing functionality from stationary network nodes (terminals or sensors) to nearby peripherals could be realized.

68.     This system also resulted in a reduction in the complexity and costs of the network infrastructure, in addition to improved overall power consumption, as compared even to a stationary BLE beacon model.   The implementation, maintenance, tracking, and cost of

implementing a system of stationary BLE beacons made such a system not effective.  Moreover, the '184 Patent's systems permit operations that conserve power and resources overall.  For example, the systems provide the ability to monitor a guest's presence or absence in a cabin and turn off the power to save on electricity and wear on the HVAC system when the guest is not present.

69.     In addition, '184 Patent's unique ordering and arrangement of its system components enables an entirely new and unprecedented level of seamless guest engagement automation.  *See, e.g.*, '184 Patent, Col. 1:44-52.   In the conventional model, a guest can only utilize the system if they have a particular device (e.g., an access card) *and* are actively engaged in locating and interacting with the other components of the system, whether that be a computer terminal, door lock, or even a stationary BLE beacon—a problem that DeCurtis itself has acknowledged in its statements to the market.  In contrast, by developing non-generic portable devices, non-generic sensors and sensor networks, and reordering the conventional model, the '184 Patent enabled a transformational system where guests are not burdened with having to take any affirmative action.  DeCurtis has acknowledged the transformational nature of such a guest engagement system, which allows for an immersive experience that requires no human interaction.

70.     For example, using the '184 Patent's claimed systems, as the guest approaches a spa on one of Carnival's ships, the guest device is automatically broadcasting the guest's unique data set, which the spa's sensors automatically detect and send for processing, so that by the time the guest arrives in the spa lobby, the guest's device has already switched into the appropriate operating mode and has already conveyed the guest's historic treatment preferences and authorized payment for their treatment, all without any affirmative action by the guest or any other human. *See, e.g.*, '184 Patent, Col. 1:14-52, Col. 17:18-37, Col. 36:10-24, claims 11 and 20.  The '184

Patent's elimination of the need for affirmative action by the guest represents an improvement over prior art systems that require guests to present identification, use login credentials, swipe access cards, or send commands from a mobile phone, for example. '184 Patent, Col. 1:32-43. This improves the functionality of both the sensors and the system as a whole by increasing efficiency and reducing errors.

71.     DeCurtis has advertised that its own (infringing) systems using this "inverted model" are "more reliable and accurate than traditional models or Wi-Fi solutions." The '184 Patent's mobile-BLE-beacon-and-stationary-sensor model was not well understood prior to the '184 Patent's invention, and it embodies a new manner of communicating that was not suggested in or practiced by any conventional systems.

72.     As another example, the '184 Patent teaches new, specific methods in which beacons function and communicate. These novel operation and communications methods enable technological improvements to the functionality and efficiency of the beacons themselves. For example, in some conventional systems, beacons continually broadcast a two-way communications signal in an effort to communicate with any sensor that comes within range— either by sending a communication to or receiving a communication from a such a sensor. But such continual broadcasting wastes power, as the beacon is often transmitting a high-energy two-way communications signal when no device is close enough to communicate. *See, e.g.*, '184 Patent, Col. 16:40-43. This power inefficiency problem is particularly acute in the context of low power beacons, such as BLE beacons, because sensors must be relatively close to the beacon to communicate with it. The '184 Patent solves this power inefficiency problem by enabling new beacon devices with multiple operating modes that can potentially be triggered by contact with any one of the stationary sensors located throughout the system environment, depending on the

unique data transmission attributes of the sensor and/or beacon.  *See, e.g.*, '184 Patent, Claims 11 and 20.

73.     For example, the '184 Patent's portable devices can operate in "sleep mode," which is a very low power mode that conserves energy.  '184 Patent, Col. 16:6-22.  While a device is in sleep mode, it listens for a network advertisement on a periodic schedule—such as once every 30 seconds, 1 minute, or 5 minutes.  *Id*.  Upon hearing a network advertisement, the beacon can determine whether the advertisement is from a recognized engagement system and switch modes accordingly.  *Id*.  Because the '184 Patent enables use of so many distinct stationary network nodes (sensors), it is not necessary for the mobile beacon devices to broadcast or listen for communications as often as it otherwise would have to.  The abundance of stationary sensors deployed throughout the system environment makes it less important if the beacon is "sleeping" when it passes any given sensor node—another node is always just a few steps and/or seconds away.

74.     As another example, when "awake," the portable device can broadcast in either a lower power "beacon" mode or a higher power "bi-directional" mode, as taught in the '184 Patent's specification.  Col. 16:23-17:3.  Sensors can transmit signals to cause the device to switch between the two modes of operation when the higher power mode is needed.  *Id*.  This functionality is expressly claimed in claims 11 and 20.  One example of this functionality is described in the '184 Patent in which the sensors are in door access panels and the device switches to the bi-directional mode to allow for secure communications between the door sensor and the device.  Col. 20:6-22:31.  The claimed functionality thus provides a solution to the technical problem of balancing the need for secure communication to open a door with the need to conserve power.  Both the portable devices that operate in these two modes and are operable to switch modes based on signals

received from sensors, and the sensors themselves operable to generate and send such signals, are inventive concepts that were not generic, routine, or conventional.

75.     The technical improvements to portable devices themselves described and claimed in the '184 Patent, such as power consumption improvements, is illustrated by the following two use cases. Two individuals wearing portable guest devices approach a wine bar—one adult and one minor. A sensor at a wine bar detects that one device is being worn by a guest who is over 21 and therefore sends a command to that device that causes the device to switch from sleep mode to bi-directional communication mode as the guest approaches the bar, the system recognizing that an of-age guest is approaching and may want to order another of their favorite vintage. *See, e.g.*, '184 Patent, claims 11 and 20. Once the device switches to bi-directional mode, it is ready to engage in two-way encrypted communications with a vending terminal at the wine bar to securely effect a purchase transaction. *Id.*; '184 Patent, claims 13 and 19. But the sensor would not cause the approaching minor's device to switch to bi-directional mode, the system recognizing that there is no need for the minor's device to waste power switching into bi-directional communication mode because the minor has no need to engage in encrypted bi-directional payment transaction communications at the wine bar. This level of efficiency was never realized in prior art systems. The '184 Patent improved on prior art technology by teaching a system with a unique architecture and arrangement of components that enable enhancements to the technical functionality and efficiency of the portable guest devices themselves that could not have been realized in a conventional system.

