# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**CARNIVAL CORPORATION,**

a Panamanian corporation,

        Plaintiff,

v.

**DECURTIS LLC,** a Delaware limited liability corporation, and **DECURTIS CORPORATION,**

a Florida corporation,

        Defendants.

No. 1:20-cv-22945-RNS

## DECURTIS'S MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

DeCurtis, LLC and DeCurtis Corporation (collectively "DeCurtis") moved to dismiss Carnival's original and first amended complaint on a number of grounds under Rule 12(b)(6). Carnival's second amended complaint ("SAC") should likewise be dismissed for the following reasons: (1) the contract claim (Count I) is defeated by the agreement's plain language and related correspondence referenced in Carnival's allegations; (2) the trade secret claims (Counts II and III) are based on amorphous, ill-defined "trade secrets" that overlap entirely with the inventions taught by the '184, '516, and '514 patents; (3) the claim for infringement of the '184 patent (Count IV) is directed to ineligible subject matter under 35 U.S.C. § 101 and fails to adequately plead direct infringement; (4) the claims for infringement of the '184 patent and the '514 patent (Counts IV and VI) fail to plausibly plead infringement under 35 U.S.C. § 271(f); and (5) the claim for infringement of the '516 patent (Count V) fails to adequately plead indirect infringement. The Court should dismiss all of these claims *with prejudice*.

## BACKGROUND

**1. Carnival hires DeCurtis to design its guest engagement system.**

DeCurtis is an Orlando-based technology company that designs and manufactures systems using wireless communications, small portable devices, and custom software to enable businesses such as cruise lines to improve guest experiences. (SAC ¶8, ECF 88) Around June 2014, Carnival retained DeCurtis to assist in the prototyping phase of Carnival's Project Trident, which involved guest engagement technology. (*Id.* at ¶¶17, 23) In July 2014, DeCurtis and Carnival entered into a non-disclosure agreement and a separate Master Services Agreement ("MSA") to design a guest engagement system for Carnival. (*Id.* at ¶24)[1] Recognizing DeCurtis was in the business of designing and building these systems, the MSA explicitly gave DeCurtis the "unencumbered right" to provide similar services to other clients, including using "know how" and "experience" gained during the Carnival project itself:

> 4.4 <u>Right to Perform Services for Others.</u> Company shall have the unencumbered right to use the general knowledge, know how, experience or the skill … gained while providing Services under this Agreement for the purpose of executing projects for other Company clients, subject to Company maintaining the confidentiality of the Carnival Confidential Information.

---

[1] Although Carnival did not attach the MSA to the SAC, the agreement is central to its claims and the Court can therefore consider its terms on a motion to dismiss. *See SFM Holdings, Ltd. v. Banc of Amer. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

(*Id.* at ¶27; MSA at § 4.4, Ex. A)[2]  DeCurtis and Carnival also agreed to exclude several things from the definition of "Carnival Confidential Information," including information already known to DeCurtis; information already in the public domain, or that subsequently entered the public domain; and information independently developed by DeCurtis. (MSA at § 4.1, Ex. A)

### 2. DeCurtis's Role with Carnival's "Project Trident."

Carnival claims to have invested "hundreds of millions of dollars" and "extensive human capital" into Project Trident. (SAC ¶¶19, 20, ECF 88) Carnival says that DeCurtis personnel working on the project "had access to substantially all Carnival's extant confidential information, trade secrets, and other Carnival Information," which supposedly includes:

> documents describing Carnival's vision, strategy, plans (e.g., strategy presentations), experience platform models, technical design documents, and list of strategic vendors. Those materials included Carnival's proprietary plans for combining a wearable device containing Bluetooth Low Energy and Near Field Communications, mobile applications, and a digital engagement system, all functioning as a unified system on a multi-layer microservices platform technical architecture. The materials Carnival provided to DeCurtis also included development schedules and team plans, early concepts for Carnival's wearable device, and Carnival's experience vision.
>
> * * * *
>
> Carnival's required hardware requirements; enterprise architecture; corporate abstraction layer of strategic services, interface layer designs, data models, database structures, and data interface designs and adapters; API dependencies; non-functional requirements; Carnival's particularized agile development methodology (timing and ordering of development sprints for different components); web service needs; show plans; user interface plans; design work; integration of technical components; testing plans; site surveys; functional plans; and studio shows.

(*Id.* at ¶¶32-34) By the end of 2015, DeCurtis was no longer involved with the project. (*Id.* at ¶34) DeCurtis has since had no access to any of the project's digital deliverables or source code, and the SAC does not allege otherwise.

### 3. Carnival obtains patents and issues correspondence to DeCurtis's clients.

Carnival obtained patents for the technology associated with Project Trident. (*Id.* at ¶43) In this case, Carnival asserts infringement of three of these patents: Nos. 10,045,184 (the "'184 Patent"), 10,049,516 (the "'516 Patent"), and 10,157,514 (the "'514 Patent"). (*Id.* at ¶45) The claims are based on guest engagement systems DeCurtis was or is providing to other cruise lines–specifically, Norwegian Cruise Lines ("NCL") and Virgin Cruise Lines. (*Id.* at ¶¶86-96) In

---

[2] Exhibit A to this motion, the MSA, was filed under seal pursuant to the Court's Order (ECF 21) and, therefore, is not attached to or filed with this motion.

January 2020, Carnival threatened DeCurtis and NCL with patent infringement claims. (*Id.* at ¶92) In February 2020, Carnival threatened Virgin with patent infringement claims (*id.* at ¶93), and demanded access to DeCurtis's records under the guise of the MSA. (*Id.* at ¶97)

**ARGUMENT**

Where, as here, a party cannot state a cause of action after amending (now twice), the Court may dismiss *with prejudice. McDonough v. City of Homestead*, 771 Fed. App'x 952, 956 (11th Cir. 2019) (after "one opportunity to replead comes and goes . . . the district court [may] dismiss with prejudice . . . .")).

