**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:20-CV-22945-SCOLA-TORRES**

| | |
|---|---|
| DECURTIS LLC, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| CARNIVAL CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| CARNIVAL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DECURTIS CORPORATION and | ) |
| DECURTIS LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECURTIS'S  RESPONSE  TO  CARNIVAL'S**
**MOTION  TO  DISMISS  FIRST  AMENDED  COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<b>Page(s)</b>

I.     THE COURT HAS DECLARATORY JUDGMENT JURISDICTION OVER ALL CLAIMS ........................................................................................................ 1

    A.    An actual controversy exists regarding the seven Carnival patents ..................... 2

    B.    No reason exists to decline jurisdiction on discretionary grounds ........................ 5

II.    DECURTIS' AMENDED COMPLAINT ADEQUATELY PLEADS INEQUITABLE CONDUCT ................................................................................... 6

    A.    DeCurtis adequately pleads fraudulent omission of material prior art ................. 6

         1.    Fraudulent failure to disclose the Disney Magic/Band system ................. 6

         2.    Fraudulent failure to disclose the Assa Abloy system .............................. 9

    B.    DeCurtis has adequately pleaded Carnival's inventorship fraud ........................ 10

III.    CARNIVAL IS NOT ENTITLED TO DISMISSAL OF ANY CLAIM ON IMMUNITY GROUNDS ............................................................................. 14

IV.    DECURTIS' AMENDED COMPLAINT ADEQUATELY PLEADS ANTITRUST CLAIMS ........................................................................ 17

    A.    DeCurtis pleads monopoly power in the market for Guest Engagement Systems for cruise ships in Count II ................................................ 17

    B.    DeCurtis pleads a dangerous probability of monopolizing the market for cruise travel with Guest Engagement Systems in Count III .............................. 18

    C.    Finally, DeCurtis pleads anticompetitive effect .................................................. 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Co. v. Avery Dennison Corp.*,
673 F.3d 1372 (Fed. Cir. 2012)..............................................................................3, 4

*ABB Inc. v. Cooper Indus., LLC*,
635 F.3d 1345 (Fed. Cir. 2011)....................................................................................3

*Advanced Ion Beam Tech., Inc. v. Varian Semiconductor Equip. Assoc., Inc.*,
721 F. Supp. 2d 62 (D. Mass. 2010) ....................................................................11, 12

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
607 F.3d 817 (Fed. Cir. 2010)...........................................................................10, 11

*Agfa Corp. v. Creo Prods., Inc.*,
451 F.3d 1366 (Fed. Cir. 2006).....................................................................................9

*Applera Corp. v. Mich. Diagnostics, LLC*,
594 F. Supp. 2d 150 (D. Mass. 2009) ...........................................................................4

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
846 F.2d 731 (Fed. Cir. 1988)......................................................................................1

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016).......................................................................................16

*Baskerville v. Sec. of Dept. of Veteran Affairs*,
377 F. Supp. 3d 1331 (M.D. Fla. 2019) .........................................................................2

*Baxter Int'l, Inc. v. CareFusion Corp.*,
Case No. 15-cv-9986, 2017 WL 1049840 (N.D. Ill. Mar. 20, 2017)........................8

*BLM Prods, Ltd. v. Covves, LLC*,
2017 WL 8811269 (C.D Calif. Oct. 26, 2017) ........................................................15

*Blue Hill Invs., Ltd. v. Silva*,
No. 15-cv-20733, 2015 WL 9319394 (S.D. Fla. Dec. 23, 2015).............................5

*Bonutti Skeletal Innovations LLC v. Arthrex, Inc.*,
Case No. 6:13-cv-620, 2014 WL 12617004 (M.D. Fla. Mar. 25, 2014) ..................8

*Capo, Inc. v. Dioptics Med. Prods., Inc.*,
387 F.3d 1352 (Fed. Cir. 2004).....................................................................................5

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
572 F.3d 1271 (11th Cir. 2009) ....................................................................................2

*CertusView Tech. v. S&N Locating Servs., LLC*,
    107 F. Supp. 3d 500 (E.D. Va. 2015) ..............................................................14, 12

*Cliff Foods Stores, Inc. v. Kroger, Inc.*,
    417 F.2d 203 (5th Cir. 1969) ..............................................................19

*Corr Wireless Communs., L.L.C. v. AT&T, Inc.*,
    893 F. Supp. 2d 789 (N.D. Miss. 2012) ..............................................................20

*Cubist Pharm., Inc. v. Hospira, Inc.*,
    75 F. Supp. 3d 641 (D. Del. 2014) ..............................................................13

*Cyber Acoustics, LLC v. Belkin Internat'l, Inc.*,
    998 F. Supp. 2d 1236 (D. Oreg. 2013) ..............................................................13

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
    797 F.3d 1248 (11th Cir. 2015) ..............................................................20

*EMC Corp. v. Norand Corp.*,
    89 F.3d 807 (Fed. Cir. 1996) ..............................................................5

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ..............................................................6, 9

*Fina Oil & Chem. Co. v. Ewen*,
    123 F.3d 1466 (Fed. Cir. 1997) ..............................................................10, 14

*Fort James Corp. v. J.H. McNairn, Ltd.*,
    2005 WL 8154754 (N.D. Ga. Oct. 7, 2005) ..............................................................15, 16

*Front Row Tech., LLC v. NBA Media Ventures, LLC*,
    163 F. Supp. 3d 938 (D.N.M. 2016) ..............................................................12

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
    205 F. Supp. 2d 1335 (S.D. Fla. 2002) ..............................................................18

*Gen–Probe Inc. v. Becton, Dickinson and Co.*,
    2012 WL 5379062 (S.D. Cal., Oct. 30, 2012) ..............................................................10

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
    362 F.3d 1367 (Fed. Cir. 2004) ..............................................................14, 15

*Hewlett-Packard Co. v. Acceleron LLC*,
    587 F.3d 1358 (Fed. Cir. 2009) ..............................................................1, 2, 3, 4

*Hoffmann-LaRoche, Inc. v. Promega Corp.*,
    319 F. Supp. 2d 1011 (N.D. Calif. 2004) ..............................................................9

*iLife Tech. Inc. v. AliphCom*,
  2015 WL 890347 (N.D. Calif. Feb. 19, 2015) ........................................................................8

*In re Wellbutrin SR Antitrust Litig.*,
  749 F. Supp.2d 260 (E.D. Pa. 2010) .................................................................................15

*Innovative Biometric Tech., LLC v. Lenovo (U.S.), Inc.*,
  2010 WL 1144753 (S.D. Fla. Oct. 12, 2010) ........................................................................12

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
  599 F.3d 1377 (Fed. Cir. 2010) ........................................................................................4

*Intel Corp. v. Tela Innovations, Inc.*,
  2019 WL 2476620 (N.D. Calif. June 13, 2019) ...............................................................11, 13

*Ion Audio, LLC v. MUSIC Grp. Servs. US, Inc.*,
  2013 WL 1023016 (S.D. Fla. Mar. 14, 2013) ........................................................................1

*Iris Wireless LLC v. Syniverse Tech.*,
  49 F. Supp. 3d 1022 (M.D. Fla. 2014) ..............................................................................17

*Kenetic Concepts, Inc. v. Convatec Inc.*,
  2010 WL 1427592 (M.D.N.C. Apr. 8, 2010) ..........................................................................8

*Lund Motion Prods., Inc. v. T-Max (Hangzhou) Tech. Co., Ltd.*,
  2018 WL 5086563 (C.D. Calif. June 5, 2018) .......................................................................12

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .................................................................................17, 18, 20

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) .................................................................................................1, 3, 5

