**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CIVIL ACTION NO. 20-22945-CIV-SCOLA**

CARNIVAL CORPORATION,

                Plaintiff,

     v.

DECURTIS CORPORATION and
DECURTIS LLC

              Defendants.

DECURTIS LLC,

              Plaintiff,

     v.

CARNIVAL CORPORATION,

              Defendant.

**PLAINTIFF CARNIVAL CORPORATION'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS CARNIVAL'S SECOND AMENDED
COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

     I.     The SAC States a Claim for Relief Based on DeCurtis' Breach of Contract ........ 1

     II.     Carnival's Detailed Trade Secrets Allegations Establish a Plausible Claim ......... 4

     III.     The '184 Patent Claims Eligible Subject Matter Under 35 U.S.C. § 101
            and Alice ........................................................................................................... 8

          A.     Decurtis Does Not Acknowledge Or Apply Controlling Precedent. ......... 8

          B.     Decurtis Does Not Meaningfully Address Any Dependent Claims .......... 8

          C.     *Alice* Step One: The Claims Are Not ....................................................... 9

               1.     The Claims Are Directed To Improvements In
                      Functionality Of A Network Platform And Its Components
                      Which Solve Technical Problems, And Thus Are Not
                      Abstract ...................................................................................... 9

               2.     Decurtis' Arguments Misapply The Law And Ignore The
                      Actual Claim Language And Specification ................................. 11

          D.     Alice Step Two: The '184 Patent's Inventive Concepts ......................... 15

    IV.     The SAC Alleges Sufficient Facts to Allege Plausible Infringement Claims ................ 17

          A.     The SAC States a Claim of Direct Infringement of the '184 Patent.................... 17

          B.     The SAC States Claims of Infringement of the '184 and '516 Patents
               under § 271(f) ................................................................................................. 18

          C.     Induced Infringement ............................................................................. 19

          D.     The Complaint States a Claim for Contributory Infringement ............... 20

     CONCLUSION ....................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
　882 F.3d 1121 (Fed. Cir. 2018)..................................................................8, 15, 16

*Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*,
　819 F. Supp. 2d 1001,1027-28 (E.D. Cal. 2011) .......................................................7

*Agostinacchio v. Heidelberg Eng'g, Inc.*,
　2019 WL 3243408 (S.D. Fla. 2019) ......................................................................2

*Am. Registry, LLC v. Hanaw*,
　2013 U.S. Dist. LEXIS 171889 (M.D. Fla. 2013) ....................................................6

*Ameriwood Indus., Inc. v. Liberman*,
　2006 WL 3825291 (E.D. Mo. 2006), *as amended*, 2007 WL 685623 (E.D.
　Mo. 2007))......................................................................................................3

*Ancora Techs., Inc. v. HTC Am., Inc.*,
　908 F.3d 1343 (Fed. Cir. 2018)...........................................................................14

*Atl. Research Mktg. Sys., Inc. v. Troy*,
　659 F.3d 1345 (Fed. Cir. 2011)............................................................................7

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
　827 F.3d 1341 (Fed. Cir. 2016).............................................................................16

*Berkheimer v. HP Inc.*,
　881 F.3d 1360 (Fed. Cir. 2018).................................................................8, 14, 15

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
　681 F.3d 1323 (Fed. Cir. 2012)......................................................................19, 20

*Biodynamic Techs., Inc. v. Chattanooga Corp.*,
　644 F. Supp. 607 (S.D. Fla. 1986) ........................................................................7

*Brandywine Commc'ns Techs., LLC v. T-Mobile USA, Inc.*,
　904 F. Supp. 2d 1260 (M.D. Fla. 2012)..................................................................20

*CardioNet, LLC v. InfoBionic, Inc.*,
　955 F.3d 1358 (Fed. Cir. 2020)............................................................................13

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
　388 F. Supp. 2d 37 (N.D.N.Y. 2005) ......................................................................2

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019)..................................................................................8, 16, 17

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
  472 U.S. 559 (1985)....................................................................................................3

*Chamberlin Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019)..............................................................................11, 12

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019)............................................................................11, 12, 15

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)..................................................................................14

*Data Engine Techs, LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018)....................................................................................17

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)..............................................................................10, 12

*Default Proof Credit Card Sys., Inc. v. State St. Bank & Tr. Co.*,
  753 F. Supp. 1566 (S.D. Fla. 1990) ..............................................................................7

*Diamond v. Diehr*,
  450 U.S. 175 (1981)....................................................................................................14

*Do It Best Corp. v. Passport Software, Inc.*,
  2005 U.S. Dist. LEXIS 7213 (N.D. Ill. 2005) ............................................................7

*DSMC, Inc. v. Convera Corp.*,
  479 F. Supp. 2d 68 (D.D.C. 2007) ..............................................................................7

*DynCorp Int'l v. AAR Airlift Grp., Inc.*,
  664 F. App'x 844 (11th Cir. 2016) (unpublished)...................................................4, 5

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)..................................................................................14

*Epps v. Watson*,
  492 F.3d 1240 (11th Cir.2007) ....................................................................................3

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018)..................................................................................13

*Garcia v. Goodwill Indus. of S. Fla.*,
  2019 U.S. Dist. LEXIS 198676 (S.D. Fla. Nov. 15, 2019)......................................20

*GlobalOptions Servs. v. N. Am. Training Grp., Inc.*,
   131 F. Supp. 3d 1291 (M.D. Fla. 2015)..................................................5

*Grow Fin. Fed. Credit Union v. GTE Fed. Credit Union*,
   2017 U.S. Dist. LEXIS 129612 (M.D. Fla. 2017) ..................................4

*HVLPO2, LLC v. Oxygen Frog, LLC*,
   2017 WL 3000033 (N.D. Fla. 2017)......................................................8

*Imagine Commc'ns Corp. v. Villegas*,
   2017 U.S. Dist. LEXIS 85295 (S.D. Fla. 2017)......................................2

*Jobscience, Inc. v. CVPartners, Inc.*,
   2014 WL 1724763 (N.D. Cal. 2014) ......................................................6

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019).............................................................9

*Life Techs. Corp. v. Promega Corp.*,
   137 S. Ct. 734 (2017)...........................................................................18

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
   869 F.3d 1372 (Fed. Cir. 2017)......................................................17, 19

*Lighthouse List Co., Ltd. Liab. Co. v. Cross Hatch Ventures Corp.*,
   2013 U.S. Dist. LEXIS 201882 (S.D. Fla. 2013)...................................5

*Lycoming Engines v. Superior Air Parts, Inc.*,
   2014 U.S. Dist. LEXIS 66819 (N.D. Tex. 2014).....................................5

*Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*,
   2019 U.S. Dist. LEXIS 32559 (M.D. Pa. 2019) ....................................4

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016).......................................................11, 15

*Medafor, Inc. v. Starch Med., Inc.*,
   2009 U.S. Dist. LEXIS 61345 (D. Minn. 2009) ....................................6

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   336 F.3d 1373 (Fed. Cir. 2003)...........................................................18

*MyMail, Ltd. v. ooVoo, LLC*,
   934 F.3d 1373 (Fed. Cir. 2019)...........................................................15

*Nalco Co. v. Chem-Mod, LLC*,
   883 F.3d 1337 (Fed. Cir. 2018)...........................................................20

*New Lenox Indus. v. Fenton*,
   510 F. Supp. 2d 893 (M.D. Fla. 2007) ..................................................................2

*Nite Glow Indus. v. Cent. Garden & Pet Co.*,
   2020 U.S. Dist. LEXIS 95582 (D.N.J. 2020) ........................................................2

*NPA Assocs., LLC v. Lakeside Portfolio Mgmt., LLC*,
   2014 U.S. Dist. LEXIS 22805 (S.D. Fla. Feb. 22, 2014) ......................................6

*Olympus Corp. v. Maxell, Ltd.*,
   2018 U.S. Dist. LEXIS 193868 (D. Del. 2018) ...................................................14

*Perdiemco, LLC v. Industrack LLC*,
   2016 U.S. Dist. LEXIS 135667 (E.D. Tex. 2016) .................................................8

