**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-22945-Civ-SCOLA/TORRES

DECURTIS LLC.

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____

CARNIVAL CORPORATION,

      Plaintiff,

v.

DECURTIS CORPORATION and DECURTIS LLC,

      Defendants.

_____/

**REPORT AND RECOMMENDATION
ON DECURTIS'S MOTION TO DISMISS**

This matter is before the Court on DeCurtis, LLC's and DeCurtis Corporation's (collectively, "DeCurtis") motion to dismiss Carnival Corporation's ("Carnival") second amended complaint ("SAC"). [D.E. 95]. Carnival responded to DeCurtis's motion on November 18, 2020 [D.E. 100] to which DeCurtis replied on November 25, 2020. [D.E. 104]. Therefore, DeCurtis's motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant

authority, and for the reasons discussed below, DeCurtis's motion to dismiss should be **GRANTED in part** and **DENIED in part**.[1]

## I. BACKGROUND

DeCurtis is an Orlando-based technology company that designs and manufactures systems using wireless communications, small portable devices, and custom software to assist businesses in improving guest experiences.  Carnival, on the other hand, is the creator and owner of a groundbreaking technology platform known as the One Cruise Experience Access Network (the "Ocean Platform"), which combines a first-of-its-kind wearable device with a network of servers, sensors, readers, and software to deliver guest engagement and personal service to guests on Carnival's ships.

In June 2014, Carnival began working on an endeavor – named Project Trident – with a goal to create technology that would enable greater personalized attention through a guest interaction and connection ecosystem.  To make Project Trident a reality, Carnival and DeCurtis entered into a non-disclosure and Master Services Agreement (the "MSA").[2]  While DeCurtis worked on Project Trident, DeCurtis had access to confidential information, trade secrets, and other proprietary information.  This included access to Carnival's vision, strategy, plans, experience platform models, technical design documents, and other confidential

---

[1]    On November 20, 2020, the Honorable Robert N. Scola referred all pretrial matters to the undersigned Magistrate Judge for disposition.  [D.E. 102].

[2]    The MSA provides that the exclusive jurisdiction for litigation of any dispute, controversy or claim arising out of or in connection with the MSA any shall be litigated in a state or federal court located in Miami-Dade County, Florida.

items. [D.E. 88 at ¶¶ 32-34]. After DeCurtis ceased working on Project Trident in 2015, Carnival obtained three patents – Nos. 10,045,184 (the '184 patent), 10,049,516 (the '516 patent), patent), and 10,157,514 (the '514 patent).

Carnival now alleges that DeCurtis breached its confidentiality obligations when the latter worked with other competitors, including Norwegian Cruise Lines and Virgin Cruise Lines to develop systems that took a fraction of the cost and time. When Carnival became suspicious, it demanded that DeCurtis allow it to review its books and records as required under the MSA. But, DeCurtis refused. Carnival subsequently filed this lawsuit on April 8, 2020, asserting claims for breach of contract, trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et seq.* (the "DTSA") and the Florida Uniform Trade Secrets Act (the "FUTSA"), Fla. Stat. §§ 688.001 *et seq.*, and patent infringement. Carnival seeks preliminary and permanent injunctive relief, monetary damages, an accounting of records, as well as fees and costs.

## II. APPLICABLE PRINCIPLES AND LAW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss. *Id.* "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted). Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id.*; *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

*Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449, 453 n.2, (2012). The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

### III.  ANALYSIS

DeCurtis seeks to dismiss each count in Carnival's SAC because they all fail to state a claim as required under Fed. R. Civ. P. 12(b)(6). DeCurtis argues that the

contract claim in count one cannot survive because the MSA and related correspondence make clear that no breach ever occurred in this case.  DeCurtis also claims that counts two and three should be dismissed because they are based on trade secrets that lack the required particularity to state a claim under state or federal law.  And to the extent Plaintiff tries to state a claim in counts four through six, DeCurtis suggests that these allegations fall short because they lack certain elements as required under the Patent Act.  For these reasons and others, DeCurtis seeks to dismiss the SAC with prejudice.

### A.   *Breach of Contract (Count 1)*

Carnival alleges in count one that DeCurtis committed a breach of contract when it made unauthorized disclosures of Carnival's confidential information and refused to comply with Carnival's audit demands.  [D.E. 88 at ¶ 105].  DeCurtis takes issue with this allegation because it contradicts the plain language of the MSA and certain emails/letters exchanged between the parties.[3]  DeCurtis states that it gave Carnival the opportunity to conduct an audit as evidenced in the parties' correspondence, but required that any audit be solely limited to the work performed under the MSA – not an audit concerning Carnival's competitors.  Therefore, while Carnival complains that a breach occurred, DeCurtis relies on both

---

[3]    Carnival also took issue with DeCurtis's alleged misuse of confidential information, but reserved that argument for later because it related to a failure to distinguish trade secrets from confidential information when asserting a breach of contract claim.   There is no need to consider this argument, for the reasons discussed below, because the breach of contract claim is viable by itself with the allegation that DeCurtis failed to comply with Carnival's audit demands.

the language of the MSA and the parties' communications to show that this claim has no merit.

A breach of contract claim, under Florida law, has four elements: (1) a valid contract, (2) a material breach, (3) causation, and (4) damages. *See Handi–Van, Inc. v. Broward Cty.*, 116 So. 3d 530, 541 (Fla. 4th DCA 2013). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co.*, 2012 WL 718803, at *11 (S.D. Fla. Mar. 6, 2012) (quoting *Covelli Family, LP v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008); *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)). An injured party in a breach of contract is entitled to recover damages that "naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002).

