# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **CARNIVAL CORPORATION,** | ) |
| a Panamanian corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 1:20-cv-22945-RNS |
| | ) |
| **DECURTIS LLC,** a Delaware limited liability | ) |
| corporation, and **DECURTIS** | ) |
| **CORPORATION,** | ) |
| a Florida corporation, | ) |
| | ) |
| Defendants. | ) |

## DECURTIS' MOTION FOR SUMMARY JUDGMENT REGARDING INVALIDITY UNDER 35 U.S.C. SECTION 112

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................................1

SUMMARY JUDGMENT LEGAL STANDARD ...................................................................2

PROCEDURAL BACKGROUND............................................................................................2

ARGUMENT ............................................................................................................................3

I.  '184 PATENT CLAIMS 11-15 ARE INVALID AS INDEFINITE ................................3

    A.  Legal Standard For Indefiniteness ......................................................................4

    B.  Claims 11-15 Of The '184 Patent Are Indefinite As A Matter Of Law .................4

II.  '514 PATENT CLAIM 11 IS INVALID FOR LACK OF ENABLEMENT .....................7

    A.  Legal Standard For Enablement...........................................................................7

    B.  Claim 11 Of The '514 Patent Is Not Enabled As A Matter Of Law......................8

    C.  The Relevant Factors Support A Finding Of Non-Enablement............................11

        1.  A Considerable Quantity Of Experimentation Would Be Required..........12

        2.  Little Direction Or Guidance Is Provided By The Specification ...............12

        3.  The Specification Lacks Working Examples..............................................13

        4.  The Nature Of The Invention Supports a Finding Of Non-Enablement ..............................................................................................13

        5.  The State Of The Prior Art Supports A Finding Of Non-Enablement ..............................................................................................14

        6.  The Relative Skill Of Those In The Art Was Relatively Modest .............14

        7.  The Art Was Static Which Supports A Finding Of Non-Enablement ...............................................................................................14

        8.  The Claims Are Extremely Broad.............................................................16

III.  '184 PATENT CLAIMS 11-15 AND '514 PATENT CLAIM 11 ARE INVALID
     FOR LACK OF WRITTEN DESCRIPTION SUPPORT ................................................16

    A.  Legal Standard For Written Description..............................................................17

    B.  Claims 11-15 Of The '184 Patent Lack Written Description Support...................17

    C.  Claim 11 Of The '514 Patent Lacks Written Description Support........................19

CONCLUSION........................................................................................................................20

i

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
 759 F.3d 1285 (Fed. Cir. 2014) ................................................................. 17

*Alcon Research, Ltd. v. Apotex Inc.*,
 687 F.3d 1362 (Fed. Cir. 2012) ............................................................. 8, 16

*Andersen Corp. v. Fiber Composites, LLC*,
 474 F.3d 1361 (Fed. Cir. 2007) ................................................................... 8

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).............................................................................. 2, 9

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
 598 F.3d 1336 (Fed. Cir. 2010) ................................................................. 17

*Atl. Research Marketing Sys, Inc. v. Troy*,
 659 F.3d 1345 (Fed. Cir. 2011) ........................................................... 17, 19

*Automotive Techs Int'l v. BMW of N. Am.*,
 501 F.3d 1274 (Fed. Cir. 2007) ................................................................... 8

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*,
 636 F.3d 1341 (Fed. Cir. 2011) ................................................................. 17

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
 358 F.3d 1371 (Fed. Cir. 2004) ................................................................... 5

*D Three Enters., LLC v. Sunmodo Corp.*,
 890 F.3d 1042 (Fed. Cir. 2018) ................................................................. 17

*Fargo Electronics, Inc. v. Iris, Ltd., Inc.*,
 287 Fed. App'x 96 (Fed. Cir. 2008) ....................................................... 4, 5

*Genentech, Inc. v. Novo Nordisk, A/S*,
 108 F.3d 1361 (Fed. Cir. 1997) ................................................................... 7

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
 407 F.3d 1297 (Fed. Cir. 2005) ................................................................... 4

*Honeywell Int'l. Inc. v. ICM Controls Corp.*,
 2014 WL 4248434 (D. Minn. 2014).............................................................. 5

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
 732 F.3d 1376 (Fed. Cir. 2013) ................................................................... 7

*In re Packard*,
 751 F.3d 1307 (Fed. Cir. 2014) ................................................................... 4

*In re Wands*,
 858 F.2d 731 (Fed. Cir. 1988) .............................................................. 7, 11

*Intel Corp. v. Tela Innovations, Inc.*,
  Case No. 3:18-CV-02848-WHO, 2021 WL 1222622 (N.D. Cal. Feb. 11, 2021) ............... 9, 10

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  481 F.3d 1371 (Fed. Cir. 2007) ........................................................................................... 8, 9

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ............................................................................................. 18

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012) ...................................................................... 8, 9, 11, 15, 16

*Markman v. Westview*,
  517 U.S. 370 (1996) .................................................................................................................. 4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) .................................................................................................................. 4

*NetAirus Techs., LLC v. Apple Inc.*,
  Case No. 13-03780, 2016 WL 5898640 (C.D. Cal. Mar. 23, 2016) ....................................... 18

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ............................................................................................... 8

*PowerOasis, Inc. v. T-Mobile USA, Inc.*
  522 F.3d 1299, 1307 (Fed. Cir. 2008) .................................................................................... 20

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
  927 F.2d 1565 (Fed. Cir. 1991) ............................................................................................. 8, 9

*SIPCO, LLC v. Abb, Inc.*,
  No. 6:11-CV-0048 LED-JDL, 2012 WL 3112302, (E.D. Tex. July 30, 2012), *adopted sub
  nom. SIPCO, LLC v. Abb, Inc.*, No. 6:11CV48 LED-JDL, 2012 WL 12842877 (E.D. Tex. Oct.
  23, 2012) ................................................................................................................................. 20

*Sitrick v. Dreamworks, LLC*,
  516 F.3d 993 (Fed. Cir. 2008) ......................................................................................... 7, 8, 11

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019) ............................................................................................... 2

*Trustees of Boston Univ. v. Everlight Elecs. Co., Ltd.*,
  896 F.3d 1357 (Fed. Cir. 2018) ............................................................................................... 8

*Union Pacific Resources Co. v. Chesapeake Energy Corp.*,
  236 F.3d 684 (Fed. Cir. 2001) ............................................................................................... 16

*White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*,
  713 F.2d 788 (Fed. Cir. 1983) ............................................................................................... 16

*Wyeth & Cordis Corp. v. Abbot Labs*,
  720 F.3d 1380 (Fed. Cir. 2013) ............................................................................................... 8

*Zoho Corp. v. Sentius Int'l, LLC*,
  494 F. Supp. 3d 693 (N.D. Cal. 2020) .................................................................................... 18

**<u>Statutes</u>**

35 U.S.C. § 112(a) ........................................................................................... 1, 2, 7, 17

35 U.S.C. § 112(b) .................................................................................................. 1, 4

DeCurtis, LLC and DeCurtis Corporation (collectively "DeCurtis") move for summary judgment that claims 11-15 of U.S. Patent 10,045,184, Ex. A,[1] ECF No. 199-1[2] (the "'184 patent"), and claim 11 of U.S. Patent 10,157,514, Ex. B, ECF No. 199-2 (the "'514 patent") are invalid under 35 U.S.C § 112. This Motion is filed concurrently with DeCurtis' Opening Claim Construction Brief, and overlaps with the issues presented therein. DeCurtis supports this Motion with the Expert Declarations of Dr. Matthew Shoemake ("Shoemake Op. Decl.") (ECF 198-4), Dr. Emmanouil M. Tentzeris ("Tentzeris Op. Decl.") (ECF 198-2), and Dr. Markus Jakobsson ("Jakobsson Op. Decl.") (ECF 198-3), as well as the Rebuttal Declaration of Dr. Shoemake ("Shoemake Reb. Decl.") (ECF 198-6). This Motion may also refer to Carnival's Opening Declaration of Erik de la Iglesia ("de la Iglesia Op. Decl.) (ECF 198-1) as well as the Rebuttal Declaration of Mr. de la Iglesia ("de la Iglesia Reb. Decl.) (ECF 198-5).

## INTRODUCTION

Carnival's patent claims include a number of defective limitations, which either fail to give reasonable notice to a person of ordinary skill in the art about the scope of what is being claimed, or seek to capture embodiments that are not disclosed and/or not enabled by the patents in accordance with the requirements of the Section 112 of the patent statute. Specifically:

- The "storing a log" limitation of claims 11-15 of the '184 patent fails to inform, with reasonable certainty, a person of ordinary skill regarding its scope. The claim is therefore invalid as indefinite under 35 U.S.C. § 112(b);

- The "portable device" limitation of claim 11 of the '514 patent does not enable a person of ordinary skill in the art to practice the entire range of its recited dimensions without engaging in "undue experimentation." As such, the claim is invalid for lack of enablement under 35 U.S.C. § 112(a);

- The "each sensor" limitation of claims 11-15 of the '184 patent requires every sensor of the sensor network to be operative to transmit a command causing the portable guest device to change operating modes. But, the specification lacks disclosure of an NFC sensor with such functionality. Thus, this claim is invalid for lack of written description under 35 U.S.C. § 112(a);

---

[1]   References in this Motion to "Ex. __" refer to the corresponding exhibit to the Declaration of Patrick T. Schmidt in support of DeCurtis Corporation's and DeCurtis LLC's Claim Construction Brief and Motion for Summary Judgment. *See* ECF 199.

[2]   ECF numbers in this brief currently cite to the publicly available versions of the documents. Once DeCurtis' Motion to Seal has been granted, an updated brief citing the ECF numbers for the relevant sealed documents will then be filed on the docket.

- Claim 11 of the '514 patent requires a portable wireless device "configured to establish secure communication links."  To the extent that Carnival argues that this limitation would cover embodiments allowing a device to *become* configured using specialized key transport or key exchange protocols, the patent specification lacks any disclosure of these protocols.  As such, the claim is invalid for lack of written description under 35 U.S.C. § 112(a).

Each of these issues turn entirely on the proper interpretation of the claims. There are no genuine issues of material fact.  Thus, the Court should grant summary judgment as set forth below.

## SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A genuine dispute of material fact requires "that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party demonstrates the absence of a triable dispute, the burden shifts to the opposing party.  *Id.* at 250.

## PROCEDURAL BACKGROUND

DeCurtis brings this motion for summary judgment pursuant to the Court's operative scheduling order, which provides a November 5, 2021 deadline to file an opening brief "asserting claims for invalidity and unenforceability."  ECF No. 177 at 10.  This deadline stems from Judge Scola's Model Patent Case Track, *see* ECF No. 44 at 3, as well as Judge Scola's Patent Rule 4-5, ECF No. 44 at 3, which call for an "opening brief asserting claims for invalidity and unenforceability" at the time of filing the opening claim construction brief.

In the parties' August 27, 2020 Joint Discovery Plan and Conference Report, ECF 72, DeCurtis noted that its defenses for unenforceability and ***prior-art*** invalidity would likely raise factual disputes, require post-claim construction discovery, and would not be amenable to an early motion for summary judgment.  *Id.* at 9.  However, DeCurtis stated that it was willing to file any summary judgment motion that it may have on "purely legal" issues under 35 U.S.C. § 112 with the opening claim construction brief.[3]  DeCurtis, therefore, requested "clarification that Rule 4-5 does not *require* briefing on issues of unenforceability or prior art invalidity, and that motions for summary judgment on these issues may be raised at a later time in the case." *Id.*

---

[3]  DeCurtis' reference to "purely legal" issues was shorthand for issues on which there were no "genuine issue of material fact" and which were "amenable to summary judgment."  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1302 n.5 (Fed. Cir. 2019) (recognizing that denial of a summary judgment motion for patent ineligibility can raise issues that are "purely legal").

(emphasis added).  The Court adopted this precise clarification.  ECF No. 73.

In advance of claim construction proceedings in this case, the parties' conferred regarding a stipulated schedule for exchanging expert witness materials concerning claim construction *and* Section 112 invalidity.  The purpose of this stipulation was to allow for the orderly exchange of expert opinions and to allow sufficient time for both sides to fairly depose any proffered experts.  In an August 5, 2021 email, Carnival's counsel agreed to a staged exchange of expert witness declarations.  Ex. AG, ECF 199-33 (8/5/2021 email correspondence).  As Carnival's counsel wrote, "[b]ecause DeCurtis bears the burden of proof on invalidity, any expert opinions on behalf of DeCurtis with respect to *section 112 arguments* that DeCurtis intends to present at this stage of the case will be served on September 10, and any expert opinions on behalf of Carnival regarding those section 112 arguments will be submitted on October 1 as rebuttal declarations."  *Id.* (emphasis added).  DeCurtis timely served its expert declarations regarding Section 112 invalidity on September 10.  Carnival, however, opted not to serve a rebuttal expert declaration on DeCurtis' enablement and written-description arguments.

Given the procedural background above, this motion for summary judgment is consistent with the Court's scheduling order.  It also advances judicial economy because the indefiniteness, lack of enablement, and lack of written description issues overlap with the concurrently filed claim construction issues, can be adjudicated now, and have the potential to streamline the case.  Moreover, given the parties' prior agreement regarding exchange of expert declarations, DeCurtis requests that the Court consider this Motion on the expert witness record currently before the Court, and not entertain any declarations that Carnival may serve in opposition.

## ARGUMENT

## I.    '184 PATENT CLAIMS 11-15 ARE INVALID AS INDEFINITE

Claim 11 of the '184 patent recites, in relevant part, a "central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and *storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network*."  SOF ¶ 1.[4]  This limitation fails to provide "reasonable certainty" to a person of ordinary skill in the art regarding its scope, and is therefore invalid as indefinite.  SOF ¶¶ 6-8.

---

[4]    References in this Motion to "SOF ¶ __" refer to DeCurtis' concurrently filed Statement of Material Facts in Support of this Motion for Summary Judgment.

### A.      Legal Standard For Indefiniteness

The Patent statute requires that the specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."  35 U.S.C. § 112(b).  A patent claim is invalid if, in light of the intrinsic evidence, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Definiteness requires that "a patent must be precise enough to afford clear notice of what is claimed, thereby 'apprising the public of what is still open to them.'"  *Id.*, *quoting Markman v. Westview*, 517 U.S. 370, 373 (1996).  Definiteness is an issue of claim construction, which is a matter of law for the Court.  *In re Packard*, 751 F.3d 1307, 1311 (Fed. Cir. 2014) ("Indefiniteness, as a subset of claim construction, is a question of law which this court reviews without deference.").  If the intended scope of a claim is subject to reasonable debate, the court may not redraft the claim to avoid a finding of indefiniteness.  *See Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302-03 (Fed. Cir. 2005); *Fargo Electronics, Inc. v. Iris, Ltd., Inc.*, 287 Fed. App'x 96 (Fed. Cir. 2008).

### B.      Claims 11-15 Of The '184 Patent Are Indefinite As A Matter Of Law

The "log" limitation of claim 11 fails to inform a person of ordinary skill in the art about the appropriate scope of the claim and is therefore indefinite.  SOF ¶¶ 6-8.  The claim language requires a "central server . . . storing a log ***associating*** each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network." (Emphasis added).  As Carnival's own expert acknowledges, "associating" involves "joining or combining together, bringing together, bringing into relationship, correlating or connecting logically, or correlating or connecting causally."  *See* de la Iglesia Reb. Decl. ¶ 22; SOF ¶ 2.  The term is used to require a connection between or amongst two or more elements.  *See* Ex. J, ECF 199-10 (de la Iglesia Dep.) at 161:22-162:1; SOF ¶ 3.  Here, however, the claim recites only one element after the "associating" term—*i.e.*, "each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network."  The claim never specifies with *what* each received "unique identifier" is associated.  This flaw becomes apparent when the term is contrasted with the similar log limitation of claim 1:

- **"Log" limitation of '184 patent claims 1 & 7**—"storing a log associating each unique identifier of a portable guest device detected using BLE communications by a sensor of the sensor network **with the known location of the sensor and a timestamp**"

4

- **"Log" limitation of '184 patent claim 11**—"storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network [    ?    ]"

As shown above, claim 1 provides that the "log" associates the received "unique identifier" *with* the "known location of the sensor and a timestamp." Claim 11, by contrast, provides no such guidance regarding what information the received "unique identifier" must be associated with. A person of ordinary skill is left to guess as to what would, and would not, infringe claim 11. *See* Shoemake Op. Decl. ¶ 110; SOF ¶ 7.

An analogous situation arose in *Fargo Electronics*. There, the claim recited "[a]n ink ribbon roll" comprising a "first support" and "a plurality of second supports," wherein "the second supports *other than the* being oriented at known positions relative to the home position . . . ." 287 Fed. App'x at 99 (emphasis in original). The Court noted that "[a] plain reading of claim shows that there [was] an error," because "the phrase 'second supports other than the' naturally leads the reader to expect a description of a further subset of that category of supports known as 'second supports.'" *Id.* at 100. Because the claim did not "identify the object of the phrase 'other than the,'" it was invalid for indefiniteness.[5]

The same is true of claim 11 here. The claim language sets forth the requirement for a log "associating" received "unique identifiers" in a manner that naturally leads the reader to expect some further description of information with which the "unique identifiers" must be associated. No such description is apparent in the plain claim language, rendering claim 11 indefinite. *See also Honeywell Int'l. Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 2014 WL 4248434, *8-10 (D. Minn. Aug. 27, 2014) (granting summary judgment that claim was invalid for being indefinite where it was clear that some language was missing from the preamble, and it was not clear how to correct the missing language where there were two plausible choices).

The patent specification only exacerbates the ambiguity.[6] The specification teaches that

---

[5]   The Federal Circuit further noted that the claim was not amenable to "correction" by the district court, because the error was not subject to only one reasonable correction, but was rather subject to reasonable debate. *Fargo*, 287 Fed. App'x at 102, *citing Group One,* 407 F.3d at 1302; *see also Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.").

[6]   Nor does the prosecution history shed any light on the intended scope of claim 11. The error in what is now claim 11 was present in the claim as originally submitted (original claim 13) on

the purpose of the "central location server" is to maintain a log of "each medallion's most recent detected location . . . ." Ex. A, ECF 199-1 ('184 patent) at 26:44-46. "[L]ocation information," is provided to the guest engagement system "at selectable levels of precision." *Id.* at 25:59-62. For example, "[a]t a low level of precision, the location of the medallion 11 is identified based on the identity(ies) of the one or more sensors 15 or other devices that detect beacon signals from the medallion 11 at any given time." *Id.* at 25:62-66. Alternatively, "at a higher level of granularity, the position of the medallion is determined based on the relative received signal strength of the beacon signal measured at each of the sensor(s) having received the beacon signal . . . ." *Id.* at 26:4-7. In the first embodiment, a person of ordinary skill in the art recognizes that the resulting log would naturally include the information required by claim 1 (*i.e.*, one that associates received "unique identifiers" *with* the "known location" of sensors and a "timestamp"). Shoemake Op. Decl. ¶ 106. In the second embodiment, however, the resulting log might associate the received "unique identifiers" with completely different information— *e.g.*, a received signal strength, or possibly even with a calculated set of coordinates for the user's location. *Id.* ¶ 108; *see also* SOF ¶¶ 4, 6-7. Without specific guidance in claim 11 as to which embodiment was intended, a person of ordinary skill in the art cannot tell what information the log is intended to associate, or what scope it was intended to cover. *Id.* Neither the claim, nor the intrinsic evidence provides any clue as to what the "claimed" log is intended to "associate." *Id.* ¶ 112. Thus, Claim 11 is indefinite.

Carnival's expert provides no coherent explanation for the meaning of the claim. Instead, Mr. de la Iglesia argues that the patentee "deliberately" left the intended association "unspecified," de la Iglesia Op. Decl. ¶ 39, apparently in an effort to preserve interpretational "flexibility," *id.* ¶ 40. *See also* SOF ¶ 5. These opinions only serve to underscore the aforementioned issues with claim 11's uncertain scope. Additionally, while Carnival insists that the claim term has a plain and ordinary meaning, both Carnival and its expert have tellingly offered an "alternative" construction that would require the received unique identifiers to be associated with "log information", a term that is wholly absent from the patent specification. *See* de la Iglesia Op. Decl. ¶ 32. This is an attempt to rewrite the claim out of whole cloth—an

---

March 15, 2017, *see* Ex. AH, ECF 199-34 ('184 prosecution history: 3/15/2017 submission of original claims), and the error was carried throughout prosecution without comment from the PTO or the applicant.

approach that the Court is not permitted to do, absent a clear error with only one reasonable correction, *supra* n.1.

Because the scope of claim 11 is completely uncertain, it is invalid as indefinite. *See* SOF ¶ 8.  Moreover, because claim 11 is indefinite, dependent claims 12 through 15 which incorporate and rely upon the same flawed "log" limitation are similarly indefinite.  *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1378 (Fed. Cir. 2013) (if an independent claim was indefinite, two dependent claims "would also be invalid").

## II.    '514 PATENT CLAIM 11 IS INVALID FOR LACK OF ENABLEMENT

Independent claim 11 of the '514 patent is invalid for lack of enablement because the supporting specification does not include sufficient disclosure to allow a person of ordinary skill in the art to practice the full range of claimed embodiments without "undue experimentation."

### A.    Legal Standard For Enablement

The "enablement" doctrine stems from 35 U.S.C. § 112(a), which requires that the patent specification describe the claimed invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use" the invention.  The policy underlying enablement is to ensure adequate disclosure of the claimed invention, and to prevent claims broader than what the patentee actually invented.  *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008) ("The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." (quotation and citation omitted)).

To satisfy the enablement requirement, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'"  *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (quotation and citation omitted).  In considering whether "undue experimentation" would be necessary, courts generally consider the so-called *Wands* factors, which include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  While the specification need not disclose what is already well-known in the art, the disclosure enabling the claimed scope of the invention must actually be present in the specification of the patent.

*See Trustees of Boston Univ. v. Everlight Elecs. Co., Ltd.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018) (noting that the artisan's knowledge of prior art, ability to interpolate between embodiments, and extrapolate beyond embodiments "cannot substitute for a basic enabling disclosure").

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the ***full scope*** of the claimed invention without 'undue experimentation.'" *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (quotation and citation omitted) (emphasis added); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) ("There must be 'reasonable enablement of the scope of the range' . . . ."). Thus, enablement issues frequently arise in patents that seek to claim "an open-ended range of values, which must be present for infringement." *See MagSil Corp.*, 687 F.3d at 1384. In such cases involving an unbounded numerical range, a patentee can attempt to show enablement by demonstrating an "inherent" limit, and teaching in the specification that enables one of skill in the art to approach that inherent limit. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) (*quoting Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1572 (Fed. Cir. 1991)). Absent such a showing, however, a patentee may not simply "disavow the invalid portion and keep the valid portion of the claim." *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) ("If everything up to 0.001% w/v is admittedly not enabled, then the entire claim is invalid.").

Enablement is a question of law based on underlying factual findings. *MagSil*, 687 F.3d at 1380. Because the issue is ultimately legal in nature, courts routinely grant summary judgment of non-enablement where the specification lacks sufficient disclosure to allow a person of ordinary skill in the art to practice the full range of embodiments without undue experimentation. *See Wyeth & Cordis Corp. v. Abbot Labs*, 720 F.3d 1380, 1385 (Fed. Cir. 2013) ("We agree with Appellees and the district court that there is no genuine dispute that practicing the full scope of the claims, measured at the time of filing, would require excessive experimentation."); *see also Magsil Corp.*, 687 F.3d at 1384; *Sitrick*, 516 F.3d at 1002; *Automotive Techs Int'l v. BMW of N. Am.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318-19 (Fed. Cir. 2007).

**B.      Claim 11 Of The '514 Patent Is Not Enabled As A Matter Of Law**

Claim 11 of the '514 patent fails to enable a person of ordinary skill in the art to practice the full range of claimed embodiments. Claim 11 recites a "portable wireless device" that is

"equal to *or smaller than* 2.5 inches" and "equal or smaller than 5/8 inch"[7] in thickness, yet fully encloses numerous structural components:

> A body having a fully enclosed cavity, ***the body having all dimensions <u>equal to or smaller than 2.5 inches</u>***, and ***the body having a thickness <u>equal to or smaller than 5/8 inch</u>***; a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity, wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications.

SOF ¶ 9 (Emphasis added). Importantly, while placing a hard upper boundary on the size of the device, the claim language places no lower boundary on the size of the device.[8] SOF ¶ 12. This open-ended claim thus covers a potentially infinite range of embodiments. *See MagSil Corp.*, 687 F.3d at 1383 (holding that claim term for "change in resistance by at least 10%" was an "open-ended" term, given lack of boundary, and the use of the transitional phrase "comprising" after the preamble); *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2021 WL 1222622, at *9-13 (N.D. Cal. Feb. 11, 2021) (analyzing open-ended claim range with an upper limit, but no lower limit specified). As DeCurtis' expert, Dr. Emmanouil Tentzeris, opines, the claim therefore expressly covers "embodiments with dimensions that are infinitesimally small . . . ." Tentzeris Op. Decl. ¶ 39; SOF ¶ 13.

Moreover, there is nothing in the specification that teaches, or even implies, the type of inherent boundary that was at issue in *Andersen* and *Scripps*. To the contrary, Dr. Tentzeris explains how "[f]urther incremental shrinkage of the device beyond these limits may theoretically be possible based on a sophisticated and intensive research and development effort," *id.* ¶ 61, or "based on the likelihood of continued advances in battery miniaturization and technology related to high-gain antennas," *id.* ¶ 62. Thus, claim 11 of the '514 patent covers an open-ended range of dimensions, capturing all embodiments smaller than the recited dimensions.

---

[7]  5/8 inch is 0.625 inches.

[8]  The '514 patent specification mentions boundaries for the *preferred* range of dimensions. *See* Ex. B, ECF 199-2 ('514 patent) at 3:52-56 (teaching front and rear surfaces having diameters of 0.75 inches to 2.5 inches, and a body thickness of 1/8 to 5/8 inch); id. at 9:28-34 (describing "token" with outer diameter of approximately 1.25 inches (range of 0.75 to 2.5 inches) and a thickness of 3/8 inch (range of 1/8 to 5/8 inch)); *see also* SOF ¶ 10. These boundaries may not be imported to limit the scope of the broader, open-ended ranges in the claim. *Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[I]t is improper to read a limitation from the specification into the claims."). In any event, as discussed below, the specification lacks fails to enable even these narrower, preferred ranges. *See* Tentzeris Op. Decl. ¶¶ 53, 57.

The open-ended range of claimed dimensions for the body of the "portable wireless device" creates an enablement issue because the specification fails to teach a person of ordinary skill in the art how to practice the entire range of claimed embodiments without undue experimentation. *See Intel*, 2021 WL 1222622 at *12 (granting summary judgment that claim to semiconductor technology, with no lower boundary on dimension, was invalid for lack of enablement where increasingly small miniaturization was "not trivial or peripheral" and "[a]chieving smaller and smaller sizes . . . [was] key in the field").  Specifically, the claimed device must enclose within it a "first and second wireless communication antennas" that are "respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications."  *See* Ex. B, ECF 199-2, claim 11.  To be "configured" for BLE and NFC communications, the antenna must have certain characteristics to generate and receive the required communication signals, as a person of ordinary skill in the art recognizes.  Ex. B, ECF 199-2 at 14:26-31; *see* Tentzeris Op. Decl. ¶¶ 42, 54; SOF ¶¶ 14-15.

For example, Dr. Tentzeris explains how, according to the very metric set forth in the '514 patent, the first (BLE) antenna must have a minimum length of 1.2295 inches in order to achieve sufficient gain and proper resonance.  Tentzeris Op. Decl. ¶¶ 41-43.  While there are certain, state-of-the-art techniques that can be used to package an antenna in a slightly smaller form factor, *id.* ¶¶ 52, 62-71, these techniques are not meaningfully disclosed in the '514 patent, *id.* ¶¶ 46-49.  In any event, these techniques would only allow for shrinking the required antenna footprint down to 1.1093, *id.* ¶¶ 52, 62-71; *see also* Ex. AI, ECF 199-35 (NXP BLE Antenna Design Guide at Figures 39-42); SOF ¶ 16.

Dr. Tentzeris further explains how for the second, NFC antenna, at least 0.3937 inches would be needed in clearance between the NFC antenna and any other metal surfaces, including the first, BLE antenna.  Tentzeris Op. Decl. ¶¶ 54, 77-78; *see also* Ex. AJ, ECF 199-36 (Texas Instruments Antenna Design Guide) at 2; SOF ¶ 17.  These analyses are based on the teachings from state-of-the-art antenna guidelines published by two of the most sophisticated antenna manufacturers in the world.  Tentzeris Op. Decl. ¶¶ 62, 76.

The foregoing antenna sizing analysis directly impacts the required size of the portable wireless device.  The "body" of the claimed device must "fully enclose[]" a cavity including the two claimed antennas (among other components).  Thus, a person of ordinary skill in the art recognizes that practicing the claim without undue experimentation would require at least a

planar dimension (*e.g.*, a diameter for a circular device) of at least 1.1093 inches, and a thickness of 0.3937 inches.  Tentzeris Op. Decl. ¶ 59; SOF ¶¶ 16-17.  Any further miniaturization would require "undue experimentation," resulting from either "a sophisticated and intensive research and development effort," or future advances in "technology related to high-gain antennas."  *Id.* ¶¶ 60-61; SOF ¶¶ 26-27.  Notably, Carnival served no rebuttal declaration, and Dr. Tentzeris' opinions are thus unrebutted, entitling DeCurtis to summary judgment.  *See Sitrick*, 516 F.3d 993 (granting summary judgment in view of only conclusory rebuttal expert testimony).

Dr. Tentzeris opinions are also consistent with the experience of Carnival in manufacturing its commercial embodiment of claim 11.  Carnival's own commercial embodiment has dimensions of ▇▇▇▇▇▇▇▇▇▇ in diameter and ▇▇▇▇▇▇▇▇ ▇▇▇▇ in thickness.  Ex. AK, ECF 199-37 (CARNIVAL00000054-55); SOF ¶ 19.  Yet, one of the inventors, Sander Lam, who was responsible for designing the BLE antenna for the device, has testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *See* Ex. AL, ECF 199-38 (Lam Depo.) at 33:11-34:15, 37:9-39:8, 61:7-62:8; SOF ¶ 20.

To summarize, claim 11 of the '514 patent expressly covers embodiments of the "portable wireless device" of any arbitrarily small size.  But, the specification does not teach arbitrarily small sized devices, and based on what is taught, "undue experimentation" would be required to practice claimed embodiments with a planar dimension less than 1.1093 inches, and with a thickness less than 0.3937 inches.  *See* SOF ¶¶ 18, 26-27.  The table below is a summary:

|  | **Planar Dimension** | **Thickness Dimension** |
|---|---|---|
| Claim 11 Requirement | Less than 2.5 inches | Less than 0.625 inches (less than 5/8 inch) |
| Preferred range in specification | 0.75 inches – 2.5 inches | 0.125 inches – 0.625 inches (1/8 to 5/8 inch) |
| Carnival Embodiment | ▇▇▇▇▇▇ | ▇▇▇▇▇▇ |
| State of the art without "undue experimentation" | 1.1093 inches | 0.3937 inches |

Accordingly, claim 11 of the '514 patent is invalid for lack of enablement.  *See MagSil*, 687 F.3d at 1384 ("This court holds that the asserted claims are invalid for lack of enablement because their broad scope is not reasonably supported by the scope of enablement in the specification.").

**C.     The Relevant Factors Support A Finding Of Non-Enablement**

11

Application of the *Wands* factors confirm that "undue experimentation" would be required to practice a wider range of embodiments in this case.  *In re Wands*, 858 F.2d at 737.

### 1.     A Considerable Quantity Of Experimentation Would Be Required

Considerable effort would be required to achieve the entire range of claimed embodiments.  State-of-the-art dimensions for the portable wireless device were 1.1093 inches in the planar dimension, and 0.3937 inches in thickness.  Tentzeris Op. Decl. ¶ 59; SOF ¶¶ 16-17.  As, Dr. Tentzeris explains, a large quantity of experimentation, beyond the disclosure of the '514 patent, that would be required to achieve even a mere incremental shrinkage from these dimensions.  Tentzeris Op. Decl. ¶¶ 91-98; SOF ¶ 18, 26-27.  For example, further shortening of the BLE antenna could, in theory be achieved through a careful and tedious process of introducing capacitance and/or reactance loading to the claimed antenna.  Tentzeris Op. Decl. ¶ 93.  Introducing such loading, however, requires a considerable amount of experimentation to properly implement, as the loading can result in "frequency detuning" which may offset the desired frequency range and also significantly degrade the radiation performance of the antenna.  *Id.* ¶ 94.  These issues, in turn, require the introduction of further complexity in the form of a "matching network" to finely adjust the antenna's impedance to match the output impedance of the corresponding RF circuitry.  *Id.* ¶ 95.  Thus, while achieving a smaller dimension BLE antenna is theoretically possible, it is a delicate process requiring intensive experimentation in order to account for and overcome a number of resulting adverse performance effects.  None of these advanced techniques (capacitance/inductance loading, impedance matching network) are discussed or taught by the specification of the '514 patent.

### 2.     Little Direction Or Guidance Is Provided By The Specification

In several places, the '514 patent specification mentions a preferred range of dimensions for device diameter and thickness, Ex. B, ECF 199-2 ('514 patent) at 3:46-59, 9:28-34; SOF ¶ 10, but provides little guidance on how these dimensions are achieved, Tentzeris Decl. ¶¶ 99-110.  In describing an exemplary BLE antenna, the patent states that Figures 5H-5L are "[d]etailed schematics," including "[d]imensions of the antenna and design tolerances on the dimensions . . . in millimeters (mm)."  Ex. B, ECF 199-2 ('514 patent) at 14:16-22.  But this is false—the figures of the issued patent provide no such dimensions or tolerances.  Tentzeris Op. Decl. ¶ 106; *see* SOF ¶¶ 23-24.  The patent then states, in conclusory fashion, that the antenna "can be scaled up or scaled down relative to the dimensions shown depending on the particular

12

application in which the BLE antenna element is to be used," but provides no further description on how this might be achieved.  Ex. B, ECF 199-2 ('514 patent) at 14:22-26.  Nor does the patent reconcile its suggestion for smaller antennas with its teaching in the following passage that resonance at the desired frequency requires "setting an overall length of the radiation element to approximately ¼ wavelength at 2.4 GHz."  *Id.* at 14:26-31; Tentzeris Decl. ¶ 105. The only teaching that even remotely hints at any specific dimensions, is the patent's disclosure that the claimed "battery" may be a CR2025 battery, Ex. B, ECF 199-2 ('514 patent) at 13:35-42, which a person of ordinary skill in the art would recognize to have a diameter of at least 0.7874 inches, Tentzeris Op. Decl. ¶ 104.  This battery diameter is greater than the lower boundary of the *preferred* range of dimensions (0.75 inches).

### 3.      The Specification Lacks Working Examples

The '514 patent specification teaches a single embodiment of the claimed portable wireless device at figures 5A-5J.  Tentzeris Op. Decl. ¶ 111, *citing* Ex. B, ECF 199-2 ('514 patent) at 13:32-14:67.  This disclosure teaches a "J-shaped" BLE antenna that is elevated above the printed circuit board.  Tentzeris Op. Decl. ¶ 112.  Even this disclosure, however, fails to provide critical information pertaining to the implementation of the BLE antenna, such as the length, radius of curvature, bend points, height of elevation above the PCB, and the materials necessary to construct the antenna.  *Id.* ¶¶ 107, 109.  While the disclosure does mention two high-level processes for forming the BLE antenna, Ex. B, ECF 199-2 ('514 patent) at 14:3-14, the disclosure is "relatively scant, lacking specific dimensions and direction as to how the various components are to be manufactured and assembled together," Tentzeris Decl. ¶ 114. Other than Figure 5, the patent provides no further examples.  *Id.* ¶ 114.

### 4.      The Nature Of The Invention Supports a Finding Of Non-Enablement

Although claim 11 purports to claim portable wireless devices of any arbitrarily small dimensions, the focus of the patent, as a whole, is not directed towards device miniaturization. Tentzeris Op. Decl. ¶¶ 115-117.  Instead, the invention is directed towards an high-level system architecture for "seamless engagement with guests of facilities through the use of wireless sensing technologies."  Ex. B, ECF 199-2 ('514 patent) at Abstract; Tentzeris Decl. ¶ 31. Carnival's own expert agrees that the patent spans a wide range of subject areas.  de la Iglesia Op. Decl. ¶ 20 (" The patents describe systems and methods spanning a range of subject matter areas and implementations.").  To the extent the patent does discuss the internal components of

the portable wireless device, it describes merely "generic components." Tentzeris Op. Decl. ¶ 116; *see also* Ex. B, ECF 199-2 ('514 patent) at 15:1-5.

### 5.    The State Of The Prior Art Supports A Finding Of Non-Enablement

At the time of the '514 patent, there existed practical limits on the degree of miniaturization for a portable wireless device having the features of claim 11. Tentzeris Op. Decl. ¶¶ 118-120. One such practical limit was the required length of the BLE antenna to achieve proper resonance at the desired frequency. *Id.* ¶ 119; SOF ¶ 14. As the patent itself teaches, it was recognized in the art that BLE antennas were typically sized to be no smaller than one-quarter the size of the desired output wavelength. Ex. B, ECF 199-2 ('514 patent) at 14:26-38; *see also* Tentzeris Decl. ¶ 119. Further miniaturization below this quarter-wavelength dimension would have required either future advances in antenna technology, or an immense amount of experimentation with the then-current state of the art. Tentzeris Op. Decl. ¶ 120.

### 6.    The Relative Skill Of Those In The Art Was Relatively Modest

The background knowledge of a person ordinarily skilled in the art cannot reasonably be expected to fill in the critical gaps missing from the '514 patent specification. Indeed, both sides have submitted expert testimony establishing that the level of ordinary skill in the art for this patent is relatively modest, particularly as it relates to device or component miniaturization. *See* Tentzeris Op. Decl. ¶ 121 (level of ordinary skill in the art is less than that of typical a PhD student); de la Iglesia Op. Decl. ¶ 20 (requiring only a bachelor's degree in Electrical Engineering, Computer Science, Computer Engineering, or in a similar discipline, and 2-4 years of relevant experience); SOF ¶ 11. In fact, Carnival's expert has opined that specific experience in the design and/or implementation of portable electronic devices is not even a requirement to qualify one as having "ordinary skill" in the art. Ex. J, ECF 199-10 (de la Iglesia Dep.) at 18:7-19:6 (testifying that experience in implementing portable devices was "permissive").

### 7.    The Art Was Static Which Supports A Finding Of Non-Enablement

Finally, the state of the art regarding miniaturized portable wireless devices was fairly consistent and predicable at the time of the '514 patent, and was characterized by only incremental advances through refinements to existing technology and components. Tentzeris Op. Decl. ¶ 126. As such, major advancements would have required an "innovative" leap. *Id.* This is supported, for example, by the testimony from Disney whose representative testified that

████████████████████████████████████████████████████████

███████████████████████  Ex. AP, ECF 199-42 (Worrall Dep.) at 88:13-90:2; SOF ¶ 22.

Additionally, the record demonstrates that Carnival achieved, at most, only a modest amount incremental shrinkage over the state of the art (*i.e.*, not nearly the entire range claimed by the patent), and even that was achieved at a great deal of effort. Specifically, non-public engineering documents containing a level of detail not included in the '514 patent indicate that the "portable wireless device" that Carnival created for its own commercial system[9] has dimensions of ███████████████ in diameter and ██████████████ in thickness. Ex. AK, ECF 199-37 (CARNIVAL00000054-55); SOF ¶ 19. The inventor responsible for this design testified regarding the challenges and complexity with achieving even these dimensions. *See* Ex. AL, ECF 199-38 (Lam Depo.) at 33:11-34:15, 37:9-39:8, 61:7-62:8; SOF ¶ 20. Yet, these dimensions are significantly *greater* than even the *preferred* dimensions mentioned in the patent specification. Tentzeris Op. Decl. ¶ 45 (explaining that Carnival's commercial embodiment has a diameter 60% greater than the lower bound of the preferred range of diameters mentioned at column 3, lines 52 through 57); *id.* ¶ 58 (explaining that Carnival's commercial embodiment has a thickness more than 100% greater than the lower bound of the preferred range of thickness); *see also* SOF ¶ 21. This proves that claim 11 encompasses a range of embodiments beyond what even the inventors themselves were able to achieve. Such evidence supports a finding of non-enablement. *See MagSil*, 687 F.3d at 1382 ("The named inventors were not able to achieve even a 20% change a year after filing the application in 1995, and 604% junctions were not achieved until 2008.").

Press releases by Carnival and its third-party contractor Nytec attest to the level of engineering effort required to achieve Carnival's dimensions. According to press releases from both Carnival and its third-party contractor (Nytec), achieving the final design for Carnival's portable wireless device was a "very challenging initiative" demanding "vision, creativity, and experience" of "global design, engineering, and manufacturing teams." Ex. AM, ECF 199-39 at 1. Carnival presented Nytec with "a complex set of design and engineering challenges" that required a "team of world-class designers, engineers, and manufacturing experts" to "translate[]

---

[9]  Carnival contends that its OceanMedallion system practices claim 11 of the '514 patent. ECF No. 107-14 at 15 ("Carnival identifies the following Carnival instrumentalities that practice the asserted claims. '514 Patent, claim 11 – Carnival's OceanMedallion™ wearable devices.").

our complex vision into compellingly simple, elegant, and viable solutions." Ex. AN at 2, ECF 199-40 at 4 ("Each Ocean Medallion is engineered, manufactured with the latest technological innovations".).   These statements demonstrate the considerable level of effort necessary to achieve a mere incremental advance in the state-of-the-art dimensions, not to mention the effort involved in achieving the entire range of claimed embodiments.

Finally, and most tellingly, Carnival's now-dismissed trade secret claims in this case included purported trade secrets relating to 

. *See* Ex. AO, ECF 199-41 (Carnival First Supp. Response to Interrogatory No. 1) at 5

" (emphasis added)); *see also* SOF ¶ 25.  Carnival's claim to have owned trade secrets related to a

is an admission that the subject matter necessary to enable the full range of dimensions recited by claim 11 of the '514 patent is undisclosed.  *See Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690-91 (Fed. Cir. 2001) (holding that inventors keeping as trade secrets computer programs used to perform vertically scaling of data in claimed "comparing step" of method claim resulted in a non-enabling specification); *White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788, 790-91 (Fed. Cir. 1983) (holding that patent was not enabled because maintenance of a trade secret on overlapping, essential element of the patent would "theoretically extend" patentee's exclusionary rights and was "inconsistent with the objectives of the patent system").

### 8.      The Claims Are Extremely Broad

The aforementioned indicators of non-enablement apply with particular force when considered within the context of the broad, open-ended language of claim 11.  Tentzeris Decl. ¶ 39.  This is a paradigmatic example of a non-enabled claim.  *See MagSil Corp.*, 687 F.3d at 1384; *Alcon*, 687 F.3d at 1368.  Carnival may not simply "disavow the invalid portion and keep the valid portion of the claim."  *Alcon*, 687 F.3d at 1368.  The Court should grant summary judgment that claim 11 of the '514 patent is invalid for lack of enablement. SOF ¶¶ 26-27.

### III.    '184 PATENT CLAIMS 11-15 AND '514 PATENT CLAIM 11 ARE INVALID FOR LACK OF WRITTEN DESCRIPTION SUPPORT

Claims 11-15 of the '184 patent and claim 11 of the '514 patent are invalid for lack of

written description because the specification does not sufficiently demonstrate that the inventors were in possession of the claimed inventions at the time of the filing.

### A.      Legal Standard For Written Description

The written-description requirement is set forth in 35 U.S.C. § 112(a), which states "[t]he specification shall contain a written description of the invention . . . ."  "The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention."  *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014).  Unlike the enablement standard, which focuses on whether a person of ordinary skill in the art could practice the invention without undue experimentation, the written description requirement focuses on whether persons of skill in the art would recognize that the patentee has invented what is claimed.  *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).  To meet the written-description requirement, the patentee "must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate that by disclosure in the specification of the patent."  *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011).  This inquiry "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art."  *Ariad*, 598 F.3d at 1351.

Although written description is a question of fact, summary judgment is appropriate in cases where an objective inquiry in the content of the specification indicates that no reasonable fact finder could return a verdict for the non-moving party.  *See D Three Enters., LLC v. Sunmodo Corp.*, 890 F.3d 1042, 1047 (Fed. Cir. 2018); *Atl. Research Marketing Sys, Inc. v. Troy*, 659 F.3d 1345, 1353 (Fed. Cir. 2011).

### B.      Claims 11-15 Of The '184 Patent Lack Written Description Support

Claim 11 of the '184 patent recites, in relevant part:

> each sensor of the sensor network is operative to transmit a command to a guest
> device in its communication range to cause the guest device to change operating
> mode between the first and second operating modes

SOF ¶ 28.  A proper claim construction must precede the written-description analysis.  *See Atl. Research Marketing Sys.*, 659 F.3d at 1354.  As discussed in DeCurtis' concurrently filed Opening Claim Construction Brief, this claim term should be interpreted to mean "[e]very sensor

of the sensor network is operative to transmit a command to cause the guest device to change between the first BLE operating mode and the second BLE operating mode."

Under this construction, there is no genuine issue of material fact that the claim lacks written description support.  This is because there is *no dispute* between the parties that a person of ordinary skill in the art objectively reviewing the patent specification would understand it to *lack any* disclosure relating to an NFC sensor transmitting a command to cause a guest device to switch between BLE operating modes.  *See* SOF ¶¶ 29-30; Shoemake Op. Decl. ¶ 158; de la Iglesia Op. Decl. ¶ 49; de la Iglesia Reb. Decl. ¶ 85.  In fact, Carnival's expert, Mr. de la Iglesia relies upon the absence of any disclosure relating to NFC sensors having this functionality in support of Carnival's misguided claim construction theory.  de la Iglesia Op. Decl. ¶ 49 (". . . a person of skill in the art understands that the 'sensor[s] of the sensor network' in this present term necessarily refer to BLE sensors because BLE sensors, and *not NFC sensors*, are described in the specification as causing the guest device to change BLE operating modes between a first and second operating modes."); *see also* Ex. J, ECF 199-10 (de la Iglesia Dep.) at 213:6-13.

The parties therefore do not dispute, but rather agree, that the specification objectively fails to disclose to a person of ordinary skill in the art the concept of an NFC sensor commanding a BLE mode change.  *See* SOF ¶¶ 29-30.  As such, there are no genuine issues of material fact regarding written-description, and the issue here boils down to a pure question of claim construction.  *See Zoho Corp. v. Sentius Int'l, LLC*, 494 F. Supp. 3d 693, 709 (N.D. Cal. 2020) (summary judgment of no written-description appropriate where experts agreed regarding the lack of disclosure in the specification).  To the extent the Court agrees that DeCurtis' construction (requiring at least one NFC sensor to be operative to transmit a command causing a guest device to change between BLE operating modes), then claim 11 of the '184 patent is invalid for lack of written description.

Because claim 11 is invalid for lack of written-description, dependent claims 12 through 15 which are dependent upon, and incorporate, claim 11 are similarly invalid.  *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346-47 (Fed. Cir. 2005); *NetAirus Techs., LLC v. Apple Inc.*, Case No. 13-03780, 2016 WL 5898640, at *3 (C.D. Cal. Mar. 23, 2016) ("[I]f a broader claim lacks written description, then a narrower claim depending therefrom, which incorporates all elements of the broader claim, necessarily lacks such a description.").

### C.     Claim 11 Of The '514 Patent Lacks Written Description Support

Claim 11 of the '514 patent recites the following limitation: "the processor is configured to establish secure communication links with remote communication devices."  SOF ¶ 31. Consistent with the scope of disclosure in the '514 patent, DeCurtis has proposed that this term be construed to mean "[t]he processor is coupled to memory storing the necessary programming and encryption keys to create the secure communication link."  Carnival's proposal, on the other hand, proposes plain and ordinary meaning, and its expert has taken the position that this claim term can be satisfied by any "general purpose processor" that could, hypothetically, be programmed and *made* to be configured with the necessary information to "establish secure communication links."  *See* de la Iglesia Reb. Decl. ¶ 104 (". . . all that is required by this claim limitation is that the processor be capable of establishing the required secure communication link with remote communication devices generally, something that ***a general-purpose processor*** is capable of doing."); Ex. J, ECF 199-10 (de la Iglesia Dep.) at 233:21-238:3; SOF ¶ 32.

DeCurtis disagrees with Carnival's overly broad construction; however to the extent this construction is adopted, it exceeds the scope of the '514 patent written description, rendering it invalid.  *See Atl. Research Marketing Sys.*, 659 F.3d at 1355 (claim rendered invalid for lack of written description on basis of broad construction urged by patentee for infringement purposes).

By way of background, establishment of a "secure communication link" is generally achieved using shared "keys."  Jakobsson Op. Decl. ¶ 41 (describing "asymmetric key" encryption); *id.* ¶ 43 ("symmetric key encryption").  Communicating devices can be pre-provisioned with the keys that will be necessary to establish secure communication links with other devices in the network.  *Id.* ¶ 44.  This is the approach that is taught by the '514 patent:

> In particular, the memory 601 is communicatively connected to the microprocessor 603, such that machine-executable programming instruction stored in the memory 601 can be executed by the microprocessor 603 to cause the medallion 11 to perform functions such as those described throughout this disclosure. . . .  ***The memory 610 can also store encryption and decryption keys and encrypted data***.

Ex. B, ECF 199-2 ('514 patent) at 15:12-21 (emphasis added); *see also* Jakobsson Decl. ¶ 38. This is also consistent with DeCurtis' construction, requiring the programming and encryption keys to be *actually* present on the portable wireless device of claim 11.

A person of ordinary skill in the art, however, recognizes that there are other, more complex methods of establishing a shared key pair between two communicating devices.

Jakobsson Decl. ¶ 46 (describing a "key transport" protocol); *id.* ¶ 47 (describing a "key exchange" protocol).   These techniques allow two devices to *become* configured for secure communications through an initial exchange of information.  *Id.* ¶ 48 (" . . . in either technique, the devices do not become configured to establish secure communication links with one another unless and until they each have access to the same session key."); *id.* ¶ 66 ("These processes, however, involve a situation where the portable guest device *becomes configured* to establish the secure communication link with the remote computing device.").   DeCurtis' expert provides *unrebutted* expert testimony that these "key exchange" and "key transport" protocols are beyond the scope of the '514 patent specification.  *Id.* ¶ 67; SOF ¶¶ 33-34.

Thus, to the extent Carnival argues that the portable wireless device of claim 11 need *not* actually contain the necessary programming and encryption keys for establishing the secure communication link, it is seeking to capture a device that is capable of ultimately becoming configured, rather than one that actually is configured.  *See* Jakobsson Decl. ¶¶ 67-69.  It is undisputed that the processes for allowing a device to become configured in this manner are not disclosed by the written description of the '514 patent.  SOF ¶¶ 33-34.  This renders the claim invalid for lack of written-description support to the extent Carnival's broader interpretation is adopted.  *See PowerOasis*, *Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) (holding that based on disclosed embodiments, there was no evidence that inventors were in possession of the claimed "customer interface" on a user's laptop).  Indeed, if Carnival's proposed construction were adopted, the claim would be broad enough to cover a mere "general purpose processor," *see* de la Iglesia Reb. Decl. ¶ 104, which "would eliminate any meaningful limits to the claims," *SIPCO, LLC v. Abb, Inc.*, No. 6:11-CV-0048 LED-JDL, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012).  To the extent the Court adopts Carnival's proposed claim construction, it should address the serious written description issue that this construction creates, and invalidate claim 11 of the '514 patent.

## CONCLUSION

For the foregoing reasons, DeCurtis respectfully requests that the Court grant summary judgment that claims 11-15 of the '184 patent and claim 11 of the '514 patent are invalid under 35 U.S.C. § 112, as set forth above.

Dated: November 5, 2021

DECURTIS LLC & DECURTIS
CORPORATION

By: /s/ Patrick T. Schmidt
          One of their attorneys

David C. Gustman (pro hac vice)
Jeffery M. Cross (pro hac vice)
Jill C. Anderson (pro hac vice)
Jennifer L. Fitzgerald (pro hac vice)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. (312) 360-6000

Jason Stearns
Florida Bar No. 059550
Freeborn & Peters LLP
201 N. Franklin Street
Suite 3550
Tampa, FL 33602
Tel. (813) 488-2920
E-mail: jstearns@freeborn.com

*Attorneys for Plaintiff DeCurtis LLC &
DeCurtis Corporation*

Scott L. Watson (pro hac vice)
Justin C. Griffin (pro hac vice)
Patrick T. Schmidt (pro hac vice)
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel. (213) 443-3000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2021, I filed the foregoing DeCurtis's Motion for Summary Judgment Regarding Invalidity Under 35 U.S.C. Section 112 ("Motion") via CM/ECF which will serve all attorneys of record.

DECURTIS LLC & DECURTIS CORPORATION


By: _/s/_ Jason P. Stearns_____
     One of their attorneys