## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-22945-Civ-SCOLA/TORRES

DECURTIS LLC,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____

CARNIVAL CORPORATION,

      Plaintiff,

v.

DECURTIS CORPORATION and
DECURTIS LLC,

      Defendants.

_____/

## REPORT AND RECOMMENDATION
## <u>ON CLAIM CONSTRUCTION AND SUMMARY JUDGMENT</u>

      Pending before the Court in this consolidated patent case are the parties' claim

construction briefs as well as DeCurtis' interwoven motion for summary judgment

relating to invalidity under 35 U.S.C. ¶ 112.[1]  The issues have been fully briefed and

---

[1]     The parties filed their joint claim construction statement on October 1, 2021, [D.E. 183], their opening claim construction briefs on November 5, 2021, [D.E. 201, 205], and their responsive claim construction briefs on November 23, 2021 [D.E. 223, 225].  DeCurtis concurrently filed its motion for summary judgment on November 5, 2021, [D.E. 203], to which Carnival responded on November 20, 2021 [D.E. 212].

are now ripe for disposition.  Having reviewed the briefing, the related submissions, and the relevant case law, and for the reasons discussed below, the Court recommends that the claims be construed as discussed below.  This effectively means that Carnival's motion opening claim construction [D.E. 205] should be **GRANTED**.[2]  Furthermore, the Court recommends that DeCurtis' motion for summary judgment [D.E. 203, 236] be **DENIED**.

## I.    *BACKGROUND*

Carnival patented[3] what it calls a "guest engagement system" – an invention that uses wireless sensing technology to enable a host to "seamlessly" engage with guests throughout the host's facilities.  Although these patents describe a complex invention that depends upon the sophisticated implementation of recent advances in computing and wireless communication technologies, the patents' claims are generally written in language that can be easily understood by a person of ordinary skill in the art (a "POSITA") as well as a lay juror.  Nevertheless, the parties dispute the meaning of some of these patents' claims – the language in the patent that describes the metes and bounds of the invention much like a deed might describe the

---

DeCurtis subsequently filed its reply on November 26, 2021, [D.E. 230], and it supplemented the record on January 6, 2022 [D.E. 249].  Unredacted versions of the summary judgment briefing have also been filed under seal.  *See, e.g.*, [D.E. 236].

[2]    On November 20, 2020, the Honorable Robert N. Scola referred this case and motion to the Undersigned Magistrate for disposition.  [D.E. 102].

[3]    The three patents at issue, which share a common specification, are U.S. Patent No. 10,045,184 (the "'184 patent" or "system patent"), [D.E. 205-2], U.S. Patent No. 10,049,516 (the "'516 patent" or "door lock patent"), [D.E. 205-3], and U.S. Patent No. 10,157,514 (the "'514 patent or "portable wireless device patent"), [D.E. 205-4].

boundaries of real property – and so the Court has been called upon at this juncture to properly interpret and construe these disputed claims.

Carnival's patents certainly have applications beyond the cruise ship environment but, for the sake of concise illustration, the Court will adopt the cruise ship as the exemplary vessel for Carnival's novel guest engagement system.  In this example, the first piece of technology that a guest might concern themselves with is the portable wireless device that is designed to be carried by the guest during the duration of their cruise: the "medallion."  *See, e.g.*, '184 patent, Figure 2B.  Small enough



FIG. 2B

to securely fit in a spectrum of accessories (*e.g.*, a wrist band or necklace), this medallion comprises a processor, a memory, a battery, and two wireless communication antennas – one configured for Bluetooth low energy communication ("BLE") and the other configured for near field communication ("NFC").

The medallion communicates with a plurality of sensors throughout the cruise ship to automatically identify and authenticate the guest throughout the facility.  *See, e.g.*, '184 patent, Figure 1A.  Thus, for example, the guest need only turn the door handle to access their state room because the guest engagement system can unlock the door when it senses that the medallion is sufficiently close to the guest's assigned room.  The guest engagement system enables additional services as well, such as granting automatic access to interactive displays throughout the cruise ship,



FIG. 1A

empowering automated payment at vending terminals, automatically informing host employees – such as the concierge – of the guest's past experiences and preferences, and permitting the host to track the location of its guests during an emergency evacuation. Accordingly, as these patents explain, the guest engagement system allows the host to provide services to guests without requiring the guests proactively identify themselves.

To be clear, the foregoing description of Carnival's patents does not fully appreciate the entire breadth of Carnival's invention; it does, however, illustrate a few ways in which Carnival's patented advances in wireless sensing technology may benefit a guest aboard one of Carnival's properly equipped cruise ships. Thus, the foregoing merely serves to orient the reader.

The patented nature of Carnival's inventions is principally controlled by the language in the patents' claims – language that this Court is now called upon to construe. Accordingly, the claims at issue are reprinted below with emphasis added to highlight the disputed language.

### A.    *'184 patent, claim 1.*

A guest engagement system comprising:

a plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device

including a wireless communication antenna and operative to emit a periodic beacon signal broadcasting a unique identifier of the guest device using Bluetooth low energy (BLE) communications;

a sensor network comprising a plurality of sensors each mounted at a different known location and operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by portable guest devices of the plurality of portable guest devices that are proximate to the sensor;

a communication network connecting each of the plurality of sensors of the sensor network; and

a central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and *storing a log associating each unique identifier of a portable guest device detected using BLE communications by a sensor of the sensor network with the known location of the sensor and a timestamp*,[4]

wherein the plurality of sensors of the sensor network comprises a plurality of access panels each configured to control an associated electronically controlled door lock,

each access panel is operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by guest devices that are proximate thereto, and to selectively unlock the associated electronically controlled door lock based on the unique identifier of the detected periodic beacons, and

each access panel comprises:

*a radio configured for wireless communication with a door lock communication module*[5] electrically connected to an electronically

---

[4]    Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary.  [D.E. 183 at 2].  DeCurtis proposes "recording in non-transitory memory an association between each unique identifier of a portable guest device detected using BLE communications, the location of the sensor that detected the portable device, and a timestamp[.]" *Id.*

[5]    Carnival proposes that this claim be given its plain and ordinary meaning, wherein the radio is a physical component of the access panel.  [D.E. 183 at 2]. DeCurtis proposes "a physical component of the access panel for communicating with the door lock communication module in the radio (RF) band, which is below the infrared (IR) band[.]" *Id.*

controlled locking mechanism of the associated electronically controlled door lock;

a first transceiver configured for wireless BLE communication with the guest devices to identify users seeking to activate the electronically controlled locking mechanism; and

*a second transceiver configured for communication with the central server*[6] storing identifiers of users authorized to activate the electronically controlled locking mechanism.

### B.   **'184 patent, claim 2.**

The guest engagement system of claim 1, wherein the central server comprises a central *reservation server*[7] associating with each electronically controlled door lock a list of unique identifiers of guest devices being authorized to access the electronically controlled door lock,

wherein each access panel is operative to selectively unlock the associated electronically controlled door lock based on whether the unique identifier of the detected periodic beacon matches an identifier of the list stored in the central server of unique identifiers of guest devices authorized access to the electronically controlled door lock.

### C.   **'184 patent, claim 7.**

A guest engagement system comprising:

a plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device including a wireless communication antenna and operative to emit a periodic beacon signal broadcasting a unique identifier of the guest device using Bluetooth low energy (BLE) communications;

---

[6]   Carnival proposes that this claim be given its plain and ordinary meaning, provided that the "second transceiver" could be a wired or wireless transceiver. [D.E. 183 at 2]. DeCurtis proposes "a wireless transceiver for communication with the central server[.]" *Id.*

[7]   Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary. [D.E. 183 at 2]. DeCurtis proposes "a server for receiving and storing information about a guest's reservation and preferences[.]" *Id.*

a sensor network comprising a plurality of sensors each mounted at a different known location and operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by portable guest devices of the plurality of portable guest devices that are proximate to the sensor;

a communication network connecting each of the plurality of sensors of the sensor network;

a central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and *storing a log associating each unique identifier of a portable guest device detected using BLE communications by a sensor of the sensor network with the known location of the sensor and a timestamp*;[8] and

a plurality of interface devices providing personalized services to users of the guest engagement system,

wherein the plurality of sensors of the sensor network comprises a plurality of access panels each configured to control an associated electronically controlled door lock,

each access panel is operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by guest devices that are proximate thereto, and to selectively unlock the associated electronically controlled door lock based on the unique identifier of the detected periodic beacons, and

each interface device comprises an associated sensor of the plurality of sensors of the sensor network, and provides the personalized services to a user proximate thereto based on an identity of the user determined based on the unique identifier emitted using BLE communications by a guest device of the user.

### D.      '184 patent, claim 11.

A guest engagement system comprising:

---

[8]      Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary.  [D.E. 183 at 2].  DeCurtis proposes "recording in non-transitory memory an association between each unique identifier of a portable guest device detected using BLE communications, the location of the sensor that detected the portable device, and a timestamp[.]" *Id.*

a plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device having a unique identifier and including first and second wireless communication antennas respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications;

a sensor network comprising a plurality of sensors each mounted at a different location, wherein at least one sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on BLE communication with the portable guest devices and at least another sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on NFC communication with the portable guest devices;

a communication network connecting each of the plurality of sensors of the sensor network; and

a central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and *storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network*,[9]

wherein each guest device is configured to selectively operate according to first and second operating modes, each guest device engaging in bi-directional communication using the first wireless communication antenna configured for BLE communications in the first operating mode and engaging in a beacon mode periodically broadcasting a beacon signal using the first wireless communication antenna configured for BLE communications in the second operating mode, and

*each sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes*.[10]

---

[9]     Carnival proposes that this claim be given its plain and ordinary meaning. [D.E. 183 at 2].  If construction is deemed necessary, however, Carnival proposes "storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network with log information[.]" *Id.*  DeCurtis argues that this claim is invalid as indefinite.  *Id.*

[10]     Carnival proposes "each BLE sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes." [D.E.

### E.      '516 patent, claim 13.

An electronic door lock assembly comprising:

a latch assembly including a latch and an electronically controlled locking mechanism operative to selectively unlock a door;

a door lock communication module electrically connected to the electronically controlled locking mechanism of the latch assembly, and including a radio configured for wireless communication; and

an access panel separate from and fixedly mounted proximate to the door lock communication module and latch assembly, and including *a radio configured for wireless communication with the door lock communication module*,[11] a first transceiver configured for wireless communication with a portable user device, and *a second transceiver for communication with a reservation server*,[12]

wherein the access panel separate from and fixedly mounted proximate to the door lock communication module is configured to receive door access information from the *reservation server*[13] via the second transceiver, determine whether the door should be unlocked based on

---

183 at 3].  DeCurtis proposes "every sensor of the sensor network is operative to transmit a command to cause the guest device to change between the first BLE operating mode and the second BLE operating mode."  *Id*.  Alternatively, DeCurtis argues that this claim is invalid for lacking written description support.  *Id*.

[11]     Carnival proposes that this claim be given its plain and ordinary meaning, wherein the radio is a physical component of the access panel.  [D.E. 183 at 2]. DeCurtis proposes "a physical component of the access panel for communicating with the door lock communication module in the radio (RF) band, which is below the infrared (IR) band[.]" *Id*.

[12]     Carnival proposes that this claim be given its plain and ordinary meaning in that the "second transceiver" could be a wired or wireless transceiver.  [D.E. 183 at 2]. DeCurtis proposes "a wireless transceiver for communication with a reservation server[.]" *Id*.

[13]     Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary.  [D.E. 183 at 2].  DeCurtis proposes "a server for receiving and storing information about a guest's reservation and preferences[.]" *Id*.

the door access information received from the reservation server, and transmit an instruction to unlock the door to the door lock communication module via the radio based on the determination.

**F.      *'514 patent, claim 11.***

*A portable wireless device comprising:*

*a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than 5/8 inch;*

*a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity,*

*wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications,*[14]

*the processor is configured to establish secure communication links with remote communication devices*[15] using the first wireless communication antenna configured for BLE communications,

*the memory stores both public and private identifiers unique to the portable wireless device,*[16]

---

[14]      Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary.  [D.E. 183 at 3].  DeCurtis argues that this claim is invalid for lack of enablement.  *Id.*  Alternatively, DeCurtis proposes that this claim be limited to the portable wireless device disclosed on Figures 5A through 5J of the common specification.  *Id.*

[15]      Carnival proposes that this claim be given its plain and ordinary meaning; no construction is necessary.  [D.E. 183 at 3].  DeCurtis proposes "the processor is coupled to memory storing the necessary encryption keys to create the secure communication link[.]"  *Id.*  Alternatively, DeCurtis argues that this claim is invalid for lacking written description support.  *Id.*

[16]      Carnival proposes that this claim be given its plain and ordinary meaning in that it recites a memory capable of performing the proposed function.  [D.E. 183 at 3-4].  DeCurtis proposes "the memory actually containing both public and private identifiers unique to the portable wireless device[.]" *Id.*

the processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications, and

the processor controls the first wireless communication antenna to transmit the private identifier only across secure communication links established with remote communication devices using BLE communications.

## II.     LEGAL STANDARD

### A.     *Claim construction.*

It is the exclusive province of the Court to determine the meaning and scope of a patent claim.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015).  But claim construction is required only when "the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution" by the Court.  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004).

The words of a claim are generally given their "ordinary and customary" meaning as understood by a POSITA at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). Importantly, the POSITA is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*. at 1313.  In some cases, the ordinary meaning of claim language as understood by a POSITA may be readily apparent even to lay judges, and so "claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id*. at 1314.

The Court looks first to the language in the claims themselves to define the scope of the patented invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). But the claims do not stand alone because they are part of a "fully integrated written instrument" that consists primarily of a specification that concludes with the claims. *Phillips*, 415 F.3d at 1315. Therefore, the claims must be read in light of the specification, which is always "highly relevant" to and usually "dispositive" of the claim construction analysis. *Id*. If the specification contains a clear lexicography or disavowal, such an explicit definition or manifest exclusion will govern. *Id*. at 1316. But,

> [u]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Id*. (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In addition to the intrinsic evidence contained within the patent itself, the Court may also consider the patent's prosecution history while interpreting the claim terms, but such history is typically less useful for claim construction purposes because it represents "an ongoing negotiation" between the USPTO and the applicant. *Id*. at 1317. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

The Court may also rely on extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* Extrinsic evidence is, however, "less significant" than the intrinsic record in determining the legally operative meaning of the language in a patent's claim because extrinsic evidence is less reliable than intrinsic evidence. *Id.* at 1317-18. Therefore, in most situations, an analysis of the "intrinsic evidence alone" will resolve any ambiguity in a disputed claim term. *Vitronics*, 90 F.3d at 1583.

### B. *Summary judgment.*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to

interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.'"  *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

## III.   *ANALYSIS*

Although the patents at issue in this case describe complex technology, it should be obvious after reviewing the language of the disputed claims that the claims

themselves are remarkably simple and clear. Carnival argues – and this Court generally agrees – that the claims describe Carnival's invention using words that are readily understood by a POSITA as well as a lay juror. Accordingly, most of the disputed claims do not require additional construction.

In addition to the claims that the Court has been asked to construe, DeCurtis seeks summary judgment with respect to the invalidity of several claims. Therefore, at the appropriate intervals, the Court will address DeCurtis' summary judgment arguments.

**A.**   ***'184 patent, claims 1 and 7: "storing a log" claim construction.***

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A guest engagement system comprising . . . a central server . . . *storing a log associating each unique identifier of a portable guest device detected using BLE communications by a sensor of the sensor network with the known location of the sensor and a timestamp*[.]"[17] | Plain and ordinary meaning; no construction necessary. | "recording in non-transitory memory an association between each unique identifier of a portable guest device detected using BLE communications, the location of the sensor that detected the portable guest device, and a timestamp" |

This is the first of several attempts by DeCurtis to narrow a patent claim through unnecessary and self-serving uber-specificity. Accordingly, the Court finds

---

[17]      For the sake of brevity and clarity, the Court has included portions of language from the relevant claims that are not in dispute. Accordingly, the *italicized language* of each recited claim term is the language that the Court has been called upon to construe; the non-italicized language is included only to present the disputed claim language as a full sentence.

that no construction is necessary with respect to the "storing a log" term of claim 1 and claim 7 of the '184 patent.

What is claimed here is a guest engagement system comprising a central server that stores a log.[18]  That "log" in turn associates each unique identifier of a portable guest device detected using BLE communications by a sensor in the sensor network with the known location of the sensor and a timestamp.  A plain reading of the claim reveals an invention that comprises (1) a log associating three data points (*i.e.*, the unique identifier, the location of the sensor that detected the unique identifier, and a timestamp documenting that moment of detection) and (2) a central server responsible for storing that log.  DeCurtis incorrectly seeks to rewrite and materially change this claim in two ways.

First, DeCurtis' proposed construction appears to require the server – not the log – to perform the task of associating the recited information.  But that is not what the text of the patent claims and, in any event, the specification teaches an embodiment wherein the sensors in the sensor network create the log associating the recited information before the log is stored on the central server.  [D.E. 205-2, 23:4-11].  Reading a preferred embodiment out of the claim language is "rarely, if ever" the correct result in a claim construction analysis.  *See Vitronics*, 90 F.3d at 1583.

Second, DeCurtis' proposed construction requires this association of the recited information to be recorded in "non-transitory" memory.  But this proposed

---

[18]    The parties agree that a "log" is a "place to record information or a place where information is stored for a period of time."  [D.E. 223 at 12].

construction is also unsupported by the intrinsic evidence.  Indeed, neither the claim

nor the specification makes any reference to "non-transitory" memory.  Moreover,

adding this additional qualification to the claim creates ambiguity with respect to the

line between "transitory" and "non-transitory" memory.  Thus, adopting DeCurtis'

proposed construction would not only seem to cut against the intrinsic evidence – by

assigning a narrowing qualification to the way in which the recited information is

stored by the central server – but it will also serve to unnecessarily confuse the fact

finder.

      The meaning of the disputed "storing a log" term in claim 1 and claim 7 of the

'184 patent is clear based upon a reading of the claims themselves and the patent

specification.  Accordingly, the Court finds that no construction is necessary.

    **B.**    **'184 patent, claim 11: "storing a log" claim construction and motion for summary judgment regarding its invalidity.**

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A guest engagement system comprising . . . a central server . . . *storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network*[.]" | Not indefinite; plain and ordinary meaning; or, if construction is deemed necessary, "storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network with log information" | Invalid as indefinite. |

DeCurtis has not proposed a construction for the "storing a log" term in claim 11 of the '184 patent.  By contrast, it argues that the claim is invalid because it is indefinite.  Accordingly, DeCurtis moves for summary judgment on this issue.

Federal law requires the patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."   35 U.S.C. § 112(b). Accordingly, a patent claim is invalid for indefiniteness if it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Put differently, a patent claim is indefinite unless it is "precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id*. at 909 (internal quotations omitted and alterations adopted).  Indefiniteness is an issue of claim construction, which is a question of law for the Court to resolve.  *In re Packard*, 751 F.3d 1307, 1311 (Fed. Cir. 2014).

Unlike claim 1 and claim 7 of the '184 patent, claim 11 does not specify the data that the "log" must associate with each unique identifier that is detected by a sensor in the sensor network.  DeCurtis argues that this makes the claim indefinite, resulting in its invalidity under 35 U.S.C. § 112.  Carnival counters that the claim is not indefinite; rather, the claim is intentionally broad.

Starting with the language of the claim itself, what is claimed is a guest engagement system comprising a central server that stores a log.  This undoubtedly has the same meaning as the materially identical language in claim 1 and claim 7,

which requires no construction by the Court.  But the log of claim 11, unlike the log described in claim 1 and claim 7, associates each detected unique identifier with some other, unspecified data.  On this much, the parties agree.  But DeCurtis then posits that the failure to specify that *other* data renders the claim indefinite.  Carnival responds that the failure to specify that *other* data was entirely the point because the claim, as written, encompasses *all* of the data that a host may wish to associate with each detected unique identifier in a log.

It is evident from the language in the patent that Carnival's invention has applications beyond the cruise ship environment.  It follows that different applications of this invention may warrant variability in the data that is associated with the detected unique identifiers in a log.  Accordingly, Carnival claimed that its invention stores a log that associates each detected unique identifier with other log information.  That is a broad claim, but breadth does not necessarily equate to indefiniteness.  *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013) ("[A] patentee is entitled to the full breadth of claim scope supported by the words of the claims and the written description[.]").

DeCurtis unpersuasively argues that Carnival's willingness to construe this claim by adding "with log information" to the end of the disputed claim language evidences the ambiguity inherent in the claim as it is written.  But, as written, the claim covers a log that associates one data point: a detected unique identifier.  The only way in which the log could "associate" that data point is to tie it, in some fashion, to at least one other data point.  Thus, Carnival's proposed construction merely

clarifies the only reasonable interpretation of the claim; it does not modify the meaning of the claim as it is written. That is why Carnival submits that this claim needs no construction; or, alternatively, expresses a willingness to construe the term by adding "with log information" to the end of the disputed claim language.

The Court finds that the "storing a log" term from claim 11 is broad but not ambiguous. As such, the claim is clear and precise enough to inform the public, with reasonable certainty, of the claim's scope; accordingly, the claim is not indefinite. *See Nautilus*, 572 U.S. at 901. The Court further finds that the claim can be readily understood according to its language's plain and ordinary meaning without additional construction. In so finding, the Court recommends that DeCurtis' motion for summary judgment regarding claim 11's invalidity be **DENIED**.

C. **'184 patent, claim 1; '516 patent, claim 13: "radio" claim construction.**

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A guest engagement system comprising . . . a plurality of access panels each configured to control an electronically controlled door lock . . . [wherein] each access panel comprises: *a radio configured for wireless communication with the door lock communication module*[.]"[19] | Plain and ordinary meaning, wherein the radio is a physical component of the access panel. | "a physical component of the access panel for communicating with the door lock communication module in the radio (RF) band, which is below the infrared (IR) band" |

---

[19]     Here, the non-italicized language comes from the '184 patent. The '516 patent uses the same italicized language somewhat differently: "An electronic door lock assembly comprising . . . an access panel . . . including *a radio configured for wireless communication with the door lock communication module*[.]"

The parties agree that, at a minimum, the term "radio" should be construed as a physical component of the access panel.  Accordingly, the Court agrees and adopts this aspect of the construction.  The parties also appear to agree that this claim concerns a radio that communicates wirelessly, even though DeCurtis' proposed construction expressly omits the word "wireless." But the parties' agreement ends there because DeCurtis believes that the term "radio" needs additional construction.

This is another unpersuasive attempt by DeCurtis to narrow the meaning of the claim through unnecessary specificity.  The Court has no doubt that a POSITA (and even a lay juror) would be familiar with the plain and ordinary meaning of the word "radio" because the technology has literally permeated everyday life for the past century.  And nothing in the intrinsic evidence otherwise merits the rewriting of a claim that can be clearly understood according to its plain and ordinary meaning.

What is claimed is a guest engagement system comprising an access panel that in turn comprises a radio configured for wireless communication with the door lock communication module.  Although the parties agree that clarity would be useful insofar as it confirms that the radio is a physical part of the access panel, DeCurtis seeks to further define communication by radio as communication occurring in the radio band.

The Court finds, however, that a POSITA would readily understand what communication by radio entails and, therefore, additional construction here is unnecessary.  Therefore, claim 1 of the '184 patent and claim 13 of the '516 patent

should be given their plain and ordinary meaning, provided that the "radio" is understood to be a physical component of the access panel.

**D.**   *'184 patent, claim 1; '516 patent, claim 13: "second transceiver"*
*claim construction.*

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A guest engagement system comprising . . . a plurality of access panels each configured to control an electronically controlled door lock . . . and each access panel comprises . . . *a second transceiver configured for communication with the central server*[.]"[20] | Plain and ordinary meaning; "second transceiver" could be a wired or wireless transceiver. | "A wireless transceiver for communication with [the central server] / [a reservation server]" |

Here, the parties dispute whether the "second transceiver" must be wireless, as proposed by DeCurtis, or whether the "second transceiver" can be wired or wireless, which is Carnival's position.  A reading of the claims themselves clearly indicates that the claims encompass both wired and wireless embodiments of the second transceiver.  But DeCurtis argues that Carnival disavowed the wired embodiment during the prosecution of the patent and, therefore, the Court should limit this claim accordingly.

---

[20]   Here, the non-italicized language comes from the '184 patent.  The '516 patent uses similar italicized language: "An electronic door lock assembly comprising . . . an access panel . . . including . . . *a second transceiver for communication with a reservation server*."  Given the minimal differences, the Court notes that the parties have apparently agreed to use the terms "central server" and "reservation server" interchangeably with respect to this particular issue of claim construction.

"The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 957 (Fed. Cir. 2000). Accordingly, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). But the standard for disclaimer is "demanding" and so there must be a "clear and unmistakable" disavowal for the doctrine of prosecution disclaimer to apply. *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F>3d 1040, 1045 (Fed. Cir. 2016).

DeCurtis' argument hinges entirely on a statement made by Carnival during patent prosecution in which Carnival distinguished its invention from prior art (specifically, the "Scalisi" patent). [D.E. 199-12 at 12] ("The security system [of the Scalisi patent] is notably <u>not</u> described as having described as having multiple wireless communication interfaces including 'a radio […], a first transceiver […], and a second transceiver […]'" in accordance with those detailed in claim 71.") (emphasis and ellipses in original). DeCurtis views this as a clear and unmistakable disavowal of a wired second transceiver because the statement can be reasonably interpreted as communicating that the radio, first transceiver, *and* the second transceiver are wireless. Although the Court agrees that this is a reasonable interpretation of a

statement made by Carnival during its patent prosecution, the Court is not persuaded that it amounts to a "clear and unmistakable" disavowal of a wired second transceiver.

A review of the Scalisi patent indicates that it does not claim *multiple* wireless communication interfaces. Accordingly, it is also reasonable to interpret Carnival's attempt to distinguish its invention from Scalisi as being inclusive of a wired second transceiver because the material distinguishing factor in Carnival's argument – *i.e.*, its inclusion of "multiple" wireless communication interfaces – can be achieved by the existence of the radio and first transceiver. Thus, DeCurtis' construction is flawed because where "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props.*, 725 F.3d at 1326.

The Court finds that the claims should be given their plain and ordinary meaning. And because DeCurtis is unable to identify a clear and unmistakable disavowal regarding the scope of these claims, the claims should be construed to encompass both wired and wireless embodiments of the second transceiver.

**E.**   **_'184 patent, claim 2; '516 patent, claim 13: "reservation server"_**
**_claim construction._**

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "The guest engagement system of claim 1, wherein the central server comprises a central *reservation server* associating with each electronically controlled door lock[.]"[21] | Plain and ordinary meaning; no construction necessary. | "A server for receiving and storing information about a guest's reservation and preferences" |

This is the next attempt by DeCurtis to narrow the meaning of a claim through artful specificity. But this effort is again unpersuasive because it violates what DeCurtis considers a "blackletter principle" of claim construction: the claim generally should not be limited to its preferred embodiment. [D.E. 201 at 18] (citing *Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004)). Nevertheless, DeCurtis' proposed construction simply cherry picks from the specification to limit the claimed function of the reservation server without providing any compelling reason for doing so (or any cohesive logic, for that matter, regarding why some embodiments taught in the specification should limit the claimed functions of the "reservation server" while other embodiments should not). Like many of the other disputed claims here, the term "reservation server" is easily understood according to its plain and ordinary meaning when it is read in context with the relevant claims and exemplary embodiments taught in the specification. As such, the Court finds

---

[21]   Here, the non-italicized language comes from the '184 patent. The '516 patent varies slightly: "An electronic door lock assembly comprising . . . a second transceiver for communication with a *reservation server*[.]"

that a POSITA would readily understand the functions and limitations of the "reservation server" within the guest engagement system, and so no construction is needed.

**F.** **'184 patent, claim 11: "each sensor" claim construction and motion for summary judgment.**

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A guest engagement system comprising: a plurality of portable guest devices . . . wherein each guest device is configured to selectively operate according to first and second operating modes [and] . . . *each sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes.*" | "each BLE sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes" | "every sensor of the sensor network is operative to transmit a command to cause the guest device to change between the first BLE operating mode and the second BLE operating mode"<br><br>Alternatively, invalid as lacking written description support. |

There is no dispute that the claims and specification of the '184 patent clearly describe a portable guest device comprising two wireless communication antennas: (1) one configured for BLE communication and (2) another configured for NFC communication.  And it is evident from the face of the '184 patent that only the BLE antenna is claimed to operate in different operating modes.  By contrast, the patent teaches that the NFC antenna, which essentially functions as a backup antenna when there is insufficient power to operate the BLE antenna, does not feature multiple

operating modes. Therefore, the parties agree that the claims regarding the portable wireless device's operating modes should be construed as BLE operating modes. But the parties disagree as to whether the patent claims that "every sensor" in the sensor network is operative to change a portable guest device's BLE operating mode, DeCurtis' position, or whether the claim is limited to "each BLE sensor" in the sensor network, the construction proposed by Carnival.

The Court agrees that some construction is warranted here because the claim, as its written, grammatically suggests that "each" sensor in the sensor network means "every" sensor in the sensor network – *i.e.*, every BLE sensor, every NFC sensor, and every combined BLE/NFC sensor. But a closer examination of the language in the patent makes it clear that the "operating modes" of claim 11 are BLE operating modes, and so a POSITA would understand from the specification that the "command" to change from one BLE operating mode to another BLE operating mode must be accomplished using BLE communication protocols. Thus, even if the grammar of the claim suggests that "each sensor" means "every sensor," the context supplied by the intrinsic evidence confirms that "each sensor" means "each BLE sensor."

Adopting Carnival's proposed construction effectively disposes of DeCurtis' summary judgment argument as well because DeCurtis' argument – the claim is invalid because it lacks the written description of an NFC sensor that is capable of commanding the change of BLE operating modes – hinges upon DeCurtis' proposed "every sensor" construction. Because the Court adopts Carnival's proposed

construction, it also recommends that DeCurtis' motion for summary judgment be

**DENIED** in this respect.

G.   *‘514 patent, claim 11: “portable wireless device” claim construction and motion for summary judgment.*

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| *“A portable wireless device comprising: a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than 5/8 inch; a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity, wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications[.]”* | Plain and ordinary meaning; no construction necessary. | Invalid for lack of enablement.<br><br>Alternatively, a portable wireless device as disclosed in Figs. 5A-5J. |

Neither party argues that this particular claim cannot be understood according to its plain and ordinary meaning.  Indeed, the claim clearly describes a portable wireless device that comprises a processor, a memory, a battery, and two wireless communication antennas that are disposed within the cavity of a fully enclosed device that is smaller than 2.5 inches in diameter and thinner than (or equal to) 5/8 inches in thickness.

Both a POSITA and a lay juror could readily understand the meaning of this claim as it is written: what is claimed is a device that is smaller than the recited size and that comprises the recited elements. DeCurtis cannot persuasively argue otherwise. Instead, DeCurtis urges the Court to find that the claim is invalid for lack of enablement, and it alternatively asks the Court to limit this claim to the embodiments disclosed in Figures 5A through 5J of the '514 patent.

The enablement doctrine is derived from 35 U.S.C. ¶ 112 and it requires the specification of a patent to teach those skilled in the art how to make and use the full scope of the invention without "undue experimentation." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). Here, because this claim does not recite a minimum size for the portable guest device, DeCurtis perceives the claimed scope of the invention to cover any embodiment of the device that is smaller than the maximum recited size. And because the current state of the art does not allow for a device comprising the recited elements to function when it is reduced to microscopic sizes, DeCurtis argues that "undue experimentation" would be required to achieve such tiny embodiments. So, in DeCurtis' view, this claim is invalid for lack of enablement.

This argument has more appeal, but it ultimately fails because it does not fully appreciate that the portable guest device's claimed size is subject to an inherent limit. *See, e.g., Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) ("[O]pen ended claims are not inherently improper . . . . [t]hey may be supported if there is an inherent, albeit not precisely known, upper limit and the specification

enables one of skill in the art to approach that limit.").  Put differently, a POSITA would readily understand that there is an inherent lower limit to the size of a device comprising two antennas, a battery, a processor, and a memory.   And that understanding is consistent with the intrinsic evidence because the invention clearly contemplates a portable guest device that is small enough to be conveniently carried yet not so small that it could be lost in the palm of a guest's hand.  Therefore, so long as the specification enables a POSITA to approach that limit without undue experimentation, this claim is not invalid for lack of enablement.

The recognition of an inherent limit in turn prompts the question: what is the inherent limit associated with this claim and can a person skilled in the art approach that limit without undue experimentation?  But the record indicates that the answer to this question – an answer that undoubtedly qualifies as a material fact – is subject to a genuine dispute.  For example, the patent's specification makes clear that near-zero values for the diameter or thickness of the portable guest device were not intended to fall within the claimed range (*i.e.*, less than 2.5 inches in diameter and equal to or less than 5/8 inches in thickness) because the claim was intended to encompass a "reasonable range" that was "customary" in the art.  [D.E. 205-4 at 39:23-29].  By contrast, DeCurtis' expert opines that the state of the art would allow for the creation of a device no larger than 1.1093 inches wide and 0.3937 inches thick.  Therefore, DeCurtis' motion for summary judgment should be **DENIED** based on the existence of a genuinely disputed material fact as to this issue.  Certainly, it cannot be granted as a matter of law in DeCurtis' favor without a definitive factual finding.

DeCurtis' next argument as to Claim 11 fares no better because it again violates what DeCurtis itself considers a "blackletter principle" of claim construction: the claim generally should not be limited to its preferred embodiment. [D.E. 201 at 18] (citing *Liebel-Flarsheim Co.*, 358 F.3d at 906). To reiterate, the Court is confident that this claim can be readily understood according to its plain and ordinary meaning. Therefore, DeCurtis' attempt to limit this claim to its illustrated description (shown here) appears to be nothing more than a naked attempt to manufacture an infringement defense through an unnecessarily specific claim construction.



FIG. 5D

For example, the claim itself makes no mention of the BLE antenna's shape. By contrast, the figures cited by DeCurtis illustrate a J-shaped BLE antenna. *See, e.g.*, '514 patent, Figure 5D. Accordingly, Carnival was quick to note that DeCurtis' portable guest device, which allegedly infringes on Carnival's patent, does not feature a J-shaped antenna. Nevertheless, DeCurtis has failed to persuade the Court that this claim requires any additional construction or should otherwise be limited to the embodiments disclosed in the specification. Thus, the Court finds that no construction is necessary; the claim should be given its plain and ordinary meaning.

**H.**   **_'514 patent, claim 11: "processor configured" claim construction and motion for summary judgment._**

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A portable wireless device comprising . . . a processor [wherein] . . . *the processor is configured to establish secure communication links with remote communication devices*[.]" | Plain and ordinary meaning; no construction necessary. | "the processor is coupled to memory storing the necessary programming and encryption keys to create the secure communication link"<br><br>Alternatively, invalid as lacking written description support. |

This is DeCurtis' next attempt to narrow the claim language through hyper-specificity. But again, the Court finds that the disputed claim language is something that would be readily understood by a POSITA according to its plain and ordinary meaning. Thus, the Court finds that no construction is necessary.

This finding tees up DeCurtis' final summary judgment argument because it hinges on the Court's adoption of Carnival's proposed construction of no construction. DeCurtis argues that, when given no construction by the Court, this claim is invalid under 35 U.S.C. § 112 because it lacks sufficient written description support.

Written description is adequate where the disclosure "conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (internal quotations omitted). The determination of whether a patent lacks sufficient written description support requires "an objective inquiry into the four corners of the specification" from the perspective of a POSITA. *Id.* (internal

quotations omitted).  To overcome the presumption of patent validity, a challenger must establish inadequate written description by clear and convincing evidence. *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1294 (Fed. Cir. 2004)

The patent claims a processor that is configured to establish "secure communication links" with remote communication devices, and the specification discloses an embodiment wherein that "secure" communication link is achieved through an encryption protocol.  [D.E. 205-4 at 15:5-31].  DeCurtis' expert opines that a POSITA would know other methods for establishing a "secure" communication link beyond the encryption protocol taught in the specification.  As such, DeCurtis argues that the claim is invalid for lacking written description support because these other methods are not taught in the specification.  But this argument should be rejected because the Federal Circuit has repeatedly warned against confining claims to cover only the disclosed embodiments absent unusual circumstances.  *See Phillips*, 415 F.3d at 1323; *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) ("Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.").

Here, it is obvious from a review of the four corners of the specification that "secure" is not synonymous with "encrypted"; by contrast, the specification makes clear that encryption is merely one disclosed method of establishing the secure communication link.  And because the specification teaches a method for creating secure communication links, which is a claimed component of Carnival's invention, the specification conveys that Carnival had possession of the claimed invention at the

time it filed its patent application.  Therefore, DeCurtis has failed to prove by clear and convincing evidence that this claim, at least as a matter of law, lacks sufficient written description support.  And so, DeCurtis' motion for summary judgment should be **DENIED** in this respect.

## I.      *'514 patent, claim 11: "memory stores" claim construction.*

| Claim Term | Carnival's Proposed Construction | DeCurtis' Proposed Construction |
|---|---|---|
| "A portable wireless device comprising . . . a memory . . . wherein . . . *the memory stores both public and private identifiers unique to the portable wireless device*[.]" | Plain and ordinary meaning; the term recites a memory capable of performing the recited function. | "the memory actually containing both public and private identifiers unique to the portable guest device." |

The parties dispute whether the claim recites a memory that actually stores the requisite unique identifiers, which is DeCurtis' position, or whether the claim recites a memory that is merely capable of doing so, which is Carnival's proposed construction.  The Court agrees with Carnival.  In cases involving very similar grammatical structure, the Federal Circuit clarified that an active-voice verb should be understood as describing what a given device is "capable" of doing.  *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017); *UltimatePointer, LLC v. Nintendo, Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016).

Perhaps as an oversight, DeCurtis' attempt to distinguish these two cases effectively highlights how relevant they are to the pending dispute.  In *MasterMine*, the disputed language claimed "a reporting module installed within the CRM software application . . . wherein the reporting module installed within the CRM

software application *presents* a set of user-selectable database fields[.]" 874 F.3d at 1315 (emphasis added). Similarly, in *UltimatePointer*, the disputed language claimed "a handheld device including: an image sensor, said image sensor *generating* data[.]" 816 F.3d at 826 (emphasis added).  Reading those claims in context, the Federal Circuit held that the claims recited each respective device's functional capability – *i.e.*, a reporting module capable of presenting database fields; an image sensor capable of generating data.  According to DeCurtis, however, the foregoing language is distinguishable from this disputed claim because the foregoing language first introduces a structural limitation (i.e., "a reporting module" in *MasterMine* and an "image sensor" in *UltimatePointer*) and then repeats that structural limitation in a separate phrase with an active verb (i.e., the reporting module "presents" and the image sensor "generat[es]").

Here, argues DeCurtis, this claim does not recite "a memory, *wherein* the memory stores" and that distinction sufficiently distinguishes this claim from those at issue in *MasterMine* and *UltimatePointer* – cases wherein the Federal Circuit relied heavily on the respective claims' sentence structures to hold that the claims recited a capability of the invention.  But DeCurtis' argument misses the mark because this claim clearly recites, in language that would be easily understood by a POSITA as well as a lay juror, that the invention includes "[a] portable wireless device comprising . . . a memory . . . wherein . . . the memory stores both public and private identifiers unique to the portable wireless device[.]"

Hence, we find it appropriate to read this claim according to its plain and ordinary meaning and to construe it as reciting a memory that is capable of performing the recited function (*i.e.*, the storage of unique identifiers). *MasterMine*, 874 F.3d at 1315-16 ("Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities of the reporting module. Like the claims in . . . *UltimatePointer*, the claims at issue here merely claim that the system possesses the recited structure which is capable of performing the recited functions.") (internal quotations omitted and alterations adopted).

## IV.   CONCLUSION

For the foregoing reasons, Carnival's motion [D.E. 205] for opening claim construction should be **GRANTED**, thereby construing the claims as summarized below, and DeCurtis' redacted motion for summary judgment [D.E. 203] (and its sealed version at [D.E. 236]) should be **DENIED**.

A.   The "storing a log" term from claim 1 and claim 7 of the '184 patent should be read according to its plain and ordinary meaning; no construction is necessary.

B.   The "storing a log" term from claim 11 of the '184 patent should be read according to its plain and ordinary meaning; no construction is necessary.

C.   The "radio" term from claim 1 of the '184 patent and claim 13 of the '516 patent should be read according to its plain and ordinary meaning,

provided that the radio is understood to be a physical component of the access panel.

D.    The "second transceiver" term from claim 1 of the '184 patent and claim 13 of the '516 patent should be read according to its plain and ordinary meaning, provided that the second transceiver may be wired or wireless.

E.    The "reservation server" term from claim 2 of the '184 patent and claim 13 of the '516 patent should be read according to its plain and ordinary meaning; no construction is necessary.

F.    The "each sensor" term from claim 11 of the '184 patent should be read according to its plain and ordinary meaning, provided it is understood that "each sensor" means "each BLE sensor."

G.    The "portable wireless device" term from claim 11 of the '514 patent should be read according to its plain and ordinary meaning; no construction is necessary.

H.    The "processor configured" term from claim 11 of the '514 patent should be read according to its plain and ordinary meaning; no construction is necessary.

I.    The "memory stores" term from claim 11 of the '514 patent should be read according to its plain and ordinary meaning, provided that the claim recites a memory capable of performing the recited function.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to

file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22d day of March, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge