**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| **CARNIVAL CORPORATION,** ) | |
| a Panamanian corporation, ) | |
| Plaintiff, ) | |
| v. ) | |
| ) No. 1:20-cv-22945-RNS | |
| ) | |
| **DECURTIS LLC,** a Delaware limited liability ) | |
| corporation, and **DECURTIS** ) | |
| **CORPORATION**, ) | |
| a Florida corporation, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT DECURTIS' OBJECTIONS TO
THE MARCH 22, 2022 REPORT AND RECOMMENDATION**

## **TABLE OF CONTENTS**

I.    ARGUMENT .................................................................................................................1

    A.    The "storing a log associating each unique identifier" limitation ('184 patent, claim 11) is indefinite for lack of written description. ................................1

    B.    Carnival disavowed the full scope of the "second transceiver" ('184 patent, claim 1; '516 patent, claim 13) during prosecution. .................................................5

    C.    Claim 11 of the '184 patent is invalid as indefinite because the "each sensor" limitation lacks written description. ...............................................................................8

    D.    Claim 11 of the '514 patent is invalid because the patent lacks an enabling disclosure for the full range of dimensions for the "portable wireless device" ...........................................................................................................................14

II.   CONCLUSION .............................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>CASES</u>

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)........................................................................... 9

*Acceleration Bay v. Activision Blizzard*,
    324 F. Supp. 3d 470 (D. Del 2018) ................................................................... 12

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
    707 F.3d 1318 (Fed. Cir. 2013)......................................................................... 13

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    805 F.3d 1368 (Fed. Cir. 2015)......................................................................... 10

*Akeva L.L.C. v. Adidas-Salomon AG*,
    208 F. App'x 861 (Fed. Cir. 2006) ................................................................... 16

*Alcon Research, Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012).......................................................................... 15

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002)......................................................................... 12

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007).......................................................................... 15

*Bell Atl. Network Servs., Inc. Covad Comm'ns Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)........................................................................... 7

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353 (Fed. Cir. 2011)......................................................................... 11

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)..................................................................... 3, 12

*Cisco Sys., Inc. v. Int'l Trade Comm'n*,
    873 F.3d 1354 (Fed. Cir. 2017)......................................................................... 10

*Fargo Elecs., Inc. v. Iris, Ltd., Inc.*,
    287 F. App'x 96 (Fed. Cir. 2008) ....................................................................... 3

*Fitbit, Inc. v. Valencell, Inc.*,
    964 F.3d 1112 (Fed. Cir. 2020)......................................................................... 12

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
    407 F.3d 1297 (Fed. Cir. 2005)........................................................................... 3

*Honeywell Int'l. Inc. v. ICM Controls Corp.*,
   45 F. Supp. 3d 969 (D. Minn. 2014) ........................................................................ 3, 4

*IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*,
   956 F.3d 1374 (Fed. Cir. 2020) ..................................................................................... 4

*Intel Corp. v. Tela Innovations, Inc.*,
   2021 WL 1222622 (N.D. Cal. Feb. 11, 2021) ............................................................ 14

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ................................................................................... 12

*Liebel-Flarsheim Co. v. Medrad*,
   358 F.3d 898 (Fed. Cir. 2004) ..................................................................................... 11

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
   541 F. Supp. 3d 435 (D. Del. 2021) ............................................................................ 14

*Liquid Dynamics v. Vaughn Co.*,
   335 F.3d 1361 (Fed Cir. 2004) ....................................................................................... 9

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005) ................................................................................... 14

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012) ................................................................................... 14

*Microsoft Corp. v. Multi-Tech Sys.*,
   357 F.3d 1340 (Fed. Cir. 2004) ..................................................................................... 7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ........................................................................................................ 1

*NetAirus Techs., LLC v. Apple Inc.*,
   Case No. 13-03780, 2016 WL 5898640 (C.D. Cal. Mar. 23, 2016) ........................... 14

*Novo Indus., L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) ................................................................................... 11

*Plastipak Packaging, Inc. v. Premium Waters, Inc.*,
   2021 WL 3675151 (W.D. Wis. Aug. 19, 2021) .......................................................... 15

*ResQNet.com, Inc. v. Lansa, Inc.*,
   346 F.3d 1374 (Fed. Cir. 2003) ................................................................................... 10

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ................................................................................... 13

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ................................................................................... 11

*SanDisk Corp. v. Memorex Prod., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ................................................................................... 13

iii

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
  927 F.2d 1565 (Fed. Cir. 1991) ................................................................ 15, 17

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
  987 F.3d 1358 (Fed. Cir. 2021) ................................................................ 13

*Thorner v. Sony Comput. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ................................................................ 16

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
  681 F. App'x 888 (Fed. Cir. Mar. 7, 2017) .............................................. 12

*TVnGo Ltd. (BVI) v. LG Elecs. Inc.*,
  861 F. App'x 453 (Fed. Cir. June 28, 2021) ............................................ 4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ................................................................ 7

*Zoho Corp. v. Sentius Int'l, LLC*,
  494 F. Supp. 3d 693 (N.D. Cal. 2020) ..................................................... 13

## STATUTES

28 U.S.C. § 636(b)(1) ...................................................................................... 1

35 U.S.C. § 112 ......................................................................................... 13, 14

35 U.S.C. § 112(b) ......................................................................................... 1

## RULES

Fed. R. Civ. P. 72(a) ...................................................................................... 1

Fed. R. Civ. P. 72(b) ...................................................................................... 1

Local Magistrate Rule 4(b) ............................................................................ 1

iv

Pursuant to Local Magistrate Rule 4(b), Fed. R. Civ. P. 72(a) and (b), and 28 U.S.C. § 636(b)(1), Defendants DeCurtis, LLC and DeCurtis Corporation (collectively "DeCurtis") respectfully submit the following objections to the Court's Report and Recommendation on Claim Construction and Summary Judgment (ECF 267) ("R&R").

## I.   ARGUMENT

### A.   The "storing a log associating each unique identifier" limitation ('184 patent, claim 11) is indefinite for lack of written description.

The "storing a log associating each unique identifier" limitation of claims 11-15 of the '184 patent fails to inform a person of ordinary skill (a "POSITA"), with reasonable certainty, what the "unique identifier" is supposed to be associated with to fall within the scope of these claims.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (holding patent claim is invalid as indefinite when claim fails to provide "reasonable certainty" as to scope).  These claims are there for invalid as indefinite.

The Court correctly stated that under §112(b) "a patent claim is indefinite unless it is 'precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them,'" and also correctly noted that "[u]nlike claim 1 and claim 7 of the '184 patent, claim 11 does not specify the data that the 'log' must associate with each unique identifier that is detected by a sensor in the sensor network."  R&R, at 18.  Specifically, claims 1 and 7 require "storing a log ***associating***" the received "unique identifier" "**with** the known location of the sensor and a timestamp."  Claim 11, by contrast, includes the same language at the beginning of this limitation—"storing a log associating each unique identifier"—but omits any "with" language that would provide necessary guidance to a POSITA as to what information the received "unique identifier" must be associated with to infringe this claim:

| '184 patent claim(s) | "storing a log associating" limitation |
|---|---|
| Claims 1 and 7 | storing a log **associating each unique identifier** of a portable guest device detected using BLE communications by a sensor of the sensor network **<u>with the known location of the sensor and a timestamp</u>** |
| Claim 11 | storing a log **associating each unique identifier** of a portable guest device received using BLE or NFC communications by a sensor of the sensor network |

The Court, however, erroneously concluded that the failure to identify any specific information that is to be associated with each unique identifier in the stored log of claim 11 "does not necessarily equate to indefiniteness" because, according to the Court, the "only reasonable interpretation of the claim" is that each unique identifier must be "tie[d]…, in some fashion, to at least one other data point."  R&R, at 19.  Misled by Carnival's argument that the drafters intentionally omitted any specificity so that this limitation would "encompass[] *all* data that a host may wish to associate with each detected unique identifier in a log" (R&R, at 19), the Court ruled that this language is not indefinite because "it is clear and precise enough…to inform the public of the claim's scope," holding that the "plain and ordinary meaning" of this limitation is that the log would associate each unique identifier "with log information" (R&R, at 20).

Both the Court and the parties agree the term "associating" in this limitation requires the association of at least two items, *e.g.*, X associated *with Y*.  Carnival's own expert acknowledged that "associating" involves "joining or combining together, bringing together, bringing into relationship, correlating or connecting logically, or correlating or connecting causally."  *See* ECF 198-5 (de la Iglesia Reb. Decl.) at 8, ¶ 22; ECF 211 (Carnival's SOF) at 2, ¶ 2 (this description of "associating" is "[u]ndisputed in the context of the 'log' limitation" of claim 11); *see* ECF 202 (DeCurtis's SOF) at 2, ¶ 2 (undisputed description of the term "associating").  The term "associating" is used to require a connection between or amongst two or more elements. *See* Ex. J, ECF 199-10 (de la Iglesia Dep. Tr.) at 161:22-162:1; ECF 211 (Carnival's SOF) at 3, ¶ 3.[1] However, claim 11 does not expressly identify the two (or more) targets of the associating requirement; as the Court held, "as written, the claim covers a log *that associates one data point*: a detected unique identifier."  R&R, 19.  The Court would likely have held that the missing target(s) of the "associating" requirement rendered the claim indefinite, had it not accepted Carnival's invitation to effectively rewrite the claim language to provide the missing target(s) under its "plain and ordinary meaning" determination, tacitly adding the missing claim language by finding that the "only reasonable interpretation" of the "plain and ordinary meaning" of this claim is that the log would associate each unique identifier with "at least one other data point." R&R, 19.

This was erroneous.  First, Carnival did not argue for (much less meet its burden to

---

[1]   References in these Objections Exs. A–AQ refer to the Declaration of Patrick T. Schmidt in support of DeCurtis' Claim Construction Brief and Motion for Summary Judgment.  ECF 199.

establish) that the claim contained an error; without such a finding it was improper for the Court to rewrite the claim language under any circumstances.  That the Court added the missing "association" target of "at least one other data point" by way of the "plain and ordinary meaning" rather than by explicitly adding that language does not change the analysis.  If the intended scope of a claim is subject to reasonable debate, a court may not redraft the claim to avoid a finding of indefiniteness.  *See Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302-03 (Fed. Cir. 2005); *Fargo Elecs., Inc. v. Iris, Ltd., Inc.*, 287 F. App'x 96, 102 (Fed. Cir. 2008) (claim not amenable to "correction" by the district court because the error was not subject to only one reasonable correction, but was rather subject to reasonable debate); *see also Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.").  A reasonable debate exists here, especially where the claim omits *any* target(s), and the Court provided no citations to any intrinsic or extrinsic evidence supporting the conclusion that "[t]he only way" the log could "associate" the unique identifiers "is to tie it, in some fashion, to at least one other data point" (R&R, at 19), presumably because Carnival did not (and could not) supply such evidence.

In fact, the specification teaches alternative possibilities for the type and amount of information that might be associated with each of the unique identifiers, leaving a POSITA to guess as to what information the log is intended to associate.  ECF 202 & 211 (parties' SOFs) at ¶ 4.[2]  Many of these alternative possibilities are expressly set out in *other* '184 patent claims.  *See* Ex. A, ECF 199-1 ('184 patent) at claims 1 ("…*with* the known location of the sensor and a timestamp"), 9 ("…*with*…account or payment information"), and 10 ("…*with*…profile

---

[2] The specification teaches that the purpose of the "central location server" is to maintain a log of "each medallion's most recent detected location…." Ex. A, ECF 199-1 ('184 patent) at 26:44-46. That location can be determined "at selectable levels of precision" (*id.* at 25:59-62), using either medallion identity data provided by one or more sensors to provide low precision (*id.* at 25:62-66), or "at a higher level of granularity" by using the relative received signal strength of the medallion's beacon signal measured at multiple sensors (*Id.* at 26:4-7).  In the first embodiment, a POSITA recognizes that the resulting log would naturally include the information required by claim 1 (*i.e.*, one that associates received "unique identifiers" *with* the "known location" of sensors and a "timestamp").  *See* ECF 198-4 (Shoemake Op. Decl.) at 33, ¶ 106.  In the second embodiment, however, the resulting log might associate the received "unique identifiers" with completely different information, *e.g.*, a received signal strength, or possibly even with a calculated set of coordinates for the user's location.  *Id.* ¶ 108; *see also* SOF ¶¶ 4, 6-7.

information").  Given these alternative approaches—none of which are recited in claim 11—a POSITA would not know whether some, or all, of these different associations fall within the scope of claim 11.  *See Honeywell Int'l. Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 984-85 (D. Minn. 2014) (granting summary judgment of indefiniteness where it was clear some claim language was missing, but not clear how to correct the missing language where there were two plausible choices); *see also TVnGo Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453, 459 (Fed. Cir. 2021) (where "one or the other of [the] options is right" for the definition of a claim term, a POSITA would is "without reasonable certainty as to which reading is correct," rendering the patent claims indefinite).

This is not a situation where a claim clearly covers multiple embodiments; it is a situation where the claim is ambiguous about which embodiments it covers, and so is indefinite. "Associating" requires establishing a connection between two (or more) elements.  Having concluded that claim 11 requires each unique identifier be associated with *something*, it was improper for the Court to conclude that claim 11 is not indefinite because it is broad enough to encompass unique identifiers being associated with *anything*.  *See, e.g.*, *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*, 956 F.3d 1374, 1376-1381 (Fed. Cir. 2020) (where a POSITA would understand the term "half-liquid" to mean "not, or at least is not necessarily, a gel or a paste" but neither the intrinsic nor extrinsic evidence "establish[ed] the boundary of a 'half-liquid,'" the court declined to adopt the construction of the term to constitute any "thick consistency between solid and liquid" and instead held that the term was indefinite).  As written, the claim omits the necessary target(s) of the recited association, leaving a person of ordinary skill left to guess as to what would, and would not, infringe claim 11.  *See* ECF 198-4 (Shoemake Op. Decl.) at 35, ¶ 110; ECF 211 (Carnival's SOF) at 3, ¶ 7.  Such unbounded breadth, where the claim covers ***entirely uncertain and unspecified*** associations, fails to inform a POSITA about the scope of claim 11 with reasonable certainty, rendering it invalid. ECF 202 (DeCurtis's SOF) at ¶¶ 6-8; *see Honeywell Int'l. Inc.*, 45 F. Supp. 3d at 982-85 (proposed reading of the claim that fails to "constrain" the claim does not provide "reasonable certainty as to its scope").

**B.**   **Carnival disavowed the full scope of the "second transceiver" ('184 patent, claim 1; '516 patent, claim 13) during prosecution.**

The parties dispute the scope of the term "second transceiver" appearing in these claims.[3] DeCurtis asserts that Carnival, in its efforts to overcome the Examiner's claim rejections based on the Scalisi reference, clearly and unmistakably disavowed any embodiment of the second transceiver that communicates over a *wired* connection.  In rejecting DeCurtis' assertion of disavowal—an assertion that the Court itself characterized as "a reasonable interpretation of a statement made by Carnival during its patent prosecution"—the Court (relying on Carnival's arguments) was misled into factually mischaracterizing the disclosure of Scalisi, causing it to erroneously conclude that Carnival's statement is "amenable to multiple reasonable interpretations [and so] cannot be deemed clear and unmistakable."  R&R, at 24.

The Court and the parties agree on what happened procedurally during prosecution of the '516 patent.  Specifically, the patent examiner issued a final rejection of all then-pending claims, including claim 71 (which ultimately became issued claim 13) in view of a combination of prior art references including the Scalisi patent application (US 2017/0048495).  *See generally* Ex. K, ECF 199-11 ('516 prosecution history: 1/22/2018 Final Rejection); Ex. N, ECF 199-14 (Scalisi). Carnival's response acknowledged that Scalisi describes an "access panel" (*i.e.*, Scalisi's "security system (202)") as claimed.  Ex. L, ECF 199-12 ('516 prosecution history: 4/23/18 Remarks at 10 (original pagination)).  Carnival, however, argued that the claim should nevertheless issue because the Scalisi reference did not disclose three separate wireless communication interfaces, ***including*** a wireless second transceiver:

> The security system (202) [of Scalisi] is notably <u>not</u> described as having ***multiple wireless communication interfaces including*** 'a radio […], a first transceiver […], ***and <u>a second transceiver</u>*** […]' in accordance with those detailed in claim 71.

*Id.* (emphases added).  The examiner accepted Carnival's argument.  Ex. M, ECF 199-13 ('516 prosecution history: 5/30/18 Notice of Allowance).

As correctly stated by the Court, DeCurtis "views this as a clear and unmistakable disavowal of a wired second transceiver because the statement can be reasonably interpreted as communicating that the radio, first transceiver, *and* the second transceiver are wireless."  R&R, at

---

[3]  A "transceiver" is a device capable of both *transmitting* and *receiving* electronic communications.  *See* ECF 198-4 (Shoemake Op. Decl.) at 36, ¶ 118.

23.  However, the Court chose to credit Carnival's alternative interpretation that what Carnival distinguished was not *wireless* communication, but *multiple* wireless communications.  But, to reach this conclusion, the Court likely relied on Carnival's mischaracterization of Scalisi as only disclosing "a security system 202 with **one** wireless communication interface 230…."  ECF 205 (Carnival Opening Claim Construction Br.) at 11; *see* R&R, at 24

Carnival's representation is demonstrably untrue.  First, in mapping Scalisi's security system 202 (shown, *e.g.*, in Fig. 23, right) to the "access panel" of claim 71, the patent examiner correctly explained that security system 202 included "a **radio** configured for wireless communication with the door lock communication module" that "wirelessly communicates with a garage door opener 926, which can be located inside of the building and configured to open a garage door of the building."  Office Action, Ex. K, ECF 199-11 at 4-5 (citing to ¶ 290 of Scalisi). The patent examiner *additionally* explained that Scalisi's security system 202 included "a



Figure 23

first transceiver configured for wireless communication with a portable user device," identifying that Scalisi's security system 202 also communicates via a **separate** wireless network interface with portable device 204, also appearing in Fig. 23.  *Id.* at 5.  Thus, the patent examiner had identified *multiple* wireless communication interfaces disclosed in Scalisi.

In fact, Scalisi teaches additional wireless communication interfaces as well.  For example, Scalisi teaches transmitting a user's voice from the security system 202 to a speaker 914 located inside a building "via wireless communication means such as Bluetooth."  Ex. N, ECF 199-14 (Scalisi) at ¶ 288 & Fig. 23.  Scalisi also teaches having the security system 202 communicate with computing device 204 via two different wireless networks, with communications over a first wireless network 5560 communicated via a router 5550, while communications are sent directly to computing device 204 via a second wireless network 5556 that can emanate from the computing

6

device itself.  *Id.*, ¶ 162 & Fig. 51.  Scalisi further discloses that security system 202 can wirelessly communicate with computing devices using a wide array of different wireless communication interfaces, including WiFi (*id.*, ¶ 163), image capture (*id.*, ¶ 167), light or sound pulses (*id.*, ¶¶ 168, 171), audio signals (*id.*, ¶ 170), Bluetooth (*id.*, ¶ 172), and infrared communication (*id.*, ¶ 173). *See, generally id.*, ¶ 99 (identifying multiple wireless communication protocols, including WiFi, cellular, Internet, Bluetooth, telecommunication, electromagnetic, infrared, light, sonic, and microwave); *id.*, ¶ 118 (identifying Bluetooth, WiFi, RFID, NFC, and cellular telephone communication protocols).

Thus, there can be no genuine dispute that Scalisi discloses *multiple* wireless communication interfaces.  The Court was misled by Carnival's contrary misrepresentation, and the Court's reliance on Carnival's misrepresentation led directly to the incorrect holding that it is somehow reasonable to interpret Carnival's prosecution statement as simply distinguishing based on the claimed invention having two wireless communication interfaces (for a wireless radio and a first transceiver).  Scalisi's disclosure of multiple wireless transceivers for the radio and first transceiver elements is well-supported, and cannot be the basis for Carnival's distinction over Scalisi, as the Court held.  Ex. L, ECF 199-12 at 10 (Carnival asserting to examiner that "the security system (202) [] merely relays communications between a remote computing device (204a) and various systems including a door lock (930)."); *see also* Ex. N, ECF 199-14 (Scalisi) at ¶ 245 (wireless communication with remote computing devices); *id.*, ¶¶ 287-293 (wireless communication with other devices, such as door locks).  Instead, the only reasonable interpretation of Carnival's prosecution statement is that it was distinguishing its claimed invention from Scalisi's security system 202 based on ***all three*** communication elements (radio, first transceiver, and second transceiver) being ***wireless***.

Carnival's statements in the prosecution history disclaiming a wired second transceiver were "clear and unmistakable."  Fairness demands that Carnival not recapture claim scope that it surrendered in the public record during prosecution, and the public should be entitled to rely on Carnival's clear representation limiting the claim scope to require a wireless "second transceiver." *See Bell Atl. Network Servs., Inc. Covad Comm'ns Grp., Inc.*, 262 F.3d 1258, 1274-75 (Fed. Cir. 2001).  The Court should thus adopt DeCurtis' proposed construction for "second transceiver" as

"A wireless transceiver for communication with [the central server] / [a reservation server]" in claim 13 of the '516 patent and claim 1 of the '184 patent.[4]

**C.      Claim 11 of the '184 patent is invalid as indefinite because the "each sensor" limitation lacks written description**

Carnival misled the Court into construing "each sensor of the sensor network" as "each BLE sensor of the sensor network," erroneously rewriting the language of claim 11 without sufficient legal or factual basis for doing so.  When this claim language is properly left unconstrued and *unedited* by the Court, and given its plain and ordinary meaning (where "sensor" is defined uniformly throughout the claim), there is no genuine issue of material fact that the claim lacks written description support and so is invalid.

There was no need to construe the word "sensor" in the final limitation of claim 11 for, as the Court itself notes, "the language of the claims themselves are remarkably simple and clear." R&R, at 14.  Claim 11 of the '184 patent recites "a sensor network comprising a plurality of sensors each mounted in a different location," and expressly defines two different types of sensors within this network.  The first sensor type is operative to detect nearby portable guest devices, and also to receive unique identifiers from those devices based on BLE communication with those devices ("BLE sensors").[5]  The second sensor type defined by claim 11 is similarly operative to detect nearby guest devices, and also to receive unique identifiers from those devices based on *NFC communication* with those devices ("NFC sensors").[6]  Thus, claim 11 defines the term "sensor network" as comprising *both* BLE and NFC sensors, and each sensor of the claimed "sensor network" is either a BLE or NFC sensor.  There is no disagreement about these portions of claim 11.

---

[4] Carnival's disavowal during prosecution of the '516 patent properly limits the scope of the earlier filed '184 patent as well, which shares a common specification.  *See Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (statements regarding claim scope during prosecution of one patent applied to all patents in family with common specification, including previously issued patents); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 (Fed. Cir. 2007).  Carnival did not dispute this argument in its briefing to the Magistrate Judge.

[5]  BLE means "Bluetooth low energy."  Ex. A, ECF 199-1 ('184 Patent), 2:19.

[6]  NFC means "near field communication,"  Ex. A, ECF 199-1 ('184 Patent), 2:41.  BLE and NFC are different wireless protocols.  *See* ECF 198-4 (Shoemaker Op. Decl.) at 9, ¶¶ 34-35.

As the Court noted (R&R, at 26), and as shown in Fig. 6 of the '184 patent (right), claim 11 describes a guest device that contains two different antennas: a BLE antenna 513 and an NFC antenna 515.   The guest devices are configured to selectively operate in two operating modes.   In a "first operating mode," a guest device wirelessly engages in "bi-directional" (two-way) communication using its "first antenna configured for BLE communications" (BLE antenna 513), and in a "second operating mode," the guest device periodically broadcasts a beacon signal, again using its BLE antenna.   On these points, the Court and the parties agree.



FIG. 6

The Court's mistake arises out of its treatment of the final limitation of claim 11, which reads:

> ***each sensor of the sensor network*** is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes.

ECF 202 (DeCurtis's SOF) at 7, ¶ 28 (emphasis added); *see also* ECF 211 (Carnival's SOF) at 7, ¶ 28 ("undisputed").   The Court recognized the clarity of this language: "…the claim, as it is written, grammatically suggests that 'each' sensor in the network means 'every' sensor in the network…" (R&R, at 27).   Nevertheless, based in part on Carnival's misreading of Federal Circuit case law as requiring the Court to construe this final limitation so that it reads on the patent's preferred embodiments (ECF 212 (SJ Opp.) at 17; ECF 225 (Carnival's CC Resp.) at 13), the Court was misguided into narrowly construing the term "sensor" as "BLE sensor" in this limitation only.

This is wrong for multiple reasons.   First, the phrase "each sensor of the sensor network" is clear and unambiguous on its face.   "As the starting point, [the Court should] give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Liquid Dynamics v. Vaughn Co.*, 335 F.3d 1361, 1367 (Fed Cir. 2004); *see also 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1337 (Fed. Cir. 2013) (O'Malley, J., concurring) ("the plain and ordinary meaning is always our starting point in a claim construction analysis").   Unless the specification acts as a dictionary and expressly defines the claim term or the patentee unequivocally disavows a certain meaning during prosecution, the plain and ordinary meaning of

9

the claim term prevails. *Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1361 (Fed. Cir. 2017) ("We depart from the ordinary meaning when patentees act as their own lexicographers or disavow the full scope of a claim term in the specification or during prosecution."); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1375 (Fed. Cir. 2015) ("a claim term is only given a special definition different from the term's plain and ordinary meaning if the patentee … clearly sets forth a definition of the disputed claim term other than its plain and ordinary meaning" (internal quotation marks and citation omitted)).

The '184 patent does not assign a special meaning to the term "sensor," nor did Carnival disavow any scope for "sensor" during prosecution. *See Cisco Sys.*, 873 F.3d at 1361. As such, no construction is required, and the phrase should be given its plain and ordinary meaning. *See Akamai Techs.*, 805 F.3d at 1375. Even the Court recognized that the plain and ordinary meaning of "*each* sensor" in this limitation is "*every* sensor in the sensor network. R&R, at 27; *see ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1379 (Fed. Cir. 2003) (where claim recited an algorithm to evaluate "each field in said first image," the algorithm was required to evaluate *all* fields in the first image, and not merely some of the fields); *see also* ECF 198-4 (Shoemake Op. Decl.) at 45, ¶¶ 149-150. It was error for the Court to construe the term "each sensor" more narrowly than its plain meaning.

Second, based on claim 11 reciting that the guest device engages in both the "beacon" and "bi-directional" operating modes using its BLE antenna, the Court erroneously concluded that only BLE sensors could send commands to change modes: "[A] POSITA would understand from the specification that the 'command' to change from one BLE operating mode to another operating mode ***must be accomplished using BLE communication protocols.*** Thus, even if the grammar of the claim suggests that 'each sensor' means 'every sensor,' the ***context supplied by the intrinsic evidence*** confirms that 'each sensor' means 'each BLE sensor.'" R&R, at 27.

But the '184 patent provides no such context. The specification teaches that the "command" to switch BLE operating modes originates with the guest engagement system 10, which includes "a sensor network 13 of sensors 15." '184 Patent, Fig. 1; 6:19-25; 21:52-58; 22:4-8. The guest engagement system can communicate with the guest device through either its BLE or NFC network sensors. *See id;* 22:40-23-3 (describing NFC-based beacon and two-way secure communications between the guest system's access panels and guest devices). The '184 patent teaches that the system periodically transmits "NFC read signals" that generate a responsive *NFC-*

*based* beacon signal from any nearby guest devices, allowing an *NFC-based* communication channel to be established so that *NFC-based* door unlocking can occur. *Id.* There is no reason why a sensor detecting these responsive NFC-based beacon communications could not also issue an NFC-based command instructing the guest device to switch between BLE operating modes. *See* ECF 198-6 (Shoemake Reb. Decl.) at 8, ¶¶ 23-24. In fact, an analogous arrangement was known in the prior art. *Id.*, ¶¶ 25-26. Thus, contrary to the Court's conclusion, nothing in the '184 patent teaches that the claimed command "must be accomplished using BLE protocols." R&R, at 27. Despite the differences in the communication protocols, there is no reason why, consistent with the clear language of claim 11, one of the sensor network's NFC sensors could not be used to transmit an NFC-based command to cause the *guest device* to change BLE operating modes. ECF 198-6 (Shoemake Reb. Decl.) at 8-9, ¶¶ 24-27.

Third, even if narrowing the scope of the phrase "each sensor" to "each BLE sensor" were warranted (it is not), construing "each sensor" in the final limitation based on the an embodiment where BLE sensors, and not NFC sensors, are described as causing the guest device to change BLE operating modes violates the blackletter principle of claim construction: a claim should not be *limited* to its preferred embodiment. *Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope.").

Fourth, instead of construing "sensor" for the entire claim, Carnival improperly asked the Court to narrow the meaning of "sensor" only in the final limitation. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (holding that "claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent"). Rewriting the phrase "each sensor" to be "each BLE sensor" in just one part of a claim is not construction, but *correction*. But Carnival never expressly asked for this limitation to be corrected, nor could it have, since it could not have met the requirements for doing so. A court can correct an "obvious error" in claim language, provided the proper showing is made. *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (*citing Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)) (A "district court may correct an obvious error in a patent claim ... 'only if (1) the correction is not subject to a reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history

does not suggest a different interpretation of the claims.'"). The phrase "every sensor" in the final limitation is not an "obvious error," precluding correction altogether. Nothing in the claim prohibits "each sensor" from being operative to transmit the recited command to a guest device. Moreover, even if one could conclude that this phrase contains an obvious error, Carnival never demonstrated that its proposed correction ("each BLE sensor") was not subject to reasonable debate, again precluding correction. *See Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 888, 904 (Fed. Cir. Mar. 7, 2017) ("The district court held that this claim limitation was not amenable to correction because the correction was subject to reasonable debate based on consideration of the claim language and the specification. We agree."); *Fitbit, Inc. v. Valencell, Inc.*, 964 F.3d 1112, 1119-20 (Fed. Cir. 2020) (noting that "precedent has provided guidelines for district courts to correct errors in issued patents," including allowing the correction where "the correction is not subject to reasonable debate"); *see also Acceleration Bay v. Activision Blizzard*, 324 F. Supp. 3d 470, 479 (D. Del 2018). "As a general matter, "[c]ourts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). Because Carnival failed to make the proper showing to <u>correct</u> the scope of this claim, it was improper for Carnival to have asked the Court to redraft the clear and unambiguous claim language in an attempt to make the claim valid. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (rejecting the argument that "perpendicular" would be understood as "parallel" in light of the specification's teachings); *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity."). Ultimately, the phrase "each sensor" should simply be given its plain and ordinary meaning: "every sensor."

The Court's error in claim construction (incurred at Carnival's urging) led to a further error in denying DeCurtis' motion for summary judgment for lack of written description. Under a proper interpretation of the claim, there is no genuine issue of material fact that the claim lacks written description support for the final limitation, because a person of ordinary skill in the art objectively reviewing the patent specification would understand it to ***lack any*** disclosure relating to an NFC sensor transmitting a command to cause a guest device to switch between BLE operating modes. On this point, both sides' experts agree. *See* ECF 202 (DeCurtis's SOF) at 7-8, ¶¶ 29-30; ECF 198-4 (Shoemake Op. Decl.) at 47, ¶ 158; ECF 198-1 (de la Iglesia Op. Decl.) at 29-30, ¶ 49; ECF

198-5 (de la Iglesia Reb. Decl.) at 39, ¶ 85.  In fact, Carnival's expert, Mr. de la Iglesia, relied upon the absence of any disclosure relating to NFC sensors having this functionality in support of Carnival's misguided claim construction theory. ECF 198-1 (de la Iglesia Op. Decl.) at 29-30 ¶ 49 (". . . a person of skill in the art understands that the 'sensor[s] of the sensor network' in this present term necessarily refer to BLE sensors because BLE sensors, and ***not NFC sensors***, are described in the specification as causing the guest device to change BLE operating modes between a first and second operating modes."); *see also* Ex. J, ECF 199-10 (de la Iglesia Dep. Tr.) at 213:6-13. While Mr. de la Iglesia's opinion that the specification fails to disclose the claimed embodiment is correct, his urging of the Court to limit the claim based on this failure is improper.[7]

Because the Court erroneously found that "each sensor" does not mean *every* sensor, it never reached the merits of DeCurtis' summary judgment motion for invalidation of claim 11 for lack of written description.   Nevertheless, since there are no genuine issues of material fact regarding the specification's failure to disclose to a person of ordinary skill in the art the concept of an NFC sensor commanding the guest device to change its BLE operating mode, the issue can be resolved on summary judgment.  *See Zoho Corp. v. Sentius Int'l, LLC*, 494 F. Supp. 3d 693, 709 (N.D. Cal. 2020) (summary judgment of no written-description appropriate where no dispute regarding the lack of disclosure in the specification); *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 468 (D. Del. 2021) (summary judgment of invalidity because no reasonable jury would find the written-description requirement satisfied).   To the extent the Court agrees that claim 11 requires at least one NFC sensor to be operative to transmit a command causing a guest device to change between BLE operating modes, claim 11 of the '184 patent is invalid for lack of written description.[8]

---

[7]   The Federal Circuit's decisions in *SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) and *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1325-26 (Fed. Cir. 2013), cited by Carnival, certainly do not stand for the proposition that a court should construe or correct an unsupported but otherwise clear and unambiguous claim term so as to save it from invalidation.  It will always be the case that a claim that is invalid for lacking written support will fail to read on any embodiment disclosed in the specification; by definition, that's what lacking written support means.  *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021) ("[W]here a person of ordinary skill in the art would understand based on the specification that the claims do not set forth what the inventor regards as his invention, the claims are invalid under § 112, paragraph 2.").

[8] Because claim 11 is invalid for lack of written-description, dependent claims 12 through 15 which are dependent upon, and incorporate, claim 11 are similarly invalid.  *See LizardTech, Inc. v. Earth*

**D.     Claim 11 of the '514 patent is invalid because the patent lacks an enabling disclosure for the full range of dimensions for the "portable wireless device"**

The first limitation of the "portable wireless device" recited in Claim 11 of the '514 patent includes a body with a cavity.  Every dimension of that body is recited as being "equal to or smaller than 2.5 inches," with "the body having a thickness equal to or smaller than 5/8 inch."  The Court determined no construction was necessary because the claim language was readily understandable according to its plain meaning.  R&R, at 28-29.  The Court then went on to deny DeCurtis' Motion for Summary Judgment that the claim was invalid for lack of an enabling disclosure.  DeCurtis objects to this denial.

Section 112 requires the patent specification "teach those skilled in the art how to make and use the ***full scope*** of the claimed invention without 'undue experimentation.'"  *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (quotation and citation omitted) (emphasis added).  DeCurtis moved for summary judgment of invalidity for lack of enablement based on the open-ended nature of these dimensional ranges, which expressly extend down to miniaturized devices with no lower boundary on their dimension.  *See Intel Corp. v. Tela Innovations, Inc.*, 2021 WL 1222622, at *12 (N.D. Cal. Feb. 11, 2021) (granting summary judgment that claim to semiconductor technology, with no lower boundary on dimension, was invalid for lack of enablement where increasingly small miniaturization was "not trivial or peripheral" and "[a]chieving smaller and smaller sizes . . . [was] key in the field").

To be sure, where a claim includes an unbounded numerical range, a patentee can attempt to show enablement by demonstrating (1) a POSITA would recognize the range has an "inherent" limit, and (2) the specification would enable a POSITA to approach that inherent limit without "undue experimentation."  *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) (*quoting Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1572 (Fed. Cir. 1991)).  Absent such a showing, however, a patentee may not simply "disavow the invalid portion and keep the valid portion of the claim."  *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) ("If everything up to 0.001% w/v is admittedly not enabled, then

---

*Res. Mapping, Inc.*, 424 F.3d 1336, 1346-47 (Fed. Cir. 2005); *NetAirus Techs., LLC v. Apple Inc.*, Case No. 13-03780, 2016 WL 5898640, at *3 (C.D. Cal. Mar. 23, 2016) ("[I]f a broader claim lacks written description, then a narrower claim depending therefrom, which incorporates all elements of the broader claim, necessarily lacks such a description.").

the entire claim is invalid.").

In denying DeCurtis' summary judgment motion, the Court did not identify any specific inherent limit for these open-ended ranges, despite ruling that a POSITA would recognize such limits existed. R&R, at 30 ("[A] POSITA would readily understand that there is an inherent lower limit to the size of the device comprising two antennas, a battery, a processor, and a memory."). Instead, the Court qualitatively held a POSITA would understand the claim scope covers a guest device "small enough to be conveniently carried yet not so small that it could be lost in the palm of a guest's hand." *Id*. Nor did Carnival otherwise set forth any inherent limit. Indeed, Carnival's expert Dr. Eisenstadt admitted at deposition that he had not determined what a POSITA would understand the inherent limit would be for claim 11, nor had he considered whether the full scope of claim 11, as written, was enabled by the description in the specification. ECF 249 (Eisenstadt Dep. Tr.) at 37:2-11, 38:18-39:2, 39:12-18, 47:20-48:8, 49:4-14. Instead of providing an objective boundary for the ranges, Dr. Eisenstadt adopted a set of subjective and contextual "use case" considerations, despite admitting that different "use cases" could result in different "inherent limits" for claim 11. *See id.* at 30:2-34:11; 77:17-80:21; 84:25-85:14. This is not the law; claim scope cannot fluctuate based on an expert's subjective opinions regarding purported "use cases." *See Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 2021 WL 3675151, at *15 (W.D. Wis. Aug. 19, 2021) (holding that it "begs credulity" to assume that a claim is enabled if the patentee cannot identify an objective inherent limit). Carnival's failure to identify any inherent lower limit for these ranges is a sufficient basis on which to find lack of enablement.

Disregarding Carnival's failure to identify any inherent lower limit, and without identifying any other specific inherent limit for these open-ended ranges, the Court nevertheless moved to the next question, asking "can a person skilled in the art approach that limit without due experimentation?" R&R, at 30. The Court found there existed a genuine issue of material fact on whether "undue experimentation" would be required to reach any inherent limit based on a portion of the patent's specification that the Court held "makes clear that near-zero values for the diameter or thickness of the portable guest device were not intended to fall within the claimed range (*i.e.*, less than 2.5 inches in diameter and equal to or less than 5/8 inches in thickness) because the claim was intended to encompass a 'reasonable range' that was 'customary' in the art." R&R, at 30 (citing the '814 Patent, at 39:23-29). The Court did not find that this language was a disavowal or an express definition sufficient to limit the plain claim language (s*ee Thorner v. Sony Comput.*

15

*Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)), nor is boiler-plate language at the end of the specification typically accorded any weight.  *See Akeva L.L.C. v. Adidas-Salomon AG*, 208 F. App'x 861, 863-64 (Fed. Cir. 2006).  On the critical issue of whether undue experimentation would be required to build a device that achieved the entire range of claimed embodiments, DeCurtis' expert explained that the smallest portable wireless device a POSITA could build without undue experimentation would be no smaller than 1.1093 inches in the planar dimension, and 0.3937 inches in thickness.  ECF 198-2 (Tentzeris Op. Decl.) at 16, ¶ 59; ECF 202 (DeCurtis's SOF) at 4, ¶¶ 16-17.  A large quantity of experimentation, beyond the disclosure of the '514 patent, would be required to achieve even a mere incremental shrinkage beyond these dimensions.  ECF 198-2 (Tentzeris Op. Decl.) at 25-27, ¶¶ 91-98; ECF 202 (DeCurtis's SOF) at 4-5, 6-7 ¶¶ 18, 26-27.  Any further miniaturization would be beyond the skill of a POSITA and would require "undue experimentation," resulting from either "a sophisticated and intensive research and development effort," or future advances in "technology related to high-gain antennas."  ECF 198-2 (Tentzeris Op. Decl.) at 16-17,  ¶¶ 60-61; ECF 202 (DeCurtis's SOF) at 6-7, ¶¶ 26-27.  Dr. Eisenstadt agreed that achieving such a physical/scientific limit would be beyond the level of ordinary skill in the art.  *See* ECF 249 (Eisenstadt Dep. Tr.) at 50:23-51:21; 54:12-24; 68:21-69:4.

The specification's boiler-plate language cannot overcome Carnival's failure to define any inherent limit for the recited open-ended ranges of claim 11 of the '514 patent, including any "inherent limit" to the device miniaturization, preventing Carnival from relying on the "inherent limit" exception to avoid summary judgment for non-enablement for this claim.  Moreover, as Carnival's expert provided no opinion regarding the point at which further shrinkage beyond any unspecified inherent limit would require undue experimentation, Carnival necessarily failed to provide any basis for the Court to conclude that the specification would enable a POSITA to "approach" any inherent limit without undue experimentation.

## II.   CONCLUSION

For the foregoing reasons, the Court should reverse the portions of the R&R that are clearly erroneous and contrary to law and:

1.   grant summary judgment that claim 11 of the '184 patent is invalid under 35 U.S.C. § 112 because both the "storing a log associating each unique identifier" limitation and the "each sensor" limitation are indefinite for lack of written description;

2.   grant summary judgment that claim 11 of the '514 patent is invalid under 35 U.S.C.

§ 112 because the "portable wireless device" limitation is not enabled for the full range of recited dimensions; and

3.   construe "second transceiver" as "a wireless transceiver for communication with [the central server] / [a reservation server]" based on Carnival's disavowal of the full scope of this phrase during prosecution before the Patent Office.

Dated: April 5, 2022

DECURTIS LLC & DECURTIS CORPORATION

By: *Jason P. Stearns*
        One of their attorneys

David C. Gustman (pro hac vice)
Jeffery M. Cross (pro hac vice)
Jill C. Anderson (pro hac vice)
Jennifer L. Fitzgerald (pro hac vice)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. (312) 360-6000

Jason Stearns
Florida Bar No. 059550
Freeborn & Peters LLP
201 N. Franklin Street
Suite 3550
Tampa, FL 33602
Tel. (813) 488-2920
E-mail: jstearns@freeborn.com

*Attorneys for Plaintiff DeCurtis LLC &
DeCurtis Corporation*

Scott L. Watson (pro hac vice)
Justin C. Griffin (pro hac vice)
Patrick T. Schmidt (pro hac vice)
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel. (213) 443-3000

17

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 5, 2022, I filed the foregoing DeCurtis's Objections to the March 22, 222 Report and Recommendation ("R&R") via CM/ECF which will serve all attorneys of record.

DECURTIS LLC & DECURTIS
CORPORATION


By:  *Jason P. Stearns*
             Jason P. Stearns
             Florida Bar No. 059550