**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CIVIL ACTION NO. 20-22945-CIV-SCOLA**

CARNIVAL CORPORATION,

                Plaintiff,

     v.

DECURTIS CORPORATION and
DECURTIS LLC

             Defendants.

DECURTIS LLC,

                Plaintiff,

     v.

CARNIVAL CORPORATION,

             Defendant.

**CARNIVAL'S RESPONSE TO DECURTIS'S OBJECTIONS (D.E. 273) TO**
**MAGISTRATE JUDGE TORRES'S REPORT AND RECOMMENDATION**
**ON CLAIM CONSTRUCTION AND SUMMARY JUDGMENT (D.E. 267)**

## <u>TABLE OF CONTENTS</u>

**Page No**.

I.  Introduction ............................................................................................................ 1

    A.  Overview of the Asserted Patents .......................................................... 1

    B.  Procedural History................................................................................... 2

II.  Legal Standards..................................................................................................... 3

    A.  Claim Construction.................................................................................. 3

    B.  Validity Under 35 U.S.C. § 112 ............................................................. 4

III.  The "Storing a Log Associating Each Unique Identifier" Limitation Is Not Indefinite ('184 Patent, Claim 11)...................................................................... 5

IV.  Carnival Did Not Disclaim Wired Transceivers from the Scope of the "Second Transceiver" ('184 Patent, Claim 1; '516 Patent, Claim 13)........................... 7

V.  Judge Torres Properly Construed the "Each Sensor" Limitation ('184 Patent, Claim 11) ............................................................................................... 11

    A.  Construction of This Term Is Necessary .............................................. 11

    B.  Judge Torres Rightly Adopted Carnival's Proposed Construction ....... 12

    C.  Judge Torres Rightly Denied DeCurtis's Motion for Summary Judgment........... 15

VI.  Genuine Disputes of Material Fact Preclude Summary Judgment on the "Portable Wireless Device" Limitation ('514 Patent, Claim 11).................................... 17

VII.  Conclusion .......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013)..................................................................4, 7, 10, 15

*AK Steel Corp. v. Sollac & Ugine*,
  344 F.3d 1234 (Fed. Cir. 2003)..................................................................................8

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  805 F.3d 1368 (Fed. Cir. 2015)................................................................................15

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)...........................................................................8, 16

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007)..........................................................................17, 18

*Appl. of Johnson*, 558 F.2d 1008, 1016 (C.C.P.A. 1977) ...............................................7

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) .............................................................5

*Atlas IP, LLC v. Medtronic, Inc.*,
  809 F.3d 599 (Fed. Cir. 2015)..................................................................................14

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017)..................................................................................6

*Bell Atl. Network Servs., Inc. v. Covad Comm'ns Grp., Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001)..................................................................................9

*Cephalon, Inc. v. Watson Pharm., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013)..................................................................................5

*Cisco Sys., Inc. v. Int'l Trade Comm'n*,
  873 F.3d 1354 (Fed. Cir. 2017)................................................................................15

*DeCurtis LLC v. Carnival Corp.*,
  IPR2021-00782 ...................................................................................................6, 7

*Eli Lilly & Co. v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004)..................................................................................3

*Future Metals LLC v. Ruggiero*,
   No. 21-CV-60114-RAR, 2021 WL 5834258 (S.D. Fla. Dec. 8, 2021) ...................................12

*IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*
   966 F.3d 1374 (Fed. Cir. 2020)..........................................................................................7

*In re Glatt Air Techniques, Inc.*,
   630 F.3d 1026 (Fed. Cir. 2011)..........................................................................................6

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
   222 F.3d 951 (Fed. Cir. 2000)............................................................................................9

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
   870 F.3d 1320 (Fed. Cir. 2017).........................................................................................15

*Intirtool, Ltd. v. Texar Corp.*,
   369 F.3d 1289 (Fed. Cir. 2004)...........................................................................................5

*Laryngeal Mask Co. v. Ambu*,
   618 F.3d 1367 (Fed. Cir. 2010)...........................................................................................3

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
   628 F.3d 1359 (Fed. Cir. 2010).........................................................................................10

*Liquid Dynamics v. Vaughan Co.*,
   355 F.3d 1361 (Fed Cir. 2004)..........................................................................................15

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)............................................................................................................3

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
   851 F.3d 1275 (Fed. Cir. 2017).........................................................................................17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)............................................................................................................4

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)...........................................................................................9

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................4, 13, 14

*Plastipak Packaging, Inc. v. Premium Waters, Inc.*,
   2021 WL 3675151 (W.D. Wis. Aug. 19, 2021)...................................................................20

*ResQNet.com, Inc. v. Lansa, Inc.*,
   346 F.3d 1374 (Fed. Cir. 2003)...................................................................................12, 14

*Route1 Inc. v. AirWatch LLC*,
   829 F. App'x 957 (Fed. Cir. 2020) ...............................................................................15

*Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*,
   665 F.3d 1269 (Fed. Cir. 2012)....................................................................................4

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015) .....................................................................................................3

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
   782 F.3d 671 (Fed. Cir. 2015)........................................................................5, 18, 19

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..................................................................................4, 8

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988).....................................................................................5

**Statutes**

35 U.S.C. § 112...........................................................................................................3, 4, 5

**Other Authorities**

Local Rule 56.1(e) ..........................................................................................................3

## I.    Introduction

Judge Torres issued a well-reasoned Report and Recommendation on patent Claim Construction and Summary Judgment ("R&R") (D.E. 267).  Judge Torres ruled on nine claim construction and summary judgment disputes.  Almost all these disputes were presented by DeCurtis.  As Judge Torres recognized, DeCurtis's proffered constructions were transparent efforts to manufacture defenses contrary to the record evidence and governing law.  DeCurtis's attempts to construe the simple and clear claim language involved "unnecessary and self-serving uber specificity."  R&R at 15; *see id.* at 21, 25, 32 (same).  They "appear[ed] to be nothing more than a naked attempt to manufacture an infringement defense." *Id.* at 31.  Moreover, DeCurtis's proposed constructions lacked "cohesive logic," "violate[d] what DeCurtis considers a 'blackletter principle' of claim construction," and would "unnecessarily confuse the fact finder." *Id.* at 17, 25, 31.

While DeCurtis has now abandoned its arguments for five of the nine terms, its objections to the remaining four terms fail to show any error in Judge Torres's analysis.  Furthermore, DeCurtis must meet a high burden to prevail on any of the remaining issues.  DeCurtis either asserts invalidity of patent claims, which must be proven by clear and convincing evidence, or asserts prosecution history disclaimer, which similarly requires "clear and unmistakable" support.  DeCurtis comes nowhere close to meeting its high burdens.  Thus, the Court should adopt Judge Torres's opinion in its entirety.

### A.    Overview of the Asserted Patents

In this matter, Carnival Corporation ("Carnival") asserts that a former contractor, DeCurtis LLC, aka DeCurtis Corporation ("DeCurtis"), breached the parties' contract by, *inter alia*, misusing Carnival's confidential information in performing work for other clients, and infringed three Carnival patents.  DeCurtis brings antitrust and tort claims against Carnival; these claims are tied to the patent issues because they are based on the theory that Carnival's litigation is objectively baseless, in bad faith, based on unenforceable patents, and thus a "sham."

The three asserted patents[1] are directed to aspects of a novel guest engagement system. Carnival set out to develop a system that would enable "hosts to seamlessly engage with the guests throughout their facilities."  '184 Patent (D.E. 205-2), 1:44-52; R&R at 2.  Beginning in 2014,

---

[1] The three patents are U.S. Patent Nos. 10,045,184 (the "'184 Patent"), 10,049,516 (the "'516 Patent"), and 10,157,514 (the "'514 Patent").  The patents share substantially identical specifications.

Carnival devoted many years to develop what became the OCEAN® Platform featuring portable guest devices, which Carnival named OceanMedallions™.  Realizing the valuable intellectual property created through this effort, Carnival applied for and obtained patent protection for various aspects of its innovation.

The R&R includes a more detailed "illustra[tion of] a few ways in which Carnival's patented advances in wireless sensing technology may benefit a guest" (while acknowledging this description "does not fully appreciate the entire breadth of Carnival's invention").  R&R at 3-4.  As described in the patents, the system enables services including automatic, secure door unlocking and payment authorization, location determination, and wayfinding.  '184 Patent (D.E. 205-2), 1:66-2:11, 34:21-39.  These enhanced guest engagement features are enabled through wireless communications networks comprising devices worn by guests, a network of sensors located throughout a facility (*e.g.*, a cruise ship) that can detect signals from and communicate with the devices, and servers that can communicate with the sensors to provide information (*e.g.*, which guests are permitted to unlock a door) and services (*e.g.*, determining the locations of devices based on sensor data).  Although Carnival developed the OCEAN® Platform for its cruise ships, the patents "certainly have applications beyond the cruise ship environment."  R&R at 3; *id.* at 19 (same).

The asserted patents are directed to different aspects of the novel guest engagement system.  The '184 Patent focuses on an overall system and interactions between its components.  The '516 Patent focuses on an electronic door lock assembly comprising sensors and configured to communicate with portable wireless devices and with servers to provide secure access.  The '514 Patent focuses on the configuration of the portable wireless devices.

Industry observers and publications have lauded the innovative Carnival technology protected by the patents. Among other accolades, IoT Breakthrough awarded Carnival the 2019 IoT Wearables Innovation of the Year for the OceanMedallion™ (D.E. 205-19); FastCompany magazine named Carnival as one of the world's most innovative companies, citing the introduction of OceanMedallion™ (D.E. 205-20); and the OceanMedallion™ garnered a 2019 CES Innovations Award Honor (D.E. 205-21).

### B.    Procedural History

The parties engaged in claim construction and filed their respective briefs under Judge's Torres's modified Scheduling Order.  *See* Scheduling Order (D.E. 177) at 10.  In the process,

DeCurtis chose to file its one summary judgment motion allowed under Local Rule 56.1(e), seeking to invalidate certain claims of the '184 and '514 Patents under 35 U.S.C. § 112. *See* DeCurtis's Mot. for S.J. ("MSJ") (D.E. 203). Most of the issues DeCurtis raised in that motion involved factual issues underlying enablement and written description. Thus, DeCurtis's motion for summary judgment was premature because discovery was ongoing.

Judge Torres recommended granting Carnival's motion for opening claim construction (D.E. 205), resolving the claim-construction disputes in the way proposed by Carnival, and recommended denial of DeCurtis's motion for summary judgment (D.E. 203, D.E. 236). R&R at 36-38. Although the asserted patents describe complex inventions comprising "sophisticated implementation" of advanced technologies, the claims are "remarkably simple and clear," "generally written in language that can be easily understood by a person of ordinary skill in the art (a 'POSITA') as well as a lay juror." *Id.* at 2, 15. Accordingly, few terms truly require construction; Carnival's proposal for most terms is that no construction is necessary. *Id.* at 36-37. Adopting Carnival's proposals disposed of most of DeCurtis's summary judgment arguments, which were premised on DeCurtis's proffered claim constructions (*id.* at 17-20, 26-28, 32-34). As to DeCurtis's argument that claim 11 of the '514 Patent lacked enablement, Judge Torres found that genuine disputed issues of material fact precluded summary judgment (*id.* at 28-30).

## II.   Legal Standards

### A.   Claim Construction

The proper determination of the meaning and scope of patent claims is a question for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015). "[C]laim construction is required only when the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution to determine the issue before the court." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004) (internal quotation marks and citation omitted).

"The words of a claim are generally given their ordinary and customary meaning as understood by a [POSITA] in question at the time of the invention when read in the context of the specification and prosecution history." *Laryngeal Mask Co. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). In this respect, the POSITA "is deemed to read the claim term not only in the context of the particular

claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

First, one looks to the words of the claims themselves to define the scope of the invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). After considering the claims themselves, the analysis turns to the specification, which is "always highly relevant" and "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315-16.

While it also is proper to look at the prosecution history in interpreting claim terms, care must be taken. "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317. In particular, courts "do[] not rely on the prosecution history to construe the meaning of the claim to be narrower than it otherwise would be unless the patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013).

The Court also may, but is not obligated to, consider "extrinsic" evidence to determine the meaning of claim language. *Phillips*, 415 F.3d at 1319. However, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583.

### B.  Validity Under 35 U.S.C. § 112

DeCurtis's arguments raise three distinct invalidity theories all arising under 35 U.S.C. § 112: indefiniteness, lack of written description, and lack of enablement.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). A "modicum of uncertainty" may be tolerated and "absolute precision is unattainable." *Id.* at 909-10. Indefiniteness, like all invalidity defenses, "must be proved by clear and convincing evidence." *Id.* at 912 n.10 (internal quotation marks omitted).

Written description is adequate where "the disclosure conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (internal quotation marks omitted). To overcome the presumption of patent validity, a patent challenger must establish

inadequate written description by clear and convincing evidence. *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1294 (Fed. Cir. 2004). Adequacy of written description is a question of fact. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).

The "enablement" requirement of 35 U.S.C. § 112 has been interpreted to require that a person skilled in the art be able to make and use the invention without "undue" experimentation. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). But "a reasonable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement." *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). Whether a claim is enabled is a legal determination based on numerous underlying factual questions. *E.g., Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 684 (Fed. Cir. 2015). A party must prove invalidity due to lack of enablement by clear and convincing evidence. *Id.*

## III. The "Storing a Log Associating Each Unique Identifier" Limitation Is Not Indefinite ('184 Patent, Claim 11)

Claim 11 of the '184 Patent recites "storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network." '184 Patent (D.E. 205-2), 42:49-54. Judge Torres correctly determined that this limitation "is broad but not ambiguous" and thus rejected DeCurtis's argument that the term is indefinite; he further correctly determined that the claim "can be readily understood according to its language's plain and ordinary meaning without additional construction." R&R at 20.

The parties, their experts, and Judge Torres all agreed that a POSITA would understand the meaning of claim 11's "log" limitation and agree as to that meaning. Carnival's expert opined that the "log" limitation requires a log associating each unique identifier received by a sensor with "[s]ome other, unspecified data." de la Iglesia Decl. (D.E. 205-5) ¶¶ 39-40. DeCurtis's expert acknowledged that "a person of ordinary skill in the art would recognize the phrase . . . require[s] that an association be created between 'each unique identifier' and some other, unidentified piece of information." Shoemake Decl. (D.E. 205-7) ¶ 104; *see also* Shoemake Dep. Tr. (D.E. 205-12) at 108:17-109:6 ("a [POSITA] would understand this storing a log associating limitation to require that an association be created between the unique identifier and something."). Indeed, he recognizes that this requirement of claim 11 of the '184 Patent is "clear[]." Shoemake Decl. (D.E. 205-7) ¶ 109. Thus, Judge Torres astutely noted that "[t]he *only* way in which the log could

'associate' [a received unique identifier] is to tie it, in some fashion, to at least one other data point." R&R at 19 (emphasis added). Far from proving, by clear and convincing evidence, that the term lacks "*reasonable* certainty," the evidence thus confirms that there is *absolute* certainty as to the meaning and scope of the claim term. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365-69 (Fed. Cir. 2017) (reversing district court's judgment of indefiniteness based on unspecified composition in the claim where "the claims and specification let the public know that any known [compositions] can be used as long as they play their claimed role in the claimed architecture").

Alleging indefiniteness[2], DeCurtis disguises its real problem with this claim term — not that its scope is uncertain but that it is broad. DeCurtis argues that claim 11 must "*expressly* identify the two (or more) targets of the associating requirement." Objs. at 2 (emphasis added). Further, DeCurtis identifies multiple embodiments of a log disclosed in the patent's specification and complains that "the claim is ambiguous about *which* embodiments it covers." *Id.* at 3-4 (emphasis added). Carnival agrees that claim 11 covers multiple embodiments and is broad — intentionally. Indeed, the same "log" language in claim 11 is found verbatim in the '184 Patent's specification describing "another aspect of the present disclosure" (*i.e.*, an embodiment). *Compare* '184 Patent (D.E. 205-2), 42:49-54 (claim 11) *with id.* at 2:53-58 (summary).

DeCurtis's argument is premised on a basic misunderstanding of the law: "breadth is not indefiniteness." *BASF*, 875 F.3d at 1367. Here, the applicants were entitled to, and did, draft this "log" limitation to cover more than just one specific embodiment. This was entirely proper. *See In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011) (acknowledging that a claim may cover multiple embodiments). To be sure, claiming more broadly *could* make a claim more vulnerable to a *prior-art*-invalidity argument. Indeed, DeCurtis already tried to invalidate this claim based on prior art in an unsuccessful petition for *inter partes* review ("IPR") filed with the Patent Office—and in so doing, adopted precisely the readily understood meaning of this term. *DeCurtis LLC v. Carnival Corp.*, IPR2021-00782, Pet. (Apr. 7, 2021) (Paper 1) (D.E. 205-22) at 61 (DeCurtis construing the term for purposes of the IPR "as requiring that the stored log must

---

[2] DeCurtis styled its objection to Judge Torres's finding with respect to this claim limitation as "indefinite for lack of written description." DeCurtis's Objections to the R&R ("Objs.") (D.E. 273) at 1. That appears to be a mistake because DeCurtis had raised claim scope, not written description, as the issue for this claim limitation. *See* R&R at 8 n.9; MSJ (D.E. 203) at 3.

associate each unique identifier with some other data."); *DeCurtis LLC v. Carnival Corp.*, IPR2021-00782, Decision Denying Institution of *Inter Partes* Review (Oct. 12, 2021) (Paper 9) (D.E. 205-14).

In his analysis, Judge Torres acknowledged, but did not adopt, Carnival's alternative proposal (if any construction was deemed necessary) "adding 'with log information' to the end of the disputed claim language," noting that it "clarifies" and "does not modify the meaning of the claim." R&R at 19-20. DeCurtis, however, accuses Judge Torres of "rewrit[ing] the claim language." Objs. at 2 ("the Court . . . [held] that the 'plain and ordinary meaning' of this limitation is that the log would associate each unique identifier 'with log information'"). Based on its erroneous accusation of claim redrafting, DeCurtis resorts to inapposite case law about correcting errors in claims. As explained above, the "log" limitation of claim 11 reflects a deliberate choice, not an error. By DeCurtis's own characterization, these cases can only apply "[i]f the intended scope of a claim is subject to reasonable debate," for example, if there exist "two plausible choices" with different claim scopes. *Id.* at 3-4. But here, as explained, Judge Torres and the parties agree that there is clearly one intended broad scope of this claim limitation.[3] Carnival "is entitled to the full breadth of claim scope supported by the words of the claims and the written description." *3M Innovative Props.*, 725 F.3d at 1325 (cited in R&R at 19); *see also Appl. of Johnson*, 558 F.2d 1008, 1016 (C.C.P.A. 1977) (reversing a finding of indefiniteness based on an unspecified value where a POSITA would be able to determine from the patent specification the value level required to practice the invention).

## IV.   Carnival Did Not Disclaim Wired Transceivers from the Scope of the "Second Transceiver" ('184 Patent, Claim 1; '516 Patent, Claim 13)

Hinging its entire argument on one statement in the prosecution history and ignoring completely the claims and specification, DeCurtis argues that Carnival disclaimed a wired transceiver from the scope of the second transceiver in claim 1 of the '184 Patent and claim 13 of the '516 Patent. *See* R&R at 23 ("DeCurtis' argument hinges entirely on a statement made by

---

[3] *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.* is similarly distinguishable. 966 F.3d 1374 (Fed. Cir. 2020) (cited in Objs. at 4). There, "the intrinsic evidence fails to establish the boundaries of a 'half-liquid.'" *Id.* at 1380. Further, the specification distinguishes "half-liquid" from pastes and gels, which fall within the scope of the patentee's proposed construction "semi-liquid." *Id.* at 1379. Moreover, during prosecution, the patentee distinguished "half-liquid" from "semi-liquid." The "log" term does not suffer from such deficiencies.

Carnival during patent prosecution . . . ."). "But the standard for disclaimer is 'demanding' and so there must be a 'clear and unmistakable' disavowal for the doctrine of prosecution disclaimer to apply." *Id.* (citing *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016)). DeCurtis's argument falls short of that demanding standard. *Id.* at 23-24.

The claims permit both a wired or wireless second transceiver.  In fact, claim 13 of the '516 Patent (the prosecution of which involves the alleged disclaimer) presumptively must include a wired second transceiver.  Both claims recite a radio and a first transceiver "configured for wireless communication." '184 Patent (D.E. 205-2), 40:49-58; '516 Patent (D.E. 205-3), 41:63-42:1.  "Wireless," however, does not appear in connection with the second transceiver. '184 Patent (D.E. 205-2), 40:59-62; '516 Patent (D.E. 205-3), 42:1-3.  Further, claim 15 of the '516 Patent, which depends from claim 13, expressly requires the second transceiver to communicate on "a *wired* network connection." '516 Patent (D.E. 205-3), 42:17-22 (emphasis added).  According to the doctrine of claim differentiation, claim 13 presumptively must have a broader scope that includes a wired second transceiver. *See AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) (holding that independent claims "must also encompass aluminum with up to about 10% silicon" because their dependent claims "expressly recite 'up to about 10% silicon'").

A claim scope that permits either a wired or wireless second transceiver also accords with the common specification, which discloses preferred embodiments with wired transceivers that communicated with central servers or reservation servers. *See, e.g.*, '184 Patent (D.E. 205-2), 19:61-65 ("a network transceiver enables the access panel 705 to communicate across a *wired or wireless* network, such as . . . with a central reservation server 21") (emphasis added); *see also id.*, 7:26-30, 18:14-28; de la Iglesia Rebuttal (D.E. 205-6) ¶¶ 62-63 (citing additional disclosures). Indeed, as DeCurtis's expert recognized, the patent discloses a preferred embodiment of a "power over Ethernet (POE)" interface — a wired communication interface. *See* Shoemake Decl. (D.E. 205-7) ¶ 120 (describing this embodiment as one "in which the 'second transceiver' is a *wired*, ethernet interface") (emphasis added).  DeCurtis's construction would read the patents' preferred embodiment out of the claim scope.  This "is rarely, if ever," the correct result. *Vitronics*, 90 F.3d at 1583; *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir.

2003) (noting that the Federal Circuit had adopted a claim construction that reads out a preferred embodiment *only once* based on "highly persuasive evidentiary support").[4]

Measured against this legal framework, the purported prosecution disclaimer here falls far short of "clear and unmistakable" evidence. The purported disclaimer was made relative to U.S. Patent Pub. No. 2017/0048495 ("Scalisi"). In a final office action, the examiner rejected pending claim 71 (issued claim 13 of the '516 Patent) based on a combination of three references: Baumgarte, Rose, and Scalisi. '516 File History, Jan. 22, 2018 Final Rejection (D.E. 205-15) at 4-5. The Examiner stated that "Baumgarte in view of Rose [is] silent regarding 'an access panel . . . and a first transceiver . . . .'" *Id.* at 4. The examiner further opined that Scalisi made up for these deficiencies. *Id.* at 4-5. In response, the applicants stated, among other bases for disagreeing with the examiner, that "[t]he security system (202) is notably <u>not</u> described as having ***multiple*** wireless communication interfaces including 'a radio [...], a first transceiver [...], and a second transceiver [...]' in accordance with those detailed in claim 71." '516 File History, Apr. 23, 2018 Applicant Remark (D.E. 205-16) at 10 (underline and alterations in original, other emphasis added). Because pending claim 71 (issued claim 13) permits the second transceiver to be either wired or wireless, if Scalisi had disclosed "multiple wireless communication interfaces" including a wireless second transceiver, that wireless second transceiver could be within the scope of the claimed second transceiver.

Thus, Carnival's statement distinguishing Scalisi's security system from the claimed access devices with *multiple* wireless communication interfaces does not constitute a clear and unmistakable disclaimer of a wired second transceiver. Critically, the parties agree that, in prosecution, "Carnival emphasized '*multiple* wireless' interfaces" when distinguishing Scalisi.

---

[4] Usually, when prosecution history disclaimer is found, the disclaimer is just one piece of evidence that further confirms a construction also supported by the claims, specification, or other prosecution statements. *See, e.g.*, *Bell Atl. Network Servs., Inc. v. Covad Comm'ns Grp., Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (cited in Objs. at 7) ("the patentees defined the term 'mode' by implication through the term's consistent use throughout the . . . patent specification . . . The prosecution history also supports limiting the transceiver to the three possible modes."); *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (clear disavowal involving drawings comparing the claimed invention with a prior-art combination and a statement how a narrow claim scope serves a different purpose of the invention, neither of which is inconsistent with the specification); *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 at 1327 (Fed. Cir. 2003) (finding disavowal where patentee "repeatedly insisted that its invention differed from the prior art" in a particular way).

DeCurtis's Opening Claim Construction Br. ("DeCurtis's Opening CC Br.") (D.E. 201) at 11 (emphasis added by DeCurtis); *id.* at 10 ("Carnival argued that the prior art lacked '*multiple* wireless communication interfaces.'") (emphasis added by DeCurtis); Carnival's Opening Claim Construction Br. (D.E. 205) at 12 (same emphasis by Carnival).[5]  Thus, the applicants were distinguishing Scalisi based on its lack of ***multiple*** communication interfaces as claimed, not based on the second communication interface being wired versus wireless.

The crux of DeCurtis's argument is a disagreement with the applicants' interpretation of Scalisi, but this misses the point.  DeCurtis argues at length that Scalisi in fact does disclose multiple wireless interfaces.  Objs. at 6-8.  Disclaimer does not hinge on whether the applicants' arguments about Scalisi were right or wrong, however.  It hinges on what the applicants argued, and more specifically, whether the applicants' arguments can be reasonably interpreted as not disclaiming claim scope.  Here, at bare minimum (and as Judge Torres found), the applicants' argument reasonably can be interpreted as distinguishing Scalisi based on Scalisi lacking "multiple" interfaces, and "[w]here, an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable [disclaimers]."  *3M Innovative Props.*, 725 F.3d at 1326; *see also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1370 (Fed. Cir. 2010) (finding no disclaimer where applicant's statements in prosecution "are consistent with [the court's] understanding of the specification").

In any event, the applicants' statement that Scalisi's security system does not comprise *multiple* wireless communication interfaces is correct, which further serves to confirm that the applicants did not clearly disclaim a wired second transceiver.  Scalisi discloses a security system 202 with *one* wireless communication interface 230.  de la Iglesia Dep. Tr. (D.E. 205-11) at 109:23-119:18 (explaining that Scalisi discloses one wireless communication interface 230); *e.g.*, *id.* at 110:13-14 ("Scalisi defines all of its interfaces as wireless communication 230."); *id.* at 112:9-10 ("I'm looking at the various figures, and I see, you know, 230 is the exemplary wireless

---

[5]  Contrary to DeCurtis's assertion, Carnival did not acknowledge that "Scalisi describes an 'access panel.'"  Objs. at 5; *contra* '516 File History, Apr. 23, 2018 applicant remark (D.E. 205-16) at 10 (disagreeing that Scalisi discloses the claimed access panel because its security system 202 is "removably located in any electric outlet" and not "providing any advanced functionalities" required of the access panel).  Indeed, DeCurtis's expert recognized "Carnival argued that unlike the 'access panel' of the claimed invention, the 'access panel' of Scalisi was 'attached to a power outlet 228.'"  Shoemake Decl. (D.E. 205-7) ¶ 120.

interface."); *id.* at 113:15-17 ("[Scalisi is] describing communication using the same interface with multiple devices.").  The same "wireless communication means 230" is used "to communicate with the computing device 204" and to "communicate with the sound output device 5014 (e.g., a solenoid-based chime, a digital chime, a speaker)."  Scalisi (D.E. 224-6) ¶¶ [0099], [0450], Figs. 1, 3; de la Iglesia Dep. Tr. (D.E. 205-11) at 113:2-5.  Selectively highlighting two lines emanating from security system 202 in Scalisi's Figure 23, DeCurtis appears to argue that each line requires a dedicated communication interface.  *See* Objs. at 6.  Neither Scalisi nor the knowledge of a POSITA, however, indicates or suggests so.  For example, Figure 23 shows two separate lines between security system 202 and identical smart phones 204a and 204b.  Scalisi (D.E. 224-6), Fig. 23.  It would not be reasonable to infer therefrom two separate interfaces on security system 202, one to connect with device 204a and the other to connect with device 204b.  de la Iglesia Dep. Tr. (D.E. 224-1) at 116:3-14; *see also id.* at 112:2-114:10, 116:15-24 (explaining Figure 23).[6]

## V.  Judge Torres Properly Construed the "Each Sensor" Limitation ('184 Patent, Claim 11)

DeCurtis challenges Judge Torres's decision to construe this limitation (a new argument), his construction, and the denial of DeCurtis's motion for summary judgment as a result of Judge Torres's construction.  Judge Torres's decisions and rulings were correct and well supported.

### A.  Construction of This Term Is Necessary

Judge Torres was right to construe this term.  Both parties proposed constructions for this term, with changes to the claim language emphasized:

---

[6] Further, the applicants' statement that "the security system (202) . . . merely relays communications between a remote computing device (204a) and various systems including a door lock (930)" accords with the applicants' understanding and the specification.  Objs. at 7 (quoting D.E. 199-12 at 10); de la Iglesia Dep. Tr. (D.E. 224-1) at 114:3-9 ("it is a logical relay. It's not clear that it is an interface relay. Again, when I look at the Scalisi diagrams, I'm seeing 2[30]. That's the exemplary interface.").  DeCurtis further alleges several information-transfer media as possible second transceivers.  *See* Objs. at 6-7 (citing, *e.g.*, paragraphs 162, 99, and 118 of Scalisi). But DeCurtis presents no evidence that an embodiment of wireless communication 230 comprises more than one of these alternatives.  Further, several alternatives such as light or sounds pulses and audio signals do not even meet DeCurtis's own definition for a transceiver: "a device capable of both transmitting and receiving *electronic* communications."  *Id.* at 5 n.3 (emphasis altered).

| Carnival's Proposed Construction | DeCurtis's Proposed Construction |
|---|---|
| each **BLE** sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes | **every** sensor of the sensor network is operative to transmit a command to cause the guest device to change between the first **BLE** operating mode and the second **BLE** operating mode |

DeCurtis has since shifted its position, now arguing that this Court should not construe this limitation.[7]  Objs. at 8 ("[w]hen this claim language is properly left unconstrued…").  It seems likely that DeCurtis is changing positions because its proposed construction undermined its arguments.  As explained further below, adding "BLE" before the two "operating modes" (in DeCurtis's construction) is similar to and supports adding "BLE" before "sensor" (in Carnival's construction).  And DeCurtis's proposal to construe "each" as "every" emphasizes that DeCurtis's position is based on a particular claim construction and not just an uncontroversial "plain meaning."  The Federal Circuit has previously held that (i) the meaning of a patent term including "each" can only be ascertained by considering the full context of the claim language and specification and (ii) the meaning of an "each" term may vary depending on the context, as further discussed below.  *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374 (Fed. Cir. 2003).

In any event, the parties still have a dispute that the Court should resolve: whether this limitation, which the parties agree is tied to BLE functionality, should be construed to make clear that it relates to sensors capable of performing that BLE functionality, or whether it should be interpreted to cover sensors incapable of performing BLE functionality as well.

### B.  Judge Torres Rightly Adopted Carnival's Proposed Construction

Having properly decided that the claim term disputed by the parties warranted construction, Judge Torres correctly concluded that the limitation should be construed to mean "each BLE sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes."  R&R at 27.

---

[7] DeCurtis's new arguments, that (1) this limitation needs no construction and (2) that the term "sensor" need not be construed, are newly raised in its objections and thus should not be considered.  *E.g.*, *Future Metals LLC v. Ruggiero*, No. 21-CV-60114-RAR, 2021 WL 5834258, at *1 (S.D. Fla. Dec. 8, 2021) (refusing to consider argument raised for the first time in objections to Magistrate Judge's report and recommendation).

The intrinsic record compels this construction.  The parties agree that the functionality of each "sensor" recited in this limitation is to switch BLE operating modes, as DeCurtis's initially proposed construction makes explicit.  *See* Objs. at 9; DeCurtis's Opening CC Br. (D.E. 201) at 12-13.  The functional capabilities help to define the meaning of those devices in the context of this limitation.  *Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").  The parties agree that BLE and NFC are different protocols and that the claimed system uses different hardware (*e.g.*, different antennas) for BLE and NFC communications. '184 Patent (D.E. 205-2), 6:12-18, 42:29-35, Fig. 6, Fig. 7H, Objs. at 8-9.  Thus, to issue commands to change between BLE operating modes (as everyone agrees this claim limitation requires), the sensor would be a BLE sensor using a BLE communication protocol rather than some other type of sensor using some other type of communication protocol.  R&R at 27; de la Iglesia Decl. (D.E. 205-5) ¶ 48.

The specification accords with the claim language by consistently and unambiguously confirming that "each sensor of the sensor network" operative to change BLE operating modes is a BLE sensor.  '184 Patent (D.E. 205-2), 21:52-66, 22-4:31, Fig. 6, Fig. 7H.  Furthermore, only BLE is described as having multiple operating modes, *e.g.*, bi-directional and periodic beacon modes.  *Id.* at 15:65-67; 16:4-6, 16:23-27, 16:43-45.  In contrast, the specification confirms that NFC sensors were not designed to change BLE operating modes.  As Judge Torres observed (R&R at 26), the specification teaches that the NFC system was a backup system to be used when "the charge level of the battery 507 falls below a threshold, and/or the battery or BLE transceiver fails." '184 Patent (D.E. 205-2), 15:39-60.  The specification does not teach NFC as having multiple modes or being used to switch modes.[8]

---

[8] DeCurtis takes issue with Judge Torres's analysis based on the specification (Objs. at 10-11), but DeCurtis's attempt to show that the patent specification supports NFC sensors changing BLE operating modes is at odds with its invalidity arguments that follow just a few paragraphs later. *Id.* at 12 ("a person of ordinary skill in the art objectively reviewing the patent specification would understand it to **lack any** disclosure relating to an NFC sensor transmitting a command to cause a guest device to switch between BLE operating modes.") (emphasis in original). DeCurtis cannot have it both ways.  DeCurtis's subsequent reference to an unrelated patent to suggest that NFC sensors could change BLE operating modes fails because such extrinsic evidence cannot outweigh the detailed teachings of the patent's intrinsic evidence, *Phillips*, 415

The claim language supports Carnival's proposed construction in another way as well: this limitation recites an express connection between the sensor's operation of transmitting a command and the communication range within which that command must be sent. '184 Patent (D.E. 205-2), 42:65-66 (the sensor is "operative to transmit a command to a guest device *in its communication range* . . . ."). The reference to the communication range supports that this limitation relates to BLE sensors only because the NFC sensors as described in the specification were not capable of operating across the same range as BLE sensors. *See* de la Iglesia Rebuttal (D.E. 205-6) ¶ 81.

DeCurtis principally argues that the Court should consider the claim language in isolation and give "each sensor" its supposed "plain meaning" as "every sensor," but the very case DeCurtis cites shows that "each" does not *necessarily* mean "every" or "all." *ResQNet.com*, 346 F.3d 1374. In *ResQNet.com*, the Court considered two terms from two patents involving "each." As to the first term, "each field in said image," one party argued that each meant "all" and the other insisted that each meant "some." *Id.* at 1379. Rather than proclaiming broadly that each meant "all," the *ResQNet.com* court carefully reviewed the specification and ultimately based its decision on a determination that the contrary construction would have prevented the claimed invention from performing in accordance with the description set forth in the specification. *Id.* at 1379-80. ("Construing the claim to solve all three problems in this case merely confirms the meaning of the claim language. Therefore, this reasoning does not run afoul of the general rule that limitations should not be imported from the specification based solely on overcoming problems in the prior art.") (citations omitted). As to the *second* term ("each of a plurality of fields"), however, the court reversed the district court's construction of the term as referring to "every field." *Id.* at 1377-78, 82-83. The claim language and specification did not support that construction, but rather supported construing the term to mean "each of at least two fields." *Id.*

*ResQNet.com* accords with the bedrock claim construction principle that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal citations omitted); *Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 608 (Fed. Cir. 2015) (finding error where the district court relied upon the plain and ordinary meaning of a term without discussing its

---

F.3d at 1317, and DeCurtis's characterization of the unrelated patent is inaccurate. *E.g.*, de la Iglesia Rebuttal (D.E. 205-6) ¶¶ 87-88.

context).[9]  In contrast, it "is incorrect to construe the claims contrary to the specification, and then to hold the claims invalid because they are contrary to the specification." *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017) (affirming district court's denial of JMOL motion for lack of written description).  This incorrect approach is what DeCurtis explicitly advocates.  Accordingly, given the teachings from the claim language itself and the patent specification, Judge Torres was justified in adopting the Carnival's proposed construction to make clear that the sensors addressed in this limitation were BLE sensors.  R&R at 27.

Finally, DeCurtis tries the same tactic as with the first term, casting Carnival's proposed construction as an improper "correction."  Objs. at 11-12.  As with the first term, Carnival's position does not amount to a "correction" as that term would be understood in the law; rather, Carnival's proposed construction justifiably emphasizes what is already plain from the claim language.  *Route1 Inc. v. AirWatch LLC*, 829 F. App'x 957, 960-62 (Fed. Cir. 2020).

### C. Judge Torres Rightly Denied DeCurtis's Motion for Summary Judgment

DeCurtis also objects to Judge Torres's denial of DeCurtis's motion for summary judgement for lack of written description.  Initially, DeCurtis concedes that its motion is premised on its incorrect claim construction, and thus must be denied under the correct construction.  Objs.

---

[9] None of the cases cited by DeCurtis justify its attempt to construe the term at odds with the specification. *Liquid Dynamics v. Vaughan Co.*, 355 F.3d 1361 (Fed Cir 2004), which is a pre-*Phillips* case, supports Carnival's position.  The Federal Circuit panel in *Liquid Dynamics* explained that district courts should look to the intrinsic evidence as a whole to inform their claim construction rulings.  355 F.3d at 1367.  DeCurtis's reference to *3M Innovative Props.* is even less helpful to its position.  In the portion of the concurrence-in-part quoted by DeCurtis, Judge O'Malley *dissented* from the majority opinion as to the meaning of a claim term.  Nevertheless, Judge O'Malley explained that in her opinion, the disputed claim term's meaning should be decided in accordance with *Phillips*' teachings to start the claim construction analysis with the plain and ordinary meaning.  725 F.3d at 1337 (O'Malley, J., concurring-in-part, dissenting-in-part).  Finally, DeCurtis tries to analogize this case to *Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1361 (Fed. Cir. 2017) and *Akamai Techs., Inc. v. Limelight Networks, Inc.,* 805 F.3d 1368, 1375 (Fed. Cir. 2015) by recasting the dispute as whether a special meaning should be attributed to the term "sensor," but that is not the basis for Judge Torres's construction.  Instead, the limitation being construed is the entire phrase starting with "each sensor of the sensor network" as shown in the boxes above, and in light of the undisputed function of the sensors in this limitation and the teachings of the patent specification, Judge Torres clarified that the claimed sensors were BLE sensors.

at 12-13. Even if the Court were to adopt DeCurtis's proposed claim construction instead, which it should not do, DeCurtis has not met its burden of showing lack of written description by clear and convincing evidence. DeCurtis's arguments are premised on misrepresenting Carnival's expert's opinion as agreeing that the claim lacks written description under DeCurtis's construction. *Id.* at 12-13. This is false as discussed below.

Even under DeCurtis's incorrect construction, the "sensor" limitation still has written-description support because the specification describes sensors that are *combined* BLE and NFC sensors that meet the claim language. The error in DeCurtis's analysis is assuming that a "sensor" must be either a BLE sensor or an NFC sensor but cannot be both. In fact, the patent teaches that a "sensor" can be, for example, a door access panel, which is a combined BLE and NFC sensor. Claim 14 of the '184 Patent, which depends from claim 11, recites that "the plurality of **sensors** of the sensor network **comprises** a plurality of **access panels**." '184 Patent (D.E. 205-2), 43:9-12. Thus, "access panels" are "sensors" as that term is used in claim 11. *See Amgen*, 314 F.3d at 1344-45 ("comprising" is synonymous with "including," which means "[t]o have . . . as a part or member"); de la Iglesia Dep. Tr. (D.E. 210-5) at 202:15-203:2. The specification teaches that access panels—that is, sensors—include both BLE and NFC components and can communicate using either BLE or NFC protocol, and more specifically are operative to meet the "transmit[ting] a command" requirement of the "sensor" limitation. *See* '184 Patent (D.E. 205-2) (*e.g.*, Figure 7H shows the "access panel" containing both a "BLE transceiver and antenna" and an "NFC transceiver and antenna," and describes using either to communicate with a "medallion"). Just as taught by the claim language recited above, a POSITA reading the specification would understand that these access panels are examples of combined BLE/NFC sensors. '184 Patent" (D.E. 205-2), 19:25-53, 22:40-47, Fig. 7H; de la Iglesia Decl. (D.E. 205-5) ¶ 54. Thus, an access panel—a combined BLE/NFC sensor that "is operative to detect portable guest devices . . . based on NFC communication with the portable guest devices"—also "is operative to transmit a command to a guest device . . . to cause the guest device to change operating mode between the first and second operating modes," as required by claim 11 using DeCurtis's construction.

DeCurtis's expert witness even acknowledges that the specification teaches access panels that communicate using either BLE or NFC. Shoemake Rebuttal (D.E. 205-8) ¶ 33. He characterizes these access panels as comprising separate BLE and NFC sensors. *Id.* But the

specification—in the very passages cited by Dr. Shoemake—describes the access panels as including BLE and NFC *transceivers and antennas*, not separate BLE and NFC *sensors*.  '184 Patent (D.E. 205-2), 19:49-53.  At minimum, the evidence presents a genuine dispute of material fact as to whether the specification provides written description support for this claim, precluding summary judgment.

Finally, the "sensor" limitation was present verbatim in claim 19 of the originally filed patent application that issued as the '184 Patent, which itself provides adequate written description support.  Carnival's SOF (D.E. 211) ¶ 49.  "Original claims are part of the original specification and in many cases will satisfy the written description requirement."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1297 (Fed. Cir. 2017) (reversing summary judgment of invalidity for lack of written description because "[t]he very language of claim 1 which the court held was not supported by the specification was present in the originally-filed claims.").

## VI.   Genuine Disputes of Material Fact Preclude Summary Judgment on the "Portable Wireless Device" Limitation ('514 Patent, Claim 11)

DeCurtis does not object to Judge Torres's finding that this claim needs no construction.  *See* Objs. at 14.  Indeed, as Judge Torres explained, "the claim clearly describes a portable wireless device that comprises a processor, a memory, a battery, and two wireless communication antennas that are disposed within the cavity of a fully enclosed device that is smaller than 2.5 inches in diameter and thinner than (or equal to) 5/8 inches in thickness."  R&R at 28.  Instead, DeCurtis attacks Judge Torres's recommended denial of its motion for summary judgment that this limitation is invalid for lack of enablement.  *Id.* at 30.  But clear disputes of material fact underlying the fact-intensive enablement inquiry preclude summary judgment.

DeCurtis argues that the phrases "equal to or smaller than 2.5 inches" and "equal to or smaller than 5/8 inch" describe open-ended ranges. The appropriateness of open-ended claims, "as for all claims . . . depends on the particular facts of the invention, the disclosure, and the prior art. They may be supported if there is an ***inherent, albeit not precisely known, upper limit*** and the specification enables one of skill in the art ***to approach that limit***."  *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376–77 (Fed. Cir. 2007) (quoting *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1572 (Fed.Cir.1991)) (emphasis added).  In *Andersen*, for example, the Federal Circuit affirmed a jury verdict that claims were not invalid for lack of enablement, despite claiming an open-ended range of "Young's modulus" tensile strength ratings,

-17-

in view of the particular facts, including testimony that a POSITA would recognize the upper limit of the Young's modulus of the claimed composition to lie somewhere between that of its components, and that a POSITA would be fully enabled to practice the invention based on the specification's disclosure. *Id.*

As DeCurtis noted, Judge Torres found that a POSITA would recognize an inherent limit exists relative to the size of a device that meets the claimed limitations. R&R at 29-30. DeCurtis does not object to that finding. *See* Objs. at 15. Nor could it; it cannot be seriously contested that "a POSITA would readily understand that there is an inherent lower limit to the size of a device comprising two antennas, a battery, a processor, and a memory." R&R at 30. Such a device could not be microscopic or infinitesimally small.

Instead, DeCurtis's objections are premised on a fundamental misunderstanding of the law. DeCurtis objects to the fact, according to DeCurtis, that Judge Torres and Carnival's expert Dr. Eisenstadt "did not identify any specific inherent limit" for the open-ended ranges at issue. Objs. at 15; *see also id.* ("Carnival's failure to identify any inherent lower limit for these ranges is a sufficient basis on which to find lack of enablement."). But Judge Torres was not required to specify the precise dimensional value that serves as the inherent limit. *Andersen Corp.*, 474 F.3d at 1376–77 ("They may be supported if there is an inherent, *albeit not precisely known*, upper limit and the specification enables one of skill in the art to approach that limit.") (emphasis added). DeCurtis's arguments that Carnival or its expert failed to precisely identify the inherent limit fail for the same reason. And, in effect, DeCurtis is attempting to shift the burden of proof on enablement to Carnival; this is error. *See Vasudevan Software,* 782 F.3d at 684. Based on these errors alone, DeCurtis's objections fail.

DeCurtis's remaining arguments relate to whether a POSITA could approach the inherent limit; this is a disputed fact question and there is ample evidence upon which the jury can find that the claim is enabled. Judge Torres correctly found that "the answer to this question – an answer that undoubtedly qualifies as a material fact – is subject to a genuine dispute." R&R at 30.

Testimony from DeCurtis's experts alone could provide a sufficient basis for a jury to reject DeCurtis's bid to invalidate this claim. DeCurtis's litigation expert, Dr. Tentzeris, opined that the smallest one could make the claimed device without undue experimentation would be a diameter of 1.1093 inches and a thickness of 0.3937 inches (well below the claimed limits). Tentzeris Decl. (D.E. 205-10) ¶¶ 59-60. But DeCurtis and Dr. Tentzeris concede that a POSITA *is* enabled to

make the device at least to that lower limit.  *Id.* ¶ 91; MSJ (D.E. 203) at 11.  A jury could readily interpret that testimony as admitting that the patent enables a POSITA to approach the inherent lower limit on device size, similar to the testimony supporting the jury verdict in *Anderson*. Furthermore, in support of its petition for *inter partes* review of the '514 Patent, DeCurtis submitted the declaration of a different expert who opined that "[a]chieving the recited dimensions for these types of devices was ***well-within the level of ordinary skill in the art at the relevant time***."  Decl. of Kevin Almeroth (D.E. 208-3) ¶ 64 (emphasis added).[10]  "Portable wireless devices, including multi-antenna devices, within the recited form factor were common in the prior art," according to DeCurtis's IPR expert.  *Id.* ¶ 95.  He identified purported examples of prior art wireless devices with all the claimed components which may exist in "extremely small sizes" such as "0.5" wide by 1.3" long by 0.25" thick"—well within the claimed size ranges. *Id.* ¶ 66.  Another alleged device cited by the expert had even smaller dimensions: a diameter as small as 0.71 inches, a thickness as small as 0.06 inches, and a width as small as 0.12 inches.  *Id.* ¶ 98.  He opined that there were "no technical limitation[s] to achieving the [claimed] form factor," *id.*, "*which is actually relatively large for portable devices of this type*."  *Id.* ¶¶ 95, 132 (emphasis added).  These opinions, at minimum, creates a genuine issue of material fact as to whether the claim is enabled.

Furthermore, Carnival's expert opined that Dr. Tentzeris's minimum size analysis was incorrect.  *E.g.*, Eisenstadt Decl. (D.E. 208-2) ¶ 27.  While he agreed that the range identified by Dr. Tentzeris is enabled, he explained in detail why many of Dr. Tentzeris's opinions underlying his belief that smaller devices would not be enabled (e.g., the size needed to enclose a BLE antenna) were incorrect, failed to account for relevant facts, or lacked basis.  *Id.* ¶¶ 24, 26-27, 31-39.  He also explained how the patent specification teaches a POSITA ways to build a device with the recited physical components in a body of the recited size.  *Id.* ¶¶ 39, 41-43.  He further explained how the nature of the invention and predictability of the art undermined Dr. Tentzeris's argument.  *Id.* ¶¶ 43-45.  Additionally, fact witness testimony supports a finding of enablement. *E.g.*, Lam Dep. Tr. (D.E. 210-10) at 48:19-49:3 (testimony of a named inventor regarding the necessary separation of BLE and NFC devices); Worrall Dep. Tr. (D.E. 210-11) at 89:19-90:2 (testimony of Disney employee regarding design of purported prior art device).  All this evidence must be considered by the jury in deciding the fact-intensive enablement inquiry.

---

[10] Carnival cites Dr. Almeroth's opinions to show that DeCurtis's own experts have disagreed on material facts relevant to the enablement inquiry, not because his prior-art analysis is correct.

DeCurtis's remaining arguments based on Dr. Eisenstadt's testimony are ill-founded and irrelevant. DeCurtis critiques Dr. Eisenstadt for purportedly not considering the final question of enablement. Objs. at 15. But DeCurtis's argument is both factually incorrect (*e.g.*, Eisenstadt Decl. (D.E. 208-2) ¶ 27) and irrelevant because it would not change the fact that Dr. Eisenstadt disagreed with Dr. Tentzeris's core factual opinions. DeCurtis next argued that certain testimony by Dr. Eisenstadt regarding "use cases" undermined his analysis, but Dr. Eisenstadt's mention of "use cases" was not an attempt to describe a fluctuating claim scope based on subjective opinions. Rather, Dr. Eisenstadt's testimony highlighted teachings within the '514 Patent's specification that could help shed light on what the minimum size of a device that meets the claims would be. *E.g.*, Eisenstadt Dep. Tr. (Ex. 1) at 33:20-34:6.[11] DeCurtis misstates Dr. Eisenstadt's testimony regarding a "physical/scientific limit." Dr. Eisenstadt made clear that he disagreed with Dr. Tentzeris's purported lower limit. *E.g.*, Eisenstadt Decl. (D.E. 208-2) ¶ 27. Further, Dr. Eisenstadt's deposition testimony regarding a physical/scientific limit was not made in reference to Dr. Tentzeris's testimony as the phrase "*such a* physical/scientific limit" would tend to suggest. Instead, it was in response to stand-alone hypotheticals asked by DeCurtis's counsel. *E.g.*, Eisenstadt Dep. Tr. (Ex. 1) at 50:23-54:24. Lastly, DeCurtis's unsupported argument that Carnival's expert provided no opinion regarding the point at which further shrinkage beyond any unspecified inherent limit would require undue experimentation ignores Dr. Eisenstadt's testimony directly addressing undue experimentation. *E.g.*, Eisenstadt Decl. (D.E. 208-2) ¶¶ 41-45.

Thus, because DeCurtis failed to object to Judge Torres's findings that an inherent limit exists, and given the factual disputes regarding whether a POSITA would have to engage in undue experimentation to reach that limit, the Court should deny DeCurtis's motion for summary judgment that claim 11 of the '514 Patent lacks enablement.

**VII.   Conclusion**

For the foregoing reasons, the Court should adopt Judge Torres's opinion in its entirety.

---

[11] DeCurtis's arguments based on dicta from the extra-jurisdictional district court opinion in *Plastipak Packaging* also fail, at least because the cited portion of that case is directed to a different issue, indefiniteness. Objs. at 15 (citing *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 2021 WL 3675151, at *15 (W.D. Wis. Aug. 19, 2021)).

Dated:  April 19, 2022 RESPECTFULLY SUBMITTED,

By:  */s/ Diana Marie Fassbender*_____
Diana Marie Fassbender
Florida Bar No. 0017095
dszego@orrick.com
Steven J. Routh (*pro hac vice*)
T. Vann Pearce, Jr. (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center, 1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel: (202) 339-8500

Robert L. Uriarte (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Tel: (650) 289-7105

Jorge Espinosa
Fla. Bar No. 779032
jorge.espinosa@gray-robinson.com
GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL  33131
Phone: (305) 416-6880
Facsimile: (305) 416-6887

*Attorneys for CARNIVAL CORPORATION*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on April 19, 2022, a copy of the foregoing was served electronically, via CM/ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

Dated:  April 19, 2022

By: <u>*/s/ Diana Marie Fassbender*</u>
Diana Marie Fassbender