# Exhibit 1

1              UNITED STATES DISTRICT COURT FOR THE
                  SOUTHERN DISTRICT OF FLORIDA
2                      MIAMI DIVISION
3
               Civil Action No. 1:20-CIV-22945-Scola
4              Civil Action No. 1:20-CIV-21547-Scola
5    DECURTIS, LLC,
6                     Plaintiff,
7    vs.
8    CARNIVAL CORPORATION,
9                     Defendant.
     _____/
10
     CARNIVAL CORPORATION,
11
                      Plaintiff,
12   vs.
13   DECURTIS CORPORATION, and
     DECURTIS, LLC,
14
                      Defendants.
15   _____/
16
                 REMOTE VIDEOTAPED DEPOSITION OF
17
                   WILLIAM EISENSTADT, PH.D.
18
19              Thursday, December 16, 2021
                3:06 p.m. - 6:34 p.m. (EST)
20
21
22            Stenographically Reported By:
               Kimberly Fontalvo, RPR,CLR
23          Realtime Systems Administrator
24
25

                                         Page 1

```
 1    APPEARANCES:
 2
      On behalf of DeCurtis,LLC:
 3
           QUINN EMANUEL URQUHART & SULLIVAN, LLP
 4         865 S. Figueroa St., 10th Floor
           Los Angeles, CA  90017  10017
 5         BY:  JUSTIN C. GRIFFIN, ESQ.
           pschmidt@quinnemanuel.com**
 6         BY:  JARED KNEITEL, ESQ.
           jkneitel@quinnemanuel.com
 7
 8
 9    On behalf of Carnival Cruises:
10
           ORRICK, HERRINGTON & SUTCLIFFE, LLP
11         777 South Figueroa, Suite 3200
           Los Angelos, CA  90017
12         BY:  DAVID MEDINA, ESQ.
           dmedina@orrick.com
13
14
15
      ALSO PRESENT:  John Macdonell, Videographer
16
17
18
19
20
21
22
23
24
25
                                        Page  2
```

```
 1                    I N D E X
 2   Examination                              Page
 3
     Direct               By Mr. Schmidt         5
 4
     Instruction to not answer question        11
 5
     Instruction to not answer question        26
 6
     Instruction to not answer question        26
 7
     Certificate of Oath                      115
 8   Certificate of Reporter                  116
     Read and Sign Letter to Witness          117
 9   Errata Sheet (forwarded upon execution)  118
10                    EXHIBITS
11
12   No.                                      Page
13   Exhibit 1      Declaration of Dr.           8
                    William R. Eisenstadt in
14                  Support of Carnival's
                    Opposition to DeCurtis'
15                  Motion for Summary
                    Judgment
16
     Exhibit 2      Curriculum Vitae of         16
17                  William Richard
                    Eisenstadt
18
     Exhibit 3      Document entitled "Design  106
19                  of Compact Adaptive RF
                    Matching Circuits using
20                  Square Split-Ring
                    Resonators," by Hyunjin
21                  Park et al.
22
23
24
25
```

1          VIDEOGRAPHER:  And we are on the record.

2     It's 3:06 p.m. Eastern Time on December 16,

3     2021.

4          This is the deposition of Dr. William

5     Eisenstadt.  We're here in the matter of

6     DeCurtis versus Carnival Corporation.

7          I'm John MacDonnell, the videographer,

8     with Veritext.

9          Before the reporter swears the witness,

10    would counsel please identify themselves,

11    beginning with Mr. Schmidt, please.

12         MR. SCHMIDT:  Good afternoon.  Patrick

13    Schmidt from Quinn Emanuel Urquhart & Sullivan

14    on behalf of DeCurtis.

15         MR. MEDINA:  Good afternoon.  David Medina

16    from Orrick, Herrington & Sutcliffe on behalf

17    of Carnival Corporation.

18         THE COURT REPORTER:  Doctor, could I have

19    you raise your right hand, please, so I can

20    swear you in.

21         Do you swear or affirm the testimony you

22    are about to give will be the truth, the whole

23    truth, and nothing but the truth?

24         THE WITNESS:  I do.

25         THE COURT REPORTER:  Thank you, Doctor.

                                            Page  4

```
 1              I'm ready.
 2              MR. SCHMIDT:  Thank you.
 3                    DIRECT EXAMINATION
 4     BY MR. SCHMIDT:
 5         Q.   Good afternoon, Dr. Eisenstadt.  Can you
 6     please state and spell your name for the record.
 7         A.   My name is William Eisenstadt,
 8     W-I-L-L-I-A-M, E-I-S-E-N-S-T-A-D-T.
 9         Q.   Would you please identify the location
10     where you are testifying from today?
11         A.   I'm testifying from my home in
12     Gainesville, Florida, and the location is 4315
13     Northwest 75th Street, Gainesville, Florida 32606.
14         Q.   Is there anyone currently in the room with
15     you?
16         A.   No.
17         Q.   Other than the computer that you are using
18     to access this Zoom session, do you have any other
19     electronic devices in the room with you?
20         A.   I have another computer and I have little
21     processors.  They are all off.
22         Q.   Okay.  I would just ask that you keep any
23     other electronic devices off for the duration of the
24     deposition, of course other than the computer you
25     are using to access this session.
```

Page 5

1          On the computer that you are using to

2    access this session, do you have any other windows,

3    browsers, or electronic documents open?

4          A.   I do not.

5          Q.   Do you have any hard-copy documents in

6    front of you?

7          A.   I have a hard-copy document of my

8    declaration and of the patent '541.

9          Q.   Are either of those hard-copy documents

10   annotated in either -- in any way?

11         A.   No.

12         Q.   Okay.  Dr. Eisenstadt, you understand that

13   now that you've been sworn as a witness in this

14   case, you are not allowed to discuss the substance

15   of your testimony with anyone until the deposition

16   closes?

17         A.   I do understand that.

18         Q.   Okay.  And I would just ask that if at any

19   time anybody tries to contact you, either through

20   cell phone or chat interface, you identify that for

21   me on the record.

22              Is that fair?

23         A.   That's fair.

24         Q.   You understand that you have been offered

25   as an expert witness in this case; is that correct?

Page  6

1        A.    I'm not familiar with the term "offered."

2        Q.    Okay.  Well, you understand that you have

3    rendered expert opinions that have been submitted

4    with Carnival's opposition to DeCurtis' Motion for

5    Summary Judgment, correct?

6        A.    Yes, I do.

7        Q.    When were you first engaged by Carnival as

8    an expert witness in this case?

9        A.    I looked at my record this morning and my

10   first engagement was on November 12.

11       Q.    Do you remember who first contacted you?

12       A.    I think I was contacted by David Medina

13   and another attorney or two.

14       Q.    Okay.  And you submitted your declaration

15   in this case on November 19; is that right?

16       A.    That is correct.

17       Q.    Are you able to approximate how many hours

18   you spent forming your expert opinions between

19   November 12 and November 19?

20       A.    Yes.

21       Q.    What is that approximation?

22       A.    I would say about ten hours.

23       Q.    Did you feel that the ten hours that you

24   invested in this matter was sufficient time for you

25   to render the expert opinions you have offered in

                                          Page  7

```
 1    this case?

 2         A.   Yes.

 3         Q.   Were you provided sufficient information

 4    in order to form the opinions you have offered in

 5    this case?

 6              MR. MEDINA:  Objection.  Vague.

 7              And you can answer that "yes" or "no," but

 8         don't get into the substance of communications

 9         with counsel.

10         A.   Yes.

11      BY MR. SCHMIDT:

12         Q.   Is there any information or data that you

13    would have liked to see but was not available to you

14    in the course of forming your expert opinions?

15              MR. MEDINA:  Same objection.

16         A.   No.

17              MR. SCHMIDT:  I'm going to mark at this

18         time the first exhibit to the deposition,

19         Exhibit 1.

20              (Thereupon, marked as Exhibit 1.)

21      BY MR. SCHMIDT:

22         Q.   Doctor, if you go to your Egnyte browser

23    and refresh, let me know when you can see Exhibit 1.

24         A.   Unfortunately, I took you too seriously

25    when you said there's no other browsers on and I
```

Page 8

| | |
|---|---|
| 1 | mistakenly turned off my Egnyte browser.  But I will |
| 2 | get it back on. |
| 3 | Q.    Okay. |
| 4 | A.    Okay.  I see Exhibit 1. |
| 5 | Q.    Can you confirm for me that Exhibit 1 is |
| 6 | the expert declaration that you've submitted in this |
| 7 | case in opposition to DeCurtis' Motion for Summary |
| 8 | Judgment? |
| 9 | A.    Yes, I confirm that it is. |
| 10 | Q.    Can you scroll to the last page of |
| 11 | Exhibit 1 and confirm for me that that's your |
| 12 | signature on the last page? |
| 13 | A.    Yes, I confirm that that's my signature. |
| 14 | Q.    And you executed this document, Exhibit 1, |
| 15 | on November 19, 2021, correct? |
| 16 | A.    Yes, I did. |
| 17 | Q.    Does Exhibit 1 contain a full and complete |
| 18 | articulation of all the expert opinions that you've |
| 19 | formed in this case to date? |
| 20 | MR. MEDINA:  Objection.  Hold on. |
| 21 | Objection.  Vague. |
| 22 | And, again, to the extent this calls for |
| 23 | discussions of the substance of your |
| 24 | communications with counsel, you are not to |
| 25 | answer that.  But you can answer that "yes" or |

Page 9

```
 1          "no" if it does not require you to disclose
 2          such information.
 3          A.    Can you ask me the question again?
 4      BY MR. SCHMIDT:
 5          Q.    Sure.
 6                Does Exhibit 1 contain a full and complete
 7      articulation of all the expert opinions that you've
 8      formed in this case?
 9                MR. MEDINA:   Same objection.
10          A.    Okay.  I'm going to ask for a little
11      clarification.
12                For expert opinions, do you mean expert
13      opinions that are fully formed that I'm ready to
14      defend today or for future expert opinions?
15      BY MR. SCHMIDT:
16          Q.    Let's start with fully formed and ready to
17      defend today.
18          A.    Yes.
19          Q.    Okay.  So with regards to expert opinions
20      that are fully formed and you are ready to defend
21      today, Exhibit 1 contains a full and complete
22      articulation of such opinions, correct?
23          A.    Correct.
24          Q.    Are there other expert opinions that you
25      intend to offer in this case that you are not
```

Page 10

1    prepared to defend here today?

2         MR. MEDINA:  Objection.  Vague.

3         And I'm going to instruct you not to

4      answer that because it involves communications

5      with counsel and it's privileged.

6         MR. SCHMIDT:  You won't even let him

7      answer "yes" or "no"?

8         MR. MEDINA:  Yeah, that's correct.

9      A.   I will not answer that.

10   BY MR. SCHMIDT:

11     Q.   Okay.  With regards to the expert opinions

12   that you are prepared to defend here today, does

13   Exhibit 1 contain all the facts and data and

14   analyses necessary to support those opinions?

15         MR. MEDINA:  Objection.  Vague.

16     A.   Well, my expert opinions are based on

17   facts and data mentioned in the report, but also

18   based on my experience, and the report can't contain

19   all my experience.

20   BY MR. SCHMIDT:

21     Q.   Okay.  Setting aside your personal

22   experience in the field, are there any other facts,

23   data, or analyses that you would rely on to support

24   your opinions that aren't described in your expert

25   declaration, Exhibit 1?

Page 11

1           MR. MEDINA:  Objection.  Vague.

2       A.   Well, I would rely on what is commonly out

3   there in the field in terms of, you know, public

4   domain information on my expert opinion.

5    BY MR. SCHMIDT:

6       Q.   Did you study any specific publications or

7   patents that are out there in the field in the

8   course of forming your expert opinions that are --

9           MR. MEDINA:  Objection.

10          Sorry.  Objection.  Vague.

11      A.   Well, in the course of my work, I am an

12   IoT designer and I experience a lot of interaction.

13          I'm also a design teacher, with spec

14   sheets and bits and pieces and parts in doing --

15   building devices and communication systems.  So

16   that's an incidental interaction with a ton of

17   technical information that I can't ignore.

18   BY MR. SCHMIDT:

19      Q.   Sure.

20          What I'm trying to identify is are you

21   able to point to anything specific that you might

22   try to use to support your expert opinions at some

23   time in the future that's not described or mentioned

24   in your expert declaration?

25          MR. MEDINA:  Objection.  Vague and calls

Page 12

1      for speculation.

2      A.   Well, in this particular matter -- and I

3  don't know what I'm going to do in future matters; I

4  only do what I'm asked to do -- but in this

5  particular matter, I would -- I would have to point

6  to my general knowledge about literature of antennas

7  and what's out there, what you can buy.

8    BY MR. SCHMIDT:

9      Q.   But you are not able to identify for me

10  here today any specific document or any specific

11  piece of data or information that you might use to

12  try to support your expert opinions in Exhibit 1 at

13  some later time, correct?

14      A.   Well, I wouldn't say that.  I would

15  probably look at documents, you know, that describe

16  chip antennas, and there's another type of antenna

17  called a PIFA, or planar inverted-F antenna, that I

18  would probably use.

19      Q.   Is there a reason why you didn't cite

20  these additional documents that you are mentioning

21  in Exhibit 1?

22      A.   Well, they're common knowledge in the

23  field and the chip antennas are actually talked

24  about in the NXP document.

25           The PIFA antennas I kind of remembered

Page 13

```
 1    after the report was completed.
 2        Q.   Okay.  But before you completed Exhibit 1,
 3    you didn't have the PIFA antennas in mind; is that
 4    right?
 5            MR. MEDINA:  Objection.  Misstates the
 6        witness's testimony.
 7        A.   Before the report was completed, I did not
 8    recall the PIFA antennas or I -- if I did recall
 9    them, I did not investigate them enough to make an
10    expert opinion about them.
11      BY MR. SCHMIDT:
12        Q.   Okay.  And other than the NXP Guide that
13    you mentioned, is there a reason why you didn't cite
14    any additional documents regarding chip antennas?
15        A.   Well, the NXP Guide is an exemplary guide
16    for chip antennas, but there are probably 30 other
17    guides out there for chip antennas when you look.
18    So I figured that was a place to start the
19    discussion.
20            MR. MEDINA:  And, Doctor, give me time to
21        state my objection for the record.
22            I would like to put an "objection, vague"
23        on that one.
24      BY MR. SCHMIDT:
25        Q.   Is there anything in any of those other
```

1    guides that you think might be noncumulative of

2    what's already in the NXP Guide, which you already

3    discuss in Exhibit 1?

4              MR. MEDINA:  Objection.  Vague.

5        A.   What do you mean, "noncumulative"?

6      BY MR. SCHMIDT:

7        Q.   Is there any teaching or data or

8    information in those other guides that you think is

9    relevant to your expert opinions that's not also in

10   the NXP Guide?

11             MR. MEDINA:  Objection.  Vague and

12        compound.

13       A.   Well, I think each guide has its own

14   layout for their antenna, and so I think that that's

15   a teaching that shows that there is no one way to

16   use chip antennas and no one way to incorporate them

17   into a system, but they each have to be looked at

18   case by case, the layout being the circuit board

19   that you incorporate the chip antenna into.

20     BY MR. SCHMIDT:

21       Q.   Can you identify for me any specific

22   portion of those other guides that you might rely on

23   to try to support your opinions at some time in the

24   future?

25       A.   Not off the top of my head.

```
 1          Q.    Okay.

 2                MR. SCHMIDT:  Let's mark your CV as the

 3          next exhibit.

 4                (Thereupon, marked as Exhibit 2.)

 5      BY MR. SCHMIDT:

 6          Q.    Please refresh your browser and let me

 7      know if you can see Exhibit 2.

 8          A.    Okay.  I refreshed and I'm not seeing

 9      anything.  Okay.  Now it just came up.  I have

10      Exhibit 1 and Exhibit 1, Tab 2.  That's probably it.

11                Okay.  I see my CV.

12      BY MR. SCHMIDT:

13          Q.    Yeah, I don't know why it's marking as

14      Exhibit 1 twice.  This should be Exhibit 2.

15                MR. MEDINA:  On my screen it also says

16          "Exhibit 1, Tab 2."

17                MR. SCHMIDT:  Right.  Well, we'll deal

18          with it afterwards.  We'll get the numbering

19          right.

20      BY MR. SCHMIDT:

21          Q.    Dr. Eisenstadt, for purposes of

22      identification, do you recognize Exhibit 2 or what's

23      marked as Exhibit 1, your CV?

24          A.    I recognize Exhibit 1, Tab 2, yes.

25          Q.    Okay.  And that's your CV?
```

Veritext Legal Solutions
866 299-5127

1      A.    And that is my CV as of the time, yeah, of

2    about a month ago, yes.

3      Q.    And that document is mentioned as

4    Exhibit A to your declaration which we looked at

5    previously, correct?

6      A.    I guess so, correct.

7      Q.    Is your CV that's in front of you at this

8    deposition accurate and complete, to your knowledge?

9      A.    To my knowledge, it's accurate and

10   complete.

11     Q.    If you scroll down to the bottom of the

12   first page, there's a heading for "Legal

13   Experience."

14           Do you see that?

15     A.    Uh-huh.  Yes.

16     Q.    Is this a complete description of all the

17   matters -- legal matters in which you've been

18   engaged as an expert witness?

19     A.    It is a complete description of matters

20   where I had expert reports where I worked more than

21   30 hours.  There were one or two matters which were

22   settled so fast that it didn't -- it wasn't worth

23   mentioning.

24     Q.    Understood.

25           Are you able to identify how many times

Page 17

```
 1    you've been deposed as an expert witness in prior
 2    matters?
 3         A.   I would say seven to nine times.  I would
 4    have to count through this to find that out.
 5         Q.   Have you ever testified at trial?
 6         A.   My very first case was a civil case and I
 7    testified at trial.  I've also testified in a
 8    Markman hearing in trial.
 9         Q.   What was the case that you testified at
10    for trial?
11         A.   That's at the bottom of the legal list
12    there.  I think it's -- oh, golly.
13         Q.   I see it, the --
14         A.   D.A.B. Contractors [sic] versus Florida
15    Department of Transportation, FDOT.
16         Q.   Okay.  And I take it that wasn't a patent
17    case?
18         A.   No.  That was a civil case where D.A.B.
19    Contractors sued Florida Department of
20    Transportation for a contract issue.
21         Q.   You mentioned you testified at a Markman
22    hearing in the past.
23              Can you tell me what --
24         A.   Yes, I did.
25         Q.   Can you tell me what case that was for?
```

Page 18

```
 1          A.    That was for Technology Research
 2    Corporation versus Tower Manufacturing.   That's Case
 3    Number 11.
 4          Q.    Is that the only case where you testified
 5    live at a Markman hearing?
 6          A.    As I recall, it is.
 7          Q.    Were you representing the plaintiff or the
 8    defendant in that case?
 9          A.    I was representing the plaintiff.
10          Q.    In all of your expert witness work, have
11    you ever had the opportunity to render opinions on
12    the issue of enablement?
13          A.    No.
14          Q.    Have you ever been engaged, as an expert
15    witness or otherwise, by the plaintiff in this case,
16    Carnival?
17          A.    Say that question again, please.
18          Q.    Have you ever been engaged in the past,
19    whether as an expert witness or otherwise, by
20    Carnival?
21          A.    No, I have not.
22          Q.    Have you ever been engaged in the past by
23    the Orrick law firm?
24          A.    No, I have not.
25          Q.    Thank you.   You can set your CV aside.
```

Page 19

```
 1              I would like to go back to the
 2  declaration, the first Exhibit 1, at this time.
 3       A.    Okay.
 4       Q.    And just for the record, I'm going to
 5  refer to the declaration as Exhibit 1.  I'm going to
 6  refer to the CV as Exhibit 2, even though it's
 7  currently marked as Exhibit 1, and we'll sort that
 8  out later.
 9              Does that make sense?
10       A.    Okay.
11       Q.    Okay.  We're looking at Exhibit 1, the
12  declaration, and I want to direct you to
13  paragraph 9.  Let me know when you're there.
14       A.    I'm at paragraph 9.
15       Q.    Paragraph 9 has a list of materials that
16  you stated that you reviewed and considered in
17  preparing your declaration.
18              Do you see that?
19       A.    Yes, I do.
20       Q.    Other than the items listed in
21  paragraph 9, are there any other documents or
22  information sources that you reviewed and considered
23  in forming your expert opinions?
24              MR. MEDINA:  Objection.  Vague.
25       A.    Well, these are the documents I considered
```

Page 20

1    in my expert opinion.  I may have a quote or two

2    from another document in this document, but these

3    are the primary documents I considered.

4      BY MR. SCHMIDT:

5        Q.   Are you able to identify any documents you

6    considered for purposes of forming your expert

7    opinions in this declaration that aren't in this

8    bulleted list on paragraph 9?

9              MR. MEDINA:  Objection.  Vague.

10       A.   I am looking to identify them.

11             In paragraph 40, it says, "I further

12   reviewed the deposition testimony cited by DeCurtis

13   of David Worrall," who is a Disney employee.  So I

14   think that has to be included in the documents I

15   reviewed for this declaration.

16     BY MR. SCHMIDT:

17       Q.   Understood.

18             Any others other than Mr. Worrall?

19       A.   Yeah, in paragraph 39, I say a "Transcript

20   of Deposition of Sander Lam . . . (testifying that

21   Carnival's actual design successfully," da da da da

22   do.  So I had to review the transcript of deposition

23   of Sander Lam.

24       Q.   Understood.

25             Any others other than those two deposition

                                        Page 21

1    transcripts and the items in paragraph 9?

2        A.    No, those are them, except they may not be

3    explicitly included.

4        Q.    What do you mean when you say "may not be

5    explicitly included"?

6        A.    I don't see them in the list in -- those

7    are the ones that I don't see in the list on

8    paragraph 9.

9        Q.    Okay.  But other than the two deposition

10   transcripts and the list on paragraph 9, you can't

11   identify any other documents that you reviewed in

12   forming the opinions in Exhibit 1, correct?

13       A.    Correct.

14       Q.    So you did not review the Complaint in

15   this action in forming your expert opinions; is that

16   correct?

17       A.    No, I don't remember reviewing the

18   Complaint.

19       Q.    Did you review the infringement

20   contentions submitted by Carnival in this case?

21       A.    No, I don't remember reviewing the

22   infringement contention.

23       Q.    Did you review the invalidity contention

24   submitted by DeCurtis in this case?

25       A.    No, I don't remember reviewing the

1    invalidity contention.

2        Q.   Did you have any conversations with any of

3    the inventors on the patent?

4        A.   No, I had absolutely no conversations with

5    the inventors on the patent.

6        Q.   Would you think that speaking with one of

7    the inventors that are at Carnival could have shed

8    some light on the issues you opine on in your

9    declaration?

10            MR. MEDINA:   Objection.   Calls for

11        speculation.

12        A.   I don't know.

13     BY MR. SCHMIDT:

14        Q.   Did you ask to speak with any of the

15    inventors at Carnival about the issues in your

16    declaration?

17        A.   No, I did not ask to speak to the

18    inventors at Carnival.

19        Q.   Did you review any sworn statements by any

20    of the inventors on the patent?

21            MR. MEDINA:   Objection.   Vague.

22        A.   Well, I don't recall all the names of the

23    inventors, so I don't know if the RF designer is one

24    of the inventors on the patent that I reviewed parts

25    of his deposition.   That is the one I just

Page 23

1    mentioned.

2     BY MR. SCHMIDT:

3         Q.   Mr. Lam, correct?

4         A.   Mr. Lam.

5         Q.   But other than Mr. Lam, you didn't review

6    any other sworn statements of anybody else who might

7    have been an inventor on the patent, correct?

8         A.   I reviewed no sworn statements by other

9    inventors on the patent.

10        Q.   Did you look at any documents in this case

11   that had been produced by DeCurtis?

12             MR. MEDINA:   Objection.   Vague.

13        A.   Well, I looked at the DeCurtis Motion for

14   Summary Judgment and exhibits therein, so that would

15   cover the documents that I had looked at.   And if

16   that includes some of the other documents that you

17   mentioned before, then I had access to those.

18     BY MR. SCHMIDT:

19        Q.   Understood.

20             But other than the Motion for Summary

21   Judgment and the exhibits to the Motion for Summary

22   Judgment, you didn't look at any other documents

23   that DeCurtis produced in this case, correct?

24        A.   Correct.

25        Q.   Did you look at any wearable devices that

Page 24

```
 1    DeCurtis is alleged to have provided to others?
 2             MR. MEDINA:  Objection.  Vague.
 3        A.   I have not had the opportunity to examine
 4    any wearable devices that DeCurtis produced.
 5      BY MR. SCHMIDT:
 6        Q.   Okay.  And I take it examining a wearable
 7    device that DeCurtis produced wasn't important to
 8    the issues that you opined on in your declaration,
 9    correct?
10             MR. MEDINA:  Objection.  Misstates his
11        testimony.
12        A.   Well, I don't know what "important" means
13    here.
14      BY MR. SCHMIDT:
15        Q.   Well, did you think that examining a
16    DeCurtis-provided device was necessary for you to
17    form the opinions in Exhibit 1?
18             MR. MEDINA:  Objection.  Vague.
19        A.   Well, there are many opinions in
20    Exhibit 1, so I don't know how to answer that in
21    bulk.
22      BY MR. SCHMIDT:
23        Q.   Did you ask to analyze or examine a
24    DeCurtis-provided device at any time prior to
25    November 19?
```

Veritext Legal Solutions
866 299-5127

```
 1          A.    No, I did not.

 2          Q.    Why not?

 3                MR. MEDINA:  Hold on.  Hold on.

 4                So to the extent this calls for you to

 5          discuss or comment on the substance of

 6          communication with counsel, I'm going to

 7          instruct you not to answer.

 8                If you can answer that without, you know,

 9          disclosing the substance or communication, you

10          can do so.  But be mindful of that.

11          A.    (No audible response.)

12      BY MR. SCHMIDT:

13          Q.    Doctor, is there a reason why you didn't

14      ask to examine a DeCurtis-provided device prior to

15      submitting your declaration on November 19?

16                MR. MEDINA:  Same objection, same

17          instruction.

18          A.    I think that goes directly to my

19      conversation with counsel and my interaction with

20      counsel, and I can't answer that question.

21      BY MR. SCHMIDT:

22          Q.    Okay.  Turn to paragraph 15 of your

23      declaration, please.  I want to discuss now your

24      understanding of the legal principles.

25          A.    Okay.
```

Page 26

```
 1         Q.    In paragraph 15, you state, "I understand
 2    that the requirement of enablement enforces the
 3    essential 'quid pro quo of the patent bargain' by
 4    requiring that the patent's specification teach a
 5    person of ordinary skill in the art how to practice
 6    the full scope of the claimed invention without
 7    undue experimentation."
 8              Do you see that?
 9         A.    Yes, I do.
10         Q.    You understand that the enabling
11    disclosure that is required is a disclosure that has
12    to be present in the patent specification itself,
13    correct?
14              MR. MEDINA:  Objection.  Calls for, you
15         know, legal conclusion.
16              THE COURT REPORTER:  Doctor, you seem to
17         be muted.
18         A.    My understanding is based -- is stated
19    with my words on the page here, because I'm not a
20    lawyer and this comes from my learning about the
21    subject.
22              And so I'm going to have to go with my
23    wording, which is, you know, I understand that the
24    requirement of enablement enforces the essential
25    "quid pro quo of the patent bargain" by requiring
```

Page 27

```
 1   the patent's specification to teach a person of
 2   ordinary skill in the art how to practice the full
 3   scope of the claimed invention without undue
 4   experimentation.  That's what I understand.
 5     BY MR. SCHMIDT:
 6       Q.   Right.
 7            And you understand that the enabling
 8   disclosure is a disclosure in the patent
 9   specification, correct?
10            MR. MEDINA:  Same objection.
11       A.   No, I understand by requiring the patent
12   specification to teach a person of ordinary skill in
13   the art how to practice the full scope of the
14   claimed invention -- that's what I understand --
15   without undue experimentation.
16     BY MR. SCHMIDT:
17       Q.   Okay.  What role does information outside
18   the patent specification play, in your
19   understanding, in determining whether the invention
20   has been enabled?
21            MR. MEDINA:  Objection.  Calls for a legal
22       conclusion.
23       A.   Well, this is not my area of expertise, so
24   I -- my -- I'm really not -- I'm not competent to
25   define what the role inside and out of a patent is.
```

Page 28

```
 1    I just have to go by those words that I put down

 2    there, that the patent specification has to teach a

 3    person of ordinary skill in the art how to practice

 4    the full scope of the claimed invention without

 5    undue experimentation.

 6      BY MR. SCHMIDT:

 7      Q.    Let me clarify I'm not asking you to

 8    render a legal opinion or to characterize the law;

 9    I'm asking for your understanding of the law because

10    it's relevant to your analysis.

11      A.    Okay.

12      Q.    So in performing your analysis in this

13    case, what weight did you put on information outside

14    the patent but available to one skilled in the art

15    as it pertains to enablement?

16            MR. MEDINA:   Same objection.

17      A.    Well, again, it's very hard to assign a

18    weight to what I did, but I would say that I put

19    this patent specification and claims as the primary

20    consideration of a person -- to teach a person of

21    ordinary skill in the art.

22            And then I have to include practical

23    factors, you know, such as safety and things like

24    that to -- that relate to the actual use case in the

25    patent specification.
```

Page 29

1    BY MR. SCHMIDT:

2        Q.   What do you mean when you say you had to

3    include practical factors like safety and use case?

4        A.   Well, there are practical design factors

5    that influence enablement, and you can't make

6    something that is unsafe, right, and you don't ask

7    somebody to do that in a particular application.

8            But this is really vague.  I need to

9    actually go into detail.  It's a case-by-case thing.

10       Q.   Let's focus on the analysis you did in

11   this case.

12           What practical design factors did you take

13   into account in analyzing enablement?

14           MR. MEDINA:  Objection.  Vague.

15       A.   Well, I mean, in this particular case for

16   the '514 patent, Claim 11 -- we're going to talk

17   about that -- I have to consider as an enablement

18   discussion what I would think a POSITA would

19   consider in an enablement discussion, factors like

20   waterproofness, can you make it waterproof? -- you

21   know, we're on a ship -- things like that.  Other

22   factors, too.

23   BY MR. SCHMIDT:

24       Q.   Is waterproofing a requirement of Claim 11

25   of the '514 patent?

Page 30

```
1          A.    No, it is not, but it may be part of the
2     consideration.   There is a lot of factors you
3     consider in enablement, including the patent
4     specification and other factors.
5          Q.    What role did waterproofing play in your
6     enablement analysis?
7          A.    In this particular one --
8               MR. MEDINA:   Hold on.
9          A.    -- very minor.
10              MR. MEDINA:   Objection.
11         A.    -- very minor.   But you were asking what
12    other factors could influence it.
13      BY MR. SCHMIDT:
14         Q.    I was asking what factors did influence.
15              So what I'm interested in knowing is:
16    What are the practical use cases that you considered
17    as factors in rendering your enablement opinions in
18    this case?
19              MR. MEDINA:   Objection.   Vague.
20         A.    Okay.   So are we talking about the '514
21    patent, Claim 11?
22      BY MR. SCHMIDT:
23         Q.    We're talking about the analysis you did
24    in this case, sir.   You submitted a declaration --
25         A.    And I --
```

Page 31

1      Q.   -- and you mentioned to me that you

2  weighed some practical use case factors, and I would

3  like to know what those are.

4      A.   Okay.  So I need to define it down,

5  because if you look at my declaration, it's about

6  the -- it's about Patent '514, Claim 11, in my

7  enablement discussion.

8          So, okay, is that where we're going?

9      Q.   Your declaration addresses '514, Claim

10  11 --

11      A.   Okay.

12      Q.   -- and you mention that in forming your

13  opinions regarding enablement, you applied some

14  practical use case factors.

15      A.   Okay.

16      Q.   And I would like you to identify what

17  those factors are.

18      A.   Okay.  I have no problem with that, but I

19  just wanted to make sure we're talking about the

20  same thing.

21          Okay.  So let me go through the patent and

22  I will tell you those practical use case factors as

23  they are in the patent in the specification.

24      Q.   Were you done with your answer, sir?

25      A.   Yeah, I have to go through the patent

Page 32

1    specification and I can give you the use case

2    factors.  I can't do them off the top of my head.

3        Q.   So short of reading the 30-plus columns of

4    the patent specification, you are not able to

5    identify for me what -- the practical use case

6    factors you applied in performing your enablement

7    analysis in this case?

8        A.   Oh, I can identify a few of these factors,

9    but you said you wanted the practical use case

10   factors, which I assumed was all the use case

11   factors.  Do you want just a few of the use case

12   factors?

13       Q.   Why don't you identify the ones that you

14   can here without having to read the entire patent.

15       A.   Well, I think -- and this is some of them,

16   but there are many more -- if you read through the

17   patent, the device is made for working on a ship,

18   and so, therefore -- and it's to connect to a

19   network on a ship.

20            And so, therefore, I think you have use

21   case factors of, first of all, you've got to be able

22   to put the device out to sea, it's seaworthy, and

23   you have to make the device communicate to the

24   network, the BLE network on the ship.

25            And then you have factors of wearability.

Veritext Legal Solutions
866 299-5127

```
 1    So there's all kinds of descriptions in the patent,
 2    which I can get into detail in, in wearability and
 3    also usability, because you have to have people
 4    seamlessly use these devices and be dependent on
 5    them for various tasks that are defined in the
 6    patent on the ship.
 7           So to get into the detail of that, I have
 8    to go through the patent and see all the things they
 9    described.  But I think that's really the use case
10    of the devices.  That's what I remember.  There's
11    more in the patent.
12       Q.   How do these use cases influence an
13    enablement analysis?
14           MR. MEDINA:  Objection.  Vague.
15       A.   Well, as I mentioned in the declaration,
16    one consideration of the use case is that it has to
17    kind of replace a similar device that people are
18    used to, and so that's a size thing where you may
19    have them wear it as a watch, so that -- you have to
20    consider, you know, maybe the device has to be a use
21    case as a watch, it can't -- you know.  And so maybe
22    there are some tangible things about size and
23    watches and the other -- in that use case.
24           And sometimes it's better to make it
25    bigger so people don't lose it and they can have a
```

Page 34

```
 1   bigger battery life on their watch.  So that's -- I
 2   did mention that -- on their watch-like beacon
 3   device.  So that's one thing I mentioned inside the
 4   declaration.
 5        Q.   In your expert analysis in this case, did
 6   the use cases restrict the scope of subject matter
 7   that you felt needed to be enabled by the patent
 8   specification?
 9             MR. MEDINA:  Objection.  Vague.
10        A.   I don't understand that question.
11     BY MR. SCHMIDT:
12        Q.   Okay.  Well, in paragraph 15, you mention
13   that the enablement requirement requires the
14   "patent's specification teach a person of ordinary
15   skill in the art how to practice the full scope of
16   the claimed invention . . . "
17             Do you see that?
18        A.   Yeah.
19        Q.   Now, my question is:  When you considered
20   these use cases, did you consider these use cases as
21   something that would narrow the scope of the claimed
22   invention that had to be enabled?
23             MR. MEDINA:  Same objection.
24        A.   So I have to understand what you mean by
25   "the scope of the claimed invention."
```

Page 35

```
 1      BY MR. SCHMIDT:
 2          Q.    Well, let me ask you this, sir:  Did you
 3      consider the scope of the claimed invention in
 4      forming your enablement opinions in this case?
 5          A.    Well, I need to know what you mean --
 6      define by "scope of the claimed invention."  So are
 7      we talking about the claim language or are we --
 8      what are we talking about here?
 9          Q.    Claim language.
10              You understand that the claim defines the
11      metes and bounds of a patent invention, correct?
12          A.    Yes.  If we're talking about the claim
13      language, the written specification before the
14      claims does not define the scope of the claims.
15          Q.    Right.  The claims define the scope of the
16      invention, correct?
17          A.    Correct.
18          Q.    You understand that -- when you analyzed
19      enablement of Claim 11 of the '514 patent, you
20      understood that the requirement was that the
21      specification had to enable the full scope of
22      Claim 11, correct?
23              MR. MEDINA:  Objection.  Calls for a legal
24          conclusion.
25          A.    Say that again.
```

Page 36

1      BY MR. SCHMIDT:

2          Q.   When you formed your enablement opinions

3      in this case, did you consider the question of

4      whether the full scope of Claim 11 was enabled?

5               MR. MEDINA:   Same objection.

6          A.   Well, no.  I considered what a POSITA

7      would do -- what the -- I considered the claim

8      language in Claim 11, including all the components,

9      and I considered the size of a device that a POSITA

10     would make to realize -- that -- could make to --

11     that would make -- for that claim.

12              VIDEOGRAPHER:   Pardon me.  Really quick,

13          Doctor, could you tilt your camera down just a

14          titch.

15              THE WITNESS:   Okay.  Sorry.

16              VIDEOGRAPHER:   And then could you take

17          your boom mic and move it a little bit further

18          away from your mouth.  Yeah.  Thank you.

19              THE WITNESS:   Sure.

20     BY MR. SCHMIDT:

21         Q.   Now, Doctor, you kind of said two things

22     in that answer and the distinction between them is

23     important, so I'm going to drill into it.

24              You said that you considered Claim 11 and

25     all the requirements and then you considered what a

Page 37

```
 1   POSITA would make and then you changed that to could
 2   make, or maybe the other way around.
 3           So which one was it?  Did you consider
 4   what a POSITA would make or did you consider what a
 5   POSITA could make?
 6       A.   Okay.  For the enablement discussion, I
 7   considered what a POSITA would understand the
 8   constraints on the size of the device that could be
 9   made and the components described in Claim 11.
10   That's really what I did.
11           MR. MEDINA:  We've been going about an
12       hour now.
13           MR. SCHMIDT:  Actually, I think we're less
14       than a hour on the record, but let me just wrap
15       up this line of questioning and then we can
16       take a break.
17     BY MR. SCHMIDT:
18       Q.   So in considering whether or not Claim 11
19   was enabled, you did not consider whether the full
20   scope of Claim 11, as written, was enabled, correct?
21           MR. MEDINA:  Objection.  Vague.  Misstates
22       the witness's testimony.
23       A.   Again, I considered what a POSITA, you
24   know, could -- or I considered a POSITA would
25   understand the size of a device that could be made
```

Page 38

```
 1    under Claim 11 with all the components included.
 2    That's what I did.
 3       BY MR. SCHMIDT:
 4        Q.   And when you made that consideration, how
 5    did that influence your enablement opinions?
 6              MR. MEDINA:  Objection.  Vague.  Calls for
 7         a legal conclusion.
 8        A.   Yeah, I guess what are you asking?
 9       BY MR. SCHMIDT:
10        Q.   Well, let me back up.  Let me try to get
11    something straight first.
12              Do you have any opinion as to whether the
13    full scope of Claim 11 is enabled?
14        A.   Well, again, I'm going to say my opinion
15    is that a POSITA would understand that the size of
16    the device in Claim 11 is -- you know, is determined
17    by the consideration of the components inside
18    Claim 11.  That's what I understand.
19        Q.   Are you telling me that the device that's
20    claimed by Claim 11 -- well, strike that.
21              Are you telling me that Claim 11 is
22    limited to a device that a POSITA could build with
23    all the components?
24        A.   No, the --
25              MR. MEDINA:  Objection.  Hold on.
```

Page 39

1          Objection.  Vague, lacks foundation, and

2          misstates the witness's testimony.

3               MR. SCHMIDT:  I didn't misstate anything.

4          It was a question.  So if this is some effort

5          to coach the witness, then we're going to have

6          a problem with that.  All right?  It's a

7          question.  There wasn't any statement.

8      BY MR. SCHMIDT:

9          Q.  The question for the witness is:  Is it

10    your opinion that Claim 11 is limited in size to

11    dimensions that a POSITA could actually make and

12    build having all the recited components?

13               MR. MEDINA:  Objection.  Vague and calls

14          for a legal conclusion.

15          A.  I think that Claim 11 stands by itself,

16    and if you read Claim 11, those are the words of

17    Claim 11.

18               But we are talking about the statement of

19    Claim 11 and then we're talking about enabling.  And

20    the written words in Claim 11 are one thing and what

21    is enabled is another thing.

22               MR. MEDINA:  Are we still on the same line

23          of questions?

24               MR. SCHMIDT:  Yes.

25

1      BY MR. SCHMIDT:

2      Q.   Is there a difference between the written

3   words in Claim 11 and what is enabled?

4              MR. MEDINA:  Objection.  Vague.

5      A.   I guess I have to say my understanding is

6   there is.

7      BY MR. SCHMIDT:

8      Q.   So your understanding, just to clarify, is

9   that the scope of Claim 11 and the scope of what the

10   patent specification enables is different, correct?

11              MR. MEDINA:  Objection.  Misstates the

12          witness's testimony.

13      A.   No.  No.  My understanding is the

14   statement of Claim 11 or the specification -- the

15   claim language of Claim 11 is one thing, but that

16   what is enabled in terms of what a POSITA would

17   understand, you know, in terms of the size of a

18   device that could be constructed using the language

19   of Claim 11 and the components of Claim 11 and the

20   specification are a different thing.

21      BY MR. SCHMIDT:

22      Q.   Okay.  I think I understand.

23              Just to be -- just to close this out, you

24   haven't offered any limiting construction for

25   Claim 11, correct?

Page 41

```
 1        A.   I don't recall mentioning limiting in my
 2   disclosure at this time.
 3        Q.   And you are not opining that the scope of
 4   Claim 11 as written is limited to some minimum
 5   dimension, correct?
 6             MR. MEDINA:  Objection.  Vague.
 7        A.   I am -- well, we have to go into that.  I
 8   am opining that it is -- there is an inherent limit
 9   in the enablement of Claim 11 that a POSITA would
10   see and understand if they were asked to design a
11   device in Claim 11 with all the components.
12    BY MR. SCHMIDT:
13        Q.   And is it your testimony that this
14   inherent limit that you mentioned limits the scope
15   of the claim?
16        A.   No.  The scope of the claim is the scope
17   of the claim as it reads.
18        Q.   So your understanding of the law is that
19   the inherent limit is the limit on what needs to be
20   enabled, but then Carnival can read the claim onto
21   some device that goes beyond the inherent limit for
22   purposes of infringement.
23             Is that your understanding of the law?
24             MR. MEDINA:  Objection.  Calls for a legal
25        conclusion.
```

Page 42

```
 1          A.    No.  I don't understand that law.
 2     BY MR. SCHMIDT:
 3          Q.    Okay.  So do you understand that the
 4     inherent limit is a limit on the scope of the claim?
 5              MR. MEDINA:  Objection.  Calls for a legal
 6          conclusion.
 7          A.    No, I understand that inherent limit is
 8     set by what a POSITA -- POSITA could understand they
 9     could design given, you know, the size of the -- in
10     size for this particular claim of the device
11     described in Claim 1 -- Claim 11 with all the
12     components of Claim 11.
13              MR. SCHMIDT:  Okay.  Why don't we take a
14          break now, come back in about ten minutes.
15              MR. MEDINA:  Yeah, sounds good.
16              MR. SCHMIDT:  Can you open up a breakout
17          room for Mr. Kneitel and myself?
18              VIDEOGRAPHER:  Sure.
19              We're off the record.  It's 4:07 p.m.
20      (Recess was held from 4:07 p.m. until 4:18 p.m.)
21              VIDEOGRAPHER:  We're back on the record.
22          It's 4:18 p.m.
23     BY MR. SCHMIDT:
24          Q.    Welcome back, Doctor.
25              I want to turn to paragraph 19 of your
```

Page 43

1    declaration.

2         A.    Okay.

3         Q.    In paragraph 19, you state, "I also

4    understand that open-ended ranges may be supported

5    if there is an inherent, but not precisely known,

6    upper or lower limit," and then it goes on from

7    there.

8               Do you see that?

9         A.    Yes, I do.

10        Q.    First of all, Claim 11 of the '514 patent

11   recites an open-ended range, correct?

12        A.    Correct.

13        Q.    And you note here your understanding that

14   such an open-ended range may be supported if there

15   is an inherent limit, correct?

16        A.    Correct.

17        Q.    What is your understanding of an inherent

18   limit?

19        A.    Again, that's a very, very general sort of

20   statement.

21              I can say specifically what I understand

22   it is for this case, but that's kind of a

23   case-by-case sort of thing.

24              VIDEOGRAPHER:  Doctor, we're losing you a

25         little bit in the picture.

                                        Page 44

1           THE WITNESS:  Sorry.  Is that better?

2           VIDEOGRAPHER:  Yes.  Thank you.

3       A.   So, no, it's kind of a case-by-case sort

4   of determination or -- you know.  But please ask the

5   question again.

6     BY MR. SCHMIDT:

7       Q.   Sure.  I was just wondering what your

8   understanding of an inherent limit was in this

9   enabling context.

10      A.   Well, in the context of the '514 patent,

11  we're looking at the specific part of the claim

12  language, which I believe is Claim Element 1 -- I'm

13  not -- I have to check that -- where you say it's

14  open-ended.

15           That particular one, I understand that --

16  you know, I understand that -- well, there's two

17  different factors.  Are you understanding how it's

18  determined or are you understanding the factors that

19  are involved in it?

20      Q.   Let's start with the factors involved in

21  determining an inherent limit.

22           Can you identify for me the factors you

23  look to?

24      A.   Well, I think, first, in this particular

25  case, in '514, Claim 11, I think you look at the

Page 45

1    claim language first and all the elements of that

2    claim.

3           And then you look at, again, the

4    specification as it describes the use case of that

5    particular device.

6           And then if there are some other factors

7    that a POSITA would naturally know would be --

8    impact that device just from their common knowledge,

9    you would have to include those other factors,

10   like -- things like, you know, cost or something

11   like that could come in if it's impossibly

12   expensive, you know, if you do certain things.

13          So -- but the primary factors would be the

14   claim language in the specification.

15      Q.   You said the specification -- strike that.

16          You said the claim language, the elements

17   of the claim, the specification, the use case --

18      A.   Right.  But the use case is defined in the

19   specification.

20      Q.   Okay.  And then you mentioned the

21   possibility of other factors.

22      A.   Right, like cost could be a prohibitive

23   thing or there could be physical factors that are

24   impossible to deal with, right?  You know, you can't

25   make something that's arbitrarily small.

Page 46

1       Q.   Did any of those other factors like cost

2  or physical factors come into play in your analysis

3  in this case?

4            MR. MEDINA:  Objection.  Vague.

5       A.   Well, I think if you want to go through my

6  analysis, I can tell you that.  But I would go

7  through and look at Sections -- Opinion Sections 23

8  and I could tell you what factors that influence me.

9   BY MR. SCHMIDT:

10      Q.   Well, maybe I should ask a threshold

11  question.

12           In your expert analysis, did you identify

13  an inherent limit to the portable device of

14  Claim 11?

15           MR. MEDINA:  Objection.  Vague.

16      A.   I -- identify an inherent limit?  Do you

17  mean did I state a number?

18   BY MR. SCHMIDT:

19      Q.   Not necessarily a number.

20           Are you able to provide any specificity

21  about what an inherent limit for a portable device

22  as recited in Claim 11 would be?

23      A.   I can say that it has to be bigger than

24  zero size.

25      Q.   Anything else?

Page 47

1      A.   I can say -- well, that's absolute

2   minimum.

3           I can say, again, that -- you know, that I

4   feel that a POSITA would have to, you know,

5   understand that there was an inherent limit in the

6   size, determined by the claim elements and the

7   structure of the claim.  But I have not determined

8   that limit.

9      Q.   In paragraph 19, you say that for an

10  open-ended range to be supported, there would have

11  to be an inherent, but not precisely known, upper or

12  lower limit and the specification enables one of

13  skill in the art to approach that limit.

14          Do you see that?

15     A.   Yes.

16     Q.   But if you haven't determined what the

17  inherent limit is, how can you say whether or not

18  the specification enables one of skill in the art to

19  approach that limit?

20     A.   Well, we know the device could be made, so

21  then the question is, what is the limit on the

22  device.  In this particular case, I'm talking about

23  size of the device.

24          And my experience as a designer and

25  looking at the specification tells me that there is

1    a limit there, but I would have to, you know, work

2    on that and investigate that limit in order to find

3    that limit.  And I've just not been asked to do so.

4         Q.   Okay.  So just so I'm clear, as an expert

5    witness in this case, you have not been asked to

6    form or render any opinion as to where any alleged

7    inherent limit might exist for the portable wireless

8    device of Claim 11 of the '514 patent, correct?

9         A.   I have -- let me put it in my own words.

10   I have not been asked to find what is the inherent

11   limit that a POSITA would understand to be the limit

12   in size of the device made in Claim 11, including

13   all its components and considering the

14   specification, no.

15        Q.   Are you sure there even is an inherent

16   limit?

17        A.   My experience tells me -- and I have

18   extensive design experience -- yes, there's an

19   inherent limit if you consider everything in terms

20   of making a practical wearable device.  There is a

21   limit.

22        Q.   Is Claim 11 limited to a wearable device?

23        A.   I would have to read the claim language.

24             MR. MEDINA:  Calls for a legal conclusion.

25

                                            Page 49

```
 1      BY MR. SCHMIDT:
 2         Q.   You recite the claim language in paragraph
 3    24, so feel free to refer to it.
 4         A.   Did you say paragraph 24?
 5         Q.   Correct.
 6         A.   Okay.  What was the question again?
 7         Q.   The question is whether Claim 11 is
 8    limited to a wearable device.
 9              MR. MEDINA:  Same objection.
10         A.   It says that Claim 11 requires a portable
11    wireless device.
12      BY MR. SCHMIDT:
13         Q.   Do you interpret "portable wireless
14    device" to mean a wearable device?
15         A.   No, I do not.
16         Q.   Okay.  So if Claim 11 is not limited to a
17    wearable device, then why did you consider what an
18    inherent limit of a wearable device would be?
19         A.   I guess I considered the patent
20    specification -- I think the title of the patent.  I
21    have to go back to the patent.  But I read the
22    patent in its entirety.
23         Q.   Is there any principle of physics that
24    prevents a device from -- strike that.
25              Is there any principle of physics that
```

Page 50

1  precludes shrinking a device having all the

2  components of Claim 11 down below a certain

3  threshold?

4          MR. MEDINA:  Objection.  Vague.

5      A.   Okay.  You just asked me a very, very

6  difficult question.

7          Because I have background in integrated

8  circuit design and also wireless IC design and

9  packaging, I really would have to work through that

10 and go through a lot of thought, especially since

11 some of the requirements here for BLE and memory and

12 such are -- require fairly sophisticated chips to

13 put on that device.

14         So the answer is I don't think you can

15 shrink this device arbitrarily, but it would take

16 awhile to come up with what that limit is.

17 BY MR. SCHMIDT:

18     Q.   And I take it you haven't performed that

19 analysis as part of your expert opinions in this

20 case?

21     A.   No, I have not.

22     Q.   Would you agree with me that whatever that

23 scientific or physical limit is, a person of

24 ordinary skill in the art is going to have to engage

25 in undue experimentation in order to reach that

                                         Page 51

1    limit?  Would you agree with that, sir?

2              MR. MEDINA:  Objection.  Vague.  Calls for

3       a legal conclusion.

4         A.    Well, I would have to separate out two

5    limits here.  I'm not a person of ordinary skill in

6    the art, and that is not a limit I would expect them

7    to be able to hit, what I can do if I was given

8    infinite resources.

9              I would expect them to come up with a

10   easier -- much easier design limit where they would

11   understand, again, a full on understanding how to

12   put all the elements of Claim 11 into a device at a

13   certain size, and that would be their limit.

14             But they would use parts that would remove

15   the undue experimentation that I would require.  I

16   mean, what you are asking is would I invent a new

17   device that could do this arbitrarily small?  And

18   the answer is I could, but that's not what I expect

19   a person of ordinary skill in the art to do.  I

20   expect them to have a different limit than what I

21   could do.

22     BY MR. SCHMIDT:

23        Q.    I understand.

24             But you would agree with me that a person

25   of ordinary skill in the art could not reach that

Veritext Legal Solutions
866 299-5127

1   physical or scientific limit that you agree likely

2   exists for these types of devices, correct?

3        A.   Well, I don't think a person of ordinary

4   skill in the art can't reach zero.  That's the

5   smallest limit you've got.  They have their limit.

6        Q.   But I'm not asking about that limit right

7   now.

8        A.   Right.

9        Q.   Let me back up.

10        You agree with me that there is a physical

11   or scientific limit to how small a device according

12   to Claim 11 can be made, correct?

13        MR. MEDINA:  Objection.  Vague.

14        A.   Well, I guess, you know, again, this gets

15   into, you know, enablement.  And we're talking about

16   inherent limits where I think there -- how would I

17   put this? -- I think that the POSITA limit, which is

18   what they would do with all the consideration of the

19   claims, they also, of course -- their enable limit

20   would also consider the use case and the

21   specification would be different than my limit if I

22   don't consider the use case.

23        So in my limit that you are asking me for

24   what I can make on that claim, I'm not considering a

25   use case.  I'm not considering the application as a

Page 53

1    wearable device on a ship.  So my constraints are

2    different.  I'm just trying to miniaturize like

3    crazy.  I'm not making a wearable device.

4      BY MR. SCHMIDT:

5        Q.   Sure, and that's all I'm asking you about

6    now.

7             You agree that just miniaturizing like

8    crazy, like you put it, you can shrink down a device

9    meeting all the limitations of Claim 11, but only to

10   some physical or scientific limit, correct?

11       A.   Yeah, I would agree with that.

12       Q.   And you would agree that a person of

13   ordinary skill in the art, as you have defined such

14   a person, couldn't build such a device, right?

15       A.   They have their limit, which would be, you

16   know, within their capability of understanding their

17   field and their -- you know, and their profession

18   and their understanding of the claim and

19   understanding of the application and the use case of

20   the device.  So they wouldn't build that device.

21       Q.   Not only wouldn't they build the device,

22   they couldn't build the device, right, sir?

23       A.   No, I don't think they could build the

24   device that I could build.

25       Q.   Let's turn to paragraph 26 of your

Page 54

1    declaration.

2         A.    Okay.

3         Q.    In paragraph 26, you say, "It is my

4    opinion that the patent specification of the '514

5    patent, read from the perspective of one skilled in

6    the art, teaches how to design a device that meets

7    all of the claim limitations recited in Claim 11."

8              Do you see that?

9         A.    Yeah.

10        Q.    All you're saying there is that a person

11   of skill in the art can reach some dimension that's

12   within the scope of the claim, right?

13        A.    Well, I don't even think I mention

14   dimensions; I just say it tells you how to design

15   the device that meets the claim limitations.

16             But, of course, they have to be -- the

17   claim -- it has to be 2.5 inches or less.

18        Q.    And what you are saying in paragraph 26 is

19   just that a person of ordinary skill in the art can

20   build a device that's at least 2.5 inches in a

21   dimension, correct?

22             MR. MEDINA:  Objection.  Vague.

23        A.    Well, I say, yeah, that the person --

24   knowledgeable POSITA would understand that they

25   could have a device having all dimensions equal or

Page 55

1   less than 2.5 inches, okay, and, of course, the body

2   thickness equal to or smaller than 5/8 of an inch.

3      BY MR. SCHMIDT:

4      Q.   Okay.   What did you rely on in rendering

5   this opinion that a person of ordinary skill in the

6   art could design some device that meets all the

7   limitations of Claim 11?

8      A.   I actually looked at the specification of

9   the patent.

10     Q.   Did you consider any devices that existed

11  out in the art?

12           MR. MEDINA:   Objection.   Vague.

13     A.   Well, that's a difficult question to

14  answer directly because I'm so involved in the art

15  every day helping people do design.   I have, you

16  know, 40 design teams of 2 seniors every semester,

17  and every day I help them do design.   So, you know,

18  I'm very aware of what's out there in the art.

19     BY MR. SCHMIDT:

20     Q.   And you know, for example, sir, that

21  devices with the sorts of features recited in

22  Claim 11 and less than 2.5 inches and 5/8 of an inch

23  in thickness are common in the art, correct?

24     A.   Well, there are particular features in

25  this device that are less common, but I've seen the

Page 56

1    features of these devices in various combinations.

2    But those particular dimensions with those

3    particular features, this is the first case.

4              And there are some specific features in

5    terms of communication that are specific to my

6    seeing this kind of thing, like, you know, BLE and

7    NFC in the same claim.  So I haven't seen them all

8    combined like this claim.

9         Q.   You've never seen a portable wireless

10   device with both BLE and NFC capabilities before?

11        A.   I have seen one, but I haven't seen

12   them -- oh, I can't say that.  I don't remember

13   seeing the BLE capability in that device.  Some of

14   them have Bluetooth.  And I don't remember seeing

15   all these things done in this dimension.

16        Q.   I was a little unclear from your answer.

17             Have you seen a portable wireless device

18   with both BLE and NFC capabilities in the art prior

19   to this case?

20        A.   No, I don't think I have.  That

21   combination I have not seen, not with this size.

22        Q.   Have you seen a portable device with a

23   combination of BLE and NFC capabilities in any size?

24        A.   I have seen a -- just recently an

25   announcement of a device which can take an NFC

Veritext Legal Solutions
866 299-5127

```
 1    antenna and runs Bluetooth, but I don't think it

 2    runs BLE, just about a month ago.

 3         Q.   What device is that?

 4         A.   I think I saw it as Particle Industries

 5    devices, but it's recently announced.  It had a -- I

 6    think it had a connection for an NFC antenna.

 7         Q.   Have you seen devices with a processor and

 8    memory in dimensions less than 2.5 inches?

 9         A.   Oh, yeah.

10         Q.   So there's nothing novel or inventive

11    about a device having processor or memory packaged

12    in a portable device less than 2.5 inches, correct?

13         A.   No, that is not novel.

14         Q.   Is there anything novel about a device

15    having a processor and memory and a BLE antenna

16    packaged within a device less than 2.5 inches?

17              MR. MEDINA:  Objection to the extent this

18         calls for a legal conclusion.

19         A.   I'm going through my memory.  When you're

20    asking me these questions, I'm -- actually have to

21    dig through it.

22              Say -- please ask the question again.

23      BY MR. SCHMIDT:

24         Q.   Sure.

25              Is there anything novel or inventive about
```

Page 58

1    a portable device having processor, a memory, and a

2    BLE antenna, all packaged within a dimension less

3    than 2.5 inches?

4              MR. MEDINA:  Same objection.

5         A.   I don't know.  I don't know if I've seen

6    that device.  So I don't know if I've seen one with

7    that -- there are fewer BLE devices out there, so I

8    don't know.

9      BY MR. SCHMIDT:

10        Q.   Would it be within the skill of a person

11   of ordinary skill in the art to package a device

12   with processor and memory and a BLE antenna in a

13   dimension less than 2.5 inches?

14        A.   Yes.

15        Q.   Would it be within the ordinary skill --

16   strike that.

17             Would it be within the capabilities of a

18   person of ordinary skill in the art to package a

19   device with processor, memory, a BLE antenna, and an

20   NFC antenna into a dimension less than 2.5 inches?

21        A.   Yes.

22        Q.   Is there anything in Claim 11 that you

23   believe would be outside the capabilities of a

24   person of ordinary skill in the art?

25             MR. MEDINA:  Objection.  Vague.

Page 59

```
 1        A.    Can I look at the claim again?
 2     BY MR. SCHMIDT:
 3        Q.    Sure.
 4        A.    Okay.  Can you please ask that question
 5     again?
 6        Q.    Sure.  I might change the wording a little
 7     bit.
 8              Is there anything in Claim 11 that you
 9     believe would be outside the ordinary knowledge of a
10     person of ordinary skill in the art?
11              MR. MEDINA:  Same objection.  Vague.
12        A.    Okay.  My strength is in hardware, and I
13     can see that a POSITA could realize the portable
14     wireless device comprising a body having a fully
15     enclosed cavity in dimensions equal to or smaller
16     than 2.5 inches and less than 5/8 of an inch, a
17     processor, a memory, a battery, and first and second
18     wireless communication antennas in the cavity, and
19     then, you know, the -- I can see the communications
20     antenna configured for Bluetooth and NFC and the
21     processor configured to make links between remote
22     devices using first communication antenna configured
23     for BLE communications.  I can see that.  You are
24     getting beyond what I know about when you talk about
25     private identifiers.
```

Veritext Legal Solutions
866 299-5127

```
 1              So I can see the physical hardware can be
 2    done by a POSITA.
 3      BY MR. SCHMIDT:
 4      Q.    Okay.  So would you agree with me, sir,
 5    that reading Claim 11 from the beginning all the way
 6    up to the recitation of the private identifier, at
 7    least all of that claim would be common knowledge to
 8    a person of ordinary skill in the art?
 9      A.    Well, I believe that -- I don't know if
10    that would be common knowledge to a person of
11    ordinary skill in the art, but I think a person of
12    ordinary skill in the art could do that given a look
13    at the specification of the patent.
14      Q.    In the portion of the claim I identified
15    for you, from the beginning all the way up to the
16    private identifier, is there anything in that
17    portion of the claim that you could identify that
18    would be outside common knowledge to a person of
19    ordinary skill in the art?
20              MR. MEDINA:  Objection.  Vague.
21      A.    Well, I think that a person of the --
22    ordinary skill in the art would use the literature
23    and the available pieces and parts out there.  So if
24    you allow them to -- you know, to use what's
25    available, you know, and get some help from, you
```

Page 61

1  know, spec sheets like NXP, like we've already

2  talked about, I think -- and the TI NFC

3  communication specifications and also the patent

4  specification itself, I think that is possible for

5  the person of ordinary skill in the art to do all

6  the stuff, as you mentioned, up to the -- you know,

7  the public and private identifiers.

8    BY MR. SCHMIDT:

9    Q.   Let me ask it this way:  Prior to the '514

10  patent, a person of ordinary skill in the art would

11  have been aware that portable wireless devices

12  existed, correct?

13    A.   Sure --

14    Q.   Prior --

15    A.   -- yes.

16    Q.   Prior to the '514 patent, a person of

17  ordinary skill in the art would have been aware that

18  portable wireless devices with a body existed,

19  correct?

20    A.   Yes.

21    Q.   Person of ordinary skill in the art, prior

22  to the '514 patent, would have been aware that

23  portable wireless devices with a body in a fully

24  enclosed cavity existed, correct?

25    A.   Yes.

Veritext Legal Solutions
866 299-5127

1      Q.   Prior to the '514 patent, a person of
2   ordinary skill in the art would have been aware that
3   a portable wireless device with a body in a fully
4   enclosed cavity and all dimensions less than
5   2.5 inches existed, correct?
6      A.   Yes.
7      Q.   A person of ordinary skill in the art,
8   prior to the '514 patent, would have been aware that
9   a portable wireless device with all those features I
10   just mentioned existed with a processor and a memory
11   within it, correct?
12      A.   Yes.
13      Q.   Prior to the '514 patent, a person of
14   ordinary skill in the art would have known that BLE
15   antennas existed, correct?
16      A.   I'm just -- it takes me awhile to think
17   about when BLE came out.  I think so.
18      Q.   Right.  Carnival didn't invent --
19      A.   No, I think it was there, yeah.
20      Q.   A person of ordinary skill in the art,
21   before the '514 patent, would have understood that
22   NFC antennas already existed, correct?
23      A.   That is true.
24      Q.   Carnival didn't invent NFC, right?
25      A.   No, they did not.

Page 63

1    Q.   Let's turn to paragraph 28 of your

2    declaration.  And I want to direct you to the second

3    sentence in paragraph 28.  For the record, this

4    sentence reads, "In the context of a wearable device

5    intended to be worn or carried by a person, it is

6    often the case that one would be inclined to make

7    the largest device possible that would be acceptable

8    for that use case because the increased size allows

9    for the greatest design flexibility."

10          Do you see that?

11    A.   Yes, I do.

12    Q.   How does the inclination of a person of

13    ordinary skill in the art make the largest device

14    possible acceptable for use case, how does that

15    inclination affect your enablement opinions in this

16    case?

17    A.   I guess I don't understand the question.

18    I mean, it affects my design, my idea of doing

19    design for this thing if I was to build one.

20          But enablement is a different -- well,

21    could you clarify your question?

22    Q.   Well, I'm really just trying to understand

23    why this sentence is in paragraph 28, because you

24    start paragraph 28 by saying, "DeCurtis' focus on

25    near-zero dimensional values misses the point."

Page 64

```
 1              Do you see that?
 2       A.   Right.
 3       Q.   And then you say, "A POSITA tasked with
 4  designing a portable wireless device must consider
 5  many design attributes or specifications."
 6              Do you see that?
 7       A.   Right.
 8       Q.   And then you go into the sentence that I
 9  started this line of questioning on.
10              So what I'm trying to understand in your
11  words is how does the inclination of a person of
12  ordinary skill in the art relate to the enablement
13  question that's really at issue here in paragraph
14  28?
15       A.   Well, their context on the enablement, you
16  know, and making a prototype, their ability to
17  understand the size that you can make the device,
18  you know, including all the components in Claim 11
19  is also driven by, again -- I was thinking the
20  specification does do something in terms of -- to
21  me, maybe not to the claim -- but to me in terms of
22  the wearable -- you know, the wearable device, that
23  they're going to see that you make a device that
24  somebody is going to wear or use, and if you can use
25  the largest possible size for that thing, then you
```

Page 65

1    can drastically sometimes lower cost and up your

2    manufacturability and have a much easier time and

3    use easier technologies, more off-the-shelf parts.

4            So it makes it -- the design flexible and

5    easier.  That's what I'm just trying to say, that

6    it's kind of a nice thing for a designer to make the

7    big device.  It makes their life easier.

8        Q.   Is it your opinion that all that

9    enablement requires for Claim 11 is that the

10   specification provide enough disclosure to practice

11   a device that a person of ordinary skill in the art

12   would be inclined to make?

13       A.   No.  I think it has to disclose enough so

14   the person with ordinary skill in the art can see

15   and understand what the limitation in size is and

16   also the use case for the device, and then that use

17   case or that -- the person can be driven by whatever

18   design specifications they're given, you know, as

19   part of their job.

20       Q.   You said that the patent specification has

21   to disclose enough so that the person of ordinary

22   skill in the art can see and understand what the

23   limitation in size is and also the use case for the

24   device, right?

25       A.   Yeah, in the sense that it adds something

                                          Page 66

1   to the claim language.

2        Q.   And based on your expert analysis in this

3   case, what is that limitation in size and the use

4   case for Claim 11 of the '514 patent?

5        A.   Okay.  I've already -- well, you said I

6   did not determine the limitation in size except for

7   the absolute lowest limitation, which is zero, so I

8   can't answer that.

9             What was the other part of the question?

10       Q.   Sure.

11            Did you make any effort to determine what

12   the use case for Claim 11 of the '514 patent was?

13       A.   Well, I looked at the specification and I

14   interpreted the use case as, you know, a use case of

15   a device that was on a ship that substituted as a

16   wristwatch, was a beacon, could be substituted as a

17   pendant or a bracelet, looking at the figures inside

18   the patent.

19       Q.   Is it your opinion that all these use case

20   requirements add limitations to the claim?

21       A.   I think --

22            MR. MEDINA:  Objection.  Calls for a legal

23       conclusion.  Sorry.

24       A.   I think that one would say that they're

25   embodiments of the claim.

Page 67

```
 1              I would have to read the patent
 2    specification and -- you know, and see exactly what
 3    it said, but I think that the patent, in light of
 4    the specification, the limitations are basically
 5    determined by the judge in the case.
 6      BY MR. SCHMIDT:
 7        Q.   Well, regardless of whether they limit the
 8    claim, you considered things like the device having
 9    to be on a ship --
10        A.   Right.
11        Q.   -- that could be substituted for a
12    wristwatch and being able to be used in a pendant or
13    bracelet, you considered these factors as relevant
14    to the scope of enablement that you felt had to be
15    provided, correct?
16        A.   Yes, I figure these factors are part of
17    the inherent limit the POSITA would do -- would find
18    when they were trying to understand, you know, the
19    size limitation, you know, of Claim 11 with all the
20    components included.
21        Q.   And if it was theoretically possible to
22    build an even smaller device outside the ship or
23    wristwatch or pendant or bracelet context, that
24    theoretical capability isn't relevant to your
25    enablement analysis; is that fair?
```

Page 68

```
 1        A.    I have not considered that as part of my
 2   enablement analysis.  I don't know whether it's
 3   relevant or not, but it's not been part of my
 4   analysis.
 5             MR. SCHMIDT:  Okay.  Why don't we take our
 6        second break.
 7             MR. MEDINA:  Ten minutes or how long,
 8        Patrick?
 9             MR. SCHMIDT:  Ten minutes.
10             MR. MEDINA:  Okay.
11             VIDEOGRAPHER:  We're off the record.  It's
12        5:08 p.m.
13      (Recess was held from 5:08 p.m. until 5:20 p.m.)
14             VIDEOGRAPHER:  We're back on the record.
15        It's 5:20 p.m.
16     BY MR. SCHMIDT:
17        Q.    Welcome back, Doctor.
18             Take a look at paragraph 24 of your
19   declaration where you recite the claim language of
20   Claim 11.
21        A.    Okay.
22        Q.    My question is:  In forming your expert
23   opinions in this case, did you understand all the
24   elements of Claim 11?
25        A.    I understand the elements of Claim 11.
```

Page 69

```
 1        Q.   Do you agree that the elements of Claim 11

 2    have a plain and ordinary meaning?

 3            MR. MEDINA:  Objection.  Outside the

 4        scope.

 5        A.   That is -- okay, that's an interesting

 6    question.

 7            A plain and ordinary meaning to me may not

 8    be a plain and ordinary meaning to somebody who is,

 9    you know, not a practitioner.  So what do you mean

10    by "plain and ordinary meaning"?

11     BY MR. SCHMIDT:

12        Q.   Well, what I really wanted to know was are

13    there any elements of Claim 11 that you think need

14    to be construed before you could consider the

15    enablement question?

16            MR. MEDINA:  Objection.  Calls for a legal

17        conclusion.

18        A.   I have not thought about claim

19    construction or claim term definition or anything

20    like that, so I would have to sit back and look at

21    this and think about it.  That's a whole 'nother can

22    of worms.  I haven't thought about it at all.

23     BY MR. SCHMIDT:

24        Q.   But you've rendered opinions regarding

25    enablement for Claim 11, correct?
```

Page 70

```
 1        A.    I've rendered opinions based upon my
 2   understanding of what a POSITA would understand what
 3   the language is.  That is how I did it.
 4            I don't know -- I mean, again, I'm coming
 5   at this from a lot of experience, and I would -- I'm
 6   rendering my opinion on what I think my students
 7   would understand this language is.
 8            But that may not be the language that the
 9   Court construes in a Markman hearing for what this
10   means.  I've often been -- my language is often
11   different than other language, but I can tell you
12   what it means to me.
13        Q.    Right.
14            And the fact that the Court hasn't
15   construed any of the terms of Claim 11 of the '514
16   patent, that didn't affect your ability to render an
17   enablement opinion in your declaration, correct?
18        A.    No, it did not, because I used the, as you
19   say, common -- I didn't use common, I used the
20   language that an electrical engineer would use or a
21   computer engineer would use to understand what this
22   means.
23        Q.    Okay.  Thank you.
24            Can you turn to paragraph 30 of your
25   declaration, please.
```

Page 71

1          A.    Okay.  I'm there.

2          Q.    And in Claim [sic] 30, you articulate some

3     of the considerations that a POSITA would take into

4     account when designing a portable wireless device;

5     is that right?

6          A.    Yes.

7          Q.    And are these considerations that a POSITA

8     would take into account in designing the portable

9     wireless device recited in Claim 11 of the '514

10    patent?

11         A.    Yes.

12         Q.    The considerations you mention are "use

13    case, whatever specifications are mandated by that

14    use case, and possibly other manufacturing-related

15    considerations to design a device."

16              Do you see that?

17         A.    Yes, I do see that.

18         Q.    What do you mean by "whatever

19    specifications are mandated by that use case"?

20         A.    So let's take an example.  If I feel that

21    the specification is for use inside a cruise ship,

22    then the specification would be -- one of the

23    specifications -- there's many -- would be

24    communication throughout that cruise ship.  So I

25    would be interested in what is the range of

Page 72

1    communication and what is the range -- you know, and
2    also inside that cruise ship, so inside a mock
3    cruise ship.
4            Range is affected by reflections and all
5    kinds of -- and RF interference, so you would have
6    to kind of understand how far you needed to
7    communicate and then you could design the
8    appropriately sized device battery for that, or you
9    would have to decide -- understand how long you
10   wanted the device to work without changing batteries
11   or being serviced and then you would have to design
12   for that specification.
13           And that is affected by the range that it
14   has to communicate.  So there are these -- and also
15   the environment that it's in, whether there's, you
16   know, again, reflections, whether there's a lot of
17   devices operating in an area or a few devices
18   operating in an area, whether it opens a door, which
19   may be able to have a shorter range to communicate,
20   or it opens -- you know, it does something which
21   needs a longer range, like you -- a beacon to tell
22   somebody you're falling overboard or something like
23   that, we may have to operate a longer range.
24           So the specifications come out of the use
25   case and then the device has to work along those

Page 73

1    specifications.

2        Q.   And you would agree, sir, that different

3    cruise ships -- if you're in the cruise context,

4    different cruise ships might have different

5    requirements, which would lead to different

6    considerations in designing this device, correct?

7             MR. MEDINA:   Objection.   Vague.

8        A.   Well, I've only been on one cruise

9    recently, which -- in the last, say, 20 years, so

10   it's speculation about what's on cruise ships.

11            But I can talk about my experience of

12   designing for different environments, and, yes, I

13   believe that specifications change with the

14   expectation of what's supposed to happen in that

15   environment, which is somewhat set by management, as

16   well as by customers.

17            So there's a real -- yeah, so, I guess I'm

18   speculating -- and I don't like doing that -- but

19   I'm speculating that there could be a difference in

20   what is needed in various applications of the

21   device.

22     BY MR. SCHMIDT:

23       Q.   These considerations that you list here in

24   paragraph 30 are considerations that you contend

25   help define the inherent limit of the claim,

Page 74

1    correct?

2        A.    That is correct.

3        Q.    So is it the case, sir, that what the

4    inherent limit for Claim 11 is depends on the

5    particular subjective specifications of any given

6    designer seeking to implement the device?

7            MR. MEDINA:   Objection.   Vague.

8        A.    Well --

9            MR. MEDINA:   Calls for a legal conclusion.

10       A.    I hate to say, you know, subjective

11   specifications, but I really do think it comes down

12   to what is -- the environment and the application

13   that it's being used for, and that environment and

14   application specification does change with what you

15   are doing with the device.

16           So, yes, I think if you have multiple use

17   cases, you may have different inherent limits on how

18   a POSITA would understand the size that you can make

19   the device from Claim 11.

20           And, you know, I can just give a case

21   where I have a device that has to broadcast 300 feet

22   and it has to last, you know, a month could be a

23   fair amount larger than a device that had to

24   broadcast 5 feet and had to last, you know, a day in

25   terms of battery usage.

1           So that's where the inherent specification

2     is -- the use case does affect how you actually put

3     what's inside that device.

4       BY MR. SCHMIDT:

5        Q.   And different designers seeking to

6     implement a device according to Claim 11 might have

7     different inherent limits based on the

8     considerations of their system, correct?

9              MR. MEDINA:  Objection.  Vague.  Calls for

10          speculation.

11        A.   Well, again, I don't know what different

12     designers are going to see, but it is possible that

13     different use cases define -- come with different

14     specifications and those specifications require

15     different minimal designs or small design.  They

16     have different size of minimal designs.

17       BY MR. SCHMIDT:

18        Q.   And, therefore, the inherent limit would

19     change based on the designer seeking to implement

20     the system, right?

21              MR. MEDINA:  Objection.  Calls for a legal

22          conclusion.

23        A.   Well, I guess it comes down to -- and this

24     is where I'm not strong -- is what is the legal

25     definition of "inherent limit."

Page 76

```
 1              So is the inherent limit of the device the
 2    minimum size of all of these particular
 3    specifications or is it an inherent limit for each
 4    device?  And that's beyond my legal understanding.
 5      BY MR. SCHMIDT:
 6      Q.   Well, what understanding did you apply in
 7    forming your expert opinions?
 8      A.   I understood that these devices -- the use
 9    cases of these devices created an inherent limit to
10    how small they could be made, but I -- and that's as
11    far as I understand it.
12      Q.   What use cases specifically did you
13    understand created an inherent limit for this
14    particular claim?
15      A.   The use cases in the specification of the
16    '514 patent.
17      Q.   I would like you now to give me as much
18    specificity around those use cases that you used in
19    conceptualizing the inherent limit in this case.
20              MR. MEDINA:  Vague.
21      A.   Yeah, I don't -- what do you mean by
22    "specificity"?
23      BY MR. SCHMIDT:
24      Q.   Well, you've opined that there's an
25    inherent limit based on use case, right?
```

Page 77

```
 1         A.    Right.

 2         Q.    And you told me that your understanding

 3   was that there were certain elements of the use case

 4   that contributed to that inherent limit, right?

 5         A.    Right.

 6         Q.    I would like to know with as much

 7   specificity as you can provide here what those

 8   elements of the use case are that contributed to

 9   your understanding of an inherent limit?

10         A.    Okay.  So I can -- okay, so I'm

11   understanding what you are saying now.

12               Okay.  So I can't cover all of them

13   because I have -- I'm not in the design space there,

14   but I can understand -- first of all, you want to

15   know -- well, I mentioned one, range.  You want to

16   know how far you want to transmit, and you need to

17   know that for both your devices.

18               You need to know how strong the other side

19   is, how good the receiver and how good on the other

20   side -- transmitter on the other side, because that

21   can change your design.

22               You need to know how long you want your

23   device to last without changing batteries.  That's a

24   very important specification.

25               You need to know the data rate that you
```

Page 78

```
 1    need to output data.  So you're communicating both
 2    with, you know, NFC and with Bluetooth, and that
 3    data rate in the communications is an important
 4    thing because that takes energy, depending on how
 5    much data you transmit.
 6            You need to know if you're going to use
 7    encryption or not, because that also consumes energy
 8    while you encrypt your data to go back and forth.
 9            You need to know the states of the device.
10    It gets very complicated, but if you read the
11    patent, there's multiple states of the device.  So
12    you have a sleep state and you have kind of a beacon
13    state and you have a wide awake state, and you need
14    to know how often they're going to be in those
15    states, because they have different energy
16    requirements.  They, basically, consume different
17    amounts of energy over time, and so that also puts a
18    requirement on your battery depending on how you
19    want to run those states.
20            You need to know your signaling and --
21    because you are moving data probably in packets, so
22    you need to have some sort of error correction and
23    you need to know how much -- how much you need to do
24    on that.
25            You need to know the latency.  That's a
```

Veritext Legal Solutions
866 299-5127

1   very important thing we design with, which is how

2   much do you need to wait between when the device

3   actually says something and gets a response or how

4   long you need to wait between somebody says "Wake

5   up, device," and the device wakes up.

6              These are, you know, kind of normal

7   things.

8              And then, as I said, you know, for range

9   and such, you need to know the design and how well

10  you can, you know, stop interferers, who can scrub

11  your RF, and so you need to know something about

12  your RF design and how much power you need to put in

13  there to make the transmitter work.

14             These are -- there's numerous things.

15             And, of course, there's the memory size

16  and how much data you want to put on the memory and

17  that kind of thing, and the program size and how

18  much data you need to put in a program.

19             And it just keeps going on and on.  So you

20  have a fair number of considerations and you have to

21  kind of go forward.

22       Q.   Now, in performing your enablement

23  analysis in this case, in conceptualizing the

24  inherent limit that you mentioned, what design did

25  you consider for purposes of all these

                                        Page 80

```
 1    considerations that you just articulated?
 2              MR. MEDINA:  Objection.
 3         A.   Oh, I -- I mean, I -- say that question
 4    again.  What design?
 5      BY MR. SCHMIDT:
 6         Q.   Sure.  So let me try to break it down.
 7              You just mentioned a number of factors
 8    that affect where the inherent limit for a
 9    particular design might lie, right?
10         A.   Correct.
11         Q.   And for a different design, those factors
12    would be different and, therefore, the inherent
13    limit might lie in a different place, correct?
14         A.   Correct.
15         Q.   So in applying this principle for purposes
16    of your enablement opinions, how did you take into
17    account all these considerations?  What design did
18    you have in mind --
19              MR. MEDINA:  Objection.
20      BY MR. SCHMIDT:
21         Q.   -- in conceptualizing the inherent limit?
22              MR. MEDINA:  Sorry.  Objection.  Compound
23         and vague.
24         A.   Well, I mean, I kind of started with --
25    it's easy to start with an existing design, so I
```

Page 81

1    started with the design specification and then I,

2    you know, looked at, you know, what you could do,

3    particularly with the antennas, to shrink them.

4              The other elements are -- except for the

5    battery are a bit less critical in terms of

6    shrinking.  The battery is really a difficult one.

7    You have to have sufficient battery to make the

8    things usable.

9              So it's actually, you know -- I would -- I

10   would say that I haven't really gone through all the

11   elements one by one -- and I've said that before, I

12   have not calculated the inherent limit -- but I

13   would have to go through that and my understanding

14   of processors and, you know, RF antennas and power

15   amplifiers and memory and sizes and stuff and I

16   could work that out.

17             But, clearly, there are a lot of factors

18   that go into this inherent limit.  It's not just

19   antenna size.

20     BY MR. SCHMIDT:

21     Q.   Have you undertaken any analysis to figure

22   out what the inherent limit would be for the use

23   case in Carnival's commercial embodiment of their

24   '514 patent?

25             MR. MEDINA:  Objection.  Vague.

```
 1        A.   I have not performed an inherent limit

 2   analysis on Carnival's use case of the -- of any

 3   Carnival device.

 4             VIDEOGRAPHER:  Pardon me.  Doctor, could

 5        you tilt your camera down one more time?

 6             THE WITNESS:  Sorry.  I'm slinking.

 7             VIDEOGRAPHER:  Thank you.

 8     BY MR. SCHMIDT:

 9        Q.   Have you undertaken any analysis to

10   determine what an inherent limit would be for the

11   use case in the accused products?

12        A.   As I've mentioned before, I have not

13   seen -- or maybe I briefly looked at it, but I

14   really have not examined the accused products, nor

15   have I examined physically or the paperwork for

16   the -- the documents for the accused product.  So,

17   no, I have no idea what the inherent limit is there.

18        Q.   Is it possible that the accused devices

19   have a use case that requires a much smaller size

20   than the inherent limit of Carnival's embodiment,

21   for example?

22             MR. MEDINA:  Objection.  Calls for

23        speculation.

24        A.   Since I have no idea what the use case for

25   the accused product is, I can't guess whether that's
```

Page 83

```
1    possible or not.  I have no idea.
2      BY MR. SCHMIDT:
3         Q.    Okay.  If you go back to paragraph 19 of
4    your declaration.
5         A.    Uh-huh.
6         Q.    The test for enablement, sir, is whether
7    the specification enables one of skill in the art to
8    approach the inherent limit, correct?
9         A.    Yeah, I say that the inherent limit is not
10   precisely known, upper or lower limit, and the
11   specification enables one of skill in the art to
12   approach that inherent limit.
13        Q.    So to be enabled, the specification has to
14   allow a person of ordinary skill in the art to
15   approach the inherent limit wherever it may be;
16   fair?
17        A.    Well, I wouldn't add the "wherever it may
18   be," but I would just say it allows one of skill in
19   the art to approach that limit.  I don't know where
20   it's going to be.
21        Q.    I guess what I'm struggling with is if the
22   inherent limit is defined by the use case based on
23   all of the information you set forth -- well, strike
24   that.
25               I think we established before the inherent
```

Page 84

```
 1    limit might be in different places based on all the

 2    considerations that you articulated already in the

 3    deposition, right?

 4         A.   Yeah, for a different use case, you may

 5    have a different inherent limit.

 6         Q.   So how do we know whether this claim is

 7    enabled?  Does the enablement inquiry turn on the

 8    use case?

 9              MR. MEDINA:  Objection.  Compound.  Calls

10         for legal conclusion.

11         A.   This one I guess I'm going to have to

12    refer to the judge and you guys, the lawyers.  I --

13    you got me there.  That's beyond my knowledge.  But

14    this is my understanding of what enablement is.

15      BY MR. SCHMIDT:

16         Q.   Okay.  If you can turn to paragraph 36 of

17    your declaration.

18              In paragraph 36, you're discussing the

19    chip antennas that are discussed in the NXP Antenna

20    Guide that Dr. Tentzeris --

21         A.   Yes.

22         Q.   -- relies on and on the next page where it

23    carries over.

24         A.   Yeah.  Yes, I see that.

25         Q.   You make the point that the NXP BLE
```

Page 85

```
 1    Antenna Guide discloses a BLE antenna just
 2    0.0787 inches long in its shortest dimension, which
 3    is 15 times smaller than Dr. Tentzeris claimed was
 4    possible.
 5              Do you see that?
 6         A.   Yes, I do.
 7         Q.   That dimension that you are identifying is
 8    the size of just the antenna, correct?
 9         A.   Yes, it is the chip size.
10         Q.   And the chip size is smaller than the PCB
11    board on which the chip must be attached in order to
12    operate, correct?
13              MR. MEDINA:   Objection.   Lacks foundation.
14         A.   Yes, there is a pattern that the chip
15    antenna is attached to on the PCB board, sometimes
16    with extra elements, depending on the supplier, and
17    that pattern is bigger than that minimum chip.
18      BY MR. SCHMIDT:
19         Q.   And you agree that an antenna in a chip
20    can't be configured for BLE communications until
21    it's mounted on that board, correct?
22              MR. MEDINA:   Objection.   Vague.
23         A.   I will say you have to mount a chip
24    antenna properly on a board in order for it to work.
25
```

Veritext Legal Solutions
866 299-5127

```
 1      BY MR. SCHMIDT:
 2         Q.   So whatever size is going to be necessary
 3    of the portable wireless device to accommodate this
 4    antenna is going to be something larger than the
 5    0.0787 inches that you identify in paragraph 36,
 6    correct?
 7         A.   Yes.  I was comparing antennas to
 8    antennas, but there is a little feed that you have
 9    to add to that antenna.
10         Q.   In paragraph 39, you are discussing the
11    Texas Instruments Antenna Guide that Dr. Tentzeris
12    relies upon.
13              Do you see that?
14         A.   Yes.
15         Q.   And you mentioned the idea of a ferrite
16    sheet?
17         A.   Yes.  That is mentioned inside the guide.
18         Q.   What is a ferrite sheet?
19         A.   It's a sheet of ferrite material,
20    basically, an iron sort of compound material.
21         Q.   And how does a ferrite sheet allow you to
22    reduce the thickness of a portable wireless device?
23         A.   Well, it contains the magnetic field,
24    depending on how you align it with the antenna.  So
25    if you can contain the magnetic field, then you
```

Page 87

1    don't have to space the antenna 10 millimeters away

2    from other sources of metal.  You can put it closer

3    to other metal.

4           Q.   In your work in this field, have you ever

5    implemented a ferrite sheet?

6           A.   No, I have not done a ferrite sheet.  I've

7    done other mitigation strategies, but not a ferrite

8    sheet.

9           Q.   Do you mention any of those mitigation

10   strategies in your declaration?

11          A.   No, but they are mentioned in the patent

12   itself.

13          Q.   What do you have in mind, sir?

14          A.   Inside the patent on Column 11 and Column

15   12, there are methods of eliminating eddy currents

16   in the container for the pendant that holds this

17   device.  And that talks about breaking -- basically,

18   breaking the path on the metal surrounding the

19   NCF -- NFC antenna.

20               And breaking that metal path eliminates

21   currents and strengthens the magnetic field and

22   makes it communicate better.  And they show how to

23   insert plastic inserts into the sides and break so

24   it's not continuous metal.  And they mention and

25   describe it all over Column 11 and Column 12, and I

Veritext Legal Solutions
866 299-5127

1   have had experience doing that kind of thing to

2   break a magnetic field in my IC designs, magnetic

3   field generating currents and losing energy.

4        Q.   How does the technique in Column 11 and

5   Column 12 of the '514 patent affect the size of the

6   portable wireless device of Claim 11?

7        A.   Well, I think it allows you to house the

8   NFC antenna inside that small housing, the 2.5-inch

9   housing, without including a 10-millimeter

10  separation between the side of the housing and the

11  NFC antenna itself.  So I think it really allows you

12  to collapse that thing.

13            If you didn't have that break in the metal

14  or you didn't use a plastic -- or do something to

15  break currents created by the NFC field in the metal

16  case, then you would have to make a much larger

17  housing.

18       Q.   You're talking about the diameter

19  dimension, correct?

20       A.   Yeah, the -- yeah, but it's 2.5 in each

21  dimension, right?  So you have to make that bigger.

22  The watch -- I have to show you on the patent, but,

23  basically, things would have to be bigger to

24  separate the metal from the NFC antenna.  So I think

25  that's a technique they use in the patent.

Page 89

1      Q.    To allow for the shrinkage in the --

2      A.    NFC.

3      Q.    -- diameter?

4      A.    Yeah, and put the NFC much closer to a

5  piece of metal.

6      Q.    Okay.  Any other techniques?

7      A.    Well, those are the two that I know of

8  right now.  I haven't researched this.

9      Q.    Okay.  Focusing on what's in your

10  declaration, you mention that for the ferrite sheet

11  how -- this is on the carryover portion of paragraph

12  39 on the next page -- you mention how "the antenna

13  must be measured for inductance and tuned when

14  placed within the final enclosure, including the

15  ferrite sheet, so that the tuning circuit can

16  account for the changes to the coil inductance

17  caused by the metal and the ferrite sheet."

18            Do you see that?

19      A.    Yes.

20      Q.    What's being described there?

21      A.    Okay.  So if you design an antenna -- and

22  these are very well-known design techniques and you

23  can use simulators, so it's very controlled.

24            But this particular NFC antenna is

25  designed at low frequency, and because it's a

Page 90

```
 1   near-field antenna, you have to put another
 2   basically identical antenna near it to communicate.
 3   And they run at kilohertz.
 4          But when you put something in there that's
 5   metal that's near it to contain the field so that it
 6   doesn't go and dissipate on, say, the case, what you
 7   are doing is you are changing the inductance of that
 8   coil, because the physical presence of the ferrite
 9   will change that inductance.
10          So, therefore, you will have to go and get
11   which -- its frequency will change, and so you have
12   to fix -- you have to work with that and fix it.
13          But this can be done.  I mean, you do it.
14   You measure it.  You tweak it.  You may have to go
15   in there with a Dremel tool and fix it and then
16   you're done.  You know, you play with it a little
17   bit.  But this is part of engineering.
18      Q.   Okay.  Does the Carnival device use a
19   ferrite sheet?
20      A.   No.  It uses -- again, the one that is in
21   the specification -- and I don't know if that's
22   what's manufactured -- but the one in the
23   specification -- the one embodiment in the
24   specification, it uses the break in the metal case
25   to basically get rid of those eddy currents so it
```

Page 91

1    doesn't dissipate the energy of the NFC antenna.

2         Q.   I'm sorry, I didn't mean to interrupt you.

3         A.   Now, there's also -- when you say

4    dissipate the energy of the NFC antenna, there's a

5    question of how much do you need.  You may be able

6    to have an NFC antenna that broadcasts not all of

7    its energy, but half of its energy, and still be

8    successful if you don't have to broadcast very far.

9              So there's a trade-off here, again, going

10   back and forth on what do you need.  There's no

11   absolute; it really goes down to how much is needed

12   for the use case.

13        Q.   Do you know how Carnival mitigates

14   interference between the NFC antenna and the BLE

15   antenna in its portable wireless device?

16             MR. MEDINA:  Lacks foundation.

17        A.   I'm going to have to look at the stack of

18   that device again.  I have to remember the

19   configuration.

20             I know I've looked carefully at the

21   J antenna that they use on the Carnival, the device,

22   and that is -- that comes in and winds around.  I

23   don't know if that's -- I don't know what antenna

24   they use in the real devices, but in the

25   specification, that one is -- basically, it uses an

Page 92

```
 1   air dielectric and just wraps around as a J inside
 2   the container.
 3            I forget where it's placed relative to the
 4   NFC antenna, but I think it's above.  And so I think
 5   it has -- it just broadcasts and has a ground plane
 6   below it.  It has both a metal ground on top and
 7   bottom, so that's how it doesn't have the NFC
 8   interfere with it.
 9     BY MR. SCHMIDT:
10        Q.   Okay.  In paragraph 41, you address
11   Dr. Tentzeris's opinions regarding the level at
12   which further miniaturization would require undue
13   experimentation, correct?
14        A.   Yes.
15        Q.   And you disagree with his opinions and you
16   say on the next page, "A POSITA could have readily
17   shrunk either dimension without committing undue
18   time or resources."
19            Do you see that?
20        A.   Yes.
21        Q.   What factors did you consider in rendering
22   that opinion?
23        A.   Well, I don't want to -- you know,
24   Dr. Tentzeris is an antenna designer and he designed
25   a very nice BLE antenna which he, I guess -- he
```

Veritext Legal Solutions
866 299-5127

```
1    didn't give me the specifications in terms of gain
2    in resonance, but I assume it's a pretty good,
3    efficient antenna.
4            If you are willing to give up a little
5    efficiency, that's one thing you can do.  You can
6    just make it smaller, you know, a little bit smaller
7    or, you know, 10 or 20 percent smaller and make sure
8    it resonates at the right frequency and you can get
9    an antenna that's not as efficient, but will do some
10   job, and it may do the job if you don't need to
11   broadcast that far.
12           So I think that -- you know, I think that
13   Dr. Tentzeris built an optimal antenna, but you
14   don't have to.  A POSITA would understand that, you
15   know, you just have to get the job done sometimes
16   and just shorten it.
17           The other thing you can do, as I mentioned
18   before, is I looked at -- after doing this and
19   actually remembering, because I've had a lot of
20   experience; I work with antenna designers -- and
21   there's an antenna called a PIFA, P-I-F-A.  It's a
22   planar inverted-F antenna.
23           And that antenna, you put a -- it has a
24   configuration -- you can look it up -- where you put
25   a metal on a substrate and you put something under
```

Page 94

1    the substrate, and you can use a substrate that has

2    a nondielectric of 1, so you can use a

3    higher-permittivity substrate.  That means that the

4    wavelength shrinks with the square of the

5    permittivity.  So if I use something like a circuit

6    board, I may be able to get a wavelength that's half

7    as much or a quarter as much, depending on what

8    circuit board I use.  And so that's another way you

9    could shrink it.

10            I think that Dr. Tentzeris wanted to make

11    an air antenna, but I can see other ways -- other

12    types of antennas that you could put in there.  And

13    these are in the literature.

14            So I think that's where I'm coming from,

15    that you can sacrifice performance of the antenna or

16    you can try alternate designs that are actually in

17    the literature or you can try a chip antenna.

18    There's lots of ways you can try to skin this thing.

19            And PIFA antennas are now widely used in

20    cell phones, by the way.

21        Q.    The PIFA antenna opinion that you just

22    provided me, that was the opinion that you hadn't

23    thought of or considered before you submitted your

24    declaration on November 19, right?

25        A.    No, I had -- I worked on -- ten hours on

Page 95

1    that declaration and then I remembered -- well, I'm

2    a -- I was doing a lot of antenna testing.  I was

3    working with another antenna designer, who was

4    making the antennas and we were doing some fun stuff

5    with tuning antennas.

6         And then she said, "Oh, yeah, I published

7    some papers on PIFAs," so I kind of remembered that.

8    That was from ten years ago.  I don't remember

9    everything immediately.

10        Q.   Okay.  And what factors did you apply in

11   considering whether or not these alternative designs

12   would require undue time or resources?

13        A.   Well, if I could find it in the

14   literature, it doesn't require undue time.  So, you

15   know, you take a look and it says, "This is how to

16   design it" on Antenna Designer, and you just

17   experiment with it a little bit and you can put it

18   on a substrate and try it.  So that's me.

19        Also, you can buy these circuit boards

20   and, you know, stuff like that and you can basically

21   pattern them or etch them or whatever you want and

22   try out different designs and see what works.  It's

23   certainly there.  The engineering tools and the

24   engineering resources are there to play with these.

25        Q.   So just so I understand your expert

                                              Page 96

1    methodology, in considering whether or not a design

2    would require undue time or resources, the only

3    thing you looked to is whether or not it was in the

4    literature; is that right?

5         A.   I looked to -- okay.  So I expect an

6    inventor to put in a lot of time and resources.

7    Okay?  They do a lot of experimentation.

8              But I expect, yes, a POSITA to have the

9    basic knowledge of -- that they would gain in my

10   courses and maybe a graduate course or two or a

11   bunch of experience working in wireless, and I would

12   expect them to be able to understand simple designs

13   in the literature and be able to kind of work a

14   couple of equations and build something from that.

15             I'm not expecting them to do major, like,

16   million-element antennas, but, you know, some stuff

17   that's in the literature, or be able to buy stuff

18   and use it with application notes.  So I expect them

19   to be able to do both.

20        Q.   Do you have any opinion as to how far down

21   these alternative antenna designs you mentioned

22   could be shrunk before undue time and resources

23   would be required?

24        A.   I actually haven't determined that.  I

25   know that a factor of three or four would be

Page 97

```
1    fairly -- you know, two to four could be fairly
2    straightforward with the PIFA antenna design, if you
3    can realize it.
4              But, you know, I haven't thought about
5    that because that becomes -- you know, that becomes
6    something where I need to study and think about it.
7    It becomes a materials issue, what kind of
8    substrates can I get with metal on them and how can
9    I pattern them and how high a dielectric can I get.
10   And that gets kind of crazy if you go too small.
11   So -- and then there's other things you can do.
12             So, you know, right off the bat, I don't
13   think a shrinkage of two or four is tough on a
14   quarter wavelength antenna, but -- I think that you
15   can go further, but I don't know how much further
16   you can go and I have not done the analysis to look
17   at that.
18        Q.   But you don't doubt that there is a
19   threshold at which further miniaturization would
20   require undue time and resources, correct?
21        A.   I -- when it comes to miniaturization,
22   there's another issue that we don't talk about
23   enough in engineering, which is replication.  So
24   it's not just making one of the things that is
25   tough; it's making millions, right, where you make
```

Page 98

1    money.

2          And so this is not -- the

3    commercialization is not a patent, but the reality

4    of it is that, ultimately, you want to make money.

5    And so there are tolerances and you can get things

6    really small, but the cost goes way up in actually

7    achieving that and it becomes impractical.

8          Those tend to be as important as a lot of

9    other factors.  I can't make it this small without

10   paying $10,000 a unit or something like that or

11   $1,000 a unit, and that's not acceptable.  So that's

12   another consideration.  It's a manufacturing

13   tolerance.  Not that I can make something one size,

14   but can I make it and it not be shifting in size by

15   20 or 30 percent or even 2 percent, because I've got

16   to have a frequency.  So that's another issue that I

17   have to worry about.

18          So it's complicated, and that's why I said

19   I have not done the analysis.  It would take me some

20   analysis before I could come up with what would be

21   an inherent limit that I would actually use in a

22   device like this.

23        Q.   Okay.  And is there a point at which you

24   shrink the device so far that any further shrinkage

25   is going to require an undue amount of time and

Page 99

1     experimentation in order to even accomplish one

2     unit?

3              MR. MEDINA:  Objection.  Vague.  Calls for

4         a legal conclusion.

5         A.   Well, I know, of course, the trivial point

6     where you have zero size, of course.  That's the

7     point.

8              I don't know.  I would have to study that

9     and then try that for that particular type of

10    antenna, and then I could tell you what that point

11    would be.  But I haven't looked that over.  It would

12    take some time and energy to do so and I have not

13    been asked to do that.

14      BY MR. SCHMIDT:

15        Q.   Okay.

16             MR. MEDINA:  Are you planning to go all

17        the way to the rest of the time, Patrick, or

18        are you going to -- because we're a little over

19        3 -- I guess 6:00 on the East Coast.

20             MR. SCHMIDT:  Yeah, I'm getting close,

21        so --

22             MR. MEDINA:  Okay.  That's fine.

23      BY MR. SCHMIDT:

24        Q.   Okay.  Further on in this paragraph, you

25    talk about Dr. Tentzeris's opinions regarding

Page 100

1    capacitance and reactance loading.

2        A.   Yeah.

3        Q.   Do you see that?

4        A.   Yeah, let me see where I do that.

5             Oh, there it is.  In the same paragraph?

6        Q.   Yeah.  It's in paragraph 41, but it's on

7    the carryover page and it's --

8        A.   Okay.

9        Q.   -- the third one down.

10       A.   Okay.  So do you have a question?

11       Q.   Yeah.

12            One of the things Dr. Tentzeris points out

13   is that introducing capacitance or reactance loading

14   results, or can result, in the detuning of the

15   antenna.

16            Do you agree with that statement?

17       A.   I would say that, yeah, capacitance and

18   reactance loading can detune the antenna or also

19   tune the antenna, depending on how you do it.  I've

20   had some experience with capacitance and reactance

21   loading.

22       Q.   And how do you overcome that detuning

23   problem if you use capacitance or reactance loading?

24       A.   Well, I just helped somebody with a chip

25   antenna, and it -- circuit demanded that I put in a

Page 101

1    capacitance to get a certain frequency.  So we put

2    it on an instrument, measured the resonance

3    frequency, it wasn't right, then you send it out to

4    the technician and they put another little

5    capacitance on there and it's a little bit better,

6    and then you put another one and it's better and you

7    get it.  So the answer is I measure the antenna and

8    I throw a little chip in, some capacitance on there,

9    and I tune it.

10              Now, if you try to make the antenna too

11    short -- that's, I think, what he's saying here --

12    yeah, you can detune it in the sense that it no

13    longer resonates with -- it no longer has such a

14    nice selectivity in the resonance.  So that means

15    that the frequency at which it can take signal is

16    broader.

17              But you may be able to -- you know,

18    that's, again, a specification, what tolerance can

19    you take with that.  And, you know, this is all

20    about antenna techniques.

21              But I think, you know, if you got a plan

22    and you know what's going on and you got some

23    technical document, you can see.  And you put a --

24    basically, kind of something like a network analyzer

25    or you put a spectrum analyzer on it, you can do

                                        Page 102

```
 1   this real-time and just play with antennas.  It's
 2   not -- it's simple experimentation.
 3        Q.   Are you familiar with introducing a
 4   matching network?
 5        A.   Absolutely.  I've done automated matching
 6   networks.  I teach matching networks.
 7             And, again, this is one of those things
 8   that you would like your POSITA to have an RF
 9   course.  We have undergraduate RF courses which our
10   POSITAs could take and then they can do matching, or
11   we have graduate-level courses that they can do
12   matching.  But you need to take a little bit of an
13   S-parameter course or microwave course, RF course,
14   and you can do matching.
15        Q.   Is it your opinion that implementing a
16   matching network for a Bluetooth low-energy antenna
17   is within the ordinary skill of one ordinarily
18   skilled in the art?
19        A.   Well, if you -- I certainly think that if
20   somebody goes to NXP or a vendor that sells these
21   chip antennas, they will tell them what matching
22   network to put on there.
23             And so I think that's definitely -- you
24   know, you put this pattern down and you put the
25   antenna and you -- with the chip there, and you, you
```

Page 103

1  know, put this capacitor 3 millimeters away and

2  you're done.  And so that, I think, is within the

3  scope of a POSITA.

4          If you're going to develop your own

5  antenna from scratch, then you are going to have

6  more fun.  That's going to -- you need to get on

7  simulation tools.

8          I think that somebody with some

9  experience, you know, a more experienced person,

10  electrical engineering with RF course, can do it.

11  So it's a question of which POSITA you have.  We

12  have a lot of lists of possible POSITAs there, I

13  mean, in the sense you have electrical engineer,

14  computer engineer, so on and so forth.  But I think

15  one of the POSITAs that's mentioned could do this --

16  one of the POSITA backgrounds that's mentioned could

17  do this.  And I think that most of them could do it

18  if they had the spec sheet and understood how to

19  design a board, which they would in our program.

20      Q.   So I want to ask a really clear question

21  now, sir:  Is it your opinion that a person of

22  ordinary skill in the art, as you apply that

23  definition through your declaration, is it your

24  opinion that such a person could implement a

25  matching network to shrink a 2.4-gigahertz antenna

Page 104

```
 1   down below the dimensions that are state of the art
 2   as of the time of the '514 patent?
 3              MR. MEDINA:  Objection.  Vague.
 4        A.   By "state of the art," do you mean the
 5   best you can buy?  Is that right?  So best
 6   available?
 7     BY MR. SCHMIDT:
 8        Q.   Correct.
 9        A.   Okay.  So I'm thinking about this
10   seriously.  Can you say the question again?
11        Q.   Right.  The situation is we're at the time
12   of the '514 patent --
13        A.   Okay.
14        Q.   -- 2016.
15        A.   Okay.
16        Q.   You are a person of ordinary skill in the
17   art --
18        A.   Okay.
19        Q.   -- and you want to implement a matching
20   network in order to shrink a 2.4-gigahertz antenna
21   below what would otherwise be available in the art
22   at that time.
23              MR. MEDINA:  Objection.
24        A.   Okay.  So if you are talking about
25   shrinking an antenna smaller than, say, some of the
```

Page 105

```
 1   chip antennas that I've -- which I consider state of

 2   the art at that time, I don't think they could do

 3   it.

 4     BY MR. SCHMIDT:

 5        Q.   In fact, in your academic papers, you have

 6   written that implementing a matching network for

 7   this frequency of an antenna can be, quote,

 8   challenging, right?

 9        A.   It depends on the antenna.  That's a case

10   by case.  But I forget -- it probably was an antenna

11   that was pretty interesting.  I would have to see

12   the paper.

13        Q.   Okay.  Why don't we take a look at it.

14             MR. SCHMIDT:  I've marked for

15        identification as Exhibit 3 the next exhibit.

16        Let me know when you can see it in the

17        ExhibitShare, sir.

18             (Thereupon, marked as Exhibit 3.)

19        A.   Okay.  Okay.  I remember this paper.  This

20   was written a number of years ago.

21             Okay.  So the context of this paper is the

22   split-ring resonator, which is a complicated

23   antenna, which I would not expect anybody to be able

24   to do who is not an antenna designer, and the

25   Varactor diodes there are also at capacitance that
```

Page 106

1     you don't know.

2            So, yes, this particular antenna is quite

3     interesting.  It's not a simple one.  It's got

4     capacitors, basically, that are tunable with voltage

5     and it's got those rings that interact with each

6     other in a complicated way.  This matching is kind

7     of interesting.  I'm thinking more along the lines

8     of a single piece of stripline antenna.

9            But I think, as I answered you before, can

10    they beat the state of the art, you know, with a

11    chip antenna?  No, but the chip antenna will tell

12    them what to do.

13           Can they match the PIFA antenna?  You may

14    not have to if you don't want to shorten it.  It can

15    be fed without a matching network.  But if you want

16    to shorten it, it could be interesting.  There are

17    equations to do it.

18           But nothing like -- this is a complicated

19    antenna.

20      BY MR. SCHMIDT:

21      Q.   Well, let's take a look at the

22    introduction of this paper where you make some

23    general statements.

24           Do you see the first sentence in the

25    introduction reads, "One challenge in the design of

                                          Page 107

1    an adaptive software defined match control circuits

2    at low RF frequencies is miniaturization."

3          Do you see that?

4    A.    Okay.

5    Q.    And then skip a sentence.  In the third

6    sentence, you say, "Miniaturization is natural at

7    shorter wavelengths (in the millimeter wave bands),

8    yet quite difficult at low . . . frequencies (1-2

9    gigahertz)."

10          Do you see that?

11    A.    Yep.

12    Q.    Millimeter wave bands are wave bands in

13    the 30- to 300-gigahertz range, approximately,

14    right?

15    A.    Yes.

16    Q.    That's about 10 to 100 times shorter

17    wavelength than the 2.4-gigahertz band used by

18    Bluetooth low energy, correct?

19    A.    That's correct.

20    Q.    And you say expressly right here in your

21    paper that miniaturization is quite difficult at low

22    RF frequencies, 1 to 2 --

23    A.    No.  I actually say the design of an

24    adaptive software match control, SMDC [sic], is

25    hard.  That's a very special match system.  That

                                        Page 108

1    system dynamically matches a circuit.

2          So the antenna -- the problem we had with

3    this paper was we take an antenna and you put it on

4    a desktop and it's metal, would it become unmatched.

5    Or you take your iPhone at the time and you put your

6    finger on the bottom of the iPhone and it would

7    detune and it couldn't work.  People had to keep

8    their finger off certain places on the iPhone.

9    There was one model that did that.

10          So this system allowed you to rematch the

11    antenna automatically, and that system is --

12    defining adaptive match control system, which

13    changes your match when your environment changes, is

14    very difficult.  We did it.

15          But if you are willing to accept a

16    constant match where you are not trying to change

17    the match -- change the Ls and C element values that

18    are in the match, that's a hell of a lot easier than

19    this.

20          So that's -- basically, the difference is

21    that this is with variable components in the match

22    that are controlled by a computer and the normal

23    match is just fastened down to capacitors and

24    inductors.

25        Q.   In paragraph 41 of your declaration, you

Page 109

```
 1    write, "Learning how to match and tune an antenna
 2    using those techniques is a skill regularly used by
 3    practical RF engineers, and well within the
 4    capabilities of a POSITA."
 5            Do you see that?
 6       A.   Yeah.  Where am I?  41.  Yeah.
 7       Q.   How is the matching that you are referring
 8    to in paragraph 41 different from the matching that
 9    you wrote in your academic paper that is quite
10    difficult at low RF frequencies?
11       A.   Well, this matching is taking an antenna
12    and -- a simple antenna and soldering down an L and
13    a C and doing the match.
14            The other article is about making a
15    computer system that measures the antenna itself,
16    looks at -- I'm going to use technical terms -- the
17    impedance of the antenna, and then changes the match
18    to adapt that impedance.
19            So when I have an antenna that gets near
20    metal or something, it's supposed to be at what we
21    call 50 ohms, which is kind of a magic impedance for
22    RF systems.
23            When you detune it by putting it, again,
24    near metal, it could be 40 ohms or 30 ohms.  Our
25    system automatically detected that change and then
```

Page 110

1  readjusted the matching networks with a computer to

2  do that.

3         So it's a different system.  It's a system

4  where your matching elements change depending upon

5  the response of the antenna, whereas this system

6  here I'm talking about is you put a metal line and

7  you solder down two components, they match, and then

8  you just let it go.  You don't try to constantly

9  change it.  You don't have a computer, you are not

10  measuring the antenna characteristic, you're just

11  using the antenna.  That's much simpler.

12     Q.    This paper was written in 2010, Exhibit 3,

13  correct?

14     A.    Okay, okay.

15     Q.    I'm asking.  Is that right?

16     A.    It's probably about that time frame.

17  Let's take a look at the -- it says November 20 --

18  oh, that's when you took it out of there.

19         It's got citations from 2007, so it could

20  be 2010.  That would be around the time frame.

21  Sometime after 2007.  2008, 2009, 2010, something

22  like that.

23     Q.    Has the state of the art regarding

24  miniaturization of antennas at low RF frequencies

25  changed appreciably between 2010 and the priority

                                        Page 111

1    date of these patents, 2016?

2            MR. MEDINA:  Objection.  Vague.

3        A.    I really haven't -- well, let me put it

4    this way:  This work was with antennas provided by

5    my collaborator, and so we looked at interesting

6    research antennas, we did not look at

7    state-of-the-art miniaturized antennas.  So I have

8    not surveyed the field for state-of-the-art antennas

9    at that time in whatever it is, 2008, 2009, nor have

10   I surveyed the field for what the state-of-the-art

11   antennas are in 2016.

12           I do remember some devices, I think, with

13   chip antennas that date back several years, many

14   years, but I don't remember exactly when they came

15   out.

16           So without some research, I can't answer

17   you, basically.  I just don't have that off the top

18   of my head.

19     BY MR. SCHMIDT:

20       Q.    Thank you.

21           What's the level of skill of the coauthors

22   that are on this paper with you?

23       A.    Hyunjin Park is probably a Ph.D.  Kathy

24   Melde is an IEEE fellow Ph.D. professor and dean at

25   University of Arizona now.  She's really very

                                          Page 112

1    skilled.  And there's me.

2        Q.   Okay.  So yourself and the two other

3    authors of this paper are all individuals that

4    exceed the level of ordinary skill in the art as of

5    the filing of the patent at issue, correct?

6        A.   Yeah, absolutely.  When you have a --

7    split-ring resonators and RF matching, automatic

8    RF -- adaptive RF matching circuits, that's not what

9    I expect a POSITA to be able to do.

10            MR. SCHMIDT:  Okay.  Why don't we take a

11        really short break, like three to four minutes,

12        just so I can check my notes, and then we'll

13        come back.  And if I have any more questions,

14        I'll ask, but otherwise we'll wrap up.

15            MR. MEDINA:  All right.  6:30?

16            THE WITNESS:  Sure.

17            MR. SCHMIDT:  Yeah, sounds good.

18            VIDEOGRAPHER:  Okay.  We're off the

19        record.  It's 6:26 p.m.

20      (Recess was held from 6:26 p.m. until 6:34 p.m.)

21            VIDEOGRAPHER:  We're back on the record at

22        6:34 p.m.

23            MR. SCHMIDT:  Okay.  Doctor, I want to

24        thank you for your time today.  I have no

25        further questions.  I will pass the witness.

Page 113

1          MR. MEDINA:  I have no questions.

2          VIDEOGRAPHER:  Okay to go off the record?

3          MR. SCHMIDT:  Off the record.

4          VIDEOGRAPHER:  Thank you.

5          We're off the record at 6:34 p.m.

6          (The deposition concluded at 6:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1                    CERTIFICATE OF OATH

2

3

4

5

6              I, the undersigned authority, certify

7

8       that WILLIAM EISENSTADT, Ph.D. appeared remotely

9

10      before me and was sworn on the 16th day of

11

12      December, 2021.

13

14              Signed this 22nd day of December, 2021.

15

16

17

18

19

20

21

22              KIMBERLY FONTALVO, RPR

23              Notary Public, State of Colorado

24              My Commission No. 20214007135

25              Expires: 2/23/2025

                                          Page 115

```
 1                    CERTIFICATE OF REPORTER

 2


 3        STATE OF COLORADO

 4


 5              I, KIMBERLY FONTALVO, Registered

 6        Professional Reporter, do hereby certify that I

 7        was authorized to and did stenographically report

 8        the foregoing remote videotaped deposition of

 9        WILLIAM EISENSTADT, Ph.D.; that a review of the

10        transcript was requested; and that the transcript

11        is a true record of my stenographic notes.

12              I FURTHER CERTIFY that I am not a

13        relative, employee, attorney, or counsel of any

14        of the parties, nor am I a relative or employee

15        of any of the parties' attorneys or counsel

16

17        connected with the action, nor am I financially

18

19        interested in the action.

20

21              Dated this 22nd day of December, 2021.

22

23

24

25              KIMBERLY FONTALVO, RPR, CLR
```

Page 116

```
 1        December 22, 2021
 2        William Eisenstadt, Ph.D. c/o David Medina, Esq.
          davidmedina@orrick.com
 3
 4        Re:  Decurtis vs. Carnival
 5        Please take notice that on the 16th day of December,
          2021, you gave your deposition in the above cause.
 6        At that time, you did not waive your signature.
 7        The above-addressed attorney has ordered a copy of
          this transcript and will make arrangements with you
 8        to read their copy.  Please execute the Errata
          Sheet, which can be found at the back of the
 9        transcript, and have it returned to us for
          distribution to all parties.
10
          If you do not read and sign the deposition within
11        thirty (30) days, the original, which has already
          been forwarded to the ordering attorney, may be
12        filed with the Clerk of the Court.
13        If you wish to waive your signature now, please sign
14        your name in the blank at the bottom of this letter
15        and return to the address listed below.
16
17        Very truly yours,
18
19
20        KIMBERLY FONTALVO, RPR, CLR
21
22        I do hereby waive my signature.
23
24        _____
25        WILLIAM EISENSTADT, Ph.D.
```

Page 117

```
 1                      ERRATA SHEET

 2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 3                In Re:  DECURTIS VS. CARNIVAL

                      WILLIAM EISENSTADT, Ph.D.

 4

 5        PAGE   LINE      CHANGE            REASON

 6        _____

 7        _____

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____

20        Under penalties of perjury, I declare that I have

          read the foregoing document and that the facts

21        stated in it are true.

22

23        _____            _____

24

25        Date                    WILLIAM EISENSTADT, Ph.D.

                                               Page 118
```

**[& - able]**

| & | |
|---|---|
| **&** | 2:3,10 4:13,16 |

**0**

**0.0787**   86:2 87:5

**1**

**1**   3:13 8:19,20,23 9:4,5,11,14,17 10:6,21 11:13,25 13:12,21 14:2 15:3 16:10,10,14 16:16,23,24 20:2,5 20:7,11 22:12 25:17,20 43:11 45:12 95:2 108:22
**1,000**   99:11
**1-2**   108:8
**10**   88:1 89:9 94:7 108:16
**10,000**   99:10
**100**   108:16
**10017**   2:4
**106**   3:18
**10th**   2:4
**11**   3:4 19:3 30:16 30:24 31:21 32:6 32:10 36:19,22 37:4,8,24 38:9,18 38:20 39:1,13,16 39:18,20,21 40:10 40:15,16,17,19,20 41:3,9,14,15,19,19 41:25 42:4,9,11 43:11,12 44:10 45:25 47:14,22 49:8,12,22 50:7,10 50:16 51:2 52:12 53:12 54:9 55:7 56:7,22 59:22 60:8 61:5 65:18 66:9 67:4,12

68:19 69:20,24,25 70:1,13,25 71:15 72:9 75:4,19 76:6 88:14,25 89:4,6
**115**   3:7
**116**   3:8
**117**   3:8
**118**   3:9
**12**   7:10,19 88:15 88:25 89:5
**15**   26:22 27:1 35:12 86:3
**16**   1:19 3:16 4:2
**16th**   115:10 117:5
**19**   7:15,19 9:15 25:25 26:15 43:25 44:3 48:9 84:3 95:24
**1:20**   1:3,4

**2**

**2**   3:16 16:4,7,10,14 16:16,22,24 20:6 56:16 99:15 108:22
**2.4**   104:25 105:20 108:17
**2.5**   55:17,20 56:1 56:22 58:8,12,16 59:3,13,20 60:16 63:5 89:8,20
**2/23/2025**   115:25
**20**   74:9 94:7 99:15 111:17
**2007**   111:19,21
**2008**   111:21 112:9
**2009**   111:21 112:9
**2010**   111:12,20,21 111:25
**2016**   105:14 112:1 112:11

**2021**   1:19 4:3 9:15 115:12,14 116:21 117:1,5
**20214007135**   115:24
**21547**   1:4
**22**   117:1
**22945**   1:3
**22nd**   115:14 116:21
**23**   47:7
**24**   50:3,4 69:18
**26**   3:5,6 54:25 55:3,18
**28**   64:1,3,23,24 65:14

**3**

**3**   3:18 100:19 104:1 106:15,18 111:12
**30**   14:16 17:21 33:3 71:24 72:2 74:24 99:15 108:13 110:24 117:11
**300**   75:21 108:13
**3190**   115:21 116:24
**3200**   2:11
**32606**   5:13
**36**   85:16,18 87:5
**39**   21:19 87:10 90:12
**3:06**   1:19 4:2

**4**

**40**   21:11 56:16 110:24
**41**   93:10 101:6 109:25 110:6,8

**4315**   5:12
**4:07**   43:19,20
**4:18**   43:20,22

**5**

**5**   3:3 75:24
**5/8**   56:2,22 60:16
**50**   110:21
**514**   30:16,25 31:20 32:6,9 36:19 44:10 45:10,25 49:8 55:4 62:9,16 62:22 63:1,8,13,21 67:4,12 71:15 72:9 77:16 82:24 89:5 105:2,12
**541**   6:8
**5:08**   69:12,13
**5:20**   69:13,15

**6**

**6:00**   100:19
**6:26**   113:19,20
**6:30**   113:15
**6:34**   1:19 113:20 113:22 114:5,6

**7**

**75th**   5:13
**777**   2:11

**8**

**8**   3:13
**865**   2:4

**9**

**9**   20:13,14,15,21 21:8 22:1,8,10
**90017**   2:4,11

**a**

**ability**   65:16 71:16
**able**   7:17 12:21 13:9 17:25 21:5 33:4,21 47:20

[able - arbitrarily]

52:7 68:12 73:19
92:5 95:6 97:12
97:13,17,19
102:17 106:23
113:9
**absolute** 48:1 67:7
92:11
**absolutely** 23:4
103:5 113:6
**academic** 106:5
110:9
**accept** 109:15
**acceptable** 64:7,14
99:11
**access** 5:18,25 6:2
24:17
**accommodate**
87:3
**accomplish** 100:1
**account** 30:13
72:4,8 81:17
90:16
**accurate** 17:8,9
**accused** 83:11,14
83:16,18,25
**achieving** 99:7
**action** 1:3,4 22:15
116:17,19
**actual** 21:21 29:24
**adapt** 110:18
**adaptive** 3:19
108:1,24 109:12
113:8
**add** 67:20 84:17
87:9
**additional** 13:20
14:14
**address** 93:10
117:15
**addressed** 117:7

**addresses** 32:9
**adds** 66:25
**administrator**
1:23
**affect** 64:15 71:16
76:2 81:8 89:5
**affirm** 4:21
**afternoon** 4:12,15
5:5
**ago** 17:2 58:2 96:8
106:20
**agree** 51:22 52:1
52:24 53:1,10
54:7,11,12 61:4
70:1 74:2 86:19
101:16
**air** 93:1 95:11
**al** 3:21
**align** 87:24
**alleged** 25:1 49:6
**allow** 61:24 84:14
87:21 90:1
**allowed** 6:14
109:10
**allows** 64:8 84:18
89:7,11
**alternate** 95:16
**alternative** 96:11
97:21
**amount** 75:23
99:25
**amounts** 79:17
**amplifiers** 82:15
**analyses** 11:14,23
**analysis** 29:10,12
30:10 31:6,23
33:7 34:13 35:5
47:2,6,12 51:19
67:2 68:25 69:2,4
80:23 82:21 83:2
83:9 98:16 99:19

99:20
**analyze** 25:23
**analyzed** 36:18
**analyzer** 102:24
102:25
**analyzing** 30:13
**angeles** 2:4
**angelos** 2:11
**annotated** 6:10
**announced** 58:5
**announcement**
57:25
**answer** 3:4,5,6 8:7
9:25,25 11:4,7,9
25:20 26:7,8,20
32:24 37:22 51:14
52:18 56:14 57:16
67:8 102:7 112:16
**answered** 107:9
**antenna** 13:16,17
15:14,19 58:1,6,15
59:2,12,19,20
60:20,22 82:19
85:19 86:1,1,8,15
86:19,24 87:4,9,11
87:24 88:1,19
89:8,11,24 90:12
90:21,24 91:1,2
92:1,4,6,14,15,21
92:23 93:4,24,25
94:3,9,13,20,21,22
94:23 95:11,15,17
95:21 96:2,3,16
97:21 98:2,14
100:10 101:15,18
101:19,25 102:7
102:10,20 103:16
103:25 104:5,25
105:20,25 106:7,9
106:10,23,24
107:2,8,11,11,13

107:19 109:2,3,11
110:1,11,12,15,17
110:19 111:5,10
111:11
**antennas** 13:6,16
13:23,25 14:3,8,14
14:16,17 15:16
60:18 63:15,22
82:3,14 85:19
87:7,8 95:12,19
96:4,5 97:16
103:1,21 106:1
111:24 112:4,6,7,8
112:11,13
**anybody** 6:19 24:6
106:23
**appearances** 2:1
**appeared** 115:8
**application** 30:7
53:25 54:19 75:12
75:14 97:18
**applications** 74:20
**applied** 32:13 33:6
**apply** 77:6 96:10
104:22
**applying** 81:15
**appreciably**
111:25
**approach** 48:13
48:19 84:8,12,15
84:19
**appropriately**
73:8
**approximate** 7:17
**approximately**
108:13
**approximation**
7:21
**arbitrarily** 46:25
51:15 52:17

[area - bulleted]

**area** 28:23 73:17
73:18
**arizona** 112:25
**arrangements**
117:7
**art** 27:5 28:2,13
29:3,14,21 35:15
48:13,18 51:24
52:6,19,25 53:4
54:13 55:6,11,19
56:6,11,14,18,23
57:18 59:11,18,24
60:10 61:8,11,12
61:19,22 62:5,10
62:17,21 63:2,7,14
63:20 64:13 65:12
66:11,14,22 84:7
84:11,14,19
103:18 104:22
105:1,4,17,21
106:2 107:10
111:23 112:7,8,10
113:4
**article** 110:14
**articulate** 72:2
**articulated** 81:1
85:2
**articulation** 9:18
10:7,22
**aside** 11:21 19:25
**asked** 13:4 42:10
49:3,5,10 51:5
100:13
**asking** 29:7,9
31:11,14 39:8
52:16 53:6,23
54:5 58:20 111:15
**assign** 29:17
**assume** 94:2
**assumed** 33:10

**attached** 86:11,15
**attorney** 7:13
116:13 117:7,11
**attorneys** 116:15
**attributes** 65:5
**audible** 26:11
**authority** 115:6
**authorized** 116:7
**authors** 113:3
**automated** 103:5
**automatic** 113:7
**automatically**
109:11 110:25
**available** 8:13
29:14 61:23,25
105:6,21
**awake** 79:13
**aware** 56:18 62:11
62:17,22 63:2,8
**awhile** 51:16
63:16

**b**

**back** 9:2 20:1
39:10 43:14,21,24
50:21 53:9 69:14
69:17 70:20 79:8
84:3 92:10 112:13
113:13,21 117:8
**background** 51:7
**backgrounds**
104:16
**band** 108:17
**bands** 108:7,12,12
**bargain** 27:3,25
**based** 11:16,18
27:18 67:2 71:1
76:7,19 77:25
84:22 85:1
**basic** 97:9
**basically** 68:4
79:16 87:20 88:17

89:23 91:2,25
92:25 96:20
102:24 107:4
109:20 112:17
**bat** 98:12
**batteries** 73:10
78:23
**battery** 35:1 60:17
73:8 75:25 79:18
82:5,6,7
**beacon** 35:2 67:16
73:21 79:12
**beat** 107:10
**beginning** 4:11
61:5,15
**behalf** 2:2,9 4:14
4:16
**believe** 45:12
59:23 60:9 61:9
74:13
**best** 105:5,5
**better** 34:24 45:1
88:22 102:5,6
**beyond** 42:21
60:24 77:4 85:13
**big** 66:7
**bigger** 34:25 35:1
47:23 86:17 89:21
89:23
**bit** 37:17 44:25
60:7 82:5 91:17
94:6 96:17 102:5
103:12
**bits** 12:14
**blank** 117:14
**ble** 33:24 51:11
57:6,10,13,18,23
58:2,15 59:2,7,12
59:19 60:23 63:14
63:17 85:25 86:1
86:20 92:14 93:25

**bluetooth** 57:14
58:1 60:20 79:2
103:16 108:18
**board** 15:18 86:11
86:15,21,24 95:6,8
104:19
**boards** 96:19
**body** 56:1 60:14
62:18,23 63:3
**boom** 37:17
**bottom** 17:11
18:11 93:7 109:6
117:14
**bounds** 36:11
**bracelet** 67:17
68:13,23
**break** 38:16 43:14
69:6 81:6 88:23
89:2,13,15 91:24
113:11
**breaking** 88:17,18
88:20
**breakout** 43:16
**briefly** 83:13
**broadcast** 75:21
75:24 92:8 94:11
**broadcasts** 92:6
93:5
**broader** 102:16
**browser** 8:22 9:1
16:6
**browsers** 6:3 8:25
**build** 39:22 40:12
54:14,20,21,22,23
54:24 55:20 64:19
68:22 97:14
**building** 12:15
**built** 94:13
**bulk** 25:21
**bulleted** 21:8

**[bunch - claimed]**

**bunch**  97:11
**buy**  13:7 96:19
  97:17 105:5

**c**

**c**  2:5 109:17
  110:13 117:2
**ca**  2:4,11
**calculated**  82:12
**call**  110:21
**called**  13:17 94:21
**calls**  9:22 12:25
  23:10 26:4 27:14
  28:21 36:23 39:6
  40:13 42:24 43:5
  49:24 52:2 58:18
  67:22 70:16 75:9
  76:9,21 83:22
  85:9 100:3
**camera**  37:13 83:5
**capabilities**  57:10
  57:18,23 59:17,23
  110:4
**capability**  54:16
  57:13 68:24
**capacitance**  101:1
  101:13,17,20,23
  102:1,5,8 106:25
**capacitor**  104:1
**capacitors**  107:4
  109:23
**carefully**  92:20
**carnival**  1:8,10 2:9
  4:6,17 7:7 19:16
  19:20 22:20 23:7
  23:15,18 42:20
  63:18,24 83:3
  91:18 92:13,21
  117:4 118:3
**carnival's**  3:14 7:4
  21:21 82:23 83:2
  83:20

**carried**  64:5
**carries**  85:23
**carryover**  90:11
  101:7
**case**  6:14,25 7:8
  7:15 8:1,5 9:7,19
  10:8,25 15:18,18
  18:6,6,9,17,18,25
  19:2,4,8,15 22:20
  22:24 24:10,23
  29:13,24 30:3,9,9
  30:11,15 31:18,24
  32:2,14,22 33:1,5
  33:7,9,10,11,21
  34:9,16,21,23 35:5
  36:4 37:3 44:22
  44:23,23 45:3,3,25
  46:4,17,18 47:3
  48:22 49:5 51:20
  53:20,22,25 54:19
  57:3,19 64:6,8,14
  64:16 66:16,17,23
  67:3,4,12,14,14,19
  68:5 69:23 72:13
  72:14,19 73:25
  75:3,20 76:2
  77:19,25 78:3,8
  80:23 82:23 83:2
  83:11,19,24 84:22
  85:4,8 89:16 91:6
  91:24 92:12 106:9
  106:10
**cases**  31:16 34:12
  35:6,20,20 75:17
  76:13 77:9,12,15
  77:18
**cause**  117:5
**caused**  90:17
**cavity**  60:15,18
  62:24 63:4

**cell**  6:20 95:20
**certain**  46:12 51:2
  52:13 78:3 102:1
  109:8
**certainly**  96:23
  103:19
**certificate**  3:7,8
  115:1 116:1
**certify**  115:6
  116:6,12
**challenge**  107:25
**challenging**  106:8
**change**  60:6 74:13
  75:14 76:19 78:21
  91:9,11 109:16,17
  110:25 111:4,9
  116:5
**changed**  38:1
  111:25
**changes**  90:16
  109:13,13 110:17
  118:2
**changing**  73:10
  78:23 91:7
**characteristic**
  111:10
**characterize**  29:8
**chat**  6:20
**check**  45:13
  113:12
**chip**  13:16,23
  14:14,16,17 15:16
  15:19 85:19 86:9
  86:10,11,14,17,19
  86:23 95:17
  101:24 102:8
  103:21,25 106:1
  107:11,11 112:13
**chips**  51:12
**circuit**  15:18 51:8
  90:15 95:5,8

96:19 101:25
  109:1
**circuits**  3:19 108:1
  113:8
**citations**  111:19
**cite**  13:19 14:13
**cited**  21:12
**civ**  1:3,4
**civil**  1:3,4 18:6,18
**claim**  30:16,24
  31:21 32:6,9 36:7
  36:9,10,12,19,22
  37:4,7,8,11,24
  38:9,18,20 39:1,13
  39:16,18,20,21
  40:10,15,16,17,19
  40:20 41:3,9,14,15
  41:15,19,19,25
  42:4,9,11,15,16,17
  42:20 43:4,10,11
  43:11,12 44:10
  45:11,12,25 46:1,2
  46:14,16,17 47:14
  47:22 48:6,7 49:8
  49:12,22,23 50:2,7
  50:10,16 51:2
  52:12 53:12,24
  54:9,18 55:7,7,12
  55:15,17 56:7,22
  57:7,8 59:22 60:1
  60:8 61:5,7,14,17
  65:18,21 66:9
  67:1,4,12,20,25
  68:8,19 69:19,20
  69:24,25 70:1,13
  70:18,19,25 71:15
  72:2,9 74:25 75:4
  75:19 76:6 77:14
  85:6 89:6
**claimed**  27:6 28:3
  28:14 29:4 35:16

Veritext Legal Solutions
866 299-5127

[claimed - contract]

35:21,25 36:3,6 39:20 86:3

**claims** 29:19 36:14 36:14,15 53:19

**clarification** 10:11

**clarify** 29:7 41:8 64:21

**clear** 49:4 104:20

**clearly** 82:17

**clerk** 117:12

**close** 41:23 100:20

**closer** 88:2 90:4

**closes** 6:16

**clr** 1:22 116:25 117:20

**coach** 40:5

**coast** 100:19

**coauthors** 112:21

**coil** 90:16 91:8

**collaborator** 112:5

**collapse** 89:12

**colorado** 115:23 116:3

**column** 88:14,14 88:25,25 89:4,5

**columns** 33:3

**combination** 57:21,23

**combinations** 57:1

**combined** 57:8

**come** 43:14 46:11 47:2 51:16 52:9 73:24 76:13 99:20 113:13

**comes** 27:20 75:11 76:23 92:22 98:21

**coming** 71:4 95:14

**comment** 26:5

**commercial** 82:23

**commercialization** 99:3

**commission** 115:24

**committing** 93:17

**common** 13:22 46:8 56:23,25 61:7,10,18 71:19 71:19

**commonly** 12:2

**communicate** 33:23 73:7,14,19 88:22 91:2

**communicating** 79:1

**communication** 12:15 26:6,9 57:5 60:18,22 62:3 72:24 73:1

**communications** 8:8 9:24 11:4 60:19,23 79:3 86:20

**compact** 3:19

**comparing** 87:7

**competent** 28:24

**complaint** 22:14 22:18

**complete** 9:17 10:6,21 17:8,10,16 17:19

**completed** 14:1,2 14:7

**complicated** 79:10 99:18 106:22 107:6,18

**components** 37:8 38:9 39:1,17,23 40:12 41:19 42:11 43:12 49:13 51:2 65:18 68:20 109:21 111:7

**compound** 15:12 81:22 85:9 87:20

**comprising** 60:14

**computer** 5:17,20 5:24 6:1 71:21 104:14 109:22 110:15 111:1,9

**conceptualizing** 77:19 80:23 81:21

**concluded** 114:6

**conclusion** 27:15 28:22 36:24 39:7 40:14 42:25 43:6 49:24 52:3 58:18 67:23 70:17 75:9 76:22 85:10 100:4

**configuration** 92:19 94:24

**configured** 60:20 60:21,22 86:20

**confirm** 9:5,9,11 9:13

**connect** 33:18

**connected** 116:17

**connection** 58:6

**consider** 30:17,19 31:3 34:20 35:20 36:3 37:3 38:3,4 38:19 49:19 50:17 53:20,22 56:10 65:4 70:14 80:25 93:21 106:1

**consideration** 29:20 31:2 34:16 39:4,17 53:18 99:12

**considerations** 72:3,7,12,15 74:6 74:23,24 76:8 80:20 81:1,17 85:2

**considered** 20:16 20:22,25 21:3,6 31:16 35:19 37:6 37:7,9,24,25 38:7 38:23,24 50:19 68:8,13 69:1 95:23

**considering** 38:18 49:13 53:24,25 96:11 97:1

**constant** 109:16

**constantly** 111:8

**constraints** 38:8 54:1

**constructed** 41:18

**construction** 41:24 70:19

**construed** 70:14 71:15

**construes** 71:9

**consume** 79:16

**consumes** 79:7

**contact** 6:19

**contacted** 7:11,12

**contain** 9:17 10:6 11:13,18 87:25 91:5

**container** 88:16 93:2

**contains** 10:21 87:23

**contend** 74:24

**contention** 22:22 22:23 23:1

**contentions** 22:20

**context** 45:9,10 64:4 65:15 68:23 74:3 106:21

**continuous** 88:24

**contract** 18:20

Veritext Legal Solutions
866 299-5127

[contractors - design]

**contractors** 18:14 18:19
**contributed** 78:4,8
**control** 108:1,24 109:12
**controlled** 90:23 109:22
**conversation** 26:19
**conversations** 23:2,4
**copy** 6:5,7,9 117:7 117:8
**corporation** 1:8 1:10,13 4:6,17 19:2
**correct** 6:25 7:5 7:16 9:15 10:22 10:23 11:8 13:13 17:5,6 22:12,13,16 24:3,7,23,24 25:9 27:13 28:9 36:11 36:16,17,22 38:20 41:10,25 42:5 44:11,12,15,16 49:8 50:5 53:2,12 54:10 55:21 56:23 58:12 62:12,19,24 63:5,11,15,22 68:15 70:25 71:17 74:6 75:1,2 76:8 81:10,13,14 84:8 86:8,12,21 87:6 89:19 93:13 98:20 105:8 108:18,19 111:13 113:5
**correction** 79:22
**cost** 46:10,22 47:1 66:1 99:6
**counsel** 4:10 8:9 9:24 11:5 26:6,19

**count** 26:20 116:13,15
**count** 18:4
**couple** 97:14
**course** 5:24 8:14 12:8,11 53:19 55:16 56:1 80:15 97:10 100:5,6 103:9,13,13,13 104:10
**courses** 97:10 103:9,11
**court** 1:1 4:18,25 27:16 71:9,14 117:12
**cover** 24:15 78:12
**crazy** 54:3,8 98:10
**created** 77:9,13 89:15
**critical** 82:5
**cruise** 72:21,24 73:2,3 74:3,3,4,8 74:10
**cruises** 2:9
**currently** 5:14 20:7
**currents** 88:15,21 89:3,15 91:25
**curriculum** 3:16
**customers** 74:16
**cv** 16:2,11,23,25 17:1,7 19:25 20:6

**d**

**d** 3:1 5:8
**d.a.b.** 18:14,18
**da** 21:21,21,21,21
**data** 8:12 11:13,17 11:23 13:11 15:7 78:25 79:1,3,5,8 79:21 80:16,18
**date** 9:19 112:1,13 118:25

**dated** 116:21
**david** 2:12 4:15 7:12 21:13 117:2
**davidmedina** 117:2
**day** 56:15,17 75:24 115:10,14 116:21 117:5
**days** 117:11
**deal** 16:17 46:24
**dean** 112:24
**december** 1:19 4:2 115:12,14 116:21 117:1,5
**decide** 73:9
**declaration** 3:13 6:8 7:14 9:6 11:25 12:24 17:4 20:2,5 20:12,17 21:7,15 23:9,16 25:8 26:15,23 31:24 32:5,9 34:15 35:4 44:1 55:1 64:2 69:19 71:17,25 84:4 85:17 88:10 90:10 95:24 96:1 104:23 109:25
**declare** 118:20
**decurtis** 1:5,13,13 2:2 3:14 4:6,14 7:4 9:7 21:12 22:24 24:11,13,23 25:1,4,7,16,24 26:14 64:24 117:4 118:3
**defend** 10:14,17 10:20 11:1,12
**defendant** 1:9 19:8
**defendants** 1:14

**define** 28:25 32:4 36:6,14,15 74:25 76:13
**defined** 34:5 46:18 54:13 84:22 108:1
**defines** 36:10
**defining** 109:12
**definitely** 103:23
**definition** 70:19 76:25 104:23
**demanded** 101:25
**department** 18:15 18:19
**dependent** 34:4
**depending** 79:4,18 86:16 87:24 95:7 101:19 111:4
**depends** 75:4 106:9
**deposed** 18:1
**deposition** 1:16 4:4 5:24 6:15 8:18 17:8 21:12,20,22 21:25 22:9 23:25 85:3 114:6 116:8 117:5,10
**describe** 13:15 88:25
**described** 11:24 12:23 34:9 38:9 43:11 90:20
**describes** 46:4
**description** 17:16 17:19
**descriptions** 34:1
**design** 3:18 12:13 21:21 30:4,12 42:10 43:9 49:18 51:8,8 52:10 55:6 55:14 56:6,15,16 56:17 64:9,18,19

Veritext Legal Solutions
866 299-5127

[design - dr]

65:5 66:4,18
72:15 73:7,11
76:15 78:13,21
80:1,9,12,24 81:4
81:9,11,17,25 82:1
90:21,22 96:16
97:1 98:2 104:19
107:25 108:23
**designed**  90:25
93:24
**designer**  12:12
23:23 48:24 66:6
75:6 76:19 93:24
96:3,16 106:24
**designers**  76:5,12
94:20
**designing**  65:4
72:4,8 74:6,12
**designs**  76:15,16
89:2 95:16 96:11
96:22 97:12,21
**desktop**  109:4
**detail**  30:9 34:2,7
**detected**  110:25
**determination**
45:4
**determine**  67:6,11
83:10
**determined**  39:16
45:18 48:6,7,16
68:5 97:24
**determining**  28:19
45:21
**detune**  101:18
102:12 109:7
110:23
**detuning**  101:14
101:22
**develop**  104:4
**device**  25:7,16,24
26:14 33:17,22,23

34:17,20 35:3
37:9 38:8,25
39:16,19,22 41:18
42:11,21 43:10
46:5,8 47:13,21
48:20,22,23 49:8
49:12,20,22 50:8
50:11,14,14,17,18
50:24 51:1,13,15
52:12,17 53:11
54:1,3,8,14,20,20
54:21,22,24 55:6
55:15,20,25 56:6
56:25 57:10,13,17
57:22,25 58:3,11
58:12,14,16 59:1,6
59:11,19 60:14
63:3,9 64:4,7,13
65:4,17,22,23 66:7
66:11,16,24 67:15
68:8,22 72:4,9,15
73:8,10,25 74:6,21
75:6,15,19,21,23
76:3,6 77:1,4
78:23 79:9,11
80:2,5,5 83:3 87:3
87:22 88:17 89:6
91:18 92:15,18,21
99:22,24
**devices**  5:19,23
12:15 24:25 25:4
34:4,10 53:2
56:10,21 57:1
58:5,7 59:7 60:22
62:11,18,23 73:17
73:17 77:8,9
78:17 83:18 92:24
112:12
**diameter**  89:18
90:3

**dielectric**  93:1
98:9
**difference**  41:2
74:19 109:20
**different**  41:10,20
45:17 52:20 53:21
54:2 64:20 71:11
74:2,4,4,5,12
75:17 76:5,7,11,13
76:13,15,16 79:15
79:16 81:11,12,13
85:1,4,5 96:22
110:8 111:3
**difficult**  51:6
56:13 82:6 108:8
108:21 109:14
110:10
**dig**  58:21
**dimension**  42:5
55:11,21 57:15
59:2,13,20 86:2,7
89:19,21 93:17
**dimensional**  64:25
**dimensions**  40:11
55:14,25 57:2
58:8 60:15 63:4
105:1
**diodes**  106:25
**direct**  3:3 5:3
20:12 64:2
**directly**  26:18
56:14
**disagree**  93:15
**disclose**  10:1
66:13,21
**discloses**  86:1
**disclosing**  26:9
**disclosure**  27:11
27:11 28:8,8 42:2
66:10

**discuss**  6:14 15:3
26:5,23
**discussed**  85:19
**discussing**  85:18
87:10
**discussion**  14:19
30:18,19 32:7
38:6
**discussions**  9:23
**disney**  21:13
**dissipate**  91:6 92:1
92:4
**distinction**  37:22
**distribution**  117:9
**district**  1:1,1
**division**  1:2
**dmedina**  2:12
**doctor**  4:18,25
8:22 14:20 26:13
27:16 37:13,21
43:24 44:24 69:17
83:4 113:23
**document**  3:18 6:7
9:14 13:10,24
17:3 21:2,2
102:23 118:20
**documents**  6:3,5,9
13:15,20 14:14
20:21,25 21:3,5,14
22:11 24:10,15,16
24:22 83:16
**doing**  12:14 64:18
74:18 75:15 89:1
91:7 94:18 96:2,4
110:13
**domain**  12:4
**door**  73:18
**doubt**  98:18
**dr**  3:13 4:4 5:5
6:12 16:21 85:20
86:3 87:11 93:11

[dr - experience]

93:24 94:13 95:10
100:25 101:12
**drastically** 66:1
**dremel** 91:15
**drill** 37:23
**driven** 65:19
66:17
**duration** 5:23
**dynamically** 109:1

**e**

**e** 3:1 5:8,8
**easier** 52:10,10
66:2,3,5,7 109:18
**east** 100:19
**eastern** 4:2
**easy** 81:25
**eddy** 88:15 91:25
**efficiency** 94:5
**efficient** 94:3,9
**effort** 40:4 67:11
**egnyte** 8:22 9:1
**eisenstadt** 1:17
3:13,17 4:5 5:5,7
6:12 16:21 115:8
116:9 117:2,25
118:3,25
**either** 6:9,10,19
93:17
**electrical** 71:20
104:10,13
**electronic** 5:19,23
6:3
**element** 45:12
97:16 109:17
**elements** 46:1,16
48:6 52:12 69:24
69:25 70:1,13
78:3,8 82:4,11
86:16 111:4
**eliminates** 88:20

**eliminating** 88:15
**emanuel** 2:3 4:13
**embodiment**
82:23 83:20 91:23
**embodiments**
67:25
**employee** 21:13
116:13,14
**enable** 36:21
53:19
**enabled** 28:20
35:7,22 37:4
38:19,20 39:13
40:21 41:3,16
42:20 84:13 85:7
**enablement** 19:12
27:2,24 29:15
30:5,13,17,19 31:3
31:6,17 32:7,13
33:6 34:13 35:13
36:4,19 37:2 38:6
39:5 42:9 53:15
64:15,20 65:12,15
66:9 68:14,25
69:2 70:15,25
71:17 80:22 81:16
84:6 85:7,14
**enables** 41:10
48:12,18 84:7,11
**enabling** 27:10
28:7 40:19 45:9
**enclosed** 60:15
62:24 63:4
**enclosure** 90:14
**encrypt** 79:8
**encryption** 79:7
**ended** 44:4,11,14
45:14 48:10
**energy** 79:4,7,15
79:17 89:3 92:1,4
92:7,7 100:12

103:16 108:18
**enforces** 27:2,24
**engage** 51:24
**engaged** 7:7 17:18
19:14,18,22
**engagement** 7:10
**engineer** 71:20,21
104:13,14
**engineering** 91:17
96:23,24 98:23
104:10
**engineers** 110:3
**enter** 118:2
**entire** 33:14
**entirety** 50:22
**entitled** 3:18
**environment**
73:15 74:15 75:12
75:13 109:13
**environments**
74:12
**equal** 55:25 56:2
60:15
**equations** 97:14
107:17
**errata** 3:9 117:8
118:1
**error** 79:22
**especially** 51:10
**esq** 2:5,6,12 117:2
**essential** 27:3,24
**est** 1:19
**established** 84:25
**et** 3:21
**etch** 96:21
**exactly** 68:2
112:14
**examination** 3:2
5:3
**examine** 25:3,23
26:14

**examined** 83:14
83:15
**examining** 25:6,15
**example** 56:20
72:20 83:21
**exceed** 113:4
**execute** 117:8
**executed** 9:14
**execution** 3:9
**exemplary** 14:15
**exhibit** 3:13,16,18
8:18,19,20,23 9:4
9:5,11,14,17 10:6
10:21 11:13,25
13:12,21 14:2
15:3 16:3,4,7,10
16:10,14,14,16,22
16:23,24 17:4
20:2,5,6,7,11
22:12 25:17,20
106:15,15,18
111:12
**exhibits** 3:10
24:14,21
**exhibitshare**
106:17
**exist** 49:7
**existed** 56:10
62:12,18,24 63:5
63:10,15,22
**existing** 81:25
**exists** 53:2
**expect** 52:6,9,18
52:20 97:5,8,12,18
106:23 113:9
**expectation** 74:14
**expecting** 97:15
**expensive** 46:12
**experience** 11:18
11:19,22 12:12
17:13 48:24 49:17

**[experience - give]**

49:18 71:5 74:11
89:1 94:20 97:11
101:20 104:9
**experienced**  104:9
**experiment**  96:17
**experimentation**
27:7 28:4,15 29:5
51:25 52:15 93:13
97:7 100:1 103:2
**expert**  6:25 7:3,8
7:18,25 8:14 9:6
9:18 10:7,12,12,14
10:19,24 11:11,16
11:24 12:4,8,22,24
13:12 14:10 15:9
17:18,20 18:1
19:10,14,19 20:23
21:1,6 22:15 35:5
47:12 49:4 51:19
67:2 69:22 77:7
96:25
**expertise**  28:23
**expires**  115:25
**explicitly**  22:3,5
**expressly**  108:20
**extensive**  49:18
**extent**  9:22 26:4
58:17
**extra**  86:16

### f

**f**  13:17 94:21,22
**fact**  71:14 106:5
**factor**  97:25
**factors**  29:23 30:3
30:4,12,19,22 31:2
31:4,12,14,17 32:2
32:14,17,22 33:2,6
33:8,10,11,12,21
33:25 45:17,18,20
45:22 46:6,9,13,21
46:23 47:1,2,8

68:13,16 81:7,11
82:17 93:21 96:10
99:9
**facts**  11:13,17,22
118:20
**fair**  6:22,23 68:25
75:23 80:20 84:16
**fairly**  51:12 98:1,1
**falling**  73:22
**familiar**  7:1 103:3
**far**  73:6 77:11
78:16 92:8 94:11
97:20 99:24
**fast**  17:22
**fastened**  109:23
**fdot**  18:15
**features**  56:21,24
57:1,3,4 63:9
**fed**  107:15
**feed**  87:8
**feel**  7:23 48:4 50:3
72:20
**feet**  75:21,24
**fellow**  112:24
**felt**  35:7 68:14
**ferrite**  87:15,18,19
87:21 88:5,6,7
90:10,15,17 91:8
91:19
**fewer**  59:7
**field**  11:22 12:3,7
13:23 54:17 87:23
87:25 88:4,21
89:2,3,15 91:1,5
112:8,10
**figueroa**  2:4,11
**figure**  68:16 82:21
**figured**  14:18
**figures**  67:17
**filed**  117:12

**filing**  113:5
**final**  90:14
**financially**  116:17
**find**  18:4 49:2,10
68:17 96:13
**fine**  100:22
**finger**  109:6,8
**firm**  19:23
**first**  7:7,10,11
8:18 17:12 18:6
20:2 33:21 39:11
44:10 45:24 46:1
57:3 60:17,22
78:14 107:24
**fix**  91:12,12,15
**flexibility**  64:9
**flexible**  66:4
**floor**  2:4
**florida**  1:1 5:12,13
18:14,19
**focus**  30:10 64:24
**focusing**  90:9
**fontalvo**  1:22
115:22 116:5,25
117:20
**foregoing**  116:8
118:20
**forget**  93:3 106:10
**form**  8:4 25:17
49:6
**formed**  9:19 10:8
10:13,16,20 37:2
**forming**  7:18 8:14
12:8 20:23 21:6
22:12,15 32:12
36:4 69:22 77:7
**forth**  79:8 84:23
92:10 104:14
**forward**  80:21
**forwarded**  3:9
117:11

**found**  117:8
**foundation**  40:1
86:13 92:16
**four**  97:25 98:1,13
113:11
**frame**  111:16,20
**free**  50:3
**frequencies**  108:2
108:8,22 110:10
111:24
**frequency**  90:25
91:11 94:8 99:16
102:1,3,15 106:7
**front**  6:6 17:7
**full**  9:17 10:6,21
27:6 28:2,13 29:4
35:15 36:21 37:4
38:19 39:13 52:11
**fully**  10:13,16,20
60:14 62:23 63:3
**fun**  96:4 104:6
**further**  21:11
37:17 93:12 98:15
98:15,19 99:24
100:24 113:25
116:12
**future**  10:14 12:23
13:3 15:24

### g

**gain**  94:1 97:9
**gainesville**  5:12,13
**general**  13:6 44:19
107:23
**generating**  89:3
**getting**  60:24
100:20
**gigahertz**  104:25
105:20 108:9,13
108:17
**give**  4:22 14:20
33:1 75:20 77:17

Page 9

**[give - infringement]**

94:1,4
**given** 43:9 52:7
61:12 66:18 75:5
**go** 8:22 20:1 27:22
29:1 30:9 32:21
32:25 34:8 42:7
47:5,6 50:21
51:10 65:8 79:8
80:21 82:13,18
84:3 91:6,10,14
98:10,15,16
100:16 111:8
114:2
**goes** 26:18 42:21
44:6 92:11 99:6
103:20
**going** 8:17 10:10
11:3 13:3 20:4,5
26:6 27:22 30:16
32:8 37:23 38:11
39:14 40:5 51:24
58:19 65:23,24
76:12 79:6,14
80:19 84:20 85:11
87:2,4 92:9,17
99:25 100:18
102:22 104:4,5,6
110:16
**golly** 18:12
**good** 4:12,15 5:5
43:15 78:19,19
94:2 113:17
**graduate** 97:10
103:11
**greatest** 64:9
**griffin** 2:5
**ground** 93:5,6
**guess** 17:6 39:8
41:5 50:19 53:14
64:17 74:17 76:23
83:25 84:21 85:11

93:25 100:19
**guide** 14:12,15,15
15:2,10,13 85:20
86:1 87:11,17
**guides** 14:17 15:1
15:8,22
**guys** 85:12

**h**

**half** 92:7 95:6
**hand** 4:19
**happen** 74:14
**hard** 6:5,7,9 29:17
108:25
**hardware** 60:12
61:1
**hate** 75:10
**head** 15:25 33:2
112:18
**heading** 17:12
**hearing** 18:8,22
19:5 71:9
**held** 43:20 69:13
113:20
**hell** 109:18
**help** 56:17 61:25
74:25
**helped** 101:24
**helping** 56:15
**herrington** 2:10
4:16
**high** 98:9
**higher** 95:3
**hit** 52:7
**hold** 9:20 26:3,3
31:8 39:25
**holds** 88:16
**home** 5:11
**hour** 38:12,14
**hours** 7:17,22,23
17:21 95:25

**house** 89:7
**housing** 89:8,9,10
89:17
**huh** 17:15 84:5
**hyunjin** 3:20
112:23

**i**

**ic** 51:8 89:2
**idea** 64:18 83:17
83:24 84:1 87:15
**identical** 91:2
**identification**
16:22 106:15
**identified** 61:14
**identifier** 61:6,16
**identifiers** 60:25
62:7
**identify** 4:10 5:9
6:20 12:20 13:9
15:21 17:25 21:5
21:10 22:11 32:16
33:5,8,13 45:22
47:12,16 61:17
87:5
**identifying** 86:7
**ieee** 112:24
**ignore** 12:17
**immediately** 96:9
**impact** 46:8
**impedance** 110:17
110:18,21
**implement** 75:6
76:6,19 104:24
105:19
**implemented** 88:5
**implementing**
103:15 106:6
**important** 25:7,12
37:23 78:24 79:3
80:1 99:8

**impossible** 46:24
**impossibly** 46:11
**impractical** 99:7
**inch** 56:2,22 60:16
89:8
**inches** 55:17,20
56:1,22 58:8,12,16
59:3,13,20 60:16
63:5 86:2 87:5
**incidental** 12:16
**inclination** 64:12
64:15 65:11
**inclined** 64:6
66:12
**include** 29:22 30:3
46:9
**included** 21:14
22:3,5 39:1 68:20
**includes** 24:16
**including** 31:3
37:8 49:12 65:18
89:9 90:14
**incorporate** 15:16
15:19
**increased** 64:8
**individuals** 113:3
**inductance** 90:13
90:16 91:7,9
**inductors** 109:24
**industries** 58:4
**infinite** 52:8
**influence** 30:5
31:12,14 34:12
39:5 47:8
**information** 8:3
8:12 10:2 12:4,17
13:11 15:8 20:22
28:17 29:13 84:23
**infringement**
22:19,22 42:22

[inherent - language]

**inherent** 42:8,14
42:19,21 43:4,7
44:5,15,17 45:8,21
47:13,16,21 48:5
48:11,17 49:7,10
49:15,19 50:18
53:16 68:17 74:25
75:4,17 76:1,7,18
76:25 77:1,3,9,13
77:19,25 78:4,9
80:24 81:8,12,21
82:12,18,22 83:1
83:10,17,20 84:8,9
84:12,15,22,25
85:5 99:21
**inquiry** 85:7
**insert** 88:23
**inserts** 88:23
**inside** 28:25 35:3
39:17 67:17 72:21
73:2,2 76:3 87:17
88:14 89:8 93:1
**instruct** 11:3 26:7
**instruction** 3:4,5,6
26:17
**instrument** 102:2
**instruments** 87:11
**integrated** 51:7
**intend** 10:25
**intended** 64:5
**interact** 107:5
**interaction** 12:12
12:16 26:19
**interested** 31:15
72:25 116:19
**interesting** 70:5
106:11 107:3,7,16
112:5
**interface** 6:20
**interfere** 93:8

**interference** 73:5
92:14
**interferers** 80:10
**interpret** 50:13
**interpreted** 67:14
**interrupt** 92:2
**introducing**
101:13 103:3
**introduction**
107:22,25
**invalidity** 22:23
23:1
**invent** 52:16 63:18
63:24
**invention** 27:6
28:3,14,19 29:4
35:16,22,25 36:3,6
36:11,16
**inventive** 58:10,25
**inventor** 24:7 97:6
**inventors** 23:3,5,7
23:15,18,20,23,24
24:9
**inverted** 13:17
94:22
**invested** 7:24
**investigate** 14:9
49:2
**involved** 45:19,20
56:14
**involves** 11:4
**iot** 12:12
**iphone** 109:5,6,8
**iron** 87:20
**issue** 18:20 19:12
65:13 98:7,22
99:16 113:5
**issues** 23:8,15 25:8
**items** 20:20 22:1

**j**

**j** 92:21 93:1
**jared** 2:6
**jkneitel** 2:6
**job** 66:19 94:10,10
94:15
**john** 2:15 4:7
**judge** 68:5 85:12
**judgment** 3:15 7:5
9:8 24:14,21,22
**justin** 2:5

**k**

**kathy** 112:23
**keep** 5:22 109:7
**keeps** 80:19
**kilohertz** 91:3
**kimberly** 1:22
115:22 116:5,25
117:20
**kind** 13:25 34:17
37:21 44:22 45:3
57:6 66:6 73:6
79:12 80:6,17,21
81:24 89:1 96:7
97:13 98:7,10
102:24 107:6
110:21
**kinds** 34:1 73:5
**kneitel** 2:6 43:17
**know** 8:23 12:3
13:3,15 16:7,13
20:13 23:12,23
25:12,20 26:8
27:15,23 29:23
30:21 32:3 34:20
34:21 36:5 38:24
39:16 41:17 43:9
45:4,16 46:7,10,12
46:24 48:3,4,20
49:1 53:14,15

54:16,17 56:16,17
56:20 57:6 59:5,5
59:6,8 60:19,24
61:9,24,25 62:1,6
65:16,18,22 66:18
67:14 68:2,18,19
69:2 70:9,12 71:4
73:1,16,20 75:10
75:20,22,24 76:11
78:6,15,16,17,18
78:22,25 79:2,6,9
79:14,20,23,25
80:6,8,9,10,11
82:2,2,9,14 84:19
85:6 90:7 91:16
91:21 92:13,20,23
92:23 93:23 94:6
94:7,12,15 96:15
96:20 97:16,25
98:1,4,5,12,15
100:5,8 102:17,19
102:21,22 103:24
104:1,9 106:16
107:1,10
**knowing** 31:15
**knowledge** 13:6
13:22 17:8,9 46:8
60:9 61:7,10,18
85:13 97:9
**knowledgeable**
55:24
**known** 44:5 48:11
63:14 84:10 90:22

**l**

**l** 5:8,8 110:12
**lacks** 40:1 86:13
92:16
**lam** 21:20,23 24:3
24:4,5
**language** 36:7,9
36:13 37:8 41:15

Veritext Legal Solutions
866 299-5127

[language - matching]

41:18 45:12 46:1
46:14,16 49:23
50:2 67:1 69:19
71:3,7,8,10,11,20
**larger**  75:23 87:4
89:16
**largest**  64:7,13
65:25
**latency**  79:25
**law**  19:23 29:8,9
42:18,23 43:1
**lawyer**  27:20
**lawyers**  85:12
**layout**  15:14,18
**lead**  74:5
**learning**  27:20
110:1
**legal**  17:12,17
18:11 26:24 27:15
28:21 29:8 36:23
39:7 40:14 42:24
43:5 49:24 52:3
58:18 67:22 70:16
75:9 76:21,24
77:4 85:10 100:4
**letter**  3:8 117:14
**level**  93:11 103:11
112:21 113:4
**lie**  81:9,13
**life**  35:1 66:7
**light**  23:8 68:3
**liked**  8:13
**limit**  42:8,14,19,19
42:21 43:4,4,7
44:6,15,18 45:8,21
47:13,16,21 48:5,8
48:12,13,17,19,21
49:1,2,3,7,11,11
49:16,19,21 50:18
51:16,23 52:1,6,10
52:13,20 53:1,5,5

53:6,11,17,19,21
53:23 54:10,15
68:7,17 74:25
75:4 76:18,25
77:1,3,9,13,19,25
78:4,9 80:24 81:8
81:13,21 82:12,18
82:22 83:1,10,17
83:20 84:8,9,10,12
84:15,19,22 85:1,5
99:21
**limitation**  66:15
66:23 67:3,6,7
68:19
**limitations**  54:9
55:7,15 56:7
67:20 68:4
**limited**  39:22
40:10 42:4 49:22
50:8,16
**limiting**  41:24
42:1
**limits**  42:14 52:5
53:16 75:17 76:7
**line**  38:15 40:22
65:9 111:6 118:5
**lines**  107:7
**links**  60:21
**list**  18:11 20:15
21:8 22:6,7,10
74:23
**listed**  20:20
117:15
**lists**  104:12
**literature**  13:6
61:22 95:13,17
96:14 97:4,13,17
**little**  5:20 10:10
37:17 44:25 57:16
60:6 87:8 91:16
94:4,6 96:17

100:18 102:4,5,8
103:12
**live**  19:5
**llc**  1:5,13 2:2
**llp**  2:3,10
**loading**  101:1,13
101:18,21,23
**location**  5:9,12
**long**  69:7 73:9
78:22 80:4 86:2
**longer**  73:21,23
102:13,13
**look**  13:15 14:17
24:10,22,25 32:5
45:23,25 46:3
47:7 60:1 61:12
69:18 70:20 92:17
94:24 96:15 98:16
106:13 107:21
111:17 112:6
**looked**  7:9 15:17
17:4 24:13,15
56:8 67:13 82:2
83:13 92:20 94:18
97:3,5 100:11
112:5
**looking**  20:11
21:10 45:11 48:25
67:17
**looks**  110:16
**los**  2:4,11
**lose**  34:25
**losing**  44:24 89:3
**lot**  12:12 31:2
51:10 71:5 73:16
82:17 94:19 96:2
97:6,7 99:8
104:12 109:18
**lots**  95:18
**low**  90:25 103:16
108:2,8,18,21

110:10 111:24
**lower**  44:6 48:12
66:1 84:10
**lowest**  67:7
**ls**  109:17

## m

**m**  5:8
**macdonell**  2:15
**macdonnell**  4:7
**magic**  110:21
**magnetic**  87:23,25
88:21 89:2,2
**major**  97:15
**making**  49:20 54:3
65:16 96:4 98:24
98:25 110:14
**management**
74:15
**mandated**  72:13
72:19
**manufacturability**
66:2
**manufactured**
91:22
**manufacturing**
19:2 72:14 99:12
**mark**  8:17 16:2
**marked**  8:20 16:4
16:23 20:7 106:14
106:18
**marking**  16:13
**markman**  18:8,21
19:5 71:9
**match**  107:13
108:1,24,25
109:12,13,16,17
109:18,21,23
110:1,13,17 111:7
**matches**  109:1
**matching**  3:19
103:4,5,6,10,12,14

[matching - need]

103:16,21 104:25
105:19 106:6
107:6,15 110:7,8
110:11 111:1,4
113:7,8
**material** 87:19,20
**materials** 20:15
98:7
**matter** 4:5 7:24
13:2,5 35:6
**matters** 13:3
17:17,17,19,21
18:2
**mean** 10:12 15:5
22:4 30:2,15
35:24 36:5 47:17
50:14 52:16 64:18
70:9 71:4 72:18
77:21 81:3,24
91:13 92:2 104:13
105:4
**meaning** 70:2,7,8
70:10
**means** 25:12 71:10
71:12,22 95:3
102:14
**measure** 91:14
102:7
**measured** 90:13
102:2
**measures** 110:15
**measuring** 111:10
**medina** 2:12 4:15
4:15 7:12 8:6,15
9:20 10:9 11:2,8
11:15 12:1,9,25
14:5,20 15:4,11
16:15 20:24 21:9
23:10,21 24:12
25:2,10,18 26:3,16
27:14 28:10,21

29:16 30:14 31:8
31:10,19 34:14
35:9,23 36:23
37:5 38:11,21
39:6,25 40:13,22
41:4,11 42:6,24
43:5,15 47:4,15
49:24 50:9 51:4
52:2 53:13 55:22
56:12 58:17 59:4
59:25 60:11 61:20
67:22 69:7,10
70:3,16 74:7 75:7
75:9 76:9,21
77:20 81:2,19,22
82:25 83:22 85:9
86:13,22 92:16
100:3,16,22 105:3
105:23 112:2
113:15 114:1
117:2
**meeting** 54:9
**meets** 55:6,15 56:6
**melde** 112:24
**memory** 51:11
58:8,11,15,19 59:1
59:12,19 60:17
63:10 80:15,16
82:15
**mention** 32:12
35:2,12 55:13
72:12 88:9,24
90:10,12
**mentioned** 11:17
12:23 14:13 17:3
18:21 24:1,17
32:1 34:15 35:3
42:14 46:20 62:6
63:10 78:15 80:24
81:7 83:12 87:15
87:17 88:11 94:17

97:21 104:15,16
**mentioning** 13:20
17:23 42:1
**metal** 88:2,3,18,20
88:24 89:13,15,24
90:5,17 91:5,24
93:6 94:25 98:8
109:4 110:20,24
111:6
**metes** 36:11
**methodology** 97:1
**methods** 88:15
**miami** 1:2
**mic** 37:17
**microwave** 103:13
**millimeter** 89:9
108:7,12
**millimeters** 88:1
104:1
**million** 97:16
**millions** 98:25
**mind** 14:3 81:18
88:13
**mindful** 26:10
**miniaturization**
93:12 98:19,21
108:2,6,21 111:24
**miniaturize** 54:2
**miniaturized**
112:7
**miniaturizing**
54:7
**minimal** 76:15,16
**minimum** 42:4
48:2 77:2 86:17
**minor** 31:9,11
**minutes** 43:14
69:7,9 113:11
**misses** 64:25
**misstate** 40:3

**misstates** 14:5
25:10 38:21 40:2
41:11
**mistakenly** 9:1
**mitigates** 92:13
**mitigation** 88:7,9
**mock** 73:2
**model** 109:9
**money** 99:1,4
**month** 17:2 58:2
75:22
**morning** 7:9
**motion** 3:15 7:4
9:7 24:13,20,21
**mount** 86:23
**mounted** 86:21
**mouth** 37:18
**move** 37:17
**moving** 79:21
**multiple** 75:16
79:11
**muted** 27:17

| **n** |
|---|

**n** 3:1 5:8
**name** 5:6,7 117:14
**names** 23:22
**narrow** 35:21
**natural** 108:6
**naturally** 46:7
**ncf** 88:19
**near** 64:25 91:1,2
91:5 110:19,24
**necessarily** 47:19
**necessary** 11:14
25:16 87:2
**need** 30:8 32:4
36:5 70:13 78:16
78:18,22,25 79:1,6
79:9,13,20,22,23
79:23,25 80:2,4,9
80:11,12,18 92:5

Page 13

[need - ordinary]

92:10 94:10 98:6
103:12 104:6
**needed**  35:7 73:6
74:20 92:11
**needs**  42:19 73:21
**network**  33:19,24
33:24 102:24
103:4,16,22
104:25 105:20
106:6 107:15
**networks**  103:6,6
111:1
**never**  57:9
**new**  52:16
**nfc**  57:7,10,18,23
57:25 58:6 59:20
60:20 62:2 63:22
63:24 79:2 88:19
89:8,11,15,24 90:2
90:4,24 92:1,4,6
92:14 93:4,7
**nice**  66:6 93:25
102:14
**nine**  18:3
**noncumulative**
15:1,5
**nondielectric**  95:2
**normal**  80:6
109:22
**northwest**  5:13
**notary**  115:23
**note**  44:13
**notes**  97:18 113:12
116:11
**nother**  70:21
**notice**  117:5
**novel**  58:10,13,14
58:25
**november**  7:10,15
7:19,19 9:15
25:25 26:15 95:24

111:17
**number**  19:3
47:17,19 80:20
81:7 106:20
**numbering**  16:18
**numerous**  80:14
**nxp**  13:24 14:12
14:15 15:2,10
62:1 85:19,25
103:20

---

**o**

**o**  117:2
**oath**  3:7 115:1
**objection**  8:6,15
9:20,21 10:9 11:2
11:15 12:1,9,10,25
14:5,21,22 15:4,11
20:24 21:9 23:10
23:21 24:12 25:2
25:10,18 26:16
27:14 28:10,21
29:16 30:14 31:10
31:19 34:14 35:9
35:23 36:23 37:5
38:21 39:6,25
40:1,13 41:4,11
42:6,24 43:5 47:4
47:15 50:9 51:4
52:2 53:13 55:22
56:12 58:17 59:4
59:25 60:11 61:20
67:22 70:3,16
74:7 75:7 76:9,21
81:2,19,22 82:25
83:22 85:9 86:13
86:22 100:3 105:3
105:23 112:2
**offer**  10:25
**offered**  6:24 7:1
7:25 8:4 41:24

**oh**  18:12 33:8
57:12 58:9 81:3
96:6 101:5 111:18
**ohms**  110:21,24,24
**okay**  5:22 6:12,18
7:2,14 9:3,4 10:10
10:19 11:11,21
14:2,12 16:1,8,9
16:11,25 18:16
20:3,10,11 22:9
25:6 26:22,25
28:17 29:11 31:20
32:4,8,11,15,18,21
35:12 37:15 38:6
41:22 43:3,13
44:2 46:20 49:4
50:6,16 51:5 55:2
56:1,4 60:4,12
61:4 67:5 69:5,10
69:21 70:5 71:23
72:1 78:10,10,12
84:3 85:16 90:6,9
90:21 91:18 93:10
96:10 97:5,7
99:23 100:15,22
100:24 101:8,10
105:9,13,15,18,24
106:13,19,19,21
108:4 111:14,14
113:2,10,18,23
114:2
**ones**  22:7 33:13
**open**  6:3 43:16
44:4,11,14 45:14
48:10
**opens**  73:18,20
**operate**  73:23
86:12
**operating**  73:17
73:18

**opine**  23:8
**opined**  25:8 77:24
**opining**  42:3,8
**opinion**  12:4 14:10
21:1 29:8 39:12
39:14 40:10 47:7
49:6 55:4 56:5
66:8 67:19 71:6
71:17 93:22 95:21
95:22 97:20
103:15 104:21,24
**opinions**  7:3,18,25
8:4,14 9:18 10:7
10:12,13,14,19,22
10:24 11:11,14,16
11:24 12:8,22
13:12 15:9,23
19:11 20:23 21:7
22:12,15 25:17,19
31:17 32:13 36:4
37:2 39:5 51:19
64:15 69:23 70:24
71:1 77:7 81:16
93:11,15 100:25
**opportunity**  19:11
25:3
**opposition**  3:14
7:4 9:7
**optimal**  94:13
**order**  8:4 49:2
51:25 86:11,24
100:1 105:20
**ordered**  117:7
**ordering**  117:11
**ordinarily**  103:17
**ordinary**  27:5
28:2,12 29:3,21
35:14 51:24 52:5
52:19,25 53:3
54:13 55:19 56:5
59:11,15,18,24

Page 14

[ordinary - placed]

60:9,10 61:8,11,12
61:19,22 62:5,10
62:17,21 63:2,7,14
63:20 64:13 65:12
66:11,14,21 70:2,7
70:8,10 84:14
103:17 104:22
105:16 113:4
**original** 117:11
**orrick** 2:10 4:16
19:23
**orrick.com** 2:12
117:2
**output** 79:1
**outside** 28:17
29:13 59:23 60:9
61:18 68:22 70:3
**overboard** 73:22
**overcome** 101:22

**p**

**p** 94:21
**p.m.** 1:19,19 4:2
43:19,20,20,22
69:12,13,13,15
113:19,20,20,22
114:5,6
**package** 59:11,18
**packaged** 58:11
58:16 59:2
**packaging** 51:9
**packets** 79:21
**page** 3:2,12 9:10
9:12 17:12 27:19
85:22 90:12 93:16
101:7 118:5
**paper** 106:12,19
106:21 107:22
108:21 109:3
110:9 111:12
112:22 113:3

**papers** 96:7 106:5
**paperwork** 83:15
**paragraph** 20:13
20:14,15,21 21:8
21:11,19 22:1,8,10
26:22 27:1 35:12
43:25 44:3 48:9
50:2,4 54:25 55:3
55:18 64:1,3,23,24
65:13 69:18 71:24
74:24 84:3 85:16
85:18 87:5,10
90:11 93:10
100:24 101:5,6
109:25 110:8
**parameter** 103:13
**pardon** 37:12 83:4
**park** 3:21 112:23
**part** 31:1 45:11
51:19 66:19 67:9
68:16 69:1,3
91:17
**particle** 58:4
**particular** 13:2,5
30:7,15 31:7
43:10 45:15,24
46:5 48:22 56:24
57:2,3 75:5 77:2
77:14 81:9 90:24
100:9 107:2
**particularly** 82:3
**parties** 116:14,15
117:9
**parts** 12:14 23:24
52:14 61:23 66:3
**pass** 113:25
**patent** 6:8 18:16
23:3,5,20,24 24:7
24:9 27:3,12,25
28:8,11,18,25 29:2
29:14,19,25 30:16

30:25 31:3,21
32:6,21,23,25 33:4
33:14,17 34:1,6,8
34:11 35:7 36:11
36:19 41:10 44:10
45:10 49:8 50:19
50:20,21,22 55:4,5
56:9 61:13 62:3
62:10,16,22 63:1,8
63:13,21 66:20
67:4,12,18 68:1,3
71:16 72:10 77:16
79:11 82:24 88:11
88:14 89:5,22,25
99:3 105:2,12
113:5
**patent's** 27:4 28:1
35:14
**patents** 12:7 112:1
**path** 88:18,20
**patrick** 4:12 69:8
100:17
**pattern** 86:14,17
96:21 98:9 103:24
**paying** 99:10
**pcb** 86:10,15
**penalties** 118:20
**pendant** 67:17
68:12,23 88:16
**people** 34:3,17,25
56:15 109:7
**percent** 94:7 99:15
99:15
**performance**
95:15
**performed** 51:18
83:1
**performing** 29:12
33:6 80:22
**perjury** 118:20

**permittivity** 95:3
95:5
**person** 27:5 28:1
28:12 29:3,20,20
35:14 51:23 52:5
52:19,24 53:3
54:12,14 55:10,19
55:23 56:5 59:10
59:18,24 60:10
61:8,10,11,18,21
62:5,10,16,21 63:1
63:7,13,20 64:5,12
65:11 66:11,14,17
66:21 84:14 104:9
104:21,24 105:16
**personal** 11:21
**perspective** 55:5
**pertains** 29:15
**ph.d.** 1:17 112:23
112:24 115:8
116:9 117:2,25
118:3,25
**phone** 6:20
**phones** 95:20
**physical** 46:23
47:2 51:23 53:1
53:10 54:10 61:1
91:8
**physically** 83:15
**physics** 50:23,25
**picture** 44:25
**piece** 13:11 90:5
107:8
**pieces** 12:14 61:23
**pifa** 13:17,25 14:3
14:8 94:21 95:19
95:21 98:2 107:13
**pifas** 96:7
**place** 14:18 81:13
**placed** 90:14 93:3

**[places - quite]**

places  85:1 109:8
plain  70:2,7,8,10
plaintiff  1:6,11
  19:7,9,15
plan  102:21
planar  13:17
  94:22
plane  93:5
planning  100:16
plastic  88:23
  89:14
play  28:18 31:5
  47:2 91:16 96:24
  103:1
please  4:10,11,19
  5:6,9 16:6 19:17
  26:23 45:4 58:22
  60:4 71:25 117:5
  117:8,13
plus  33:3
point  12:21 13:5
  64:25 85:25 99:23
  100:5,7,10
points  101:12
portable  47:13,21
  49:7 50:10,13
  57:9,17,22 58:12
  59:1 60:13 62:11
  62:18,23 63:3,9
  65:4 72:4,8 87:3
  87:22 89:6 92:15
portion  15:22
  61:14,17 90:11
posita  30:18 37:6
  37:9 38:1,4,5,7,23
  38:24 39:15,22
  40:11 41:16 42:9
  43:8,8 46:7 48:4
  49:11 53:17 55:24
  60:13 61:2 65:3
  68:17 71:2 72:3,7

75:18 93:16 94:14
  97:8 103:8 104:3
  104:11,16 110:4
  113:9
positas  103:10
  104:12,15
possibility  46:21
possible  62:4 64:7
  64:14 65:25 68:21
  76:12 83:18 84:1
  86:4 104:12
possibly  72:14
power  80:12 82:14
practical  29:22
  30:3,4,12 31:16
  32:2,14,22 33:5,9
  49:20 110:3
practice  27:5 28:2
  28:13 29:3 35:15
  66:10
practitioner  70:9
precisely  44:5
  48:11 84:10
precludes  51:1
prepared  11:1,12
preparing  20:17
presence  91:8
present  2:15 27:12
pretty  94:2 106:11
prevents  50:24
previously  17:5
primary  21:3
  29:19 46:13
principle  50:23,25
  81:15
principles  26:24
prior  18:1 25:24
  26:14 57:18 62:9
  62:14,16,21 63:1,8
  63:13

priority  111:25
private  60:25 61:6
  61:16 62:7
privileged  11:5
pro  27:3,25
probably  13:15,18
  14:16 16:10 79:21
  106:10 111:16
  112:23
problem  32:18
  40:6 101:23 109:2
processor  58:7,11
  58:15 59:1,12,19
  60:17,21 63:10
processors  5:21
  82:14
produced  24:11
  24:23 25:4,7
product  83:16,25
products  83:11,14
profession  54:17
professional  116:6
professor  112:24
program  80:17,18
  104:19
prohibitive  46:22
properly  86:24
prototype  65:16
provide  47:20
  66:10 78:7
provided  8:3 25:1
  25:16,24 26:14
  68:15 95:22 112:4
pschmidt  2:5
public  12:3 62:7
  115:23
publications  12:6
published  96:6
purposes  16:21
  21:6 42:22 80:25
  81:15

put  14:22 29:1,13
  29:18 33:22 49:9
  51:13 52:12 53:17
  54:8 76:2 80:12
  80:16,18 88:2
  90:4 91:1,4 94:23
  94:24,25 95:12
  96:17 97:6 101:25
  102:1,4,6,23,25
  103:22,24,24
  104:1 109:3,5
  111:6 112:3
puts  79:17
putting  110:23

**q**

quarter  95:7
  98:14
question  3:4,5,6
  10:3 19:17 26:20
  35:10,19 37:3
  40:4,7,9 45:5
  47:11 48:21 50:6
  50:7 51:6 56:13
  58:22 60:4 64:17
  64:21 65:13 67:9
  69:22 70:6,15
  81:3 92:5 101:10
  104:11,20 105:10
questioning  38:15
  65:9
questions  40:23
  58:20 113:13,25
  114:1
quick  37:12
quid  27:3,25
quinn  2:3 4:13
quinnemanuel.c...
  2:5,6
quite  107:2 108:8
  108:21 110:9

[quo - reviewed]

**quo**  27:3,25
**quote**  21:1 106:7

**r**

**r**  3:13
**raise**  4:19
**range**  44:11,14
  48:10 72:25 73:1
  73:4,13,19,21,23
  78:15 80:8 108:13
**ranges**  44:4
**rate**  78:25 79:3
**reach**  51:25 52:25
  53:4 55:11
**reactance**  101:1
  101:13,18,20,23
**read**  3:8 33:14,16
  40:16 42:20 49:23
  50:21 55:5 68:1
  79:10 117:8,10
  118:20
**readily**  93:16
**reading**  33:3 61:5
**readjusted**  111:1
**reads**  42:17 64:4
  107:25
**ready**  5:1 10:13,16
  10:20
**real**  74:17 92:24
  103:1
**reality**  99:3
**realize**  37:10
  60:13 98:3
**really**  28:24 30:8
  34:9 37:12 38:10
  51:9 64:22 65:13
  70:12 75:11 82:6
  82:10 83:14 89:11
  92:11 99:6 104:20
  112:3,25 113:11
**realtime**  1:23

**reason**  13:19
  14:13 26:13 118:5
**recall**  14:8,8 19:6
  23:22 42:1
**receiver**  78:19
**recess**  43:20 69:13
  113:20
**recitation**  61:6
**recite**  50:2 69:19
**recited**  40:12
  47:22 55:7 56:21
  72:9
**recites**  44:11
**recognize**  16:22
  16:24
**record**  4:1 5:6
  6:21 7:9 14:21
  20:4 38:14 43:19
  43:21 64:3 69:11
  69:14 113:19,21
  114:2,3,5 116:11
**reduce**  87:22
**refer**  20:5,6 50:3
  85:12
**referring**  110:7
**reflections**  73:4,16
**refresh**  8:23 16:6
**refreshed**  16:8
**regarding**  14:14
  32:13 70:24 93:11
  100:25 111:23
**regardless**  68:7
**regards**  10:19
  11:11
**registered**  116:5
**regularly**  110:2
**relate**  29:24 65:12
**related**  72:14
**relative**  93:3
  116:13,14

**relevant**  15:9
  29:10 68:13,24
  69:3
**relies**  85:22 87:12
**rely**  11:23 12:2
  15:22 56:4
**rematch**  109:10
**remember**  7:11
  22:17,21,25 34:10
  57:12,14 92:18
  96:8 106:19
  112:12,14
**remembered**
  13:25 96:1,7
**remembering**
  94:19
**remote**  1:16 60:21
  116:8
**remotely**  115:8
**remove**  52:14
**render**  7:25 19:11
  29:8 49:6 71:16
**rendered**  7:3
  70:24 71:1
**rendering**  31:17
  56:4 71:6 93:21
**replace**  34:17
**replication**  98:23
**report**  11:17,18
  14:1,7 116:7
**reported**  1:22
**reporter**  3:8 4:9
  4:18,25 27:16
  116:1,6
**reports**  17:20
**representing**  19:7
  19:9
**requested**  116:10
**require**  10:1 51:12
  52:15 76:14 93:12
  96:12,14 97:2

98:20 99:25
**required**  27:11
  97:23
**requirement**  27:2
  27:24 30:24 35:13
  36:20 79:18
**requirements**
  37:25 51:11 67:20
  74:5 79:16
**requires**  35:13
  50:10 66:9 83:19
**requiring**  27:4,25
  28:11
**research**  19:1
  112:6,16
**researched**  90:8
**resonance**  94:2
  102:2,14
**resonates**  94:8
  102:13
**resonator**  106:22
**resonators**  3:20
  113:7
**resources**  52:8
  93:18 96:12,24
  97:2,6,22 98:20
**response**  26:11
  80:3 111:5
**rest**  100:17
**restrict**  35:6
**result**  101:14
**results**  101:14
**return**  117:15
**returned**  117:9
**review**  21:22
  22:14,19,23 23:19
  24:5 116:9
**reviewed**  20:16,22
  21:12,15 22:11
  23:24 24:8

Veritext Legal Solutions
866 299-5127

[reviewing - ship]

reviewing  22:17
22:21,25
rf  3:19 23:23 73:5
80:11,12 82:14
103:8,9,13 104:10
108:2,22 110:3,10
110:22 111:24
113:7,8,8
richard  3:17
rid  91:25
right  4:19 7:15
14:4 16:17,19
28:6 30:6 36:15
40:6 46:18,22,24
53:6,8 54:14,22
55:12 63:18,24
65:2,7 66:24
68:10 71:13 72:5
76:20 77:25 78:1
78:4,5 81:9 85:3
89:21 90:8 94:8
95:24 97:4 98:12
98:25 102:3 105:5
105:11 106:8
108:14,20 111:15
113:15
ring  3:20 106:22
113:7
rings  107:5
role  28:17,25 31:5
room  5:14,19
43:17
rpr  1:22 115:22
116:25 117:20
run  79:19 91:3
runs  58:1,2

s

s  2:4 5:8,8 103:13
sacrifice  95:15
safety  29:23 30:3

sander  21:20,23
saw  58:4
saying  55:10,18
64:24 78:11
102:11
says  16:15 21:11
50:10 80:3,4
96:15 111:17
schmidt  3:3 4:11
4:12,13 5:2,4 8:11
8:17,21 10:4,15
11:6,10,20 12:5,18
13:8 14:11,24
15:6,20 16:2,5,12
16:17,20 21:4,16
23:13 24:2,18
25:5,14,22 26:12
26:21 28:5,16
29:6 30:1,23
31:13,22 35:11
36:1 37:1,20
38:13,17 39:3,9
40:3,8,24 41:1,7
41:21 42:12 43:2
43:13,16,23 45:6
47:9,18 50:1,12
51:17 52:22 54:4
56:3,19 58:23
59:9 60:2 61:3
62:8 68:6 69:5,9
69:16 70:11,23
74:22 76:4,17
77:5,23 81:5,20
82:20 83:8 84:2
85:15 86:18 87:1
93:9 100:14,20,23
105:7 106:4,14
107:20 112:19
113:10,17,23
114:3

scientific  51:23
53:1,11 54:10
scola  1:3,4
scope  27:6 28:3,13
29:4 35:6,15,21,25
36:3,6,14,15,21
37:4 38:20 39:13
41:9,9 42:3,14,16
42:16 43:4 55:12
68:14 70:4 104:3
scratch  104:5
screen  16:15
scroll  9:10 17:11
scrub  80:10
sea  33:22
seamlessly  34:4
seaworthy  33:22
second  60:17 64:2
69:6
sections  47:7,7
see  8:13,23 9:4
16:7,11 17:14
18:13 20:18 22:6
22:7 27:8 34:8
35:17 42:10 44:8
48:14 55:8 60:13
60:19,23 61:1
64:10 65:1,6,23
66:14,22 68:2
72:16,17 76:12
85:24 86:5 87:13
90:18 93:19 95:11
96:22 101:3,4
102:23 106:11,16
107:24 108:3,10
110:5
seeing  16:8 57:6
57:13,14
seeking  75:6 76:5
76:19

seen  56:25 57:7,9
57:11,11,17,21,22
57:24 58:7 59:5,6
83:13
selectivity  102:14
sells  103:20
semester  56:16
send  102:3
seniors  56:16
sense  20:9 66:25
102:12 104:13
sentence  64:3,4,23
65:8 107:24 108:5
108:6
separate  52:4
89:24
separation  89:10
seriously  8:24
105:10
serviced  73:11
session  5:18,25 6:2
set  19:25 43:8
74:15 84:23
setting  11:21
settled  17:22
seven  18:3
shed  23:7
sheet  3:9 87:16,18
87:19,21 88:5,6,8
90:10,15,17 91:19
104:18 117:8
118:1
sheets  12:14 62:1
shelf  66:3
shifting  99:14
ship  30:21 33:17
33:19,24 34:6
54:1 67:15 68:9
68:22 72:21,24
73:2,3

Veritext Legal Solutions
866 299-5127

[ships - square]

**ships** 74:3,4,10
**short** 33:3 102:11
  113:11
**shorten** 94:16
  107:14,16
**shorter** 73:19
  108:7,16
**shortest** 86:2
**show** 88:22 89:22
**shows** 15:15
**shrink** 51:15 54:8
  82:3 95:9 99:24
  104:25 105:20
**shrinkage** 90:1
  98:13 99:24
**shrinking** 51:1
  82:6 105:25
**shrinks** 95:4
**shrunk** 93:17
  97:22
**sic** 18:14 72:2
  108:24
**side** 78:18,20,20
  89:10
**sides** 88:23
**sign** 3:8 117:10,13
**signal** 102:15
**signaling** 79:20
**signature** 9:12,13
  115:21 116:24
  117:6,13,22
**signed** 115:14
**similar** 34:17
**simple** 97:12
  103:2 107:3
  110:12
**simpler** 111:11
**simulation** 104:7
**simulators** 90:23
**single** 107:8

**sir** 31:24 32:24
  36:2 52:1 54:22
  56:20 61:4 74:2
  75:3 84:6 88:13
  104:21 106:17
**sit** 70:20
**situation** 105:11
**size** 34:18,22 37:9
  38:8,25 39:15
  40:10 41:17 43:9
  43:10 47:24 48:6
  48:23 49:12 52:13
  57:21,23 64:8
  65:17,25 66:15,23
  67:3,6 68:19
  75:18 76:16 77:2
  80:15,17 82:19
  83:19 86:8,9,10
  87:2 89:5 99:13
  99:14 100:6
**sized** 73:8
**sizes** 82:15
**skill** 27:5 28:2,12
  29:3,21 35:15
  48:13,18 51:24
  52:5,19,25 53:4
  54:13 55:11,19
  56:5 59:10,11,15
  59:18,24 60:10
  61:8,11,12,19,22
  62:5,10,17,21 63:2
  63:7,14,20 64:13
  65:12 66:11,14,22
  84:7,11,14,18
  103:17 104:22
  105:16 110:2
  112:21 113:4
**skilled** 29:14 55:5
  103:18 113:1
**skin** 95:18

**skip** 108:5
**sleep** 79:12
**slinking** 83:6
**small** 46:25 52:17
  53:11 76:15 77:10
  89:8 98:10 99:6,9
**smaller** 56:2 60:15
  68:22 83:19 86:3
  86:10 94:6,6,7
  105:25
**smallest** 53:5
**smdc** 108:24
**software** 108:1,24
**solder** 111:7
**soldering** 110:12
**somebody** 30:7
  65:24 70:8 73:22
  80:4 101:24
  103:20 104:8
**somewhat** 74:15
**sophisticated**
  51:12
**sorry** 12:10 37:15
  45:1 67:23 81:22
  83:6 92:2
**sort** 20:7 44:19,23
  45:3 79:22 87:20
**sorts** 56:21
**sounds** 43:15
  113:17
**sources** 20:22 88:2
**south** 2:11
**southern** 1:1
**space** 78:13 88:1
**speak** 23:14,17
**speaking** 23:6
**spec** 12:13 62:1
  104:18
**special** 108:25
**specific** 12:6,21
  13:10,10 15:21

45:11 57:4,5
**specifically** 44:21
  77:12
**specification** 27:4
  27:12 28:1,9,12,18
  29:2,19,25 31:4
  32:23 33:1,4 35:8
  35:14 36:13,21
  41:10,14,20 46:4
  46:14,15,17,19
  48:12,18,25 49:14
  50:20 53:21 55:4
  56:8 61:13 62:4
  65:20 66:10,20
  67:13 68:2,4
  72:21,22 73:12
  75:14 76:1 77:15
  78:24 82:1 84:7
  84:11,13 91:21,23
  91:24 92:25
  102:18
**specifications** 62:3
  65:5 66:18 72:13
  72:19,23 73:24
  74:1,13 75:5,11
  76:14,14 77:3
  94:1
**specificity** 47:20
  77:18,22 78:7
**spectrum** 102:25
**speculating** 74:18
  74:19
**speculation** 13:1
  23:11 74:10 76:10
  83:23
**spell** 5:6
**spent** 7:18
**split** 3:20 106:22
  113:7
**square** 3:20 95:4

Veritext Legal Solutions
866 299-5127

st 2:4
stack 92:17
stands 40:15
start 10:16 14:18
  45:20 64:24 81:25
started 65:9 81:24
  82:1
state 5:6 14:21
  27:1 44:3 47:17
  79:12,13,13 105:1
  105:4 106:1
  107:10 111:23
  112:7,8,10 115:23
  116:3
stated 20:16 27:18
  118:21
statement 40:7,18
  41:14 44:20
  101:16
statements 23:19
  24:6,8 107:23
states 1:1 79:9,11
  79:15,19
stenographic
  116:11
stenographically
  1:22 116:7
stop 80:10
straight 39:11
straightforward
  98:2
strategies 88:7,10
street 5:13
strength 60:12
strengthens 88:21
strike 39:20 46:15
  50:24 59:16 84:23
stripline 107:8
strong 76:24 78:18
structure 48:7

struggling 84:21
students 71:6
study 12:6 98:6
  100:8
stuff 62:6 82:15
  96:4,20 97:16,17
subject 27:21 35:6
subjective 75:5,10
submitted 7:3,14
  9:6 22:20,24
  31:24 95:23
submitting 26:15
substance 6:14 8:8
  9:23 26:5,9
substituted 67:15
  67:16 68:11
substrate 94:25
  95:1,1,3 96:18
substrates 98:8
successful 92:8
successfully 21:21
sued 18:19
sufficient 7:24 8:3
  82:7
suite 2:11
sullivan 2:3 4:13
summary 3:15 7:5
  9:7 24:14,20,21
supplier 86:16
support 3:14
  11:14,23 12:22
  13:12 15:23
supported 44:4,14
  48:10
supposed 74:14
  110:20
sure 10:5 12:19
  32:19 37:19 43:18
  45:7 49:15 54:5
  58:24 60:3,6
  62:13 67:10 81:6

94:7 113:16
surrounding
  88:18
surveyed 112:8,10
sutcliffe 2:10 4:16
swear 4:20,21
swears 4:9
sworn 6:13 23:19
  24:6,8 115:10
system 15:17 76:8
  76:20 108:25
  109:1,10,11,12
  110:15,25 111:3,3
  111:5
systems 1:23
  12:15 110:22

**t**

t 5:8,8
tab 16:10,16,24
take 18:16 25:6
  30:12 37:16 38:16
  43:13 51:15,18
  57:25 69:5,18
  72:3,8,20 81:16
  96:15 99:19
  100:12 102:15,19
  103:10,12 106:13
  107:21 109:3,5
  111:17 113:10
  117:5
takes 63:16 79:4
talk 30:16 60:24
  74:11 98:22
  100:25
talked 13:23 62:2
talking 31:20,23
  32:19 36:7,8,12
  40:18,19 48:22
  53:15 89:18
  105:24 111:6

talks 88:17
tangible 34:22
tasked 65:3
tasks 34:5
teach 27:4 28:1,12
  29:2,20 35:14
  103:6
teacher 12:13
teaches 55:6
teaching 15:7,15
teams 56:16
technical 12:17
  102:23 110:16
technician 102:4
technique 89:4,25
techniques 90:6
  90:22 102:20
  110:2
technologies 66:3
technology 19:1
tell 18:23,25 32:22
  47:6,8 71:11
  73:21 100:10
  103:21 107:11
telling 39:19,21
tells 48:25 49:17
  55:14
ten 7:22,23 43:14
  69:7,9 95:25 96:8
tend 99:8
tentzeris 85:20
  86:3 87:11 93:24
  94:13 95:10
  101:12
tentzeris's 93:11
  100:25
term 7:1 70:19
terms 12:3 41:16
  41:17 49:19 57:5
  65:20,21 71:15
  75:25 82:5 94:1

[terms - understand]

110:16
**test** 84:6
**testified** 18:5,7,7,9
18:21 19:4
**testifying** 5:10,11
21:20
**testimony** 4:21
6:15 14:6 21:12
25:11 38:22 40:2
41:12 42:13
**testing** 96:2
**texas** 87:11
**thank** 4:25 5:2
19:25 37:18 45:2
71:23 83:7 112:20
113:24 114:4
**theoretical** 68:24
**theoretically**
68:21
**thickness** 56:2,23
87:22
**thing** 30:9 32:20
34:18 35:3 40:20
40:21 41:15,20
44:23 46:23 57:6
64:19 65:25 66:6
79:4 80:1,17 89:1
89:12 94:5,17
95:18 97:3
**things** 29:23 30:21
34:8,22 37:21
46:10,12 57:15
68:8 80:7,14 82:8
89:23 98:11,24
99:5 101:12 103:7
**think** 7:12 15:1,8
15:13,14 18:12
21:14 23:6 25:15
26:18 30:18 33:15
33:20 34:9 38:13
40:15 41:22 45:24

45:25 47:5 50:20
51:14 53:3,16,17
54:23 55:13 57:20
58:1,4,6 61:11,21
62:2,4 63:16,17,19
66:13 67:21,24
68:3 70:13,21
71:6 75:11,16
84:25 89:7,11,24
93:4,4 94:12,12
95:10,14 98:6,13
98:14 102:11,21
103:19,23 104:2,8
104:14,17 106:2
107:9 112:12
**thinking** 65:19
105:9 107:7
**third** 101:9 108:5
**thirty** 117:11
**thought** 51:10
70:18,22 95:23
98:4
**three** 97:25 113:11
**threshold** 47:10
51:3 98:19
**throw** 102:8
**thursday** 1:19
**ti** 62:2
**tilt** 37:13 83:5
**time** 4:2 6:19 7:24
8:18 12:23 13:13
14:20 15:23 17:1
20:2 25:24 42:2
66:2 79:17 83:5
93:18 96:12,14
97:2,6,22 98:20
99:25 100:12,17
103:1 105:2,11,22
106:2 109:5
111:16,20 112:9
113:24 117:6

**times** 17:25 18:3
86:3 108:16
**titch** 37:14
**title** 50:20
**today** 5:10 10:14
10:17,21 11:1,12
13:10 113:24
**told** 78:2
**tolerance** 99:13
102:18
**tolerances** 99:5
**ton** 12:16
**tool** 91:15
**tools** 96:23 104:7
**top** 15:25 33:2
93:6 112:17
**tough** 98:13,25
**tower** 19:2
**trade** 92:9
**transcript** 21:19
21:22 116:10,10
117:7,9 118:2
**transcripts** 22:1
22:10
**transmit** 78:16
79:5
**transmitter** 78:20
80:13
**transportation**
18:15,20
**trial** 18:5,7,8,10
**tries** 6:19
**trivial** 100:5
**true** 63:23 116:11
118:21
**truly** 117:17
**truth** 4:22,23,23
**try** 12:22 13:12
15:23 39:10 81:6
95:16,17,18 96:18
96:22 100:9

102:10 111:8
**trying** 12:20 54:2
64:22 65:10 66:5
68:18 109:16
**tunable** 107:4
**tune** 101:19 102:9
110:1
**tuned** 90:13
**tuning** 90:15 96:5
**turn** 26:22 43:25
54:25 64:1 71:24
85:7,16
**turned** 9:1
**tweak** 91:14
**twice** 16:14
**two** 7:13 17:21
21:1,25 22:9
37:21 45:16 52:4
90:7 97:10 98:1
98:13 111:7 113:2
**type** 13:16 100:9
**types** 53:2 95:12

### u

**uh** 17:15 84:5
**ultimately** 99:4
**unclear** 57:16
**undergraduate**
103:9
**undersigned** 115:6
**understand** 6:12
6:17,24 7:2 27:1
27:10,23 28:4,7,11
28:14 35:10,24
36:10,18 38:7,25
39:15,18 41:17,22
42:10 43:1,3,7,8
44:4,21 45:15,16
48:5 49:11 52:11
52:23 55:24 64:17
64:22 65:10,17
66:15,22 68:18

**[understand - wireless]**

69:23,25 71:2,7,21
73:6,9 75:18
77:11,13 78:14
94:14 96:25 97:12
**understanding**
26:24 27:18 28:19
29:9 41:5,8,13
42:18,23 44:13,17
45:8,17,18 52:11
54:16,18,19 71:2
77:4,6 78:2,9,11
82:13 85:14
**understood**   17:24
21:17,24 24:19
36:20 63:21 77:8
104:18
**undertaken**   82:21
83:9
**undue**   27:7 28:3
28:15 29:5 51:25
52:15 93:12,17
96:12,14 97:2,22
98:20 99:25
**unfortunately**
8:24
**unit**   99:10,11
100:2
**united**   1:1
**university**   112:25
**unmatched**   109:4
**unsafe**   30:6
**upper**   44:6 48:11
84:10
**urquhart**   2:3 4:13
**usability**   34:3
**usable**   82:8
**usage**   75:25
**use**   12:22 13:11,18
15:16 29:24 30:3
31:16 32:2,14,22
33:1,5,9,10,11,20

34:4,9,12,16,20,23
35:6,20,20 46:4,17
46:18 52:14 53:20
53:22,25 54:19
61:22,24 64:8,14
65:24,24 66:3,16
66:16,23 67:3,12
67:14,14,19 71:19
71:20,21 72:12,14
72:19,21 73:24
75:16 76:2,13
77:8,12,15,18,25
78:3,8 79:6 82:22
83:2,11,19,24
84:22 85:4,8
89:14,25 90:23
91:18 92:12,21,24
95:1,2,5,8 97:18
99:21 101:23
110:16
**uses**   91:20,24
92:25

**v**

**vague**   8:6 9:21
11:2,15 12:1,10,25
14:22 15:4,11
20:24 21:9 23:21
24:12 25:2,18
30:8,14 31:19
34:14 35:9 38:21
39:6 40:1,13 41:4
42:6 47:4,15 51:4
52:2 53:13 55:22
56:12 59:25 60:11
61:20 74:7 75:7
76:9 77:20 81:23
82:25 86:22 100:3
105:3 112:2
**values**   64:25
109:17

**varactor**   106:25
**variable**   109:21
**various**   34:5 57:1
74:20
**vendor**   103:20
**veritext**   4:8
**versus**   4:6 18:14
19:2
**videographer**   2:15
4:1,7 37:12,16
43:18,21 44:24
45:2 69:11,14
83:4,7 113:18,21
114:2,4
**videotaped**   1:16
116:8
**vitae**   3:16
**voltage**   107:4
**vs**   1:7,12 117:4
118:3

**w**

**w**   5:8
**wait**   80:2,4
**waive**   117:6,13,22
**wake**   80:4
**wakes**   80:5
**want**   20:12 26:23
33:11 43:25 47:5
64:2 78:14,15,16
78:22 79:19 80:16
93:23 96:21 99:4
104:20 105:19
107:14,15 113:23
**wanted**   32:19 33:9
70:12 73:10 95:10
**watch**   34:19,21
35:1,2 89:22
**watches**   34:23
**waterproof**   30:20
**waterproofing**
30:24 31:5

**waterproofness**
30:20
**wave**   108:7,12,12
**wavelength**   95:4,6
98:14 108:17
**wavelengths**   108:7
**way**   6:10 15:15,16
38:2 61:5,15 62:9
95:8,20 99:6
100:17 107:6
112:4
**ways**   95:11,18
**we've**   38:11 62:1
**wear**   34:19 65:24
**wearability**   33:25
34:2
**wearable**   24:25
25:4,6 49:20,22
50:8,14,17,18 54:1
54:3 64:4 65:22
65:22
**weighed**   32:2
**weight**   29:13,18
**welcome**   43:24
69:17
**wide**   79:13
**widely**   95:19
**william**   1:17 3:13
3:17 4:4 5:7 115:8
116:9 117:2,25
118:3,25
**willing**   94:4
109:15
**windows**   6:2
**winds**   92:22
**wireless**   49:7
50:11,13 51:8
57:9,17 60:14,18
62:11,18,23 63:3,9
65:4 72:4,9 87:3
87:22 89:6 92:15

Veritext Legal Solutions
866 299-5127

[wireless - zoom]

| | |
|---|---|
| 97:11 | **wrote**   110:9 |
| **wish**   117:13 | **x** |
| **witness**   3:8 4:9,24 | **x**   3:1 |
| 6:13,25 7:8 17:18 | **y** |
| 18:1 19:10,15,19 | **yeah**   11:8 16:13 |
| 37:15,19 40:5,9 | 17:1 21:19 32:25 |
| 45:1 49:5 83:6 | 35:18 37:18 39:8 |
| 113:16,25 | 43:15 54:11 55:9 |
| **witness's**   14:6 | 55:23 58:9 63:19 |
| 38:22 40:2 41:12 | 66:25 74:17 77:21 |
| **wondering**   45:7 | 84:9 85:4,24 |
| **wording**   27:23 | 89:20,20 90:4 |
| 60:6 | 96:6 100:20 101:2 |
| **words**   27:19 29:1 | 101:4,6,11,17 |
| 40:16,20 41:3 | 102:12 110:6,6 |
| 49:9 65:11 | 113:6,17 |
| **work**   12:11 19:10 | **years**   74:9 96:8 |
| 49:1 51:9 73:10 | 106:20 112:13,14 |
| 73:25 80:13 82:16 | **yep**   108:11 |
| 86:24 88:4 91:12 | **z** |
| 94:20 97:13 109:7 | **zero**   47:24 53:4 |
| 112:4 | 64:25 67:7 100:6 |
| **worked**   17:20 | **zoom**   5:18 |
| 95:25 | |
| **working**   33:17 | |
| 96:3 97:11 | |
| **works**   96:22 | |
| **worms**   70:22 | |
| **worn**   64:5 | |
| **worrall**   21:13,18 | |
| **worry**   99:17 | |
| **worth**   17:22 | |
| **wrap**   38:14 113:14 | |
| **wraps**   93:1 | |
| **wristwatch**   67:16 | |
| 68:12,23 | |
| **write**   110:1 118:2 | |
| **written**   36:13 | |
| 38:20 40:20 41:2 | |
| 42:4 106:6,20 | |
| 111:12 | |

Page 23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.