# EXHIBIT M

Patent Owner Preliminary Response submitted by Carnival in IPR2021-00783, concerning U.S. Patent 10,157,514

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DECURTIS LLC,

Petitioner,

v.

CARNIVAL CORPORATION,

Patent Owner

_____

Case No. IPR2021-00783
U.S. Patent No. 10,157,514

_____

**CARNIVAL CORPORATION'S PATENT OWNER
PRELIMINARY RESPONSE
<u>PURSUANT TO 35 U.S.C. § 313 AND 37 C.F.R. § 42.107</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................ 1

II.    BACKGROUND ......................................................................... 3

    A.    Carnival Develops and Introduces the OCEAN®
         Platform, Garnering Widespread Acclaim ............................... 3

    B.    The Inventions of the '514 Patent .............................................. 5

    C.    Years After Carnival's Inventions, Petitioner Markets its
         Own System by Claiming that Mobile BLE Beacons
         were "New" and "Inverted the Traditional Model" ................. 8

    D.    The District Court Proceedings ................................................ 10

III.   THE PETITION FAILS TO ESTABLISH A REASONABLE
      LIKELIHOOD OF SUCCESS OF INVALIDATING THE
      CHALLENGED CLAIMS .......................................................... 14

    A.    Ground 1 Fails Because Soleimani, Alone or in View of
         Yuen, Does Not Disclose or Render Obvious Key
         Aspects of the Invention of Claim 11 ...................................... 15

    B.    Ground 2 Fails Because of a Lack of Motivation to
         Combine and Because of Missing Elements in the
         Combined Device ...................................................................... 23

    C.    Ground 3 Fails Because the Alleged Motivation to
         Combine Is Insufficient ............................................................ 25

    D.    Ground 4 Fails Because Raina Does Not Disclose the
         Claimed Private Identifier of Claim 11 and Because
         Motivation to Combine Raina and Yuen Is Insufficient .......... 28

IV.   THE PETITION SHOULD BE DENIED IN THE
      DISCRETION OF THE DIRECTOR UNDER 35 U.S.C. §
      314(a) ....................................................................................... 30

    A.    Whether the court granted a stay or evidence exists that
         one may be granted if a proceeding is instituted .................... 32

    B.    Proximity of the court's trial date to the Board's
         projected statutory deadline for final written decision ........... 34

i

## TABLE OF CONTENTS
(continued)

**Page**

C.   Investment in the parallel proceeding by the court and the parties and petitioner's delay in filing the petition .................36

D.   Overlap between issues raised in the petition and the parallel proceeding....................................................................42

E.   Whether the petitioner and the defendant in the parallel proceeding are the same party.................................................44

F.   Other circumstances that impact the Board's exercise of discretion, including the merits...............................................45

V.   CONCLUSION ..................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Fintiv, Inc.*,
   IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020) ..................................*passim*

*Apple v. Fintiv*,
   No. IPR2020-00019, Paper 15, 12-13 (P.T.A.B. May 13, 2020) ...........34, 35, 37

*Carnival Corp. v. DeCurtis Corp. et al.*,
   No. 1:20-cv-21547, Dkt. No. 1 (S.D. Fla. April 10, 2020) ................................11

*Carnival Corp. v. DeCurtis Corp.*,
   No. 20-21547, Dkt. No. 15 ...............................................................................39

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ........................................................................38

*Cuozzo Speed Techs., LLC v. Lee*,
   136 S. Ct. 2131 (2016).......................................................................................31

*DeCurtis LLC v. Carnival Corp.*,
   No. 6:20-cv-00607 (M.D. Fla. Apr. 8, 2020), Dkt. No. 1 .............................1, 11

*DeCurtis LLC v. Carnival Corporation*,
   No. 1:20-cv-22945 (S.D. Fla.)....................................................................*passim*

*Douglas Dynamics, LLC v. Meyer Prods. LLC*,
   No. 14-cv-886-jdp, 2017 WL 1382556 (W.D. Wis. Apr. 18, 2017) .................48

*Epic Games, Inc. v. Acceleration Bay LLC*,
   No. 4:19-CV-04133-YGR, 2020 WL 1557436 (N.D. Cal. Apr. 1,
   2020) .................................................................................................................48

*Google, LLC v. Personalized Media Commc'ns*,
   No. IPR2020-00720, 2020 WL 6530766 (P.T.A.B. Nov. 5, 2020)....................40

*Mylan Lab'ys Ltd. v. Janssen Pharmaceutica Nv*,
   No. IPR2020-00440, 2020 WL 5580472 (P.T.A.B. Sept. 16, 2020) .................33

*NHK Spring Co., Ltd. v. Intri-Plex Techs., Inc.*,
  IPR2018-00752, Paper 8 (P.T.A.B. Sept. 12, 2018)...............................31, 40, 44

*Pers. Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) .................................................................21, 24, 26

*Sand Revolution II, LLC v. Continental Intermodal Group – Trucking LLC*,
  IPR2019-01393, Paper 24 (June 16, 2020).........................................................42

*SAS Inst. Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)........................................................................................31

*Sotera Wireless, Inc. v. Masimo Corp.*,
  IPR2020-01019, Paper 12 (December 1, 2020) ..................................................42

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ..........................................................................47

*Totes-Isotoner Corp. v. United States*,
  594 F.3d 1346 (Fed. Cir. 2010) ..........................................................................47

*WesternGeco LLC v. ION Geophysical Corp.*,
  889 F.3d 1308 (Fed. Cir. 2018) ..........................................................................47

**Statutes**

35 U.S.C. §101 ...........................................................................................12, 37

35 U.S.C. §102................................................................................40, 43, 44, 47

35 U.S.C. §103 ..................................................................................................47

35 U.S.C. §271(f) ...............................................................................................12

35 U.S.C. § 314(a) .......................................................................................30, 31

35 U.S.C. § 314(b)(1)....................................................................................34, 35

35 U.S.C. § 315(a)(1)....................................................................................46, 48

35 U.S.C. § 316(a)(11)...................................................................................34, 35

iv

## LISTING OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 2001 | Complaint, *DeCurtis LLC v. Carnival Corp.*, No. 6:20-cv-00607 (M.D. Fla. Apr. 8, 2020) (Dkt. No. 1) |
| 2002 | Report and Recommendation on Carnival's Motion to Dismiss, *DeCurtis LLC v. Carnival Corp.*, No. 1:20-cv-22945 (S.D. Fla. Feb. 9, 2021) (Dkt. No. 128) |
| 2003 | Order re Magistrate Judge's Reports and Recommendations as to Motions to Dismiss, *DeCurtis LLC v. Carnival Corp.*, No. 1:20-cv-22945 (S.D. Fla. Apr. 20, 2021) (Dkt. No. 144) |
| 2004 | Order on Pending Motions to Compel, *DeCurtis LLC v. Carnival Corp.*, No. 1:20-cv-22945 (S.D. Fla. June 17, 2021) (Dkt. No. 163) |
| 2005 | Carnival Corporation's CEO Arnold Donald Unveils Game-Changing Guest Experience Platform in Historic Keynote Address at CES 2017 (Jan. 2017) |
| 2006 | *Intentionally left blank* |
| 2007 | Carnival Corporation's OceanMedallion$^{TM}$ Named IoT Wearables Innovation of the Year (Jan. 8, 2019) |
| 2008 | Fast Company Ranks Carnival Corporation as a Most Innovative Company for 2017 |
| 2009 | Carnival Corporation Recognized as CES 2019 Innovation Awards Honoree for OceanMedallion (Nov. 8, 2018) |
| 2010 | Carnival's tiny Ocean Medallion wearable brings tech luxury to cruise ships (May 23, 2019) |
| 2011 | *Intentionally left blank* |
| 2012 | How Carnival revolutionized its guest experience with super-smart tech (Jan. 8, 2017) |
| 2013 | Notice of Allowance, U.S. Application Serial No. 15/460,983 (Sept. 5, 2018) |
| 2014 | DeCurtis Corporation, The Wayback Machine – https://web.archive.org/web/20180829040951/http://www.decurtis.com:80/ble |
| 2015 | Complaint, *Carnival Corporation v. DeCurtis Corporation etal.*, No. 1:20-cv-21547 (S.D. Fla. Apr. 10, 2020) (Dkt. No. 1) |

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 2016 | Order Consolidating Related Cases, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. July 29, 2020) (Dkt. No. 40) |
| 2017 | Order Consolidating Related Cases, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-21547 (S.D. Fla. July 29, 2020) (Dkt. No. 48) |
| 2018 | Report and Recommendation on DeCurtis's Motion to Dismiss, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Jan. 6, 2021) (Dkt. No. 120) |
| 2019 | Order on Carnival's Motion for Leave to Amend Infringement Contentions, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Feb. 10, 2021) (Dkt. No. 129) |
| 2020 | Order on DeCurtis's Motion to Amend a Protective Order, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Jan. 5, 2021) (Dkt. No. 119) |
| 2021 | Scheduling Order and Order of Referral to Mediation, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Sept. 14, 2020) (Dkt No. 73) |
| 2022 | [Proposed] Order re Discovery Disputes and Modified Scheduling Order, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Apr. 30, 2021) (Dkt. 154-1) |
| 2023 | Order Requiring Discovery and Scheduling Conference and Referring Discovery Matters to Magistrate Judge, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. July 23, 2020) (Dkt. No. 44) |
| 2024 | Carnival's Motion to Modify the Scheduling Order, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. July 9, 2021) (Dkt. No. 166) |
| 2025 | Hearing Transcript, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Oct. 22, 2020) (Dkt. No. 93) |
| 2026 | Hearing Transcript, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Jan. 7, 2021) (Dkt. No. 123) |
| 2027 | Hearing Transcript, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Apr. 9, 2021) (Dkt. No. 143) |
| 2028 | Return of Service, *Carnival Corp. v. DeCurtis Corp.*, No. 1:20-21547, (S.D. Fla. Apr. 21, 2021) (Dkt. No. 15) |

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 2029 | Non-Infringement, Unenforceability, and Invalidity Contentions of DeCurtis LLC and DeCurtis Corporation, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Apr. 30, 2021) (Dkt. No. 153-4) |
| 2030 | DeCurtis's Motion to Amend Protective Order, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Sept. 25, 2020) (Dkt. No. 77) |
| 2031 | DeCurtis Answer to Second Amended Complaint, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. May 3, 2021) (Dkt. No. 155) |
| 2032 | First Amended Complaint, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945, (S.D. Fla. Oct. 21, 2020) (Dkt. No. 87) |
| 2033 | U.S. Pat. Pub. No. 2007/0060056A1, to Whitaker, et al. |
| 2034 | U.S. Pat. Pub. No. 2017/0142660A1, to Chatterton, et al. |

## I.     INTRODUCTION

The half-truths in the Petition's Introduction reveal this much: the Petition, along with the two others Petitioner ("DeCurtis") filed, is not about invalidating an allegedly invalid patent but instead is about pursuing as many parallel proceedings as possible against Patent Owner ("Carnival").  Over a year ago, Petitioner filed a declaratory judgment action asserting an unenforceability claim against the '514 Patent based on a prior art invalidity argument: that the Patent's claims were invalid over prior art purportedly withheld from Patent Office. That is, Petitioner *chose* to initiate litigation between the parties, in district court, by putting at issue whether patent claims "that the applicants asserted as valid against the prior art" in fact claimed "precisely the invention embodied in" prior art.  Ex. 2001 (Compl., *DeCurtis LLC v. Carnival Corp.*, No. 6:20-cv-00607 (M.D. Fla. Apr. 8, 2020), Dkt. No. 1) ¶ 80.

Petitioner's purported basis for filing that lawsuit is that Carnival "began to improperly threaten both Petitioner and its new customers with baseless infringement claims, including [of] the specific patent challenged in this Petition." Pet. at 1. Two Federal judges already have found otherwise. A U.S. Magistrate Judge examined Petitioner's allegations and found that Petitioner "mischaracterizes the content" of Carnival's communications with Petitioner and

1

its customers. Ex. 2002 (Dkt. No. 128) at 15.[1]  Carnival "merely describe[d] Carnival's investments in developing its own technology and then reference[d] its growing patent portfolio. Nothing suggests that Carnival intends to enforce any intellectual property rights in connection with all of these patents." *Id.* at 19.  A U.S. District Court Judge adopted this ruling. Ex. 2003 (Dkt. No. 144).  In truth, Carnival was not threatening anyone; it was investigating whether Petitioner (its former contractor) has misused Carnival's technology; Petitioner filed suit to try to deter Carnival from protecting Carnival's rights.

After filing suit, Petitioner then sat on its hands and waited an entire year (almost to the day) to file this duplicative IPR Petition asserting the same prior art that Petitioner had identified in its district court invalidity contentions *over five months earlier*.  In an apparent effort to avoid discretionary denial of this Petition, Petitioner sought to cause delays in the district court case schedule by withholding its technical document production required under the court's patent rules, so that Petitioner could then claim (incorrectly) that "the district court has invested virtually no time in assessing the parties' claims and defenses." Pet. at 80.  The

---

[1] Unless indicated otherwise, all "Dkt." references herein are to the currently pending, consolidated Southern District of Florida action, *DeCurtis LLC v. Carnival Corporation*, No. 1:20-cv-22945 (S.D. Fla.) (the "Florida Litigation").

district court recently put a stop to this behavior by entering an order compelling Petitioner to produce these documents, along with many other categories of documents and discovery that Petitioner has been withholding, which will allow the parallel district court case to proceed expeditiously to trial.  Ex. 2004 (Dkt. No. 163) at 3-19.

*Both parties* already chose the district court as the forum to litigate the validity and infringement of the '514 Patent.  Petitioner's decision to try again in the PTAB a year later, and to manipulate the procedural processes in the district court litigation that Petitioner initiated to try to litigate validity in parallel in both the PTAB and district court, is exactly what the IPR statutes and this Board's precedent (in the *Fintiv* decision among others) were designed to prevent.

The Petition also falls short on merit.  Although Petitioner asserts four grounds against the same claim, each ground fails due to a missing claim element and/or inadequate motivation to combine the references.

The Petition should be denied on the merits, on discretionary grounds, or both.

## II.   BACKGROUND

### A.   Carnival Develops and Introduces the OCEAN® Platform, Garnering Widespread Acclaim

Carnival is the world's largest and leading cruise vacation company.  It also is the creator and owner of a ground-breaking technology platform known as the

One Cruise Experience Access Network®, also referred to as the O.C.E.A.N.™ or OCEAN® Platform.  OCEAN® combines a first-of-its-kind wearable device (OceanMedallion™ or Medallion®) with a network of servers, sensors, readers, and software to deliver unparalleled guest engagement and personal service to guests on Carnival's MedallionClass™ ships.  Carnival began development on what became the OCEAN® Platform in 2014. The project required an enormous investment of financial resources and human capital over several years.

In January 2017, Carnival's CEO, Arnold Donald, made history as the first travel industry executive to deliver the opening keynote at CES, the world's largest consumer technology event.  He used his speech to announce the OCEAN® Platform. Ex. 2005.  Carnival's OCEAN® Platform, enabled by the OceanMedallion™ wearable, facilitates payment, shipboard wayfinding, shipmate location services, personalized itineraries, expedited embarkation, state room access without a key card, and a wide range of on-demand services.  The OCEAN® Platform debuted on a cruise ship in November 2017 and has since been installed on several other ships of Carnival's Princess Cruises brand.

Carnival's willingness to invest heavily in its vision and to undertake risks to remain a technology leader has resulted in widespread acclaim.  Accolades for the OCEAN® Platform have poured in.  IoT Breakthrough awarded Carnival the 2019 IoT Wearables Innovation of the Year for the OceanMedallion™.  Ex. 2007.

4

FastCompany magazine named Carnival as one of the world's most innovative companies, citing the introduction of OceanMedallion™.  Ex. 2008.  The OceanMedallion™ garnered a 2019 CES Innovations Award Honor.  Ex. 2009.  One early reviewer described use of the OceanMedallion™ as "a magical experience that foretells the way that the internet of things ought to work." Ex. 2010.  Articles gushed that Carnival had "revolutionized" the guest experience with "super-smart tech."  Ex. 2012.

Carnival recognized that its OCEAN® Platform innovations included patentable inventions, and accordingly, Carnival applied for and obtained patent protection for this valuable intellectual property, beginning with the filing of provisional patent applications in November and December 2016.  So far, seven U.S. patents have issued in this family, including the '514 Patent.

### B.    The Inventions of the '514 Patent

The '514 Patent teaches and claims a novel portable wireless device for use in a guest engagement system where portable devices serving as beacons communicate with a networked, sensor-rich environment to enhance the guest experience. The '514 Patent confronts technical problems facing the inventors that resulted in "interactions between hosts and guests [being] impersonal and disjointed." '514 Patent, 1:46-47. By overcoming those constraints through the creation of a novel and non-obvious device/system, the inventors enabled various

5

technical improvements over prior art systems, including: (1) an improved beacon-centric model of communication to the environment, (2) relocation of demanding computation-intensive resources, (3) a new and superior user interface, (4) improved battery life and power consumption, and (5) an improved location determination system particularly suited for environments such as a cruise ship. In short, the '514 Patent reveals a paradigm-shifting approach to guest engagement system design.

Prior to the invention, almost every type of interaction in conventional systems of the type described in the '514 Patent's background required a different form of communication, identity recognition, or authentication process. *See* '514 Patent, 1:36-47 (noting that prior art systems provided service and engagement on the basis of users providing a name or identification, tapping or swiping an access card, or having information on bookings retrieved manually by a host through a computer terminal). To the extent devices were used to permit access, *e.g.*, an access card for a locked door, guests using those devices were required to affirmatively present such credentials prior to gaining access. *Id.*

At the time of the inventions, there had been efforts to leverage Bluetooth Low Energy ("BLE") to improve guest engagement systems that focused on utilizing stationary objects as BLE beacons that continually broadcast signals to any devices containing sensors that might happen to come within communication

6

range of the beacon. Carnival's inventors recognized that this model would not be suited to address Carnival's unique vision for an unprecedented immersive guest engagement system, which requires automated location services enabled by many thousands of points of reference aboard a moving cruise ship.

The '514 Patent's claimed inventions differ from, and are an important advance over, any such stationary BLE beacon systems: they flip the entire frame of refence by making the *sensors stationary* and the *beacons mobile*. *See, e.g.*, *id.* at 23:12-18 ("Each sensor 15 has a known location, and the sensors 15 in the network 13 are used to track the locations of [portable] medallions 11 in the facility . . . ."). This arrangement is captured in the claims. For example, the sole challenged claim 11 of the '514 Patent requires a *portable wireless device* comprising, among others, a processor that (i) "controls [a] first wireless communication antenna to emit a periodic beacon signal *broadcasting [a] unique public identifier* of the portable wireless device *using BLE [Bluetooth low energy] communications*"; and (ii) "controls the first wireless communication antenna to *transmit [a] private identifier* only across secure communication links established with remote communication devices *using BLE communications*." *Id.* at 41:51-58

During prosecution of the '514 Patent, the examiner considered over 170 patent and non-patent references, and determined that the prior art failed to teach or suggest the entirety of the claimed device—the recited portable BLE beacon

model *combined with* the additional aspects of the device identified in the preceding paragraph. Ex. 2013 (Sep. 5, 2018 Notice of Allowability) at 4 (pending claim 59).

The '514 Patent addresses shortcomings of the conventional systems and solves problems related to location determination, configuration needs, deployment speed, data access, and security. The '514 Patent's technical improvements, in turn, enable accurate wayfinding and location determination in an environment such as a cruise ship ('514 Patent, 33:45-34:46), more efficient and secure room access (*id.* at 17:25-44), more efficient and secure payment (*id.* at 32:59-33:44), and improved and more efficient power consumption while balancing the need for secure communication by portable devices with the need to conserve power (*id.* at 16:5-29, 16:50-65).

### C.   Years After Carnival's Inventions, Petitioner Markets its Own System by Claiming that Mobile BLE Beacons were "New" and "Inverted the Traditional Model"

Petitioner has expressly acknowledged that the model for arranging beacon and sensor system components, as described and claimed in the '514 Patent, was not a conventional solution, and that such a model departed significantly from any conventional systems.  In 2018—years after Carnival filed patent applications describing its inventive concepts—Petitioner began marketing its own services by touting the same arrangement of components described and claimed in the '514

Patent as "where the magic really happens." Ex. 2014 at 3. Petitioner claimed that "[b]eacons had, thus far, been the stationary object." *Id.* Petitioner dismissed the idea of improving a system that used stationary BLE beacons as merely "enabling your environment to shout more accurately." *Id.*

Instead, Petitioner claimed its "ground-breaking work" in "invert[ing] the traditional model," and touted a "new" model of "tethering people to beacons" so that "your environment can respond intelligently to those people that are present" in a way that existing systems could not. *Id.* Petitioner claimed (in 2018) to be "introducing the concept of a wearable" that "contains a small beacon." *Id.* at 5. Petitioner identified benefits that were made possible by this inverted model: "making every experience better, more efficient, more human, more informed, more enjoyable and more profitable." *Id.* at 4.

Thus, when it suited Petitioner's business needs, the concepts embodied in the claims of the '514 Patent were novel and unique and enabled meaningful technical improvements compared to the state-of-the-art (even in 2018). Faced with litigation over patents covering these "new" and "novel" concepts, Petitioner now sings a different tune, claiming that because the patented inventions are implemented using "pre-existing communication standards" like BLE, the patent is "vastly overbroad" and covers merely "well-known and obvious technologies." Pet. at 1-2.

### D.    The District Court Proceedings

Petitioner was one contractor (of many) hired by Patent Owner to assist with rapid prototyping work related to the OCEAN® Platform. Given the recognition and success Carnival achieved with the OCEAN® Platform, it is unsurprising that others, including Carnival's competitors in the cruise industry, sought to follow suit.  Petitioner began marketing its "DXP" system to Carnival's competitors. Carnival eventually learned of this and was concerned that Petitioner had misused Carnival's confidential and proprietary information to develop its DXP system, based on public reports about the technology Petitioner was implementing for cruise companies NCL and Virgin Voyages. Carnival thus sought more information, including exercising its right under the parties' contract to audit Petitioner's records. Petitioner refused to comply with its audit obligation. Instead, without warning, Petitioner initiated litigation against Carnival.

On April 8, 2020, Petitioner filed a complaint in the Middle District of Florida seeking declaratory judgments of noninfringement of non-infringement of five Carnival patents and unenforceability of seven Carnival patents, including U.S. Patent Nos. 10,045,184, 10,157,514, and 10,049,516 (respectively, the '184,

'514, and '516 Patents), along with other claims.[2]  Ex. 2001 (*DeCurtis LLC v. Carnival Corp.*, No. 6:20-cv-00607, Dkt. No. 1 (M.D. Fla. April 8, 2020)).  Two days later, Carnival filed a complaint in the Southern District of Florida for breach of contract, trade secret misappropriation, and infringement of the '184, '514, and '516 Patents. Ex. 2015 (*Carnival Corp. v. DeCurtis Corp. et al.*, No. 1:20-cv-21547, Dkt. No. 1 (S.D. Fla. April 10, 2020)). Petitioner's declaratory judgment action was transferred to the Southern District of Florida and the two actions were consolidated. Exs. 2016, 2017 (*DeCurtis LLC v. Carnival Corp.*, No. 1:20-cv-22945, Dkt. Nos. 40, 48 (S.D. Fla.)).

In the over fifteen months of litigation, the Southern District of Florida has made several substantive rulings in the case.  These rulings are relevant to the Board's consideration of discretionary denial, discussed further below in Section IV:

- Magistrate Judge Torres (to whom all pretrial matters have been referred) issued a 40-page ruling on Petitioner's motion to dismiss Carnival's complaint. Ex. 2018 (Dkt. No. 120). Of note, Judge Torres analyzed Petitioner's argument that

---

[2] At the same time it filed the instant Petition, Petitioner filed Petitions challenging claims of the '184 and '516 Patents. Case Nos. IPR2021-00782 and IPR2021-00784.

each claim of the '184 Patent failed to claim patent-eligible subject matter under 35 U.S.C. §101.  *Id.* at 20-28. Judge Torres considered Petitioner's detailed arguments as to whether the patent claims were directed to an abstract idea and whether they recited an inventive concept, concluding that Petitioner's motion to dismiss must be denied.  *Id.*  Judge Torres also examined patent law issues regarding whether the operative complaint stated a claim for induced infringement, contributory infringement, and infringement under 35 U.S.C. §271(f).  *Id.* at 28-38.

- Judge Torres also issued a 58-page ruling on Carnival's motion to dismiss Petitioner's complaint. Ex. 2002 (Dkt. No. 128). This ruling also involved the '514 Patent. Judge Torres considered whether Petitioner had established subject-matter jurisdiction over its declaratory judgment claims, including its claims directed to the '514 Patent, and determined that Petitioner had not.  *Id.* at 6-22. As noted in the Introduction, Judge Torres found that Petitioner has "mischaracterize[d]" Carnival's pre-litigation communications with Petitioner and its customers.  *Id.* at 15, 21. Judge Torres also considered, in detail, motions to dismiss Petitioner's unenforceability claims. Judge Torres found that Petitioner had failed to state claims for prior-art based fraud (*id.* at 22-28) but allowed Petitioner's claims for fraud based on allegedly improper inventorship to proceed (*id.* at 28-36).  Finally, Judge Torres's rulings on Petitioner's tort and antitrust claims also turned largely on patent issues, including the patent privilege doctrine.  *Id.* at 36-47.

- District Court Judge Scola then considered the parties' objections to Judge Torres's rulings on the motions to dismiss, and issued his own ruling adopting (with modifications) Judge Torres's rulings. Ex. 2003 (Dkt. No. 144). Judge Scola conducted his own *de novo* review of all the issues summarized above. *Id.* at 3. Judge Scola also noted that Judge Torres's review of the issues had been "thorough," "comprehensive and all-encompassing." *Id.* at 3, 6, 7.

- Judge Torres further considered issues related to the '514 Patent in granting Carnival's contested motion for leave to amend its infringement contentions in a 13-page ruling. Ex. 2019 (Dkt. No. 129).

- Judge Torres also issued a 28-page ruling on DeCurtis's motion to amend the protective order to add a prosecution bar provision specifically addressing whether Carnival's litigation counsel could participate in amending claims in an IPR *if* DeCurtis filed an IPR, the IPR were instituted, and Carnival then sought to amend claims. Ex. 2020 (Dkt. No. 119). As explained further below in the section discussing discretionary denial, the fact that DeCurtis filed this motion in *September 2020*, after raising the issue months earlier, reveals that DeCurtis has intended to file IPR petitions all along and just waited until the last moment for tactical advantage.

- Finally, Judge Torres has invested substantial time in addressing discovery disputes related to the patent issues in the case, holding four hearings and

13

eventually issuing a 31-page order on motions to compel discovery. Evidently seeking to delay the district court proceeding to tip the *Fintiv* scale in its favor for the IPR petitions, Petitioner had unreasonably refused discovery in response to Patent Owner's legitimate requests, including refusing to produce the core technical documents on the schedule required by the District Court's patent rules (which, as in most courts, requires early production of such documents). This forced Carnival to move to compel discovery. Judge Torres ruled in favor of Carnival on most disputed issues and ordered Petitioner to produce technical documents, source code information, communications with third parties, advertising and marketing materials, documents listed on a "trade secret log," and amended responses to certain interrogatories. Ex. 2004 (Dkt. No. 163).

## III. THE PETITION FAILS TO ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS OF INVALIDATING THE CHALLENGED CLAIMS

As explained below, Petitioner is using the IPR process as a "second bite at the apple" after challenging the validity of Carnival's patents in district court. *See infra* § IV.F**Error! Reference source not found.**. Worse yet, against the '514 Patent, Petitioner wants *four* extra bites at the apple and asserts *four* different grounds against the same claim. But as explained below, all of the four grounds are missing key aspects of the invention disclosed in claim 11 of the '514 Patent.

Petitioner did not establish a reasonable likelihood that claim 11 is invalid and thus its Petition should be denied.[3]

### A. Ground 1 Fails Because Soleimani, Alone or in View of Yuen, Does Not Disclose or Render Obvious Key Aspects of the Invention of Claim 11

Soleimani does not disclose the inventive, unconventional arrangement of the portable wireless device of claim 11, including all of the functionalities alongside the beacon feature and the private identifier.  Further, Soleimani, alone or in view of Yuen, does not disclose or render obvious packaging the inventive assembly of components in the claimed form factor.

#### 1. Soleimani's Device Does Not Comprise Elements of the Claimed Portable Wireless Device When Configured to Emit a Periodic Beacon

Petitioner relies on Soleimani's disclosure regarding RF communication unit 214 — a stationary unit installed proximal to a secure door — for its arguments

---

[3] The cited prior art plainly fails to disclose or render obvious elements of '514 Patent claim 11, as shown below. Accordingly, Carnival need not detail every defect in the prior art and Petitioner's arguments for purposes of this Preliminary Response. Carnival reserves the right to address additional deficiencies in the Petition in its Patent Owner Response if the Board institutes the Petition (which it should not).

supposedly showing the claimed portable wireless device, which, among other aspects, is operative to emit a periodic beacon signal. *See, e.g.*, Pet. at 26 ("describing RF communication units transmitting advertisements using BLE . . . ."). The RF communication unit, however, is part of the access control unit 210, which also comprises door and lock. Soleimani, 5:42-48.

Although Soleimani briefly mentions a role reversal between the RF communication unit and the wireless mobile device, this role reversal is limited to the roles of the devices operating in BLE, *i.e.*, whether the device operates as a BLE GAP Common or a BLE GAP Peripheral. *Id.* at 17:60-18:7. This role reversal does not mean, for example, that access control server would communicate with the wireless mobile device instead of the RF communication unit via a wired network. *See id.* at 4:51-56 ("access control server 110 communicates with . . . RF communication unit 173 via wired network 150.").

Petitioner, however, ignores the limit of this role reversal. Consequentially, several of its arguments have no merit.

First, this role reversal should be consistently applied to the BLE roles of the devices. With respect to claim elements 11[e][ii] and 11[g], Petitioner relies on an encrypted message 236 that the mobile device 230 of Soleimani transmits to the access control system "via BLE" to allegedly satisfy claim requirements that the portable wireless device transmits the private identifier. Pet. at 35, 38. But

16

because Petitioner relies on Soleimani's teaching to reverse the BLE roles of the devices (*id.* at 33), the encrypted message 236 would be *received* by the mobile device 230 under Petitioner's read.  This is the opposite to the claim requirements that the portable wireless device stores and *transmits* a private identifier, which Petitioner alleges that the encrypted message 236 shows.  *See id.* at 35, 38.

Further, this role reversal does not expand to cover non-BLE protocols. Although Soleimani teaches that RF communication unit 214 may transmit RF advertisement using 802.11, RFID, or NFC protocol (Soleimani, 6:37-47), it does not teach or suggest role reversal of RF advertisement in these non-BLE protocols. Petitioner's contrary assertion has no basis in Soleimani.  *See* Pet. at 26-27 (asserting "a POSITA would recognize the benefits of implementing Soleimani's disclosed *wireless communication device* with at least one BLE antenna, and at least one NFC antenna" in the portable wireless device because Soleimani "describ[es] *RF communication units transmitting advertisements using* BLE, *802.11, RFID, and NFC protocols*") (emphasis added).  Petitioner's assertion constitutes impermissible hindsight to contort Soleimani into the novel invention of the '514 Patent.

### 2.     Soleimani's Device Does Not Comprise the Claimed Private Identifier

The portable wireless device of claim 11 comprises a processor controlling a wireless communication antenna to transmit a *private* identifier *only* across secure

communication links.  Petitioner contradicts Soleimani's teachings in its read of this limitation (11[g]).

Specifically, contrary to Petitioner's allegations, Soleimani does not disclose the claimed private identifier.  Soleimani discloses some types of information that may be included in message 236, including identifiers, a time/date indicator, a function that the access control device is to perform, or RSSI (received signal strength indicator).  Soleimani, 13:6-14.  Soleimani further discloses that its mobile device *may* encrypt a portion of message 236 using an encryption key.  *Id.* at 12:67-13:6 ("Wireless mobile device 230 *may* be configured to encrypt one or more portions of message 236 . . . .") (emphasis added).  By teaching that the mobile device *may* encrypt some part of the message, Soleimani discloses that the message *may* be sent in clear text, *i.e.*, without encryption.  This does not meet the claim requirement that "the private identifier [is transmitted] *only* across secure communication links."

Because Soleimani's identifiers may be transmitted without encryption, a POSITA would have understood them not to constitute private identifiers that are transmitted *only* across secure communication links.  Faced with this deficiency of Soleimani, Petitioner makes a conclusory statement that, for the access control system to determine whether to grant access based on message 236, "the mobile device would *have to* communicate an identifier that is unique to the device to the

18

access panel so that the identifier could be compared to the door access information in the access control server 110." Pet. at 36 (emphasis added) (arguing for obviousness with respect to a claim limitation requiring storage of a *private* identifier). Petitioner does not explain, however, why a unique private identifier *has to* be communicated to gain access. Indeed, Petitioner's conclusory assertion is contradicted by Soleimani's disclosure. Soleimani discloses that "access may be granted in response to successful decryption of the portion [of message 236] using the unique key or the decrypted data having a particular value or characteristics." Soleimani, 13:21-23. But, as explained, Soleimani teaches that identifiers in message 236 need not be encrypted. Thus, access may be granted based on, for example, characteristics of a portion of message 236 not including any identifier. This disproves Petitioner's conclusory assertion.

### 3. Soleimani's Device Does Not Comprise a Body of the Claimed Form Factor

Petitioner refers to Soleimani's disclosure that its wireless device "may be implemented in a keyfob form factor" three times to allege that Soleimani, alone or in combination with Yuen, renders obvious the requirements of claim element 11[a]. Pet. at 21, 23, 24. Soleimani does not describe or explain what it means by "a keyfob form factor," and neither does Petitioner. *See id.* But a keyfob can be "large" enough to "create an unsightly bulge in the pocket." Ex. 2033 (U.S. Pat. Pub. No. 2007/0060056A1) ¶ [0004]. Thus, Petitioner's unsupported assertion that

Soleimani's keyfob discloses the dimensions of claim element 11[a] cannot be taken as true.  Moreover, a keyfob "may include [a] hole 307 that extends from the one or more front surfaces . . . ."  Ex. 2034 (U.S. Pat. Pub. No. 2017/0142660A1) ¶ [0084].



FIG. 8

*Id.*, Fig. 8 (showing a hole 307 (annotated) on key fob 300).  Thus, Soleimani's keyfob, even if it necessarily "includes an enclosure to house electrical components" as Petitioner alleges, does not inherently or obviously satisfy the claim requirement of "a body having a *fully enclosed cavity*."  Pet. at 23, 40; *see also id.* at 25-27 (failing to address the requirement of claim element 11[b] that components be "disposed in the cavity").

Relatedly, Petitioner's "obvious design choice" argument, even if it is taken as true, only addresses the dimension requirement of claim element 11[a].  *See id.*

at 22 (concluding that "[a] POSITA would thus view the recited *dimensions* as obvious over Soleimani" based on the design-choice argument) (emphasis added).

Thus, Soleimani does not disclose the required form factor of the portable wireless device.

### 4. Petitioner's Motivation to Combine Soleimani with Yuen for a Device of the Claimed Form Factor Fails Due to Faulty Reasoning

Petitioner argues, in the alternative, that Soleimani modified according to Yuen would render obvious the requirements of claim element 11[a].  Pet. at 23-25.  Petitioner's alleged motivation to combine fails, however, because of its faulty reasoning.

Petitioner alleges a few reasons common to all grounds to combine the references.  *Id.* at 19-21.  These reasons include "the same field of endeavor," "similar techniques to solve the same problems."  *Id.* at 19, 20.  These reasons, however, at best "say no more than that a skilled artisan, once presented with the . . . references, would have understood that they *could be* combined."  *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993 (Fed. Cir. 2017) (emphasis in original).  "And that is not enough."  *Id.*  Indeed, if the references use "similar techniques to solve the same problems" as Petitioner alleges, it is not obvious why a POSITA would have been motivated to apply duplicative solutions toward the same problem.  Pet. at 20.

Turning to the alleged motivation with respect to claim element 11[a], Petitioner's reliance on Soleimani's unexplained key-fob disclosure fails to supply proper motivation. As shown above, a key fob may be large and may have a hole on its surface. Thus, Petitioner's alleged motivation based on Soleimani's key-fob disclosure, *i.e.*, "increased wearability, portability, and protection from external elements," is conclusory and contradicted by contrary prior art. *Id.* at 24.

Petitioner further alleges that Soleimani "welcomes modification by recognizing that its disclosure is not limited to particular components or form factors." *Id.* (citing Soleimani, 18:22-32). The alleged support from Soleimani, however, is directed to "operations," not form factors. Soleimani, 18:22-32 ("It is noted that although the above examples may be illustrated in terms of various *operations* being performed by certain components of access control system 100, this disclosure is not to be understood as limited to those particular illustrations.") (emphasis added). Thus, Petitioner alleges a nonexistent motivation to modify Soleimani.

Petitioner's motivation-to-combine argument is further deficient because it largely ignores the "fully enclosed cavity" requirement. Petitioner mentions "a fully enclosed cavity" and "protection from external elements" in the first paragraph of the subsection. Pet. at 24. But, as explained above, the argument in this paragraph rests on faulty reasoning. Petitioner's subsequent arguments are

based on "miniaturization" and are directed to "the *dimensions* recited in this limitation." *Id.* at 25 (emphasis added). Thus, Petitioner offers no properly supported rationale to motivate a combination that would meet the "fully enclosed cavity" requirement.

Accordingly, Soleimani does not disclose the required form factor, nor does Petitioner present proper motivation to modify Soleimani in view of Yuen to render obvious the required form factor.

### B. Ground 2 Fails Because of a Lack of Motivation to Combine and Because of Missing Elements in the Combined Device

Like Soleimani, Berg in view of Badinski and Goosen does not disclose the inventive, unconventional arrangement of the invention of claim 11, including all of the functionalities alongside the beacon feature. Further, there is no motivation to combine Goosen in the first place.

#### 1. Petitioner Presents Insufficient Motivation to Combine Berg with Goosen

Petitioner concedes that Berg does not discloses the periodic beacon claim limitation and attempts to combine Goosen's disclosure to meet this limitation. Pet. at 38, 51. Petitioner, however, presents insufficient motivation to combine the two.

First, as explained above, Petitioner's few reasons common to all grounds to combine the references at best amounts to an assertion that the references *could be* combined.  *See supra* Part III.A.4.  That is not enough.

Petitioner's alleged motivation to combine Berg and Goosen with respect to claim element 11[f] is also insufficient.  First, Petitioner cites no teaching or suggestion from Berg that would have motivated a POSITA to look for another system to combine with Berg for this limitation.  *See generally* Pet at 51-53.  Further, Petitioner's reliance on Goosen to supply the requisite motivation is misplaced for two reasons.  One, the arguments that Goosen's teachings "dovetail with Berg's" and that "a POSITA would consider it obvious to use a BLE antenna to emit a periodic beacon signal" "[i]n view of the disclosures of Berg and Goosen" say no more than that a POSITA "would have understood that they *could be* combined."  *Pers. Web Techs.*, 848 F.3d at 993 (emphasis in original) (finding same of an argument that the combination of two references would have allowed the feature of one to be used with a different feature of the other).  That is not enough.  Two, the alleged advantage of "making efficient use of battery power" because of BLE's "low power usage" does not even make sense.  If Berg does not teach, and therefore can operate without, emitting a periodic beacon signal, modifying Berg to do so *increases* power consumption.  Thus, if making efficient use of battery power is desirable as Petitioner alleges, a POSITA would have been

24

motivated to *not* add to Berg's working device a feature that consumes more power.

### 2. Berg in View of Goosen Teaches Away from the Claimed Portable Wireless Device

Insufficient motivation aside, the combination of Berg and Goosen does not actually constitute the portable device of claim 11. Petitioner relies on Goosen's role-reversal disclosure to allege the combination discloses claim element 11[f]. Pet. at 52. But, as Petitioner recognizes, Goosen's beacon refers to a "very simple" Bluetooth device. *Id.* (quoting Goosen at 9). So simple, in fact, it "does *little else* than to periodically advertise themselves with small 31 byte data packages." Goosen at 9 (emphasis added). Consistent with the beacon's very limited capability, when the roles of beacons and smartphone (the portable device) are reversed, "nothing happens on the smartphone, since it is only advertising itself to the scanning beacons." *Id.* at 37. This teaches away from the claimed portable wireless device, which is configured to, among others, establish secure communication links and transmit the private identifier only across secure communication links.

### C. Ground 3 Fails Because the Alleged Motivation to Combine Is Insufficient

Apparently concerned over the deficiency of ground 2, Petitioner proposes a ground 3 substituting Goosen in ground 2 with the BLE specification. Similar to

its argument in ground 2, Petitioner cites no teaching or suggestion from Berg that would have motivated a POSITA to look for another system to combine with Berg for this limitation. *See generally* Pet at 57-58. Petitioner also repeats the same rationales from ground 2 for the alleged motivation, including that the BLE Specification's and Berg's teachings "dovetail[]," and that "a POSITA would recognize as well-known and obvious at the time of invention to use a BLE antenna to emit a periodic beacon signal" "[i]n view of the disclosures of Berg and the BLE Specification." *Id.* at 57. As explained above, however, such rationales say no more than that the reference *could be* combined, not that a POSITA would have been motivated to combine them. *See supra* Part III.B.1. Petitioner also repeats the "low power usage" or "battery efficiency" argument. Pet. at 57-78. But as also explained above, this argument does not even make sense. *See supra* Part III.B.1. The argument of "a reasonable expectation of success" (*id.* at 58) does not make up for a lack of motivation to combine because that argument addresses a separate element of the obviousness analysis. *Pers. Web Techs.*, 848 F.3d at 991 ("the Board had to find that a person of ordinary skill in the art would have been motivated to combine the prior art in the way claimed by the . . . patent claims at issue *and* had a reasonable expectation of success in doing so.") (emphasis added).

Petitioner additionally argues that "advances in access control technology" would have motivated a POSITA to add the alleged periodic beacons from the BLE Specification to Berg.  Pet. at 58.  The chronology of prior-art publications belies this argument.  The BLE Specification, published in 2010, preceded Berg's filing date of 2016 by almost six years.  BLE Specification at 1 (showing publication date of June 30, 2010); Berg at 1 (showing filing date May 2, 2016).  If the alleged "advances" would have motivated a POSITA, Berg would have incorporated the periodic beacons from the BLE Specification since Berg presumably was aware of the specification, published six years earlier.

Moreover, the alleged "advances in access control technology" has no relevance to the periodic-beacon limitation for which Petitioner uses the BLE Specification to allege obviousness.  Pet. at 58.  Specifically, the alleged advances include the evolution of communication protocols "to offer more security, portability, and interoperability."  *Id.*  But adding a periodic beacon broadcast to Berg's disclosures does not serve any security purpose, does not make the devices smaller or more portable, and requires the same modification to both transmitting and receiving devices and is thus at best neutral with respect to interoperability.  Petitioner does not explain why doing so would increase any of these characteristics.  *See id.*  Further, Petitioner does not identify any deficiency in the

security, portability, or interoperability of Berg's device that would have motivated a POSITA to seek "more."  *See id.*

Accordingly, Petitioner's alleged motivation falls short.

> **D.    Ground 4 Fails Because Raina Does Not Disclose the Claimed Private Identifier of Claim 11 and Because Motivation to Combine Raina and Yuen Is Insufficient**

Claim 11 requires the portable wireless device to comprise a processor controlling the portable wireless device to store and transmit a private identifier *unique to the portable wireless device*.  Petitioner alleges that "information for validation" disclosed by Raina constitutes this private identifier.  Pet. at 70. Petitioner is mistaken.

Raina does not disclose the claimed private identifier, which the claim language clearly requires to be unique to the portable *device*.  Raina discloses "information, such as user profile, balance amount, passes and concession information" or "credentials, such as user account number" or "user's credentials which may be a user ID, account number, or a similar unique identifier which can be used to access the user's information from the backend server" may be stored on the mobile device and used for validation.  Raina ¶¶ [0052]-[0056] (cited in Pet. at 70).  Equating such information or credential with the claimed private identifier is at best conclusory.

Indeed, the information and credentials disclosed in Raina are associated with the user — *e.g.*, user profile, user account number, user ID — rather than the portable device.  Further, Raina distinguishes the user from the mobile device. *Compare id.* ¶ [0021] ("User refers to anyone or anything trying to gain access to the restricted area 101.") *with id.* ¶ [0022] ("end user mobile devices 130 that can each run an access control application 132 to exchange information with beacons 140 and zone computers 150 . . . .").  Consistent with Raina's differentiation of a user from the mobile device, Raina discloses "the processor 612 *validates a user associated with the mobile device* 130a . . . ."  *Id.* ¶ [0062] (emphasis added); *see also id.* ¶¶ [0064], [0066], cls. 1, 9, 11, 18 (validating "a user associated with the mobile device"); *id.* ¶ [0074] ("the mobile device 130a may send *user credentials of the user 131* a during the message exchange *to validate the user 131a*.  The user credentials may include account information, password, or any information needed *to validate the user 131a*.") (emphases added); *id.* ¶ [0080] ("Validation 1122 . . . may include a message exchange with mobile device 130a to receive user credentials and *validate the user 131a* based on the credentials and send a validation decision back to the mobile device 130a.") (emphasis added).

Such information and credentials, associated with the user, would be distinct from an identifier unique to the *portable wireless device* as required by claim 11. For example, a user may use more than one device to gain access.  Raina itself

contemplates that "[t]he mobile devices 130 may be any computer that a user may carry and that can run applications including the access control applications 132. Examples of the mobile devices 130 include mobile phones, tablets, wearable computers, such as GOOGLE glass or smart devices embedded into clothing, a smart watch, fitness tracker, or wireless enabled shoes, or some other type of mobile computer." *Id.* ¶ [0024]. A typical user often would have more than one of these devices. Each device would store the *user's* profile or account information as credentials, and thus all of the user's devices would have the same user identifier. Further, information such as balance amount, passes and concession information, is not unique and does not constitute an identifier, much less a private identifier. For example, many users to an event may have the same concession information, rendering it nonunique.

Ground 4 fails for an additional reason related to motivation to combine the references. Specifically, Petitioner presents substantively identical arguments to allege motivation to combine Raina and Yuen as in ground 1. *Compare* Pet. at 24-25 *with id.* at 61-62. Thus, the alleged motivation falls short for the same reasons explained above in ground 1. *See supra* Part III.A.4.

## IV.   THE PETITION SHOULD BE DENIED IN THE DISCRETION OF THE DIRECTOR UNDER 35 U.S.C. § 314(a)

The present Petition is exactly the type which the Board's standards for discretionary denial are designed to prevent. Petitioner, after first attempting to

challenge the patent's validity via an unenforceability claim in a declaratory judgment action, after already presenting the same prior art in the district court five months before filing the Petition, and after waiting until nearly the last possible day to file its petition, now comes to the Board with no reasonable argument under any of the *Fintiv* factors. Institution should be denied.

Section 314(a) "invests the Director with discretion on the question whether to institute review." *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1351 (2018); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ( "[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."). The Board, in determining whether to exercise discretion to deny institution under 35 U.S.C. § 314(a), may consider an early trial date in related litigation as part of an assessment of all relevant circumstances of the case, including the merits, in an effort to balance considerations such as efficiency and fairness. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5-6 (P.T.A.B. Mar. 20, 2020) (precedential) ("***Fintiv*** **Order**"); *NHK Spring Co., Ltd. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 (P.T.A.B. Sept. 12, 2018) (precedential) (denying institution relying, in part, on § 314(a) because the parallel district court proceeding was scheduled to finish before the Board reached a final decision).

In exercising discretion under 35 U.S.C. § 314(a), the Board may consider "events in other proceedings related to the same patent, either at the Office, in

district courts, or the ITC." Consolidated Trial Practice Guide November 2019 at 58. When a patent owner raises an argument for discretionary denial due to the advanced state of a parallel proceeding, the Board has set forth several factors that it will consider to balance considerations of system efficiency, fairness, and patent quality. *See Fintiv* Order at 5-6. These factors include:

1. whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;
2. proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;
3. investment in the parallel proceeding by the court and the parties;
4. overlap between issues raised in the petition and in the parallel proceeding;
5. whether the petitioner and the defendant in the parallel proceeding are the same party; and
6. other circumstances that impact the Board's exercise of discretion, including the merits.

*Fintiv* Order at 5-6. In evaluating these factors, "the Board takes a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Id.* at 6.

Here, ***each*** *Fintiv* factor favors denying institution, some strongly so. The combined weight of these factors tips the scale decisively in favor of denial.

### A. Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted

This factor weighs in favor of denial because a stay has not been granted, and the record evidence is that a stay will not be sought, and in any case would not

be granted, if the Petition is instituted.  Under the first *Fintiv* factor, "[i]f a court has denied a defendant's motion for a stay pending resolution on a PTAB proceeding, and has not indicated to the parties that it will consider a renewed motion or reconsider a motion to stay, if a PTAB trial is instituted, this fact has sometimes weighed in favor of exercising authority to deny institution." *Fintiv Order* at 7-8.

Neither party to the Florida Litigation has moved for a stay. Moreover, the District Court set a March 12, 2021 "[d]eadline to file a motion to stay the lawsuit pending reexamination in the U.S. Patent Office." Ex. 2021 (Dkt. No. 73 (Scheduling Order)) at 2.  Petitioner waited until *after* this deadline to file the subject Petition and has not sought, either before or after the deadline, to amend the deadline. Indeed, as discussed further below, both parties have submitted proposals for an amended case schedule through discovery and trial next year, with no mention of the possibility of a stay. Accordingly, this factor favors denial. *Mylan Lab'ys Ltd. v. Janssen Pharmaceutica Nv*, No. IPR2020-00440, 2020 WL 5580472, at *6 (P.T.A.B. Sept. 16, 2020) ("the balance of facts in the two litigations indicate that no stay is likely to be entered in either, and therefore *Fintiv* factor 1 leans towards denial of institution.").

## B.   Proximity of the court's trial date to the Board's projected statutory deadline for final written decision

Under the second *Fintiv* factor, "[i]f the court's trial date is earlier than the projected statutory deadline the Board generally has weighed this fact in favor of exercising authority to deny institution … If the court's trial date is at or around the same time as the projected statutory deadline or even significantly after the projected statutory deadline, the decision whether to institute will likely implicate other factors . . . such as the resources that have been invested in a parallel proceeding." *Fintiv* Order at 9.

If review is instituted in this proceeding, Carnival estimates that the statutory deadline will fall sometime around October 2022. *See* 35 U.S.C. § 316(a)(11); 35 U.S.C. § 314(b)(1).  The Florida Litigation is currently scheduled for trial in January 2022 (Ex. 2021 (Dkt. 73 at 3)—*eight months* before the Board's expected statutory deadline. The Board "generally takes courts' trial schedules at face value absent some strong evidence to the contrary." *Apple v. Fintiv*, No. IPR2020-00019, Paper 15, 12-13 (P.T.A.B. May 13, 2020) (informative) ("***Fintiv II***"). The parties recently have filed motions proposing modifications to the scheduling order.[4]

---

[4] Of note, the parties now have begun the claim construction process in the Florida Litigation, exchanging lists of terms for construction on July 12, 2021.  The parties

Carnival's proposal would have trial set for June 2022, about four months before the projected deadline for the Board's final written decision. *See* Ex. 2024 (Dkt. No. 166) at 6. The Board has previously found that this factor "weighs somewhat in favor of discretionary denial" where trial is set to occur just two months prior to the final written decision deadline. *Fintiv II* at 12-13. Thus, this factor favors denial under Carnival's proposal.

Petitioner's conduct in this regard is quite revealing. On April 30, Petitioner filed a brief proposing a new case schedule with trial set for August 2022. Ex. 2022 (Dkt. 154-1) at 6-7. Under *Fintiv II*, this schedule also would favor denial, as trial would happen about two months before the projected statutory date. Just days before this preliminary response was due, however, Petitioner filed a new motion proposing a trial date of November 2022—just after the expected final written decision date in the event that the Board institutes this IPR. *See* 35 U.S.C. § 316(a)(11); 35 U.S.C. § 314(b)(1). Notably, this date is several months after the trial date (in August 2022) that would be expected if the court follows the timing set forth in its usual patent case track keyed off the claim construction deadlines. *See* Ex. 2023 (Dkt. 44) at 1, 3-4.

---

also have agreed to a schedule of claim construction deadlines culminating in briefing to be filed in November 2021. Ex. 2024 (Dkt. No. 166) at 5.

The Court has yet to rule on these motions, but regardless, Carnival submits that the Board should weigh this factor in favor of denial given that (a) the current trial date is well in advance of the projected statutory deadline, (b) the district court is likely to enter a schedule with trial scheduled for several months before the projected statutory deadline, and (c) Petitioner's latest proposed schedule with a later trial date is just further evidence of Petitioner's efforts to delay the district court case to justify unnecessary parallel IPR proceedings.

## C. Investment in the parallel proceeding by the court and the parties and petitioner's delay in filing the petition

The third *Fintiv* factor weighs heavily in favor of denial given (a) Petitioner's unexplained delay of *over five months* after serving invalidity contentions raising the same prior art and arguments it makes here, and even longer after Petitioner first made clear its intent to file IPRs against Carnival's patents, and (b) the substantial investment by the District Court and the parties in the parallel proceeding.

Under the third *Fintiv* factor, "[t]he Board also . . . consider[s] the amount and type of work already completed in the parallel litigation by the court and the parties at the time of the institution decision." *Fintiv* Order at 9. Such "investments" can come in various forms. For example, "if, at the time of the institution decision, the district court has issued substantive orders related to the patent at issue in the petition, this fact favors denial." *Fintiv* Order at 9-10.

Ultimately, this particular factor "is related to the trial date factor, in that more work completed by the parties and court in the parallel proceeding tends to support the arguments that the parallel proceeding is more advanced, a stay may be less likely, and instituting would lead to duplicative costs." *Fintiv* Order at 10.

In the present case, contrary to Petitioner's assertion that "investment in the parallel proceeding has been minimal" (Pet. at 82), the court has in fact issued two detailed opinions on the parties' motions to dismiss Exs. 2018, 2002 (Dkt. 120, 128), opinions regarding Carnival's infringement contentions and Petitioner's motion to amend the protective order as it related to IPR-specific issues Exs. 2020, 2019 (Dkt. 119, 129), and has conducted a number of hearings to resolve various discovery disputes, resulting in a ruling on cross-motions to compel. Ex. 2004 (Dkt. 163). These rulings are detailed in Section II.D above. The extensive effort the district court has put into the parallel litigation weighs in favor of denial.

Of note, the district court unquestionably has issued "substantive orders related to the patent at issue in the petition," and thus this factor favors denial under *Fintiv II*. In particular, the Court became familiar with both the disclosures and the claims of the related '184 Patent in considering and denying Petitioner's motion to dismiss based on Section 101. Ex. 2018 (Dkt. No. 120) at 20-28.

Petitioner blames the so-called lack of investment on "several deadlines" that "have slipped and have not been rescheduled." Pet. at 82. But these delays

stem entirely from Petitioner's withholding of core documents, which has prevented the parties from moving forward with the claim construction process. Petitioner refused to produce its technical documents on the basis of what it was calling a "trade secrets objection." But its "trade secrets objection" was that Carnival had not identified its trade secrets to Petitioner's satisfaction, a question the Magistrate Judge noted was irrelevant to Petitioner's production of its own technical documents. Ex. 2025 (Dkt. No. 93) at 7:22-25 ("Now, what I don't understand is, why would you need to know what Carnival's alleged trade secret is to be able to identify what your trade secret is? Why would it be dependent on Carnival?"). As the Magistrate Judge further observed on more than one occasion, it "makes no sense" for Petitioner to withhold discovery relevant to the patent issues based on its complaints about Carnival's identification of trade secrets: "The two are not linked at all." Ex. 2026 (1/7/2021 Hr'g Tr.) at 20:20-21:25; *see also* Ex. 2027 (4/9/2021 Hr'g Tr.) at 40:22-24 (Judge Torres expressing that he was "at a loss as to why the patent disclosures and the patent production can't be separately completed" despite Petitioner's "trade secrets" objection).  Ultimately, the district court granted Carnival's motion to compel and put an end to Petitioner's tactics. Ex. 2004 (Dkt. No. 163).  The Board should not reward these dilatory tactics. *See, e.g.*, *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d

1336, 1362 (Fed. Cir. 2001) (declining to award prejudgment interest where "delay was a litigation tactic").

A separate compelling basis for denial under this factor is Petitioner's lengthy and unexplained delay in filing the IPR after (a) signaling its intent to do so, (b) receiving Carnival's identification of asserted claims, and (c) serving its invalidity contentions identifying the same prior art and arguments presented in the petition.  In evaluating this third *Fintiv* factor, the Board has also considered the question of how expeditiously the petitioner filed the petition.  If a petitioner, "faced with the prospect of a looming trial date, waits until the district court trial has progressed significantly before filing a petition," that decision "may impose unfair costs to a patent owner." *Fintiv* Order at 11.  Here, Petitioner waited nearly the full year before the time bar expired to file its petition.  *See* Ex. 2028 (Return of Service, *Carnival Corp. v. DeCurtis Corp.*, No. 20-21547, Dkt. No. 15) (Carnival's complaint asserting infringement of the '514 Patent served on DeCurtis LLC on April 15, 2020; Petition, IPR No. 2021-00783 (dated April 7, 2021). There is no good reason for the delay. Petitioner has been unequivocally aware of the claims being asserted in the Florida Litigation since at least September 2020, when

Carnival served its preliminary infringement contentions.[5] Yet Petitioner delayed another *seven months* after Carnival identified the asserted claims, waiting until just days before the statutory time bar would expire to file this Petition—hardly "expeditious[]" or "diligent []." *Cf. Fintiv* Order at 11 ("If the evidence shows that the petitioner filed the petition expeditiously, such as promptly after becoming aware of the claims being asserted, this fact has weighed against exercising the authority to deny institution under *NHK*.").

In addition, Petitioner served its invalidity contentions in October 2020, identifying the same prior art it relies on in this Petition. *Compare* Pet. at 5 *with* Ex. 2029 (Dkt. 153-4) at A1-A10 (listing Soleimani, Yuen, Hulusi, Berg, Badinski, Raina, Goosen, and the BLE Specification in its list of prior art references), ii-iii (alleging that the asserted '514 Patent claims are invalid under 35 U.S.C. § 102 or 103 "in light of at least the prior art references identified in Appendix A"). "If … the evidence shows that the petitioner did not file the petition expeditiously, such as at or around the same time that the patent owner responds to the petitioner's invalidity contentions, … these facts have favored denial." *Fintiv* Order 11-12. *See, e.g.*, *Google, LLC v. Personalized Media Commc'ns*, No. IPR2020-00720,

---

[5] Carnival has amended its infringement contentions since September, but has not added any new claims. Ex. 2019 (Dkt. No. 129) at 5.

2020 WL 6530766, at *3 (P.T.A.B. Nov. 5, 2020) (*Fintiv* factor 3 weighed in favor of denying institution where "Petitioner was aware of the claims asserted and presented invalidity contentions against those claims, and then waited a significant amount of time . . . before filing the Petition.").

It is of course no surprise that there is almost complete overlap between the prior art identified in Petitioner's invalidity contentions and the prior art identified in this Petition: Petitioner knew all along that it intended to seek *inter partes* review of the asserted patents. In July of 2020—nearly *nine months* before filing the Petition—when the parties were negotiating the terms of the protective order in the Florida Litigation, Petitioner proposed a prosecution bar that would "preclude the parties' counsel from advising or participating in potential claim amendments sought for an existing patent in a parallel invalidity proceeding." Ex. 2030 (Dkt. No. 77) at 3-4.  Carnival opposed adding that language to the protective order, so Petitioner filed a motion in September 2020 to amend the protective order specifically to add this provision.  Ex. 2030 (Dkt. 77).  The District Court granted that motion in January 2021.  Ex. 2020 (Dkt. 119).  Petitioner knew when it was negotiating the Protective Order, and certainly by the time it filed a motion to amend the Protective Order to add an IPR amendment-specific provision, that it would be filing this Petition, yet still waited until the last possible moment to do so.

Petitioner's twelve-month delay in filing its petition cannot be explained or justified.

For the reasons set forth above, this factor strongly weighs in favor of denying institution.[6]

### D.     Overlap between issues raised in the petition and the parallel proceeding

Under the fourth *Fintiv* factor, the Board evaluates whether "the petition includes the same or substantially the same claims, grounds, arguments, and evidence as presented in the parallel proceeding[.]" *Fintiv* Order at 12. In such

---

[6] This factor is an important distinction between this case and *Sand Revolution II, LLC v. Continental Intermodal Group – Trucking LLC*, IPR2019-01393, Paper 24 (June 16, 2020), cited by Petitioner.  In *Sand Revolution*, the Petitioner's diligence in filing the Petition was not addressed as a factor weighing against institution.  *Id.* at 10-11. In *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (December 1, 2020), a much shorter delay than here (approximately two months after initial invalidity contentions compared to over five months here) was excused by settlement discussions and office closures among other factors.  *Id.* at 16-17. There are no such excuses here.  *Sotera* also is meaningfully distinct in that the Petitioner had moved to stay the district court case and the court already had vacated *Markman* deadlines pending a ruling on that motion.  *Id.* at 13-14.

cases, this fact "has favored denial." *Id*. The question of "the degree of overlap is highly fact dependent," *id*. at 13:

> For example, if a petition involves the same prior art challenges but challenges claims in addition to those that are challenged in the district court, *it may still be inefficient to proceed because the district court may resolve validity of enough overlapping claims to resolve key issues in the petition*. The parties should indicate whether all or some of the claims challenged in the petition are also at issue in district court.

*Id*. (emphasis added).  Petitioner challenges claim 11 of the '514 Patent in this proceeding, precisely the claim at issue in the Florida Litigation. This represents a complete overlap.

Petitioner stipulates in its Petition that "if this IPR proceeding is instituted, then Petitioner will not pursue in the [Florida] Litigation the specific grounds identified above in connection with the referenced . . . claims, or any other ground that was raised or could have been reasonably raised in an IPR (*i.e.*, any ground that could be raised under §§ 102 or 103 on the basis of prior art patents or printed publications)." Pet. at 77. But this stipulation is so narrow as to be meaningless.

In particular, even with this stipulation in place, Petitioner intends to litigate prior art invalidity-based arguments in the Florida Litigation.  This factor therefore favors denying institution.

As noted above, the District Court dismissed Petitioner's prior art fraud-based unenforceability claims but did *not* dismiss Petitioner's unenforceability

claims based on alleged improper inventorship.  Petitioner intends to litigate issues based on alleged prior art invalidity in its effort to prove those remaining claims. Petitioner's theory is that Carnival and its agents omitted a proper inventor from the '514 Patent, and that the motive was to prevent that inventor from notifying the Patent Office of supposedly material prior art. Petitioner recently filed an Answer and Counterclaims alleging that this prior art was "material" because it supposedly discloses elements claimed in the '514 Patent (and other Carnival patents).  Ex. 2031 (Dkt. 155) at 42-47.

Petitioner's stipulation is carefully limited to "any ground that could be raised under §§ 102 or 103 on the basis of prior art patents or printed publications," which presumably would leave Petitioner free to litigate issues of what various alleged prior art references disclose in connection with its unenforceability theory.

### E.   Whether the petitioner and the defendant in the parallel proceeding are the same party

In cases where the "petitioner is unrelated to a defendant in an earlier court proceeding, the Board has weighed this fact against exercising discretion to deny institution under *NHK*."  *Fintiv* Order at 13-14.  But here, the parties are identical: Carnival is the Plaintiff in the Litigation and Patent Owner before the Board, and DeCurtis is the Defendant in the Florida Litigation and Petitioner before the Board. For this reason, this factor weighs in favor of denying institution.

**F.     Other circumstances that impact the Board's exercise of discretion, including the merits**

For the reasons set forth above, the *Fintiv* factors strongly favor denial of institution. And, for the reasons set forth in further detail herein, Carnival respectfully submits that Petitioner has not set forth "sufficiently strong" proposed grounds that would support a grant of institution.  *Fintiv* Order at 15 ("By contrast, if the merits of the grounds raised in the petition are a closer call, then that fact has favored denying institution when other factors favoring denial are present.").

Furthermore, DeCurtis sought a declaratory judgment in the Florida Litigation that the patents asserted are unenforceable, but those unenforceability claims are based on allegations of ***prior art invalidity***.  Petitioner's original declaratory judgment Complaint and First Amended Complaint in the Florida Litigation alleges that the '514 Patent is unenforceable "because the purported inventors, patent attorneys, and others associated with [its] filing and prosecution knowingly failed to disclose to the USPTO material prior art that would have otherwise prevented the Carnival Patents from issuing." Ex. 2001 (Dkt. No. 1 (Petitioner's Original Complaint)) ¶ 72; *see also id.* ¶¶ 73-84. In particular, Petitioner asserted that "the implementation details of [certain] prior art Disney systems," including Disney's "Be Our Guest" system and MagicBands, "were material to the prosecution of the Carnival Patents." *Id.* ¶ 77. Petitioner acknowledged that the inventors disclosed "certain patents and patent applications

related to" the Disney prior art, but claims that Carnival "failed to disclose the full extent of the prior art systems and the available publications relating to those systems." *Id.* ¶ 76. And, according to Petitioner, "[h]ad the USPTO examiner been made aware of the full extent of the Disney … prior art, the USPTO examiner would not have issued … the Carnival Patents …," including the '514 Patent (*id.* ¶¶ 79, 134-135).[7]

Petitioner pleaded these as unenforceability claims, but nonetheless, the claims are premised on a challenge to the validity of the patents. A party cannot file an IPR petition against a patent after having already brought a declaratory judgment action challenging the validity of a claim of that patent.  35

---

[7] In its First Amended Complaint, Petitioner repeated these allegations and added nearly identical allegations about Carnival's failure to disclose the "full extent of" Assa Abloy's "Allure" electronic lock system, which it argued was relevant prior art for the '514 Patent. *See* Ex. 2032 (Dkt. No. 87 (DeCurtis' First Amended Complaint)) ¶¶ 84-96. Although the District Court subsequently dismissed Petitioner's prior art-based fraud allegations with prejudice for failure to state a claim (Ex. 2002 (Dkt. No. 128) at 22-28), this subsequent dismissal does not affect whether the statutory bar which was triggered by Petitioner's filing of the declaratory judgment complaint.

U.S.C. § 315(a)(1); *see also WesternGeco LLC v. ION Geophysical Corp.*, 889

F.3d 1308, 1318 (Fed. Cir. 2018). "With respect to pleadings, it is understood that

a court looks to 'the quality of its substance rather than according to its form or

label.'" *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1355 (Fed. Cir.

2010) (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1286 (3d ed. 2004)). Petitioner's declaratory judgment action asked

the district court to declare the '514 Patent unenforceable because, had the patent

examiner known about a relevant piece of prior art, the patent would not have

issued because the claims would have been found invalid over the prior art. That is

the core of a 35 U.S.C. §102/§103 validity challenge. Moreover, to establish

"inequitable conduct" and prove unenforceability, a party must show the asserted

prior art is "but-for material" to patentability: "Because neither mere nondisclosure

of prior art references to the PTO nor failure to mention prior art references in an

affidavit constitutes affirmative egregious misconduct, claims of inequitable

conduct that are based on such omissions require proof of but-for materiality."

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292-93 (Fed. Cir.

2011). And "[w]hen an applicant fails to disclose prior art to the PTO, that prior art

is but-for material if the PTO would not have allowed a claim had it been aware of

the undisclosed prior art." *Id*. at 1291. Accordingly, Petitioner's unenforceability

claim in substance constituted "a civil action challenging the validity of the claim

of the patent," and thus the Petition is statutorily barred under 35 U.S.C. § 315(a)(1).

Even if the Board were to find that the statutory bar does not apply here, however, Petitioner's declaratory judgment action should be considered as one factor (of many) favoring discretionary denial of the Petition.  Institution of this Petition would be inconsistent with the purpose of the statutory bar of Section 315(a), which is to prevent an accused infringer from using the IPR process as a "second bite at the apple" after challenging the validity of a patent in district court. *Epic Games, Inc. v. Acceleration Bay LLC*, No. 4:19-CV-04133-YGR, 2020 WL 1557436, at *1 (N.D. Cal. Apr. 1, 2020).  *See also Douglas Dynamics, LLC v. Meyer Prods. LLC*, No. 14-cv-886-jdp, 2017 WL 1382556, at *4 (W.D. Wis. Apr. 18, 2017) ("Congress intended IPR to serve as a complete substitute for litigating validity in the district court.") (quoting *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1354 (Fed. Cir. 2016) (Newman, J, dissenting in part)).

Even if the Board determines that this challenge does not violate the "letter of the law" to trigger the statutory bar, it certainly violates the spirit of the statute's intent to prevent overlapping parallel proceedings—particularly when it is the Petitioner who chose to initiate both proceedings. The Board should take this into account in balancing considerations of system efficiency and fairness as yet another factor weighing against institution.

## V.    CONCLUSION

This Petition is subject to the Director's discretionary denial and statutorily

barred.  Further, Petitioner has failed to establish a reasonable likelihood of

prevailing on the challenged claim of the '514 Patent.  Thus, this Petition for *inter*

*partes* review should be denied.

Respectfully submitted by:

Date: <u>July 14, 2021</u>                              <u>/ *Christopher J. Higgins* /</u>
Christopher J. Higgins, Reg. No. 66,422
ORRICK, HERRINGTON & SUTCLIFFE
LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Fax: (202) 339-8500
0CHPTABDocket@orrick.com

*Counsel for Patent Owner*

## <u>CERTIFICATION UNDER 37 C.F.R. § 42.24(d)</u>

This Preliminary Response of Patent Owner complies with the requirements of 37 C.F.R. § 42.24. As calculated by the word count feature of Microsoft Word, it contains 10,878 words, excluding the words in the following: Table of Contents, Table of Authorities, List of Exhibits, Certification Under § 42.24(d) and Certificate of Service.

Date: <u>July 14, 2021</u>

<u>/ *Christopher J. Higgins* /</u>
Christopher J. Higgins, Reg. No. 66,422
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Fax: (202) 339-8500
0CHPTABDocket@orrick.com

*Counsel for Patent Owner*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing was

served by electronic mail on counsel of record for the Petitioner as follows:

James Glass
Patrick Schmidt
Sam Stake
Gavin Snyder
Jared Kneitel
Richard Lowry
**Quinn Emanuel Urquhart & Sullivan, LLP**
51 Madison Ave., 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Email: jimglass@quinnemanuel.com
Email: patrickschmidt@quinnemanuel.com
Email: samstake@quinnemanuel.com
Email: gavinsnyder@quinnemanuel.com
Email: jaredkneitel@quinnemanuel.com
Email: richardlowry@quinnemanual.com


Respectfully submitted by:

Date: <u>July 14, 2021</u>

   / Christopher J. Higgins /
Christopher J. Higgins, Reg. No. 66,422
ORRICK, HERRINGTON & SUTCLIFFE
LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Fax: (202) 339-8500
0CHPTABDocket@orrick.com

*Counsel for Patent Owner*