# EXHIBIT X

Petition for *Inter Partes* Review submitted by DeCurtis in
IPR2021-00783, concerning U.S. Patent 10,157,514

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

DECURTIS, LLC
Petitioner

v.

CARNIVAL CORP.
Patent Owner

——————

## U.S. Patent No. 10,157,514

"Portable wireless devices for use in
wireless guest engagement systems"

——————

*Inter Partes* Review No. 2021-00783

——————

# PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 10,157,514 UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. §§ 42.100 *ET SEQ*.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION .......................................................................1

II.     MANDATORY NOTICES ......................................................2

    A.      Real Party-in-Interest (37 C.F.R. § 42.8(b)(1)) ..........................2

    B.      Related Matters (37 C.F.R. § 42.8(b)(2))...................................3

        1.      Related Patent Office Proceedings ...................................3

        2.      Related Litigation ..........................................................3

        3.      Related Applications.......................................................3

    C.      Lead and Back-Up Counsel (37 C.F.R. § 42.8(b)(3)) and Service Information (37 C.F.R. § 42.8(b)(3)-(4))......................4

    D.      Payment of Fees (37 C.F.R. § 42.15(a)) ....................................5

III.    REQUIREMENTS FOR INTER PARTES REVIEW .......................6

IV.     STATEMENT OF RELIEF REQUESTED FOR THE CHALLENGED CLAIM (37 C.F.R. § 42.104(B)................................6

V.      OVERVIEW OF THE '514 PATENT ......................................7

VI.     PERSON OF ORDINARY SKILL IN THE ART .............................7

VII.    CLAIM CONSTRUCTION ....................................................8

VIII.   BLUETOOTH LOW ENERGY OVERVIEW ................................8

IX.     ASSERTED PRIOR ART AND MOTIVATION TO COMBINE............................................................................ 13

    A.      Soleimani (Ex-1003) ............................................... 13

    B.      Yuen (Ex-1004)...................................................... 14

    C.      Hulusi (Ex-1005)..................................................... 15

    D.      Berg (Ex-1006)........................................................ 16

    E.      Badinski (Ex-1007) ................................................. 17

    F.      Raina (Ex-1008) ..................................................... 17

    G.      BLE Specification (Ex-1009)..................................... 18

    H.      Motivation to Combine The Cited References ...................... 19

X.      GROUND 1:  SOLEIMANI, YUEN, AND HULUSI ..................... 21

i

A.    Claim 11 ................................................................ 21

    1.    11pre .......................................................... 21

    2.    11a:   *"a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅜ inch;"* .............................. 21

    3.    11b:   *"a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity;"* .............................. 25

    4.    11c:   *"wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications,"* .............................................. 31

    5.    11d:   *"the processor is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications,"* .......................................... 31

    6.    11e: ............................................................. 32

        (i)    *"the memory stores ... [a] public ... identifier[] unique to the portable wireless device,"* .................................................. 32

        (ii)   *"the memory stores ... [a] private ... identifier[] unique to the portable wireless device,"* .................................................. 35

    7.    11f ............................................................. 36

    8.    11g ............................................................. 37

XI.   GROUND 2: BERG, BADINSKI, AND GOOSEN RENDER OBVIOUS CLAIM 11 ................................................ 38

A.    Claim 11 ................................................................ 39

    1.    11pre .......................................................... 39

    2.    11a ............................................................. 39

    3.    11b ............................................................. 45

|      | 4.   | 11c .................................................................... 46 |
|      | 5.   | 11d .................................................................... 46 |
|      | 6.   | 11e: ................................................................... 47 |
|      | 7.   | 11f ..................................................................... 51 |
|      | 8.   | 11g .................................................................... 53 |

XII.  GROUND 3: BERG, BADINSKI, AND BLE SPECIFICATION
      RENDER OBVIOUS CLAIM 11 ............................................ 55

A.    Claim 11 .......................................................................... 55

      1.    11pre-11e and 11g ...................................... 55

      2.    11f ..................................................................... 55

XIII. GROUND 4:   RAINA, YUEN, AND HULUSI RENDER
      OBVIOUS CLAIM 11 ........................................................ 58

A.    Claim 11 .......................................................................... 59

      1.    11pre ................................................................ 59

      2.    11a .................................................................... 59

      3.    11b .................................................................... 62

      4.    11c .................................................................... 66

      5.    11d .................................................................... 66

      6.    11e .................................................................... 67

            (i)    *"the memory stores ... [a] public ...
                   identifier[] unique to the portable wireless
                   device,"* ................................................ 67

            (ii)   *"the memory stores ... [a] private ...
                   identifier[] unique to the portable wireless
                   device,"* ................................................ 70

      7.    11f ..................................................................... 71

      8.    11g .................................................................... 74

XIII. INSTITUTING THIS IPR WOULD BE EQUITABLE ................... 75

A.    35 U.S.C. § 325(d) Factors Support Institution ...................... 75

B.    *NHK-Fintiv* Factors Support Institution.................................. 77

iii

1.    Overlap Between Issues Raised in the Petition and in the Parallel Proceeding .............................................. 77

2.    Likelihood of a Stay ...................................................... 78

3.    Proximity of the Court's Trial Date to a FWD ............. 78

4.    Investment in the Parallel Proceeding .......................... 79

5.    Whether the Petitioner and the Defendant in the Parallel Proceeding are the Same Party ........................ 80

6.    Other Circumstances, that Impact the Board's Exercise of Discretion, Including the Merits ................. 80

XIV.  CONCLUSION ................................................................. 81

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex-1001 | U.S. Patent No. 10,157,514 ("the '514 patent") |
| Ex-1002 | File History of U.S. Patent No. 10,157,514 (U.S. Patent Application No. 15/460,983) |
| Ex-1003 | U.S. Patent No. 9,483,887 ("Soleimani") |
| Ex-1004 | U.S. Patent No. 8,935,119 ("Yuen") |
| Ex-1005 | U.S. Patent Pub. No. 2016/0198287 ("Hulusi") |
| Ex-1006 | PCT/EP2016/059748 ("Berg") |
| Ex-1007 | U.S. Patent Pub. No. 2015/0220109 ("Badinski") |
| Ex-1008 | U.S. Patent Pub. No. 2016/0055697 ("Raina") |
| Ex-1009 | Specification of the Bluetooth System, Covered Core Package version: 4.0 (June 20, 2010) ("BLE Specification") |
| Ex-1010 | Christian Alexander Goosen, *Design and Implementation of a Bluetooth 4.0 LE Infrastructure for Mobile Devices*, Ulm University, Faculty of Engineering and Informatics (May 16, 2014) ("Goosen") |
| Ex-1011 | U.S. Patent Pub. No. 2016/0077495 ("Brown") |
| Ex-1012 | Declaration of Dr. Kevin Almeroth ("Almeroth") |
| Ex-1013 | List of Recent Expert Witness Engagements of Dr. Kevin Almeroth |
| Ex-1014 | Curriculum Vitae of Dr. Kevin Almeroth |

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

| Exhibit No. | Description |
|---|---|
| Ex-1015 | Chief Judge Moore's Eight Order Concerning Jury Trials and Other Proceedings relating to Coronavirus Public Emergency (S.D. Fla Feb. 10, 2021) (available at https://www.flsb.uscourts.gov/sites/flsb/files/documents/news/USDC_AO_2021-12_Coronavirus_Public_Emergency_-_Eighth_Order_Concerning_Jury_Trials_and_Other_Proceedings_02-10-21.pdf) |
| Ex-1016 | Complaint, *Carnival Corp. v. DeCurtis Corp. et al.,* Case No. 1:20-cv-21547-JEM, Dkt. 1 (S.D. Fla. April 10, 2020) |
| Ex-1017 | U.S. Patent Pub. No. 2017/0180930 ("Mycek") |
| Ex-1018 | Scheduling Order, *Carnival Corp. v. DeCurtis Corp. et al.,* Case No. 1:20-cv-21547-JEM, Dkt. 73 (S.D. Fla. Sept. 14, 2020) |
| Ex-1019 | Hall-Ellis Declaration |
| Ex-1020 | Hall-Ellis CV |

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## CHALLENGED CLAIM

| Claim 11 | |
|---|---|
| 11pre | A portable wireless device comprising: |
| 11[a] | a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch; |
| 11[b] | a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity, |
| 11[c] | wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications, |
| 11[d] | the processor is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications, |
| 11[e] | the memory stores both public and private identifiers unique to the portable wireless device, |
| 11[f] | the processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications, and |
| 11[g] | the processor controls the first wireless communication antenna to transmit the private identifier only across secure communication links established with remote communication devices using BLE communications. |

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

# I.     INTRODUCTION

Petitioner, DeCurtis LLC, is an Orlando-based technology company who has for 20+ years worked on guest engagement systems for cruise lines and theme parks. Petitioner, in fact, previously worked as a consultant for Patent Owner ("PO"), Carnival Corporation, on Carnival's guest engagement system.  After the parties' commercial relationship ended, Petitioner, consistent with its business, entered into commercial relationships with other cruise lines.  Unbeknownst to Petitioner, however, Carnival had sought and obtained vastly overbroad patents, covering a wide range of well-known and obvious technologies that were the subject of the parties' prior relationship.

Carnival soon began to improperly threaten both Petitioner and its new customers with baseless infringement claims, including claims based on the specific patent challenged in this Petition.  These threats have disrupted Petitioner's business, interfered with its customer relationships, and are clearly aimed at driving Petitioner out of the market and out of business.  In April 2020, Petitioner filed suit, seeking a declaration of non-infringement and unenforceability of the patents, as well as affirmative relief for the damage caused to its business and customer relationships. In parallel, Petitioner respectfully asks the Board to clear the market of these facially invalid patents, and help remove the cloud that PO has placed over Petitioner's business.

1

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Challenged here is U.S. Patent No. 10,157,514 ("the '514 patent"), which is directed to a portable wireless device for gaining access to secure areas. Embodiments are described for use in hotels, cruise ships, and other guest establishments. Only one '514 claim is at issue, and it claims nothing more than a small wireless device form factor, having dimensions within a specified range, that relies on the pre-existing Bluetooth Low Energy ("BLE") and Near Field Communication ("NFC") standards to transmit a "public identifier" via a periodic beacon signal, and a "private identifier" via a secure, encrypted channel. As will be demonstrated below, there is nothing new about this technique, which was disclosed throughout the prior art.

Petitioner respectfully requests Inter Partes review of claim 11 ("the challenged claim") of the '514 patent assigned to PO pursuant to 35 U.S.C. § 311 and 37 C.F.R. § 42.100.

## II.   MANDATORY NOTICES

Pursuant 37 C.F.R. § 42.8(a)(1), the following mandatory notices are provided as part of this Petition.

### A.   Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))

The real party-in-interest for Petitioner is DeCurtis LLC.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### B.   Related Matters (37 C.F.R. § 42.8(b)(2))

#### 1.   Related Patent Office Proceedings

Concurrent with this Petition, Petitioner is also requesting *inter partes* review

of related U.S. Patent Nos. 10,045,184 ("the '184 patent") and 10,049,516 ("the '516

patent").

#### 2.   Related Litigation

PO is currently asserting the '514 patent against Petitioner in *DeCurtis LLC*

*v. Carnival Corp*, Case No. 1:20-cv-22945-RNS (S.D. Fla.) ("the Litigation"), which

was transferred from Case No. 6:20-cv-607-ORL-40LRH (M.D. Fla.).

PO previously asserted the '514 patent against Petitioner in *Carnival Corp. v.*

*DeCurtis Corp.*, Case No. 1:20-cv-21547-RNS (S.D. Fla.).   That case was

consolidated with Case No. 1:20-cv-22945-RNS, and is now closed.

#### 3.   Related Applications

There are no related applications pending at the USPTO.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### C.   Lead and Back-Up Counsel (37 C.F.R. § 42.8(b)(3)) and Service Information (37 C.F.R. § 42.8(b)(3)-(4))

Petitioner provides the following counsel and service information.[1]  Pursuant to 37 C.F.R. § 42.10(b), a Power of Attorney accompanies this Petition.

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| James Glass<br>Reg. No. 46729<br>jimglass@quinnemanuel.com<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>51 Madison Ave., 22nd Floor<br>New York, NY 10010<br>Tel: (212) 849-7000 | Patrick Schmidt (*pro hac vice* to be requested upon grant authorization)<br>patrickschmidt@quinnemanuel.com<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, California 90017<br>Tel: (213) 443-3000<br><br>Sam Stake (*pro hac vice* to be requested upon grant authorization)<br>samstake@quinnemanuel.com<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>50 California St., 22nd Floor<br>San Francisco, CA 94111<br>Tel: (415) 875-6600<br><br>Gavin Snyder (*pro hac vice* to be requested upon grant authorization) |

---

[1]     Petitioner consents to electronic service to qedecurtiscarnival@quinnemanuel.com and the email addresses listed in the table below.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

| | gavinsnyder@quinnemanuel.com |
| --- | --- |
| | Quinn Emanuel Urquhart & Sullivan, LLP |
| | 1109 First Avenue |
| | Suite 210 |
| | Seattle, WA 98101 |
| | Tel: (206) 905-7000 |
| | |
| | Richard Lowry |
| | Reg. No. 70306 |
| | richardlowry@quinnemanuel.com |
| | Quinn Emanuel Urquhart & Sullivan, LLP |
| | 1300 I Street, NW |
| | Suite 900 |
| | Washington, DC 20005 |
| | Tel: (202) 538-8000 |
| | |
| | Jared Kneitel |
| | Reg. No. 51178 |
| | jaredkneitel@quinnemanuel.com |
| | Quinn Emanuel Urquhart & Sullivan, LLP |
| | 1109 First Avenue |
| | Suite 210 |
| | Seattle, WA 98101 |
| | Tel: (206) 905-7000 |

## D.    Payment of Fees (37 C.F.R. § 42.15(a))

The undersigned authorizes the Office to charge the fee for this Petition to Deposit Account No. 50-5708.  Any additional fees that might be due are also authorized.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## III.    REQUIREMENTS FOR INTER PARTES REVIEW

Petitioner certifies that the '514 patent is available for *inter partes* review, Petitioner is not barred or estopped from requesting *inter partes* review on the grounds identified herein, and the prohibitions of 35 U.S.C. §§315(a)-(b) are inapplicable.

## IV.    STATEMENT OF RELIEF REQUESTED FOR THE CHALLENGED CLAIM (37 C.F.R. § 42.104(B)

Petitioner respectfully requests *Inter Partes* review of the challenged claims based on the following obviousness grounds:

| # | Ground for Challenge |
|---|---|
| 1 | Soleimani, Yuen, and Hulusi |
| 2 | Berg, Badinski, and Goosen |
| 3 | Berg, Badinski, and BLE Specification |
| 4 | Raina, Yuen, and Hulusi |

These grounds are not duplicative of each other because Soleimani, Berg, and Raina disclose materially different techniques to manage access control, including the approach to transmission of public and private identifiers, within the scope of the '514 patent.   Ground 3 also presents a unique approach to the public identifier limitation 11f.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## V.    OVERVIEW OF THE '514 PATENT

The earliest priority date listed on the face of the '514 patent is November 11, 2016.   The '514 patent relates to portable wireless devices in a generic "guest engagement" system that are used by guests to gain access to locations and services. Ex-1001 ('514 Patent) at 1:60-2:2.  The wireless device broadcasts an identifier that is received by compatible stationary devices located in the guest's environment, such as door access panels or vending machines.  *Id.* at 2:3-15.  In some cases, the wireless device communicates with the stationary devices using known wireless protocols such as BLE and NFC.  *Id.* at 4:38-54, 1:48-53.  The '514 purports to solve for guests the problem of having to "tap or swipe an access card to activate elevators or unlock doors of health facilities and guest rooms during their stay."  *Id.* at 1:40-44.

## VI.    PERSON OF ORDINARY SKILL IN THE ART

A  person of ordinary skill in the art ("POSITA") relating to the subject matter of the '514 patent is a person with a Bachelor of Science degree in electrical engineering, computer science, or a related subject matter, plus at least two years of professional experience in the field of computer networks, wireless communications, or a similar field.  Ex-1012 (Almeroth Declaration) at ¶¶39-41.  This level of skill is approximate, and more experience would compensate for less formal education, and vice versa.  *Id.*

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## VII.  CLAIM CONSTRUCTION

Claim construction in the Litigation has not yet started.  For purposes of this petition, Petitioner and its expert have applied the plain and ordinary meaning of all claim terms of the challenged claim.  Petitioner reserves all rights to respond at the appropriate time to any claim construction-related argument advanced by PO.

## VIII.  BLUETOOTH LOW ENERGY OVERVIEW

The claim at issue in this Petition recites use of the preexisting BLE protocol, and many of the claimed concepts (*e.g.*, beacon-emitting devices, transmission of public and private identifiers, using secure communication links) are nothing more than straightforward applications of the functionality afforded by this protocol.  Ex-1012 at ¶44.  Petitioner's prior art grounds specifically rely on references applying the BLE protocols in secure environments and payment systems.  Nevertheless, the following background of the BLE specification is provided for further context and the background knowledge of a POSITA.  *Id.*

BLE was introduced in 2010 in the 4.0 version of the Bluetooth specification, more than six years prior to the earliest priority date listed on the face of the '514 patent.  Ex-1009 at 1; Ex-1012 at ¶45.  The Generic Access Profile (GAP) is the framework that defines how BLE devices interact with each other, including device roles, advertisements, connection establishment, and security.  Ex-1009 at 1625, 1634; Ex-1012 at ¶45.  Devices can take on roles such as a **Broadcaster**, which

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

sends out advertisements but does not receive packets or allow connections with other devices, and an **Observer**, which listens for advertising but does not initiate a connection. Ex-1009 at 1638. Devices can also assume roles such as a **Central**, which discovers and listens for advertising devices and can connect to the advertising device, and a **Peripheral**, which sends advertisements and accepts connections from Central devices. Ex-1009 at 1639. A single device may operate in multiple roles at the same time. *Id.*

### A.  Advertising Events

In an advertising state (*i.e.*, Broadcaster role), a device periodically broadcasts an "Advertising Event" on an advertising event interval (comprising a fixed-length "advInterval" and pseudorandom-length "advDelay"). Ex-1009 at 2197, 2223; Ex-1012 at ¶46.



Figure 4.1: Advertising events perturbed in time using advDelay

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Ex-1009 at 2223.[2]

The BLE Specification defines four advertising event types, each including a "public device address" that uniquely identifies a wireless device to other devices in proximity. *Id.* at 2197; Ex-1012 at ¶47. For example, during an advertising event, a device transmits a connectable undirected advertising ("ADV_NONCONN_INFO," *id.* at 2222) channel packet PDU with a payload containing that device's public device address (*i.e.*, "AdvA" field).[3] Ex-1009 at 2204, 2221-22.



*2.3.1.3 ADV_NONCONN_IND*

The ADV_NONCONN_IND PDU has the Payload as shown in Figure 2.6. The PDU shall be used in non-connectable undirected advertising events. The TxAdd in the Flags field indicates whether the advertiser's address in the AdvA field is public (TxAdd = 0) or random (TxAdd = 1).

| Payload | |
|---|---|
| AdvA (6 octets) | AdvData (0-31 octets) |

*Figure 2.6: ADV_NONCONN_IND PDU Payload*

The Payload field consists of AdvA and AdvData fields. The AdvA field shall contain the advertiser's public or random device address as indicated by TxAdd. The AdvData field may contain Advertising Data from the advertiser's Host.

---

[2]   Annotations to Figures are added unless indicated otherwise.

[3]   The same is true for all other advertising event types ADV_IND, ADV_DIRECT_IND, and ADV_SCAN_IND. *Id.* at 2203-05.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

*Id.* at 2204.  In response to receiving the advertising packet, a device in the central

role may make a connect request (CONNECT_REQ) identifying itself to the

advertiser device.  *Id.* at 2222-26, 2206-07.  When the advertiser device accepts the

connect request, a point-to-point connection results between the central device

(which becomes the master) and the advertiser device (which becomes the slave).

*Id.* at 2224.  Once the connection is established, the two devices can exchange data

on one of 37 data channels:



Figure 1.4: Connection Events

*Id.* at 127; Ex-1012 at ¶47.

## B.    Pairing Events

Pairing is a process where devices exchange the information necessary to

establish an encrypted connection.  It involves authenticating the identity of the two

devices to be paired, encrypting the link, and distributing keys to allow security to

be restarted on a reconnection.  Ex-1009 at 1959; Ex-1012 at ¶48.  Pairing establishes

keys that are used for encrypted communications.  Ex-1009 at 1959.  Either master

or slave device can initiate pairing.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



Figure 2.1: LE Pairing Phases

*Id.*  In Phase 1, the devices perform a handshaking procedure to exchange capabilities and authenticate.  In Phase 2, the devices exchange a Temporary Key (TK) and use it to create a Short Term Key (STK) which is used to encrypt the connection.  Using the secure connection, a device can send other keys in Phase 3, including a private identifier to establish a bond with the other device for future communications.  *Id.* at 1974-75; Ex-1012 at ¶49.  Specifically, the devices can securely exchange private keys, including an Identity Resolving Key (IRK) (*id.* at

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

1972-73) that indicates a device's private address.  Ex-1009 at 1973 (citing 1732).

Notably, if authentication requirements are not met by either device, a pairing

procedure will end without exchanging private key information.  *Id.* at 1721.

## IX.  ASSERTED PRIOR ART AND MOTIVATION TO COMBINE

The references used in this Petition are prior art under at least 35 U.S.C. §

102(a)(1) and were not cited during prosecution unless otherwise noted.

### A.  Soleimani (Ex-1003)

Soleimani describes a mobile device (*e.g.*, 140a-140e, 230; highlighted in

yellow below) that is portable and configured to communicate with devices (*e.g.*, RF

communication unit 214; highlighted in green below) related to entering or exiting

a protected area.  Ex-1003 at 3:59-4:3, 4:23-34, 4:48-51, Figs. 1-11; Ex-1012 at ¶51.



13

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

*Id.* at Fig. 4.  The portable device uses wireless communication protocols such as

BLE and NFC, including BLE broadcasting and secure communications.  *Id.* at 8:15-

19 (BLE), 6:42-46 (NFC), 6:25-37 (BLE beacon emitted from RF communication

unit), 17:60-18:7 (reversal of BLE roles), 12:53-13:14 (transmission of encrypted

message for door access), Figs. 2-5.

### B.    Yuen (Ex-1004)

Yuen describes small form factor wearables "designed to be worn relatively

continuously by a person."  Ex-1004 at 17:8-15.  Yuen discloses a portable biometric

monitoring device that (1) has a small form factor (dimensions less than 2.5 inches,

thickness less than 5/8 inch) and (2) houses a processor, memory, battery, a BLE

antenna, and an NFC antenna for facilitating wireless communications in a

waterproof cavity.  Ex-1004 at 17:8-24, 17:65-18:14; 33:24-29, 46:5-10, 53:36-46,

54:40-46; Ex-1012 at ¶52.

 

*Id.* at Figs. 2A-2B.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### C.      Hulusi (Ex-1005)

Hulusi discloses a portable wireless device (*e.g.*, NFC device 108) that communicates with external devices using several wireless communication protocols to, for example, unlock a door.  Ex-1005 at ¶¶[0040]. [0046], [0051], Fig. 1.  Hulusi's device houses a processor (*e.g.*, processor 204), a memory (*e.g.*, memory 208, data storage 212), a battery (*e.g.*, power source 260), an NFC antenna 224 (highlighted in green below) and a BLE antenna 224 (highlighted in orange below). *Id.* at ¶¶[0046], [0054], [0049], [0089], Fig. 2; Ex-1012 at ¶53.



*FIG. 2*

15

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

*Id.* at Fig. 2.

### D.    Berg (Ex-1006)

Berg discloses a portable wearable device (*e.g.*, 104, 512) configured for wireless communications related to accessing a protected area at an access point such as a door or gate.  Ex-1006 at ¶¶[0010]-[0014], Figs. 1, 2, 5A-5C.  Berg's wearable device can communicate with external devices using wireless communication protocols such as BLE and NFC.  *Id.* at ¶¶[0014], [0071], [0081], Fig. 2; Ex-1012 at ¶54.



*Id.* at Fig. 1.  Berg discloses that only after authenticating a wearable device, further communication of sensitive access control information such as keys, codes, and

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

credentials may occur over an encrypted communication link with the reading device

112. *Id.* at ¶[0073].

### E.     Badinski (Ex-1007)

Badinski discloses a wearable computing device ("WCD") that can be in the

form of a ring worn on the finger of a user, and used to access locked doors.  Ex-

1007 at ¶¶[0155], [0264], Fig. 1A, 25.  The WCD houses components such as a

processor, memory, battery, and BLE/NFC antennas in a "completely waterproof"

housing.  *Id.* at ¶¶[0161], [0162], [0170], [0174], [0182], [0187]-[0200], [0254],

[0270], [0282], Fig. 2.  Badinski's device has a small form factor with all dimensions

less than 2.5 inches and thickness less than 5/8 inch.

 

*Id.* at Figs. 12A and 12B; Ex-1012 at ¶55.

### F.     Raina (Ex-1008)

Raina discloses a wearable device (*e.g.*, mobile device 130) that is portable

and configured for wireless communications related to gaining access to a secure

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

area.  Ex-1008 at ¶[0022], Figs. 1-5.  The mobile device 130 can take the form of "mobile phones, tablets, wearable computers, such as GOOGLE glass or smart devices embedded into clothing, a smart watch, fitness tracker, or wireless enabled shoes, or some other type of mobile computer."  *Id.* at ¶[0024].  Raina's device can include multiple, distinct interfaces 601 that communicate with external devices using wireless protocols such as BLE and NFC.  *Id.* at ¶[0058], Fig. 6; Ex-1012 at ¶56.



Ex-1008 at Fig. 1.

### G.   BLE Specification (Ex-1009)

The BLE Specification is a prior art specification that was integrated into Bluetooth 4.0 in December 2010 and codifies wireless personal area network

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

technology aimed at applications in wireless mobile devices.   Ex-1009.   The
specification teaches the broadcast of advertising packets at periodic intervals.  *Id.*
at 2197, 2223; Ex-1012 at ¶57.



Figure 4.1: Advertising events perturbed in time using advDelay

Ex-1009 at 2223.

### H.   Motivation to Combine The Cited References

This Petition relies on Soleimani, Berg, and Raina as primary references, as
modified by the teachings of Yuen, Hulusi, Badinski, and/or the BLE Specification
(collectively, the "Cited References").   Motivations for each of these combinations
are discussed below, as are the element-specific motivations to combine.

A POSITA would have been motivated to modify the primary references
according to the teachings of the secondary references for several reasons common
to all grounds.   Ex-1012 at ¶59.   The Cited References are in the same field of
endeavor as the '514 patent—portable wireless devices using the BLE
communication protocol.   Ex-1006 at 3:6-41, Figs. 1-4C; Ex-1004 at 17:8-18:14,

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

25:3-39, Figs. 1-2B; Ex-1003 at 8:5-19, 6:19-60, Figs. 1, 2; Ex-1005 at ¶¶[0046],

[0054], [0049], [0089], Fig. 2; Ex-1007 at ¶¶[0161]-[0200], [0254], [0270], [0282],

Fig. 2; Ex-1009 at 126-28, 2197, 2203, 2221-22; Ex-1008 at ¶[0024], Figs. 1, 2, and

5; Ex-1012 at ¶59.

The Cited References also use similar techniques to solve the same problems

as the '514 patent.  Berg, Soleimani, Hulusi, and Raina use the same techniques as

the '514 patent (*i.e.*, portable wireless devices transmitting device identifiers using

BLE) to provide a more user-friendly validation of access information to provide

access to a secure resource such as, for example, specific areas of a building.  Ex-

1006 at 3:32-41, 7:52-8:3, Fig. 1; Ex-1003 at 3:59-4:3, 4:23-34, 4:48-51, Figs. 1-11;

Ex-1005 at ¶¶[0062], Fig. 3; Ex-1008 at ¶[0022], Figs. 1-3.  Other references reflect

a form factor used by the '514 patent—Yuen and Badinski disclose a small form

factor for a portable wireless device housing a processor, memory, battery, and

BLE/NFC antennas.  Ex-1004 at 17:8-24, 17:65-18:14; 33:24-29, 46:5-10, 53:36-

46, 54:40-46; Ex-1007 at ¶¶[0192], [0161]-[0182], [0187]-[0200], [0254], [0270],

[0282], Figs. 2, 6, 12A, 12B; Ex-1001 at 3:46-59.  It was well-known in the art that

interfacing with access control systems presented issues such as inconvenience to

the user, power consumption inefficiencies, and security vulnerabilities.  Ex-1006 at

1:43-2:13; Ex-1003 at 1:5-23; Ex-1012 at ¶60.  These problems prompted the

development of the solutions described in the Cited References, and would have

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

motivated a POSITA to combine the prior art references as set forth in the grounds below.  Ex-1012 at ¶60.

## X.     GROUND 1:  SOLEIMANI, YUEN, AND HULUSI

This ground relies on Soleimani as a primary reference.  Soleimani describes a portable wireless device that interacts with an access system for authentication.  Additionally, Petitioner relies on Yuen for its disclosure of the recited form factor dimensions and Hulusi for its disclosure of BLE/NFC antennas pertinent to limitations 11b-11c.

### A.     Claim 11

#### 1.     11pre

**"*[a] portable wireless device*"**:  Soleimani discloses a wireless mobile device (*e.g.*, 140a-140e, 230) that is portable and configured for wireless communications related to entering or exiting a protected area.  Ex-1003 at 3:59-4:3, 4:23-34, 4:48-51, 7:22-25, 8:15-19, 17:60-18:7, Figs. 1-11; Ex-1012 at ¶62.

#### 2.     11a:  *"a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅜ inch;"*

Soleimani's wireless mobile devices may take the form of wearable devices, such as a smartphone or smart watch device (*i.e.*, those manufactured by Apple and Pebble).  Ex-1003 at 4:23-29.  Soleimani also discloses that these wireless mobile devices "may be implemented in a keyfob form factor without any user interface or

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

user input elements for direct manipulation." *Id.* at 4:29-34; Ex-1012 at ¶63. Although Soleimani does not disclose particular dimensions, a POSITA would recognize that these disclosures imply the type of devices that have a form factor within the recited dimensions. Ex-1012 at ¶63. Achieving the recited dimensions for these types of devices was well-within the level of ordinary skill in the art at the relevant time. *Id.*

Ultimately, this limitation recites nothing more than an obvious design choice. *See Gardner v. TEC Sys., Inc.*, 725 F.2d 1338, 1345-46 (Fed. Cir. 1984) (recognizing that a difference in relative dimension untethered to performance will not render claims patentably distinct); *Estey v. Burdett*, 109 U.S. 633, 640 (1884) ("no invention in making length or size greater or lesser"); *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1340 (Fed. Cir. 2020) (differences "amount[ed] to a design choice" and POSITA "has good reasons to pursue the known options"); *Miniature Precision Components, Inc. v. Eagle Indus., Inc.*, IPR2017-01403, Paper 29 (P.T.A.B. Sept. 28, 2018) (the choice "for aesthetic purposes" mere obvious design choice); *In re Asiatico*, No. 2012-003942, 2015 WL 1522469, at *2 (P.T.A.B. Mar. 31, 2015); M.P.E.P § 2144.04.10; *see also* Ex-1002 at 285, 417 (Examiner recognizing limitations 11a and 11b as obvious changes in size). A POSITA would thus view the recited dimensions as obvious over Soleimani. Ex-1012 at ¶64.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

A POSITA would also recognize that Soleimani's wireless mobile device includes an enclosure to house electrical components to increase portability and be suitable as, for example, a keyfob. Ex-1012 at ¶65; Ex-1003 at 4:31-34.

While a POSITA would readily understand based on the Soleimani's disclosure that it was obvious for Soleimani's wireless mobile device to exist in the recited form factor, to the extent PO argues otherwise, such dimensions are expressly disclosed by Yuen. Ex-1012 at ¶¶66-69. Yuen establishes that there was no technical limitation to achieving the recited form factor, and confirms that this limitation would be obvious to a POSITA. *Id.* Yuen discloses a portable wireless device (*e.g.*, "biometric monitoring device") with all components enclosed in a "watertight seal" (Ex-1004 at 29:20-31) that is "typically of a small size" and "designed to be worn relatively continuously by a person" (*id.* at 17:8-15). Yuen's device houses a processor (*id.* at 18:31-39), memory (*id.*), battery (*id.* at 33:24-26), a Bluetooth Low Energy antenna (*id.* at 46:5-10, 55:59-56:2), and an NFC antenna (*id.* at 54:40-46) for facilitating wireless communications. In some cases, the biometric device can be inserted into a wristband or bracelet, as disclosed in known devices such as Fitbit Flex. *Id.* at 17:25-33; *see also id.* at 1:42-52 (Fitbit Ultra). Yuen explains that the portable wireless device may exist in "extremely small sizes" such as "2″ long, 0.75″ wide, and 0.5″ deep," or in other cases, "0.5″ wide by 1.3″

23

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

long by 0.25″ thick." *Id.* at 1:42-52, 17:25-33, 18:15-50, Figs. 2A, 2B.  This meets

the claimed dimensions.

### (i) Motivation to Combine

A POSITA would have been motivated to modify the portable wireless device

of Soleimani to include a body having a fully enclosed cavity, and all dimensions as

taught in Yuen, to improve user experience by enabling increased wearability,

portability, and protection from external elements like liquids and debris when

entering or exiting a protected area.  Ex-1004 at 29:20-31, 33:49-55, Figs. 2B-3C;

Ex-1012 at ¶67; Ex-1003 at 4:31-34 ("[W]ireless mobile device 140 *e* may be

implemented in a keyfob form factor without any user interface or user input

elements."); Section VIII.H.  This modification is supported by Soleimani's

disclosure of providing convenient and secure access to privileged areas and

promoting the portability of a wearable device.  Ex-1003 at 1:5-22; Ex-1012 at ¶67.

Soleimani also welcomes modification by recognizing that its disclosure is not

limited to particular components or form factors.  Ex-1003 at 18:22-32.  A POSITA

reviewing Soleimani would thus look to complimentary prior art to understand other

potential design options.  Ex-1012 at ¶67.  It would have been obvious to a POSITA

at the time of invention to modify the form factor of Soleimani to easily transport a

wearable and offer versatility in application.  *Id.*

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Design and market forces such as "advances in sensor, electronics, and power source miniaturization" would have also favored combining Soleimani and Yuen to achieve a small and durable form factor.  Ex-1004 at 1:43-52; Ex-1012 at ¶68.  Indeed, Yuen discloses that small form factor wearables such as the Fitbit Ultra and the Fitbit Flex were already available for sale.  Ex-1004 at 1:43-52, 17:25-33.

Moreover, a POSITA would have had a reasonable expectation of success because Soleimani and Yuen disclose straightforward techniques that are based on standard technology and wireless communication protocols like BLE, and could be readily implemented to provide a known and expected result.  Ex-1012 at ¶69; Ex-1003 at 8:11-19.  Notably, the '514 patent ascribes no significance to, and derives no unexpected results from, the dimensions recited in this limitation.  Ex-1001 at 3:24-57, 9:28-34.

    **3.**    **11b:**  *"a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity;"*

Soleimani discloses that the wireless mobile device (*e.g.*, 140a-140e) may be implemented on a computer system depicted in Figure 11 below.  Ex-1003 at 18:47-52; Ex-1012 at ¶70.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



FIG. 11

*Id.* at Fig. 11.  Soleimani describes a portable wireless device with a processor (Ex-1003 at 18:52-67, 18:33-46; *e.g.*, highlighted in yellow above), a memory (*id.* at 18:33-67, 10:56-63; *e.g.*, highlighted in orange above), and a power source (*see id.* at 7:16-21 (not shown)), Fig. 11.

The device can communicate using wireless protocols such as BLE (*id.* at 8:11-19) and NFC (*id.* at 6:42-47).  Soleimani discloses the potential use of the wireless communication device in an environment comprising multiple different access control devices, using many different communication protocols or frequencies.  *See* Ex-1003 at 3:59-64 & Fig. 1, at 6:19-47 (describing RF communication units transmitting advertisements using BLE, 802.11, RFID, and NFC protocols); *see also id.* at 6:56-60 (discussing the possibility that neighboring

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

RF communication units would use different channels or RF frequencies to avoid RF signal collisions or contentions).  Thus, a POSITA would recognize the benefits of implementing Soleimani's disclosed wireless communication device with at least one BLE antenna, and at least one NFC antenna, so that the device could communicate with a variety of different access control devices.  Ex-1012 at ¶71.

A POSITA would also recognize that BLE and NFC each have their own respective benefits and drawbacks in different communication contexts.  For example, while BLE has the advantage of longer-range communication, it requires a power source.  Ex-1012 at ¶72.  NFC, on the other hand, can rely upon inductive coupling and thus requires no internal power source.  *Id.*  NFC also operates only at relatively closer distances, which limits the communication range, but also generally requires the user to explicitly bring the device within range of the reader which adds a measure of protection.  *Id*.  A POSITA would recognize that implementing a dual antenna system into the wireless mobile device of Soleimani would allow the wireless device to capture the benefits of each of these respective protocols, and operate more flexibly and effectively in a wider variety of communication contexts. *Id*.

While a POSITA would readily understand based on the Soleimani's disclosure that its system would include a battery and antennas, to the extent PO argues otherwise, such trivial additions are expressly disclosed by Hulusi.  Ex-1012

27

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

at ¶73.  Hulusi discloses a portable wireless device (*e.g.*, NFC device 108), such as a smart phone or mobile computing device, that wirelessly communicates with external devices to gain access to a secure resource by, for example, unlocking a door.  Ex-1005 at ¶¶[0040], [0055], [0088], Figs. 1, 2, 4, and 7.  Hulusi's device houses a processor (*e.g.*, processor 204 highlighted in yellow below), a memory (*e.g.*, memory 208 and data storage 212 highlighted in orange below), a battery (*e.g.*, power control module 260 highlighted in green below), and an NFC antenna 224 configured for NFC communications (highlighted in purple below).  *Id.* at ¶¶[0046], [0049], [0054] (power control module 260 can be a battery), Fig. 2.  Hulusi also includes antenna 244 configured for BLE communications (highlighted in blue below).  *Id.* at ¶¶[0089] (NFC device 108 can be configured to communicate using BLE), [0049] (dedicated antenna 244 can be used for Bluetooth communications), Fig. 2.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



*FIG. 2*

*Id.* at Fig. 2.

### (i)      Motivation to Combine

In addition to the reasoning set forth above regarding limitation 11a and in Section VIII.H, a POSITA would have been motivated to modify the portable wireless device of Soleimani according to the teachings of Hulusi. Ex-1012 at ¶¶73-76.

A POSITA would have been motivated to modify the Soleimani device to include a battery, as taught in Hulusi, to improve user experience by improving portability and rechargeability of the device. Ex-1012 at ¶75. With a rechargeable

29

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

battery, a user could interact with numerous access points of an access control system for an extended period of time, thereby increasing convenience for the user. *Id.*; Ex-1003 at 1:5-11 (disclosing the aim to provide convenient access to privileged areas and promoting the portability of a wearable).

A POSITA would also have been motivated to modify the Soleimani device to include independent BLE and NFC antennas, as taught in Hulusi, to improve user experience by improving versatility in interfacing with other external devices. Ex-1012 at ¶76; Section VIII.H. With a dedicated antenna for each of BLE and NFC, a user could still interact with an access control system even if one antenna stopped working. Ex-1012 at ¶76; Ex-1003 at 1:5-11 (disclosing the aim to provide convenient and secure access to privileged areas and promoting the portability of a wearable device). Such modification also increases the versatility of the device by enabling simultaneous communications with external access systems at differing distances—*i.e.*, NFC at short range and BLE at longer range. Ex-1012 at ¶76; Ex-1003 at 6:42-47 (indicating that the RF communication unit 214 of the access control system uses both NFC and BLE protocols to communicate with wireless mobile devices). Moreover, a POSITA would have had a reasonable expectation of success because Soleimani and Hulusi disclose straightforward components that are based on standard BLE and NFC technology and could be readily implemented to provide a known and expected result. Ex-1012 at ¶76.

30

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

4.    **11c:**    *"wherein the first and second wireless communication antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications,"*

As discussed in limitation 11b, Soleimani discloses that the wireless mobile device can be configured to communicate using wireless protocols such as BLE (*id.* at 8:11-19) and NFC (*id.* at 6:42-47).  A POSITA would understand the benefits of including two distinct BLE and NFC antennas for the reasons discussed regarding limitation 11b.  Ex-1012 at ¶77.

Hulusi provides additional disclosure rendering this limitation obvious.  Ex-1012 at ¶78.  As discussed regarding limitation 11b, Hulusi discloses an NFC antenna 224 configured for NFC communications (Ex-1005 at ¶[0049]) and an antenna 244 configured for BLE communications (*id.* at ¶¶[0089], [0049], Fig. 2).

5.    **11d:**    *"the processor is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications,"*

Soleimani discloses that the portable wireless device (*e.g.*, wireless mobile device 230 highlighted in orange below) transmits message 236 (highlighted in yellow below) to RF communication unit 214 (highlighted in red below) using the BLE protocol.  *Id.* at 12:53-62, 13:15-18; Ex-1012 at ¶79.  As Soleimani discloses, "[w]ireless mobile device 230 may be configured to encrypt one or more portions of message 236."  Ex-1003 at 12:67-13:6.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



*Id.* at Fig. 4.

6.    **11e:**

    **(i)**    *"the memory stores … [a] public … identifier[] unique to the portable wireless device,"*

Soleimani discloses that, in some embodiments, the RF communication unit 214 operates in a BLE GAP Broadcaster Role and the wireless mobile device 230 operates in a BLE GAP Observer role. *Id.* at 6:25-30, 8:15-19. Thus, RF communication unit 214 may broadcast RF advertisement message 220 in a BLE beacon format that includes a UUID (Universally Unique Identifier) to uniquely identify RF communication unit 214. Ex-1003 at 6:30-35, 11:43-56; *see also* Ex-

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

1009 at 1576 ("A UUID is a universally unique identifier that is guaranteed to be unique across all space and all time."); Ex-1012 at ¶80.



Ex-1003 at Fig. 2.

Significantly, Soleimani expressly discloses that this communication model may be "reversed," such that the RF communication unit 214 operates in BLE GAP Observer role and wireless mobile device operates in BLE GAP Broadcaster role. *Id.* at 17:60-18:7. In other words, in this alternative embodiment, mobile device 230 transmits the RF advertisement 220, including transmission of an advertisement with a UUID from the portable user device to the access panel. *See id.* at 6:30-35; Ex-1012 at ¶81.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



Ex-1003 at Fig. 2.  A POSITA would recognize that a UUID in the BLE standard is

a "public identifier" as claimed by the '514 patent.  Ex-1012 at ¶81; Ex-1009 at

1576.

As discussed regarding limitation 11b *supra*, Soleimani discloses memory

including ROM "for storing static information and instructions for processor 1104."

Ex-1003 at 18:62-65.  In view of this disclosure and the disclosure of the wireless

mobile device 230 broadcasting the Advertisement Message 220 containing the

UUID, a POSITA would understand that the UUID is stored in memory on the

wireless mobile device 230.  Ex-1012 at ¶¶82-83.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

**(ii)** *"the memory stores … [a] private … identifier[] unique to the portable wireless device,"*

Soleimani discloses that the wireless mobile device 230 is configured to transmit a private identifier unique to the device to RF communication unit 214 of the access panel.  For example, Soleimani teaches that when wireless mobile device 230 approaches an access control point, the wireless mobile device 230 may transmit an encrypted message (236) via BLE.  Ex-1003 at 12:52-62, 12:67-13:6; Ex-1012 at ¶84.  The transmitted message 236 encodes, for example, "an identifier associated with wireless mobile device 230" for encrypted transmission.  Ex-1003 at 13:6-13:14.  A POSITA would recognize that the embodiments of Soleimani relating to encryption would involve this "identifier" comprising a "private identifier."  *Id.* at 12:67-13:14; Ex-1012 at ¶84.  Indeed, encryption is a technique for preventing an attacker from intercepting, and improperly using a message.  Ex-1012 at ¶84.  Where the information to be transferred is a "private identifier," Soleimani's encryption techniques would be appropriate.  *Id*.

RF communication unit 214 performs "validation of message 236, and determine[s] whether access should be granted to the secured area or resource controlled by access control device 210."  Ex-1003 at 13:15-18; Ex-1012 at ¶85.  To determine whether to grant access, RF communication unit 214 may, in some implementations, pass message 236 to access control server 110, which "maintain(s)

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

a database indicating which users or wireless mobile devices should be granted access." Ex-1003 at 13:26-32; *see also id.* at 5:11-15. For example, Soleimani discloses that certain "wireless mobile devices may not be granted access on weekends or during the night, but may be granted access at other times." *Id.* at 13:34-37. A POSITA would recognize that in order for the access panel to validate message 236 and determine whether to grant access, the mobile device would have to communicate an identifier that is unique to the device to the access panel so that the identifier could be compared to the door access information in the access control server 110. Ex-1012 at ¶85.

In view of the above and the discussion regarding the "public identifier" portion of limitation 11e, a POSITA would view it obvious to store the identifier associated with the mobile device 230 of Soleimani in the memory of mobile device 230 to facilitate secure wireless communications with numerous external devices as the user of the device travels throughout a secure area or building. Ex-1012 at ¶86; Ex-1003 at 1:6-22, Figs. 1.

### 7. 11f

***"the processor controls the first wireless communication antenna"***: Soleimani discloses that the processor of wireless mobile device 230 executes functions stored in memory to perform the disclosed implementations (Ex-1003 at 18:33-67, 19:17-31), including use of the BLE antenna in broadcasts

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

communications with RF communication unit 214. *Id.* at 6:30-35, 17:60-18:7, Figs.
2-10; Ex-1012 at ¶87.

**"to emit a periodic beacon signal broadcasting the unique public identifier
of the portable wireless device using BLE communications,"**:  Soleimani discloses
that the portable wireless device (*e.g.*, wireless mobile device 230) can operate in a
BLE GAP (Generic Access Profile) Broadcaster role, in which it broadcasts RF
advertisement 220 in "beacon" format. *Id.* at 6:19-37, 17:60-18:7, Figs. 2-3.  As
discussed regarding limitation 11e *supra*, the RF advertisement 220 includes the
unique public identifier (*e.g.*, UUID) that identifies the wireless mobile device 230.
*Id.* at 6:19-37, 11:38-42, 17:60-18:7; Ex-1012 at ¶88.

### 8.      11g

**"the processor controls the first wireless communication antenna"**:
Soleimani discloses this as described regarding limitation 11f, *supra*.

**"to transmit the private identifier only across secure communication links
established with remote communication devices using BLE communications"**:
Soleimani discloses that wireless mobile device 230 can transmit information using
encryption to "secure communications" between it access control device 160 like
RF communication unit 214. Ex-1003 at 5:12-19.  For example, the wireless mobile
device uses encrypted BLE communications (*e.g.*, BLE GATT communication link)
to transmit the private identifier uniquely identifying the device (*e.g.*, "identifier

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

associated with the wireless mobile device 230") only across secure communication

links (*e.g.*, encrypted) established with remote communication devices (*e.g.*, RF

communication unit 214).  Ex-1003 at 12:53-13:8; *see id.* at 5:11-24.  Soleimani

discloses wherein wireless mobile device 230 encrypts message 236 using, for

example, a key associated with the device, to encode the private identifier.  As

discussed above regarding limitation 11e, in some cases access is granted by

comparing the private identifier of the device to a database indicating which devices

should be granted access.  *Id.* at 13:26-37.  In light of these disclosures, a POSITA

would understand that a private identifier used to access a secured area or resource

should only be transmitted over a secure communications link, such as an encrypted

link, to avoid theft or inadvertent disclosure of the private identifier.  Ex-1012 at

¶90; Ex-1003 at 1:6-11.

## XI.   GROUND 2: BERG, BADINSKI, AND GOOSEN RENDER OBVIOUS CLAIM 11

Petitioner relies on Berg as a primary reference.  Berg describes a portable

wireless device that interacts with an access system for authentication.  Additionally,

Petitioner relies on Badinski to provide the recited form factor described in limitation

11a and Goosen to provide the periodic beacon signal described in limitation 11f.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## A.  Claim 11

### 1.  11pre

**"*[a] portable wireless device*"**:  Berg discloses a wearable device (*e.g.*, 104, 512) that is portable and configured for wireless communications related to entering or exiting a protected area.  Ex-1006 at ¶¶[0010], [0014], Figs. 1, 2, 5A-5C.  Berg discloses wearable devices that can include, for example, "watches, rings, belts, bracelets, jewelry, clothing, buttons, necklaces, shoes, hats, pins," and even "may be worn as an implant introduced intradermally (e.g., within the skin, etc.) and/or subdermally (e.g., under the skin, etc.) in a user."  *Id.* at ¶[0012].  Berg also discloses that the wearable device can include "one or more antennas 212A-N" that can communicate with external devices using a variety of wireless communication protocols including both BLE and NFC.  *Id.* at ¶[0081], Fig. 2; *see also id.* at ¶¶[0079], [0014], [0071]; Ex-1012 at ¶92.

### 2.  11a

Berg discloses a wearable device that houses a processor, memory, and communications capability that can exist in several small form factors, including as a watch, ring, button, and subdermal implant.  Ex-1006 at ¶[0012], Fig. 2.  Berg does not expressly recite dimensions, but its teachings suggest a form factor within the recited dimensions.  Ex-1012 at ¶93.  Additionally, Badinski discloses a similar

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

device, proving that such dimensions were achievable and desirable for devices like those disclosed in Berg. *Id.* at ¶¶93-102.

*"a body having a fully enclosed cavity"*:  A POSITA would recognize that Berg discloses a wearable device that includes an enclosure to house electrical components as well as a small form factor to increase portability and be suitable as, for example, a subdermal implant.  Ex-1012 at ¶94; *see* Ex-1006 at ¶¶[0006], [0012].

*"the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch"*:  A POSITA would also view the recited dimensions as obvious over Berg's teachings.  Berg specifically teaches form factors (*e.g.*, a "key fob," Ex-1006 at ¶[0004], and/or "watches, rings, belts, bracelets, jewelry, [etc.]," *id.* at ¶[0012], which are all small form factors and consistent with the recited dimensions.  Ex-1012 at ¶95.  Berg's teaching of portable devices in the form of subdermal implants also strongly suggests a device well within the recited dimensions.  *Id.*  Portable wireless devices, including multi-antenna devices, within the recited form factor were common in the prior art, were desirable because their small size and light weight made them easy to carry for users.  *Id.*  There are no technical reasons that prevent Berg's device from meeting the form factor, which is actually relatively large for portable devices of this type, and a POSITA would be motivated to implement a form factor within the recited dimensions to increase portability.  *Id.*  Ultimately, this limitation recites nothing

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

more than an obvious design choice, as discussed regarding limitation 11a in Ground 1. *Id.*

While a POSITA would find it obvious for Berg's wearable device to exist in the recited form factor, to the extent PO argues otherwise, such dimensions are expressly disclosed by Badinski. Badinski discloses a wearable computing device ("WCD") in the form of a wrist band, bracelet, ring, "or any other type of wearable accessory." Ex-1007 at ¶[0155], Fig. 1A; Ex-1012 at ¶96. Badinski also discloses that the WCD includes a processor (Ex-1007 at ¶[0162]), a battery (*id.*), and a memory (*id.* at ¶¶[0165]). Badinski also teaches communication by a single device according to multiple protocols, including "NFC" and "Bluetooth," (*id.* at ¶[0170]), and clarifies that the SoC IC can include BLE capability, (*id.* at ¶[0270]). Like Berg, Badinski discloses a wearable (*e.g.*, WCD 2510 highlighted in orange below) that communicates with an access node (*e.g.*, 2530 highlighted in red below) to unlock a door using BLE communications. *Id.* at ¶¶[0264], [0265], [0270], Fig. 25.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



**FIG. 25**

*Id.* at Fig. 25.

    ***"a body having a fully enclosed cavity"***:  Badinski discloses a housing (*e.g.*, 1210) of WCD that houses all device components in a "hermetically sealed" cavity (*e.g.*, 1220 highlighted below in yellow) excluding all water and debris.  Ex-1007 at ¶¶[0193], [0197], Figs. 12A-12F; *see also id.* at Figs. 4-8, 13-16C; Ex-1012 at ¶97.




Ex-1007 at Fig. 4.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

***"the body having all dimensions equal to or smaller than 2.5 inches, and***

***the body having a thickness equal to or smaller than ⅜ inch;"***: Badinski discloses

that housing 1210 can take on various form factors.  Ex-1007 at ¶[0192]; Ex-1012

at ¶98.  For example, Badinski discloses that the WCD interior diameter $d_1$ can be

between 12mm to 24mm (0.47 inches to 0.95 inches) and the exterior diameter $d_2$

can be between 18mm to 30mm (0.71 inches to 1.18 inches).  Ex-1007 at ¶[0192],

Fig. 12B.  Badinski also discloses that the thickness between diameters $d_1$ and $d_2$ can

be, for example, between 1.5mm to 3mm (0.06 inches to 0.12 inches).  *Id.*  Badinski

further discloses that the width of the WCD in the longitudinal direction ("WR") can

be, for example, from 3mm to 8mm (0.12 inches to 0.31 inches).  *Id.* at ¶[0192], Fig.

12A.




*Id.* at Figs. 12A and 12B.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### (i)  Motivation to Combine

A POSITA would have been motivated to modify the portable wireless device of Berg to include a body having a fully enclosed and watertight cavity, the body having dimensions as taught in Badinski, to improve user experience by increasing wearability, portability, and protection from external elements like liquids when entering or exiting a protected area.  Ex-1007 at ¶¶[0193], [0197]; Ex-1012 at ¶¶99-101; Section VIII.H.  This modification is supported by Berg's disclosure to promote the portability and interoperability of the wearable device.  Ex-1006 at ¶¶[0006], [0009]; Ex-1012 at ¶99.  It would have been obvious to a POSITA at the time of invention to modify the form factor of Berg to easily transport a wearable and offer versatility in application, considered known and expected results.  Ex-1012 at ¶99.

Additionally, design objectives to protect sensitive credentials in access control systems would have favored combining Berg and Badinski and would have motivated a POSITA to combine these references to achieve a small and durable form factor.  Ex-1012 at ¶100.

Moreover, a POSITA would have had a reasonable expectation of success because Berg and Badinski disclose straightforward techniques that are based on standard technology components and could be readily implemented to provide a known and expected result.  Ex-1012 at ¶101; Ex-1006 at ¶¶[0006], [0009]; Ex-1007 at ¶[0270].

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

As discussed above in limitation 11a of Ground 1, this limitation recites nothing more than an obvious design choice.  Ex-1012 at ¶102.

### 3.    11b

Berg describes a portable wireless device with a processor (*e.g.*, 208 boxed in purple below; Ex-1006 at ¶[0079]), a memory (*e.g.*, 204 boxed in red below; *id.*), and a battery (*id.* at ¶[0082] (not shown below)).  *Id.* at ¶[0012], [0019], [0080], Fig. 2.  Berg also discloses first and second wireless communication antennas (*e.g.*, 212A and 212B boxed in blue and orange below) disposed in the cavity of the wearable device.  *Id.* at ¶¶[0081], [0079], Fig. 2; Ex-1012 at ¶103.



*Fig. 2*

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Ex-1006 at Fig. 1.  Berg discloses that the first and second antennas are configured for wireless communication using "[a]ny number of communication protocols" including BLE and NFC.  *Id.* at ¶¶[0014], [0071], [0081].

### 4.    11c

Berg further discloses that the wearable device includes first and second antennas (*e.g.*, 212A and 212B; *see* Fig. 2 *supra*) "configured to enable wireless communications between the wearable device 104 and a reading device 112."  Ex-1006 at ¶[0081].  The first and second wireless communication antennas can be respectively configured for numerous protocols, including BLE and NFC communications.  Ex-1006 at ¶¶[0014], [0081].  Berg describes that wearable device 104 can "communicate with a reading device 112 across one or more wireless communication connections," which "can include communications via at least one of … BLE [and] NFC."  *Id.* at ¶[0071]; Ex-1012 at ¶104.

### 5.    11d

Berg discloses that the processor 208 of the wearable device executes functions stored in memory "to run other components of the wearable device 104," such as the BLE and NFC antennas.  Ex-1006 at ¶¶[0080], [0079] (describing antennas as "components"), Fig. 2; *see id.* at ¶[0083].  As described in connection with limitation 11c, the wearable device uses a first wireless communication antenna configured for BLE communications to communicate with other remote devices,

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

such as reading device 112 and mobile device 108. *Id.* at ¶[0081], Figs. 1 and 2; Ex-1012 at ¶105. Furthermore, Berg discloses that these BLE communication links with remote communication devices can be secure communication links. Ex-1006 at ¶[0133] ("wireless links can also be secure links and may be capable of communicating encrypted information"). For example, Berg discloses that after authenticating a wearable device, further communication of sensitive information such as keys, codes, and credentials may be required to occur over an encrypted communication link. *Id.* at ¶[0073].

> ### 6.   11e:
>
> > **(i)**   *"the memory stores ... [a] public ... identifier[] unique to the portable wireless device,"*

Berg discloses a wearable device (*e.g.*, 104 highlighted in orange below) with memory 204 that stores "credential information and/or access control information." Ex-1006 at ¶[0080]. "Credential information" includes "unique identifications, manufacturer identification, passwords, keys, encryption schemes, transmission protocols, and the like." *Id.* at ¶[0020]. Berg explains that the purpose of the "credential information" is "to authenticate and/or to verify its authenticity with a reader, mobile device, and/or interrogator." *Id.* A POSITA would understand that this teaching requires that the "credential information" be "unique to the device."

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Ex-1012 at ¶106.  Thus, Berg's "credential information," stored on the portable device, is a "public identifier" as claimed.  *Id.*

That Berg's "credential" information is a "public identifier" is confirmed by Berg's further description of how the "credential information" is used in the overall authentication/validation process.  Ex-1012 at ¶107.  Berg describes a process wherein a wearable device 104 is authenticated with a reading device 112 before validation communications can occur, during which access control information is exchanged.  Ex-1006 at ¶[0073] ("In one embodiment, authentication may be required between the wearable device 104 and the reading device 112 before further communications are enabled.").  Berg discloses that the authentication process may include "simple authentication based on site codes, trusted data formats, shared secrets, and/or the like."  *Id.*  A POSITA would recognize that Berg is describing that the reading device receives "credential information" unique to the mobile device for purposes of performing an initial authentication of the user's identity.  Ex-1012 at ¶107; Ex-1006 at ¶[0073].  As Berg describes, this may be performed in advance of "further communications" that involve the exchange of sensitive "access control information" over a more secure, encrypted channel.  Ex-1006 at ¶¶[0073]-[0074].

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



*Id.* at Fig. 1.

> **(ii)** *"the memory stores … [a] private … identifier[] unique to the portable wireless device,"*

In addition to "credential information," Berg discloses that its portable device with memory 204 stores "access control information," which can include "unique identifications, manufacturer identification, passwords, keys, encryption schemes, transmission protocols, and the like." Ex-1006 at ¶¶[0080] ("access control information"; stored in memory). As Berg describes, "access control information is more sensitive and may require more involved validation via, for example, an encrypted exchange of access control information." *Id.* at [0073]. A person of ordinary skill in the art would recognize that Berg's "access control information" is

49

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

the "private identifier" that uniquely identifies the device, as claimed.  Ex-1012 at ¶108.

This is confirmed by Berg's further description of the "access control information."  After an authentication process (described in the prior limitation), Berg describes how "further communications" can be enabled.  Ex-1006 at ¶[0073].  Such "further communications" may involve the reading device requesting "access control information" from the wearable device for the purposes of validating the wearable device to the reading device.  *Id.* at ¶[0074]; Ex-1012 at ¶109.  Because "access control information" is more sensitive, Berg teaches that the use of an "encrypted exchange of access control information."  Ex-1006 at ¶[0073]; Ex-1012 at ¶109.

Thus, as a POSITA would recognize, Berg is teaching that the portable device transmits "credential information" (*i.e.*, a "public identifier") to a reading device for initial authentication, which can then trigger the reading device requesting more sensitive "access control information" (*i.e.*, a "private identifier") over an encrypted channel for validation.  Ex-1012 at ¶110.  Upon validation, the reading device 112 may provide access of the device 104 to "a secure room" by unlocking a physical door, for example.  Ex-1006 at ¶[0074]; *see also id.* at ¶[0100] & Figs 4A-4D.  In sum, based on Berg's teachings, a POSITA would recognize the "access control information" as the "private identifier" of the '514 patent.  Ex-1012 at ¶110.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### 7.    11f

*"the processor controls the first wireless communication antenna"*:  Berg discloses that the processor 208 of the wearable device executes functions stored in memory "to run other components of the wearable device 104," such as the BLE and NFC antennas.   Ex-1006 at ¶¶[0080] (processor runs components of wearable device), [0079] (describing antennas as "components"), *see also id.* at ¶[0083] & Fig. 2; Ex-1012 at ¶111.

*"to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications,"*:  Berg does not expressly disclose that the wearable device emits a periodic beacon signal broadcasting the unique public identifier.  However, this feature would be obvious in view of the teachings in Goosen.  Ex-1012 at ¶¶112-16.

Goosen describes a small, stationary device called a "Beacon" that uses BLE to periodically transmit advertisement packages for applications at expositions and conferences.  Ex-1010 at 2-3, 9-10; *see id.* at 13 ("In advertising mode, the BLE device periodically transmits a data package containing information about the device and its services.").  The BLE beacon message includes a UUID (*i.e.*, a universal unique identifier, as provided in the BLE specification) associated with the device.  *Id.* at 10, 15-16 (describing that the Beacon's advertising transmission includes a UUID in the original configuration).  When a consumer walks near a booth at an

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

expo, his or her smartphone will receive the beacon signal, including the UUID, which the smartphone can use to identify the source of the beacon, and provide location sensitive information to a server.  *Id.* at 2-3, 13; Ex-1012 at ¶113.

As Goosen teaches, the implementation of a "beacon" is really just a "very simple" implementation of BLE-enabled devices that periodically advertise themselves with special advertising packages.  Ex-1010 at 9.  Goosen also teaches how this is merely a logical application of the capability already included in the BLE specification, which provides a "Generic Access Profile (GAP)" defining the different Bluetooth modes that a device may take on (*i.e.*, "advertising," "observing," "central," or "peripheral").  *Id.* at 7-8; Ex-1012 at ¶114.

Significantly, while the aforementioned disclosures of Goosen teach the use of stationary beacons transmitting UUIDs, Goosen further describes that the roles of the mobile device and Beacon can be reversed, such that the smartphone transmits advertising messages and the Beacon scans for messages.  Ex-1010 at 37 (Section 7.3: "Role Reversal").   In fact, Goosen teaches that such an "inverted" communication model, where the *mobile* device takes on the beacon role, "can lead to some very interesting applications" in which "the system [can] replace smartphones with something smaller, more efficient, like bracelets, or build[] BLE capabilities into watches."  *Id.*; Ex-1012 at ¶115.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

As a POSITA would recognize, Goosen's teaching to implement a portable, BLE-beacon to periodically transmit a UUID, dovetail with Berg's teachings regarding compact mobile devices that transmit unique identifiers for purposes of authentication with, for example, secured doors.  Ex-1012 at ¶116.  Goosen, in fact, teaches the use of "[w]earable advertisers" in a "smart home" environment to perform applications, such as unlocking doors.  Ex-1010 at 38.  In view of the disclosures of Berg and Goosen, a POSITA would consider it obvious to use a BLE antenna to emit a periodic beacon signal broadcasting a unique public identifier of a portable wireless device to facilitate wireless communications with external devices while making efficient use of battery power.  Ex-1012 at ¶116; Ex-1010 at 1, 41 (highlighting the battery advantages of BLE).  A POSITA would further recognize the advantage of using BLE advertising broadcasts because of its low power usage and the resulting ability to use a smaller and more portable wireless device.  Ex-1012 at ¶116; Ex-1010 at 43.

### 8.    11g

*"the processor controls the first wireless communication antenna"*:  Berg discloses this as described regarding limitation 11f, *supra*.

*"to transmit the private identifier only across secure communication links established with remote communication devices using BLE communications"*:  Berg discloses that only after authenticating a wearable device, further

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

communication of sensitive access control information such as keys, codes, and credentials can require an encrypted communication link with the reading device 112. Ex-1012 at ¶118. Specifically, Berg teaches that "access control information is more sensitive and may require more involved validation via, for example, an encrypted exchange of access control information." Ex-1006 at ¶[0073]. Thus, Berg teaches the use of an encrypted channel BLE communication links between a wearable device and a reading device 112 can be secure communication links. *Id.* at ¶[0133] ("wireless links can also be secure links and may be capable of communicating encrypted information"); Ex-1012 at ¶118.

A POSITA would recognize how in a secure environment, the access control information that is used to determine whether to unlock a secure door for a user, is sensitive information that could be misused if intercepted by an attacker. Ex-1012 at ¶119; *see, e.g.*, Ex-1010 at 42 ("Beacons exist, and so do devices that can intercept their signals."). Thus, in order maintain security, a POSITA would recognize the advantages of transmitting access control information *only* across a secure, encrypted link, as taught by Berg. Ex-1012 at ¶119.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## XII.  GROUND 3: BERG, BADINSKI, AND BLE SPECIFICATION RENDER OBVIOUS CLAIM 11

For this ground, Petitioner relies on Berg and Badinski as in Ground 2. Additionally, Petitioner relies on the BLE Specification for its disclosure regarding the periodic beacon signal described in limitation 11f.  Ex-1012 at ¶120.

### A.  Claim 11

#### 1.  11pre-11e and 11g

These limitations are disclosed by Berg and Badinski as described above in Ground 2.

#### 2.  11f

***"the processor controls the first wireless communication antenna"***:  Berg discloses this limitation as discussed in limitation 11f of Ground 2.

***"to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications,"***:  Berg does not expressly disclose that the wearable device emits a periodic beacon signal broadcasting the unique public identifier.  However, this feature would be obvious in view of the teachings in the BLE Specification.  Ex-1012 at ¶¶123-127.  Although Ground 2 relies on Goosen which describes teachings of the BLE Specification, this ground is based on the BLE Specification itself for completeness.

The BLE Specification discloses a "public device address" that uniquely identifies a wireless device during a BLE advertising event to devices in proximity.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Ex-1009 at 2197; Ex-1012 at ¶124.   For example, during an advertising event, a

device transmits a connectable undirected advertising ("ADV_NONCONN_INFO,"

Ex-1009 at 2222) channel packet PDU with a payload containing that device's public

device address (*i.e.*, "AdvA" field).[4]   *Id.* at 2204, 2221-22.



*Id.* at 2204.   The BLE Specification also discloses that a mobile device can use BLE

to broadcast the public device address by emitting a periodic beacon signal on an

advertising event interval (including fixed-length "advInterval" and pseudorandom-

length "advDelay").   *Id.* at 2223; Ex-1012 at ¶124.

---

[4]   The same is true for all other advertising event types ADV_IND,

ADV_DIRECT_IND, and ADV_SCAN_IND.   Ex-1009 at 2203-05.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



Figure 4.1: Advertising events perturbed in time using advDelay

Ex-1009 at 2223.

### (i)    Motivation to Combine

A POSITA would be motivated to review and incorporate portions of the BLE
Specification in view of Berg's disclosure of a wearable device using a BLE antenna
for BLE communications.  Ex-1006 at ¶¶[0014], [0081], Fig. 2; Ex-1012 at ¶125;
Section VIII.H.  As a POSITA would recognize, the BLE Specification's teaching
to implement a BLE-beacon to periodically transmit a public device address,
dovetails with Berg's teachings regarding compact mobile devices that use BLE to
transmit unique identifiers for purposes of authentication with, for example, secured
doors.  Ex-1012 at ¶125; Ex-1006 at ¶¶[0010], [0014].  In view of the disclosures of
Berg and the BLE Specification, a POSITA would recognize as well-known and
obvious at the time of invention to use a BLE antenna to emit a periodic beacon
signal broadcasting a unique public identifier of a portable wireless device to
facilitate wireless communications with external devices while making efficient use

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

of battery power.  Ex-1012 at ¶125.  A POSITA would further recognize the advantage of using BLE advertising broadcasts because of its low power usage and the resulting ability to use a smaller and more portable wireless device.  *Id.*

Additionally, design objectives such as advances in access control technology, including device and communication protocols that evolve to offer more security, portability, and interoperability, like BLE as demonstrated by its codification as a wireless specification, would have favored combining Berg and the BLE Specification and would have motivated a POSITA to combine these references to achieve improvements and in battery efficiency and wireless interactions with access and payment portals.  Ex-1012 at ¶126.

Moreover, a POSITA would have had a reasonable expectation of success because Berg and the BLE Specification disclose straightforward techniques that are based on standard technology and could be readily implemented to provide a known and expected result.  Ex-1012 at ¶127.

## XIII. GROUND 4:  RAINA, YUEN, AND HULUSI RENDER OBVIOUS CLAIM 11

For this ground, Petitioner relies on a primary reference, Raina, which discloses an access control system in which devices are configured to wirelessly provide access information to receiving systems to gain access.  Raina describes a portable wireless device that interacts with an access system for authentication and

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

validation.  Petitioner also relies on Yuen to provide the recited form factor and

Hulusi to disclose the recited antennas.  Ex-1012 at ¶128.

### A.   Claim 11

#### 1.   11pre

**"*[a] portable wireless device*"**:  Raina discloses a wearable device (*e.g.*,

"mobile device 130") that is portable and configured for wireless communications

with "zone computers 150" for gaining access to a secure area.  Ex-1008 at ¶[0022],

Figs. 1-3.  Raina discloses that the mobile device 130 can take the form of "mobile

phones, tablets, wearable computers, such as GOOGLE glass or smart devices

embedded into clothing, a smart watch, fitness tracker, or wireless enabled shoes, or

some other type of mobile computer."  *Id.* at ¶[0024].  Raina also discloses that the

wearable device can include multiple, distinct interfaces 601 that communicate with

external devices using wireless communication protocols including both BLE and

NFC.  *Id.* at ¶[0058], Fig. 6 (elements 601a, 601b, and 601c); Ex-1012 at ¶129.

#### 2.   11a

Raina discloses a wearable device that houses a processor (*e.g.*, processor

602), memory (*e.g.*, data storage 604), and wireless communications interfaces

(*e.g.*, 601b BLE and 601c NFC).  Ex-1008 at ¶¶[0057]-[0059], Fig. 6.  Raina teaches

that these elements can exist in several small form factors, including specifically a

"smart watch," "fitness tracker," and "smart devices embedded into clothing."  *Id.*

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

at [0024]. While Raina does not expressly recite dimensions, its teachings suggest a form factor within the recited dimensions and render such a form factor obvious. Ex-1012 at ¶130. Additionally, Yuen discloses a similar device, proving that such dimensions were achievable and desirable for devices like those disclosed in Raina. Ex-1012 at ¶¶130-37.

*"a body having a fully enclosed cavity"*: A POSITA would recognize that Raina discloses a wearable device that includes an enclosure to house electrical components as well as a small form factor to increase portability and be suitable as, for example, a fitness tracker. Ex-1008 at ¶[0024]; Ex-1012 at ¶131.

*"the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅜ inch"*: A POSITA would also view the recited dimensions as obvious over Raina's teachings. Ex-1012 at ¶132. Raina specifically teaches form factors (*e.g.*, a "smart watch," "fitness tracker," and "smart devices embedded into clothing"), that are all small form factors and consistent with the recited dimensions. Ex-1008 at [0024]. Portable wireless devices, including multi-antenna devices, within the recited form factor were common in the prior art and were desirable because their small size and light weight made them easy to carry for users. Ex-1012 at ¶132. There are no technical reasons that prevent Raina's device from meeting the form factor, which is actually relatively large for portable devices of this type, and a person of ordinary skill in the art would

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

be motivated to implement a form factor within the recited dimensions to increase

portability. *Id*.

While a POSITA would readily understand based on the Raina's disclosure

that it was obvious for Raina's wearable device to exist in the recited form factor, to

the extent PO argues otherwise, such dimensions are expressly disclosed by Yuen.

*See* limitation 11a of Ground 2; Ex-1012 at ¶133.  Yuen's teachings are suggested

by Raina, which specifically discloses that the mobile devices may comprise "fitness

trackers."  Ex-1008 at ¶[0024]; Ex-1012 at ¶133.

### (i)    Motivation to Combine

A POSITA would have been motivated to modify the portable wireless device

of Raina to include the dimensions as taught in Yuen, to improve user experience by

increasing wearability, portability, and protection from external elements like liquids

when entering or exiting a protected area.  Ex-1004 at 29:20-31, 33:49-55, Figs. 2B-

3C; Ex-1012 at ¶¶132-37; Section VIII.H.  This modification is supported by Raina's

disclosure to protect sensitive credentials and promote the portability and

interoperability of a wearable device.  Ex-1008 at ¶¶[0004]; Ex-1012 at ¶134.  It

would have been obvious to a POSITA at the time of invention to modify the form

factor of Raina to easily transport a wearable and offer versatility in application,

considered known and expected results.  Ex-1012 at ¶134.

61

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Design and market forces such as "advances in sensor, electronics, and power source miniaturization" would have favored combining Raina and Yuen and would have motivated a POSITA to combine these references to achieve a small and durable form factor.  Ex-1004 at 1:43-52; Ex-1008 at ¶[0024]; Ex-1012 at ¶135.  Indeed, Yuen discloses that small form factor wearables such as the Fitbit Ultra and the Fitbit Flex were already available for sale.  Ex-1004 at 1:43-52, 17:25-33; Ex-1012 at ¶135.

Moreover, a POSITA would have had a reasonable expectation of success because Raina and Yuen disclose straightforward techniques that are based on standard technology components and could be readily implemented to provide a known and expected result.  Ex-1012 at ¶136; Ex-1008 at ¶[0059].

Ultimately, this limitation recites nothing more than an obvious design choice.  *See* limitation 11a of Ground 1, *supra*.  Ex-1012 at ¶137.

### 3.   11b

Raina discloses a wearable device that houses a processor (*e.g.*, processor 602 highlighted in yellow below), a memory (*e.g.*, data storage 604 highlighted in orange below), and first and second wireless communications interfaces (*e.g.*,601b BLE and 601c NFC highlighted in blue and purple respectively) that can exist in several small and mobile form factors, including as a smart watch, fitness tracker, smart devices

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

embedded into clothing, "or some other type of mobile computer," Ex-1008 at

¶[0024]; *id.* at ¶¶[0059], [0058]; Ex-1012 at ¶138.



FIG. 6

Ex-1008 at Fig. 6.

A POSITA would view the recited battery as obvious over Raina's teachings.

Raina specifically teaches *mobile* devices that wirelessly communicate (*e.g.*, smart

watch, fitness tracker, *id.* at ¶[0024]) which conventionally include batteries. Ex-

1012 at ¶139. A POSITA would also recognize a battery is necessary to power the

processor 602 and wireless communications interfaces 601a-c of the mobile device.

*Id*. Raina's teaching that Bluetooth Classic "may consume more battery power" than

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

BLE strongly suggests the presence of a battery in Raina's mobile devices.  Ex-1008 at ¶[0024]; Ex-1012 at ¶139.

In a similar manner, a POSITA would view the recited antennas as obvious over Raina's teachings.  Ex-1012 at ¶140.  A POSITA would recognize that Raina's disclosure of wireless communications interfaces 601a-c implies use of antennas to facilitate communications with remote devices such as zone computers 150a.  Ex-1008 at ¶[0058], Fig. 6; Ex-1012 at ¶140.  A POSITA would find including antennas obvious in view of Raina's teachings that the mobile device can be a smart watch or fitness tracker—devices that routinely use antennas to communicate stored data with external devices like a laptop or smartphone.  Ex-1012 at ¶140.  Moreover, Raina discloses that the mobile device wirelessly communicates using BLE—an activity that conventionally requires an antenna.  *Id.*

While a POSITA would readily understand based on the Raina's disclosure that its system would include a battery and antennas, to the extent PO argues otherwise, such trivial additions are expressly disclosed by Hulusi.  *See* limitation 11b of Ground 1; Ex-1012 at ¶¶141-44.

### (i)    Motivation to Combine

In addition to the reasoning set forth in Section VIII.H, a POSITA would have been motivated to modify the portable wireless device of Raina according to the teachings of Hulusi.  Ex-1012 at ¶¶141-44.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

A POSITA would have been motivated to modify the Raina device to include a battery, as taught in Hulusi, to improve user experience by enabling improved portability and rechargeability of the device. Ex-1012 at ¶143; Section VIII.H. With a rechargeable battery, a user could interact with numerous access points of an access control system for an extended period of time, thereby increasing convenience for the user. Ex-1012 at ¶143; Raina at ¶[0004] (recognizing the inconvenience in conventional embodiments that lack a battery to support wireless transmissions facilitating access to secure areas).

A POSITA would also have been motivated to modify the Raina device to include independent BLE and NFC antennas, as taught in Hulusi, to improve user experience by improving versatility in interfacing with other external devices. Ex-1008 at ¶[0058]; Ex-1012 at ¶144; Section VIII.H. With a dedicated antenna for each of BLE and NFC, a user could still interact with an access control system even if one antenna stopped working. Ex-1012 at ¶144; Ex-1008 at ¶¶[0058], [0061] (disclosing the wireless device with an NFC interface and a BLE interface). Such modification also increases the versatility of the device by enabling simultaneous communications with external access systems at differing distances—*i.e.*, NFC at short range and BLE at longer range. Ex-1012 at ¶144; Ex-1008 at ¶[0061] (recognizing the difference in range of NFC and BLE protocols). Moreover, a POSITA would have had a reasonable expectation of success because Raina and

65

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Hulusi disclose straightforward components that are based on standard BLE and NFC technology and could be readily implemented to provide a known and expected result. Ex-1012 at ¶144.

### 4.    11c

As discussed in limitation 11b, Raina expressly discloses separate BLE and NFC communication interfaces, which would be understood to imply separate antennas to facilitate these communication protocols. Ex-1012 at ¶145. Hulusi discloses an NFC antenna 224 configured for NFC communications (Ex-1005 at ¶[0049]) and an antenna 244 configured for BLE communications (*id.* at ¶¶[0089], [0049], Fig. 2).

### 5.    11d

Raina discloses the processor 602 of the mobile device 130a runs the operating system and access control applications stored in data storage 604. Ex-1008 at ¶[0059]. Raina also discloses that the mobile device 130a can establish a secure communication link with zone computer 150a. *Id.* at ¶[0051]. For example, the mobile device 130a may use keys "to encrypt or encipher the message" between the mobile device 130 a and the zone computer 150 a." *Id.* In another example, "both encrypting and MACing might be used to secure the communication." *Id.*; *see id.* at ¶[0055]; Ex-1012 at ¶146.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Raina discloses use of these secure communications in order to allow the mobile device 130a to provide the zone computer 150a with information that it needs to determine whether to grant access to the mobile device 130a. Ex-1008 at ¶¶[0063]-[0064]. When a mobile device 130a is in a specific location (*e.g.*, lane 110a) of an access control area 102, the mobile device 130a can exchange messages with the zone computer 150a "in a secure manner using one or more encryption keys via a short-distance communication interface (e.g., Bluetooth) to mutually authenticate each other and validate a user associated with the mobile device." Ex-1008 at ¶[0064]; *see also id.* at ¶[0050] & Fig. 5 (Step I); Ex-1012 at ¶147. Raina discloses wherein this validation process can occur using BLE. Ex-1008 at ¶[0029]; *see id.* at ¶[0058].

### 6.    11e

#### (i)    *"the memory stores ... [a] public ... identifier[] unique to the portable wireless device,"*

Raina discloses a "mobile device unique ID, which includes the calculated unique ID or IDs" that is broadcast by the mobile device to the zone computers. Ex-1008 at ¶[0046]; *see also id.* at Fig. 5 (Step E). This "mobile device unique ID" is a "public identifier" as claimed. Ex-1012 at ¶¶148-151.

Specifically, Raina discloses a process where the mobile device receives a signal with a UUID from a stationary beacon at the access control point. Ex-1008

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

at ¶[0046].  This signal is used to determine whether the mobile device is located within an access lane 110, *id.* at Fig. 5 (Step C), and, if so, causes the access control application 132 running on the mobile device to calculate a unique ID for the mobile device, *id.* at Fig. 5 (Step D).  The mobile device then itself begins acting as a beacon, broadcasting its calculated "unique ID" to a local zone computer using a short-range broadcast, such as BLE.  *Id.* at ¶[0046]; *see also id.* at ¶[0024] ("[T]he mobile devices 130 themselves may operate as a beacon and broadcast a beacon signal or act as a peripheral, enabling services and/or characteristics, or act as a central and start searching for peripherals with certain services and/or characteristics and/or name and/or other unique identifiers."); Ex-1012 at ¶¶149-150.  Raina discloses that "[t]he zone computer may use the unique IDs to identify the mobile device."  Ex-1008 at ¶¶[0027], [0047].

This process is depicted by the annotated figures below:

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514



*Id.* at Fig. 1.



*Id.* at Fig. 5.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

A person of ordinary skill in the art would recognize that the steps of calculating the mobile device unique ID and broadcasting it to the zone computer, require and disclose the storage of that ID in memory of the mobile device.  Ex-1012 at ¶¶148-151.

> **(ii)** *"the memory stores ... [a] private ... identifier[] unique to the portable wireless device,"*

After the broadcasted "unique ID" of the mobile device is used to perform the authentication Steps C-E depicted in Figure 5, Raina discloses a validation Step I, in which "information for validation" is transmitted from local storage on the mobile device to the zone computer over an encrypted link for validation.  Ex-1008 at ¶¶[0052]-[0056].  This "information for validation" is the private identifier as claimed.  Ex-1012 at ¶¶152-155.

Specifically, Raina discloses that validation may involve a "stored value" or a "credential" system.  Ex-1008 at ¶[0052].  In either case, "[t]he information for validation . . . can be encrypted and stored within a local data storage in the mobile device."  *Id.* at ¶[0053]; *see also id.* at ¶[0054] ("The information related to user's account may be stored inside a secure storage area inside the mobile device . . . .").  This information can include information such as "user profile, balance amount, passes and concession information."  *Id.* at ¶¶[0052].  The information might, for

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

example, be used by the zone computer to grant access to the user and then to deduct a fare from the user's account.  *Id.* at ¶[0075]; Ex-1012 at ¶153.

Raina describes the set-up of an encrypted link for the transmission of this information from the mobile device to the zone computer.  Ex-1008 at ¶¶[0054]; Ex-1012 at ¶154.  Specifically, transmission of the information related to the user account from the mobile device to the zone computer "may involve an additional authentication performed between the zone computer and the secure storage, establishing the identity of both sides . . . ."  Ex-1008 at ¶[0055].  "[O]ne or more keys may be used to encrypt the communication between the secure storage and the zone computer."  *Id.* at ¶[0056].

A POSITA would recognize that because the information for validation is used to grant access and deduct a fare from a specific user's account, and because the information is used to "establish[] the identity" of the mobile device (Ex-1008 at ¶[0054], the information must uniquely identify the device.  Ex-1012 at ¶155.  Accordingly, this information for validation is a "private identifier" unique to mobile device 130.  *Id.*

### 7.    11f

***"the processor controls the first wireless communication antenna"***:  Raina discloses the processor 602 of the mobile device 130a runs the operating system and

71

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

access control applications stored in data storage 604.  Ex-1008 at ¶[0059]; Ex-1012
at ¶156.

> *"to emit a periodic beacon signal broadcasting the unique public identifier
> of the portable wireless device using BLE communications,":*   As discussed
regarding "public identifier" of limitation 11e, Raina discloses when the mobile
device 130a detects it is in an area of secure access, it "may operate as a beacon and
broadcast a beacon signal."  Ex-1008 at ¶[0024], Fig. 5 (Step E).  Raina teaches that
this may include causing the mobile device to act as a "peripheral" which, within the
context of BLE communications, discloses that the mobile device emits "periodic"
advertisements, as a POSITA would recognize.  Ex-1012 at ¶157; *see* Ex-1008 at
¶[0024].  The mobile device beacon in Raina should not be confused with Raina's
separate disclosure of stationary beacons, which are used to initiate the mobile
device beacon.  Ex-1008 at Fig. 5 (Steps A-C).  As Raina makes clear, "in addition
to receiving signals from the beacons 140, the mobile devices 130 themselves may
operate as a beacon and broadcast a beacon signal or act as a peripheral";
specifically, the mobile device itself "broadcast[s] a beacon signal to initiate
communication with a local zone computer.  *Id.* at ¶[0024].  Raina further discloses
that these broadcasts are BLE broadcasting transmissions.  *Id.* at ¶¶[0024], [0046].

Because Raina discloses that the mobile device acts as a "peripheral," *id.* at
¶[0024], (a term of art from the BLE specification) it discloses periodic

72

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

advertisement transmissions. Ex-1012 at ¶158; *see also* Ex-1009 at 1698-1703

(describing that a device in the "Peripheral Role" transmits "undirected advertising

events"), 2223 (describing that "all undirected advertising events" are transmitted

periodically based on a calculated interval). A POSITA would further recognize

from Raina's disclosure of the mobile device acting as "beacon" implies periodic

transmissions to the zone computer. Ex-1012 at ¶158. Finally, as discussed for

limitation 11e, these broadcast messages include a unique identifier, which can be

calculated by the mobile device and acts a unique public identifier for the device.

Ex-1008 at ¶[0046]; Ex-1012 at ¶158. Raina discloses that "[t]he zone computer

may use the unique IDs to identify the mobile device." Ex-1008 at ¶¶[0027], [0047].



FIG. 5

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

*Id.* at Fig. 5.

### 8.    11g

**"the processor controls the first wireless communication antenna"**: Raina

discloses this as described regarding limitation 11f, supra.

**"to transmit the private identifier only across secure communication links**

**established with remote communication devices using BLE communications":**

Raina discloses that "information for validation," including user credentials used for

validation, can be sent only across secure communication links established with the

zone computers 150 using BLE communications.  Ex-1008 at ¶[0064]; Ex-1012 at

¶160.  Raina discloses that "[a] secure communication channel is established for

message exchange between the mobile device and the zone computer to facilitate

validation."  Ex-1008 at ¶¶[0031], [0029].  Keys may be used to encrypt or encipher

messages between the mobile device 130 and the zone computer 150 on the secure

communication channel.  *Id.* at ¶[0051].  Raina discloses that during validation, the

mobile device 130 sends user credentials in this secure manner.  *Id.* at ¶¶[0043],

[0044]; *see id.* at ¶¶[0074], [0080] ("Validation 1122 is described with respect

to FIG. 10 and may include a message exchange with mobile device 130 a to receive

user credentials and validate the user 131 a based on the credentials."); Ex-1012 at

¶160.  Once validated, the user of the mobile device may be granted access to, for

example, a secure area.  Ex-1008 at ¶[0029], Fig. 1.

74

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

This exchange occurs using BLE communications. Ex-1008 at ¶¶[0058] ("[M]essage exchanges between the mobile device 130 *a* and the zone computer 150 *a* are done through Bluetooth or Bluetooth 4.0 or BLE."), [0064] ("Messages are exchanged with the zone computer 150 *a* for the sub-location in a secure manner using one or more encryption keys via a short-distance communication interface (e.g., Bluetooth) to mutually authenticate each other and validate a user associated with the mobile device and to allow access to the restricted area through the sub-location if the user is validated"); Ex-1012 at ¶161.

A POSITA would recognize how in a secure environment, the "information for validating," including user credentials used to determine whether to grant access to a secure area, is sensitive information that could be misused if intercepted by an attacker. Ex-1012 at ¶162. Thus, in order maintain security, a POSITA would recognize the advantages of transmitting access control information *only* across a secure, encrypted link, as taught by Raina. *Id.*

## XIII.  INSTITUTING THIS IPR WOULD BE EQUITABLE

### A.    35 U.S.C. § 325(d) Factors Support Institution

The Board should not exercise its discretion under § 325(d). Neither of the two prongs relevant to discretionary denial under 325(d) are applicable here. *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 7 (PTAB Feb. 13, 2020).

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

First, the primary references discussed in Grounds 1-4 have not been considered by the Patent Office in prosecution by the examiner or listed in an IDS, and there are no IPR or post-grant proceedings involving the '514 patent to date. *See generally* Ex-1001, Ex-1002. None of the references mentioned in this Petition were cited or mentioned during prosecution. Ex-1002.

Second, the art cited in this petition is not cumulative of the art substantively considered by the Examiner—namely, Brown (Ex-1011) and Mycek (Ex-1017). Ex-1002 at at 282-301, 416-433; *see id.* at 436 (citing other references cited). The Examiner recognized allowable subject matter in limitations recited in dependent claim 59 (issued as claim 11)—including limitations 11e, 11f, and 11g addressed in this Petition. *Id.* at 300, 433. The prior art references in this Petition provide the exact disclosure of the limitations recited in challenged claim 11 and are more probative to the obviousness inquiry than references previously considered by the Office. *See, e.g.*, Grounds 1-4 at limitations 11e, 11f, and 11g. In contrast to the Examiner's finding, the prior art cited in this Petition renders obvious claim 11 of the '514 patent.

Discretionary denial under § 325(d) is thus unwarranted. *Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, Paper 7 at 11 (PTAB July 23, 2018).

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## B.    *NHK-Fintiv* Factors Support Institution

The Board balances six factors in considering denial under 35 U.S.C. §314(a); here, the weight of these factors strongly favors institution.  *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential).

### 1.    Overlap Between Issues Raised in the Petition and in the Parallel Proceeding

Petitioner stipulates herein that, if this IPR proceeding is instituted, then Petitioner will not pursue in the Litigation the specific grounds identified above in connection with the referenced patents and claim, or any other ground that was raised or could have been reasonably raised in an IPR (*i.e.*, any ground that could be raised under §§ 102 or 103 on the basis of prior art patents or printed publications).[5]  *See* 35 U.S.C. §315(e)(2).

Although this Petition challenges the only claim at issue in the Litigation, this waiver eliminates any overlap in invalidity issues between the Litigation and an IPR, thus alleviating any concerns of inefficiency and duplicative efforts.   *Sand*

---

[5]   This stipulation is not intended, and should not be construed, to limit Petitioner's ability to assert invalidity of the asserted claim of the '514 patent in the Litigation on any other ground (*i.e.*, invalidity under §§ 101, 112), regardless of whether *inter partes* review is instituted.

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

*Revolution II, LLC v. Continental Intermodal Grp. – Trucking LLC*, IPR2019-01393,

Paper 24 at 11-12 (June 16, 2020) (informative) ("*Sand Revolution*"); *Sotera*

*Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 18-19 (December 1,

2020).

Accordingly, this factor favors institution.

### 2.    Likelihood of a Stay

Neither party has requested a stay in the parallel Litigation.  Typically, a

district court stay of the litigation pending resolution of the PTAB trial allays

concerns about inefficiency and duplication of efforts.  However, here those

concerns are alleviated by the above stipulation, which confirms that the PTAB—

and the PTAB alone—will address invalidity under §§ 102 and 103 based on patents

and printed publications.  This ensures that IPR is a "true alternative" to the district

court proceeding.  *Sand Revolution*, IPR2019-01393, Paper 24 at 7.

This factor weighs in favor of institution or is at least neutral.

### 3.    Proximity of the Court's Trial Date to a FWD

At the time of filing this Petition, trial is scheduled for January 18, 2022.  Ex-

1018.  However, several deadlines on the schedule have slipped and have not been

rescheduled.  The parties were slated to file opening Claim Construction briefing on

March 26, 2021 according to the schedule, but have not done so.  *Id.*  The parties

have yet to even exchange terms for construction, originally scheduled to occur on

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

December 3, 2020.  *Id*.  As of the filing of this Petition, there are no stipulations between the parties as to when these deadlines, or other missed deadlines, are to be rescheduled.

The pandemic and resulting unprecedented disruption to district court proceedings adds uncertainty to the scheduled trial date.  Specifically, in an Order dated February 10, 2021, the Chief United States District Judge for the SDFL required that all trials scheduled to begin on or after March 30, 2020 are continued until May 3, 2021.  Ex-1015.  And the suspension has created a large backlog of trials in other matters, including criminal trials that take precedence over this district court case.  Even in cases where trial is earlier than an expected final written decision, the Board should seek "to balance considerations such as system efficiency, fairness, and patent quality."  *Fintiv*, IPR2020-00019, Paper 11 at 5 (collecting cases).  Here, that balance weighs in favor of institution.

### 4.    Investment in the Parallel Proceeding

This is a unique case.  Although PO filed a complaint on April 10, 2020, investment in the parallel proceeding has been minimal.  Ex-1016.  As mentioned, the parties have stipulated to stay all claim construction related deadlines until the resolution of various ongoing discovery disputes—in fact, the parties have yet to exchange constructions (originally scheduled to occur on December 3, 2020).  Ex-1018.  Congress, when enacting the America Invents Act, explained that district

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

court defendants should be permitted more than 6 months to fully evaluate claims in

a parallel litigation—extending the IPR bar date from 6 months to 1 year.  *See* 157

Cong. Rec. S5429 (Sept. 8, 2011) (S. Kyl) (explaining importance of allowing an

accused infringer to seek IPR in view of estoppel, and concomitant need to extend

deadline from six months to 12 months to afford defendants a reasonable opportunity

to identify and understand patent claims before filing an IPR that may trigger

estoppel).

At this point, the district court has invested virtually no time in assessing the

parties' claims and defenses—including invalidity.  No motion for preliminary

injunction was filed.  There have been no summary judgment motions.  No

depositions have been taken yet.  The district court will have invested little time in

addressing the invalidity of the '514 patent by the time this Board decides whether

to institute this Petition.

Given these circumstances, this factor favors institution.

### 5. Whether the Petitioner and the Defendant in the Parallel Proceeding are the Same Party

The parties are the same in this IPR and in the Litigation.

### 6. Other Circumstances, that Impact the Board's Exercise of Discretion, Including the Merits

Other circumstances strongly favor institution.  In particular, denying

institution here will (1) negate the statutorily provided 1-year filing period—because

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

this Petition was filed before closure of the 1-year window; (2) encourage forum shopping; and (3) condition the institution of IPRs on the timing of an oft-changed trial placeholder.  No other parties have sought IPR of the '514 patent.

Moreover, the merits of the present Petition are particularly strong and outweigh countervailing considerations of efficiency.  Had the Examiner been aware of these references during prosecution, the Examiner would not have issued the challenged claims of the '514 patent.  As detailed above, the combinations based on Soleimani, Berg, and Raina provide compelling disclosures that render obvious the challenged claims of the '514 patent.   These considerations weigh in favor of institution. *Illumina, Inc. v. Natera, Inc*, IPR2019-01201, Paper 19 at 8 (PTAB Dec. 18, 2019) (instituting when "the strength of the merits outweigh relatively weaker countervailing considerations of efficiency").

## XIV.  CONCLUSION

For at least the foregoing reasons, this Petition should be instituted.


DATED:  April 7, 2021             */s/ James Glass*
                                                 James Glass (Reg. No. 46729)

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

## CERTIFICATION UNDER 37 C.F.R. § 42.24

Under the provisions of 37 C.F.R. § 42.24, the undersigned hereby certifies

that the word count for the foregoing Petition for *inter partes* review (excluding the

table of contents, table of authorities, mandatory notices, certificate of service or

word count, and appendix of exhibits or claim listing) totals 13,758 words, which is

within the word limit allowed under 37 C.F.R. § 42.24(a)(i).

Date:  April 7, 2021                    */s/ James Glass*
                                        James Glass (Reg. No. 46729)

82

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

### CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e), 42.105(a), the undersigned hereby certifies

service on the Patent Owner of a copy of this Petition and its respective exhibits at

the official correspondence address for the attorney of record for the '514 Patent as

shown in USPTO PAIR via FedEx:

MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, D.C. 20001

Additionally, a copy of this Petition and its respective exhibits were served

via FedEx to the following address:

ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center, 1152 15th Street, N.W.,
Washington, D.C. 20005-1706

Courtesy copies were also sent via electronic mail to Patent Owner's counsel

of record in the related district court proceeding, Case No. 1:20-cv-22945-RNS (S.D.

Fla.) at the following addresses:

Diana Szego Fassbender
dszego@orrick.com

Steven J. Routh
srouth@orrick.com

T. Vann Pearce, Jr.
vpearce@orrick.com

Robert L. Uriarte
ruriarte@orrick.com

Petition for *Inter Partes* Review of
U.S. Patent No. 10,157,514

Orrick's Carnival-DeCurtis Email List
Carnival-DeCurtis_OHS@orrick.com

Mayanne Downs
mayanne.downs@gray-robinson.com

Jorge Espinosa
jorge.espinosa@gray-robinson.com

Robert R. Jimenez
robert.jimenez@gray-robinson.com

Date:  April 7, 2021          */s/ James Glass*
                              James Glass (Reg. No. 46729)