# EXHIBIT 104

**Statement of the Federal Trade Commission**

**Concerning**

***Royal Caribbean Cruises, Ltd./P&O Princess Cruises plc*** and
***Carnival Corporation/P&O Princess Cruises plc***, FTC File No. 021 0041

After a thorough inquiry that lasted nearly 10 months, the Federal Trade Commission has closed its investigation of two proposed transactions in the cruise industry: the proposed friendly creation of a "dual-listed company" combining Royal Caribbean Cruises, Ltd. ("RCCL") and P&O Princess Cruises plc ("Princess"), and the competing hostile tender offer by Carnival Corporation ("Carnival") for Princess. In addition to the intense scrutiny they received from the Commission, the proposed mergers were investigated without challenge by several other antitrust enforcement agencies, including those of the European Union and the United Kingdom.

These matters presented important, albeit firmly settled, issues of merger policy. The issues were complex and the ultimate decision depended on a close analysis of industry-specific facts. In addition, the transactions have been the subject of unusually extensive media coverage - some of it misinformed. In these circumstances, we believe it is appropriate to provide an unusually detailed explanation for our decision. While we hope that this explanation may also help lawyers to counsel their clients in the future, the fact that we have cleared merger proposals at relatively high concentration levels in this particular situation does not mean that we will do so in another case in the future. Each case must stand or fall on its particular facts.

Contrary to the position some have expressed, these transactions would not result in a merger to duopoly. Absent extraordinary circumstances, there is a strong presumption that a three-to-two merger of significant competitors in a properly delineated relevant market is likely to harm consumers.[1] In this situation, however, there are now four major firms and a "fringe" of other competitors. In addition, there is considerable competitive interaction between the cruise industry and alternative vacation options.

The Department of Justice and Federal Trade Commission Horizontal Merger Guidelines make it clear that "market share and concentration data provide only the starting point for analyzing the competitive impact of a merger."[2] Among the relevant factors that affect the significance of concentration data in this industry are changing market conditions[3] and the degree of difference between services in this market and those outside.[4] In addition, there are particular circumstances here that would render either unilateral or coordinated effects unlikely.[5]

In conducting this investigation, staff from the Commission's Northeast Region and the Bureau of Economics reviewed voluminous documents, held numerous interviews and investigative hearings, and obtained considerable information and commentary from third-party sources. Of particular importance, the staff conducted extensive empirical analyses of a very large volume of quantitative data on prices, bookings, ship deployments, and the financial characteristics of the industry and the parties. Ultimately, the investigating staff as well as the management of the Bureau of Competition and the Bureau of Economics recommended that the Commission close the investigation without challenging either transaction.

Competitors have provided the strongest opposition to these transactions. Competitors can often provide useful information about conditions in the industry but, with competitors as with the parties, we always need to take account of their self-interest - often with a healthy dose of skepticism. Opposition to a merger from a competitor often indicates that the transaction will increase - rather than decrease - competition. If a merger is likely to lead to higher prices from coordinated interaction or unilateral behavior, then the remaining competitors will benefit from the reduction in competition.

Within the limits imposed by confidentiality considerations, we briefly discuss the issues underlying the Commission's decision.

## I. The Cruise Industry

The modern ocean cruise industry is relatively young and still developing. Cruising has evolved from a minor offshoot of the oceanic passenger industry of the past into a broad-based vacation business patronized by consumers of all ages, incomes, and interests. Today's cruise ships, bearing a far stronger resemblance to floating luxury hotels or even amusement parks than to traditional ocean

liners, offer their thousands of passengers amenities such as full-scale, "Main Street"-style shopping districts, multiple restaurants, spas, basketball courts, and even ice-skating rinks and rock-climbing walls. The ships call on an ever-expanding variety of attractions and destinations, from the glaciers of Alaska, to the port cities of Europe and the Mediterranean, to the beaches and islands of the Caribbean, and beyond.

During the 1990s, cruising grew roughly 10 percent each year. More than 10 million people worldwide - nearly 70 percent of them from the United States - cruised in the year 2000. Cruising's rapid growth is reflected in the fact that even today, roughly half of the passengers on any given cruise have never cruised before (and even repeat customers cruise only once every several years). As cruising has grown in size and quality, its average prices have declined. Nevertheless, cruising remains a relatively small segment - roughly four percent - of the overall vacation industry in the United States.[6]

The parties to these proposed transactions are three of the four largest cruise lines in the world. Carnival, the largest, is based in Miami, Florida, and operates 43 ships under its various brands, with 16 new ships slated for delivery over the next four years. Its total worldwide passenger capacity exceeds 60,000 and, based on current orders, will grow to over 90,000 by 2005. RCCL, the world's second-largest cruise line, is also based in Miami and operates 23 ships, with a total passenger capacity of more than 50,000. RCCL is adding six new ships over the next four years, which will bring its capacity to approximately 60,000 by the end of 2004. It should be noted that in North America, RCCL and Carnival are roughly the same size. Princess, the third-largest cruise line, is based in the United Kingdom and operates 19 ships worldwide, with 8 new ships on order between now and 2004. Its capacity is nearly 30,000, slated to increase to slightly more than 40,000 by 2004.

In addition to the parties, the worldwide cruise industry features numerous significant competitors. The fourth-largest cruise company, Star Cruises of Hong Kong, operates 19 ships with a capacity of over 26,000. Eleven of Star's ships will operate under the Norwegian Cruise Lines ("NCL") brand in North America by the end of this year. NCL recently announced that it intends to add at least one, and possibly two, large new ships to its North American fleet. To treat this as a merger to duopoly implicitly assumes that NCL does not exist. There is no basis for such a conclusion. NCL is nearly the same size as Princess, is currently an aggressive competitor, and is viewed as such by the other three leading firms.

There are also several significant European cruise lines, such as Festival, Mediterranean Shipping Cruises, Fred Olsen, and Royal Olympic, some currently carrying North American passengers and some operating ships in North American waters. There are also numerous smaller cruise lines in North America, not least among them Disney Cruise Lines, a subsidiary of the Walt Disney Company. Either proposed transaction, then, would combine two of the four largest cruise companies but would leave untouched at least two major competitors plus numerous smaller but still significant cruise competitors.

## II. The Transactions' Competitive Implications

If cruising is simply a part of a larger relevant market for vacations, then the proposed transactions - involving less than four percent of that market - would lack even potential antitrust significance. It appeared more likely, however, that cruising is a relevant product market. Nonetheless, as discussed below, this was an especially complex market definition exercise. That complexity played a role in the Commission's decision, particularly because the primary relevant theory of violation in this case was coordinated interaction (rather than unilateral effects).

## A. Is Cruising an Antitrust Product Market?

A cruise is only one of many options available to consumers taking vacations. Nevertheless, largely because of its increasing affordability, cruising is also a rapidly expanding industry, with a steadily growing share of an "all-vacation" market. Thus, at any given time, much of the demand for cruising comes from consumers who have never cruised before and have chosen previously to spend their vacation time and money elsewhere. In addition, although consumers who take a cruise typically enjoy the experience and state that they are likely to cruise again, repurchase frequencies are low. For example, even customers whom the cruise lines consider "frequent cruisers" typically take only one cruise every few years. Thus, cruising is unlike an expanding market in which consumers adopt a superior new technology or product and generally do not switch back: consumers who become cruise customers continue to patronize other forms of vacation.[7]

The facts that many passengers have never cruised before and that consumers as a whole cruise very infrequently and often select vacation options other than cruising suggest that demand is fairly elastic. Various empirical analyses relating average prices and capacity confirm this conclusion. Substantial increases in capacity reduce average fares, and implied demand elasticities are large relative to standard "Critical Loss" measures.[8]

Nevertheless, cruising is differentiated from other forms of vacations. Despite some evidence that the cruise lines consider land-based vacations serious competitive threats (and *vice-versa*), the cruise lines' primary competitive focus is on each other. The evidence also shows that the cruise lines expend significant effort to monitor (to the best of their ability) each other's prices, deployments, and other behavior, and that only occasionally do they closely monitor the price or capacity of non-cruise vacation options.

Market definition under the Merger Guidelines is based on demand responses to a price increase imposed by a hypothetical monopolist. In view of a high elasticity of demand in the cruise industry relative to the Critical Loss, an *across-the-board* price increase would be unprofitable and unlikely under current market conditions. A hypothetical monopolist, however, could likely use yield management systems to mitigate this effect[9] and thus likely raise *average* prices profitably. On balance, therefore, the evidence supports defining oceanic cruising as a relevant antitrust market.

**B. Geographic Market**

The evidence also indicated that the market definition should be further narrowed to cruises marketed to North Americans. These cruises largely sail in or around North American waters - for instance, in the Caribbean, Alaska, the coasts of Mexico and the Eastern United States, and Bermuda. Because some cruises in Europe and elsewhere are marketed to North Americans and obtain numerous passengers from North America, we included such cruises in the market.

**C. Competitive Effects**

In a cruise market, either transaction would significantly increase concentration in a market already highly concentrated. Under the Merger Guidelines, however, such an increase in concentration triggers - but does not end - our analysis. Looking beyond the interest-provoking rise in concentration, we must be satisfied that there is evidence to support one or more viable theories of antitrust violation. In this case, the evidence does not support any theory of anticompetitive effects arising from either of the subject transactions.

**1. *Unilateral Effects***

Although the staff devoted considerable effort to probing unilateral issues, substantial evidence indicated that neither merger was likely to exacerbate the risk of unilateral anticompetitive effects. Neither merger involves firms that are uniquely close competitors. While the cruise companies each offer a wide array of product choices, there is substantial overlap between the choices offered by each cruise line as a whole, as well as among the types of products (such as the size, location, and features of cabins) available on each cruise ship.[10]

Unilateral effects are also unlikely if rival sellers are likely to replace any lost competition by repositioning or expanding their product lines.[11] In this case, after either transaction, there still will be two large competitors and a substantial fringe that will compete with the merged entity and could constrain any unilateral attempt by the merged firm to increase price or reduce capacity. Such firms could build new ships, reconfigure ships or otherwise adjust their product offerings or marketing, or respond in any number of ways to any unilateral price increase or capacity reduction.[12]

**2. *Coordinated Interaction***

Accordingly, the investigation focused primarily on the risk of coordinated interaction among the firms remaining post-merger. The industry has responded to intense competition with lower prices, capacity growth, and quality improvements. The cruise companies have powerful unilateral incentives to compete on all these dimensions. A viable coordinated interaction theory must establish why either the Carnival/Princess or the RCCL/Princess transaction would likely reorient these powerful incentives in a dramatically different direction, *i.e.*, toward higher prices, reduced capacity, or diminished quality. We considered four types of coordinated interaction theory: the so-called "maverick" theory, theories of price coordination, theories of coordination on amenities offered

("quality" coordination), and theories of coordinated capacity reduction. Under current market conditions, the evidence does not support any of these theories in connection with either of these proposed transactions.

### a. "Maverick" Theory

Under the "maverick" theory, an acquisition could make coordinated interaction more likely or more effective by eliminating an industry "maverick," *i.e.*, a firm with greater economic incentives than most of its rivals to deviate from terms of coordination.[13] Examined from the perspective of either pricing or capacity coordination, this theory was inapplicable to this case. All competitors have powerful financial incentives to compete on price, capacity, and quality; all have acted on those incentives in the past; and all remaining firms will have unchanged incentives going forward in the wake of either proposed merger. In a fiercely competitive atmosphere, no firm has stood out as a "maverick."

### b. Coordinated Interaction on Pricing

Cruising is a complex market. The cruise lines sell a large number of different products at an even larger number of price points. A single cruise ship contains several different types of cabins, ranging from small interior cabins to luxurious upper-deck suites with balconies. Moreover, even a single cruise line's own ships vary substantially in age, size, and on-board amenities, such as pools, spas, internet cafes, ice-skating rinks, casinos, shopping malls, and more. Within a single cruise line, cruises vary substantially in itineraries and offer diverse opportunities for accompanying land experiences (including, among many others, hiking or mountain-biking on Caribbean islands; trekking to interior Alaska by train; exploring ancient Mayan ruins; touring historic European cities; and the more traditional sand-and-surf recreation offered on many Caribbean, Mediterranean, and Mexican beaches). The different cruise lines pursue heterogeneous pricing strategies, follow disparate itineraries, and offer a multitude of different cruise "experiences" in terms of type of ship, on-board atmosphere, and facilities.

Prices vary by cabin types, ships, itineraries sailed, time of year, and time of booking; to some extent, prices also vary by travel agent and by location. Price changes take many forms. On any given cruise, they may include across-the-board reductions or increases in price for particular types of cabins; discounts targeted to particular geographic areas or to types of customers; or discounts in the form of air fare benefits, "free" cabin upgrades, in-kind benefits, and the like (including occasional rebates of travel agent commissions). Discounting is ubiquitous in the cruise industry.

Not only are prices very complex, but there is no easy way for a cruise line accurately to monitor its competitors' prices. At any given time there are a large number of prices in the marketplace. Even with access to all actual transaction prices from historical data, it is difficult to discern any pattern in how competitors are pricing. Travel agents sell the overwhelming proportion of berths and often do their own discounting, adding to the complexity and opacity of industry pricing.

Given this enormous complexity, it was apparent that across-the-board pricing coordination would be unworkable and that coordination would have to involve some subset of prices to be feasible.[14] In addition, because many passengers are likely to have highly elastic demands, a coordinated price increase would probably require some form of price discrimination. Thus, the investigation attempted to determine whether, under current market conditions, the cruise lines could impose a coordinated price increase on some significant, identifiable set of relatively inelastic consumers - that is, was there a viable coordinated interaction theory involving price discrimination? If it were possible to identify inelastic consumers in advance, then it might be feasible for the cruise lines to coordinate a price increase to them.

The evidence refuted this theory. The cruise lines have limited information about their customers at the time they book cabins, a problem exacerbated by the fact that a substantial proportion of passengers are first-time cruisers and also by the fact that, as noted above, cruises are overwhelmingly sold through travel agents. Further, there is no identifiable segment of less price-elastic cruise customers - such as, for example, last-minute flyers ("business travelers") on airlines - and there is no evidence that any particular group of customers exhibits any discernible, systematic pattern in booking tendencies or elasticity. Thus, a coordinated price discrimination theory based on customer characteristics was not viable.

Another avenue of inquiry involved whether the cruise companies' use of yield management systems would enable them to coordinate on price discrimination based on characteristics of bookings (such

as time of booking or category of berth) rather than characteristics of customers. For example, could the cruise lines raise prices early (or delay discounting), capture the inelastic customers, and then employ aggressive discounting under their yield management systems to fill their ships with the more elastic customers? To evaluate this theory, the investigation used, among other techniques, extensive empirical analyses of actual transactions to search for systematic pricing patterns indicating that an identifiable type of transaction might be subject to coordinated interaction. These empirical analyses showed that actual transaction prices in the cruise industry display substantial, unsystematic variation. There is no stable relationship between early and later prices. On average, prices tend to fall as the cruise gets closer to the sail date, but prices rise near sailing in a very substantial portion of cases, and the extent to which they change varies dramatically. In addition, the proportion of passengers who book by certain dates before sailing varies dramatically across cruises. There is not even a consistent correlation among the prices of "head-to-head" cruises offered by different cruise lines using similar ships and sailing identical itineraries from the same port at the same time. Finally, the prices of different categories of berths vary unsystematically over time and over categories.[15] Given these facts, the evidence did not indicate that either proposed merger would enable the putatively coordinating cruise lines to agree tacitly on and successfully implement a price increase based on booking characteristics.

Based in significant part on our empirical analyses, we concluded that no identifiable category of transactions could provide a basis for challenging either merger under a theory of coordinated interaction on prices.

### c. Coordinated Interaction on Amenities

We also considered whether there could be coordination post-merger to reduce the level or variety of, or the extent of improvements in, the amenities offered on cruise ships. This theory was not viable. Offering and improving amenities are important to demand growth in the industry. Thus, it is not likely, even with perfect coordination, that reducing the level of amenities or forbearing improvements in them would be profitable. In addition, there would be strong unilateral incentives to cheat on any such coordination because new ships with new amenities are highly profitable and are a means of differentiating a competitor from its rivals. Finally, competitors outside the coordination group or new entrants could undermine any such coordination by offering better amenities.

### d. Coordinated Interaction on Capacity

Another theory of potential competitive effects was that the proposed transactions could result in a coordinated reduction in industry capacity, either by removing capacity from the North American market or by reducing the rate of capacity expansion. The evidence examined under either variant of this theory included extensive financial analyses of ship deployments and of the profitability of new ships, as well as information about industry participants' existing commitments to substantial increases in capacity over the next few years. The evidence does not support a coordinated capacity reduction theory in the context of these proposed mergers.

Although cruise ships are mobile, it would be costly to redeploy enough ships to non-North American markets to affect North American prices. Because of the high demand elasticity and the large size of the North American market, the putatively coordinating firms would have to redeploy a substantial portion of their existing fleets to achieve a meaningful price increase. A shift in capacity of the required magnitude would impose such large losses on the parties that any such conduct appears incapable of being profitable, even assuming perfect coordination and no competitive response. The game would not be worth the candle.

First, to effectuate a "North American" price increase, the ships would have to be deployed to far smaller markets (because North America contains the substantial majority of cruise passengers and capacity). Thus, the coordinating cruise lines - which already have significant presences in non-North American markets - would incur price decreases on both the redeployed ships *and* their other ships already operating in the non-North American market.

Second, there is a substantial probability that demand in other markets simply could not absorb the amount of capacity required to be redeployed from North America. As a result, prices would fall even further and yet, even in the face of this price slide, ships could well end up sailing with high vacancy rates. These price declines would most likely exceed the profit gained from the hypothetical North American price increase.

Third, redeployment, particularly of otherwise profitable ships, is itself costly. The redeployed ships forgo revenues from the cruises they would otherwise have offered. They may also need to be reconfigured to attract customers of different nationalities. Further, moving a ship requires a repositioning cruise, which itself may be unprofitable, and there may be other marketing costs.

Even if these impediments could be surmounted, a hypothetical anticompetitive redeployment would be vulnerable to entry or expansion in North America, both of which appear highly likely. In the face of redeployment's costs, risks, and vulnerability to competitive response, establishing and maintaining a coordinated redeployment scheme would be untenable.

Another possibility we analyzed was that either merger would enable the parties to coordinate a reduction in the number of ships they build. The evidence again demonstrated that no such theory was viable. Because the cruise lines are already contractually committed to a large capacity expansion over the next four years in North America, the coordinating parties would have to cancel a very large proportion of the ships they have on order to garner a meaningful price increase. The costs of any such behavior would be prohibitively high, even assuming (once again) perfect coordination and a lack of response from other cruise lines or new entrants. Canceling existing orders would expose the cruise lines to significant contractual and other risks. Financial analyses indicate that there are strong unilateral financial incentives to add new capacity, even when one takes into account the potential effects of new capacity on average prices. Moreover, in this industry, new capacity is the most important form of product differentiation and quality competition.

In the face of these problems, the benefits of a coordinated capacity reduction would be speculative and untimely. The long times involved in ship construction mean that the full price effect of the reduction would not be felt for many years. In all likelihood, the magnitude of the reduction represents considerably less in profits to the cruise lines than they would realize from building and deploying the ships. Under these circumstances, even if the parties could cancel their new orders without substantial costs, it seems highly unlikely that they would do so. Moreover, any such coordinated scheme would be even more vulnerable to entry and expansion than the redeployment scenario discussed above, particularly because canceling orders would free up capacity at the shipyards. Even relatively small-scale entry or expansion by the European cruise lines or the smaller North American fringe - which is already occurring, even in the absence of a hypothesized post-merger capacity reduction by the biggest cruise lines - would substantially erode any potential profitability of the capacity reduction. It would also leave the coordinating parties at substantial risk of falling behind their rivals in technology, market profile, and, ultimately, market position. Under such circumstances, the coordinated scheme, even if it could be implemented in the first place, would almost certainly break down.

### III. Dissenting Statement

As applied for the last 20 years, the applicable guidelines require an analysis of the likelihood that a merger would result in the exercise of coordinated or unilateral market power. The dissent suggests a number of different theories of these potential anticompetitive effects. As indicated above, the staff has investigated each of these theories in exhaustive detail and unanimously concluded that any adverse effects were unlikely. For example, the staff performed a meticulous empirical analysis of whether "[c]ruise lines may be able to effectively price discriminate among their customers through use of yield management systems." *See* Dissenting Statement fn. 9. The empirical data overwhelmingly demonstrated that such coordinated discrimination is highly unlikely. By discounting the staff's empirical analyses, the dissent in effect has made the concentration-based presumption virtually irrebuttable.

### IV. Conclusion

This investigation provides a compelling illustration of the principle that our review of mergers is intensely fact-specific, driven by the dynamics of the relevant industry and the impact of the specific transactions under review. After an extensive investigation, we have concluded, as did our counterparts in Europe (who considered these mergers' potential effects on Europeans), that the facts do not warrant enforcement action.

**Endnotes:**

1. Of course, evidence might be mustered in a particular three-to-two case to rebut the presumption. For example, in 1997, after an extensive investigation, the Commission did not challenge the merger of Boeing and McDonnell Douglas.

2. Horizontal Merger Guidelines, � 2.0.

3. *Id.* at ¶ 1.521.

4. *Cf. id.* at ¶ 1.522 (the Guidelines refer specifically to large differences increasing the significance of concentration, with the negative implication that small differences may diminish the import of market concentration).

5. *See id.* at ¶¶ 2.1, 2.2.

6. While the parties' high shares of a cruise market would normally raise considerable concerns - and did so here - the particular economic characteristics of the industry as it exists today mitigate those shares' probative value in predicting future competitive effects from the proposed mergers. Some of those characteristics - which we discuss in more detail below - include cruising's rapid growth relative to all vacations; the cruise lines' trend toward offering amenities similar to other vacation options; and the fact that the industry's prices have declined even while concentration has increased. *Id.* at ¶ 1.521.

7. *Id.* at ¶¶ 1.521, 1.522.

8. "Critical Loss" refers to the amount of sales that a hypothetical monopolist would have to lose in response to a price increase to make that price increase unprofitable. Because most costs of cruising are fixed and a passenger generates incremental margins from onboard expenditures, standard Critical Loss estimates are quite small. Consistent with the low Critical Loss, the cruise lines make considerable efforts to maintain high "load factors." For example, despite substantial capacity increases over recent years - including very large short-term increases at times in some areas (*e.g.*, the Caribbean) - average load factors have remained high.

9. As in other segments of the general hospitality industry, the cruise companies use various forms of "yield management" (sometimes called "revenue management"). Roughly speaking, yield management uses estimates of predicted load factors relative to actual load factors as one indicator of whether prices should be changed. One element that goes into this pricing decision is information about the prices of competitive offerings. For example, if load factors are low relative to prediction *and* competitors have significantly lower prices, there could be added impetus to decrease prices in order to increase load factors. The Merger Guidelines' hypothetical monopolist would (by definition) not be faced with competitive offerings and so would likely sometimes make decisions on prices different from the decisions it would make if faced with competition. Economic theory establishes that the hypothetical monopolist could likely raise *average* yields in comparison to a market characterized by competition. This does not necessarily mean that no one other than a hypothetical monopolist could ever use yield management to increase prices; rather, our analysis indicates that a monopolist *could* likely do so. Nevertheless, the specifics of pricing are complex even for the hypothetical monopolist. For example, the hypothetical monopolist might have higher prices for some transactions and lower prices for other transactions (because high incremental margins also provide strong incentives for the hypothetical monopolist to fill capacity). The complexity of pricing even for the hypothetical monopolist is itself a factor in assessing the viability of competitive effects theories.

10. *See* Merger Guidelines, ¶ 2.211.

11. *Id.* at ¶ 2.212; *see also id.* at ¶ 2.22.

12. The fact that significant competition would remain following either proposed merger would defeat any attempt by the merged firm to use its yield management systems to raise average yields.

13. Merger Guidelines, ¶ 2.12. *See also* Jonathan B. Baker, *Mavericks, Mergers, and Exclusion: Proving Coordinated Competitive Effects Under the Antitrust Laws*, 77 N.Y.U.L. Rev. 135 (2002).

14. Merger Guidelines, ¶¶ 2.11, 2.12.

15. These empirical analyses focused on bookings for passengers who actually sailed. Most bookings cancel, however, requiring the cruise ships to book the same cabins several times in order to fill the ships. This provides another dimension of unsystematic complexity. Other facts about cruising that magnify this complexity are that (1) on average, a substantial percentage of cruise customers are upgraded and (2) cruises are sold both bundled and unbundled with air travel.