**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

DECURTIS LLC,

      Plaintiff,

      v.

CARNIVAL CORPORATION,

         Defendants.

CARNIVAL CORPORATION,

      Plaintiff,

      v.

DECURTIS CORPORATION, and
DECURTIS LLC,

      Defendants.

Case No: 20-22945-Civ-Scola/Torres

**CARNIVAL CORPORATION'S MOTION FOR JUDGMENT
AS A MATTER OF LAW PURSUANT TO RULE 50(a)**

Carnival Corporation respectfully requests that the Court grant judgment as a matter of law in Carnival's favor on all the grounds and for all the reasons discussed below.

The Federal Rules of Civil Procedure permit this Court to grant judgment as a matter of law in favor of Carnival on any issue if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [DeCurtis] on that issue." Fed. R. Civ. P. 50(a)(1). This judgment, also called a directed verdict, is appropriate if "the facts and inferences so overwhelmingly favor the verdict that no reasonable juror could reach a contrary conclusion." *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004) (citation omitted). A "mere scintilla of evidence does not create a jury question"; rather, "a substantial conflict in evidence" is required to defeat a motion under Rule 50(a). *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) (citation omitted).

## I.   A REASONABLE JURY COULD ONLY FIND THAT DECURTIS BREACHED THE MSA.

Carnival is entitled to judgment as a matter of law on its breach of contract claim. The evidence of breach is so overwhelming that no reasonable jury could fail to conclude that Carnival proved its case by a preponderance of the evidence.

It is undisputed that Carnival and DeCurtis entered into the MSA. Jury Instr. 6.1. And the evidence establishes that Carnival complied with its obligations under the contract and that the conditions required for DeCurtis's performance had occurred. *Id.*; *see, e.g.*, 3/7 Trial Tr. 135:5-17 (Mr. Learish agreeing that DeCurtis "was paid for all the work it did under all 22 of those SOWs" that fell under the MSA). To succeed on its claim, therefore, Carnival

1

needs to show (1) that "DeCurtis failed to do something essential which the MSA required it to do or DeCurtis did something which the MSA prohibited it from doing and that prohibition was essential to the MSA" and (2) that "Carnival was damaged" by DeCurtis's conduct. Jury Instr. 6.1. There can be no dispute that Carnival has made this showing.

**Breach of Article 4.** Under the MSA, DeCurtis agreed it would "not use any Carnival Information for its own use or for any purpose" other than performing under the MSA, nor would it "disclose any Carnival Information to any other person or entity." Ex. P-1 at 6 (MSA Art. 4.1). "Carnival Information" includes both "Deliverables"—defined as "all material prepared for Carnival under this Agreement (including each SOW hereto)"—and "Confidential Information," including "any information of any nature and in any form" that DeCurtis learned "in connection with this Agreement." *Id.*; *see* 2/28 Trial Tr. 106:8-11 (Mr. Padgett testifying that Article 4 was of "[t]he highest" importance to Carnival). While the MSA entitled DeCurtis "to use the general knowledge, know how, experience or the skill ... gained while providing Services under this Agreement," Carnival specifically restricted that right to ensure that DeCurtis's use of such experience would be "without the aid of written materials of any type produced in connection" with the work performed for Carnival. Ex. P-1 at 7 (MSA Art. 4.4); *see* 2/28 Trial Tr. 115:12-16 (Mr. Padgett testifying he "specifically wrote" this caveat).

The evidence establishes that DeCurtis violated Article 4 repeatedly through its use of Carnival's proprietary information and property for other

clients and its disclosure of Carnival's valuable non-public information to those clients. There is extensive evidence of DeCurtis using and disclosing material it prepared for Carnival under the MSA in its work for other clients. Multiple DeCurtis witnesses acknowledged that this was true. *See, e.g.*, D.E. 549.01 101:20-103:18 (Ms. Agrawal testifying that prototypes that had been "prepared for Carnival" were "repurposed" to be "used and made brand specific for a new potential client"), 105:17-106:2 (Ms. Agrawal testifying that the Greeter app that was "prepared for Carnival" was being demoed to a potential new customer), 106:03-106:22 (Ms. Agrawal testifying that "the prototypes that were prepared for Carnival as part of Project trident" were then "reused for a demo for a potential new customer[] for DeCurtis"), 146:07-147:16 (Ms. Agrawal testifying that DeCurtis used prototypes prepared for Carnival "in the work that [DeCurtis was] doing for Virgin"), 157:04-158:02 (Ms. Agrawal testifying that the "starting point" for DeCurtis's work for Virgin was "the Carnival Studio Prototype user interface"); 3/7 Trial Tr. 167:18-168:21 (Mr. Learish testifying that DeCurtis was "using Carnival studio prototypes to do the work for Virgin"); *see also, e.g.*, Ex. P-348; Ex. P-519; Ex. P-753; Ex. P-754; Ex. P-755; Ex. P-756; Ex. P-766; Ex. P-772; Ex. P-773; Ex. P-809; Ex. P-886; Ex. P-887; Ex. P-888; Ex. P-889; Ex. P-890; Ex. P-895; Ex. P-896; Ex. P-897; Ex. P-1325. This conduct cannot reasonably be deemed use of "general knowledge, know how, experience or … skill"— certainly not given the extensive use of "written materials of any type produced in connection" with Project Trident. Ex. P-1 at 4 (MSA Art. 4.4).

The testimony from Norwegian Cruise Lines' Vice President of Guest

Experiences and Innovation accords with this evidence. According to Mr. Murray, DeCurtis in 2016 told Norwegian "[t]hat DeCurtis were working on a proof of concept of an on-board guest experience [for Carnival] that used a medallion." D.E. 549.02 61:10-21. Mr. DeCurtis even went so far as to bring a Carnival Medallion to Norwegian's offices and leaving it with Mr. Murray's team for review. *Id.* 59:19-60:08; Ex. P-900. According to Mr. Murray, Norwegian understood that Mr. DeCurtis was "trying to market or sell the work that he had done for Carnival." *Id.* 62:12-15.

Furthermore, as Carnival's expert testified, DXP's location engine software contains approximately 200 lines of "bespoke" Carnival-owned source code reflecting Carnival's specific implementation of a finely-tuned Kalman filter--software that was indisputably written for Carnival under various Project OCEAN statements of work.; 3/6 Trial Tr. 92:11-96:4 (discussing SOW for bespoke code); 149:17 ("This is Carnival's location engine."); *see also* Ex. P-346. While DeCurtis has made much of the fact that Kalman filters generally are known, 3/7 Trial Tr. 214:7-16, that is irrelevant. Carnival's expert analyzed Level 11's pre- and post-OCEAN code; concluded that there were differences; and determined that the code added as part of Level 11's work for Carnival now appears in DeCurtis's source code. 3/6 Trial Tr. 148:2-14. DeCurtis's expert agreed that the Kalman filter in DXP's source code came from Level 11, and he did not disagree that it came from the work Level 11 did on Project Trident. 3/9 Rough Trial Tr. AM 57:9-11 (Dr. Shoemake). This code is unquestionably protected by the MSA, at least as "Confidential Information," and DeCurtis violated its obligation not to

"use any Carnival Information for its own use" or otherwise outside of the MSA. Ex. P-1 at 6.

DeCurtis has attempted to defend its misuse of Carnival information and deliverables by suggesting that it was simply reusing its own pre-existing material that DeCurtis had prepared prior to its work for Carnival. *See, e.g.*, 3/9 Rough Trial Tr. AM 27:21-28:3 (Mr. DeCurtis). But there is no evidence to support this claim. On the contrary, the evidence establishes that the only preexisting software actually owned by DeCurtis was the DeCurtis Mobile Assembly Suite, an application that was not used by Carnival and is not the subject of this dispute. *See, e.g.*, 3/1 Trial Tr. 104:7-15 (Mr. Jungen testifying that "MAS, Mobile Assembly System," was not used in Carnival's system); *id.* at 45:11-15 (Mr. Padgett testifying that DeCurtis "was not a product company, with the exception of one product, MAS"). The remaining applications that DeCurtis has tried to claim as its own were all the property of Disney. *See* Ex. D-614 (2015 document identifying every DeCurtis experience except the Mobile Assembly Suite as being for "DCL" or "NGE," both Disney projects); 3/8 Trial Tr. 74:16-75:23 (Mr. Schwalb, former Disney Chief Technology Officer, testifying that these were all "projects that Disney is commissioning DeCurtis to do work for Disney"); 3/8 Trial Tr. 77:11-16 (Mr. Schwalb testifying that he "suppose[d] [Disney] wouldn't like it" if a contractor took work owned by Disney and used it with other customers).

Moreover, even if there were a basis to find that DeCurtis had preexisting work product that it used for Project Trident, that would provide no defense to

the breach of contract claim. If DeCurtis intended to bring prior proprietary work to Project Trident, it was required to disclose that intention "in writing" and receive "approval" from Carnival in order to prevent such material from becoming "property of Carnival." Ex. P-2 (SOW 1 at 2). The undisputed testimony is that DeCurtis never provided any such disclosure, and that Carnival never gave any such approval. *See, e.g.*, 2/28 Trial Tr. 137:22-138:3 (Mr. Padgett); 3/1 Trial Tr. 102:8-104:6 (Mr. Jungen). No reasonable jury could infer, therefore, that any of the Carnival information that was repurposed or reused for other DeCurtis clients had legitimately originated from DeCurtis's prior work or that it was not the property of Carnival.

**Breach of Section 3.4.** The MSA required DeCurtis to "keep accurate and complete records of all matters relevant to or as required by this Agreement," and entitled Carnival to have "access to inspect [DeCurtis's] relevant books and records at any reasonable time or times upon prior notice to [DeCurtis] in order to … [e]nsure compliance by [DeCurtis] with its obligations hereunder." Ex. P-1 at 5 (MSA § 3.4); *see* 2/28 Trial Tr. 118-19 (Mr. Padgett testifying that this provision was "[e]xtremely" important to Carnival). This access right was to be "exercised at the discretion of Carnival." Ex. P-1 at 5 (MSA § 3.4). When Carnival had reason to believe that DeCurtis was *not* complying with its obligations under the MSA—namely, because it was reusing Carnival's Confidential Information with other cruise line customers—Carnival invoked its rights under Section 3.4 and asked DeCurtis "to audit their records to understand compliance with the contract." 2/28 Trial Tr. 175:13-14; *see* Ex. P-1827.

DeCurtis undisputedly did not permit Carnival to perform an audit. DeCurtis instead responded that it would "decline[] the requested audit." Ex. P23 at 1; 3/7 Trial Tr. 124:14-16 (Mr. Learish agreeing that "an audit request was made" and "DeCurtis's lawyers declined the request"). Even after further correspondence, DeCurtis continued to refuse Carnival the access it was guaranteed to DeCurtis's books and records relevant to compliance with the MSA. DeCurtis offered to "make ... available" certain narrow categories of information, Ex. P-711, but that is not what Section 3.4 contemplates. Although DeCurtis's witness testified that the company was "willing to provide everything that [it] had in terms of books and records that [it] thought were relevant," 3/8 Trial Tr. 15:5-8 (Mr. Carino), there is no evidence that such willingness was ever communicated to Carnival back in 2020 when it requested the audit. *See id.* 29:11-15 (playing deposition clip of Mr. Carino recalling "that DeCurtis did not permit Carnival to audit DeCurtis"). And it is undisputed that DeCurtis did not produce—let alone permit inspection of—any relevant records until well into the course of this litigation. *See* D.E. 163 at 2-8 (largely granting, more than a year into the litigation, Carnival's motion to compel DeCurtis to provide this information in discovery). Instead, within weeks of receiving Carnival's audit request, DeCurtis filed this litigation. 2/28 Trial Tr. 176:5-18 (Mr. Padgett).

**Damages.** No reasonable jury could find that Carnival was not damaged by DeCurtis's breaches discussed above. The record contains ample, undisputed evidence of harm. As Carnival's damages expert testified, "Carnival didn't get what it paid for" when it contracted with DeCurtis, which was "exclusive use" of

the material developed as part of Project Trident. 3/7 Trial Tr. 222:14-25 (Dr. Coleman testifying that this caused Carnival "significant harm"). Mr. Padgett illustrated some of the concrete effects of this broken bargain, testifying to Carnival's attempts to mitigate the devastating financial effects of the COVID-19 pandemic on the cruise industry. When Carnival tried to market its innovative OCEAN platform to investors to raise capital, it was told that the platform was "not bespoke," because DeCurtis had the same product. 2/28 Trial Tr. 177:16-178:23 (Mr. Padgett). Moreover, DeCurtis's misuse of Carnival's proprietary information—and its stonewalling of Carnival's requests to investigate the records that would ultimately prove that misuse—forced Carnival to spend years engaging in this litigation, including defending against DeCurtis's now-rejected claims of tortious interference, antitrust violations, and other supposed misconduct. Beyond the direct financial costs, Carnival also suffered "the opportunity cost of time"—and it did so at a particularly painful point, "during COVID, under extreme financial stress." 2/28 Trial Tr. 177:1-6 (Mr. Padgett).

There is no contrary evidence, and no reasonable jury could find that Carnival was unharmed by DeCurtis's violation of its contractual obligations. Furthermore, no reasonable jury could award damages of less than the modest $3.2 million that Carnival's damages expert calculated. 3/7 Trial Tr. "An award of damages for breach of contract is intended to place the injured party in the position he or she would have been in had the breach not occurred." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. Dist. Ct. App. 2002). Dr. Coleman applied this principle in her analysis, conservatively calculated the

amounts that were paid to DeCurtis for work performed under the MSA, and verified the resulting number by looking to other estimates of economic reasonability. 3/7 Trial Tr. 220, 222-24. DeCurtis did not present a competing damages analysis. No reasonable jury could find that DeCurtis's breach caused Carnival any less harm than the minimum $3.2 million that Carnival paid DeCurtis, without receiving the expected benefit of exclusive use of the work that Carnival commissioned.

## II.    A REASONABLE JURY COULD ONLY FIND THAT DECURTIS INFRINGED THE '184 PATENT.

Carnival bears the burden of proving patent infringement by a preponderance of the evidence. Jury Instr. 9.1. No reasonable jury could find that Carnival failed to meet this burden. *See, e.g.*, *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1330-31, 1333 (Fed. Cir. 2013) (affirming grant of Rule 50(a) judgment of patent infringement).

**Direct infringement.** Carnival has shown that DeCurtis directly infringed claims 11, 12, and 15 of the '184 patent. Carnival's expert demonstrated that the DXP system—as described in DeCurtis's presentation to investors and prospective customers—meets every limitation of the asserted claims. *See* 3/6 Trial Tr. 182:3-197:8 (Mr. de la Iglesia). DeCurtis's non-infringement position consists primarily of legally irrelevant statements, for example about the guest engagement systems *currently* used on Norwegian and Virgin ships. *See, e.g.*, 3/9 Rough Trial Tr. AM 60-61 (Dr. Shoemake). Even though Norwegian eventually fired DeCurtis for poor performance, Ex. P-796, and Virgin eventually agreed with Carnival to avoid using infringing technology, 3/1 Trial Tr. 36:9-18

(Mr. Padgett), that does not erase past infringement. DeCurtis's expert also took an unduly narrow view of what it means to "make" an infringing system. 3/9 Rough Trial Tr. AM 64 (Dr. Shoemake). "[A] final assembler can be liable for making an infringing combination … even if it does not make each individual component element." *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1372 (Fed. Cir. 2019). And even if DeCurtis were not an infringing finally assembler, DeCurtis's expert's suggestion that DeCurtis cannot "offer to sell" anything it doesn't also "make" is simply wrong. *See* 3/9 Rough Trial Tr. AM 64:12-13 ("They don't make and, therefore, they don't offer to sell.") (Dr. Shoemake). The patent statute separately calls out making and offering to sell as different acts of infringement. 35 U.S.C. § 271(a). And DeCurtis's contracts with Norwegian and Virgin plainly reflect offers to sell a "guest experience system[]." Ex. P-908.

DeCurtis has not rebutted Carnival's showing that the system DeCurtis offered to sell met each limitation of claims 11, 12, and 15 of the '184 patent. Nor has DeCurtis rebutted Carnival's showing that the testing conducted at Virgin's Florida facility constituted "use" of an infringing system. DeCurtis's defense relies on the assertion that the testing included only one door panel and thus lacked "a plurality of sensors" and a "communication network." 3/9 Trial Tr. 69:19-70:16 (Dr. Shoemake). But the contemporaneous evidence of testing belies that assertion. *See, e.g.*, Ex. P-1864; Ex. P-1865; Ex. P-1866; Ex. P-1867. It also belies any suggestion that the testing was unsuccessful at unlocking the door. *See, e.g.*, 3/7 Trial Tr. 118:5-23 (Mr. Learish acknowledging successful testing of the Virgin wearable device triggering the door panel).

**DeCurtis's § 272 Defense.** DeCurtis has asserted an affirmative defense under 35 U.S.C. § 272, which excludes from infringement "[t]he use of any invention in any vessel, aircraft or vehicle of any country which affords similar privileges" to U.S. vessels "entering the United States temporarily or accidentally." This defense applies only if the invention is not "offered for sale or sold in" the United States. 35 U.S.C. § 272. DeCurtis's defense fails as a matter of law, for at least the reason that DeCurtis's DXP system *is* offered for sale in the United States (and has been used in the United States). *See supra* 9-10.

**Inducement.** Carnival has shown that DeCurtis induced infringement of all asserted claims of the '184 patent in multiple ways. First, to the extent that the testing described above was conducted by Virgin, not by DeCurtis, it constitutes direct infringement by Virgin. DeCurtis is "liable as an infringer" for "actively induc[ing]" that infringement. 35 U.S.C. § 271(a). DeCurtis served as the general contractor and, through that role, "actively induced others to infringe." 3/6 Trial Tr. 179:2-7 (Mr. de la Iglesia); *see also, e.g.*, 3/8 Trial Tr. 230:18 (Mr. DeCurtis describing himself as "Virgin's chief architect"). And it is undisputed that DeCurtis was aware of Carnival's patent.

Second, DeCurtis used that same general contractor role to actively induce infringement by Virgin on its ships. The undisputed evidence is that DeCurtis provided wearables with BLE capability to Virgin, and that Virgin used these wearables for location services on its ship until March 2022. 3/8 Trial Tr. 67:19-24 (Mr. Schwalb); *see also* 3/9 Rough Trial Tr. PM 20 (Dr. Shoemake). As specified in DeCurtis's September 2019 contract with Virgin, those wearables

included "a beacon with an Assa Abloy format." 3/9 Rough Trial Tr. PM 22; *see* Ex. P-562 at 18. The only reasonable inference is that the wearables were being used in conjunction with Assa Abloy's BLE-capable door panels.

**Contributory infringement.** Carnival has shown that DeCurtis infringed the '184 patent by "offer[ing] to sell or sell[ing] within the United States ... a component of a patented" system that "constitut[es] a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent." 35 U.S.C. § 271(c). Carnival's expert testified, and DeCurtis does not dispute, that DeCurtis's system includes at least the "entire software operation that is running the wearable" and "the DeCurtis wearable," which constitute "a material part of the invention" of the '184 patent. 3/6 Trial Tr. 178:4-10 (Mr. de la Iglesia). He further testified that "both the DXP software and the DXP wearables are specially adapted for infringement" and not "capable of substantial non-infringing use." *Id.* 178:13-179:1.

DeCurtis's only response to this showing is its expert's testimony that the DXP system is capable of doing things other than controlling door locks, as the claims recite. *See* 3/9 Rough Trial Tr. AM 76:13-79:8 (testifying to "a number of DeCurtis suites that leverage location" but do not involve door locks). That is legally irrelevant. The fact that an infringing system has other capabilities, beyond the infringing one, is not sufficient to avoid liability for contributory infringement. *See, e.g.*, *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008). DeCurtis has offered no evidence to rebut Carnival's showing that the DXP software and wearables are specially adapted for use in the

infringing DXP system and incapable of substantial use outside of that system.

**271(f) Infringement.** Carnival is entitled to judgment that DeCurtis infringed the '184 patent by "suppl[ying] or caus[ing] to be supplied in or from the United States all or a substantial portion of the components of a patent invention," so as to induce the combination of those components outside of the United States and/or knowing that the components will be combined outside of the United States in an infringing manner. 35 U.S.C. § 271(f)(1)-(2). As discussed above, Carnival's expert presented unrebutted testimony that the DXP software and wearables supplied by DeCurtis from the United States were at least a substantial portion of the DXP system and were "not a staple article or commodity of commerce suitable for substantial noninfringing use," *id.* § 271(f)(2). Carnival also presented unrebutted testimony that DeCurtis "actively induced others to infringe" through its contracts with Norwegian and Virgin. 3/6 Trial Tr. 178:24-179:7 (Mr. de la Iglesia). To the extent DeCurtis alleges that the full system was not used within the United States, Carnival is at least entitled to judgment of infringement under § 271(f).

**Willful infringement.** A reasonable jury could only find that DeCurtis's infringement was willful, such that the Court has discretion to award enhanced damages under 35 U.S.C. § 284. To do so, the jury needs to "find no more than deliberate or intentional infringement." *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020). Particularly in view of the extensive evidence of DeCurtis's misuse of Carnival's proprietary technology that was prepared for Project Trident, *see supra* 2-5, no reasonable jury could

fail to find this standard met.

### III.   NO REASONABLE JURY COULD FIND THAT DECURTIS MET ITS BURDEN TO PROVE THE '184 PATENT INVALID.

Carnival's '184 patent is presumed valid, and DeCurtis has the burden of proving by clear and convincing evidence that any individual claim is invalid. Jury Instr. 10.1. DeCurtis's sole asserted ground of invalidity is that the '184 patent claims would have been obvious in view of what it calls "the Disney Magic Band system" combined with what it calls "the Assa Abloy system."  3/9 Rough Trial Tr. AM 92:4-13. DeCurtis therefore must prove, by clear and convincing evidence, (1) that both these alleged systems are prior art to the '184 patent; (2) that a person of ordinary skill in the art would have been motivated, before the priority date of the '184 patent, to combine the Disney Magic Band and the Assa Abloy system; and (3) that a person of ordinary skill in the art, before the priority date of the '184 patent, would have had a "reasonable expectation of success" in "combin[ing] the teachings of the prior art to achieve the claimed invention." *InTouch Tech., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014). For at least the reasons set forth below, DeCurtis has not presented evidence from which a reasonable jury could find that DeCurtis satisfied this heavy burden. Accordingly, the Court should grant judgment as a matter of law that the '184 patent is not invalid. *See, e.g.*, *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1379 (Fed. Cir. 2017) (affirming district court's grant of JMOL of non-obviousness).

**First**, DeCurtis has not shown by clear and convincing evidence that either of its alleged systems is prior art to the '184 patent. It is undisputed that the

'184 patent is entitled to a priority date no later than November 11, 2016. 3/9 Rough Trial Tr. AM 80:15-22 (Dr. Shoemake). DeCurtis therefore has the burden of showing that the Disney and Assa Abloy "systems" were used *with the components and configuration* that DeCurtis relies on for its obviousness analysis *before November 11, 2016. See, e.g.*, *Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974, 987 (N.D. Cal. 2015). DeCurtis has not provided evidence to meet this burden. As just one example, DeCurtis's expert referred in his obviousness analysis to Disney Magic Bands "being used with Bluetooth and NFC" in theme parks. 3/9 Rough Trial Tr. AM 93:9-10. But DeCurtis's own witness acknowledged that, according to his friends, Disney's Magic Bands began using Bluetooth (that is, BLE) only "relatively recently." 3/8 Trial Tr. 72:5-9 (Mr. Schwalb); *see also, e.g.*, Ex. P-1968 (Disney's Mr. Kaufman stating in February 2020 that "our bands aren't BLE"). DeCurtis's expert also testified that his investigation relied on a Magic Band that he had obtained in the course of working on this case—that is, years after the priority date of the '184 patent—without clarifying when that model of Magic Band was actually in use. 3/9 Rough Trial Tr. AM 86:18-24; *see also id.* at 96:16-20 (purporting to identify BLE capability in this Magic Band in performing obviousness analysis). He made no attempt in his testimony to distinguish between the capabilities of a Magic Band in 2013 and the capabilities of a Magic Band in 2023. Nor did Dr. Shoemake provide any evidence that Assa Abloy's Allure 2 door panel—the version he purported to rely on for his obviousness analysis, *see* 3/9 Rough Trial Tr. AM 39:9-12—was the same product advertised in the 2016 Assa Abloy catalog that

he cited for its priority date, *see id.* 91:10-17.

**Second**, DeCurtis has not shown by clear and convincing evidence that a person of ordinary skill in 2016 would have been motivated to combine the Disney Magic Band and the Assa Abloy door panel. "A reason for combining disparate prior art references is a critical component of an obviousness analysis; 'this analysis should be made explicit.'" *InTouch*, 751 F.3d at 1351 (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). Dr. Shoemake did not provide any explicit analysis. His testimony was limited to a brief, vague assertion that "we have Assa Abloy saying you can use wearables to open doors," "[w]e also know that Assa Abloy had new door panels on the left that had Bluetooth and NFC," and "we also know that the[re] were Magic Bands that were being used with Bluetooth and NFC to open doors at the Disney theme parks, and cruise ships." 3/9 Rough Trial Tr. AM 92:22-93:10.

Even if those assertions were factually correct, they amount to no more than an assertion that certain elements of the claim limitations were present in each alleged prior-art reference. *See also* 3/9 Rough Trial Tr. AM 102:12-21. That is far below what is required to show a motivation to combine. It is, in fact, strikingly similar to the kind of "vague" testimony that the Federal Circuit has rejected because it "d[oes] not articulate reasons why a person of ordinary skill in the art at the time of the invention would combine these references." *InTouch*, 751 F.3d at 1352; *see also, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (testimony by expert that one would "want[] to build something better" with "more features" was "generic" and

"insufficient for a reasonable jury to support a determination of obviousness"). Dr. Shoemake did not even provide adequate testimony to support his assertion that a skilled artisan *could* combine the Magic Band and Assa Abloy references; he certainly did not do what is required, which is to prove that a skilled artisan *would* combine those two distinct technologies. *See, e.g.*, *In re Nuvasive, Inc.*, 842 F.3d 1376, 1385-86 (Fed. Cir. 2016) (vacating PTAB holding of obviousness because the Board "failed to articulate a *reason why* the [person of ordinary skill] would have been motivated" to combine prior-art references).

**Third,** DeCurtis has not provided clear and convincing evidence from which a reasonable jury could conclude that a person of ordinary skill in 2016, even if motivated to do so, would have had a reasonable expectation of success in combining a Disney Magic Band and an Assa Abloy door panel to achieve a result that meets all the limitations of the asserted '184 patent claims. Dr. Shoemake did not offer any testimony for why this would be so. He simply pointed to various elements of Disney technology and Assa Abloy technology—not even limited to the Magic Band and door panel themselves—and purported to find each claim limitation present somewhere in the mix.

**Fourth**, DeCurtis's expert failed to show that the combination of the Disney Magic Band and the Assa Abloy door panel available in 2016—even if successfully made—would practice each limitation of any asserted claim of the '184 patent. For example, with respect to claim 1, Dr. Shoemake failed to identify in the prior art an access panel comprising "a radio configured for wireless communication with a door lock communication module." *See* 3/9 Rough Trial

Tr. PM 38 (Mr. de la Iglesia). Dr. Shoemake did not even attempt to locate this limitation in the prior-art references that he was purporting to combine. He instead pointed to an Assa Abloy patent—*not* the Assa Abloy "system"—for this limitation. 3/9 Rough Trial Tr. AM 105:1-3. But Dr. Shoemake did not even attempt to provide a motivation for a person of ordinary skill to combine this patent with the Magic Band and the Assa Abloy door panel product.

As another example, with respect to claim 11, Dr. Shoemake failed to identify in the prior art the limitation of a sensor operative to "transmit a command to a guest device ... to cause the guest device to change operating mode between" the beacon mode and the bidirectional communication mode. *See id.* Here too, Dr. Shoemake did not attempt to identify this capability in either the Disney Magic Band or the Assa Abloy door panel. Instead, he relied on the totally separate "X band reader that was in the Disney parks"—again, without providing any basis for pulling a component of this separate device into the obviousness analysis. 3/9 Rough Trial Tr. AM 111:11-15.

**Fifth**, DeCurtis's expert made no attempt to assess the role of secondary considerations of non-obviousness in his analysis. These secondary considerations include factors such as "commercial success, long felt but unsolved needs, failure of others," and other facts that "give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). And, when present, these factors "must be considered in determining obviousness." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000); *see also, e.g., Ortho-McNeil*

*Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) (evidence of secondary considerations "is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness").

Carnival's expert testified that his opinion on validity was influenced by several such factors, including the "commercial success" of Project OCEAN, the "praise within the industry" (including in the wake of the 2017 CES presentation), and the fact that "DeCurtis and Assa appeared to have copied the architecture described in Carnival's '184 patent." 3/9 Rough Trial Tr. PM 51. Even if DeCurtis could make a prima facie showing of obviousness, these factors would preclude any reasonable jury from finding the patent claims obvious.

## IV. A REASONABLE JURY COULD ONLY FIND THAT CARNIVAL IS ENTITLED TO A REASONABLE ROYALTY OF NO LESS THAN $24.8 MILLION FOR DECURTIS'S INFRINGEMENT.

As discussed above (Part III), Carnival is entitled to judgment as a matter of law that DeCurtis has infringed the '184 patent. As such, Carnival is also entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284. A reasonable jury could only conclude that the reasonable royalty is no less than the $24.8 million that Carnival's expert calculated. 3/7 Trial Tr. 221:11-13. Indeed, DeCurtis failed to offer any competing calculation, so the jury has heard no contrary opinion on what constitutes a reasonable royalty. And DeCurtis's attempts to attack the reasonableness of Dr. Coleman's royalty calculation amounted to no more than mischaracterizing her analysis, as she repeatedly explained. *See, e.g.*, 3/7 Trial Tr. 268:12-22, 269:16-23, 271:20-272:12.

DeCurtis has argued that Carnival's damages are limited based on an alleged failure to mark its products pursuant to 35 U.S.C. 287(a). But DeCurtis failed to meet its burden of production "to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). Even if it had done so, Carnival would at least be entitled to a reasonable royalty of no less than $11 million—the uncontradicted calculation offered by Carnival's expert. 3/7 Trial Tr. 261:23-262:20 (Dr. Coleman).

Dated:  March 10, 2023

By: */s/ Diana Marie Fassbender*
Diana Marie Fassbender
Florida Bar No. 0017095
dszego@orrick.com

Steven J. Routh (*pro hac vice*)
T. Vann Pearce, Jr. (*pro hac vice*)
Eileen M. Cole *(pro hac vice)*
Emily Luken *(pro hac vice)*
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center, 1152 15th Street, N.W.,
Washington, D.C. 20005-1706
Tel:  202/339-8533

Jorge Espinosa
Fla. Bar No. 779032
jorge.espinosa@gray-robinson.com
GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL  33131
Phone: (305) 416-6880

Robert L. Uriarte (*pro hac vice*)
David R. Medina (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Ave.
Los Angeles, CA 90071
Tel: (213) 629-2020

Olivia Clements (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-5000

Johannes Hsu (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Tel: (949) 567-6700

Sheryl Garko (*pro hac vice*
Laura Najemy (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street
Suite 2000
Boston, MA  02116
(617) 880-1800

*Attorneys for Carnival Corporation*