76.     In addition, the '184 Patent's portable guest devices can operate in a beacon broadcast mode. In this mode, the beacon is configured to emit a one-way beacon signal via the BLE transceiver and antenna. '184 Patent col 16:43-58. This mode has a lower power

consumption than the bi-directional communication mode, but higher consumption that the sleep mode of operation.  Again, the guest's beacon device can switch from beacon broadcast mode into sleep mode or bi-discretional communication mode in response to contact with various sensors and peripherals.  This mode shifting can depend on the time, location of the beacon and/or sensors, and the beacon's distinct, unique data package.

77.     Portable guest devices equipped with BLE, as described and claimed in the '184 Patent, were not generic or conventional.  Indeed, such devices did not exist "off the shelf."  The '184 Patent's inventors designed and built these devices specifically to operate in the new network environment described in the '184 Patent.  These devices enabled omnidirectional transmission of signals, multiple operational modes, and secure, bidirectional communications with sensors.  The inventors of the '184 Patent tailored these portable guest devices to overcome specific problems related to physical size limitations, battery life, power consumption, security, transmission signal strength, and the need to efficiently interact and communicate with various sensors and peripherals aboard a moving cruise ship, as described throughout the 184 Patent and discussed further herein.

78.     As another example, the '184 Patent teaches a new, specific way in which sensors interoperate and communicate with beacons and other network nodes.  The novel operation and communications mode disclosed in the '184 Patent enable technological improvements to the functionality of the sensors and beacons themselves, resulting in increased accuracy and efficiency of the sensor network, as well as efficiencies resulting from the ability of sensors and associated peripherals to engage in independent operation.  First, because the sensors are relatively low cost and low power compared to conventional sensors, computer terminals, or the like, the '184 Patent's system allows for placement of more stationary network nodes (sensors) in a given space than conventional systems relying on traditional complex components.  This increased number of

stationary sensor nodes relative to conventional systems allows for more accurate, finely tuned location services compared to prior art systems.

79.     In addition, the '184 Patent teaches portable guest devices containing first and second wireless antennas respectively configured for BLE and NFC communications. '184 Patent, Col 2:35-44.  These antennas communicate with BLE and NFC sensors to provide efficient and redundant communications between the mobile beacons and the network in an unconventional manner.  For example, operation of a BLE transceiver generally requires that the device's battery provide sufficient power to the device for operation.  *See* '184 Patent, Col. 15:43-47.  A BLE device would either require a constant source of wired power or would require a battery change or recharge once the beacon's battery charge dropped below the threshold required to power the device.  The '184 Patent teaches a solution to this problem.  When the charge level of the device's battery falls below a threshold (or if the battery fails), the device can operate as a passive NFC/RFID device.  '184 Patent, Col. 15:47-64.  When operating as a passive NFC device, the device does not require any power from the battery for operation.  Instead, the device harvests power through the NFC antenna from radio frequency signals inducing current flow in the NFC antenna.  Using this harvested power, the user's device can switch between operating modes as needed.  *Id.*; see also '184 Patent, claims 11 and 19.  This is a technical improvement over conventional devices that used NFC (for example, an RFID access card), which lacked BLE and the functionalities enabled by it.  This technological improvement would not have been possible in systems using a stationary BLE beacon, for example, because a power-drained stationary beacon would be effectively useless unless and until a guest was close enough to the beacon for it to harvest power through an NFC antenna.  In other words, a stationary beacon could not help a guest

find the beacon until the user finds the beacon on their own—which would defeat the fundamental purpose of such a system in the first place.

80.     In addition, the '184 Patent describes and claims devices that use dual antennas to communicate with BLE and NFC sensors that are uniquely linked to each other and to beacons through the sensor network in a manner unseen in conventional systems.  In particular, the use of a sensor network peripheral can enable the guest engagement system to function without using sensors that require storage of individual network identifiers (addresses) to identify themselves to the communication network or to identify the data transmitted by each sensor as having originated in the respective sensor. '184 Patent, Col. 8:8-34.  Instead, because of the '184 Patent's novel arrangement of components, the sensor network peripherals (such as a door lock access panel) can be configured to packetize data received from sensors for communication across the network, removing the need for sensors to be operative to communicate on the network. *Id., see also* Claim 14 (discussing sensors connected to a door access panel peripheral); Col. 9:15-18 (access panel may be configured as a peripheral).  Moreover, each sensor does not need processing power sufficient to identify and process packets communicate across the network.  Thus, the use of sensor network peripherals disclosed in the '184 Patent enables operation using improved low-cost sensors that do not need network communication circuitry, and permits the guest engagement system to be configured for and begin operation without having to assign individual network identifiers to each sensor, and/or without having to configure servers with information on each individual sensor in the system. '184 Patent, Col. 8:3-50.

81.     As another example, the '184 Patent teaches new, specific improvements to door lock mechanisms by integrating sensors and peripherals (e.g., door lock access panels).  These components can engage in two-way communications with mobile devices to control the door lock

mechanics.  Because of its unique ordering and combination of components and communications protocols, the '184 Patent enables use, for example, of an access panel separate from an associated electronically controlled door lock and configured to control that door lock.  The access panel can detect periodic BLE beacon signals including the unique identifiers from the guest devices and selectively unlock the associated door based on the same, communicating with the door lock mechanism, the portable devices, and the central server.  This improvement to door lock structure and operation is claimed in claims 1 and 7, for example.  The '184 Patent addresses the foregoing and other related technical improvements to door lock and sensor hardware, as illustrated, for example, by Figures 7A-8D.  As the specification explains in detail, this system improves on the construction and operation of conventional door access technology to provide improved efficiency: "The door lock 17a provides guests the ability to gain access to their cruise ship stateroom, resort room, or other limited access facility (e.g., a VIP lounge, spa, fitness facility, elevator bank, or the like) simply by walking up to the door, reaching out to grasp the handle, and opening the door that is automatically unlocked based on wireless communications with the guests' medallions 11."  The system also improves security in improving the ability to detect and prevent unauthorized access. Col. 17:17-22:30.

82.     The '184 Patent enables improvements to technology by operating differently than conventional systems and utilizing technology improvements such as those discussed above and throughout the '184 Patent.

83.     Because of its improvements to technology and methods, the inventions disclosed in the '184 Patent assisted Carnival in overcoming numerous technical difficulties required to enable Carnival's unique and novel vision for a comprehensive and seamless guest engagement system.

84.    DeCurtis has admitted that the '184 Patent's claims reflect inventive techniques for communicatively coupling door access panels via power efficient networks to a centralized reservation and logging system and inventive techniques for efficiently leveraging BLE communications in both a low-power beacon state, as well as a more power-intensive bi-directional state.  DeCurtis further has admitted that these techniques were conceived of by the inventors of the '184 Patent.  DeCurtis has thus admitted that the '184 Patent's claimed inventions employ techniques that were not routine, conventional, or well-understood to improve upon existing technology, providing technical solutions to technical problems with tangible benefits (e.g. improved power efficiency).

85.    These inventions—the result of Carnival's development project beginning in 2014 and described in Carnival's patent applications beginning in 2016—were later copied by DeCurtis.

**DeCurtis' Misappropriation of Carnival's Technology**

86.    According to a joint press release by Carnival competitor Norwegian Cruise Lines ("NCL") and DeCurtis, sometime prior to May 4, 2018, NCL hired DeCurtis to develop a system that closely tracks Carnival's OCEAN® Platform.  NCL calls its system "Cruise Freedom" and claims that DeCurtis is working with NCL to "leverage the latest in location-based technologies, including wearables, to meaningfully enhance the guest experience from the moment of booking and throughout their Norwegian cruise."  NCL has indicated that Cruise Freedom will "bring proximity and location [technology] to life" to facilitate *inter alia* embarkation and dining experiences.  In an investor conference call discussing Cruise Freedom, an NCL executive acknowledged "we're playing catch-up" to Carnival.  Within months of hiring DeCurtis, NCL was ready to begin live testing Cruise Freedom features on the Norwegian Bliss Cruise in late 2018.

87.     By no later than June 2018, DeCurtis separately began marketing a "new" Bluetooth Low Energy reader project.  In its marketing materials for this product, DeCurtis has passed off Carnival's inventions as its own.  For example, a page that first appeared on DeCurtis' website on or about June 2018 differentiates DeCurtis' product from existing stationary Bluetooth Low Energy beacons that push targeted advertisements to customers: "At DeCurtis, we rarely stop at the obvious. … We learned through our ground-breaking work in the cruise space around location and proximity that we needed to invert the traditional model. Beacons had, thus far, been the stationary object."

88.     DeCurtis "learned" to "invert the traditional model" from Carnival.  DeCurtis knew that its statements that "thus far" beacons had been stationary objects, and that DeCurtis "introduce[ed] the concept of a wearable" that contains a small beacon, were false.  Carnival conceived of these concepts long before and hired DeCurtis to help prototype them.  DeCurtis also knew that Carnival developed this technology to provide the same types of "transformational experiences" and location-based services that DeCurtis is now advertising.

89.     DeCurtis has marketed Carnival Information and Carnival's intellectual property as DeCurtis' own "solution to the cruise industry," and it has touted its ability to provide "Customized Experiences" that track closely with OCEAN® Platform functionality and with the descriptions in Carnival's patents.

90.     In publications, interviews, and marketing materials made public around the same time, DeCurtis bragged about how quickly it had developed its BLE solution and acknowledged that the solution was based on its prior work, i.e., DeCurtis' work for Carnival.  DeCurtis executive Derek Fournier has publicly stated that "going from concept to reality was remarkably quick. Leveraging years of previous experience and R&D in BLE projects made that possible."  The

"experience" "leveraged" by DeCurtis was its work for Carnival including DeCurtis' access to and misuse of Carnival's confidential, proprietary, and trade secret information.  Another article stated that DeCurtis' development timeline for its BLE reader was "just six months."  DeCurtis' "remarkably quick" development timeline would not have been possible without DeCurtis' access to and misuse of Carnival's confidential, proprietary, and trade secret information.

91.     DeCurtis contacted many other third-party vendors with which Carnival had contracted to assist in the development of Project Trident seeking to work with those vendors to develop DeCurtis' competing solution.  DeCurtis knew that these vendors worked on Project Trident only through DeCurtis' access to Carnival's confidential information.

92.     Carnival sent correspondence to DeCurtis and NCL in January 2020 notifying DeCurtis and NCL of Carnival's patent portfolio covering aspects of the OCEAN® Platform technology.  Carnival further reminded DeCurtis of its confidentiality obligations to Carnival.

93.     In early February 2020, Carnival sent a letter to a new entrant to the cruise industry, Virgin Voyages ("Virgin"), notifying Virgin of Carnival's patent portfolio.  Just days later, Virgin announced its intention to use a wearable device called "The Band" on its maiden cruise ship voyage.

94.     An industry article about the "The Band" noted that it "sounds incredibly similar" to Carnival's OceanMedallion™.  Indeed, Virgin is marketing many of the same material features as Carnival's OCEAN® Platform, such as granting cabin access, permitting ticketless boarding, making payments, pinpointing traveler location for beverage delivery, and facilitating onboard purchasing.

95.     Virgin began building its first cruise ship in or about early 2017, and at some point in 2017 or 2018, Virgin tasked DeCurtis with creating "The Band" and its associated systems on board the cruise ship.  The Band and its associated systems use technology sourced from DeCurtis.

96.     The same DeCurtis employees who worked on Project Trident have also worked on NCL's Cruise Freedom system and Virgin Voyages "The Band" system.  At all times relevant, these DeCurtis employees had access to Carnival's written materials in DeCurtis' possession.

**DeCurtis' Breaches of Audit Requirements of the MSA to Conceal its Misconduct**

97.     The announcement of "The Band" heightened Carnival's concern DeCurtis may have disclosed or misused Carnival confidential information, proprietary information, and trade secrets to Virgin and/or NCL.  Accordingly, Carnival sent DeCurtis a letter exercising its audit rights under the MSA.  Carnival sought to audit DeCurtis' documents, source code, and records related to DeCurtis' work under the MSA, as well as records showing all measures DeCurtis has taken, if any, to ensure the confidentiality of Carnival's confidential information.  Carnival asked that DeCurtis respond by February 24, 2020 providing a date certain, by no later than March 2, 2020, when Carnival could begin the audit along with necessary logistical information.

98.     By letter dated February 24, 2020, DeCurtis refused Carnival's audit demand in breach of the MSA.  DeCurtis' February 24 letter stated that it was denying Carnival's audit demand because, *inter alia*, "DeCurtis must maintain the confidentiality of information from third parties whose information you have requested."  Yet Carnival requested no third-party information in its audit demand.

99.     DeCurtis' February 24 letter admits that an audit of DeCurtis' Carnival work product and Carnival confidential information in DeCurtis' possession would require disclosure of work that DeCurtis performed for third-parties.  This admission confirmed Carnival's fears that

DeCurtis used work product it had prepared for Carnival and Carnival's confidential information to rapidly create competing technology, a breach of the MSA and a misappropriation of Carnival's trade secrets.

100.    Notwithstanding Carnival's continued, repeated demands to conduct an audit of DeCurtis' records relating to its work under the MSA, DeCurtis has refused to permit such an audit or otherwise to permit Carnival to ascertain the extent of DeCurtis failure of compliance with the terms and conditions of the MSA.

101.    NCL's and Virgin's accelerated development time for their respective wearable devices and related systems is the result of DeCurtis' breaches of the MSA, misappropriation, disclosure and use of Carnival information and trade secrets, and patent infringement.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

102.    Carnival incorporates by reference the allegations in paragraphs 1-42 and 86-101.

103.    Carnival and DeCurtis are parties to a valid, existing contract: the MSA.

104.    Carnival has performed its obligations under the MSA.

105.    DeCurtis has breached its obligations under the MSA by making unauthorized disclosures and/or use of Carnival's trade secrets and confidential information, by making unauthorized disclosures and/or use of work product and deliverables produced for Carnival under the MSA and which are Carnival's property, and by refusing to comply with Carnival's audit demands.

106.    DeCurtis' breaches have proximately caused Carnival foreseeable monetary harm in an amount to be proven at trial.

107.    DeCurtis' breaches have proximately caused Carnival irreparable injury that can only be remedied by an order of specific performance and injunctive relief.

## SECOND CLAIM FOR RELIEF
### (Violations of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*)

108.     Carnival incorporates by reference the allegations in paragraphs 1-42 and 86-101.

109.     Project Trident information that Carnival provided to DeCurtis includes financial, business, scientific, technical, economic, and engineering information.

110.     At all times relevant, Carnival has taken reasonable measures to keep Project Trident information secret.   Among other measures, Carnival maintains Project Trident information in password-secured repositories and maintains robust physical security to its facilities, including the XIC, to ensure that unauthorized persons cannot gain unauthorized access. Carnival only permits persons to access Project Trident on a need to know basis, and only to persons who have agreed to maintain the secrecy of such information.

111.     Carnival's Project Trident information disclosed to DeCurtis included at least the following trade secrets: Project Trident prototypes; Project Trident software, including software embodying proprietary and secret methods of operation that are not apparent to end users; Project Trident hardware and software architecture, including specific microservices platform technical architecture; Project Trident technical specifications and data interface designs; Project Trident databases and database structures; Project Trident operations procedures; Project Trident creative strategies; Project Trident deployment plans; Project Trident testing plans and results; Project Trident development schedules; Project Tridents strategic vendor lists; Project Trident's corporate abstraction layer of services; Project Trident interface layer designs, data models, database structures, and data interface designs and adapters; Project Trident API dependencies; Project Trident non-functional requirements; Project Trident's particularized agile development methodology; Project Trident web services information; Project Trident show plans; Project

Trident design work; Project Trident technical integration information; Project Trident site surveys, Project Trident functional plans; and Project Trident studio shows.

112.   Much of this trade secret information was disclosed in documentary form (including, for example, PowerPoint presentations) provided to DeCurtis at Carnival's XIC and other locations.  Some of this trade secret information was also disclosed to DeCurtis, or embodied in, source code and software documentation.  In addition, by virtue of its access to the foregoing materials, DeCurtis obtained negative knowledge about unsuccessful strategies, methods, and technologies that did not work or are not likely to work in light of Carnival's experience on Project Trident.  The documents, source code, and trade secret information provided to DeCurtis as alleged in this paragraph derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, third parties.

113.   Without Carnival's consent, DeCurtis disclosed to NCL and/or Virgin, and/or used on their behalf, Carnival's Project Trident trade secret information.  DeCurtis was aware that Carnival's Project Trident information comprised trade secrets, and that it was improper for DeCurtis to disclose and/or use Carnival's trade secrets in the manner alleged.

114.   DeCurtis' conduct violates the Defend Trade Secrets Act.

115.   DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately harmed Carnival and caused monetary loss in an amount to be determined at trial.

116.   DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately caused Carnival irreparable harm that can only be remedied by injunctive relief.

117.   DeCurtis' conduct was willful and carried out with conscious disregard for Carnival's rights.

118.    Carnival is entitled to damages, attorneys fees, and injunctive relief on account of DeCurtis' violation of the Defend Trade Secrets Act.

### THIRD CLAIM FOR RELIEF
### (Violations of the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 *et seq.*)

119.    Carnival incorporates by reference the allegations in paragraphs 1-42 and 86-101.

120.    Project Trident information that Carnival provided to DeCurtis includes financial, business, scientific, technical, economic, and engineering information.

121.    At all times relevant, Carnival has taken reasonable measures to keep Project Trident information secret.   Among other measures, Carnival maintains Project Trident information in password-secured repositories and maintains robust physical security to its facilities, including the XIC, to ensure that unauthorized persons cannot gain unauthorized access. Carnival only permits persons to access Project Trident on a need to know basis, and only to persons who have agreed to maintain the secrecy of such information.

122.    Carnival's Project Trident information disclosed to DeCurtis included at least the following trade secrets: Project Trident prototypes; Project Trident software, including software embodying proprietary and secret methods of operation that are not apparent to end users; Project Trident hardware and software architecture, including specific microservices platform technical architecture; Project Trident technical specifications and data interface designs; Project Trident databases and database structures; Project Trident operations procedures; Project Trident creative strategies; Project Trident deployment plans; Project Trident testing plans and results; Project Trident development schedules; Project Tridents strategic vendor lists; Project Trident's corporate abstraction layer of services; Project Trident interface layer designs, data models, database structures, and data interface designs and adapters; Project Trident API dependencies; Project Trident non-functional requirements; Project Trident's particularized agile development

methodology; Project Trident web services information; Project Trident show plans; Project Trident design work; Project Trident technical integration information; Project Trident site surveys, Project Trident functional plans; and Project Trident studio shows.

123.    Much of this trade secret information was disclosed in documentary form (including, for example, PowerPoint presentations) provided to DeCurtis at Carnival's XIC and other locations.  Some of this trade secret information was also disclosed to DeCurtis, or embodied in, source code and software documentation.  In addition, by virtue of its access to the foregoing materials, DeCurtis obtained negative knowledge about unsuccessful strategies, methods, and technologies that did not work or are not likely to work in light of Carnival's experience on Project Trident.  The documents, source code, and trade secret information provided to DeCurtis as alleged in this paragraph derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, third parties.

124.    Without Carnival's consent, DeCurtis disclosed to NCL and/or Virgin, and/or used on their behalf, Carnival's Project Trident trade secret information.  DeCurtis was aware that Carnival's Project Trident information comprised trade secrets, and that it was improper for DeCurtis to disclose and/or use Carnival's trade secrets in the manner alleged.

125.    DeCurtis' conduct violates the Florida Uniform Trade Secrets Act.

126.    DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately harmed Carnival and caused monetary loss in an amount to be determined at trial.

127.    DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately caused Carnival irreparable harm that can only be remedied by injunctive relief.

128.    DeCurtis' conduct was willful and carried out with conscious disregard for Carnival's rights.

129.    Carnival is entitled to damages, attorneys fees, and injunctive relief on account of DeCurtis' violation of the Florida Uniform Trade Secrets Act.

**FOURTH CLAIM FOR RELIEF**
**(Infringement of United State Patent No. 10,045,184)**

130.    Carnival incorporates by reference the allegations in paragraphs 1-97.

131.    On August 7, 2018, the '184 Patent, titled "Wireless Guest Engagement System," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office.  A copy of the '184 Patent is attached to this Second Amended Complaint as Exhibit A.

132.    At all times since the date of issue of the '184 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '184 Patent.

133.    Carnival's ownership of the '184 Patent includes, without limitation, the exclusive right to enforce the '184 Patent, the exclusive right to file actions based on infringement of the '184 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '184 Patent and the exclusive right to be awarded injunctive relief pertaining to the '184 Patent.

134.    The '184 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

135.    For example, claim 11 of the '184 Patent recites:

A guest engagement system comprising:

a plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device having a unique identifier and including first and

second wireless communication antennas respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications;

a sensor network comprising a plurality of sensors each mounted at a different location, wherein at least one sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on BLE communication with the portable guest devices and at least another sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers there-from based on NFC communication with the portable guest devices;

a communication network connecting each of the plurality of sensors of the sensor network; and

a central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network,

wherein each guest device is configured to selectively operate according to first and second operating modes, each guest device engaging in bi-directional communication using the first wireless communication antenna configured for BLE communications in the first operating mode and engaging in a beacon mode periodically broadcasting a beacon signal using the first wireless communication antenna configured for BLE communications in the second operating mode, and

each sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes.

136.    DeCurtis and its customers, including Virgin and NCL, directly infringe the '184 Patent.  The claims infringed by DeCurtis and/or its customers include at least independent claim 1 and its dependent claims 2 and 3, independent claim 7 and its dependent claims 8, 9, and 10, and independent claim 11 and its dependent claims 12, 13, 14, and 15 of the '184 Patent.  Discovery may reveal further evidence that additional claims of the '184 Patent are directly infringed by DeCurtis or its customers.

137.    An exemplary explanation of how DeCurtis' customers infringe these claims is set forth below.  The relevant and cited portions of the public domain documents referenced below describe the functionality of DeCurtis' customers' Accused Systems.

138.    Virgin Voyages is using a guest engagement system that includes "the Band." "The Band," is a portable guest device provided by Virgin to users to be carried by the users.  *See* https://www.virginvoyages.com/press/latest-releases/smart-cruise-wearable  ("Introducing The Band – Virgin Voyages' Smart Wearable Technology Made with Ocean Plastic")

139.    Each Band device has a unique identifier.  Each Band device has a unique Bluetooth Low Energy ("BLE") identifier.  *See* Figure 3 below.  When the data obtained via packet capture shown in Figure 3 is decoded, a UUID (Universally Unique Identifier), Major, and Minor values are obtained, which are unique identifiers.  In documentation describing its BLE system, DeCurtis has described the "Beacon" as "[a] combination of identifying (UUID, major, minor, mac address, etc.) and location metadata (geom field, point) representing a single Beacon. The design assumption is that the (UUID, major, minor, mac address) will be unique to a single device."  The

Band also has unique identifiers associated with NFC communications, including a UUID and a serial number.  *See* Figure 4 below.  These BLE and NFC identifiers are received by sensors onboard the Virgin cruise ship (discussed further below) which detect Band devices proximate to the sensors.

140.    The Band includes a first and second wireless antenna as shown in Figure 1 below. The Band's antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC).

*Figure 1*



141.    Virgin's cruise ship includes a sensor network with a plurality of sensors mounted at different locations.  The Band is used by guests to "[a]ccess their cabins, serving as a room key," "[p]inpoint location for delivery" of services (e.g., champagne delivery), "[m]ake onboard purchases," "[g]ame at the casino," and as a "VIP pass." *See* https://www.virginvoyages.com/press/latest-releases/smart-cruise-wearable.    Each of these functionalities uses sensors that are part of a sensor network; e.g., a sensor is used to detect and

communicate with the Band devices to unlock a guest's room door, and sensors are used to detect and communicate with a Band device to pinpoint that device's location.

142.    The Band communicates with at least one sensor operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on BLE communication. *Inter alia*, the Band communicates two different types of BLE "advertisements" and NFC data, each of which provides location-based information and services.  The BLE data communicated by the Band and received by the sensors includes a unique identifier, as does the NFC data communicated by the Band, as described above.

143.    Figure 2 below a depicts BLE packet capture for advertisements communicated by the Band in mode with a Protocol Data Unit ("PDU") type of "ADV_IND."  This is a mode in which the BLE device requests connection to a central device.

*Figure 2*



| No. | Time | Source | | Destination | Protocol | Length | Opcode | Info |
|---|---|---|---|---|---|---|---|---|
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |

```
> Frame 10994: 63 bytes on wire (504 bits), 63 bytes captured (504 bits) on interface 0
> Nordic BLE Sniffer
v Bluetooth Low Energy Link Layer
    Access Address: 0x8e89bed6
  v Packet Header: 0x2560 (PDU Type: ADV_IND, ChSel: #2, TxAdd: Random)
      .... 0000 = PDU Type: ADV_IND (0x0)
      ...0 .... = RFU: 0
      ..1. .... = Channel Selection Algorithm: #2
      .1.. .... = Tx Address: Random
      0... .... = Reserved: False
      Length: 37
    <Length: 37>
    Advertising Address: 3e:7a:df:1e:2e:f9 (3e:7a:df:1e:2e:f9)
```

144.    Figure 3 below depicts a BLE packet capture for advertisements communicated by the Band in a mode with a PDU type of "ADV_NONCONN_INFO."  This is a mode in which the BLE device broadcasts a non-connectible beacon advertisement.

*Figure 3*



145.    The Band devices include hardware and/or software supplied by DeCurtis for at least BLE communications.  The sensors on the Virgin ship include hardware and/or software supplied by DeCurtis operative to detect The Band devices proximate to the sensors and receive unique identifiers from The Band devices based on at least BLE communication.  For example,

DeCurtis has advertised that its "Bluetooth Low Energy Module" "can read hundreds of beacons per second providing specific location, not just relative proximity information, which allows businesses to improve the customer experience in various ways." *See* https://decurtis.com/2018/10/21/introducing-our-bluetooth-low-energy-module/. This sensor functionality is provided by DeCurtis as hardware modules that plug into wireless access points or as software that integrates with wireless access points or other wireless communication devices on the Virgin ship.

146.    Figure 4 below depicts an NFC packet capture for communications by the Band.

*Figure 4*



147.    Virgin Voyages ships include a communication network, such as a Wi-Fi network, connecting a plurality of sensors, as explained further above.

148.    The system relies on a central server to connect the sensor network, and this server logs information associating unique device identifiers received by the sensors with other data, such as device location, for example.  *See, e.g.,* https://www.seatrade-cruise.com/news/virgin-voyages-introduces-its-wearable-technology-band ("Activated with a tap of the wrist, it also pinpoints location for delivery of Shake for Champagne, enables gaming in the casino and serves as a VIP pass for suite sailors to enter Richard's Rooftop.")  DeCurtis has explained that the hardware and/or software it provides for the sensors processes information received from BLE beacons (here, the Band devices) and forwards that information to a central location services platform to track the location of the devices and provide navigation and wayfinding.  *See* https://decurtis.com/decurtis-experience-platform/location-proximity/

149.    The Band is configured to selectively operate according to first and second operating modes.  Because the Band device has one BLE antenna, the Band device cannot transmit different types of BLE communications simultaneously.  In one operating mode, the Band transmits periodic beacon advertisements on fixed intervals to any listening device.   This is discussed above with respect to Figures 2 and 3.  DeCurtis provided hardware and/or software in the   Band   devices   that   causes   the   devices   to   operate   in   beacon   mode.   *See* https://decurtis.com/decurtis-experience-platform/location-proximity/   ("We   have   flipped   the traditional model of placing beacons in rooms, we give that power to the guests in the form of a wearable and put the BLE readers on the walls of an indoor space.")  As explained above, when broadcasting in the "ADV_IND" mode, the Band is requesting a connection from a central device. This mode is used to establish bi-directional communication between devices.  When the Band receives a bi-directional communication from a sensor, the Band changes to a second operating mode.  In this second operating mode, the Band stops its fixed interval beacon transmissions while

it engages in bi-directional communication with sensors.  This occurs, for example, when the Band communicates with sensors to "act as a room key" and open a guest's cabin.

150.    DeCurtis has contracted with its customers, including Virgin and NCL, to provide and maintain systems that infringe the '184 Patent.  DeCurtis has made, used, offered for sale, and sold systems in the United States that infringe the '184 Patent.

151.    DeCurtis' customers directly infringe the '184 Patent at least when they make and use the guest engagement systems that practice the claims of the '184 Patent, for example as described above (hereafter, the "'184 Infringing Systems").

152.    DeCurtis contributes to its customers' direct infringement of the '184 Patent, including by providing discrete, material components of the '184 Infringing Systems to its customers for installation or replacement, which components are at least a substantial portion of the components of the inventions patented in the '184 Patent.  Components of the '184 Infringing Systems provided by DeCurtis to its customers include hardware and/or software in the sensors described above, hardware and/or software comprising the central server describe above, and hardware and/or software comprising the portable guest devices described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '184 Patent.  Said components are not suitable for any substantial non-infringing use.

153.    DeCurtis has actively induced and is actively inducing its customers to make and use the '184 Infringing Systems in a manner that directly infringes the '184 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '184 Infringing Systems in a manner that infringes one or more claims of the '184 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials,

instructing customers on how to make and use the '184 Infringing Systems, including making and using infringing features and functionalities of the '184 Infringing Systems. DeCurtis also has provided and provides marketing materials that include information on the '184 Infringing Systems and infringing features of the '184 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '184 Infringing Systems in an infringing manner. DeCurtis provides ongoing technical and other customer support to its customers to ensure that its customers continue to make and use the '184 Infringing Systems. DeCurtis intends for customers to use the '184 Infringing Systems to commit acts of direct infringement. DeCurtis also has infringed by supplying or causing to be supplied in or from the United States the components of the '184 Infringing Systems identified in Paragraph 157, which are uncombined in whole or in part, intending and actively inducing the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States.

154.    DeCurtis has had knowledge of the '184 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '184 Patent. Even before that date, DeCurtis had actual knowledge of the '184 Patent or at minimum willfully blinded itself to the existence of the '184 Patent and DeCurtis' infringement. DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew that Carnival owned the intellectual property in the OCEAN® Platform. DeCurtis could not have embarked upon and continued developing competing products using Carnival's confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '184 Patent). DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate.

DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially adapted for use in an infringement of the '184 Patent.  DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '184 Patent.  DeCurtis' infringement of the '184 Patent is and has been willful.

155.    Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including loss of market share and customer goodwill.  Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

156.    Carnival has been and is being damaged due to DeCurtis' infringement.  Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
### (Infringement of United State Patent No. 10,049,516)

157.    Carnival incorporates by reference the allegations in paragraphs 1-97.

158.    On August 14, 2018, the '516 Patent, titled "Door Locks and Assemblies for Use in Wireless Guest Engagement Systems," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office.  A copy of the '516 Patent is attached to this Second Amended Complaint as Exhibit B.

159.    At all times since the date of issue of the '516 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '516 Patent.

160.    Carnival's ownership of the '516 Patent includes, without limitation, the exclusive right to enforce the '516 Patent, the exclusive right to file actions based on infringement of the '516 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '516 Patent and the exclusive right to be awarded injunctive relief pertaining to the '516 Patent.

161.    The '516 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

162.    For example, claim 13 of the '516 Patent recites an electronic door lock assembly comprising:

a latch assembly including a latch and an electronically controlled locking mechanism operative to selectively unlock a door;

a door lock communication module electrically connected to the electronically controlled locking mechanism of the latch assembly, and including a radio configured for wireless communication; and

an access panel separate from and fixedly mounted proximate to the door lock communication module and latch assembly, and including a radio configured for wireless communication with the door lock communication module, a first transceiver configured for wireless communication with a portable user device, and a second transceiver for communication with a reservation server;

wherein the access panel separate from and fixedly mounted proximate to the door lock communication module is configured to receive door access information from the reservation server via the second transceiver, determine whether the door should be unlocked based on the door access information received from the reservation server, and

transmit an instruction to unlock the door to the door lock communication module via the radio based on the determination.

163.    DeCurtis' customers directly infringe the '516 Patent. The claims infringed by DeCurtis' customers include at least claim 13 of the '516 Patent and its dependent claims 15 and 18, at least when they make and use the guest engagement systems that practice the claims of the '516 Patent.  Discovery may reveal further evidence that additional claims of the '516 Patent are directly infringed by DeCurtis' customers.

164.    The Virgin cruise ship designed to work with the Band and implement DeCurtis's technology includes a latch assembly with an electronically controlled locking mechanism, a door lock communication module, including a radio configured for wireless communication, and an access panel separate from and fixedly mounted proximate to the door lock communication module and latch assembly.  These are shown below.

*Figure 5*



165.    The access panel includes a first transceiver configured for wireless communication with a portable user device.  As described above with respect to Figure 2, the Band devices broadcast BLE communications with a PDU type of "ADV _INFO," an advertisement designed to establish a bidirectional communication, here with a BLE sensor in the access panel that uses hardware and/or software provided by DeCurtis.  Information obtained from capture of Bluetooth packets from a Band device indicates that these advertisements are used to establish bi-directional communications with a sensor used in a door access panel for unlocking a cabin door.

166.    The access panel includes a second transceiver for communication with a reservation server, is configured to receive door access information from the reservation server via the second transceiver, determine whether the door should be unlocked, and transmit an instruction to unlock the door to the door lock communication module.  The Band and the BLE sensor in the access panel establish a secure bidirectional communications channel.  After receiving identifying information from the Band, hardware and software within the access panel determine whether the door should be unlocked based on that information and door access information received from a

reservation server, and then when appropriate transmit an instruction to unlock the door to the door lock communication module.

167.   DeCurtis contributes to its customers' direct infringement of the '516 Patent, including by providing discrete, material components of the '516 Infringing Systems to its customers for installation or replacement.  Components of the '516 Infringing Systems provided by DeCurtis to its customers include hardware and/or software in the access panel and reservation server described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '516 Patent.  Said components are not suitable for any substantial non-infringing use.

168.   DeCurtis has actively induced and is actively inducing its customers to make and use the '516 Infringing Systems in a manner that directly infringes the '516 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '516 Infringing Systems in a manner that infringes one or more claims of the '516 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials, instructing customers on how to make and use the '516 Infringing Systems, including making and using infringing features and functionalities of the '516 Infringing Systems.  DeCurtis also has provided and provides marketing materials that include information on the '516 Infringing Systems and infringing features of the '516 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '516 Infringing Systems in an infringing manner.  DeCurtis provides ongoing technical and other customer support to its customers to ensure that its customers continue to make and use the '516 Infringing Systems.

DeCurtis intends for customers to use the '516 Infringing Systems to commit acts of direct infringement.

169.    DeCurtis has had knowledge of the '516 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '516 Patent.  Even before that date, DeCurtis had actual knowledge of the '516 Patent or at minimum willfully blinded itself to the existence of the '516 Patent and DeCurtis' infringement.  DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew the Carnival owned the intellectual property in the OCEAN® Platform.  DeCurtis could not have embarked upon and continued developing competing products using Carnival's confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '516 Patent).  DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate.  DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially adapted for use in an infringement of the '516 Patent.  DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '516 Patent.  DeCurtis' infringement of the '516 Patent is and has been willful.  Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including loss of market share and customer goodwill.  Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

170.    Carnival has been and is being damaged due to DeCurtis' infringement.  Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**(Infringement of United State Patent No. 10,157,514)**

171.    Carnival incorporates by reference the allegations in paragraphs 1-97.

172.    On December 18, 2018, the '514 Patent, titled "Portable Wireless Devices for Use in Wireless Guest Engagement Systems," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office.  A copy of the '514 Patent is attached to this Second Amended Complaint as Exhibit C.

173.    At all times since the date of issue of the '514 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '514 Patent.

174.    Carnival's ownership of the '514 Patent includes, without limitation, the exclusive right to enforce the '514 Patent, the exclusive right to file actions based on infringement of the '514 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '514 Patent and the exclusive right to be awarded injunctive relief pertaining to the '514 Patent.

175.    The '514 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

176.    For example, claim 11 of the '514 Patent recites a portable wireless device comprising:

> a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch;
>
> a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity,

wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications,

the processor is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications,

the memory stores both public and private identifiers unique to the portable wireless device,

the processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications, and

the processor controls the first wireless communication antenna to transmit the private identifier only across secure communication links established with remote communication devices using BLE communications.

177.    DeCurtis and its customers directly infringe at least claim 11 of the '514 Patent. Discovery may reveal further evidence that additional claims of the '514 Patent are directly infringed by DeCurtis' customers.

178.    For example, the Band is a portable wireless device with a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch, as depicted in Figure 6 below.  The thickness of the Band's body is approximately ¼ of an inch.

*Figure 6*



179.    In addition, the Band includes a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity, wherein the first and second wireless communication antennas are respectively configured for BLE and NFC communications, as depicted in Figure 1 above.

180.    The processor in the Band is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications, the Band's memory stores a private identifier unique to the portable wireless device, and the Band's processor transmits the private identifier only across secure communication links established with remote communication devices using BLE communications. As explained above, the Band, for example, establishes a bi-directional communication link with a remote communication device located in the access panel for a guest's cabin and transmits unique identifying information to the access panel.   This transmission is done over a secure

communication link and uses a private identifier transmitted only over the secure communications link to ensure security and prevent unauthorized room entry.

181.    The Band's memory stores a public identifier unique to the portable wireless device, and the Band's processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communication.  This is described above with respect to Figure 3.

182.    DeCurtis has contracted with its customers to provide and maintain systems that infringe the '514 Patent.  DeCurtis has made, used, offered for sale, and sold systems in the United States, and imported systems into the United States, that infringe the '514 Patent.

183.    DeCurtis' customers, including Virgin, directly infringe the '514 Patent at least when they make, use, sell, and offer for sale devices that practice the claims of the '514 Patent, for example as described above (hereafter, the "'514 Infringing Systems").  DeCurtis contributes to its customers' direct infringement of the '514 Patent, including by providing discrete, material components of the '514 Infringing Systems to its customers for installation or replacement, which components are at least a substantial portion of the components of the inventions patented in the '514 Patent.  Components of the '514 Infringing Systems provided by DeCurtis to its customers include hardware and/or software comprising the portable guest devices described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '514 Patent.  Said components are not suitable for any substantial non-infringing use.

184.    DeCurtis has actively induced and is actively inducing its customers to make and use the '514 Infringing Systems in a manner that directly infringes the '514 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '514 Infringing

Systems in a manner that infringes one or more claims of the '514 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials, instructing customers on how to make and use the '514 Infringing Systems, including making and using infringing features and functionalities of the '514 Infringing Systems.  DeCurtis also has provided and provides marketing materials that include information on the '514 Infringing Systems and infringing features of the '514 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '514 Infringing Systems in an infringing manner.  DeCurtis provides ongoing technical and other customer support to its customers to ensure that its customers continue to make and use the '514 Infringing Systems. DeCurtis intends for customers to use the '514 Infringing Systems to commit acts of direct infringement.

185.   DeCurtis also has infringed by supplying or causing to be supplied in or form the United States the components of the '514 Infringing Systems identified in Paragraph 183, which are uncombined in whole or in part, intending and actively inducing the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States

186.   DeCurtis has had knowledge of the '514 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '514 Patent.  Even before that date, DeCurtis had actual knowledge of the '514 Patent or at minimum willfully blinded itself to the existence of the '514 Patent and DeCurtis' infringement.  DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew the Carnival owned the intellectual property in the OCEAN® Platform.  DeCurtis could not have embarked upon and continued developing competing products using Carnival's

confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '514 Patent). DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate. DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially adapted for use in an infringement of the '514 Patent. DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '514 Patent. DeCurtis' infringement of the '514 Patent is and has been willful.

187. Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including loss of market share and customer goodwill. Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

188. Carnival has been and is being damaged due to DeCurtis' infringement. Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Carnival prays for judgment against DeCurtis as follows:

A. Entry of judgment in favor of Carnival against DeCurtis on all counts;

B. A judgment and order awarding Carnival damages caused by DeCurtis' breach of contract;

C. A judgment and order awarding Carnival damages caused by DeCurtis' misappropriation of trade secrets and disgorgement of any ill-gotten profits;

D. A judgment and order requiring DeCurtis to pay Carnival all damages caused by

DeCurtis' infringement of the '184 Patent, the '514 Patent, and the '516 Patent (but in no event less than a reasonable royalty) pursuant to 35 U.S.C. § 284;

E.      A judgment and order requiring DeCurtis to pay Carnival pre-judgment and post-judgment interest on any damages or profits awarded;

F.      A judgment and order requiring DeCurtis to pay Carnival increased damages up to three times the amount found or assessed pursuant to 35 U.S.C. § 284;

G.      A judgment and order awarding Carnival its costs and attorneys' fees;

H.      An order for an accounting of all gains, profits, cost savings and advantages realized by DeCurtis from its breach of contract and misappropriation of trade secrets;

I.      An order requiring DeCurtis to comply with the MSA, including the MSA's audit provisions;

J.      An order preliminarily and permanently enjoining DeCurtis, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons and entities acting in concert with them, from misappropriating Carnival's trade secrets;

K.      An order preliminarily and permanently enjoining DeCurtis, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons and entities acting in concert with them, from breaching the parties agreement;

L.      An order and judgment preliminarily and permanently enjoining DeCurtis its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest,  and all persons and entities acting in concert with them, from infringing the '184 Patent, the '514 Patent, and the '516 Patent;

M.      A determination that this action is an exceptional case pursuant to 35 U.S.C. § 285; and

N.     All such further and additional relief, in law or equity, to which Carnival may be entitled or which the Court deems just and proper.

**JURY TRIAL DEMAND**

Carnival hereby demands a jury trial on all issues so triable as of right.

Dated:  October 21, 2020                    RESPECTFULLY SUBMITTED,


**GRAYROBINSON, P.A.**
333 S.E. 2nd Avenue, Suite 3200
Miami, FL  33131
Phone: (305) 416-6880
Facsimile: (305) 416-6887

By: */s/Jorge Espinosa/*
   Jorge Espinosa
   Fla. Bar No.  779032
   jorge.espinosa@gray-robinson.com
   Robert R. Jimenez
   Fla. Bar. No. 72020
   robert.jimenez@gray-robinson.com

   Diana Marie Fassbender
   Florida Bar No. 0017095
   dszego@orrick.com
   Steven J. Routh (*pro hac vice*)
   T. Vann Pearce, Jr. (*pro hac vice*)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
   Columbia Center, 1152 15th Street, N.W.
   Washington, D.C. 20005-1706
   Tel: (202) 339-8500

   Robert L. Uriarte (*pro hac vice*)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
   Menlo Park, CA 94025
   Tel: (650) 289-7105

   *Attorneys for CARNIVAL CORPORATION*