I.   **Count I should be dismissed because the allegations in the SAC are contradicted by the plain terms of the MSA and referenced correspondence.**

Carnival alleges that DeCurtis breached the MSA by: (1) making unauthorized disclosures and/or use of Carnival's confidential information, work product and deliverables, and (2) refusing to comply with Carnival's audit demands. (SAC ¶105, ECF 88) Neither theory can survive dismissal. Carnival's failure to distinguish its trade secrets from its "confidential information" in its breach of contract claim is addressed *infra* at section II.A.[3] This section addresses the theory that DeCurtis breached by supposedly refusing Carnival's audit demand.

Carnival alleges that concerns over DeCurtis's alleged "misuse" of "Carnival confidential information, proprietary information, and trade secrets" caused Carnival to send DeCurtis a letter exercising its audit rights under the MSA. (*Id.* at ¶97) Carnival alleges generally that "DeCurtis has refused to permit such an audit." (*Id.* at ¶100) But, Carnival's allegations are belied by the plain language of the MSA and the related correspondence between the parties that Carnival references in the SAC but fails to attach.[4]

The same Carnival lawyer who threatened NCL and Virgin sent a letter demanding sweeping access to DeCurtis's documents under the guise of the audit provision of the MSA,

---

[3] Courts routinely combine the analysis for pleading deficiencies in contract-based "confidential information" claims and trade secret misappropriation claims because both require that the plaintiff describe what was allegedly taken. *See, e.g., Agostinacchio v. Heidelberg Eng'g, Inc.*, 2019 WL 3243408, at *6 (S.D. Fla. Feb. 5, 2019) (dismissing claims for misuse of confidential information and misappropriation of trade secrets because the defendant "cannot divine from these allegations what trade secrets or confidential information he allegedly misappropriated").

[4] On a motion to dismiss, the Court may consider documents outside of the complaint that are indisputably authentic and central to the complaint's allegations. *SFM Holdings, Ltd.*, 600 F.3d at 1337. When there is a conflict between allegations of a complaint and the exhibits thereto, the exhibits govern. *Griffin Indust., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

requesting to inspect documents that would show *if DeCurtis had employed Carnival's information for its own use*. (2/20/20 Ltr., Ex. B) Carnival demanded the audit be "conducted by a computer forensics firm working with Carnival's outside legal counsel at Orrick." (*Id.*) The MSA provides no such right. By its plain language, the MSA requires only that DeCurtis "keep accurate and complete records of all matters relevant to or as required by [the MSA]." (*See* MSA, § 3.4, Ex. A) The MSA permits Carnival to inspect DeCurtis's books and records "at any reasonable time or times upon prior notice." (*Id.*)

Although Carnival was clearly engaged in a fishing expedition, or trying to drum up a claim, DeCurtis offered to allow Carnival to inspect documents relating to the work DeCurtis did under the MSA, including any source code to which DeCurtis had reasonable access,[5] records of expenses and receipts, policies and methods used to protect confidential information, and documents relating to statements of work that Carnival had identified. (3/12/20 Ltr., Ex. C) Carnival rejected this offer. (3/23/20 Email String, Ex. D) Carnival's bald allegation that DeCurtis simply refused to permit an audit under the MSA does not make it so. The documents referenced in the SAC control, requiring dismissal of Count I.

**II.    Counts II and III should be dismissed because Carnival fails to identify any trade secrets with the degree of particularity required by both Florida and federal law.**

The law requires Carnival to plead substantially the same elements for its state and federal trade secret claims. Under the Florida Uniform Trade Secret Act ("FUTSA"), Carnival must allege that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret it possessed was misappropriated." *Viable Resources, Inc. v. Belyea*, 2016 WL 7334285, at *4 (M.D. Fla. Dec. 1, 2016) (citing *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006)). Because the elements are identical under the Defend Trade Secrets Act ("DTSA"), courts analyze DTSA and FUTSA claims together. *M.C. Dean, Inc. v. Cty. Of Miami Bch., Florida*, 199 F. Supp. 3d 1349, 1353-56 (S.D. Fla. 2016).

**A. Carnival fails to plead alleged trade secrets with particularity.**

Carnival claims trade secret protection for the "Project Trident information that Carnival provided to DeCurtis includ[ing] financial, business, scientific, technical, economic, and engineering information." (SAC ¶109, ECF 88) Carnival alleges general categories of

---

[5] DeCurtis offered to provide documents to which it had "reasonable access" because the digital deliverables were placed on Carnival's local servers, not kept by DeCurtis. Nor did DeCurtis have access to the source code. (*See* 3/23/20 Email String, Ex. D)

information, some of which might, under certain conditions and if identified with particularity, qualify for trade secret protection, such as "prototypes; software; source code; architecture documents; technical specifications (e.g., data interface designs); databases; enterprise-ready web services; presentations; and documentation with respect to operations procedures, creative strategy, experience content, application support, deployment plans, and testing." (*Id.* ¶31; *see also* ¶¶33, 34, 111) But Carnival does not say what is merely "confidential information" and what constitutes a "trade secret," as that term is defined under DTSA or FUTSA. *See* 18 U.S.C. § 1839(3) (defining trade secret under DTSA); Fla. Stat. § 688.002(4) (defining trade secret under FUTSA). It is not enough for Carnival to vaguely allege general categories of information.

Rather, Carnival's "complaint must 'describe the subject matter of the trade secret with sufficient particularity to separate [the trade secret] from matters of general knowledge in the trade.'"[6] *ProV Int'l, Inc. v. Lucca*, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (citation omitted) (conclusory assertion that defendants misappropriated "proprietary practices" and "operating procedures" insufficient); *Am. Registry, LLC v. Hanaw*, 2013 WL 6332971, at *3-4 (M.D. Fla. Dec. 5, 2013) ("broad and generic categories of information" are insufficient to plead existence of a trade secret); *accord Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 1724763, at *3 (N.D. Cal. May 1, 2014) (holding that "Defendant cannot reasonably prepare its defenses and search for art in the field if the boundaries of the trade secret are so undetermined"); *Lycoming Engines v. Superior Air Parts, Inc.*, 2014 WL 1976757, at *8 (N.D. Tex. May 15, 2014) (holding that allegations referring to "drawings, process, specifications, [and] procurement specification" were insufficiently particular to satisfy trade secret pleading requirements); *Medafor, Inc. v. Starch Med. Inc.*, 2009 WL 2163580, at *1–2 (D. Minn. July 16, 2009) (holding that "business methodologies, formulas, devices, and compilations of information, including suppliers and customers" were insufficiently particular to satisfy trade secret pleading requirements).

This is especially important here, where Carnival:

- acknowledges that DeCurtis "designs, develops, engineers, manufactures, markets, and sells systems and methods for providing guests' engagement with cruise ship facilities through the use of wireless sensing technologies" (SAC ¶8);
- agreed in the MSA that "information that was already known to [DeCurtis] . . . prior to disclosure of it to [DeCurtis] by Carnival" "shall not be considered [Carnival]

---

[6] Florida law requires a trade secret plaintiff to disclose its trade secret prior to seeking discovery. *See Revello Med. Mgmt., Inc. v. Med-Data Infotech, Inc.*, 50 So. 3d 678, 679-80 (Fla. 2d DCA 2010) (describing obligation to disclose trade secrets with "reasonable particularity").

Confidential Information (MSA at § 4.1, Ex. A); and

- agreed in the MSA that DeCurtis "shall have the unencumbered right to use the general knowledge, know how, experience or the skill . . . gained while providing Services under this Agreement for the purpose of executing projects for other Company clients." (MSA at § 4.4, Ex. A)

Carnival's vague allegations make it impossible to distinguish between its alleged trade secrets and (a) the knowledge DeCurtis brought to Carnival or (b) general knowledge in the field, neither of which can form the basis of Carnival's claims. *See ProV Int'l*, 2019 WL 5578880, at *3; *Jobscience*, 2014 WL 1724763, at *3 (holding that vague descriptions made it "virtually impossible to distinguish the alleged trade secrets from knowledge in the field").

Carnival amended its trade secret claim rather than defend against DeCurtis's initial motions to dismiss, but neither of two substantive amendments is sufficient to avoid dismissal. First, Carnival added paragraph 111 to the trade secret count, but that paragraph merely recasts the same general categories it previously alleged in paragraph 31 of the original complaint.[7] *Compare* (SAC ¶31, ECF 88) *with* (*id.* at ¶111) ("prototypes" with "Project Trident prototypes"); ("software" with "Project Trident software"); ("architecture documents" with "Project Trident hardware and software architecture"; ("technical specifications (data interface designs)" with "Project Trident technical specifications and data interface designs").[8] What particular "Project Trident prototype" is Carnival talking about? What architecture documents? What technical specifications? Carnival will not say; it leaves the Court and DeCurtis to guess.

The answers to these questions are essential and a plaintiff with a colorable trade secret claim "ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery." *JobScience, Inc.*, 2014 WL 1724763, at *1 ("Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify what ever [*sic*] happens to be there as having been trade secrets stolen from plaintiff."). Carnival is no different from the plaintiff in *JobScience* (and many other cases) where vague pleadings are used to attempt to gain access to discovery and fill in the blanks with cleverly crafted particulars. Carnival is likely to argue—as it has previously— that a rule forcing it to disclose the particulars would render its trade secrets meaningless, but that is not true. Carnival could have identified the specific "step-by-step plans," interface

---

[7] Paragraph 31 of the SAC is identical to paragraph 31 of the first two complaints.
[8] These are only a sample of the duplicative allegations. A review of the remainder confirms that Carnival added nothing new to its pleading beyond the same broad categories of information.

designs," "testing plans and results" by reference to a file name, creation date, or other identifying marker, or Carnival could have provided the actual trade secrets to DeCurtis in a confidential document and filed it under seal with the Court. Carnival could have pursued a host of avenues to comply with the trade secret disclosure requirements, but it chose not to do so even after DeCurtis pointed out these defects in its first two motions to dismiss. The reality is that Carnival does not have any trade secrets to protect, so it wishes to keep its claims as amorphous as possible. This is now unmistakably clear because we are several months into discovery and Carnival still refuses to provide the particulars of its trade secret claim.[9] Because none exists.

Second, Carnival now claims that DeCurtis misappropriated "negative knowledge about unsuccessful strategies, methods, and technologies that did not work or are not likely to work in light of Carnival's experience on Project Trident." (SAC ¶112) Even if "negative knowledge" could qualify for trade secret protection, Carnival expressly agreed that DeCurtis "shall have the unencumbered right to use the *general knowledge, know how, experience or the skill . . . gained while providing Services* under this Agreement for the purpose of executing projects for other Company clients." (MSA at § 4.4, Ex. A) (emphasis added). Any trade secret claim centered on "know how" (positive or negative) gained while working on Project Trident is barred by the plain language of the MSA. Accordingly, the Court should dismiss Counts II and III.

## B. The issuance of the '184, '514, and '516 patents are an abandonment of secrecy.

Pleading with reasonable particularity becomes even more critical where, as here, the supposed trade secrets collide with the very same technology claimed in the patents asserted. (*See* SAC ¶¶43-85) To the extent that Carnival's trade secrets are coextensive with the inventions publicly disclosed and claimed in the asserted patents, they are entitled to no trade secret protection because "[t]he Supreme Court has established that the patenting of a product negates the possibility that the product is also a trade secret." *Tedder Boat Ramp Sys., Inc. v. Hillsborough County, Fla.*, 54 F. Supp. 2d 1300, 1303 (M.D. Fla. 1999) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)). "After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret." *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004); *see*

---

[9] There have been two discovery hearings related to Carnival's failure to disclose its trade secrets with "reasonable particularity." Most recently, at the October 22 hearing, Carnival acknowledged that it has not provided any source code even though its interrogatory response identifying its trade secrets invoked Rule 33(d) in lieu of providing a substantive response.

*also BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006) ("Publication in a patent destroys the trade secret[.]"); *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975) ("If a trade secret is patented there is no further right to secrecy."); *Vital State Canada, Ltd. v. DreamPak, LLC*, 303 F. Supp. 2d 516, 525 (D.N.J. 2003); *Hickory Specialties, Inc. v. Forest Flavors Intern., Inc.*, 26 F. Supp. 2d 1029, 1033 (M.D. Tenn. 1998).

And that rule makes sense. Trade secrets derive their legal protection from their inherently secret nature. Patents, by contrast, can be protected only through public disclosure. To comply with the enabling requirement in 35 U.S.C. § 112(a), Carnival was required to disclose sufficient information regarding the subject matter of the '184, '516, and '514 patents to enable one skilled in the art to make and use the claimed invention. Although a filed patent application is initially kept in confidence by the United States Patent and Trademark Office, when it issues it is published for the world to see. 35 U.S.C. §§ 122(a), (b)(1).

The same holds true for any "confidential information" under the MSA that does not otherwise qualify for trade secret protection. (*See* MSA, § 4.1, Ex. A) ("The following shall not be considered Confidential Information . . . (iii) information that is in the public domain or hereafter enters the public domain through no fault of [DeCurtis]"). Put simply, "[t]he element of secrecy evaporated with the issuance of the patent." *Keystone Plastics, Inc. v. C&P Plastics, Inc.*, 340 F. Supp. 55, 74 (S.D. Fla. 1972) (applying Florida law).

Finally, the "features, functions, and characteristics of the design and operation" of a computer-based system are self-disclosing and cannot be a trade secret. *See Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1016, 1027-28 (E.D. Cal. 2011). Accordingly, Carnival's allegation that DeCurtis must have misappropriated trade secrets because "the Band" is "incredibly similar" to the OceanMedallion, such as "granting cabin access, permitting ticketless boarding, making payments, pinpointing traveler location for beverage delivery, and facilitating onboard purchasing" fails as a matter of law.

These pleading deficiencies are particularly glaring when considered against Carnival's decision to incorporate each of its general trade secret allegations into *both* the patent and trade secret counts of its SAC, effectively treating its trade secrets and patent claims as one and the same. That cannot be. Stripped of what has been disclosed in its patents, as well as any outward facing functions or features, nothing remains for Carnival to claim as a secret.

**III.    The Court should dismiss Count IV because the '184 patent is directed to ineligible subject matter under 35 U.S.C. § 101.**

Count IV should be dismissed because the '184 patent seeks to claim a mere "abstract idea." The Supreme Court has "long held that [the patent statute] contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). *Alice* sets forth a two-step framework for determining patent eligibility. At step one, the court assesses whether the claims are directed to an abstract idea by determining the "focus of the claimed advance over the prior art." *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325 (Fed. Cir. 2017) (quotation omitted). Where the "character of the claim" is directed, without more, to the broad concept of communicating information wirelessly, it is an abstract idea under *Alice* step one. *Chamberlin Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1347 (Fed. Cir. 2019).

If a claim is directed to an abstract idea, the analysis proceeds to step two, where the court searches for an "inventive concept"—*i.e.*, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217-18. A patentee cannot avoid ineligibility by limiting the idea to "a particular technological environment," *id.* at 222, or by adding "well-understood, routine, conventional" features, *id.* at 225. The mere recitation of generic computer components does not transform an abstract idea into a patent-eligible invention. *Id.* at 223, 225.

Eligibility under § 101 is generally a question of law. *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1342 & n.4 (Fed. Cir. 2018). In appropriate cases, eligibility determinations are amenable to a Rule 12 determination. *E.g.*, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 776-77 (Fed. Cir. 2019) (affirming motion to dismiss); *Interval*, 896 F.3d at 1348 (affirming judgment on the pleadings). This is such a case.

**A.    Step 1: The '184 patent claims are directed to the abstract idea of wirelessly communicating guest information so that it may be logged at a central server.**

All of the asserted claims (claims 1-3, 7-8, and 11-15) of the '184 patent are directed to an abstract idea. Each of the asserted independent claims merely recite generic, high-level computer components for enabling the abstract idea of wirelessly communicating guest information so that it may be logged at a central server. Specifically, the claims recite a "guest engagement system" comprising "a plurality of portable guest devices" that operate wirelessly

within a generic "sensor network." Put simply, the '184 patent teaches the age old practice of logging guest information, but in a new computer-based environment.

All asserted independent claims utilize pre-existing standards for wireless communication protocols. Claims 1 and 7 recite guest devices using "Bluetooth low energy communications" ("BLE"), while claim 11 requires both BLE and "near field communications." Claim 11 recites that when using BLE communications, the portable guest device must be configured to selectively operate according to two distinct modes ("bi-directional" and "beacon" modes). The patent specification, however, admits these wireless communication protocols and technologies were embodied in pre-existing "standards." (*See* SAC, Ex. A, ECF 88, '184 Patent at 6:12-15) ("[A] medallion can be configured to communicate according to both near field communication (NFC) standards and Bluetooth low energy (BLE) standards . . . ."), 15:30-35 ("[A] first transceiver operates according to the BLE standard . . . while a second transceiver operates according to the NFC standard (*e.g.*, a radio-frequency identification (RFID) standard).")

The claims further specify that a generic "sensor network" be connected via a "communication network" and "communicatively coupled" to a "central server." But, the only requirement of the "central server" is that it maintain a generic "log" for storing information received from guest devices. There is nothing unique about the computer equipment necessary to implement this claimed network. The patent admits that "any of the servers described herein," may be implemented with high-level functional block diagrams. (*Id.* at 38:55-67) The patent concedes that this architecture was "conventional." (*Id.* at 39:9-12 ("The hardware elements, operating systems and programming languages of such servers are conventional . . . ."))

The remaining independent claim limitations fail to add any substance to the abstract idea of wirelessly communicating and logging guest information. Claims 1 and 7 simply add that the sensor network include generalized "interface devices" for "personalized services" (claim 7), and "access panels" with basic computer equipment to interface with an "electronically controlled door lock" (claims 1 and 7). Neither the specification nor the claims describe any specific new or improved "interface device," "access panel," or "electronically controlled door lock." The claims merely recite these broad, generalized elements with no technical detail.

Nor do the asserted dependent claims add anything of substance.  Claim 2 merely requires a "reservation server," with a "list of unique identifiers," that is used by a generic "access panel" in determining whether to grant access. Claim 3 requires that an access panel

report signals received to the central server, which is part and parcel of the abstract idea. Claim 8 recites a generic laundry list of well-known devices that may satisfy the "interface device" limitation of claim 7. Claim 15 simply restates the insufficient "beacon" limitations discussed above. While claims 12, 13, and 14 require that sensors engage in "two-way," "bi-directional," and/or "secure encrypted communications," no further specificity is provided. In sum, the asserted claims are vague, high-level, lacking in technical specificity, and therefore firmly directed to the concept of wirelessly communicating information in the abstract.

### a. Allegations in the SAC cannot render the claims less abstract.

Carnival's SAC attempts to bolster the eligibility of the '184 patent with 33 paragraphs of allegations spanning 17 pages. (SAC ¶¶ 51-84) According to these allegations, the '184 patent "enabled various technical improvements," including "(1) a new and superior user interface, (2) relocation of demanding computer-intensive resources, (3) an improved beacon-centric model of communication to the environment, (4) improved battery life and power consumption, (5) enhanced security through novel door lock mechanism designs, and (6) an improved location determination system particularly suited for environments such as a cruise ship." (SAC ¶ 51) But, these self-serving allegations cannot backfill the deficiencies in the actual claims. Each of these six purported "improvements," as well as the allegations that follow, are either (i) not required by the claims, and thus irrelevant; and/or (ii) contradicted by the intrinsic evidence.

### i. The purported improvements are not required by the claims.

Carnival's alleged technical improvements are not reflected in specific claim limitations and thus cannot render the patent non-abstract. *See, e.g., ChargePoint*, 920 F.3d at 769 ("The § 101 inquiry must focus on the language of the Asserted Claims themselves . . . ."). For example, the '184 claims do not mention a "superior user interface," nor do they mention relocating any "computer-intensive" resources. There are no claim limitations that *require* an "improved beacon-centric model" or "improved battery life"—the claims are broad enough to capture conventional beacon-emitting devices that make no improvement to battery life. While claims 13 and 14 make passing reference to "secure encrypted communication," the claims fail to specify any detail regarding the means of "encryption" and say nothing about "enhancing security" in the context of a "novel door lock mechanism." Finally, although Carnival alleges location determination "particularly suited for environments such as a cruise ship" (SAC ¶ 51),

the claims are not limited to a "cruise ship" at all.[10] (*See* '184 patent at 1:56-61, 5:28-49)

Carnival extols the alleged benefits of the patent's multi-mode devices. (SAC ¶¶72-76) But, while the patent specification may describe certain power-saving features (*see* '184 patent at 16:23-58), the claims themselves lack these technical requirements. Instead, the claims merely require a "first" bi-directional communication mode and a "second" beacon communication mode (claim 11), without any further technical detail or limitation. Indeed, as written, the claims are broad enough to cover "first" and "second" modes that do not realize any technical benefit. *See ChargePoint*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea.").

Carnival's allegations regarding a reduction in the complexity, energy usage, and costs of network infrastructure fare little better. (SAC ¶¶67, 68, 54, 78) In support, Carnival cites from the specification's disclosure of "peripheral devices" ('184 Patent at 8:3-8). (SAC ¶67) But, these allegations are irrelevant, because the "peripheral device" limitation only appears in *unasserted* claims. Besides, while Carnival alleges that reducing complexity may have been a *goal* of the system, the claims require no specific components or functions that would facilitate *any* of the processing, power consumption, configuration, or space saving benefits that Carnival touts.

Finally, no weight should be given to Carnival's allegations regarding statements made by DeCurtis about its own DXP System (SAC ¶¶60-62, 71), alleged industry praise for its own custom-built OCEAN platform (SAC ¶¶63, 77), or the implementation of systems by Carnival's competitors (SAC ¶63). The eligibility of the '184 patent claims must be assessed based on the specificity of the claim language itself—not by proxy to the features of specific systems that Carnival contends fall within the scope of those claims. *ChargePoint*, 920 F.3d at 769.

### ii. The FAC's "beacon" allegations are contradicted by the '184 prosecution history which is part of the intrinsic record.

Carnival's SAC makes much of the "beacon" requirement of the claimed "portable devices." (SAC ¶56 (alleging that prior efforts "all focused on utilizing BLE beacons as stationary objects"), ¶57 (alleging that invention "flip[s] the entire frame of reference"), ¶58 (discussing portable beacons), ¶60-61 (discussing "inverted model"). However, to the extent

---

[10] Because the claims are not limited to any particular context, Carnival's "wayfinding" allegations (SAC ¶¶ 54, 64-66) are easily disregarded.

Carnival is claiming that it was the first ever to conceive of implementing a beacon in a portable device, that allegation is clearly contradicted by the prosecution history of the '184 patent.[11] During prosecution, the patent examiner rejected the then-existing claims over prior-art patent application 2016/0066123 ("Ko"), finding that Ko disclosed the very same "inverted" model of communication Carnival now tries to pass off as its own. (Ex. E, '184 prosecution history, October 20, 2017 Final rejection at pp. 3-4). In its February 20, 2020 response to the examiner's rejection, Carnival did *not* dispute that the prior art disclosed portable beacon devices using BLE communications, but rather acquiesced to the Examiner's finding by cancelling its broader claims in favor of more narrow, dependent claims. (Ex. F, Feb. 20, 2020 Applicant Remarks at pp. 9-10) The Court should therefore disregard Carnival's allegations that the portable-beacon limitations is somehow a novel improvement conferring patent eligibility.

**b. The specification confirms that the patent is directed to an abstract idea.**

Tellingly, the "background" of the invention section of the patent itself fails to mention any of the supposed network, communication, or infrastructure improvements that Carnival details in the SAC. Rather, as this section describes, the "invention" "relies on recent improvements in low power wireless communication technologies and distributed sensor networks . . . ." ('184 Patent at 1:45-49) At most, the patent describes how to piggy-back off these pre-existing technologies, to "provide novel services to [] guests without requiring guests to proactively identify and/or authenticate themselves." (*Id.* at 1:44-49) Thus, as the patent freely admits, the "invention" does not involve any *technological* improvement to a network, sensor, or method of wireless communication. Rather, the patent simply uses pre-existing technology as a "tool" to streamline business and basic human activity (here, guest service), which is insufficient to establish eligibility. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (abstract ideas embrace "fundamental economic practices long prevalent in our system of commerce" including "longstanding commercial practices" and "methods of organizing human activity"); *Electric Power, Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("[T]he focus of the claims is not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools.") Moreover, "merely adding computer functionality to increase the speed or efficiency of [a]

---

[11] The prosecution history may be considered on a Rule 12 motion considering patent eligibility. *Data Engine Techs LLC v. Google LLC*, 906 F.3d 999, 1008 & n.2 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 Fed. App'x. 1013, 1019 (Fed. Cir. 2019).

process does not confer patent eligibility on an otherwise abstract idea." *Ericsson v. TCL Comm'n Tech. Holdings*, 955 F.3d 1317, 1330-31 (Fed. Cir. 2020) (quotation and citation omitted); *see also Credit Acceptance v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology"). Thus, the claims are ineligible abstract ideas.

> ### c. The most relevant Federal Circuit case law confirms that the '184 patent claims are abstract under *Alice*.

The claims of the '184 patent are similar to those found abstract in *Chamberlin*. There, the Federal Circuit considered claims for wirelessly communicating information about a moveable barrier, for example, a garage door. 935 F.3d at 1345. The court noted that neither the patent specification nor the claims purported to improve upon prior-art moveable barriers, or the general technique of wireless communication. *Id.* at 1347 ("The specification admits that the act of transmitting data wirelessly is 'well understood in the art,' and no other changes to the generically claimed movable barrier operator are recited in the asserted claims or described in the specification."). The patentee tried to argue that the claims were directed to a "novel combination" of a prior-art moveable barrier and wireless communication, but the Court rejected this argument because "merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract." *Id.* at 1348.

Also instructive is the Federal Circuit's decision in *ChargePoint*, which involved claims for wirelessly communicating demand information from charging stations for electric cars over a network to a remote server. 920 F.3d at 766. Reviewing the specification, the Court found that the invention was not directed to an improvement in the charging station itself; rather, "the problem perceived by the patentee was a lack of a communication network for these charging stations, which limited the ability to efficiently operate them from a ***business perspective***." *Id.* at 768 (emphasis added). Again, the mere act of implementing wireless communication for an otherwise prior-art system was insufficient to render the claims non-abstract. *Id.* at 770.

Thus, under *Alice* step one, all of the claims of the '184 patent are directed to the abstract idea of wirelessly communicating guest information so that it may be logged at a central server.

> ### B. Step 2: The '184 patent claims do not contain significantly more than the abstract idea and therefore recite no inventive concept.

Step two of the *Alice* framework requires assessment of "whether the claim limitations ***other*** than the invention's use of the ineligible concept to which it was directed were well-

understood, routine, and conventional." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (emphasis added). "[T]he relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine," but whether the claims recite "significantly more" than the abstract idea itself. *Id.*

The claims of the '184 patent recite no limitations that are "significantly more" than the abstract idea of wirelessly communicating guest information so that it may be logged at a central server. After parsing out the abstract idea itself, the claims merely recite admittedly prior art communication protocols (*i.e.*, BLE and NFC), and basic, unimproved hardware (*e.g.*, "interface devices," "sensors," "access panels," "radios," "transceivers," "electronically controlled door locks," etc.). Neither the specification nor the SAC describes anything inventive about these additional features, either in isolation or in combination. To the contrary, the purported invention of the '184 patent is not an improvement to wireless technology, but instead "relies on recent [*i.e.*, *pre-existing*] improvements in low power wireless communication technologies and distributed sensor networks." (*See* SAC, Ex. A, ECF 27, '184 Patent at 1:44-49). The specification goes on to teach that the invention merely uses "conventional" networking technologies (*id.* at 39:9-12, 38:55-67) and protocols (such as BLE). (*Id.* at 6:12-15,15:30-35)

Carnival provides a laundry list of alleged unconventional "sensor network" features that it claims are "specifically recited in the claims, including in how the claims recite the structure and operation of the portable devices and sensor network." (SAC ¶¶53, 59) However, neither the specification nor the claims purport to identify anything novel about the "sensors," "access panels," "transceivers," "electronically controlled door locks," or "vending terminals." Rather, these limitations are recited as generic components for implementing the abstract idea of wirelessly communicating guest information. *See Alice*, 573 U.S. at 223-224 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself."). Carnival alleges that the "sensors" may transmit signals to allow the portable devices to switch between a beacon and bi-directional mode. (SAC ¶74). But, as discussed above, there is nothing new or novel about beacons or bi-directional communications, and the claims lack the specificity to impart anything inventive to the selective "mode" feature. Finally, Carnival notes how claim 11 requires the portable device to comprise two separate communication "antennas." (SAC ¶¶ 59, 79-80) But, these separate

antennas do no more than implement the communication protocols that the patent (at 6:12-15, 15:30-35), as well as the SAC (at ¶ 56), admit were known in the prior art.

The situation here is similar to that in *ChargePoint*. There, the court rejected the argument that the claims resulted in an improved "demand response," because the patent specification described this demand response approach as already existing for prior-art, albeit un-networked, car charging stations. 920 F.3d at 774. Likewise, here the '184 patent describes the "invention" as merely the implementation of prior human-to-human guest engagement techniques using pre-existing communication systems and networks. ('184 patent at 1:20-52) The court in *ChargePoint* also affirmed the grant of a 12(b)(6) motion—and rejected the patentee's efforts to manufacture a factual dispute—where the complaint failed to allege any solution to a technological problem solved by specific, *non-abstract* features of the claims themselves. 920 F.3d at 774. For all of these reasons, the '184 patent claims also fail at step 2 and are ineligible, and the Court should dismiss the fourth claim for relief in its entirety.

**IV.    Alternatively Carnival fails to plausibly allege direct infringement of the '184 patent and the Court should dismiss at least the direct infringement theory from Count IV.**

At a minimum, the Court should dismiss Count IV insofar as it alleges a direct infringement theory for the '184 patent. Previously, Carnival alleged only that DeCurtis was liable for indirect infringement of the '184 patent. The SAC, however, now alleges that the '184 patent is <u>directly</u> infringed by DeCurtis, as well as its customers. (SAC ¶131) As shown below, Carnival fails to plausibly allege direct infringement, requiring dismissal of this theory.

A direct infringer under 35 U.S.C. § 271(a) must "make," "use," "sell," or "offer for sale" the invention as a whole. Because the claims of the '184 patent are system claims, DeCurtis cannot be liable for merely providing components of the accused system. Rather, "making" an accused system requires the alleged direct infringer to manufacture or combine all of the claim elements. *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) ("Qwest does not "make" the patented invention under § 271(a) as a matter of law.") Similarly, "use" of a claimed system occurs only by the party that "put[]s the claimed invention into service, *i.e.*, control[s] the system and obtain[s] benefit from it." *Id.* at 1286-87; *see also Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017).

Here, the SAC admits that the accused "guest engagement system" is installed on third-party ships outside of DeCurtis' control (e.g., Virgin Voyages). (SAC ¶138) The SAC fails,

however, to make any allegation that DeCurtis actually "makes," "uses," "sells," or "offers for sale" the <u>entire</u> system that exists on these third-party ships. Instead, the SAC's entire direct infringement theory for the '184 patent appears to be premised on the following allegation:

> DeCurtis has contracted with its customers, including Virgin and NCL, to provide and maintain systems that infringe the '184 Patent. DeCurtis has made, used, offered for sale, and sold systems in the United States that infringe the '184 Patent.

(SAC at ¶150) This is primarily legal boilerplate, which is insufficient to plausibly allege a direct infringement theory. At most, Carnival alleges that DeCurtis provides mere <u>components</u> of the accused system. Carnival does not allege that DeCurtis provides the accused system <u>as a whole</u>. Nor does Carnival plausibly allege that DeCurtis assembles the accused system or puts it into service. Carnival's vague reference to DeCurtis' contractual relationships cannot salvage this claim. The SAC is devoid of any facts pertaining to any contractual relationship, much less facts to establish that DeCurtis "makes," "uses," "sells," or "offers for sale," the accused systems as a whole. Accordingly, the '184 patent direct infringement theory fails as a matter of law.

## V.     Carnival fails to plausibly allege infringement of either the '184 patent or the '514 patent under 35 U.S.C. § 271(f).

Counts IV and VI of the SAC also apparently include new theories of infringement of the '184 patent and the '514 patent under 35 U.S.C. § 271(f). For example paragraph 153 alleges:

> DeCurtis also has infringed by supplying or causing to be supplied in or from the United States the components of the '184 Infringing Systems identified in Paragraph 157, which are uncombined in whole or in part, intending and actively inducing the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States.

(SAC ¶153; *id.* ¶185 (same for the '514 patent)) Carnival fails to plausibly allege these theories of infringement, necessitating dismissal from Counts IV and VI. Section 271(f) provides:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be

17

combined outside of the United States in a manner that would infringe the
patent if such combination occurred within the United States, shall be liable as
an infringer.

For § 271(f)(1), the Supreme Court has clarified that software "detached from an activating
medium" is "uncombinable" and is therefore not a "component" that can give rise to liability.
*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007); *see also Cardiac Pacemakers, Inc. v.
St. Jude Med., Inc.*, 576 F.3d 1348, 1361-62 (Fed. Cir. 2009). Additionally, because the statute
requires the supply of "all or a substantial portion of the components of a patented invention,"
liability cannot be established where an alleged infringer supplies only a *single* component of a
multicomponent invention. *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 741 (2017).

For the '184 patent, Carnival vaguely alleges that the components of the accused system
that DeCurtis provides "include hardware and/or software in the sensors described above,
hardware and/or software comprising the central server describe [*sic*] above, and hardware
and/or software comprising the portable guest devices described above." (SAC ¶152) Carnival
does not describe specifically what components DeCurtis provides, or how exactly they are
combined abroad to form an infringing system. To the extent Carnival relies on DeCurtis' mere
supply of software, or a single hardware component, these allegations cannot create liability
under § 271(f)(1) under the Supreme Court's holdings in *Microsoft* and *Life Techs.* Additionally,
Carnival does not even attempt to allege that any of the purportedly supplied components are
"especially made or especially adapted for use in the invention" or that they are "not . . . suitable
for substantial noninfringing use," as is required for a theory under § 271(f)(2). Without further
specificity, Carnival's § 271(f) theory for the '184 patent must fail.

Carnival's § 271(f) theory for the '514 patent is even more deficient.  Asserted claim 11
of the '514 patent is directed to "a portable wireless device." Carnival alleges that this claim is
satisfied, for example, by a device used on Virgin's ships called "the Band."(SAC ¶¶178-182)
Carnival alleges that DeCurtis "creat[ed] 'The Band' and its associated systems" and that "The
Band and its associated systems use technology sourced from DeCurtis." (SAC ¶95)  But, if
DeCurtis provides "the Band" (*i.e.*, the entire "portable wireless device") as the SAC alleges,
then there is no "component" that is provided for combination abroad as § 271(f) requires. Not
only does Carnival not allege the supply of a component for combination, its own allegations
suggest that no such combination is actually made. Accordingly, the § 271(f) theory against the
'514 patent lacks plausibility, and must be dismissed.

**VI.    The Court should dismiss Count V for failure to adequately plead indirect infringement of the '516 patent under §§ 271(b) and (c).**

The fifth claim for relief is limited to allegations that DeCurtis *indirectly* infringes the '516 patent. (SAC ¶¶ 163, 167, 168, ECF 88) But, the SAC fails to plausibly allege either inducement or contributory infringement, and this count must be dismissed.

**A.  Carnival fails to plausibly allege induced infringement.**

Induced infringement requires that the defendant "knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (quotation omitted); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement.").

At the pleading stage, a patentee must meet the "demanding" standard of alleging facts "plausibly showing that the defendant specifically intended [its] customers to infringe the patent[]." *CyWee Grp. Ltd. v. HTC Corp.*, 312 F. Supp. 3d 974, 978 (W.D. Wash. 2018) (quotation, citation, and alteration omitted). Conclusory allegations regarding specific intent will not suffice and warrant dismissal. *Brandywine Comms. Techs., LLC v. T-Mobile USA, Inc.*, 904 F. Supp. 2d 1260, 1269-70 (M.D. Fla. 2012); *Universal City Studios v. Nissim Corp.*, 2015 WL 1124704, at *5-6 (S.D. Fla. March 12, 2015). Although marketing, instructional, and training materials can sometimes demonstrate the requisite specific intent, courts have required that such materials "advocate for 'use in an infringing manner' for the court to reasonably infer specific intent." *CyWee*, 312 F. Supp. 3d at 979; *see also Google LLC v. Princeps Interface Technologies LLC*, 2020 WL 1478352, *4-5 (N.D. Cal. 2020) ("[G]eneral and imprecise references to 'instructional materials and/or services related to the Accused Instrumentalities'" were insufficient to survive a motion to dismiss); *Memory Integrity, LLC v. Intel Corp.*, 144 F. Supp. 3d 1185, 1195 (D. Or. 2015) ("Where defendants have not touted the benefits of the accused products in ways that track the asserted patents, courts generally do not infer specific intent."); *Twentieth Century Fox Home Enter. LLC v. Nissim Corp.*, 2015 WL 3465838, at *2 (S.D. Fla. June 1, 2015) ("Examples of active steps that encourage direct infringement include advertising an infringing use or instructing on how to engage in an infringing use.").

Here, Carnival fails to allege sufficient facts to raise a plausible inference that DeCurtis induced infringement with specific intent. In paragraph 168, Carnival vaguely references

"documentation," including "marketing," "instructional," and "training" material. (SAC ¶168, ECF 88) But, these allegations fail to plausibly show that DeCurtis instructed any customer to take any *specific* steps that would map against the claim limitations and therefore result in infringement. Without more, such vague and imprecise references to unspecified marketing, training, and support materials are insufficient under cases like *CyWee*, *Google*, and *Memory Integrity*. As such, the induced infringement allegations fail and should be dismissed.

### B. Carnival fails to plausibly allege contributory infringement.

The contributory infringement allegations also fail. Contributory infringement occurs where a party provides a component of a patented article that is (1) "a material part of the invention"; (2) known to be "especially made or especially adapted for use in an infringement of [the] patent"; and (3) not "a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). "To state a claim for contributory infringement, [] a plaintiff must, among other things, plead facts that allow an inference that the components sold or offered for sale have **no substantial non-infringing uses**." *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (emphasis added).

Here, Carnival claims that DeCurtis contributes to the direct infringement by Virgin by providing components that result in an infringing article on Virgin's cruise ships. (SAC ¶¶167-168) This requires a close analysis of what DeCurtis is alleged to provide Virgin relative to the '516 patent claims. Exemplary claim 13 of the '516 patent requires an "electronic door lock assembly" comprising: (1) "a latch assembly"; (2) "a door lock communication module"; and (3) "an access panel" capable of wirelessly communicating with a "portable user device" and a "reservation server." But, Carnival does not allege that DeCurtis provides Virgin with any of these components. The *only* allegation in the SAC regarding DeCurtis providing a component with "no substantial non-infringing use" is paragraph 167, which vaguely asserts that DeCurtis supplies "hardware and/or software in the access panel and reservation server." These allegations fail for a lack of specificity regarding the allegedly supplied components. *See Brandywine*, 904 F. Supp. 2d at 1271-72. Carnival's vague allegations regarding some unspecified "hardware and/or software in the access panel and reservation server" are insufficient, requiring dismissal.

### CONCLUSION

DeCurtis respectfully requests that the Court dismiss Carnival's second amended complaint with prejudice, as well as award any other relief that is just and proper.

20

Dated: November 4, 2020

DECURTIS LLC & DECURTIS
CORPORATION

By: _Jason P. Stearns_____
   One of their attorneys

David C. Gustman (pro hac vice)
Jeffery M. Cross (pro hac vice)
Jill C. Anderson (pro hac vice)
Jennifer L. Fitzgerald (pro hac vice)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. (312) 360-6000

Jason Stearns
Florida Bar No. 059550
Freeborn & Peters LLP
201 N. Franklin Street
Suite 3550
Tampa, FL 33602
Tel. (813) 488-2920
E-mail:  jstearns@freeborn.com

*Attorneys for DeCurtis LLC & DeCurtis
Corporation*

Scott L. Watson (pro hac vice)
Justin C. Griffin (pro hac vice)
Patrick T. Schmidt (pro hac vice)
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel. (213) 443-3000

## CERTIFICATE OF SERVICE

   I hereby certify that on November 4, 2020, I filed the foregoing DeCurtis's Motion to Dismiss Second Amended Complaint for Failure to State a Claim ("Motion") via CM/ECF which will serve all attorneys of record.

DECURTIS LLC & DECURTIS
CORPORATION


By: _/s/ Jason P. Stearns_____
   One of their attorneys