*Nilssen v. Osram Sylvania, Inc.*,
  504 F.3d 1223 (Fed. Cir. 2007) ........................................................................................9

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998) ......................................................................................14

*Novelty, Inc. v. Mountain View Marketing, Inc.*,
  2010 WL 1325436 (S.D. Ind. Mar. 30, 2010) ......................................................................15

*NST Global LLC v. Ewer Enter. LLC*,
  2016 WL 7183054 (M.D. Fla. Apr. 7, 2016) .......................................................................2, 4

*Omni Healthcare, Inc. v. Health First, Inc.*,
  2015 WL 275806 (M.D. Fla. Jan. 22, 2015) .....................................................................17, 15

*Patch Prods. v. L.B. Games, Inc.*,
No. 09-cv-00040, 2009 WL 1249981 (W.D. Wis. May 6, 2009) ..............................................4

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
225 F.3d 1315 (Fed. Cir. 2000)........................................................................................10

*Preservation Tech. LLC v. Mindgeek USA Inc.*,
2019 WL 8137707 (C.D. Calif. Nov. 27, 2019) ...................................................................14

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) ........................................................................................19

*Re/Max Internat'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir 1999) .............................................................................................17

*SanDisk Corp. v. STMicroelectronics, Inc.*,
480 F.3d 1372 (Fed. Cir. 2007).....................................................................................1, 3

*Securitypoint Media, LLC v. The Adason Group, LLC*,
2007 WL 2298024 (M.D. Fla. Aug. 7, 2007) .......................................................................16

*Silverhorse Racing, LLC v. Ford Motor Co.*,
2016 WL 7137273 (M.D. Fla. April 27, 2016)....................................................................16

*Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*,
376 F.3d 1065 (11th Cir. 2004) ...................................................................................19, 20

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)........................................................................................................18

*Stinson v. Twin Pines Coal Co., Inc.*,
2014 WL 4472605 (M.D. Ala. Sept. 11, 2014) .....................................................................2

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011)..............................................................................6, 10, 12

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993) ....................................................................................17, 18, 19

*Univ. of Fla. Research Found., Inc. v. Motorola Mobility, LLC*,
2013 WL 12043501 (S.D. Fla. Dec. 11, 2013) ....................................................................12

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ...........................................................................................19

*Wolf v. Cowgirl Tuff Co.*,
2016 WL 4597638 (W.D. Texas Sept. 2, 2016) ...................................................................15

*Wyeth Holdings Corp. v. Sandoz, Inc.*,
  2012 WL 600715 (D. Del. Feb. 3, 2012) ...................................................................6, 7, 12

*YKK Corp. of Am., Inc. v. Silver Line Bldg. Prods. Corp.*,
  Case No. CV 305-155, 2007 WL 9711195 (S.D. Ga. May 14, 2007) .......................................5

*Zvelo, Inc. v. SonicWall, Inc.*,
  2013 WL 5443858 (D. Colo. Sept. 30, 2013) ........................................................................12

**STATUTES**

28 U.S.C. § 2201(a) .........................................................................................................................1

35 U.S.C. § 115 ............................................................................................................................13

35 U.S.C. § 115(a), (b) .................................................................................................................10

35 U.S.C. § 116 ............................................................................................................................13

35 U.S.C. § 256 ............................................................................................................................13

35 U.S.C. § 272 ......................................................................................................................15, 16

35 U.S.C. § 286 ............................................................................................................................13

**OTHER AUTHORITIES**

37 C.F.R. § 1.56(a) .......................................................................................................................10

With its business suffering harm from Carnival's threats of baseless patent infringement litigation, DeCurtis LLC filed its original complaint on April 8, 2020 seeking (1) a declaratory judgment of non-infringement of certain Carnival patents; and (2) to establish that Carnival is using patents improperly procured by fraud to try to prevent its competitors from deploying DeCurtis's product and to monopolize the market.

Carnival responded on April 10 with a second, overlapping lawsuit over the same patents. Carnival seeks dismissal of DeCurtis's declaratory judgment claims on jurisdictional grounds, contending that, until Carnival filed its own action a couple days later, no actual case or controversy existed. Carnival also challenges the sufficiency of DeCurtis's fraud and antitrust allegations. As shown below, none of Carnival's arguments has merit and its motion should be denied in its entirety.

**I.      The Court Has Declaratory Judgment Jurisdiction Over All Claims.**

Under the Declaratory Judgment Act, the Court may "declare the rights and other legal relations of any interested party . . . ." 28 U.S.C. § 2201(a). The Act prevents patentees from seeking "extra-judicial patent enforcement with scare-the-customer-and run tactics that infect the competitive environment of the business community with uncertainty and insecurity." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988). In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court "lowered the bar for determining declaratory judgment jurisdiction." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1361 (Fed. Cir. 2009). Under *MedImmune* a dispute must merely be "definite and concrete" capable of "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *Id.*

Post-*MedImmune*, the Federal Circuit expanded its test for declaratory judgment jurisdiction to all cases "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without a license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007); *Ion Audio, LLC v. MUSIC Grp. Servs. US, Inc.*, 2013 WL 1023016, at *1–2 (S.D. Fla. Mar. 14, 2013) (jurisdiction existed where letter from outside counsel identified patent, warned of "possible" infringement, outlined potential infringement remedies, and confirmed patentee's willingness to protect its rights). A patentee cannot defeat jurisdiction with carefully worded letters and avoidance of "magic words." *Hewlett-Packard*,

587 F.3d at 1362. The law is clear that an express "threat" of infringement litigation is **_not_** required. Rather, jurisdiction exists even where the patentee stops short of threatening litigation or providing detailed infringement theories. *Id.* at 1362; *see also NST Global LLC v. Ewer Enter. LLC*, 2016 WL 7183054, at *2 (M.D. Fla. Apr. 7, 2016) (collecting cases post-*MedImmune*).

Procedurally, an attack on declaratory judgment jurisdiction arises under Rule 12(b)(1), which may be facial or factual. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). Carnival purports to make a facial challenge. Dkt. 94 (Mot.) at 3 n.3. The Court must therefore accept all allegations in the complaint as true. *Carmichael*, 572 F.3d at 1279; *Baskerville v. Sec. of Dept. of Veteran Affairs*, 377 F. Supp. 3d 1331, 1334 (M.D. Fla. 2019). Even under a facial 12(b)(1) challenge, however, the Court may consider an integral, extrinsic document if it is central to the plaintiff's claim and its authenticity is not disputed. *See Stinson v. Twin Pines Coal Co., Inc.*, 2014 WL 4472605, at *3 n.3 (M.D. Ala. Sept. 11, 2014).

A. **An actual controversy exists regarding the seven Carnival patents.**

Carnival argues that "The Complaint does not allege [] that Carnival in fact accused DeCurtis or anyone else of infringing any of [Carnival's] patents or stated an intent to litigate any patent against anyone." (Mot. at 4) That is false. DeCurtis' Amended Complaint (Dkt. 87, hereafter "FAC") alleges that "Carnival has begun issuing threats of litigation and claiming that the DXP System and services infringe on Carnival's patents," which has damaged DeCurtis' business. (FAC ¶149) That allegation standing alone is sufficient to defeat this facial challenge.

Additional detail in the complaint and the parties' correspondence further confirms that jurisdiction exists. For example, Carnival's outside patent litigation counsel sent a January 29, 2020 letter to David DeCurtis claiming that public descriptions of the DXP System developed for Norwegian Cruise Lines ("NCL") "closely track" Carnival's technology. (FAC ¶113; *see also* Ex. 1 at 1)[1] The letter identified, by patent number, all seven Carnival patents challenged in this lawsuit and put DeCurtis on notice of "Carnival's intent to vigorously enforce its intellectual property rights . . . ." (FAC ¶¶113; Ex. 1 at 2)

Carnival's outside law firm then followed up with a second letter to Mr. DeCurtis, dated February 20. (FAC ¶114) Critically, that letter **admits** that the previous correspondence "**_identified specific Carnival patents that apply to the technology in question_**." (Ex. 2 at 1,

---

[1] Attached to this opposition are each of the relevant letters sent from Carnival to DeCurtis and DeCurtis LLC. As discussed above, the Court may consider these integral documents in the context of this facial Rule 12(b)(1) challenge. *See Stinson*, 2014 WL 4472605, at *3 n.3.

emphasis added) Carnival again accused DeCurtis of providing technology to NCL that "closely resembles Carnival's patented [] technology." (Ex. 2 at 1; *see also* FAC ¶114) The letter reiterated that Carnival would "vigorously enforce" its rights, and asked for information about DeCurtis's counsel so Carnival could "pursue this matter further." (Ex. 2 at 1) The February 20 letter further claimed that an announcement by Virgin Voyages "heightened the reasons for Carnival's concern." (FAC ¶114; Ex. 2 at 1) According to Carnival, the technology DeCurtis planned to provide Virgin appeared "incredibly similar" and "tracks very closely" to Carnival's own technology. (Ex. 2 at 1, 2) Carnival expressed "serious concerns that DeCurtis has failed to . . . respect Carnival's intellectual property rights." (*Id.* at 2) The letter threatened "severe" consequences for willful patent infringement, and reserved Carnival's "rights" to seek preliminary and permanent injunctive relief. (FAC ¶114; Ex. 2)

These letters alone establish jurisdiction. The decision in *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372 (Fed. Cir. 2012), is instructive. There, the patentee stated on a phone call that a product line "may infringe" certain patents. *Id.* at 1375. The patentee confirmed that it had analyzed the infringement issues, but failed to provide claim charts. *Id.* Nevertheless, the Federal Circuit found that these allegations were sufficient. *Id.* at 1378-79. The Court rejected the patentee's argument that its oral communications were "informal, equivocal, and did not include any threat of litigation." *Id.* at 1378. The totality of the circumstances "effectively charged 3M with infringement," creating a justiciable controversy. *Id.* at 1379. So too here, where Carnival's letters go even further by, for example, expressing an intent to "vigorously enforce" specific patents and threatening specific consequences.

While the letters to DeCurtis are sufficient, Carnival's actions did not end there. Carnival also engaged in a series of written and oral communications with DeCurtis' customers NCL and Virgin. (FAC ¶¶103-112) For example, Carnival's CEO personally made a phone call to NCL's CEO to discuss the DeCurtis technology and its "supposed infringement of Carnival's patents." (*Id.* ¶¶109-110) Shortly thereafter, NCL put any further work by DeCurtis on hold and refused to pay DeCurtis amounts owed under its contract. (*Id.* ¶111) Similarly, Carnival's communications with Virgin forced DeCurtis to indemnify Virgin. (*Id.* ¶¶112, 149) These third-party communications, which have caused actual, concrete damage to DeCurtis and its business, also establish jurisdiction. *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1349 (Fed. Cir. 2011).

Most of Carnival's cited cases (*i.e.*, *MedImmune*, *Hewlett-Packard*, and *SanDisk*) found

that declaratory judgment jurisdiction did, in fact, exist. The remaining cases are distinguishable. For example, in *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377 (Fed. Cir. 2010), the only pre-suit communications were initiated by the plaintiff in what the district court interpreted to be an effort to manufacture jurisdiction, and the patentee had never seen or analyzed the product planned to be released by the plaintiff. *Id.* at 1380-81. In *Applera Corp. v. Mich. Diagnostics, LLC*, 594 F. Supp. 2d 150 (D. Mass. 2009), after a patent holder sued on seven patents, the district court dismissed the defendant's counterclaims for non-infringement of fifty-five additional patents because even the defendant's own correspondence acknowledged a lack of any actual dispute. *Id.* at 160. Finally, the Court's holding in *Patch Prods. v. L.B. Games, Inc.*, No. 09-cv-00040, 2009 WL 1249981 (W.D. Wis. May 6, 2009), was based on the observation that the notice failed to identify a specific accused product or a specific proprietary right. *Id.* at *6. Here, by contrast Carnival identified the specific seven patents at issue here, and identified DeCurtis' DXP System as implemented for Virgin and NCL.

Carnival attempts to explain away its threating statements, arguing that its letters used "conditional terms" for the purposes of "seeking information." (Mot. at 5; *see also id.* at 4) But, this is a vast understatement of the correspondence. By Carnival's *own* previous characterization, its January 29 letter, for example, "identified specific Carnival patents that apply to the technology in question," which Carnival intended to "vigorously enforce." (Ex. 2 at 1) Even had Carnival used less threatening language, jurisdiction cannot be avoided by using carefully phrased "conditional" or "information seeking" language. *Hewlett-Packard*, 587 F.3d at 1362; *3M Co.*, 673 F.3d at 1376; *NST Global LLC*, 2016 WL 7183054, at *2 (stating that "an actual controversy does not require an explicit threat").

Carnival is also wrong to suggest (Mot. at 6) that DeCurtis's challenge of Carnival's "entire portfolio" somehow reflects a lack of jurisdiction. Carnival put all seven of these patents at issue by specifically identifying each of them in its correspondence without drawing any distinction regarding their relative litigation strength and stating expressly that they "apply to the technology in question." (*See* Exs. 1 & 2) Therefore, Carnival made the same aggressive and threatening statements in regards to all of its patents equally. Carnival suggests that DeCurtis and its customers should be left to guess as to which of its threats were genuine and which were bluster, but none of its cited cases support this position. Carnival chose to identify its patents as "applying" to DeCurtis' technology—it, not DeCurtis, put them in issue.

**B.      No reason exists to decline jurisdiction on discretionary grounds.**

The Court should reject Carnival's argument to decline jurisdiction. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *YKK Corp. of Am., Inc. v. Silver Line Bldg. Prods. Corp.*, Case No. CV 305-155, 2007 WL 9711195, at *6 (S.D. Ga. May 14, 2007). As such, there must be "well-founded" reasons for declining declaratory judgment jurisdiction in a patent case, and it is error to leave a declaratory plaintiff "unable to resolve its accused liability for patent infringement." *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352, 1358 (Fed. Cir. 2004). Carnival identifies no such compelling circumstances here; if anything, the circumstances underscore the need for a broad adjudication of the dispute.

Contrary to Carnival's characterization, DeCurtis did not "race[] to court" to file an "indiscriminate challenge to Carnival's entire patent portfolio." (Mot. at 6-7) DeCurtis filed suit only after Carnival sent letters to DeCurtis, and contacted DeCurtis' customers, specifically identifying, by number, the patents challenged here. In its multiple letters, Carnival characterized DeCurtis' product as "incredibly similar" to its own patented technology, confirmed its intent to "vigorously enforce" its patents, and raised the specter of injunctive relief and damages for willful patent infringement. (Ex. 2 at 1; *see also* FAC ¶114) These baseless allegations have caused lasting damage to DeCurtis' business relationships. (FAC ¶111, 149)

Carnival's citation to *Blue Hill Invs., Ltd. v. Silva*, No. 15-cv-20733, 2015 WL 9319394 (S.D. Fla. Dec. 23, 2015), is inapposite. There, the Court found that the claims "would serve no useful purpose" only after noting that a summary judgment order in a parallel case had settled the issue for which declaratory judgment was sought. *Id.* at *3. Similarly, the Court should also reject Carnival's strained analogy to *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996), a case that long predates the new, more lenient declaratory judgment framework set forth in *MedImmune*. In *EMC*, it was undisputed that the parties were engaged in good-faith licensing discussions, *id.* at 809, whereas here there were no such "ongoing discussions" regarding settlement. Finally, Carnival cites Judge Bryon's order from the Middle District of Florida. (Mot. at 7) But, Judge Bryon's reasoning weighs in favor of jurisdiction, because it acknowledges that Carnival did, in fact, issue concrete threats of patent infringement prior to the lawsuit. *Id.* at 11 ("DeCurtis is in the business of selling its DXP System and guest engagement systems to Carnival's competitors, and ***Carnival contends its patents—derived in part from Plaintiff's consulting services—are being infringed***.") (emphasis added)).

5

For all these reasons, the Court should deny the motion to dismiss the declaratory judgment counts for lack of jurisdiction.

## II.     DeCurtis' Amended Complaint Adequately Pleads Inequitable Conduct.

DeCurtis alleges that Carnival is unfairly wielding patents obtained by fraud. Although fraud on the patent office must be pleaded with specificity, such claims cannot be brushed aside as easily as Carnival suggests. "[H]onesty at the PTO is essential." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). DeCurtis' claims are premised on two distinct theories: (1) Carnival personnel withheld material prior art during prosecution; and (2) Carnival personnel intentionally omitted David DeCurtis as a named inventor.

### A.     DeCurtis adequately pleads fraudulent omission of material prior art.

For a fraudulent omission of prior art theory, a plaintiff adequately pleads fraud by identifying the "specific who, what, when, where and how" of the alleged fraud. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009). The complaint need only include "sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328-29. An individual's intent and knowledge may be alleged generally so long as the factual allegations give rise to a reasonable inference that a specific individual possessed the requisite state of mind. *See id.* at 1327, 1328-29 & n.5; Fed. R. Civ. P. 9(b). To plead intent, a plaintiff "need only allege facts from which the Court could *reasonably infer*" an intent to deceive. *Wyeth Holdings Corp. v. Sandoz, Inc.*, 2012 WL 600715, at *7 (D. Del. Feb. 3, 2012) (emphasis in original). These standards are met here.

DeCurtis has alleged that Carnival fraudulently withheld from the PTO known details of two separate, material prior-art systems: the Disney MagicBand/Be Our Guest ("BOG") system, and the Assa Abloy "Allure" system. (FAC ¶¶74-83 (Disney), ¶¶84-95 (Assa Abloy)). Either theory is sufficient to render the Carnival patents unenforceable. With regards to both theories, Carnival does not challenge, nor could it, that DeCurtis has failed to allege the "*who*" and "*when*." Also, contrary to Carnival's argument, DeCurtis adequately alleges the "*what*," "*where*," "*how/why*," and deceptive intent pertaining to the omission.

### 1.     Fraudulent failure to disclose the Disney Magic/Band system

"***What***" and "***Where***": The Disney BOG system was then in public use and any person

skilled in the art of designing guest engagement systems would understand the technology, systems and methods involved. (FAC ¶¶74-75) The BOG system used the MagicBand as the "guest device having guest identifiers," (*id.* at ¶¶26, 75), and the system made use of wireless communication capability, a network of sensors, a communication network connecting the sensors, a central server, and vending terminals configured to authorize payment. (*Id.* ¶26) Instead of disclosing the *entire* BOG system as prior art, Padgett disclosed only *some* BOG applications. (*Id.* ¶¶66-67, 78, 81-82) These applications, however, did not disclose the system's full functionality. (*Id.* ¶¶78-80) Padgett, who was intimately involved with BOG,[2] *knew* as much—David DeCurtis raised with Padgett that the BOG patent application did not cover the functioning restaurant, but Padgett told DeCurtis not to worry about it. (*Id.* ¶67) The BOG System, of course, is in the possession of third-party Disney and a more specific technical identification of these features will require third-party discovery on the merits.

Carnival argues that a "fundamental defect" with the FAC is that it does not specify "what" information Carnival withheld. (Mot. at 8) Not true. As the FAC explains, among the features implemented BOG, but omitted from the submitted prior art, is a portable guest device emitting a "beacon signal," which is "precisely" what Carnival now claims in amended claim 1 of the '184 patent. (*Id.* ¶80). Not only did the Disney applications disclosed by Carnival fail to demonstrate this feature, Carnival and its agents sought to convince the patent examiner that this was a key, novel feature of the claims in response to a rejection. (*Id.*) Similarly, in this litigation, Carnival touts this "portable-device-as-beacon" feature as a "key innovation[]." (Dkt. 88 at ¶39). As the FAC alleges, however, the portable-beacon feature was known by Carnival to be part of the prior art BOG system, and Carnival misled the patent office by withholding these details.

"***Why/How***": The FAC is also sufficient to show "*why*" the withheld prior art is material and "*how*" the PTO would have used it. For example, DeCurtis alleges (at ¶80) that the examiner rejected claims in Carnival's original application over prior art, and in response Carnival amended the claims "to refer to guests devices that were portable and were to be carried by the users of the guest engagement system. The applicants argued that the prior art did not teach 'the claimed system in which 'sensors each mounted at a different know [sic] location' are 'operative to detect the periodic signals…'" (FAC ¶80) DeCurtis further alleges these amendments,

---

[2]   As alleged, Padgett was the Senior Vice President of Guest Experiences at Disney (FAC ¶19) and was the head of the guest engagement system known as MagicBand. (*Id.* at ¶21)

emphasizing the "portable-device-as-beacon" feature, rendered claim 1 of the '184 patent "precisely the invention embodied in" BOG. (*Id.*) This "portable-device-as-beacon" feature also became part of the remainder of the independent claims of the '184 patent (*id.* ¶¶192-195), and independent claims of the '514 and the '228 patents (*id.* ¶¶210-213; 224-225). This is sufficient for an inference of materiality. *See Bonutti Skeletal Innovations LLC v. Arthrex, Inc.*, Case No. 6:13-cv-620, 2014 WL 12617004, at *2 (M.D. Fla. Mar. 25, 2014) (holding that pleading included sufficient allegations that withheld prior art was material to patentability). Carnival knew that its argument to the PTO was contrary to known prior art and it would not have made the argument except to convince the examiner to allow the patent. *See Kenetic Concepts, Inc. v. Convatec Inc.*, 2010 WL 1427592, *8 (M.D.N.C. Apr. 8, 2010) (applicant failed to disclose references that called into question arguments and statements made regarding patentability of limitation). Whether Carnival made additional arguments to secure the patent is irrelevant.

Carnival faults the FAC for not alleging that the withheld prior art was non-cumulative. (Mot. at 9). But, the FAC alleges that the Disney patent applications that were disclosed failed to disclose pertinent features of the implemented system that map directly to claim limitations of Carnival's patents. (FAC ¶ 66-67, 78, 80-82) The FAC further alleges that Padgett was aware of this fact and chose to keep it hidden. (*Id.* ¶67) The FAC alleges that the patents would not have issued had the examiner been informed of the BOG system. (*Id.* ¶81) That is sufficient. *Baxter Int'l, Inc. v. CareFusion Corp.*, Case No. 15-cv-9986, 2017 WL 1049840, at *7 (N.D. Ill. Mar. 20, 2017) (holding that identification of withheld references that anticipated or rendered obvious patent claims implicitly alleged that those references were not cumulative, and that Rule 9(b) did not "require adherence to blind formalism" of specifically reciting non-cumulativeness).

***Deceptive Intent***: Moreover, the allegations are enough to infer the intent element. Padgett was intimately aware of the design and features of the BOG restaurant. (FAC ¶¶25-26, 67, 77) As an experienced patentee, Padgett knew that the duty of candor obligated him to disclose that prior art. (*Id.* ¶¶47-48, 63) Although these allegations are sufficient, *see iLife Tech. Inc. v. AliphCom*, 2015 WL 890347, at *9 (N.D. Calif. Feb. 19, 2015) (noting that "in some cases, pleadings establishing knowledge of withheld material information can lead to an inference of specific intent to deceive the PTO"), the allegations that Padgett intentionally failed to name David DeCurtis—BOG's designer—as an inventor makes the inference even stronger.[3]

---

[3] DeCurtis is not required at this stage to rule out all competing inferences. (*See supra* at p.6).

Finally, to the extent Carnival argues that the FAC meets the *Exergen* requirements only as to the '184, '514, and '228 patents, the FAC and its attachments are sufficient to support an inference that all seven are unenforceable, at least under the doctrine of infectious unenforceability. *See, e.g., Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006); *Hoffmann-LaRoche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1018-21 (N.D. Calif. 2004). Each patent arises from two provisional applications, all are expressly identified as related, all claim the same inventors (and share the same fraudulent nonjoinder of David DeCurtis), and claim related subject matter. (FAC ¶71) DeCurtis sufficiently alleges a "descendant relationship," *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1228 (Fed. Cir. 2007), and an "immediate and necessary relation[ship]," *Hoffman-La Roche v* 319 F. Supp. 2d at 1017, between the seven related patents. Further, "inequitable conduct 'early in the prosecution may render unenforceable all claims that eventually issue from … related application[s]'" that are continuations of the earlier application ruled unenforceable. *Agfa*, 451 F.3d at 1379.

### 2. Fraudulent failure to disclose the Assa Abloy system

The FAC also alleges an alternative fraudulent failure on the part of Carnival to disclose the known features of the prior-art Assa Abloy Allure system. There is no question that before filing for patents, Carnival and the named inventors knew of the Allure system because they sourced relevant components for use in their own OceanMedallion system (FAC ¶87). Carnival contends that its OceanMedallion system practices its own patents (*e.g.*, Dkt. 88 ¶43), which is an admission that the prior art Allure door panels meet the relevant claim limitations.

A feature that Carnival included in the claims of its patents is an electronic door lock with an "access panel" that is "separate" from, and in wireless communication (*i.e.*, via "radio"), with the door lock. (*E.g.*, FAC Ex. B ('184 patent, claim 1 reciting "access panel" with "radio"); FAC Ex. C ('516 patent, claim 13 reciting "access panel separate from and fixedly mounted proximate to the door lock communication module"); FAC Ex. E ('978 patent, claim 1 reciting "access panel" with "radio" for "wireless communication" with "door lock communication module"). In fact, similar to the beacon-emitting portable device feature described above, Carnival cited this separate access panel feature as a point of novelty in its claims to overcome cited prior art and obtain issuance of its patents. (FAC ¶90) This "separate" access panel feature, however, is a distinguishing characteristic of the omitted Allure system. (FAC ¶¶ 84, 85, 91) Carnival went out

of its way to cite to the examiner other electronic door lock art that did <u>not</u> have a separate access panel (FAC ¶86), but it conspicuously omitted the Allure system.

Carnival argues that DeCurtis "fails to allege facts showing how any limitation of the Carnival patents was 'embodied in' the Allure system." (Mot. at 12) But, DeCurtis alleges that the prior art Allure system involved an "exterior panel" mounted "on the wall next to the door" (FAC ¶85), which maps directly to Carnival's claim amendments reciting an "access panel" that is "separate" from, and in "wireless communication with," a door lock (*id.* ¶91) Carnival also does not dispute that its own OceanMedallion system (which it contends practices the patents) implements the Allure, which is an admission that this prior art system meets the relevant claim limitations. The omission of Allure during prosecution is a clear-cut case of inequitable conduct.

### B.  DeCurtis has adequately pleaded Carnival's inventorship fraud.

DeCurtis' second inequitable conduct theory is even more straightforward. Despite internal documents at Carnival acknowledging David DeCurtis' role as an "inventor" of certain concepts underlying each of the Carnival patents (FAC ¶50), Carnival omitted Mr. DeCurtis from the patents to avoid him identifying his prior work with the named inventors at Disney.  (*Id.* ¶66) The FAC details the specific claim features that Mr. DeCurtis contributed that should have caused Carnival to include him as an inventor on the patent application. (*Id.* ¶¶ 51-60)

An inventor is a person who contributes to the conception of an invention. *See Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). Where an invention has multiple purported inventors, the application *must* disclose each of them, and each must execute an oath. *See* 35 U.S.C. § 115(a), (b). Moreover, all individuals associated with filing a patent application, including all of the inventors, "has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability." 37 C.F.R. § 1.56(a).

Disclosing the correct inventors is "a critical requirement" that is *per se* "material" to the patent application process. *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 830 (Fed. Cir. 2010). There "can be no doubt" that "falsehoods and omissions . . . calculated to obfuscate the threshold issue of inventorship" are "highly material." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000). In fact, courts have held that false statements of inventorship are so egregious that they may be deemed material without applying the "but-for" test of *Therasense. See, e.g., Gen–Probe Inc. v. Becton, Dickinson and*

10

*Co.*, 2012 WL 5379062, at *2 (S.D. Cal., Oct. 30, 2012); *see also Intel Corp. v. Tela Innovations, Inc.*, 2019 WL 2476620, at *7 (N.D. Calif. June 13, 2019) ("The [complaint] properly alleges that if Tela had disclosed [third party's] contributions to the patents in suit, the PTO would have had to reject the patents for incorrect inventorship."). As a consequence, "when named inventors deliberately conceal a true inventor's involvement, the applicants have committed inequitable conduct and the patent is unenforceable even as to an innocent co-inventor." *Advanced Magnetic Closures,* 607 F.3d at 828; *Advanced Ion Beam Tech., Inc. v. Varian Semiconductor Equip. Assoc., Inc.*, 721 F. Supp. 2d 62, 81 (D. Mass. 2010).

That is exactly what the FAC alleges happened here. The FAC alleges specific facts, detailing how David DeCurtis contributed to the conception of specific elements claimed in each of the Carnival patents, including "guest device wearables that could be mounted in a variety of accessory form factors" which is claimed in at least the '271, '642, and '514 patents (FAC ¶¶51, 55); "techniques related to unlocking doors using low power BLE technologies" which is claimed in at least the '514 patent (*Id.* ¶¶55, 57); "techniques for communicatively coupling door access panels via power efficient networks to a centralized reservation and logging system" which is claimed in at least '184 and '228 patents (*Id.* ¶¶58); "techniques for efficiently leveraging BLE communications in both a low-power beacon state, as well as a more power-intensive bi-directional state," which is claimed in at least the '184 and '978 patents (*Id.* ¶59); and "the idea for using capacitive touch door handles that would only trigger the latch upon a user touching the door handle to improve safety" which is claimed in at least the '516 patent (*Id.* ¶60). There is no question that despite these contributions, DeCurtis is omitted as an inventor. (*Id.* ¶¶ 49, 62) Carnival and the named inventors knew of Mr. DeCurtis status as an inventor, but nevertheless failed to name him with intent deceive the PTO. (*Id.* ¶¶ 49-50, 61-70) Carnival had a plausible motive to omit DeCurtis as an inventor to avoid him disclosing the existence of his prior work on material prior art, including the BOG system. (*Id.* ¶¶ 65-68)

The allegations here also support a reasonable inference of deceptive intent.[4]  DeCurtis alleges that Padgett and others were experienced applicants "familiar with the [PTO] filing requirements" (FAC ¶63), including the duty of candor and the absolute requirement to identify all inventors (*id.* ¶¶46-48). Padgett nevertheless failed to disclose DeCurtis's inventorship over the course of multiple applications filed over a period of years. (*Id.* ¶¶64-65) Along with the allegations that DeCurtis contributed to the conception of the inventions, and that Padgett knew this, these allegations support a reasonable inference that Padgett intended to deceive the PTO. *See CertusView Tech.*, 107 F. Supp. 3d at 514-51 (allegations that applicants were aware of PTO inventorship standards and knew of individual's contributions to inventions were sufficient to infer that individual's omission as named inventor was with deceptive intent); *Zvelo, Inc. v. SonicWall, Inc.*, 2013 WL 5443858, at \*10 (D. Colo. Sept. 30, 2013) (reasonable to infer deceptive intent where applicant who misrepresented inventorship "knew or was aware of his duty of candor"); *see also Lund Motion Prods., Inc. v. T-Max (Hangzhou) Tech. Co., Ltd.*, 2018 WL 5086563, at \*3 (C.D. Calif. June 5, 2018) (finding inference of intent to deceive PTO from "pattern of withholding information over the course of several years").

Moreover, Carnival acknowledges that the FAC alleges a motive to omit DeCurtis—namely a desire on the part of Carnival and its agents to avoid Mr. DeCurtis identifying material prior art to the patent office. (Mot. at 13; *see also* FAC ¶66) Carnival disputes the materiality of Mr. DeCurtis' prior work (Mot. at 12-13), but this argument lacks merit for the reasons discussed above. *Supra* at p. 6. In any event, Carnival's attack on the sufficiency of the FAC's prior art fraud allegations do not make the motive to commit inventorship fraud less plausible. After all, the facts might show that the applicants omitted DeCurtis due to their *subjective* concern about what would happen if prior art were disclosed regardless of whether that prior art later becomes the subject of a successful fraud claim.

Carnival contends that there was no intent because Mr. DeCurtis would have no *ownership* rights in the issued patents. (Mot. at 12) But, ownership and inventorship are different

---

[4]   Again, to survive a motion to dismiss, the allegations need only give rise to reasonable inference of deception. *Wyeth Holdings*, 2012 WL 600715, at \*7. At the pleading stage, the "majority position" is that the 'single most reasonable inference' standard adopted in *Therasense* for cases on the merits does *not* apply when evaluating the sufficiency of the pleadings. *Front Row Tech., LLC v. NBA Media Ventures, LLC*, 163 F. Supp. 3d 938, 986-87 (D.N.M. 2016) (surveying cases); *see also Univ. of Fla. Research Found., Inc. v. Motorola Mobility, LLC*, 2013 WL 12043501, at \*3 (S.D. Fla. Dec. 11, 2013) (*Therasense* does not apply to pleadings); *Innovative Biometric Tech., LLC v. Lenovo (U.S.), Inc.*, 2010 WL 1144753, at \*5 (S.D. Fla. Oct. 12, 2010) (same).

concepts. While ownership may be assigned, even prior to patent issuance, *see* 35 U.S.C. § 286, the application must always name the *actual* inventors and provide the required oath from each of them, *see* 35 U.S.C. §§ 115, 116. The mere fact DeCurtis may have allegedly assigned ownership of ideas for potential patenting, does not give Carnival license to misrepresent the source of those ideas.

Next, Carnival argues that the failure to name Mr. DeCurtis was not material to patentability because the patents would have issued anyway. (Mot. at 13) This argument is groundless. As shown above, identifying the correct inventors on a patent application is essential, and thus necessarily "but for" material. The question is not whether the patents would have issued had Mr. DeCurtis been properly named as an inventor. Rather, the proper inquiry is whether the patent applications would have been rejected had the examiner known that DeCurtis was omitted. *Intel*, 2019 WL 2476620, at *7 ("[I]f Tela had disclosed Pileggi's contributions to the patents in suit, the PTO would have had to reject the patents for incorrect inventorship."). The answer, as shown above and pleaded at FAC ¶70, is that the patents would not have issued.

Carnival's argument that incorrect inventorship in an *issued* patent is sometimes viewed as a "technical defect" (Mot. at 13), is of no moment. The inequitable conduct inquiry turns on what was represented to the patent office during prosecution, *not* on whether the issued patent can now be corrected by the Court. There is no question that, even under the AIA, incorrect inventorship remains a basis for an examiner rejecting an application during prosecution.[5] *See* 35 U.S.C. §§ 115, 116; Manual of Patent Examining Procedure ("MPEP") §§ 706.03(a)(IV), 2157.

---

[5]   Carnival also disputes materiality on the grounds that the AIA eliminated an exception to the correction-of-inventorship statute (35 U.S.C. § 256) that previously applied where an error in inventorship was fraudulent in nature. (Mot. at 13) According to Carnival, this suggests that now even ***fraudulent*** errors in inventorship are correctable, and thus no longer a basis for finding an issued patent invalid. But, Carnival cites no authority under the AIA for this counter-intuitive proposition. In fact, the few courts that have considered this issue have all rejected Carnival's position out of hand. *See Intel*, 2019 WL 2476620, at *7 n.5 (noting that although "[§]102(f) was later eliminated with the passage of the [AIA], the requirement [that a patent must accurately list inventors] stands"); *Cubist Pharm., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 673 n.14 (D. Del. 2014) (noting that, post-AIA, "proper inventorship remains a requirement of patentability through [35 U.S.C.] § 101"). The Court need not, however, decide this issue because the question is not whether the issued patents can now be corrected; the issue is whether the applications giving rise to the patents would have been rejected by the examiner during prosecution. *Cyber Acoustics, LLC v. Belkin Internat'l, Inc.*, 998 F. Supp. 2d 1236, 1244 (D. Oreg. 2013) (holding that the ability to correct inventorship under the AIA "do[es] not restrict judicial relief based on inequitable conduct.").

Finally, without citing any authority, Carnival erroneously suggests that an omitted inventor claiming inequitable conduct must plead contributions to specific claim limitations. (Mot. at 13-14) On the contrary, the law requires only that an inventor "contribute in some significant manner to the conception of the invention." *Fina Oil & Chem.*, 123 F.3d at 1473. As discussed above, the FAC details DeCurtis's significant contributions to the conception of at least one claim of each of the challenged patents. Carnival cites no case law holding allegations such as these insufficient. In fact, the law is otherwise. *See, e.g., Preservation Tech. LLC v. Mindgeek USA Inc.*, 2019 WL 8137707, at *5 (C.D. Calif. Nov. 27, 2019) (finding sufficient allegation that alleged co-inventor "was primarily responsible for programming the first version of the cataloguing system"); *CertusView Tech. v. S&N Locating Servs., LLC*, 107 F. Supp. 3d 500, 514 (E.D. Va. 2015) (holding that "allegations that [inventor] contributed to the conception of the eSketch product" were sufficient to infer that "[inventor] contributed to the conception of at least one of the claims of" related patents).

## III.   Carnival Is Not Entitled To Dismissal Of Any Claim On Immunity Grounds.

As shown in the prior section, DeCurtis has successfully alleged fraud. Accordingly, neither *Noerr-Pennington* immunity nor "patent privilege" provide a basis for dismissal of DeCurtis's antitrust and tort claims.

To be sure, the law generally protects patentees from liability in connection with enforcing patent rights. But there are limits. For one, a patentee that enforces a patent obtained through fraud may be exposed to antitrust liability. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). Additionally, a patentee is liable for damages if its suit or threats were "a mere sham to cover what is actually nothing more than an attempt to interfere directly with a competitor." *Id.* The "sham" exception allows for antitrust and tort liability where a party acting in bad faith makes "objectively baseless allegations of infringement." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004).

Both exceptions—fraud on the PTO and sham litigation—apply here. DeCurtis's allegations that Carnival obtained all of the patents by fraud are sufficient by themselves to dispense with *Noerr-Pennington* and the patent privilege. On top of that, DeCurtis also alleges that Carnival's communications to NCL and Virgin were "sham threats of litigation" that were "objectively baseless in that no reasonable litigant making such threats could realistically expect

success on the merits" because, at the time, Carnival "*knew* that the patents referenced in these threats were unenforceable." (*Id.* ¶¶117-19, emphasis added) Moreover, DeCurtis alleges that Carnival's purpose in engaging in this wrongful conduct "was not to seek government redress or otherwise protect legitimate patent rights," but to harm competition and DeCurtis's business. (*Id.* ¶120) These allegations are more than sufficient.[6]

Carnival's primary criticism is the applicability of 35 U.S.C. § 272, which DeCurtis alleges as an additional and independent reason why Carnival's patent claims fail and why its threats and infringement claims are shams. (FAC ¶¶97-102) Carnival argues (at 15-18) that because section 272 does not apply to *all* of the counts in Carnival's second amended complaint (*i.e.*, its trade secret/contract claims and a handful of newly added patent claims), section 272 cannot support a finding of objective baselessness. Carnival is wrong for at least three reasons.

*First*, with respect to the trade secret and contract claims, Carnival ignores that the harm here arose from Carnival's *threats* of sham patent infringement litigation to DeCurtis's customers NCL and Virgin, not from threats of contract or trade secret litigation (in fact, no such threats were made). Accordingly, it is unnecessary to consider the merits of Carnival's subsequently filed trade secret and contract claims to determine whether Carnival's *exclusively patent-related threats* were a sham and caused antitrust damage.[7]

*Second*, Carnival is wrong to suggest that the law clearly allows a party to avoid liability for sham litigation by tacking one meritorious claim to an otherwise objectively baseless suit. *See In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp.2d 260 (E.D. Pa. 2010) (rejecting argument that entire lawsuit must be sham for sham exception to apply and noting that "[d]ismissing plaintiff's claims at this point would ignore the reality that the [sham] '798 claim, in and of itself, was sufficient to cause antitrust damage"); *Novelty, Inc. v. Mountain View Marketing, Inc.*, 2010

---

[6] *See, e.g., BLM Prods, Ltd. v. Covves, LLC*, 2017 WL 8811269, at *6 (C.D Calif. Oct. 26, 2017) (holding that allegations that party knew patent was procured through inequitable conduct supported inference of bad faith and thus met "objectively baseless" standard); *Fort James Corp. v. J.H. McNairn, Ltd.*, 2005 WL 8154754, at *3 (N.D. Ga. Oct. 7, 2005) (refusing to dismiss where infringement suit was allegedly brought "with knowledge" that patents were unenforceable and action was allegedly brought "in bad faith and for the purpose of harassing the defendants and driving them out of business in restraint of trade"); *see also Wolf v. Cowgirl Tuff Co.*, 2016 WL 4597638, at *9 (W.D. Texas Sept. 2, 2016) (refusing to dismiss tort claim on *Noerr-Pennington* grounds where plaintiff's allegations did not "foreclose[]" existence of sham exception).

[7] The contract and trade secret claims as later filed are baseless for other reasons and are the subject of a pending motion to dismiss.

WL 1325436, at *2 n.2 (S.D. Ind. Mar. 30, 2010) (rejecting argument that prevailing on any single claim prevents liability for any sham claims) ("Sham litigation…requires a claim-by-claim analysis."); *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 414 (3d Cir. 2016) (acknowledging that "one might imagine a situation where a single claim, separated from an otherwise arguably meritorious suit, is so harmful and costly to a defendant that it might impose anticompetitive harm on the defendant in a way that triggers the sham litigation exception to *Noerr-Pennington*"). In fact, in Carnival's principal case, *Fort James*, 2005 WL 8154754, the court made the statement Carnival quotes as dicta, but ultimately denied the motion to dismiss.

*Third*, the question of whether one meritorious patent claim can establish an immunity is not even relevant here, because *all* of Carnival's patent claims are objectively baseless. Tellingly, Carnival does even attempt to defend its assertion of the '184 and '516 patents, both of which can only be plausibly infringed through use on a Virgin vessel in international commerce and therefore fall squarely within the defense of Section 272. Carnival's sole argument (at 16) is that infringement of the '514 patent may avoid the exception to liability in Section 272. But, even putting the Section 272 defense aside, DeCurtis' complaint alleges a number of additional non-infringement arguments for the '514 patent *on the merits*. (FAC ¶¶ 214-218) As these arguments establish, no reasonable litigant could have expected to successfully establish infringement of the '514 patent (FAC ¶ 118), rendering Carnival's allegations for this patent objectively baseless for this independent reason.

Finally, Carnival erroneously suggests (at 17) that DeCurtis failed to plead Carnival's bad faith in pursuing its sham threats and sham litigation. Not so—the complaint is replete with allegations showing that Carnival's challenged conduct was in bad faith and with intent to harm both DeCurtis and competition. (*See* FAC ¶¶117-121, 162-64, 170-71, 178-79) And Carnival's assertion that DeCurtis is required at the pleading stage to rule out hypothetical alternative motivations for Carnival's wrongful conduct is baseless. Carnival's cited cases certainly do not hold as much. On the contrary, the ordinary pleading standard applies here.[8] For all of these reasons, Carnival's immunity arguments fail.

---

[8] *See, e.g., Silverhorse Racing, LLC v. Ford Motor Co.*, 2016 WL 7137273, at *4 (M.D. Fla. April 27, 2016) (applying notice-pleading standard and finding sufficient the allegation that defendant's threats to customers were objectively baseless); *Securitypoint Media, LLC v. The Adason Group, LLC*, 2007 WL 2298024, at *5 (M.D. Fla. Aug. 7, 2007) (finding allegations "sufficient under [] notice pleading" to show that suit was "objectively baseless" and filed with "subjective motivation to interfere" with competitor's

**IV.      DeCurtis' Amended Complaint Adequately Pleads Antitrust Claims.**

Contrary to what Carnival assumes, a section 2 antitrust claim "involves fact intensive analysis," and motions to dismiss should be granted "very sparingly." *Iris Wireless LLC v. Syniverse Tech.*, 49 F. Supp. 3d 1022, 1029 (M.D. Fla. 2014); *see also Omni Healthcare, Inc. v. Health First, Inc.*, 2015 WL 275806, at *12 (M.D. Fla. Jan. 22, 2015) (dismissals are "particularly disfavored in fact-intensive antitrust cases") (quotation omitted). None of Carnival's arguments for dismissal has merit.

**A.      DeCurtis pleads monopoly power in the market for Guest Engagement Systems for cruise ships in Count II.**

The Eleventh Circuit has defined monopoly power as "the ability to control prices or exclude competition." *McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (quotations omitted). DeCurtis alleges that Carnival, through its threats of sham litigation based on unenforceable patents (and later by actually bringing sham litigation), has been able to exclude DeCurtis from the market for "Guest Engagement Systems" ("GES") as defined in the amended complaint. Indeed, DeCurtis alleges that Carnival's threats caused NCL, the world's third largest cruise line, to stop doing business with DeCurtis (one of only three providers of GES) despite DeCurtis's extensive development of a platform for NCL's ships. (FAC ¶¶ 103, 105-111). Exclusion of competition—which is alleged here—is *direct* evidence of market power. *See, e.g., Re/Max Internat'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018-19 (6th Cir 1999).

Additionally, DeCurtis alleges *circumstantial* evidence of monopoly power. Because direct proof of monopoly power in the form of the ability to raise prices above competitive levels is rarely available, courts typically examine market structure, which requires defining the relevant market, determining whether a firm has a dominant share, and considering barriers to entry. *See McWane*, 783 F.3d at 830. Carnival ignores the detailed allegations showing that the market has only three competitors and significant barriers to entry. (FAC ¶¶135-39) And while Carnival asserts in a footnote that the market definitions are "gerrymandered," it makes no meaningful argument that DeCurtis does not sufficiently allege their characteristics (*see id.* ¶¶ 122-30, 136-39, 142-44), particularly with respect to substitutability and cross-elasticity of demand. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993).

---

business relationships).

Carnival asserts (at 18) that because DeCurtis alleges that "if" Carnival's anticompetitive acts eliminate DeCurtis as a competitor, Carnival "would have" more than 87 percent of the market, DeCurtis has failed to allege *current* market share. Carnival ignores the allegations that DeCurtis has in fact *already* been effectively eliminated as a competitor by Carnival's threats of sham litigation.[9] (FAC ¶¶ 103-111, 149, 180) Thus, Carnival's argument fails.

### B.  DeCurtis pleads a dangerous probability of monopolizing the market for cruise travel with Guest Engagement Systems in Count III.

Carnival limits its challenge to DeCurtis's attempted monopolization count to the sufficiency of the allegations regarding the market for cruise ship *travel* with Guest Engagement Systems—implicitly conceding that DeCurtis has alleged attempted monopolization of the separate market for Guest Engagement Systems. With regard to the market for cruise ship travel with GES, Carnival argues (at 19) that DeCurtis has supposedly failed to plead the current state of Carnival's market power, instead relying on what Carnival calls a hypothetical.

Carnival misunderstands the basis of a claim for attempted monopoly, which focuses on whether there exists a "dangerous *probability* of monopolization." *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). For such claims, the monopoly power element "is necessarily speculative to some extent because it requires an evaluation of future behavior by market participants, viewed at the time the alleged attempt began." *U.S. Anchor,* 7 F.3d at 994. DeCurtis alleges that Carnival's threats have, in fact, been successful in blocking DeCurtis from working with NCL, giving Carnival a current market share of 84% of cruise ships with or likely to have GES. (FAC ¶¶103-111, 141-146,180)

At the pleadings stage, these allegations are sufficient to establish a dangerous probability of monopoly. The Eleventh Circuit recognizes that market share between 80%-95% is sufficient to establish monopoly power, *see McWane,* 783 F.3d at 830, and that 60%- 65% is sufficient to establish a dangerous probability of monopolization, *see U.S. Anchor,* 7 F.2d at 999.[10] But the court also acknowledges the tension between cases recognizing bright-line market thresholds and those recognizing that courts must be "particularly wary of the numbers game of market

---

[9] To be sure, DeCurtis is still doing business with Virgin, a cruise line with only one ship. But Carnival's conduct has totally blocked DeCurtis from continuing business with NCL, the third largest cruise line with twenty-four ships. (FAC ¶¶ 111, 149, 180)

[10] Carnival's reliance (at 19) on *General Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F. Supp. 2d 1335, (S.D. Fla. 2002), is misplaced. DeCurtis alleges that Carnival has 84% of the market for cruise ships with GES, far more than the 50% threshold discussed in *General Cigar.*

percentage" in determining a dangerous probability of achieving a monopoly. *Id.* at 999 (quoting *Cliff Foods Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969)). Such tension may be reconciled by carefully defining the market and assessing each firm's ability to vary its output. *See id.* at 999-1000. The latter factor, of course, is supply substitutability. Here, DeCurtis pleads significant barriers to entry (including high capital outlays and significant R&D requirements), preventing supply substitutability and bolstering an inference of monopoly power from high market shares. (FAC ¶¶ 138-40)

### C.  Finally, DeCurtis pleads anticompetitive effect.

The amended complaint details at length the anticompetitive conduct at issue here, including Carnival's sham threats of patent infringement litigation based on unenforceable patents. (FAC ¶¶42, 103-121) In challenging whether DeCurtis sufficiently pleads anticompetitive effect, Carnival isolates four paragraphs (¶¶131-34) summarizing the effects of Carnival's anticompetitive conduct and ignores the extensive allegations detailing that conduct itself. In *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016), the Eleventh Circuit held that anticompetitive effect can be established either by an actual detrimental effect on competition or by pleading that "the restraint has the potential for genuine anticompetitive effects and that the [Defendant] had market power in the relevant market." Carnival ignores that the effects summarized in paragraphs 131-34 flow logically from the exclusionary conduct alleged here. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020) (noting that acts that have potential to harm competition "are exclusionary in nature, impairing rivals' opportunity to compete in a way that is inconsistent with competition on the merits") (quotations omitted). Here, Carnival's threats of sham litigation based on unenforceable patents in a market where it has monopoly power has had an adverse effect on competition and, unless enjoined, will continue to do so. (FAC ¶¶103-121)

Contrary to what Carnival argues, the impact alleged here is nothing like that found to be insufficient in *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004). There, the alleged harmful conduct—including pressuring analysts to harm the plaintiff's stock price, inducing the breach of employment contracts, spreading rumors that impacted the ability to raise capital—consisted of acts that adversely affected a competitor, not competition. *See id.* at 1069-70. Here, by contrast, DeCurtis alleges competitive injury in the market for Guest Engagement Systems, including higher prices and

19

lower output. (FAC ¶131) DeCurtis also alleges that customers in the market for cruise line travel with Guest Engagement Systems will be charged higher prices and have fewer choices. (*Id.* ¶¶133-34)

Moreover, the court may infer that Carnival's blocking DeCurtis from doing business with NCL will hinder DeCurtis's ability to invest and receive profitable returns. This impacts competition as a whole, enabling a dominant company to maintain its monopoly power and charge monopoly prices. *See McWane*, 783 F.3d at 838 (defendant's conduct "deprived its rivals…of distribution sufficient to achieve efficient scale, thereby raising costs and slowing or preventing effective entry").[11]

## CONCLUSION

DeCurtis respectfully requests that the Court deny Carnival's motion to dismiss in its entirety. Should the Court grant any part of Carnival's motion, DeCurtis respectfully requests the opportunity to re-plead.

Dated: November 18, 2020

DECURTIS LLC

By: *Jason P. Stearns*
    One of its attorneys

David C. Gustman (pro hac vice)
Jeffery M. Cross (pro hac vice)
Jill C. Anderson (pro hac vice)
Jennifer L. Fitzgerald (pro hac vice)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. (312) 360-6000

Jason Stearns
Florida Bar No. 059550
Freeborn & Peters LLP
201 N. Franklin Street
Suite 3550
Tampa, FL 33602

Scott L. Watson (pro hac vice)
Justin C. Griffin (pro hac vice)
Patrick T. Schmidt (pro hac vice)
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel. (213) 443-3000

---

[11] Carnival's citations are inapposite. For example, in *Corr Wireless Communs., L.L.C. v. AT&T, Inc.,* 893 F. Supp. 2d 789, 806-07 (N.D. Miss. 2012), the complaint alleged only that the defendant might at some point in the future deny roaming access to the plaintiffs, who had yet to even request it. In *Duty Free Ams., Inc. v. Estee Lauder Cos.,* 797 F.3d 1248, 1263 (11th Cir. 2015), the court assumed market power, but held that the defendant's refusal to deal was not anticompetitive in light of the rule that a company is free to decide independently with whom its wants to trade.

Tel. (813) 488-2920
E-mail:  jstearns@freeborn.com

*Attorneys for DeCurtis LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2020, I filed the foregoing DeCurtis's Response to Carnival's Motion To Dismiss First Amended Complaint via CM/ECF which will serve all attorneys of record.

DECURTIS LLC


By: */s/  Jason P. Stearns*
One of its attorneys