*PPS Data, LLC v. Jack Henry & Assocs.*,
   404 F. Supp. 3d 1021 (E.D. Tex. 2019) ...............................................................9

*Prov Int'l Inc. v. Rubens Dalle Lucca*,
   2019 U.S. Dist. LEXIS 187060 (M.D. Fla. 2019) ................................................5

*Ricoh Co. v. Quanta Comput. Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008) ..........................................................................20

*S. Cent. Educ. Risk Mgmt. Program v. Star Ins. Co.*,
   2017 WL 5764168 (S.D. Fla. 2017) ....................................................................20

*Schofield v. United States Steel Corp.*,
   2005 U.S. Dist. LEXIS 30481 (N.D. Ind. 2005) ..................................................3

*Scigrip, Inc. v. Engineered Bonding Sols., LLC*,
   2016 U.S. Dist. LEXIS 196537 (M.D. Fla. 2016) ................................................7

*Sentry Data Sys., Inc. v. CVS Health*,
   361 F. Supp. 3d 1279 (S.D. Fla. 2018) ................................................................5

*Spanakos v. Aronson*,
   No. 17-cv-80965, Dkt. 15 (S.D. Fla. Apr. 2, 2018) ............................................18

*T-Mobile USA, Inc. v. Huawei Device USA, Inc.*,
   115 F. Supp. 3d 1184 (W.D. Wash. 2015) ...........................................................2

*Tessina Holdings Pty, Ltd. v. Trend S.p.A.*,
   2017 WL 7344219 (S.D. Fla. 2017) ....................................................................20

*Textile USA, Inc. v. Diageo N. Am., Inc.*,
   2017 U.S. Dist. LEXIS 120785 (S.D. Fla. 2017) ..................................................5

*Thales Visionix Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017)....................................................................................11, 12, 16

*Thinklite Llc v. Tlg Sols.*,
2017 U.S. Dist. LEXIS 220829 (S.D. Fla. Jan. 30, 2017) ...........................................................5

*In re TLI Commc'ns. LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)...................................................................................................11

*Transocean Offshore Deepwater Drilling, Inc. v. Stena Drilling Ltd.*,
659 F.Supp.2d 790 (S.D. Tex. 2009) .........................................................................................18

*Treco Int'l S.A. v. Kromka*,
706 F. Supp. 2d 1283 (S.D. Fla. 2010) .....................................................................................5, 6

*Trinidad & Tobago Unit Tr. Corp. v. CB Richard Ellis, Inc.*,
280 F.R.D. 676 (S.D. Fla. 2012)..................................................................................................2

*Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*,
320 F. Supp. 3d 1285 (M.D. Fla. 2018) .......................................................................................1

*Twentieth Century Fox Home Entm't LLC v. Nissim Corp.*,
No. 14-cv-81349, Dkt. 98 (S.D. Fla. Oct. 5, 2015)....................................................................18

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020)......................................................................................... *passim*

*Va. Innovation Scis., Inc. v. Amazon.com, Inc.*,
227 F. Supp. 3d 582 (E.D. Va. 2017) ........................................................................................10

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
80 F. Supp. 3d 1152 (D. Or. 2015) ..........................................................................................5, 6

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017)..................................................................................................14

*Wellogix, Inc. v. Accenture, LLP*,
823 F. Supp. 2d 555 (S.D. Tex. 2011) .........................................................................................7

*Westmoreland Adv. Mats., Inc. v. Allied Mineral Prods., Inc.*,
No. 16-cv-00263, Dkt. 42 (W.D. Pa. June 23, 2016)..................................................................18

## Statutes

18 U.S.C. § 1839...........................................................................................................................7

35 U.S.C. § 101.................................................................................................................. *passim*

35 U.S.C. § 271(f)........................................................................................................................18

Cal. Civ. Proc. Code § 2019.210 ......................................................................6

Fla. Stat. § 688 ...............................................................................................7

Fla. Stat. § 688.008 ........................................................................................2

**Other Authorities**

1 Milgrim on Trade Secrets § 1.06, n.11-n.12 (2020) .................................7

## INTRODUCTION

Although the technology is complex, the facts and claims in this case are simple.  Plaintiff Carnival is the creator and owner of a highly innovative guest engagement platform referred to as the O.C.E.A.N. Platform.  Defendant DeCurtis Corporation is a contactor that Carnival hired to assist in developing the O.C.E.A.N. Platform.  Carnival's Second Amended Complaint ("SAC") alleges that DeCurtis breached its confidentiality obligations to Carnival, misappropriated Carnival trade secrets, and infringed three Carnival patents on distinct aspects of the O.C.E.A.N. Platform, including by working with Carnival competitors to develop remarkably similar systems in a fraction of the time required to develop the O.C.E.A.N. Platform.[1]  Carnival filed this lawsuit when DeCurtis refused to permit Carnival to exercise its rights under the parties' Master Services Agreement ("MSA") to audit DeCurtis' books and records and instead filed an anticipatory lawsuit in the wrong forum that seeks to divert attention from the claims before this Court.

DeCurtis' motion can be denied out of hand because it relies on extrinsic evidence to raise a host of (incorrect) factual arguments that cannot be adjudicated on a motion to dismiss, such as the fact-based arguments that DeCurtis did not breach the parties' contract, that Carnival's trade secrets are not really secrets, that Carnival's inventions are not novel, and that DeCurtis' technology does not infringe Carnival's patents.  DeCurtis motion also fails because it ignores controlling Eleventh Circuit, Federal Circuit, and Supreme Court law.

## ARGUMENT

### I.    The SAC States a Claim for Relief Based on DeCurtis' Breach of Contract

SAC Count 1 alleges two types of breaches of the parties' MSA: (1) DeCurtis' misuse and disclosure of Carnival information and work product DeCurtis prepared for Carnival; and (2) DeCurtis' refusal to permit an audit of its Carnival-related books and records.  SAC ¶¶ 26, 30, 105. DeCurtis devotes only one sentence to the first type of breach, arguing that Carnival's claim should be dismissed because it "fail[s] to distinguish its trade secrets from its 'confidential information' in its breach-of-contract claim."  Mot. at 3.  Rule 8 imposes no such requirement, however.  *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1295 (M.D. Fla. 2018)

---

[1] Carnival's First Amended Complaint fix a procedural issue and expressly alleged facts establishing patent eligibility under 35 U.S.C. § 101.  With the Court's permission (D.E. 86), Carnival filed the SAC to allege additional details of DeCurtis' infringement.

(distinguishing trade secrets and contractually protected information not necessary). DeCurtis' alleged bad acts constitute both a breach of contract *and* statutory trade secrets misappropriation (SAC ¶ 105), and Carnival has a right to plead both claims, as is done in the SAC. *See, e.g.*, *New Lenox Indus. v. Fenton*, 510 F. Supp. 2d 893, 909 (M.D. Fla. 2007) (rejecting argument that plaintiff was barred from "bringing a claim for misappropriation of a trade secret because that claim is indistinguishable from the breach of contract claim");[2] Fla. Stat. § 688.008 (FUTSA "does not affect: (a) Contractual remedies … based upon misappropriation of a trade secret").

DeCurtis errs in asking the Court to "combine the analysis" of DeCurtis' contract and trade secrets arguments, citing *Agostinacchio v. Heidelberg Eng'g, Inc*., 2019 WL 3243408, at *6 (S.D. Fla. 2019) to suggest that "contract-based 'confidential information' claims" must be pled with trade-secret-level "particularity." Mot. at 3 n.3. *Agostinacchio* merely applied the basic *Iqbal/Twombly* standard to contract allegations that, unlike Carnival's, were "the definition of '[t]hreadbare recitals of the elements of a cause of action.'" 2019 WL 3243408, at *6. Moreover, unlike the *Agostinacchio* contract claims, which appeared to "rely upon the misappropriation of trade secrets," *id*., Carnival alleges that DeCurtis breached specific provisions of the MSA by disclosing trade secrets *and* non-trade secret information. SAC ¶ 105. DeCurtis' argument "is therefore misplaced, as [Carnival's] breach of contract claims are not limited to the misappropriation of trade secrets." *Imagine Commc'ns Corp. v. Villegas*, 2017 U.S. Dist. LEXIS 85295, at *7 (S.D. Fla. 2017). "The elements of a breach of contract action are: (1) a valid contract, (2) a material breach, and (3) damages. Defendants do not dispute that the [SAC] alleges these requisite elements." *New Lenox Indus*., 510 F. Supp. 2d at 905.

DeCurtis' argument regarding its breach of the MSA's audit provision also fails. DeCurtis asks the Court to consider documents outside the SAC (but not the complete record of communications),[3] disregard well-pled factual allegations, and draw inferences in the moving party's favor. *Contra Trinidad & Tobago Unit Tr. Corp. v. CB Richard Ellis, Inc.*, 280 F.R.D.

---

[2] *Accord T-Mobile USA, Inc. v. Huawei Device USA, Inc*., 115 F. Supp. 3d 1184, 1194 (W.D. Wash. 2015) (plaintiff may claim "the same acts constituted both misappropriation of trade secrets and breach" of contract); *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 70-71 (N.D.N.Y. 2005) (same); *Nite Glow Indus. v. Cent. Garden & Pet Co*., 2020 U.S. Dist. LEXIS 95582, at *10 (D.N.J. 2020) (same).

[3] DeCurtis' fails to apprise the Court that, after Carnival invoked its audit rights, DeCurtis flatly "decline[d] the requested audit." D.E. 27-6. DeCurtis never changed its position, even after Carnival told DeCurtis that it breached the MSA by "refus[ing]" to allow an audit. SAC ¶ 100.

676, 677 (S.D. Fla. 2012); *Epps v. Watson*, 492 F.3d 1240, 1242 (11th Cir.2007)).  Even if the Court were inclined to consider extrinsic evidence, the complete record of the parties' correspondence supports Carnival's claim for breach.  The MSA provides that "Carnival or its duly authorized representative shall have continuing access to *inspect* [DeCurtis'] relevant books and records at any reasonable time or times upon prior notice.'"  MSA at § 3.4, D.E. 21.  The SAC alleges that Carnival properly requested such an audit and that DeCurtis refused to permit it.  SAC ¶¶ 3, 98, 100. Nothing more is needed to state a claim for breach of the MSA at § 3.4.

DeCurtis argues that its offer to make a limited document production complied with the audit provision, Mot. at 4 (citing Exs. C, D.), but the cited document is evidence of *breach*, not compliance.  The MSA's audit provision confers on Carnival a contractual right to "inspect [DeCurtis'] relevant books and records," not to just accept whatever documents DeCurtis might select or have conveniently available to produce.  The two are not the same.  *See, e.g., Schofield v. United States Steel Corp.*, 2005 U.S. Dist. LEXIS 30481, at *6-7 (N.D. Ind. 2005) (granting motion to compel physical inspection, despite losing party's offer to produce documents);[4] *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,* 472 U.S. 559, 567 (1985) (interpreting audit provision in light of "generally accepted auditing standards").  Allowing DeCurtis to self-select information for production, with no way for Carnival to verify if the production were complete, or to obtain crucial information like where and how documents were stored as well as when and by whom they were accessed, would defeat the purpose of the MSA's audit provision.

Finally, DeCurtis' argument that Carnival went beyond the scope of the audit provision is both mistaken and irrelevant. The MSA allows "Carnival *or its authorized representative*" to conduct the audit—its outside counsel and a forensics firm are its authorized representatives.  The audit provision is meant to ensure "compliance by [DeCurtis'] with its obligations" under the MSA, which include the confidentiality obligations prohibiting DeCurtis from employing Carnival Information for its own use, so it was appropriate for Carnival to audit DeCurtis' records relevant to that issue.  MSA at §3.4.  To rule otherwise would require impermissible inferences in DeCurtis' favor.

---

[4] The distinction between inspection and production is particularly important in technology cases like this one.  *See Ameriwood Indus., Inc. v. Liberman,* 2006 WL 3825291, at *4 (E.D. Mo. 2006) (discussing importance of forensic discovery), *as amended*, 2007 WL 685623 (E.D. Mo. 2007).

3

## II.      Carnival's Detailed Trade Secrets Allegations Establish a Plausible Claim

DeCurtis' trade secrets arguments involve factual disputes that cannot be resolved on a Rule 12 motion.  That's why DeCurtis' motion "reads like a summary judgment motion and largely focuses on whether the information at issue constituted a trade secret, which is typically a question of fact."  *Grow Fin. Fed. Credit Union v. GTE Fed. Credit Union*, 2017 U.S. Dist. LEXIS 129612, at \*9 (M.D. Fla. 2017).  The only proper Rule 12(b) argument DeCurtis raises is whether Carnival has sufficiently pled particular facts to support a plausible trade secrets claim.  That argument fails because, at this "[s]tage [of the case], there are numerous allegations about the secret nature of the information and the steps [Carnival] took to protect the information."  *Id.*

**Particularity.**  Even assuming that there is a "reasonable particularity" requirement for pleading trade secret claims, "to satisfy this requirement at the dismissal stage in federal court, the plaintiff need only allege sufficient facts **[1]** to plausibly show a trade secret was involved and **[2]** to give the defendant notice of the material it claims constituted a trade secret."  *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (unpublished) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555-56 (2007)).[5]  The SAC does both.  *First,* the SAC "allege[s] sufficient facts to plausibly show a trade secret was involved" in DeCurtis' misconduct.  *Id.*  The SAC explains that Carnival was the first to design a wearables-based system to deliver personalized leisure travel experiences, as part of a Carnival development project with the internal code name "Project Trident."  SAC ¶ 17.  Carnival invested hundreds of millions of dollars in Project Trident, which was headquartered at a dedicated, highly-secure research and development facility(the "XIC").  SAC ¶¶ 18-20.  Carnival hired DeCurtis to perform rapid prototyping for Carnival at the XIC, giving DeCurtis access to "substantially all of Carnival's extant confidential information," including strategy presentations, models, technical design documents, strategic vendor lists, development plans, and early concepts for Carnival's wearable device.  SAC ¶¶ 32-34.  Carnival's work with DeCurtis yielded closely guarded Project Trident work product that DeCurtis *concedes* can "qualify for trade secret protection" under "certain conditions,"[6] such as, for example, system prototypes, source code, and data interface designs.  Mot. at 5.

---

[5] *But see Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*, 2019 U.S. Dist. LEXIS 32559, at \*25-27 (M.D. Pa. 2019) (collecting cases rejecting particularity standard).

[6] The SAC specifically alleges the existence of conditions prerequisite to trade secret protection, which DeCurtis does not dispute.  SAC ¶¶ 17, 19, 22, 31, 90, 99, 110.

4

*Second*, the SAC gives DeCurtis more than fair "notice of the material [Carnival] claims constituted a trade secret." *DynCorp*, 664 F. App'x at 848.  The SAC does not "vaguely allege" mere "general categories of information" (Mot. at 5), the SAC *specifically alleges* trade secrets comprising *particular information* contained in *specific Project Trident materials* given to or created by DeCurtis under the auspices of the MSA.  SAC ¶¶ 31-35, 111; *compare GlobalOptions Servs. v. N. Am. Training Grp., Inc*., 131 F. Supp. 3d 1291, 1298-99, 1300-01 (M.D. Fla. 2015) (description of trade secrets as work product created under parties' services agreement "identified the form and nature of [materials] sufficient[ly] to satisfy the Rule 8"); *Vesta Corp. v. Amdocs Mgmt. Ltd.,* 80 F. Supp. 3d 1152, 1164-65 (D. Or. 2015) (allegations describing "categories of trade secrets … and the places where those secrets are found" sufficient to satisfy Rule 8).  Carnival's allegations thus provide the requisite "reasonable particularity"—Carnival need not spell out, in a public filing, the "exact information" misappropriated.  *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010) ("technical information … obtained through … discussions with [R&D] and engineering personnel" satisfied reasonable particularity standard).[7]

Unlike the complaints in cases relied on by DeCurtis, the SAC contains more than merely "a formulaic recitation of the elements." *Lycoming Engines v. Superior Air Parts, Inc*., 2014 U.S. Dist. LEXIS 66819, at *24 (N.D. Tex. 2014).  Rather, the SAC "describe[s] the subject matter of the trade secret with sufficient particularity to separate [Carnival's trade secrets] from matters of general knowledge in the trade." *Prov Int'l Inc. v. Rubens Dalle Lucca*, 2019 U.S. Dist. LEXIS 187060, at *8 (M.D. Fla. 2019).  For example, the SAC alleges Carnival disclosed to DeCurtis the specific "corporate abstraction layer of strategic services" needed to implement a first-of-its-kind engagement system that others in the industry viewed with skepticism.  SAC ¶¶ 34, 21.  Others with "general knowledge in the trade" did not believe Carnival's system was possible, *contra Prov Int'l,* 2019 U.S. Dist. LEXIS 187060, at *8, and the SAC alleges that Carnival disclosed to DeCurtis documents akin to "step-by-step plans" for "how [Carnival] would design and implement [Carnival's] solution[s]," which are the type of detailed plans entitled to trade secrets protection,

---

[7] *Accord e.g.*, *Lighthouse List Co., Ltd. Liab. Co. v. Cross Hatch Ventures Corp*., 2013 U.S. Dist. LEXIS 201882, at *20 (S.D. Fla. 2013) ("business and corporate strategies, business plans, product strategies, product cost and pricing information"); *Textile USA, Inc. v. Diageo N. Am., Inc.*, 2017 U.S. Dist. LEXIS 120785, at *15 (S.D. Fla. 2017) (similar level of detail); *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294 (S.D. Fla. 2018) (same); *Thinklite Llc v. Tlg Sols*., 2017 U.S. Dist. LEXIS 220829, at *10 (S.D. Fla. Jan. 30, 2017)(same).

*Vesta*, 80 F. Supp. 3d at 1165; *e.g.*, SAC ¶¶ 31-35.  The SAC cannot be fairly compared to cases like *Medafor, Inc. v. Starch Med., Inc.*, 2009 U.S. Dist. LEXIS 61345, at *4 (D. Minn. 2009) or *Am. Registry, LLC v. Hanaw,* 2013 U.S. Dist. LEXIS 171889, at *6 (M.D. Fla. 2013), both of which involved bare allegations the defendants once had access to unspecified confidential information and subsequently became competitors.  In both cases, the trade secret descriptions were so generic and broad "as to be meaningless." *Medafor,* 2009 U.S. Dist. LEXIS 61345, at *3-4; *Am. Registry,* 2013 U.S. Dist. LEXIS 171889, at *9.  Unlike the unspecified, unbounded "software," "records," and "compilations of information," alleged to be trade secrets in *Am. Registry* and *Medafor*, the SAC identifies specific attributes of specific software (e.g., "data interface designs and adapters") and specific records.  SAC ¶¶ 34, 111, 122.

DeCurtis' arguments that some of the alleged Project Trident materials might constitute "merely 'confidential information,'" "knowledge DeCurtis brought to Carnival," "general knowledge in the field," or "know how" within the meaning of the MSA (Mot. at 5-6) rest on disputed facts that must be "resolved by a fact finder after full presentation of evidence from each side." *E.g., Treco*, 706 F. Supp. 2d at 1286-87.  DeCurtis' heavy reliance on *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 1724763, at *3 (N.D. Cal. 2014) highlights the prematurity of DeCurtis' arguments.  *Jobscience* concerned the sufficiency of a plaintiff's required "detailed statement of trade secrets" under Cal. Civ. Proc. Code § 2019.210 *after* the party received access to source code discovery.  2014 WL 1724763, at *2.  *Jobscience* does not suggest that Rule 8 requires 2019.210-level detail; such a requirement would "render the entire concept of trade secrets meaningless." *See NPA Assocs., LLC v. Lakeside Portfolio Mgmt., LLC*, 2014 U.S. Dist. LEXIS 22805, at *9 (S.D. Fla. Feb. 22, 2014).  Moreover, DeCurtis' feigned ignorance about what prototypes, architecture documents, and technical specifications are at issue (Mot. at 6) is resolved by a simple reading of the SAC, which describes the asserted trade secrets both in terms of the nature of the materials as well as the time period in which they were created.

**Patent Preemption.**  DeCurtis does not even attempt to explain how any Carnival patent discloses any asserted trade secrets.  *See* Mot at 7-8.  Instead, DeCurtis simplistically argues that all of Carnival's Project Trident trade secrets automatically "evaporated with the issuance of [Carnival's] patent[s]."  Mot. at 8.  In doing so, DeCurtis ignores the law, the SAC's factual allegations, the content of Carnival's patents, and the timeline of relevant events.

"[A] trade secret can coexist with patent protection" covering "the same general subject

matter," so long as the patent does not "disclose the salient features of the trade secrets."  1 Milgrim on Trade Secrets § 1.06, n.11-n.12 (2020) (collecting cases).  Thus, "[t]he fact that [Carnival] patented the [O.C.E.A.N. Medallion] System does not, in itself, preclude [Carnival] from claiming the existence of [] trade secret[s]" related to the System.  *Default Proof Credit Card Sys., Inc. v. State St. Bank & Tr. Co.*, 753 F. Supp. 1566, 1573 (S.D. Fla. 1990); *Scigrip, Inc. v. Engineered Bonding Sols., LLC*, 2016 U.S. Dist. LEXIS 196537, at *10 (M.D. Fla. 2016).  Whether any of Carnival's patents "fully disclose the trade secrets at issue in this lawsuit" is, at most, an issue for the trier of fact.  *Scigrip*, 2016 U.S. Dist. LEXIS 196537, at *10; *Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011).  Patent preemption certainly cannot support a Rule 12 dismissal, as the SAC alleges trade secrets that aren't even arguably within the scope of Carnival's patents, such as strategic vendor lists.  SAC ¶ 34.

DeCurtis' patent preemption argument fails even on its own terms.  Carnival's first relevant patent issued on August 7, 2018 (SAC ¶ 46), *after* the SAC alleges that DeCurtis began its misappropriation (SAC ¶¶ 86-90).  Thus, *even if* all of Carnival's trade secrets somehow "evaporated with the issuance of [Carnival's] patent[s]," that would not warrant dismissal of Carnival's trade secrets claims, which seek remedies for the "accelerated development time" enabled by DeCurtis' misappropriation of Carnival's trade secrets *before* any Carnival patent issued.  SAC ¶¶ 99, 101; *see, e.g.,* 1 Milgrim on Trade Secrets § 1.06, 10 (2020) (collecting cases acknowledging claims based on misuse of information "prior to issuance of patent"); *accord Biodynamic Techs., Inc. v. Chattanooga Corp.*, 644 F. Supp. 607, 612 (S.D. Fla. 1986).

**Software as Trade Secrets.**  DeCurtis makes the sweeping argument that the "features, functions, and characteristics of the design and operation" of software cannot be trade secrets.  Mot. at 8.  That is not the law.  *E.g., Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 567 (S.D. Tex. 2011) (recognizing specific software functions as trade secrets); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 79 (D.D.C. 2007); *Do It Best Corp. v. Passport Software, Inc.*, 2005 U.S. Dist. LEXIS 7213, at *44 (N.D. Ill. 2005).  DeCurtis' argument is foreclosed by the trade secrets definitions provided by Fla. Stat. § 688 and 18 U.S.C. § 1839.[8]

---

[8] In *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, the court there reasoned that all users of an "enrollment manager" software could see "how the program works…." 819 F. Supp. 2d 1001,1027-28 (E.D. Cal. 2011). But that reasoning does not apply to source code or software embedded in Carnival's Medallion devices, which operate without user engagement.  SAC ¶ 69.

### III.     The '184 Patent Claims Eligible Subject Matter Under 35 U.S.C. § 101 and *Alice*

#### A.     DeCurtis Does Not Acknowledge or Apply Controlling Precedent

DeCurtis's motion omits entirely foundational Federal Circuit precedent governing motions to dismiss based on 35 U.S.C. § 101.  *First*, patents are presumed eligible under § 101 just as they are presumed valid.  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019). *Second*, patent eligibility may involve underlying questions of fact. In particular, the key question at step two of the *Alice* inquiry—"whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field"—is "a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1368 (Fed. Cir. 2018).  *Third*, given the factual nature of *Alice* step two, a court may rule a claim ineligible on a Rule 12(b) motion "*only* when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (emphasis added).

DeCurtis does not mention, much less address, any of these principles. Rather, DeCurtis' arguments at *Alice* step one are premised on legal theories that the Federal Circuit has squarely rejected, and at *Alice* step two, DeCurtis brushes aside seventeen pages of concrete factual allegations showing that the claimed inventions were far from routine and conventional.

#### B.     DeCurtis Does Not Meaningfully Address Any Dependent Claims

As an initial matter, DeCurtis motion fails to properly analyze the patent eligibility of each of the asserted claims, which is reason enough to deny DeCurtis § 101 motion to dismiss. *HVLPO2, LLC v. Oxygen Frog, LLC*, 2017 WL 3000033, at *3 (N.D. Fla. 2017) (denying motion where party did not establish that independent claims were representative of all asserted claims); *Perdiemco, LLC v. Industrack LLC*, 2016 U.S. Dist. LEXIS 135667, at *21-22 (E.D. Tex. 2016) (representative claim requires a "showing that the other asserted claims are substantially similar and linked to the same abstract idea") (citation omitted).  The SAC alleges infringement of 11 patent claims, both independent and dependent, and specifically calls out unconventional technological improvements in several dependent claims.  SAC ¶¶ 59, 75, 80.  DeCurtis focuses on independent claims 1, 7 and 11, devoting no more than a sentence to each asserted dependent claim.  A conclusory attempt to lump all asserted claims together for purposes of its §101 analysis is insufficient to meet DeCurtis' burden. *Perdiemco*, 2016 U.S. Dist. LEXIS 135667, at *21-22 ("Defendants strip away all limitations related to computers as mere 'conventional

concepts'…without addressing the role played by those elements in the context of the claim as an ordered combination").  Because claims 1, 7, and 11 are not "representative" claims, DeCurtis cannot prevail on its motion without analyzing each of the asserted claims.  *See id; PPS Data, LLC v. Jack Henry & Assocs.*, 404 F. Supp. 3d 1021, 1031 (E.D. Tex. 2019) ("[A] claim is not representative merely because it generally deals with the same subject matter as the other asserted claims.").

Even with respect to the claims DeCurtis' does attempt to provide fulsome argument on (claims 1, 7, and 11) DeCurtis' arguments fail as a matter of law at step one and fail at step two because of factual issues that cannot be resolved on a Rule 12 motion to dismiss stage.

### C.  *Alice* Step One: The Claims Are Not "Directed to" An Abstract Idea

#### 1.  The Claims Are Directed to Improvements in Functionality of a Network Platform and Its Components Which Solve Technical Problems, and Thus Are Not Abstract

Step one of the *Alice* inquiry typically involves looking at "the focus of the claimed advance over the prior art."  *Koninklijke KPN N.V. v. Gemalto M2M GmbH,* 942 F.3d 1143, 1149 (Fed. Cir. 2019).  The Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself."  *Uniloc USA, Inc. v. LG Elecs. USA, Inc*., 957 F.3d 1303, 1307 (Fed. Cir. 2020).  Here, the '184 Patent's claims are directed to a new and improved network platform.  The claims recite a network architecture that combines *portable Bluetooth Low Energy (BLE) beacon devices*, *stationary* sensors, peripheral devices, and servers arranged in an inverted model that transforms the functionality of a guest engagement system.  SAC ¶¶ 52-63; 75-82; '184 patent, Col. 1:66-2:4 (the system "relies on the guest devices … periodically broadcasting beacon signals that uniquely identify the devices and their associated guests. . . detected by sensors provided throughout the facility…to provide personalized services").  This is an entirely different type of guest engagement system than conventional systems. SAC ¶¶ 52-55.

This inventive, unconventional arrangement is captured in the claims.  Every claim of the '184 Patent requires at least (i) a "plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device" including a wireless communication antenna which is configured for "Bluetooth low energy (BLE)" communications and further which has a "unique identifier"; (ii) a "sensor network comprising a plurality of sensors each mounted" at a different [known] location and "operative to detect"/"receive" the "unique

identifiers" emitted using or based on "BLE communications" by or with the "portable guest devices" that are "proximate" to the sensor, along with a "communication network connecting each of the plurality of sensors of the sensor network." '184 Patent, independent claims 1, 7, and 11.  The claims also recite a portable device operative to broadcast periodic BLE beacon signals.

The '184 Patent claims are further directed to improvements to the functionality of the components and the network as a whole, including: improved automatic door lock systems (Claims 1 and 7), personalized-service facilitating interface devices (Claim 7), dual-antenna beacon devices (Claim 11), and multiple-mode BLE devices (Claim 11).  These improvements are expressly claimed.  Claim 1 requires a specific type of "access panel" that (i) "is operative to detect the periodic beacon signals…using BLE communications" (ii) comprises "a radio configured for wireless communication with a door lock communication module electrically connected to an electronically controlled locking mechanism;" (iii) includes "a first transceiver configured for wireless BLE communication with the guest devices;" and (iv) includes "a second transceiver configured for communication with the central server."  Claim 7 similarly recites a specific "access panel" operative to communicate with a portable BLE beacon device and unlock an associated door lock.  Claim 7 also recites interface devices that (i) "comprise[] an associated sensor of the plurality of sensors of the sensor network," and (ii) "provide[] the personalized services to a user proximate thereto based on an identity of the user determined based on the unique identifier emitted using BLE communications by a guest device."  Claim 11 recites portable devices that "include first and second wireless communication antennas respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications" and a sensor network with at least one sensor operative to receive a unique identifier from a portable device using each type of communication.  Claim 11 also recites that the portable devices have a first operating mode configured for "bi-directional communication" and a second operating mode "engaging in a beacon mode periodically broadcasting a beacon signal."

The SAC identifies and cites to numerous passages from the specification detailing the "problems" solved by the '184 Patent, *Va. Innovation Scis., Inc. v. Amazon.com, Inc*., 227 F. Supp. 3d 582, 596 (E.D. Va. 2017), many of which are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).  Specifically, the specification: (1) discusses problems with traditional location systems like GPS and explains how

the patent's new sensor network solves these problems to provide improved wayfinding functionality, SAC ¶¶ 64-66; (2) teaches that the system's improved components and their claimed combination reduce complexity and energy usage of the network infrastructure, SAC ¶¶ 67-68; (3) describes seamless, automated guest engagement systems which, as the SAC explains, improve the functionality of the system as a whole by improving efficiency and reducing errors, SAC ¶¶ 69-71; (4) teaches how a portable BLE beacon capable of operating in multiple modes solves power inefficiency problems, while also solving the technical problem of balancing the need for secure communication to open a door with the need to conserve power, SAC ¶¶ 72-77; (5) describes one technical benefit of a dual-antenna (BLE and NFC) design is the ability for the guest device to operate in passive NFC mode that requires no battery power, SAC ¶¶ 79; and (6) explains in detail how the new door lock / access panel structure, combined with the other system elements, improves both efficiency in room access and security.  SAC ¶ 81.

Because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply . . . abstract ideas,'" *In re TLI Commc'ns. LLC Patent Litig*., 823 F.3d 607, 611 (Fed. Cir. 2016), a court "must . . . ensure at step one that [it] articulate[s] what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).  Here, a meaningful analysis demonstrates that the claims of the '184 Patent are "directed to" new technological solutions as described above.  These are claimed advances over the prior art, and they enable "improvements to the functionality of …[the] network platform itself" as the specification and SAC make clear.  *Uniloc*, 957 F.3d at 1309.

### 2.    DeCurtis' Arguments Misapply the Law and Ignore the Actual Claim Language and Specification

DeCurtis' motion is a textbook example of what *not* to do at *Alice* step one: "oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims."  *McRO, Inc. v. Bandai Namco Games Am. Inc*., 837 F.3d 1299, 1313 (Fed. Cir. 2016).  DeCurtis ignores the actual limitations imposed by the claims and focuses only on a single aspect of the claims: wirelessly communicating and logging guest information.  Mot. at 9.  But the idea of wirelessly communicating guest information to log on a server *cannot* be the '184 Patent's "claimed advance over the prior art." The specification acknowledges prior art that wirelessly communicates and logs guest information (i.e., "having information on bookings retrieved manually by a host through a computer terminal").  *See, e.g.*, '184 Patent, Col. 1:32-44.

In relying on *ChargePoint* and *Chamberlin*, DeCurtis has it exactly backwards.  In

11

*Chamberlin*, "[t]he only described difference between the prior art movable barrier operator systems and the claimed movable barrier operator system is that the status information about the system is communicated wirelessly." *Chamberlin Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346 (Fed. Cir. 2019). Similarly, in *ChargePoint*, the only claimed advance over the prior art was "the mere act of implementing wireless communication for an otherwise prior-art system." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019)). The '184 Patent's claims are the opposite of claims that merely apply generic wireless technology to a prior art system. As the specification makes clear, using a wireless network in a guest engagement system was already well known; the '184 Patent's unique BLE-beacon-and-sensor-based system was not. The '184 Patent claims a *new* system, with new types of hardware arranged in a new way.

This case is analogous to *Thales,* which found eligible claims "directed to systems and methods that use inertial sensors in a non-conventional manner" to "more efficiently track an object on a moving platform." 850 F.3d at 1348-49. At *Alice* step one, the claims were not "directed to an abstract idea" because the claims "specify a particular configuration of inertial sensors and a particular method of using the raw data from the sensors." *Id.* So too here: the '184 Patent specifies a particular configuration of sensors, beacons, and peripherals and a particular way of using beacon signal data to provide guest services including tracking objects (guest devices) to provide improved location services. Notably, the claims approved of in *Thales* required only "a first inertial sensor mounted on the tracked object; a second inertial sensor mounted on the moving reference frame; and an element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object." *Id.* at 1345. The '184 Patent claims are substantially more detailed and technical than the claims in *Thales*, requiring specific communications protocols and hardware—some of which was entirely new. SAC ¶ 79.

DeCurtis' arguments that claim limitations regarding BLE and NFC communications are abstract because these were "pre-existing standards for wireless communication[s]" (Mot. at 10) can be readily dismissed. "The claimed invention's compatibility with conventional communication systems does not render it abstract." *Uniloc*, 957 F.3d at 1309 (also involving Bluetooth). Likewise, DeCurtis' selective quotations from the specification's discussion of business benefits (Mot. at 14) are of no moment. An invention can solve both technical and business problems at the same time. *DDR Holdings,* 773 F.3d at 1257 ("Although the claims

12

address a business challenge," it "is a challenge particular to the Internet").[9]

DeCurtis does not deny that most of the technical improvements recited in the specification and SAC are non-abstract improvements, but instead asserts that the technical improvements are not recited expressly in the claims. Mot. at 11-13. However, "[c]laims need not articulate the advantages of the claimed combinations to be eligible." *Uniloc*, 957 F.3d at 1309. *Uniloc* is instructive. The relevant claim language recited "adding to each inquiry message prior to transmission an additional data field for polling at least one secondary station." *Id.* at 1305-06. The Federal Circuit held that the claims were "directed to" the patent-eligible improvement of "the reduction of latency experienced by parked secondary stations in communication systems." *Id.* at 1307. The *Uniloc* Court rejected the same argument DeCurtis advances here: "To the extent LG argues that the claims themselves must expressly mention the reduced latency achieved by the claimed system, LG is in error." *Id.* at 1309; *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1371 (Fed. Cir. 2020) (district court "erred by disregarding the written description's recitation of the advantages of the claimed invention").

Improved wayfinding functionality perhaps is the simplest example. DeCurtis does not deny that addressing technical limitations in conventional location systems like GPS is a non-abstract technical improvement, as the '184 Patent explains in detail. Instead, DeCurtis argues that because the claims are not limited to a particular environment like "cruise ships," this benefit can be ignored. Mot. at 12. *But neither is the improvement so limited.* The specification teaches that "[t]he guest engagement system 10 can thus be used to provide accurate location determination and wayfinding *in any of the facilities*, including fixed facilities (*e.g.*, land-based), moving facilities (*e.g.*, ship-based), and facilities including both fixed and moving components (*e.g.*, facilities accessed by cruise passengers during a cruise, which may include both ship-based and land-based facilities)." Cruise ships are just an *example*, not a requirement. And the specification expressly ties this technical benefit to the system as claimed in the '184 Patent. Col. 34:43-50. (emphasis added) This technical benefit—*alone*—shows that the claims are not directed to an abstract idea.

The Federal Circuit consistently has held claims to be non-abstract when the claimed inventions "*enabled*" technological improvements. *See Finjan, Inc. v. Blue Coat Sys., Inc.,* 879

---

[9] The decisions cited in the Motion on this point involve claims directed to automating manual processes; the claims asserted by Carnival are not at all similar for reasons discussed herein.

F.3d 1299 (Fed. Cir. 2018); *Visual Memory LLC v. NVIDIA Corp.*,, 867 F.3d 1253 (Fed. Cir. 2017); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.,* 880 F.3d 1356 (Fed. Cir. 2018); *Uniloc,* 957 F.3d 1303.  Likewise, the claimed inventions of the asserted Carnival patents recite specific elements (alone or in combination) that enable the technical improvements described in the specification and SAC.  The "access panels" claimed in claims 1 and 7 enable the improved efficiency and security as described in the specification.  *See Ancora Techs., Inc. v. HTC Am., Inc.,* 908 F.3d 1343 (Fed. Cir. 2018) (improved security); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) (improved efficiency).  Similarly, the specification and the SAC describe energy efficiency improvements resulting from the '184 Patent's dual operating-mode ("beacon" and "bi-directional") limitations, demonstrating that the '184 Patent is directed to a technical improvement tied directly to the mode-switching language of Claim 11.  As described in SAC ¶ 79 and the specification, one technical benefit of this dual-antenna design claimed in claim 11 is the ability for the guest device to operate in passive NFC mode that requires no battery power. This is a concrete technical improvement, not an abstract idea.  *See Olympus Corp. v. Maxell, Ltd.,* 2018 U.S. Dist. LEXIS 193868, at *16 (D. Del. 2018) (claim disclosing "different modes of operation and power consumption" to improve batter life not directed to abstract idea).  Finally, the specification's asserted advantages of using sensors using "minimal (or no) on-board processing power and memory" and requiring "minimal configuration during initial system installation," SAC ¶ 67 (quoting '184 Patent, Col. 8:3-8), are enabled by the coupling of stationary sensors with peripheral devices supplying power and performing processing functions, as recited in several claims. '184 Patent, *e.g.*, Claim 14, Col. 8:35-38, Col. 9:15-18.

Finally, DeCurtis concedes (as it must) that the claims *do* recite mobile BLE beacons and an "inverted model" which, as the SAC explains, is a technological improvement itself.  Mot. at 13-14.  DeCurtis' response, a selective and incomplete citation to the '184 Patent's prosecution history, is irrelevant to the *Alice* inquiry.  *Diamond v. Diehr*, 450 U.S. 175, 190 (1981) (novelty is distinct from §101 inquiry). It has no bearing on *Alice* step one, and even at step two, "[t]he mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional."  *Berkheimer*, 881 F.3d at 1369.  Of course, accepting DeCurtis' characterization of the prior art and prosecution history would require the Court to inappropriately draw adverse inferences against Carnival (*e.g.*, that Carnival's response somehow acted as a concession rather than an effort to expedite prosecution).  This is representative of

DeCurtis' utterly misguided approach to the Section 101 inquiry as a whole.[10]

### D.    *Alice* Step Two: the '184 Patent's Inventive Concepts

DeCurtis' Motion has less to say about step two of the *Alice* analysis, possibly because DeCurtis knows that this step turns on factual questions that cannot be resolved against Carnival on a Rule 12 motion.  *See Berkheimer*, 881 F.3d at 1368; *Aatrix*, 882 F.3d at 1125-26.  "The second step of the *Alice* test is satisfied when the claim limitations 'involve more than performance of "well-understood, routine, [and] conventional activities previously known to the industry."'" *Berkheimer*, 881 F.3d at 1367.  Even accepting the (incorrect) notion that the '184 Patent is directed to the abstract "idea of wirelessly communicating guest information so that it may be logged" (Mot. at 10), the claims do far more than that.

The SAC presents "concrete allegations in the second amended complaint that individual elements" claimed "are not well-understood, routine, or conventional activity."  *Aatrix*, 882 F.3d at 1128.  It alleges in detail facts showing that the claimed individual components are inventive, SAC ¶¶ 54, 57, 64-65, 67-70, and were not well-understood, routine, or conventional, SAC ¶¶ 51, 53, 55-56, 58-59, 72-74, 77-81.  Taking one example (of many), the SAC explains that portable guest devices equipped with BLE, multiple operational modes and secure bidirectional communication with sensors *did not exist* "off the shelf"—they were not conventional or generic. *Id.* ¶ 77.  So too for portable devices using NFC and BLE as claimed, an improvement on conventional NFC devices.  *Id.* ¶¶ 79-80.  Thus, the claimed "portable guest devices" are unconventional components.  So too are other claimed elements. *Id.* ¶¶ 51-81.

The SAC is replete with specific allegations of how these unconventional components are technological improvements.  As just one example, the SAC specifically alleges *how* the '184 Patent increases beacon power efficiency by enabling different operating modes, citing specific

---

[10] DeCurtis' suggestion that the claims encompass devices that would not achieve the patent's disclosed improvements is nothing more than unsupported attorney argument.  Mot. at 11-13. Moreover, it is enough that the claimed inventions *enable* these benefits, as described above. Likewise, DeCurtis' argument that certain claims cover "'first' and 'second' [operating] modes that do not realize any technical benefit," Mot. at 12, presents a disputed claim construction issue that cannot be resolved on a motion to dismiss. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019).  DeCurtis' reliance on *Chargepoint* is also misplaced, as that case involved a patent claim that was so broad as to "preempt" all use of an abstract idea. *ChargePoint*, 920 F.3d 759, 769.  Here, DeCurtis has not argued preemption.  For example, claim 1 does not result in "preemption of all processes for achieving automated [door locks]" which weighs against a step-one finding that claim 1 is directed to an abstract idea. *See McRO*, 837 F.3d at 1315.

passages from the specification and discussing particular claim limitations.  SAC ¶¶ 73-79.  The SAC further alleges improvements to the functionality of peripheral devices such as door locks, supporting these allegations with specific citations to the specification.  SAC ¶¶ 53, 75, 81, 84.

DeCurtis makes no serious effort to engage with these well-pled allegations; instead, it merely repeats the conclusory (and false) mantra that the '184 Patent uses "basic, unimproved hardware components."  Mot. at 16-18.  DeCurtis "show[s] no proper basis for rejecting [the SAC's] allegations as a factual matter."  *See Aatrix*, 882 F.3d at 1128.  Even if the '184 Patent's components were themselves conventional, however, "an inventive concept can be found in the non-conventional and non-generic arrangement of [components that are individually well-]known [and] conventional."  *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  DeCurtis does not address the SAC's allegations that the unique arrangement of components improved the performance of the network components and the platform itself.  *See* Mot. at 16-18.  Taking one example (of many), the SAC alleges that prior BLE beacons in guest engagement systems (which themselves were not "conventional") were stationary.  SAC ¶ 56.  The '184 Patent "flip[s] the entire frame of refence" "by making the *sensors stationary* and the *beacons mobile*," "which was not well-understood, routine, or conventional at the time Carnival conceived it" and addressed "technical issues particular to Carnival's unique use case."  *Id.* ¶ 57.  "The result is a concrete technical improvement to 'traditional' location systems" which enables, *inter alia*, "wayfinding within a moving reference frame as well as within a fixed reference frame."  *Id.* ¶ 65; *see Thales,* 850 F.3d at 1345, 1348-49 (inventive use of sensors to "calculate position information relative to the frame of the moving platform").  "This improved wayfinding functionality results from the unconventional portable devices and sensors claimed in the '184 Patent and the ordered combination of those components."  SAC ¶ 65.

The Federal Circuit's holding in *Cellspin Soft, Inc. v. Fitbit, Inc*., forecloses DeCurtis' argument that the claims fail at step two merely because they use known protocols like Bluetooth Low Energy.  Cellspin's claimed inventions used known communications protocols, specifically Bluetooth and HTTP, and "[l]everage[d] the hardware and software" already existing "on a user's mobile device."  *Cellspin*, 927 F.3d 1317.  "But even assuming that Bluetooth was conventional at the time of these inventions, implementing a well-known technique with particular devices in a specific combination, like the two-device structure here, can be inventive."  *Id.* at 1318.  The Federal Circuit reversed the district court's grant of a motion to dismiss, because the claims "recite

a specific, plausibly inventive way of arranging devices and using protocols" and there was "no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional." *Id.* at 1318-19. The same is true here. The SAC alleges, among other things, that Carnival's implementation of Bluetooth Low Energy and NFC communications as claimed was inventive and the SAC supports these allegations with specific facts that the Court must credit as true. SAC ¶¶ 58-60, 79-80. That alone is sufficient to defeat a § 101 challenge on this issue. *Cellspin*, 927 F.3d at 1318 ("patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)"). Notably, "the specification need not expressly list all the reasons why this claimed structure is unconventional." *Id.* at 1317. Here, however, the '184 Patent's specification *does* explain how many aspects of the claimed inventions are unconventional technical improvements. SAC ¶¶ 51-81.

Finally, DeCurtis' admissions belie DeCurtis' arguments. In 2018—*after* Carnival filed patent applications—DeCurtis asserted that "[b]eacons had, thus far, been the stationary object." SAC ¶ 60. DeCurtis claimed that "we inverted the *traditional model*" by "*introducing* the concept of a wearable" that "contains a small beacon." *Id.* ¶ 61 (emphasis added). DeCurtis described the technical benefits of this model much as the '184 Patent does: "improve safety and security, drive operational efficiencies" and improved wayfinding compared to "geo-location." *Id.* ¶¶ 61, 66. Likewise, Carnival's allegation about the outpouring of praise it received for its invention, and its competitors' effort to play "catch-up" to Carnival, show that the '184 Patent's claims reflect inventive concepts. SAC ¶ 63; *Data Engine Techs, LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018) (industry praise supported patentability finding under § 101).

## IV. The SAC Alleges Sufficient Facts to Allege Plausible Infringement Claims

### A. The SAC States a Claim of Direct Infringement of the '184 Patent.

The SAC sufficiently "place[s] [DeCurtis] on notice of what activity is being accused of infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc*., 869 F.3d 1372, 1381 (Fed. Cir. 2017) (reversing motion to dismiss direct infringement claim). The SAC alleges, in detail, how systems of DeCurtis' customers infringe the '184 Patent. SAC ¶¶ 137-149. The SAC also alleges that DeCurtis provided the hardware and software that run those systems, and that DeCurtis contracted to provide and maintain the infringing systems. SAC ¶¶ 150-152. And, of course, the SAC expressly alleges that DeCurtis sells guest engagement systems, including a system that infringes the '184 Patent, under contract. SAC ¶¶ 8, 150. Nothing more is required to state a

plausible infringement claim here.  *E.g., Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d
1373, 1378 (Fed. Cir. 2003) (software license was an "offer for sale"); *Transocean Offshore
Deepwater Drilling, Inc. v. Stena Drilling Ltd.*, 659 F.Supp.2d 790, 799-800 (S.D. Tex. 2009)
(contract to provide drilling services was an "offer for sale"). DeCurtis cites *no* case holding that
the type of facts alleged here fail to state a claim for direct infringement.  *Cf. Spanakos v.
Aronson*, No. 17-cv-80965, Dkt. 15 at 6-7 (S.D. Fla. Apr. 2, 2018) (holding as sufficient the
complaint's allegation that defendant "infringed by marketing the patented technology and
offering it for sale"); *Westmoreland Adv. Mats., Inc. v. Allied Mineral Prods., Inc.*, No. 16-cv-
00263, Dkt. 42 at 6-7 (W.D. Pa. June 23, 2016) (rejecting argument that the complaint must
include additional details of an "offer for sale," such as price).

## B.  The SAC States Claims of Infringement of the '184 and '516 Patents under § 271(f)

First, DeCurtis' argument that the SAC must identify components more specifically to
state a plausible § 271(f) claim is simply wrong, and again DeCurtis cites to no cases supporting
its position.  *See Twentieth Century Fox Home Entm't LLC v. Nissim Corp.*, No. 14-cv-81349,
Dkt. 98 at 5-6 (S.D. Fla. Oct. 5, 2015) (denying motion to dismiss a § 271(f) claim and noting
that "it is not necessary for [patentee] to identify and plead the actual component"). Second,
Carnival does not rely on "DeCurtis mere supply of software, or a single hardware component"
for its § 271(f) claim.  Mot. at 18.  The SAC alleges that DeCurtis supplies from the United
States *inter alia* BLE wearable devices (each of which themselves are made of multiple hardware
and software components), SAC ¶¶ 87-95, 138-149, 152, 153, which are a substantial part of the
claimed invention, *Life Techs. Corp. v. Promega Corp.*,137 S. Ct. 734, 741 (2017). Indeed, the
fact that DeCurtis did not move to dismiss Carnival's contributory infringement allegations on
these patents undermines any claim that Carnival failed to identify components specifically
enough. Third, the SAC alleges that the components DeCurtis supplies are made especially for
an inverted mobile beacon model as described in Carnival's patents (which is why DeCurtis has
not moved to dismiss Carnival's contributory infringement allegations on these patents), *see*
SAC ¶¶ 87-95, 152, and that DeCurtis' components operate in the precise manner disclosed in
the '184 patent, *see* SAC ¶¶ 138-149.

Fourth, and finally, DeCurtis argues that "if DeCurtis provides 'the Band' (i.e., the entire
'portable wireless device' [of the '514 Patent]) as the SAC alleges, then there is no 'component'
that is provided for combination abroad as § 271(f) requires."  Mot. at 18.  But to the extent

DeCurtis argues that the Band is not infringing at the moment of sale, given the SAC's allegations, it is plausible to infer that the Band is later combined in a manner that would infringe the patent.  Carnival is entitled to plead in the alternative.  *E.g.*, *Lifetime Indus.,* 869 F.3d at 1372 (approving of alternative direct and indirect infringement allegations).

### C.  The SAC States a Claim for Induced Infringement of the '516 Patent

"For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer 'specifically intended [another party] to infringe [the patent] and knew that the [other party]'s acts constituted infringement.'" *Lifetime Indus.,* 869 F.3d at 1380. This "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable ...." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1341 (Fed. Cir. 2012).

DeCurtis argues only that the allegations in paragraph 167 do not suffice to allege intent, (Mot. at 19), but that is not the only relevant paragraph in the SAC.  The SAC alleges that DeCurtis personnel had extensive access to Carnival's information about Project Trident, SAC ¶¶ 33-34; that Carnival applied for and obtained patents, including the '516 Patent, protecting inventions Carnival developed during Project Trident, *id.* ¶¶ 43-46; and that DeCurtis copied these inventions, *id.* ¶ 85.  The SAC further explains how, after working for Carnival, DeCurtis was hired to develop products that closely tracked Carnival's products and has marketed and sold products that used technology DeCurtis knew Carnival invented.  *Id.* ¶¶ 86-90, 94.  In so doing, DeCurtis touted the benefits of the accused products in ways that the asserted patents.  *Id.* ¶¶ 60-61, 66, 69, 71, 87-90.  These allegations render plausible paragraph 167's allegations that DeCurtis has induced infringement through its marketing, instruction, and training activities. And they are more than enough to allege specific intent to infringe. *See, e.g., Lifetime Indus.*, 869 F.3d at 1380. Refusing to consider the broader relationship between the parties when assessing whether the allegations in a complaint state a claim, as DeCurtis asks the Court to do, would be error.  *Id.*

Indeed, DeCurtis admits that marketing, instructional, and training materials can demonstrate intent where, as here, defendants have touted the benefits of the accused products in ways that track the asserted patent.  Mot. at 19 (citing *Memory Integrity, LLC v. Intel Corp.*, 144 F. Supp. 3d 1185, 1195 (D. Or. 2015)).  And "there is no requirement that the facts alleged mimic the precise language used in a claim; what is necessary is that facts, when considered in their entirety and in context, lead to the common sense conclusion that a patented method is being

practiced." *In re Bill of Lading*, 681 F.3d at 1343.

### D. The SAC States a Claim for Contributory Infringement of the '516 Patent

The Motion does not dispute that the SAC adequately pleads most requirements of contributory infringement, contesting only that Carnival failed to identify the components supplied by DeCurtis with enough specificity.  DeCurtis quotes only *part* of a sentence of paragraph 166 when it argues that the phrase "hardware and/or software in the access panel and reservation server," was not a specific enough disclosure; the full quote added the words "described above" to the end.  The preceding paragraphs describe, in detail, how the system used by DeCurtis' customer Virgin Voyages "implement[s] DeCurtis's technology."  SAC ¶¶ 162-165.  Specifically, the system includes "a BLE sensor in the access panel that uses hardware and/or software provided by DeCurtis" and which, as the SAC shows, is specifically designed to communicate with Virgin's "Band" device, which also includes DeCurtis technology.  *Id.* (also referring to Figure 2 in ¶ 143).  The SAC separately identified additional hardware and software in the access panel responsible for communicating with the reservation server.  The Federal Circuit has found similarly detailed allegations of contributory infringement to be sufficient.  *See, e.g.*, *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018).  Components may contributorily infringe even if incorporated into a larger device.  *Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1340 (Fed. Cir. 2008). The lone case relied upon by DeCurtis is distinguishable; there the plaintiff alleged "unspecified 'use' of a largely undefined group of devices and services, including cell phones" and pointed to services as the target of its contributory infringement claim.  *Brandywine Commc'ns Techs., LLC v. T-Mobile USA, Inc.*, 904 F. Supp. 2d 1260, 1271-72 (M.D. Fla. 2012).

### <u>CONCLUSION</u>

For the foregoing reasons, DeCurtis' motion should be denied in its entirety.[11]

---

[11] Carnival respectfully requests leave to amend any deficiencies identified by the Court.  *S. Cent. Educ. Risk Mgmt. Program v. Star Ins. Co.*, 2017 WL 5764168, at *2 (S.D. Fla. 2017) (citing *Silva v. Bieluch*, 351 F.3d 1045, 1048-49 (11th Cir. 2003) (leave to amend freely granted early in the case); *Tessina Holdings Pty, Ltd. v. Trend S.p.A.*, 2017 WL 7344219, at *2 (S.D. Fla. 2017). Contrary to DeCurtis' suggestion (Mot. at 3), there has never been any adjudication that would warrant dismissal with prejudice here.  *See, e.g., Garcia v. Goodwill Indus. of S. Fla.,* 2019 U.S. Dist. LEXIS 198676, at *12 (S.D. Fla. Nov. 15, 2019) ("after a district court grants an opportunity to amend and identifies the pleading's deficiencies… dismissal with prejudice is appropriate.").

Dated:   November 18, 2020

Diana Marie Fassbender
Florida Bar No. 0017095
dszego@orrick.com
Steven J. Routh (pro hac vice)
T. Vann Pearce, Jr. (pro hac vice)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Columbia Center,
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel:  (202) 339-8533


By: */s/Diana Marie Fassbender*
     Diana Marie Fassbender

Jorge Espinosa
Fla. Bar No.  779032
jorge.espinosa@gray-robinson.com
Robert R. Jimenez
Fla. Bar. No. 72020
robert.jimenez@gray-robinson.com
**GRAYROBINSON, P.A.**
333 S.E. 2nd Avenue, Suite 3200
Miami, FL  33131
Phone: (305) 416-6880
Facsimile: (305) 416-6887

Robert L. Uriarte (pro hac vice)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1000 Marsh Road
Menlo Park, CA 94025
Tel: (650) 289-7105

*Attorneys for Plaintiff CARNIVAL CORPORATION*