DeCurtis claims that the breach element has not been met because, when it denied Carnival's audit demand, it complied with the MSA. The problem with this assertion is that it goes beyond the scope of the allegations presented and tries to resolve both a factual and legal ambiguity with respect to a contractual provision on a motion to dismiss. That is unpersuasive, in many respects, because the argument is based on nothing more than a denial of Carnival's allegations. This is not tenable because Carnival only alleges that DeCurtis "breached its obligations . . . by refusing to comply with Carnival's audit demands." [D.E. 88 at ¶ 105]. How and to

what extent that refusal violated the MSA is an issue that will need to be revisited either at trial or on a motion for summary judgment. DeCurtis wants to resolve the issue now, but a motion to dismiss is not the vehicle to do so. DeCurtis even goes so far as to attach letters and emails between the parties to show how the parties have spoken about the audit demand and how DeCurtis complied with its contractual obligations. Yet, even if we considered the emails and letters attached to the motion to dismiss, DeCurtis has missed the forest for the trees. The issue is not *only* whether DeCurtis refused Carnival's audit request, but also whether DeCurtis had the right to do so in the first place and what response, if any, would have been appropriate in response to the demand for documents. The issue is not as simple as DeCurtis makes it out to be.

This, of course, presumes that the Court should consider any of the emails and letters in the first place. DeCurtis argues that the Court may consider these documents because they are indisputably authentic and central to a complaint's allegations. DeCurtis also states that, when there is a conflict between the allegations in a complaint and the attached exhibits, the exhibits must control. This is a feeble assertion because a court's review at the motion to dismiss stage is generally limited to the four corners of the complaint with the only exception occurring when: (1) a plaintiff refers to a document in the complaint; (2) the document is central to its claim; (3) the document's contents are not in dispute; and (4) the defendant attached the document to its motion to dismiss. *See Fin. Sec.*

*Assurance, Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284 (11th Cir. 2007) (internal citation omitted).

DeCurtis requests that we examine extrinsic documents to find that Carnival's allegations have no merit. But, we decline to do so because – as Carnival points out – there is an ongoing disagreement on whether these items constitute all of the communications between the parties. Carnival also asserts that, if the Court had the benefit of all the correspondence between the parties, it would be clear that a breach occurred because DeCurtis rejected the audit demand and never changed its position. Thus, the universe of these documents is in dispute, negating any possibility that they should be considered on a motion to dismiss.

The documents should also not be considered at the pleading stage because Carnival never referred to them in the SAC. While the documents are relevant in determining whether a breach occurred, there is nothing to show that Carnival referred to them in the complaint. As such, at least two out of the four factors enumerated above have not been met to justify a departure from a review limited to the four corners of the complaint.

In addition, it would be improper to consider these documents for an entirely separate reason because discovery may reveal many more communications evidencing how DeCurtis breached, if at all, its obligations under the MSA. To make such a preliminary determination at this stage would deprive both parties of the opportunity to seek discovery and to present evidence in support of their respective positions. Accordingly, DeCurtis's motion to dismiss the breach of

contract claim should be **DENIED** because – even if we considered the extrinsic documents attached to the motion to dismiss – there is a complex factual and legal issue on what obligation DeCurtis had in complying with Carnival's audit demand.

### B. _Violation of the DTSA and the FUTSA (Counts 2 and 3)_

Counts two and three of the SAC allege that DeCurtis misappropriated Carnival's trade secrets.  DeCurtis argues that neither count should survive because Carnival failed to identify the alleged trade secrets with any degree of particularity.  Although Carnival made allegations that trade secrets were misappropriated with respect to "financial, business, scientific, technical, economic, and engineering information," DeCurtis reasons that these generic categories are not enough to comply with the particularity requirements under state and federal law.  [D.E. 88 at § 109].  DeCurtis states that Carnival's allegations are, in other words, too vague because a complaint must "describe the subject matter of the trade secret with sufficient particularity to separate [the trade secret] from matters of general knowledge in the trade[.]"  _ProV Int'l Inc. v. Lucca_, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (quoting _Pellerin v. Honeywell Int'l, Inc._, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012)).

On May 11, 2016, Congress passed the DTSA Act, which conferred on U.S. district courts subject matter jurisdiction over civil actions pertaining to the theft of trade secrets used in interstate or foreign commerce.  _See_ 18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section.").  Under the DTSA, "an owner of a trade secret that is

9

misappropriated may bring a civil action [in federal court] . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).  The definition of trade secrets under the Act covers information that "the owner thereof has taken reasonable measures to keep . . . secret; and [where] the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).  Misappropriation includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," where "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(5)-(6).

In a similar vein, the FUTSA permits injunctive relief to redress "actual or threatened misappropriation" of trade secrets. Fla. Stat. § 688.003.  "To set forth such a claim, a plaintiff must establish both of the following: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *All Leisure Holidays, Ltd. v. Novello,* No. 12-62328, 2012 WL 5932364, at *4 (S.D. Fla. Nov. 27, 2012); *see also Del Monte Fresh Produce Co. v. Dole Food Co.,* 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001)

(citing Fla. Stat. § 688.002).   Trade secrets are broadly defined under Florida law, and include information that "derive[s] economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Del Monte,* 136 F. Supp. 2d at 1291.

Having set forth the statutory framework. "[i]t is not common for a trade secret misappropriation plaintiff to know, prior to discovery, the details surrounding the purported misappropriation." *American Registry, LLC v. Hanaw*, 2013 WL 6332971, at *3 (M.D. Fla. Dec. 5, 2013).   Some courts still require, however, that a plaintiff provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Iqbal,* 556 U.S. at 678 (citations omitted).   Other courts have cautioned plaintiffs from employing an "old trick" where they make vague trade secrets allegations and then try to fill in the gaps after discovery begins:

> Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify what ever happens to be there as having been trade secrets stolen from plaintiff.   A true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery.   This order will not allow this old trick of vague pleading with the blanks to be artfully filled in only after discovery.

*Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014).

The Eleventh Circuit has acknowledged that some courts in our circuit impose a rule that requires a plaintiff to identify with reasonable particularity any trade secrets before proceeding with discovery.   *See DynCorp Int'l v. AAR Airlift*

*Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (citing *AAR Mfg., Inc. v. Matrix Composites, Inc.*, 98 So. 3d 186, 188 (Fla. 5th DCA 2012) ("[P]laintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery."); *Revello Med. Mgmt., Inc. v. Med–Data Infotech USA, Inc.*, 50 So. 3d 678, 679 (Fla. 2d DCA 2010) ("[Med–Data] concedes that before proceeding with discovery in [a trade-secret misappropriation] suit, the plaintiff must identify with reasonable particularity the nature of the trade secret involved.").  The Eleventh Circuit has rejected that rule, at least to some extent, because "at the dismissal stage in federal court, the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret."  *DynCorp Int'l*, 664 F. App'x at 848 (citations omitted).  This is sometimes referred to as the "sufficient particularity" rule, *VVIG, Inc. v. Alvarez*, 2019 WL 5063441, at *3 (S.D. Fla. Oct. 9, 2019), because – while it does not constitute a high pleading requirement – a claimant must do more than "identify broad categories of information, such as financial and technical data." *DynCorp Int'l*, 664 F. App'x at 849.

The Eleventh Circuit's decision in *DynCorp* is instructive on how to determine if a plaintiff meets this standard because, in that case, the complaint described the trade secrets as follows:

> [C]onfidential and proprietary [company] financial and technical data .
> . *such as* lists of the personnel employed by [the company] to provide
> services under [an] Incumbent Contract, the salaries and pay
> differentials for those personnel on the Incumbent Contract, other
> pricing and financial data about [the company's] performance on the
> Incumbent Contract, and technical data about [the company's] staffing

> approach and business operations pertaining to the Incumbent
> Contract[;] [including a binder with] "lists of [the company's]
> employees staffed on [the] Incumbent Contract and their salary
> information, as well as numerous emails and other documents with
> [the company] logos."

664 F. App'x at 849 (emphasis and alterations added).  The Eleventh Circuit found

that "[t]hese allegations identified the trade secrets for which [the company] was

claiming protection with sufficient particularity to survive a motion to

dismiss." *Id.* (alterations added).  And the court further distinguished the foregoing

allegations from "broad categories of information, such as financial and technical

data." *Id.*

Here, Carnival's trade secret allegations rely on the same "broad categories of

information" that *DynCorp* frowned upon.  *Id.* at 849.  Carnivals claims, for

instance, that its trade secrets include "software," "prototypes," "hardware,"

"database structures," "operations procedures" "testing plans," and other categorical

descriptions in connection with Project Trident.  But, "'all information concerning a

product [(i.e. Project Trident)] is not a trade secret." *VVIG, Inc.*, 2019 WL 5063441,

at *4 (S.D. Fla. Oct. 9, 2019) (citing *DynCorp*, 644 F. App'x at 849).  And that is

exactly what Carnival has done in the SAC because each description of its trade

secrets are preceded by the word "Project Trident" with the hope that it confers

enough specificity to survive a motion to dismiss:

> Carnival's Project Trident information disclosed to DeCurtis included
> at least the following trade secrets: Project Trident prototypes; Project
> Trident software, including software embodying proprietary and secret
> methods of operation that are not apparent to end users; Project
> Trident hardware and software architecture, including specific
> microservices platform technical architecture; Project Trident technical

specifications and data interface designs; Project Trident databases and database structures; Project Trident operations procedures; Project Trident creative strategies; Project Trident deployment plans; Project Trident testing plans and results; Project Trident development schedules; Project Tridents strategic vendor lists; Project Trident's corporate abstraction layer of services; Project Trident interface layer designs, data models, database structures, and data interface designs and adapters; Project Trident API dependencies; Project Trident non-functional requirements; Project Trident's particularized agile development methodology; Project Trident web services information; Project Trident show plans; Project Trident design work; Project Trident technical integration information; Project Trident site surveys, Project Trident functional plans; and Project Trident studio shows.

[D.E. 88 at ¶ 111].[4]  That is insufficient because using a label of Project Trident and then following it with categorical descriptions tells DeCurtis nothing as to which trade secrets it misappropriated.  *See VVIG, Inc* 2019 WL 5063441, at *4 ("Couching specific terms within a sweeping definition is insufficient to state a trade secret claim because doing so fails to notify Counter-Defendants *which* trade secret or secrets they allegedly misappropriated.") (emphasis in original) (citing *Taxinet, Corp. v. Leon*, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018)).  More specificity is required.

Judge Moreno's decision in *Taxinet, Corp.* is consistent with this interpretation.  *See Taxinet, Corp.*, 2018 WL 3405243, at *3.  There, the complaint defined the trade secrets as "confidential business information, processes, techniques, software applications, and business characteristics, including present, future, and proposed services, and business model." *Id.*  The complaint also described the specific characteristics of the business model, including its

---

[4]     These trade secret allegations appear to be identical in both counts two and three.  *Compare*  [D.E. 88 at ¶ 111] *with* [D.E. 88 at ¶ 122].

"Taximeter, GPS Navigation System, a Tracking System with panic button, a Payment Gateway for credit cards, and a future booking system." *Id.* Yet, the court dismissed the trade secrets claim because – notwithstanding the finer description of the business model – the complaint did "not lay out . . . which of these 'trade secrets' were impermissibly used[.]" *Id.* (alterations added).

The same reasoning applies here because the SAC fails to give DeCurtis any notice of the alleged trade secret violation(s) because there is nothing specifically identified. *See American Registry, LLC*, 2013 WL 6332971, at *4 (finding that categories such as "software," "financial data," "lists," and "information and records" are broad and generic categories of information and provide insufficient notice as to the actual trade secrets misappropriated). This is not to say that Carnival is obligated to divulge all the details of its confidential and proprietary information for counts two and three to survive a motion to dismiss. But, the allegations must still "identify [the trade secret(s)] with enough specificity as to give [DeCurtis] notice of what was misappropriated." *American Registry, LLC*, 2013 WL 6332971, at *4; s*ee also RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1352 (M.D. Fla. 2019) (finding that pleadings were adequate when they did more than suggest "the existence of general categories of 'confidential information.'").

This approach is consistent with how district courts have followed *DynCorp* in our circuit because a plaintiff can only survive a motion to dismiss when a complaint identifies trade secrets related to something *specific*. *See, e.g., Hurry*

*Family Revocable Tr. v. Frankel*, 2019 WL 2868945, at *3 (M.D. Fla. July 3, 2019) ("District courts in the Eleventh Circuit have generally followed the *DynCorp* decision in holding that a plaintiff sufficiently alleges a misappropriation claim when a complaint identifies trade secrets related to specific clients, competitors, and projects."). Those types of allegations can come in many different forms, but they are often specific to clients, competitors, documents, or agreements. *See id.* at *2. ("Plaintiffs' second amended complaint now alleges that Frankel "forwarded emails containing Confidential Information from his employee email account to his personal email account" on sixteen specific dates from August 15, 2016, to October 7, 2018."); *Developmental Techs., LLC v. Mitsui Chems., Inc.*, 2019 WL 1598808, at *3 (M.D. Fla. Apr. 15, 2019) (holding that the complaint sufficiently stated a claim for misappropriation because it identified several categories of confidential and proprietary information, including specific photographs of active tests, system configurations, and visual demonstrations); *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294 (S.D. Fla. 2018) (holding that the complaint sufficiently stated a claim for misappropriation because it identified specific trade secrets, including a Pharmacy Service Agreement template, proprietary software programs, and proprietary configurations and data specifications of software).

The SAC falls short in this respect because there is nothing specifically alleged in connection with Carnival's trade secrets. The only inference to take away from the SAC is that everything connected to Project Trident constitutes a trade

secret.  Yet, that is not a plausible allegation nor does it give notice to DeCurtis of what was misappropriated.  While there is no requirement to plead a high degree of particularity – such as the requirements generally found under Fed. R. Civ. P. 9(b) – Carnival must provide some specifics to state a plausible claim for relief.  And, as suggested earlier, that is not a high bar to meet.  Therefore, given Carnival's failure to identify anything specific in connection with the alleged trade secrets, DeCurtis's motion to dismiss counts two and three should be **GRANTED**.[5]  *Cf. DynCorp Int'l*, 664 F. App'x at 849 (finding that the plaintiff sufficiently identified trade secrets because there were, among other things, collections of compensation data including salaries and pay differentials).

## C.   *Direct Infringement (Count 4)*

Carnival alleges in count four that DeCurtis directly infringed on its '184 patent pursuant to 35 U.S.C. § 271.[6]  Section 271 of Title 35 creates liability for three types of patent infringement:  (1) direct infringement, (2) induced infringement, and (3) contributory infringement.  *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015).  Under Section 271(a), direct infringement occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any

---

[5]   DeCurtis presented other arguments in support of the dismissal of counts two and three, but we offer no opinion on those because the alleged trade secret claims fail for the reasons already stated.

[6]   The '184 patent describes a guest engagement system, where portable devices serving as beacons communicate with a networked, sensor-rich environment to enhance the guest experience.  The '184 patent is related to systems that provide engagement with guests through the use of wireless sensing technologies.

patented invention during the term of the patent therefor."   Section 271(b) addresses induced infringement and provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  And finally, Section 271(c) addresses contributory infringement, which occurs if a party sells or offers to sell:

> [A] component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]

35 U.S.C. § 271.  While all three of these theories are presented in the SAC (and discussed in greater detail below), we must first consider whether Carnival has stated a claim for direct infringement.

To state a claim for direct infringement, a complaint must include five factual assertions[7]: (1) ownership of the patent; (2) the name of each defendant; (3) the patent allegedly infringed; (4) a statement on how the defendant allegedly infringed; and (5) the sections of the patent law invoked.  *See WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, 2019 WL 718576, *3 (M.D. Fla. Feb. 20, 2019) (citing Hall v. Bed Bath & Beyond, Inc., 705 F.3d 1357, 1362 (Fed. Cir. 2013)).  "Plaintiff need not prove its case at the pleading stage, but need only place the potential infringer on notice of what activity it is accused of

---

[7]     Section 271(a) of Title 35, U.S.C., provides, in full, the following:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271.

infringing." *Id.* (citing *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018)).

DeCurtis argues that the direct infringement claim should be dismissed because Carnival's allegations are too conclusory:

> DeCurtis has contracted with its customers, including Virgin and NCL, to provide and maintain systems that infringe the '184 Patent. DeCurtis has made, used, offered for sale, and sold systems in the United States that infringe the '184 Patent.

[D.E. 88 at ¶ 150]. This point would ordinarily be well taken – if Carnival's allegations were confined solely to this paragraph – because an allegation of direct patent infringement is "insufficient under *Twombly* and *Iqbal* if it simply recites some of the elements of a representative claim and then describes generally how an accused product operates, without specifically tying the operation to any asserted claim or addressing all of the claim requirements." *Blue Water Innovations, LLC v. Fettig*, 2019 WL 1904589, *2 (S.D. Fla. Mar. 8, 2019) (citation omitted).

However, that is not the case here given the remaining allegations in the SAC because Carnival describes how DeCurtis's customers infringed on the '184 patent, and how DeCurtis provided the hardware and software to run those systems. Carnival nonetheless claims that count four should be dismissed because there are no allegations that DeCurtis provided a *system* to any customers. But, that allegation is also included in the SAC and Carnival even refers to it as a guest engagement system. [D.E. 88 at ¶¶ 150-152]. DeCurtis's actual grievance is that the SAC is short on details and that Carnival did the bare minimum in stating a direct infringement claim. That assertion might very well be true. Yet, that is not

a sufficient reason, by itself, to dismiss the direct infringement claim when every element has otherwise been presented.   And those elements are supported with enough facts – albeit not many – to put DeCurtis "'on notice of what activity . . . is being accused of infringement.'"   *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017) (quoting *K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1284 (Fed. Cir. 2013)).   Therefore, DeCurtis's motion to dismiss Carnival's direct infringement claim should be **DENIED**.

### D.   *Patent Eligibility (Count 4)*

DeCurtis's next argument is that count four should be dismissed for a separate reason because Carnival's '184 patent is not eligible for protection under 35 U.S.C. § 101.  Section 35 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent[.]"   35 U.S.C. § 101.   This section does not, however, cover "[l]aws of nature, natural phenomena, and abstract ideas."  *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted).   Thus, "in applying the § 101 exception, [courts] must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more, thereby 'transform[ing]' them into a patent-eligible invention."   *Id*. (quoting *Mayo Collaborative Servs., v. Prometheus Laboratories, Inc*., 566 U.S. 66 (2012)).

The first question we must consider is whether DeCurtis's argument can be presented on a motion to dismiss because "[t]he patent eligibility inquiry may

contain underlying issues of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (citing *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016)). Courts have recognized this dilemma and have found that, although patent eligibility can present a mixed question of law and fact, dismissal under Rule 12(b)(6) is appropriate "when there are no factual allegations that, taken as true prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("We have held that patent eligibility can be determined at the Rule 12(b)(6) stage.") (citing cases). However, while dismissal can occur, "plausible factual allegations may preclude dismissing a case . . . where, for example, 'nothing on th[e] record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6).'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (quoting *Bascom Global Internet Services, Inc. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016)).

Having made that clear, *Alice Corp. Pty. v. CLS Bank Int'l* is the landmark Supreme Court case on how to determine if a claim is patentable under 35 U.S.C. § 101. *Id*. The Court employed in that case a two-part test "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty.*, 573 U.S. 208 at 217. First, a court must determine "whether the claims at issue are directed at a patent-ineligible concept." *Id*. If the claim is an abstract idea, the analysis proceeds to step two where a court must determine whether the claims

contain an "inventive concept" – that is, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. (internal citations and quotations omitted). However, "[s]imply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Id.* at 222; *see also BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018) ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea.").

In looking closer at step one, "[t]he trick is to try and detect the beating heart of the patent, its animating function." *Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 173 F. Supp. 3d 1324, 1330 (N.D. Ga. 2016) (citing *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012)), *aff'd*, 708 F. App'x 684 (Fed. Cir. 2018). In *Alice*, for example, the Supreme Court rejected an effort to patent a computer-implemented system of intermediated settlement, concluding that the "concept" of intermediated settlement was reducible to a "fundamental economic practice" and was therefore an "abstract idea" within the meaning of § 101. The Federal Circuit has also elaborated on the test in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), holding that where computer-implemented method claims are at issue, the question under *Alice* step one is whether the claims implement an "improvement in computer

capabilities" or instead "a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Id.* at 1335-36.

Since *Alice*, courts have grappled with the question of how to determine if a patent qualifies as an "abstract idea." While the scope remains undefined to some extent, there are several guiding principles:

> First, mathematical algorithms or formulas, if executed on a generic computer, are abstract ideas. Second, some fundamental economic and conventional business practices, if performed on a generic computer, are also abstract ideas. Third, longstanding, well-known methods of organizing human behavior are also abstract ideas. Fourth, manipulating information—collecting information, analyzing information, or presenting information—without more, is also an abstract idea.

*Automated Tracking Sols., LLC v. Coca-Cola Co.*, 223 F. Supp. 3d 1278, 1285 (N.D. Ga. 2016), *aff'd*, 723 F. App'x 989 (Fed. Cir. 2018).

Against this backdrop, DeCurtis argues that all of the asserted claims in connection with the '184 patent are directed toward an abstract idea because they merely recite generic, high-level computer components for enabling wireless communication between guests and a central server. The SAC references, for example, the '184 patent as describing a "guest engagement system" comprising "a plurality of portable guest devices" that operate wirelessly with a generic network. [D.E. 88 at ¶ 58]. DeCurtis views this as an abstract idea because, while it might sound innovative, the concept is nothing more than logging guest information in a computer-based environment.

DeCurtis also takes aim at the "technical improvements" contained throughout the SAC:

> (1) a new and superior user interface, (2) relocation of demanding
> computer- intensive resources, (3) an improved beacon-centric model of
> communication to the environment, (4) improved battery life and
> power consumption, (5) enhanced security through novel door lock
> mechanism designs, and (6) an improved location determination
> system particularly suited for environments such as a cruise ship.

[D.E. 88 at ¶ 51].  DeCurtis takes issue with these "improvements" because they are not reflected in the '184 patent.  DeCurtis states, for instance, that the '184 patent fails to even mention a "superior user interface" or  "computer-intensive resources," and that there is nothing that requires an "improved beacon-centric model" or an "improved battery life."  And while the '184 patent references "secure encrypted information," DeCurtis maintains that this is equally insufficient because there is a lack of specificity.  So, while the SAC mentions several improvements, "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves[.]"  *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016).

Carnival's response is that there are an abundance of improvements in both the '184 patent and the SAC, and that the Federal Circuit has "routinely held [that] software claims [are] patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself."  *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed Cir. 2020).  Carnival describes these improvements as a network architecture that combines portable Bluetooth Low Energy beacon devices, stationary sensors, peripheral devices, and servers arranged in an inverted model that transforms the functionality of a guest engagement system.  Carnival also states that, while the use of a guest engagement

system in a wireless network was already well known, the unique beacon and sensor system was not.  Indeed, Carnival views the '184 patent as an entirely new system with hardware configured in a unique way.

We could spend copious amounts of time sifting through the many arguments presented, but there is no need to do so when there are obvious issues of fact that preclude the dismissal of count four.  Take, for instance, the allegation that Carnival's use of a beacon is an entirely new system previously unknown to the industry:

> The '184 Patent's claimed inventions are not directed to and have different inventive concepts than any such stationary BLE beacon systems (which themselves would not have been routine or conventional): they flip the entire frame of refence [sic] by making the *sensors stationary* and the *beacons mobile*.  The overall arrangement of this system, which was not well-understood, routine, or conventional at the time Carnival conceived it, was an inventive concept driven by, and directed to address, technical issues particular to Carnival's unique use case.  In doing so, the '184 Patent's inventors devised several technical improvements to the hardware and software components themselves.  These improvements facilitate the '184 Patent's unconventional and specific arrangement of its system components.  This arrangement represented an important technical innovation in and of itself.

[D.E. 88 at 57].

If true, this allegation undermines dismissal at step two because – even if we assume that the '184 patent is an abstract idea at step one – there are well-pleaded allegations that the elements of this device are not well-understood, routine, or conventional activity.  *See Aatrix*, 882 F.3d at 1128 ("There are concrete allegations in the second amended complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity.").

Carnival claims that these individual components are innovative in their device and that – even if the the hardware (i.e. the interface, sensors, access panes, radios) – is conventional "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Global Internet Services, Inc.*, 827 F.3d at 1350.

DeCurtis's answer to this allegation is to reference other cases, where patent examiners have found that Carnival was not the first company to ever conceive of implementing a beacon in a portable device. But, even if we considered these cases (and we decline to do so), that is not what Carnival alleges. Carnival claims that, while there have been prior efforts to use beacons in guest engagement systems, none of those devices share the same characteristics with the model it produced:

> [A]t the time of the inventions, there had been efforts to leverage Bluetooth Low Energy to improve guest engagement systems, but these efforts all focused on utilizing BLE beacons as stationary objects that continually broadcast beacon signals to any devices containing sensors that might happen to come within communication range of the beacon. Carnival's inventors recognized that this model would not be suited to address Carnival's unique vision for an unprecedented immersive guest engagement system, which requires automated location services enabled by many thousands of points of reference aboard a moving cruise ship.

[D.E. 88 at 56].

In other words, Carnival's argument is much more complex than what DeCurtis makes it out to be because it is not simply the use of a beacon in a guest engagement system that makes it patentable, but the way in which the device is composed of certain hardware and software that it makes the finished product an inventive concept. *See Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed.

Cir. 2019) ("[E]ven assuming that Bluetooth was conventional at the time of these inventions, implementing a well-known technique with particular devices in a specific combination, like the two-device structure here, can be inventive.") (citing *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983) ("Most, if not all, inventions are combinations and mostly of old elements.")).   Whether this includes making sensors stationary and beacons mobile, [D.E. 88 at 57], or enabling wayfinding technology within a moving reference frame as well as within a fixed reference frame, *id*. at 65, there are so many allegations to show that Carnival's device is anything but routine even if the underlying components are conventional.

DeCurtis remains unconvinced because Carnival's device, even if customized, is insufficient evidence of an inventive concept.   But, on this record and at the pleading stage, DeCurtis lacks the ammunition to discount Carnival's allegations because – at best – DeCurtis has presented a factual dispute that cannot be resolved on a motion to dismiss.   The Federal Circuit has made this point clear in several prior cases because, when a patentee presents adequate allegations that its device is inventive, the inquiry ends.   *See Cellspin Soft, Inc.*, 927 F.3d at 1318 ("The district court . . . erred by ignoring the principle, implicit in *Berkheimer* and explicit in *Aatrix*, that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101."); *Aatrix*, 882 F.3d at 1126–27 ("[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6).").

*Bascom* is instructive on this point because there the Federal Circuit

explained that the placement of a filtering tool "at a specific location," and configured in a particular way, evidenced an inventive concept because the "limited record" before the court did not demonstrate that the "specific method of filtering" claimed "ha[d] been conventional or generic." *Bascom Global Internet Services, Inc.*, 827 F.3d at 1350. Parties have tried to sidestep cases like *Bascom* with arguments that certain hardware or software concepts are not particularly novel for a device to be inventive. Yet, so long as the patentee does "more than simply label [the innovative] techniques as inventive," and point to some "evidence suggesting that these techniques had not been implemented in a similar way," that is enough to survive a motion to dismiss. *Cellspin Soft, Inc.*, 927 F.3d at 1318 (citation omitted). The same is true here because Carnival's allegations present a specific, plausible way of arranging components to do significantly more than any other portable on the market. Whether this is true is not for us to decide on a motion to dismiss. So, given that Carnival's allegations must be accepted as true at the pleading stage, DeCurtis's motion to dismiss count four pursuant to 35 U.S.C. § 101 should be **DENIED**.

### E.   *Violation of Section 271 (Counts 4 and 6)*

Carnival alleges in counts four and six that DeCurtis violated 35 U.S.C. § 271(f) when it supplied components to infringe on the '184 patent and the '514 patent:

> DeCurtis also has infringed by supplying or causing to be supplied in or from the United States the components of the '184 Infringing Systems identified in Paragraph 157, which are uncombined in whole or in part, intending and actively inducing the combination of such

components outside the United States in a manner that would infringe
the patent if such combination occurred within the United States.

[D.E. 88 at ¶ 153; *id*. at ¶ 185].

To understand the arguments that follow, it is important to first discuss the
statutory framework of Section 271(f) and how it outlines several types of
infringement. Congress adopted Section 271(f) in 1984 to provide that infringement
occurs when one "suppl[ies] . . . from the United States," for "combination" abroad, a
patented invention's "components." 35 U.S.C. § 271(f)(1). The general infringement
provision, § 271, covers most infringements that occur "within the United States."
However, § 271(f), "expands the definition of infringement to include supplying from
the United States a patented invention's components." *Microsoft Corp. v. AT & T.*,
550 U.S. 437, 441 (2007). It contains two provisions that "work in tandem" to
address "different scenarios." *Life Techs. Cpr. v. Promega Corp.*, 137 S. Ct. 734, 742
(2017).

Section 271(f)(1) addresses the act of exporting a substantial portion of an
invention's components:

Whoever without authority supplies or causes to be supplied in or from
the United States all or a substantial portion of the components of a
patented invention, where such components are uncombined in whole
or in part, in such manner as to actively induce the combination of
such components outside of the United States in a manner that would
infringe the patent if such combination occurred within the United
States, shall be liable as an infringer.

35 U.S.C. § 271(f)(1).

Section 271(f)(2) looks to the act of exporting components that are specially
adapted for an invention:

> Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(2). "Patent owners who prove infringement under § 271 are entitled to relief under § 284, which authorizes "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2135 (2018).

In light of these principles, DeCurtis claims that count four is deficient because – although Carnival alleges that DeCurtis infringed on the '184 patent through the use of hardware and/or software – Carnival failed to describe with any specificity the underlying components. This argument is unavailing because, to state a claim under 35 U.S.C. § 271(f)(1), there is no requirement that a patentee has to identify and plead the underlying component(s) of an infringing system. *See Twentieth Century Fox Home Entm't LLC v. Nissim Corp.*, 2015 WL 10857478, at *3 (S.D. Fla. Oct. 5, 2015) ("Defendant included allegations that Plaintiffs have sent or caused to be sent, from the United States, components for providing User Operation Control or Seamless Play capability. The Court finds that this allegation is sufficient at the pleading stage to state a claim, and it is not necessary for Defendant to identify and plead the actual component.") (internal citation omitted). Thus, based on this argument, DeCurtis's motion to dismiss count four

should be **DENIED**.

Moving to count six, Carnival alleges that DeCurtis infringed on the '514 patent and violated § 271(f) when it created a portable wireless device known as "The Band." DeCurtis takes issue with these allegations because – if DeCurtis supplied this device as a unit – then it is implausible that other components were used in combination as required under § 271(f). DeCurtis's argument is not without merit because, based on the SAC, Carnival's theory of liability is short on details. However, dismissal is inappropriate because there are just enough factual allegations that the underlying components were supplied from the United States and combined elsewhere:

> DeCurtis also has infringed by supplying or causing to be supplied in or form [sic] the United States the components of the '514 Infringing Systems identified in Paragraph 183, which are uncombined in whole or in part, intending and actively inducing the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States

[D.E. 88 at ¶ 185].

DeCurtis's argument is really aimed at whether these allegations are true or not because, in its view, it seems unclear as to how a device was later combined with other items to infringe on Carnival's patent. That is certainly a point well taken and it should be explored at a later date, either at trial or on a motion for summary judgment. But, given that we are merely at the motion to dismiss stage, it would be inappropriate to require Carnival to allege more specificity as to how this conduct took place. After all, that is the whole point of discovery – to either substantiate or disprove the allegations presented in a pleading. So, given that we

have to accept these allegations as true for the time being and that, Carnival has also alleged that certain hardware and software components were used to turn "The Band" into an infringing product with certain unspecified components, DeCurtis's motion to dismiss count six for this reason should be **DENIED**.

### F. *Induced Infringement (Count 5)*

In count five, Carnival brings a claim for induced and contributory infringement of the '516 Patent.  Turning first to Carnival's allegations for induced infringement, DeCurtis argues that this claim fails because the SAC only contains vague allegations.  DeCurtis takes aim at paragraph 168 of the SAC because – although it references the ways in which DeCurtis induced others – the allegations are hopelessly vague.  As a result, DeCurtis asks that this claim be dismissed because the SAC fails to allege enough facts to raise a plausible claim for relief that DeCurtis acted with specific intent.

A party is liable for induced infringement if it "actively induces infringement of a patent." 35 U.S.C. § 271(b).  To prove induced infringement, a patentee must demonstrate that the accused infringer had the intent to cause the acts which constitute the infringement. *See Mee Indus. v. Dow Chemical Co.,* 608 F.3d 1202, 1215 (11th Cir. 2010).  That is, a plaintiff has the burden to demonstrate that the defendant was aware of the patent and actively and knowingly aided and abetted another's direct infringement. *Id.*  Thus, to establish a claim for induced infringement, a patentee must show that: (1) there has been direct infringement; (2) the alleged infringer knowingly induced infringement; and (3) the alleged infringer

possessed specific intent to encourage another's infringement.  *See Zamora Radio, LLC v. Last.FM, Ltd.*, 758 F. Supp. 2d 1242, 1248 (S.D. Fla. 2010).[8]

The SAC is not the most elaborate pleading with respect to the allegations of specific intent.  That much is clear when reviewing the SAC and DeCurtis's motion to dismiss.  It is not accurate, however, to say that the allegations are too vague to survive a motion to dismiss.  Carnival alleges that DeCurtis acted with specific intent because it provided documentation, marketing materials, and training items to customers so that they could make use of the '516 Patent.  If Carnival had stopped there, the allegations might have fallen short in alleging specific intent.  *See, e.g.*, *Bonutti Skeletal Innovations LLC v. Arthrex, Inc.*, 2013 WL 12149302, at *4 (M.D. Fla. July 10, 2013) ("The Court determined that marketing infringing products, without more, is not sufficient to show that a defendant possessed specific intent to encourage another's infringement, stating, "[m]erely including instructions and conducting training sessions, standing alone, are innocuous activities that do not suggest a specific intent to encourage another's infringement.") (citation omitted); *see also MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 234–35 (D. Del. 2012) (citations omitted) (holding that allegations of "selling, advertising, supplying and instructing its respective customers on the use of the infringing product" are insufficient to establish that the defendants knew such activities contributed to infringement or possessed the specific intent to encourage infringement).

---

[8]     "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and actions to induce infringement must be proven." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006).

But, Carnival supported those allegations with the additional assertion that DeCurtis provided ongoing technical and customer support to *teach* customers how to make use of the patent to commit acts of direct infringement.  This is enough to survive a motion to dismiss because it shows that DeCurtis took specific steps to help customers violate Carnival's patent.  *See Telecomm Innovations, LLC v. Ricoh Co., Ltd.*, 966 F. Supp. 2d 390, 395 (D. Del. 2013) (denying motion to dismiss because the "plaintiff . . . alleges that that defendants provided technical support and instructions to their customers on how to use products in such a way as to infringe the patented invention.").

The difference is subtle, but it is important to draw a distinction between ordinary acts and those that are aimed at teaching an infringing use.  On one hand, "ordinary acts incident to product distribution, such as offering customers technical support or product updates," will not support inducement liability.  *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005).  On the other hand, instructions that "teach an infringing use" of a product may be sufficient to infer "an affirmative intent to infringe the patent."  *Vita–Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009); *see also Metro–Goldwyn–Maye Studios*, 545 U.S. at 936 ("Evidence of 'active steps . . . taken to encourage direct infringement,' . . . such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe.") (citation omitted); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012) (noting that in order to be liable

for induced infringement, the defendant must "go beyond describing the infringing mode" and "recommend[ ] that customers use the infringing mode"). Ultimately, what the patentee must allege is "culpable conduct, directed to encouraging another's infringement." *DSU Med. Corp.*, 471 F.3d at 1306.

That is exactly what Carnival has done in this case because there are allegations that DeCurtis gave customers documentation on how to make use of the '516 Patent and then trained those customers on how to accomplish the unlawful conduct. *See, e.g.*, *Arthrex, Inc. v. DePuy Mitek, Inc.*, 2009 WL 10671496, at *6 (M.D. Fla. Sept. 4, 2009) ("Defendant's actions clearly demonstrate its affirmative intent to cause direct infringement. It provides customers with 'Instructions for Use,' trains surgeons and its sales force in the SingShot method, and supports its customers with in-person training and conference calls."). This goes beyond everyday matters of technical and customer support because the purpose of these training sessions – at least when accepting the allegations as true – was to guide customers on how to infringe on Carnival's patents. That is enough to raise a plausible claim for relief because the Court can infer that DeCurtis acted with specific intent. *See Unilin Beheer B.V. v. Tropical Flooring*, 2014 WL 2795360, at *5 (C.D. Cal. June 13, 2014) ("Plaintiffs plead that Defendants advertised the products, and 'provid [ed] written instructions instructing customers on how to assemble and use the products.' These factual allegations enable the Court to draw a reasonable inference that Defendants possessed the required specific intent.") (internal citation omitted); *MyMedicalRecords, Inc. v. Jardogs, LLC*, 1 F. Supp. 3d 1020, 1027 (C.D.

Cal. 2014) ("[P]laintiff may establish a defendant's specific intent to induce infringement based on the defendant's instructions that teach users to practice the accused product in a manner the defendant knows is infringing.") (citing *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 852 (Fed. Cir. 2010)).  While DeCurtis has a viable argument that the SAC's allegations are short on details, there are enough facts to infer that DeCurtis acted with specific intent and therefore the motion to dismiss the induced infringement claim should be **DENIED**.

### G.    *Contributory Infringement (Count 5)*

The penultimate issue is whether Carnival has stated a claim for contributory infringement.  Contributory infringement occurs if a party sells or offers to sell a material or apparatus for use in practicing a patented process, and that "material or apparatus" is material to practicing the invention, has no substantial non-infringing uses, and is known "to be especially made or especially adapted for use in the infringement of such patent." 35 U.S.C. § 271(c).  The Supreme Court has clarified that "§ 271(c) requires knowledge of the existence of the patent that is infringed." *Global–Tech,* 131 S.Ct. at 2068.  In addition to pleading the requisite knowledge of the patent-in-suit at the time of infringement, a claim for contributory infringement must plead facts allowing an inference that the components sold or offered for sale have no substantial non-infringing uses. *See In re Bill of Lading,* 681 F.3d 1323 at 1337; *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1312 (Fed. Cir. 2005) ("In order to succeed on a claim of contributory infringement, in addition to proving an act of direct

infringement, plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented and infringing' and that defendant's components have 'no substantial non-infringing uses.'"). (quoting *Golden Blount, Inc. v. Robert H. Peterson Co.,* 365 F.3d 1054, 1061 (Fed. Cir. 2004)).  A substantial non-infringing use is any use that is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita–Mix Corp., Inc.,* 581 F.3d at 1327–29.

DeCurtis argues that Carnival's claim for contributory inducement in count five should be dismissed because there are insufficient factual allegations to explain how the components that DeCurtis provided to customers have no substantial non-infringing use.  This point is well taken because there is only a *single* sentence in count five that touches on this subject.  [D.E. 88 at ¶ 167 ("Said components are not suitable for any substantial non-infringing use.")].  That is inadequate because it needs more factual support to explain why that statement is true and to raise the claim above the speculative level.  *See Sundesa, LLC v. JH Studios, Inc.,* 2020 WL 4003127, at *6 (M.D. Fla. July 15, 2020) ("Plaintiff merely concludes that the 'Accused Product has no substantial non-infringing uses.'  However, the law requires Plaintiff to allege *facts* that permit the Court to infer no substantial non-infringing use.  Plaintiff fails to do so.  As such, the contributory infringement claim under § 271(c) fails.") (internal citation omitted); *Brandywine Commc'ns Techs., LLC v. T-Mobile USA, Inc.,* 904 F. Supp. 2d 1260, 1271 (M.D. Fla. 2012) ("Brandywine's allegations that the 922 Accused Products and the '717 Accused

Products 'have no substantial non-infringing uses'", without more, is insufficient to support a claim of contributory infringement pursuant to § 271(c).") (citation omitted).  Because more facts are required to explain how certain components were not suitable for any substantial non-infringing use, DeCurtis's motion to dismiss Carnival's contributory infringement claim in count five should be **GRANTED**.

### H.  *Whether the SAC Should be Dismissed with Prejudice*

The final issue is whether Carnival's SAC should be dismissed with prejudice.  DeCurtis suggests, in a single sentence, that leave to amend should be denied because Carnival has already had one opportunity to correct the errors previously identified.  *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) (stating that "after that one opportunity to replead comes and goes . . . the district court [may] dismiss with prejudice if the party has still neither filed a compliant pleading nor asked for leave to amend.") (citing *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 .7 (11th Cir. 2006)).

That is not entirely accurate because this is merely the first time that the Court has ruled on a pending motion to dismiss and identified the shortfalls that need to be corrected.  *See Bloom v. Alvereze*, 498 F. App'x 867, 884 (11th Cir. 2012) ("After a district court grants an opportunity to amend and identifies the pleading's deficiencies, if the plaintiff fails to submit a proper pleading, dismissal with prejudice is appropriate.") (citing *Welch v. Laney,* 57 F.3d 1004, 1009 (11th Cir. 1995) (affirming dismissal of a portion of the complaint with prejudice after the district court gave the plaintiff two opportunities to amend her complaint, but the

38

plaintiff failed to properly plead a § 1983 claim)).  If this was the second time the Court had pointed out pleading errors and Carnival had failed to remedy them, DeCurtis's argument would be much more persuasive.

Leave to amend should also be granted for a separate reason because "[w]here a more carefully drafted complaint might state a claim upon which relief could be granted, the district court should allow [a] plaintiff to amend the complaint rather than dismiss it." *Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995).  That is exactly the case here because, although there are flaws in the SAC, the corrections may not require any herculean efforts.   We therefore recommend that any dismissal be without prejudice and that Carnival be given leave to file an amended complaint.

## IV.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that DeCurtis's motion to dismiss be **GRANTED in part** and **DENIED in part**:

A.   DeCurtis's motion to dismiss counts two, three, and the contributory inducement claim in count five should be **GRANTED** without prejudice.

B.   In all other respects, DeCurtis's motion to dismiss should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District

Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 6th day of January, 2021.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge